## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

COMPASS, INC.,

                *Plaintiff*,

      v.

ZILLOW, INC., ZILLOW GROUP, INC., and TRULIA, LLC,

             *Defendants*.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Compass, Inc. ("Compass"), by and through its undersigned counsel, files this Complaint against defendants Zillow, Inc., Zillow Group, Inc., and Trulia, LLC (collectively, "Zillow" or "Defendant"), and alleges as follows:

## I.    INTRODUCTION AND NATURE OF THE ACTION

1. Instead of competing on the merits for home sellers, home buyers, and the agents who work for them, Zillow has sought to rely on anticompetitive tactics to protect its monopoly and revenues in violation of the antitrust laws.

2. Zillow has assumed a role at the heart of the home sale process. Nearly every house for sale nationwide is on Zillow's home search platform, and most prospective buyers begin their home hunt by searching on Zillow. Through its relentless acquisition of competitors and with the power of network effects, Zillow has become the vital, go-to destination for consumers looking to purchase homes. Although most prospective buyers believe home searches on Zillow are free, Zillow imposes an incremental tax on the real estate transaction. Every time a buyer requests a tour on Zillow, Zillow redirects the buyer away from the listing agent of the property, who would not charge the buyer an incremental commission. Instead, Zillow directs the

buyer to a Zillow-affiliated buyer agent who charges the buyer an incremental commission to show the property. Zillow then collects up to 40% of this incremental buyer agent commission from the buyer agent in exchange for having provided the buyer's user information to the buyer agent. Zillow is extracting anticompetitive rents. They put a toll booth on a road that otherwise worked fine, adding friction and cost to the process because the money goes to them.

3.    To protect its market dominance, Zillow has retaliated against competitive threats by enacting an exclusionary policy, its Listing Access Standards (the "Zillow Ban"), and conspiring with at least two of its competitors to work toward a common end: block those, like Compass, who are bringing innovation and competition through pre-marketing strategies to the real estate home search market. Simply stated, the Zillow Ban mandates that if a home seller and her agent market a home off Zillow for more than one day, then Zillow and its allies will ban that listing from their search platforms, making the home invisible for many buyers. The Zillow Ban seeks to ensure that *all home listings* in this country are steered on to its dominant search platform so Zillow can monetize each home listing and protect its monopoly.

4.    Compass is a brokerage firm with a home search platform that competes with Zillow. Since its inception, Compass has developed innovative tools for those looking to buy or sell a home. Like Zillow, access to Compass's home search platform is free to prospective buyers. Based on client and agent feedback, Compass recently adopted the Compass 3-Phased Marketing Strategy ("3-Phased Marketing Strategy"). Rather than immediately having their listings dumped into the Zillow search pool—untried and untested—Compass provides home sellers and their agents a helpful, phased staging ground for their listings. The listing is first presented as a Compass Private Exclusive on Compass's internal platform, where it is accessible to Compass agents who can then share these listings with their home buyer clients or with other

brokerages' agents. Then, the listing moves to the Coming Soon phase, where the house is posted to Compass's public home search platform and made searchable for consumers and agents across the country. In phase three, the listing is shared with multiple listing services ("MLS"), databases of listings accessible to agents, and thus distributed to aggregators like Zillow. Most home sellers using Compass's 3-Phased Marketing Strategy continue on to phase three (94% of sold Compass listings in 2024).

5.      Collectively, the three phases provide home sellers with a range of benefits, including a chance to test list prices, experiment with marketing approaches, and gather early feedback. The strategy also benefits buyers by "unlocking" inventory, giving buyers an opportunity to see homes that otherwise may not be ready for a fully public listing. It also provides buyers with additional information and time, allowing them to conveniently see a home on their own schedule and prepare the strongest offer. Notably, houses marketed during the first two phases are not on aggregators like Zillow.

6.      Zillow is an unfriendly place for home listings, which is one of the reasons home sellers have welcomed Compass's strategy. Homes listed on Zillow are displayed with a series of "negative insights," added by Zillow, including: (1) a "Zestimate," which even Zillow admits is an inaccurate estimate of the listed property's actual "value," and is often lower than the home seller's asking price; (2) a "Climate Risks" section, with frequently inaccurate and speculative information predicting the expected impact of natural disasters; and (3) an "Offer Strategies" section, where Zillow recommends a proposed offer price, which like the Zestimate, is often inaccurate, influences price expectations, and always works against the seller's interests. Homes posted to Zillow also begin accruing and displaying a "days on Zillow" metric, showing how long the property has been listed for sale, and a tracker showing reductions of the asking price as

soon as the listing is posted. Zillow's platform also harms prospective buyers, who may miss out on the best match by relying on these misleading negative insights.

7.      The home seller has no influence or control over these negative insights and information. Listings on Zillow thus differ meaningfully from those on Compass.com. Compass.com never includes negative insights like Zestimates, Climate Risks, or Offer Strategies and, during the Private Exclusive and Coming Soon phases, also does not reference days on market or price reductions. Compass.com is thus a preferable starting point for many home sellers. For these reasons, Compass's 3-Phased Marketing Strategy has been exploding with home sellers—in the first quarter of 2025, nearly 50% of home sellers represented by Compass agents started marketing their property using the strategy.

8.      Offering the 3-Phased Marketing Strategy thus allows Compass to differentiate its product offerings in both the brokerage market (where Compass competes for home buyer and home seller clients) and the home search market, where Compass competes with Zillow for home search queries. And the strategy poses a significant threat to Zillow's home search monopoly and its revenues. For Zillow, every home buyer search conducted on Compass instead of Zillow is a lost opportunity for Zillow to lock that prospective home buyer into Zillow's ecosystem and make money selling her information to real estate agents for a lead fee—Zillow's central business model. Put simply, Zillow does not like the 3-Phased Marketing Strategy because (1) Zillow cannot make money selling leads off listings in Phase 1 and Phase 2, when Zillow does not have the listings, and (2) the strategy provides Compass's home search platform with search results not available on Zillow.

9.      Zillow's response to this threat: blocking listings of any property marketed off Zillow for more than one day, the Zillow Ban. This ban is a mandate that only a monopolist

would adopt, sacrificing short-term economic gain, from the loss of banned listings in the third phase, to maintain its market dominance. But implementing this anticompetitive rule was not enough; Zillow also conspired with two home-search competitors and brokerages, Redfin (the third most visited real estate website) and eXp Realty (the largest real estate brokerage in the United States by number of transactions). Each agreed to adopt and adhere to the Zillow Ban.

10. The Zillow Ban violates the antitrust laws in two ways. First, Zillow leverages its monopoly power to impose the Zillow Ban on the market (monopolistic conduct in violation of Section 2 of the Sherman Act). Second, and simultaneously, Zillow entered anticompetitive agreements with its home-search competitors to do the same (a conspiracy in violation of Section 1 of the Sherman Act). The Zillow Ban is unlawful under both claims: it was adopted to harm a competitive threat, it eliminates a new and innovative business model that creates competitive differentiation in the market, and it reduces homeowner choice.

11. As Zillow uses the Zillow Ban to block real estate search rivals like Compass from competing head-to-head, home sellers, home buyers, and their agents will lose. They will be deprived of the choice, innovation, and quality that such competition will provide. In a free and competitive market, competitors' products and strategies should rise and fall on merit—not the whims of a monopolist gatekeeper like Zillow. For these reasons, the Court should block the Zillow Ban.

## II.    PARTIES

### A.    Plaintiff

12. Compass, Inc. is a technology-powered real estate company that provides its agents with cutting edge technology to help their clients buy and sell real estate across the United States. Founded in 2012, Compass is a corporation organized and existing under the laws of the

State of Delaware with a principal place of business at 110 Fifth Avenue, 3rd Floor, New York, New York. In November 2024, Compass rolled out its 3-Phased Marketing Strategy, an innovative model for selling and marketing residential homes in the United States. Compass competes with Zillow in a number of markets within the real estate industry, including in the market for online residential real estate search services.

### B.    Defendants

13.    Zillow, Inc. is an online real estate marketplace. Zillow is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington. Zillow maintains real estate brokerage licenses in several states. It may be served through its registered agent. On its website, Zillow maintains a residential housing search platform in competition with Compass. Zillow has several divisions through which it operates, including all of the corporations, subsidiaries, and divisions identified in Section II(B). All such entities identified in Section II(B) of this Complaint are collectively referred to herein as "Zillow," and all may be served through their registered agents.

14.    Zillow Group, Inc. offers online real estate services and is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

15.    Zillow Homes, Inc. is organized and existing under the laws of the State of Delaware, with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington. It maintains real estate brokerage licenses in a number of states.

16.    Zillow Listing Services, Inc. offers miscellaneous real estate services. It maintains real estate brokerage licenses in several states. It is a general corporation organized and existing

under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

17.     Zillow Home Loans, LLC offers home financing services, including mortgages and loans. It is a limited liability company existing under the laws of the State of California with its principal place of business at 2600 Michelson Drive, Suite 1201, Irvine, California.

18.     Trulia, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington. It is a real estate website. Zillow acquired Trulia in 2015.

19.     StreetEasy, Inc., formerly NMD Interactive, Inc. d/b/a StreetEasy ("StreetEasy"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1250 Broadway, New York, New York. StreetEasy is a real estate website that Zillow acquired in 2013.

**C.     Co-Conspirators**

20.     Various other persons, entities, and firms not named as defendants have participated as co-conspirators and performed acts in furtherance of the conspiracy alleged herein. These co-conspirators include:

a.  Redfin Corp. ("Redfin") is a corporation organized and existing under the laws of Delaware with its principal place of business in Seattle, Washington. Redfin is an online real estate marketplace company, where it operates a home search platform. Redfin also operates a traditional real estate brokerage. It is the third largest competitor in the online residential real estate search services market, and it competes with Zillow in that market.

b. eXp Realty, LLC ("eXp Realty" or "eXp") is a Washington limited liability company with its principal place of business in Bellingham, Washington. eXp Realty is a real estate brokerage and is the largest brokerage by number of transactions in the United States. eXp also competes with Zillow in the online residential real estate search services market by hosting and running its online home search portal.

### III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

21.    This Court has personal jurisdiction over Zillow because it: (a) resides in this district or transacted business in this district; (b) directly and/or indirectly marketed and sold products and services in this district; (c) has had continuous and systematic contacts with this district; and (d) engaged in anticompetitive, unfair, and deceptive business practices that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this district, including Compass.

22.    This Court has subject matter jurisdiction over Compass's Federal antitrust claims pursuant to 15 U.S.C. §§ 15, 26 and 28 U.S.C. §§ 1331, 1337, 1367, and 2201.

23.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391, because Zillow transacted business, resided, and/or had agents in this district, a substantial part of the events giving rise to Compass's claims occurred here, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district. In addition, Compass's corporate headquarters is in this district.

## IV.    INDUSTRY BACKGROUND

### A.    The home sale process and the role of real estate brokerages and agents

24.    The residential real estate brokerage market is made up of state-regulated real estate brokerage firms and individually licensed real estate agents. Under state laws, agents must "hang their license" with a brokerage to do business. Brokerages take on oversight and legal responsibility for agents and provide agents with training, tools, and marketing materials, among other services. For offering these services, brokerages typically withhold a certain percentage of each commission paid to an agent on each home the agent sells. Traditionally, agents are not employees of their brokerages but, instead, operate as independent contractors.

25.    In the United States, most home buyers and sellers are represented by real estate agents acting on their behalf to execute the transaction. For example, according to the National Association of Realtors ("NAR"), the largest national trade association for real estate brokerages and agents across the country, 90% of home sellers and 88% of home buyers used an agent in 2024. These professionals help home buyers and home sellers navigate what is for many people the largest and most important financial transaction of their lives.

### B.    The role of multiple listing services and online home search platforms

26.    A multiple listing service ("MLS") is a database accessible to agents that contains properties listed for sale within a defined geographic region. Most MLSs are owned by local real estate associations that, collectively, are members of, and governed by, NAR. Only brokerages, agents and other participants that pay for membership with the specific local MLS receive credentials and access to that MLS's database. There are approximately 510 MLSs in the United States.

27.     Selling agents typically list their clients' properties on their local MLS. Once a listing is registered with a local MLS, online digital platforms like Zillow (and Compass), in almost all cases, automatically obtain and display the listings through back-end technological feeds called the Internet Data Exchange ("IDX") and/or Virtual Office Website ("VOW"). Indeed, Zillow acquired and maintains its real estate brokerage licenses—in paper and name only—in order to access MLSs' listing databases for relatively nominal fees. This access allows Zillow to monetize the listings without providing compensation to the MLSs or the agents and home sellers who created the listings. Zillow does not itself operate as a brokerage in the traditional sense; it does not hire agents or submit listings to the MLS, and no one hires Zillow to sell homes.

28.     Once a listing is posted to Zillow, the public can see it. Accordingly, Zillow is distinctly situated from local MLSs in that Zillow can be accessed by the public at large (not just real estate agents or other industry participants who subscribe and pay dues to the MLS). Moreover, unlike an MLS—which contains listings for its local market only—Zillow contains real estate listings from across the country.

**C.     The Role of the National Association of Realtors and its Clear Cooperation Policy**

29.     NAR, which refers to itself as "America's largest trade organization," is made up of licensed residential real estate agents, salespeople, property managers, appraisers, and other members of the real estate industry. As of January 2025, NAR's membership totaled just under 1.5 million people. NAR generates revenues by collecting dues from its members as well as other smaller revenue streams. In 2024, NAR generated roughly $150 million in revenues. Today, NAR owns assets worth over $1 billion.

30.    But NAR is much more than a traditional trade association. For decades, it has promulgated rules and policies that governed real estate sales in the United States. For example, in 1913, NAR established its first code of ethics which was one of the first codifications of ethical rules of any business. Since then, it has promulgated hundreds of rules dictating industry practice. Just last year, in response to a lawsuit challenging certain of its rules, NAR instituted a mandatory rule requiring agents to have executed buyer-representation agreements with a home buyer before showing that home buyer any properties.

31.    NAR is also one of the country's largest lobbying organizations. In 2024, NAR spent $86 million in lobbying efforts, which represented more than half of its annual revenues and made it the highest lobbying spender in the country. Over the last five years, NAR has spent a staggering nearly $350 million in lobbying efforts.

32.    In recent years, NAR has faced heavy criticism for not adapting to a changing real estate market. Even local real estate associations questioned NAR's competency and governance policies, with the Houston Association of Realtors passing a motion of non-support of NAR. The criticism eventually percolated into several legal problems for NAR, including publicly announced government investigations and private class action lawsuits.

33.    Compass Private Exclusive listings are "office exclusives." For over 50 years, such office exclusives have been a critical part of the freedom that home sellers have in deciding how to market their property. In fact, they are so important that NAR has protected office exclusives in its antitrust policy since 1971, following resolution of an investigation initiated by the Department of Justice ("DOJ").[1] In the most recent version of its antitrust policy, along with prohibitions against price-fixing, NAR instructs MLSs that follow its rules that they "shall not"

---

[1] Edward I. Sumber, *NAR's 14 Point Multiple Listing Policy*, Aspire North Realtors, https://www.aspirenorthrealtors.com/images/uploads/14-Point-MLS-Policy.pdf (last visited June 22, 2025).

"[p]rohibit or discourage participants from taking 'office exclusive' listings." Office exclusives have long been important to sellers: they provide home sellers a path to hiring a licensed real estate broker and agent without immediately putting their home on the MLS. Office exclusives provide sellers with the option to market and sell their homes off the MLS entirely, if they choose.

34.    Compass was an early mover in adopting an "inventory-based" strategy through which it shares its inventory (real estate property listings) internally or publicly on its own platforms for a certain period before launching them publicly on an MLS. Compass first developed this inventory-based competitive strategy to differentiate itself from competing brokerages in 2018-2019 by experimenting with Coming Soon listings and later Private Exclusives. Private Exclusives were marketed exclusively within the Compass brokerage to other Compass agents and their clients. Coming Soons were displayed publicly on Compass's website and other areas on the internet, but not in local MLSs.

35.    In response to Compass's strategy, NAR's Board of Directors adopted the Clear Cooperation Policy (the "CCP"), to be implemented by local MLSs by May 1, 2020. The CCP required that agents must enter a listing into their local MLS within one business day of publicly marketing the property.[2] Once entered into the MLS, the listing then becomes available to other MLS participants and is generally shared to public platforms like Zillow. In other words, the CCP effectively prohibited homeowners from marketing their property online or elsewhere unless they quickly posted it on an MLS, thereby restricting homeowners' choices of how to list and market their property. However, as mentioned above, the CCP contained an exception for

---

[2] Public marketing of the listing included, for example, "flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public."

"office exclusives" that were withheld from the MLS at the direction of the seller. Compass Private Exclusives are Compass's version of office exclusives and thus meet all applicable NAR criteria for this listing type.

36.     It was widely known in the real estate industry that NAR's CCP efforts—supported by Zillow and other competitors of Compass—were targeted at Compass's early innovative efforts. In its early formulation, the CCP was even referenced as the "Compass Rule" within the industry, clear retaliation against Compass for challenging industry trends.

37.     In June 2020, a month after the CCP went into effect, the DOJ issued a civil investigative demand to NAR, seeking information regarding the CCP and other NAR rules. According to the DOJ, the CCP "restricted the choices available to home sellers and listing brokers who want to market homes outside the NAR-affiliated MLS system and potentially excludes new listing services that seek to compete against MLSs for home listings."

38.     For a while, Zillow hoped that the CCP would smother the rise of Compass and its innovative model. But its hopes were dashed for a few reasons. First, and most importantly, the CCP still allows Compass's Private Exclusive listings under the office exclusives exemption required by NAR's antitrust policy. Second, enforcement of the CCP was left to local MLSs, which took different positions on its scope and application. Many MLSs took the position that the CCP required mandatory submission of listings to the MLS, where agents could search the listings, but that CCP did not require mandatory syndication to MLS participants like Zillow, resulting in Zillow not getting the listings from many MLSs. Third, some MLSs opted to either not adopt the rule or not strictly enforce it. Fourth, and relatedly, the penalty for violating the CCP is not an outright listing ban but instead is a monetary fine. Thus, Zillow was unable to use the CCP as its lever to force all listings onto its platform and monetize each one.

39.     Zillow therefore petitioned NAR to strengthen the CCP. In September 2024, while NAR was considering either relaxing the rules for public marketing under the CCP or withdrawing the CCP altogether, Zillow argued in a letter to the Chairperson of the relevant NAR subcommittee that NAR should expand the CCP to prohibit office exclusives. Zillow called out Compass by name *five times, while no other brokerage was named once.* In the letter, Zillow even excerpted screenshots from Compass's website, criticizing the CCP's office exclusive exemption for having created a "loophole" that "brokerages (such as Compass and others) have exploited." Zillow failed to realize that the reason the CCP has an office exclusive exemption is because, without it, NAR would be in violation of its own antitrust policy, which states that "MLSs shall not prohibit or discourage participants from taking 'office exclusive' listings."

40.     Zillow was unsuccessful. NAR did not give in to Zillow's demands but instead went in the other direction by expanding, not restricting, seller choice. On March 25, 2025, with the DOJ investigation still ongoing, in a NAR statement titled "NAR Introduces New MLS Policy to Expand Choice for Consumers," NAR updated the CCP through its new Multiple Listing Options for Sellers policy ("MLOS"). The MLOS doubled down on protecting office exclusives. It also adopted a new category of listings— delayed marketing listings—that still must be registered with the MLS and shared with MLS members within one day of public marketing but which aim to provide more flexible marketing options for sellers, depending on local MLS implementation.[3] The result was clear: NAR would not go further to extinguish Compass's strategies than it already had—and in fact created more flexibility to allow homeowners to market their homes outside of the MLS and off Zillow.

---

[3] Because Zillow gets access to the relevant MLS feeds in its capacity as a registered broker, it nonetheless still manages to get all these listings through MLS feeds.

**D.    Zillow's Listing Access Standards**

41.    With NAR refusing to protect Zillow's flank, Zillow took matters into its own hands. On April 10, 2025—just two weeks after NAR's decision to provide home sellers more flexibility—Zillow adopted the Zillow Ban, its new Listing Access Standards. The rule became effective on May 28, 2025, and enforcement begins on June 30, 2025.

42.    The Zillow Ban requires that any listing that is "publicly marketed" must be given to Zillow within one business day or else Zillow bans the listing. The only way Zillow will allow the homeowners to get their listings back on Zillow, is by firing their agents and brokerages and moving the listing to a new agent and brokerage—clearly a tactic intended solely to prevent competition and penalize agents and brokerages helping home sellers market their homes off Zillow. Zillow defines public marketing incredibly broadly—much more broadly than NAR does in the CCP and MLSs do in implementing the CCP—to cover virtually any effort by an agent or home seller to drum up interest in the listing.[4]

43.    The Zillow Ban specifically attacks Compass's highly desirable Private Exclusive and Coming Soon listing options because they are marketed off Zillow where Zillow cannot make money from them. With respect to Private Exclusives, the Zillow Ban permits the sharing of Private Exclusive listings *only when* the listing is shared "in 1:1 communication between agents within the same brokerage and shared 1:1 to their individual clients." This has several disastrous implications for the way Compass (and likely other brokerages) executes its Private Exclusives strategy (which is compliant with NAR and MLSs' implementation of the CCP).

---

[4] Zillow defines "public marketing" to mean "(i) promoting, marketing, or advertising a Listing in any manner, including without limitation, flyers, yard signs, social media, public-facing websites or apps, e-mails, mailers, newspapers, open houses, previews, showings, multi-brokerage listing sharing networks, virtual tours,  and brokerage private listing networks to extent such listing network is publicly marketed and/or accessible to consumers, including those accessible only to  a Brokerage's clients behind a registration wall; and/or (ii) sending and/or transmitting a Listing, regardless of status, to an MLS,  unless seller opts out of the display of the Listing everywhere on the internet due to privacy concerns, and executes a Seller Waiver (as defined below)."

First, it means that Compass agents cannot leverage its internal database to browse Private Exclusive inventory, which today is accessible by Compass agents who then share Private Exclusives on a 1-to-1 basis with their clients. NAR's CCP places no restrictions on how Private Exclusives are shared amongst agents within a brokerage. Second, Compass cannot share any of its Private Listings with agents at other brokerages at all, even on a 1-to-1 basis, which is expressly allowed in NAR's CCP. Third, because the Zillow Ban prohibits listings within a brokerage's private listing network when the network or the brokerage's inventory "is actively marketed to consumers, including through any public-facing website," Compass cannot continue its general branding and marketing of Private Exclusives on Compass.com without jeopardizing its home seller clients' access to Zillow. For example, Private Exclusive listings that are referenced in advertisements on Compass.com mentioning the number of Private Exclusive listings available in a city or specific geography, or similarly returned in response to a search result on Compass.com, will trigger the Zillow Ban. Put plainly, Zillow has granted itself the power to ban *every* Compass Private Exclusive listing from going to Zillow because of the way in which Compass markets and executes its Private Exclusive listing strategy internally and externally.

44.     The Zillow Ban also jeopardizes Compass's Coming Soon listings. Home sellers currently have some discretion in many geographies as to how and when they post their listing to the MLS and/or public platforms like Zillow. As such, home sellers currently can market their homes as a Compass Coming Soon for more than one day in many geographies and MLSs. By contrast, the Zillow Ban mandates that, within one business day of being publicly marketed, any Coming Soon listing must be made accessible and viewable on Zillow—where all the negative insights will immediately attach to the listing and where Zillow can make money selling leads

off the listing. The Zillow Ban is thus far more restrictive than the CCP and will force on to

Zillow tens of thousands of listings across brokerages that, today, are being marketed off Zillow

by home sellers who are not yet ready to post their listings on Zillow's platform.

45.     As for enforcement, the Zillow Ban is draconian. On an agent's third violation of

the rule, that violating listing will be blacklisted from Zillow—as will any non-compliant listing

posted by that agent going forward. Thus, an agent can have a Private Exclusive listing that

follows all CCP and MLS rules yet nonetheless violate the Zillow Ban—an incredibly precarious

and confusing scenario for home sellers and their agents.

46.     The Zillow Ban is designed to make it hard, indeed nearly impossible, for home

sellers to sell their home outside of Zillow, in an effort to force all listings to be on Zillow where

Zillow makes money selling leads off the homeowners' listings. The Zillow Ban also makes it

difficult, indeed nearly impossible, for Zillow's home search competitors to carry unique

inventory and search results. Zillow thus ensures that home search competitors cannot use

differentiated listings to steal searches from Zillow. In addition, the Zillow Ban removes privacy

benefits and instead forces homeowners into a painful and untenable choice: either they

immediately give up their privacy and security by listing on Zillow or they surrender the ability

to do broader marketing and maximize exposure on Zillow if they ultimately decide to go that

route later in their sale process.

## V.    ZILLOW'S MONOPOLIZATION AND ANTICOMPETITIVE CONSPIRACY

### A.    Zillow launches and develops its central business model

47.     Zillow operates an online real estate search platform accessible through its

website and mobile applications. As noted above, Zillow aggregates MLS real estate listings via

IDX and VOW feeds and displays them to the public. While Zillow is licensed as a real estate

brokerage in order to secure access to these feeds, it does not operate like a brokerage in the traditional sense—Zillow does not retain agents or clients or create its own listings.

48.    To understand Zillow's central business model, it is first essential to understand how listings on Zillow differ from those on the MLS. When listing agents post a listing on the MLS, the agents must include their name and contact information so potential buyers and buyer agents know who to contact about the property. The agents also post photos and other information about the home, including a description of its specifications and features.

49.    When the MLS sends the listing to Zillow, Zillow then adds its own information. First, it adds buttons to drive its monetization strategy. The primary way in which Zillow generates revenue is by selling leads—prospective home buyers—to real estate agents. These buttons, labeled "request a tour" or "contact agent," connect the Zillow end user (a prospective buyer) not with the listing agent but with an agent who, for a fee, paid to access the prospective buyer. This entire process is misleading to prospective buyers using Zillow, who believe they are being introduced to the listing agent of the property hired by the home seller to list and sell the home. Instead, they are introduced to whichever agent has paid Zillow the most to secure the introduction.[5] Instead of being directed to the listing agent, to whom the buyer would not have to pay an incremental buyer agent commission, the buyer is redirected to a buyer agent who will charge an incremental buyer agent commission. This model has been highly lucrative, and Zillow has grown exponentially since its 2011 initial public offering, with revenue swelling from $30.5 million in 2010 to $2.2 billion last year.

---

[5] Zillow sells these leads through its "Premier Agent" program, through which agents pay upfront for the leads, and its "Zillow Flex" program, through which the agent does not pay for the lead upfront but instead gives Zillow a percentage of any commission the agent eventually receives from the Zillow-provided lead. The exact percentage that Zillow receives under Zillow Flex depends on the state and size of the transaction, but it can be as high as 40% of the commission.

50.     Second, Zillow adds other negative metrics or information that have the potential to devalue the home and are therefore undesirable to home sellers. For example, as shown below in Figure 1, Zillow adds negative insights like its "Zestimate," "Climate Risk" scores, the property's walk and bike score, and a proposed "Offer Strategy" for buyers. Homes posted to Zillow also begin accruing and displaying "days-on-Zillow" history and detailed price-reduction history as soon as the listing is posted. Home sellers may find this information harmful, as these negative insights and data about price drops or extended days on the market may impact the final price a seller is able to obtain for the home.[6]

---

[6] Zillow's information is also sometimes incorrect and thus also can harm buyers. *See, e.g., Patel v. Zillow, Inc.,* 915 F.3d 446, 447 (7th Cir. 2019) (explaining that Zillow's Zestimate "is off by more than 20% in about 15% of all sales.").

**Figure 1**



**B.    Zillow begins an acquisition spree—including first StreetEasy and then its biggest competitor, Trulia—on the way to building its monopoly**

51.    Shortly after going public, Zillow kicked off an acquisition spree to acquire and cement its dominant position. In 2011, Zillow bought Postlets, a leading online platform for real estate listing creation and distribution. The following year, Zillow rolled up other players, including Hotpads, a real estate platform competitor to Zillow focused predominantly on real estate listings in New York City and Washington D.C.

52.     Zillow then focused on larger and more established players. In 2013, it acquired a significant competitor, StreetEasy. Like Hotpads, StreetEasy was a digital listings platform focused on displaying New York City real estate listings that allowed Zillow to secure these highly lucrative and desirable listings. Indeed, when describing the acquisition in 2013, Zillow proclaimed that the deal offered Zillow "clear market leadership in the country's largest and most important real estate market" and would complement Zillow's "dominant and growing national brand."[7] One year later, in 2014, Zillow acquired Trulia, its then-largest competitor, for $3.5 billion, a 25% premium above Trulia's then-trading stock price.[8]  The New York Times, relying on industry data from the time, warned that the Zillow-Trulia deal would create a new powerhouse that "will dominate" the search for online home listings."[9]

### C.     Zillow secures its dominance and expands into other areas of the real estate industry

53.     Zillow has grown into a dominant and unrivaled force in the market for residential real estate online search services. Zillow dominates virtually every metric in the market: it has more users, receives more views, has a higher visitor duration, and generates more clicks.

54.     With its platform dominance secured, Zillow expanded into other segments of the real estate industry to monetize and protect its monopoly. As of today, Zillow has several other business divisions or strategic initiatives focused on selling additional real-estate-related services to Zillow users. These businesses and strategies—which are dependent on Zillow first recruiting users to its platform—include:

---

[7] Kelly Clay, *Zillow Acquires NYC Real Estate Site StreetEasy for $50M, Plans Stock Offer*, Forbes (Aug. 19, 2013), https://www.forbes.com/sites/kellyclay/2013/08/19/zillow-acquires-nyc-real-estate-site-streeteasy-for-50m-plans-stock-offer/.
[8] Michael J. de la Merced, *Zillow to Buy Trulia for $3.5 Billion in All-Stock Deal*, N.Y. Times (July 28, 2014), https://archive.nytimes.com/dealbook.nytimes.com/2014/07/28/zillow-to-buy-trulia-for-3-5-billion/#:~:text=Under%20the%20terms%20of%20the,premium%20of%20roughly%2025%20percent.
[9] *Id.*

a. ***Zillow Home Loans:*** Available in 49 states and Washington D.C., Zillow Home Loans provides mortgage origination services to users of its platform. These mortgage origination service fees currently account for roughly 15% of Zillow's revenues. Zillow Home Loans is growing fast. In the fourth quarter of 2024, this business experienced 86% year-over-year growth, driven by a 90% rise in purchase loan origination volume to $923 million.

b. ***Zillow Closing Services:*** Zillow Closing Services collects transaction-based closing costs, such as title and escrow services, and currently accounts for 5-10% of Zillow's annual revenue.

c. ***Zillow Enhanced Markets:*** Zillow Enhanced Markets aims to connect prospective sellers and buyers with agents who pay Zillow while then facilitating all other parts of the home purchase or sale process. The premise is that Zillow will provide an integrated, end-to-end home buying experience in which the consumer digitally moves through the entire process (touring, financing, and closing on a home) within Zillow's ecosystem and using Zillow's suite of services. Zillow claims that its Enhanced Markets offering is "gaining meaningful share," and Zillow has plans to expand it dramatically this year.

d. ***ShowingTime:*** ShowingTime is a digital platform that allows listing agents to schedule tours of their home sellers' homes with interested buyers and buyer agents. In 2021, after ShowingTime had gained traction and established itself as the industry leading home-touring platform, Zillow acquired it for $500 million.

e. ***Follow Up Boss***: Follow Up Boss is a leading customer relationship management system for real estate agents that Zillow acquired in 2023. It is used by over 100,000 agents to manage leads, streamline communication, automate follow-ups, and help convert the leads that agents buy from Zillow.

55.    Zillow's ambitions are clear: it wants to use its monopoly power in home search to own every facet of the home selling and buying process while making it harder for other competitors like Compass to challenge it. To do so, Zillow must maintain its monopoly in the home search market—the first and essential step to locking in the users that feed its business model. This model, which is based on maximizing visitors to Zillow and locking them into the Zillow ecosystem, is depicted below in Figure 2.

**Figure 2**



### D. Compass develops its innovative brand and business strategy

56.    From its infancy in 2012, Compass was an innovator in the real estate market, bringing fresh ideas and much-needed competitive pressure to the existing and entrenched industry. Compass's early vision was to build an end-to-end, one-stop-shop software solution for agents and their clients. Since its founding, Compass has accomplished goals that no one in the real estate world thought possible. And it has done so by attracting home sellers and home buyers and their agents to join and stay at Compass because of its innovation and investment.

57.    In April 2024, Compass took another step in its innovative journey—focusing on its inventory-oriented strategy as a central pillar on which to continue building its brand. In June 2024, Compass began to focus more on Compass Private Exclusives, incorporating some of the best practices of professional home builders and real estate developers, who sell hundreds of thousands of properties off the MLS each year. In November 2024, leveraging these learnings, Compass went all-in with its newly branded "3-Phased Marketing Strategy":

a. **Compass Private Exclusive:** In phase 1, the seller and agent privately market the property to other agents and their clients. Just as many companies test products with a smaller audience before launch, listing a home as a Private Exclusive allows

a seller to test price, gain critical insights, and generate early demand before going public.

b. **Compass Coming Soon:** In phase 2, the listing moves to "Coming Soon" status and is publicly launched on Compass.com, showcasing it to all agents and consumers without displaying days on market, price drop history, or other negative insights. This is a signal to prospective buyers that increased competition for the listing will be coming soon when it is launched on all other sites, and it provides another chance for the seller and agent to collect valuable feedback.

c. **Active on MLS and Home Search Portals**: The final phase is going active on the MLS and third-party sites, now armed with the benefit of price discovery and other information gained from Phases 1 & 2. With the listing live on the MLS and third-party sites, it will, for the first time, accrue days on market, visible price drop history, and other negative insights created by platforms like Zillow.

58.    The benefits and optionality offered by Compass's model were clear to Compass and its home selling and buying clients immediately. The approach allows home sellers to show a home before they or the home are fully market-ready, generate urgency and early interest, and test market demand and listing price—all while maintaining the seller's privacy and without accumulating days on the market or broadcasting public list price reductions that could harm the seller's efforts.

59.    Importantly, while the client may choose to sell her home during phase 1 and 2, most do not. Indeed, 94% of all sold Compass listings in 2024, including Private Exclusives and Coming Soons, were marketed and sold on the MLS and thus were also displayed on Zillow. But the advantage for these listings over those that did not go through the 3-Phased Marketing Strategy is that the listing went public after receiving the significant benefits from having gone through the first two stages. Home sellers go to market with more confidence, more information, and an enhanced strategy about how to best market and sell the homes, all while avoiding the downside risks that come with listing blind. And buyers also benefit. In a highly competitive market with low inventory, the 3-Phased Marketing Strategy enables buyers to search, identify,

tour, and prepare their strongest offer by viewing properties early that might not be ready for a full public listing.

60.     Accordingly, studies have shown that homes that progressed through the first and/or second stages of the 3-Phased Marketing Strategy and sell during phase three on average were associated with a better quality-adjusted price compared to Compass-sold properties that were not pre-marketed. And this is common sense; with more time and information provided to all interested parties, the strategy consistently facilitates better and more efficient matchmaking between home buyers and home sellers. The result is that the high-intent, committed buyers—those willing to make the best offer for the house that best suits their needs—receive the home and the seller receives the benefits that come with locating those high intent buyers.

61.     Betting on these strong benefits, Compass dedicated resources to educating and incentivizing agents to use the pre-marketing strategy and making it a core part of Compass's brand. Compass even revamped its branding around the 3-Phased Marketing Strategy, touting the strategy and its benefits across its website and branding (see Figures 3 and 4 respectively).

**Figure 3**

## The Benefits of Pre-Marketing Your Home as a Compass Private Exclusive



### Soft-Launch to an Exclusive Audience

Make your listing available to a network of thousands of top agents.



### Showcase Before Being Market-Ready

Pre-market your home to buyers before investing time or effort into preparing it for the public.



### Generate Early Demand

Create early buyer anticipation and interest without accumulating days on market or damaging public price drops.



### Test Your Price & Gain Insights

Know how buyers are engaging with your listing. These insights, available only before your home goes live on other sites, help you make adjustments to your pricing.



### Attract Competitive Offers

You can get competitive offers from buyers who are willing to pay a premium for certainty and reduced stress.



### Maintain Your Privacy

Your privacy is valuable. Photos and floorplans of your home are only visible to Compass agents and their serious clients.

**Figure 4**



62.     Compass also developed a specific training module as part of its Compass Core Training program. Compass's Head of Coaching routinely presents on how the 3-Phased Marketing Strategy strengthens agents' and Compass's business. Similarly, every other week, Compass sales managers deliver presentations to their offices' agents to educate them on the benefits of the strategy and improve execution. Compass has further designed marketing materials and brochures for agents to use while pitching the listing strategy "in the living room" to home sellers to help win listings. Compass agents have consistently been gaining market share because home sellers are looking for more options and choices, not less—the 3-Phased Marketing Strategy gives them more choice.

63.     Compass has also spent millions of dollars to advance the strategy. It has budgeted for media blitzes and billboards in Compass's largest regions, revamped its branding, and dedicated significant in-house product and engineering resources towards enhancing technology used to facilitate Private Exclusive and Coming Soon listings. Indeed, although product and engineering plans are typically solidified months or up to a year in advance, Compass redirected resources from other projects towards tools to help home sellers, home buyers, and Compass agents execute the strategy. Lastly, during the launch, Compass purchased digital advertisements on behalf of home sellers whose listings transitioned from the Private Exclusive to Coming Soon phase.

64.     These efforts have borne fruit, as nearly half of Compass's listings in the first quarter of 2025 went through some form of pre-listing marketing. These rapid adoption rates reflect two important facts. First, although the notion of office exclusives has been a mainstay in the real estate industry, it was Compass that modernized the idea, launched it at scale, and made it the desirable centerpiece of its competitive offering. For decades, office exclusives often were

raised by agents at weekly sales meetings—but nothing more. Often agents would forget about them, with no easy way to access the relevant information through a searchable space. Compass changed this; by harnessing its technological prowess, Compass constructed a bespoke and efficient technological infrastructure to make the strategy run like a well-oiled machine and allocated significant resources towards building technology to input off-MLS and off-Zillow listings on Compass's own platform. These efforts included the development of internal tools, like Compass Collections and Compass One, which allow agents and clients to seamlessly filter, share, and comment on listings, as well as tools like Reverse Prospecting and a marketing Insights report. Similarly, Compass built an advanced, public-facing website, Compass.com, through which consumers can view the number of Private Exclusive listings that match their search criteria, Compass Coming Soon listings, and fully active MLS listings. Active listings include those posted by Compass and non-Compass agents alike, which is directly permitted under MLS rules. Second, the adoption rates necessarily reflect the strategy's benefits. Home sellers and their agents are choosing the 3-Phased Marketing Strategy despite being free to use whatever selling strategy they prefer; they would not be using this strategy if they did not believe it helped them sell their listings.

65.    The results speak for themselves. Listings launched under the 3-Phased Marketing Strategy on average generate 16% more open house traffic, solicit 17 times more direct inquiries, and sell in 21% fewer days once displayed on the MLS and Zillow during phase three. Buyers likewise have benefited from an extended period to see the homes and prepare their strongest offers.

66.    Given these benefits and results, Compass's 3-Phased Marketing Strategy has received strong praise from Compass agents and their clients. In response to a recent survey, one

agent explained that Compass's 3-Phased Marketing Strategy allowed her client to "create anticipation" and "urgency" for her listing, which resulted in two offers on the first day it hit the market and a fair price for her home. Another agent described the 3-Phased Marketing Strategy as a "total game-changer," explaining that as soon as she posted the listing as a Coming Soon, two non-Compass agents inquired about the property after finding it on Compass.com. Her takeaway: "This whole experience reinforced how powerful [the 3-Phased Marketing Strategy] really is. It creates a real sense of urgency, brings in interest from outside our network, and . . . introduce[s] new leads." Another agent loved that the strategy allowed her clients to "build early demand with a Private Exclusive, launch publicly with the strongest possible positioning, and optimize based on real-time feedback. It protects their home's value, minimizes days on market, and often leads to faster, stronger offers. My clients appreciate how strategic, flexible, and buyer-focused the entire process is."

67.    Home sellers have provided similar positive feedback. One client contacted Compass about selling his mother's home after his mother had to move into assisted living due to her Parkinson's diagnosis. He explained that home sales in his area had been sluggish, and that his mother had been dealing with significant mental stress from having to move and sell her home. He was incredibly grateful about how the 3-Phased Marketing Strategy created urgency, allowed his mother to line up back-to-back showings, and ultimately secured a full-price offer in less than a week—despite the neighbor's listing sitting on the market for over six months without selling. The home seller client's conclusion: the speed and success of the sale "would not have been possible without Compass and the 3 Phase Marketing Plan." He signed the email by thanking Compass for its leadership.

68.     The 3-Phased Marketing Strategy has also been critical to Compass Plus, a specialized division within Compass that assists senior citizens with their real estate transitions. These clients are often overwhelmed by the need to sell their longtime home and transition to the next stage of their life. And they need significant help in preparing the home for sale, scheduling showings, and managing the process. In many cases, the homes are far from "showing ready" and require significant work to clean and prepare for sale. The 3-Phased Marketing Strategy thus has been a critical tool to help these home seller clients take their time while gaining feedback on the home. Compass Plus has grown dramatically by using the approach, with over 1,000 Compass agents focused on using the 3-Phased Marketing Strategy to help its senior citizen home sellers.

69.     Compass's strategy has been a critical tool in attracting and retaining agents too. Agents routinely expressed that they were "incredibly impressed by our 3-phased marketing strategy" and "especially excited about Private Exclusives, Compass One, and the Business Tracker." One agent told Compass she "knows her clients will love the 3-phase[d] marketing strategy" and was "excited to have a competitive edge" it will bring.

70.     Wall Street has also taken notice of Compass's strategy. One investment firm explained that "three-phase marketing could be a significant lever for [Compass]" and would "help [Compass] win seller listings." For these reasons, Compass's brokerage competitors have begun copying the 3-Phased Marketing Strategy. Indeed, other brokerages already have responded by launching similar models, including Douglas Elliman's "Black Label Private Listings," Sotheby's "Quiet Exclusives," and Corcoran's "Reserve Listings."

E.    **Zillow takes heed as Compass grows into a significant competitive threat in home search**

71.    Over time, Compass has become increasingly threatening to competitors—and to Zillow specifically. Compass has built its own platform to display listings online, which has been growing. The more Compass grows, the more consumers (and Zillow users) will begin to search for properties on Compass instead of Zillow. As Compass thrives, it will divert consumers and users from Zillow's platform to Compass's, thus disintermediating Zillow from the process. And that shifting competitive dynamic would spell disaster for Zillow's business model and revenue. Indeed, as Zillow users begin their search on Compass (or other real estate platforms), Zillow's value proposition shrinks.

72.    The most worrisome threat is to Zillow's lead-selling business. As described above, Zillow sells "leads"—real estate consumers who peruse its platform—to paying agents, and those fees currently make up around 70% of Zillow's total annual revenue. If Compass continues to scale its 3-Phased Marketing Strategy, then Zillow in turn will not have access to Compass's (and other brokerages') newest and most in-demand listings before they launch on Zillow. Zillow thus fears it will be relegated to listing "stale bread," which would mean less viable leads to sell agents, reduced overall inventory and quality on the Zillow platform, and fewer or less serious users on the platform. In turn, agents who currently pay Zillow fees for leads may stop doing so or refuse to pay Zillow's current prices. The threat of the 3-Phased Marketing Strategy, and its contagion market wide, thus imperils Zillow's primary business model.

73.    But Zillow's lead-selling business is not the only part of Zillow's business that will be impacted. Zillow is currently focused on enhancing its "Super App" model, through which it will provide agents and their clients everything needed to move through a home sale

transaction. Compass provides a similar end-to-end platform for agents and their clients, and its new functionality called Compass One similarly allows a client to move through her entire real estate transaction with Compass. Compass, like Zillow, also offers mortgages and closing services to these home seller and buyer clients it draws into its platform. That integrated business model and approach to market runs headfirst into Zillow's Super App efforts. At bottom, Zillow and Compass are both competing to draw consumers to their online portals, in the hopes they can sell them several real estate-related services during the home sale process. More listings (and consumers) landing on Compass means that there are fewer real estate customers landing on Zillow.

**F.    Fearing competition that could undermine its dominance, Zillow adopts the Zillow Ban and conspires with its competitors to boycott Compass, hoping to kill competition**

74.    Frustrated that the industry's efforts to keep Compass in check were failing, Zillow sprang into action earlier this year when it began to ingratiate itself with several of its (and Compass's) largest competitors. Zillow's plan eventually gave rise to promulgation of the Zillow Ban and a Zillow-led conspiracy with co-conspirator Redfin and co-conspirator eXp to boycott Compass. Through the conspiracy, co-conspirator Redfin agreed to adopt a virtually identical policy as the Zillow Ban and co-conspirator eXp likewise agreed with the policy. Zillow, co-conspirator eXp, and co-conspirator Redfin knew that these policies would harm Compass and hoped that slamming the door on Compass's approach would arrest the wave of support and similar strategies that had started to spread.

75.    Redfin and Zillow had the opportunity to collude through the execution of a strategic partnership earlier this year. On or around February 6, 2025, Zillow and co-conspirator Redfin—despite being competitors with one another—announced an alliance through which

Zillow would exclusively provide multifamily rental listings on co-conspirator Redfin's platform; for this opportunity, Zillow paid co-conspirator Redfin $100 million plus compensation for leads Zillow generated through co-conspirator Redfin's site. This agreement provided Zillow and co-conspirator Redfin—both based in Seattle—an opportunity to collude. According to public reporting, the Federal Trade Commission ("FTC") is currently investigating Zillow and co-conspirator Redfin's relationship.

76.    As Zillow was building its relationship with co-conspirator Redfin, it was also engaging in discussions with co-conspirator eXp about the Zillow Ban. On information and belief, Zillow and co-conspirator eXp engaged in discussions about these policies and agreed to adopt them jointly, culminating in a public announcement. On April 10, 2025, in the same hour that Zillow announced the Zillow Ban, Zillow and eXp issued a joint press release announcing their "new agreement" and "partnership." Despite being clear competitors for home search services, Zillow and co-conspirator eXp had agreed to policies that limit the output on their platforms and, in doing so, harm Compass, other brokerages, and home sellers and home buyers.

77.    Just 41 minutes after the Zillow-eXp announcement, co-conspirator Redfin's CEO, Glenn Kelman, texted Compass's CEO, Robert Reffkin, to request a call within the next hour, despite the two executives seldom speaking with one another. Mr. Reffkin agreed to the call but stated that he wanted Compass's counsel present. That night, at 10:30 pm, Mr. Kelman and Mr. Reffkin, with other Redfin and Compass executives and counsel on the line, had a roughly forty-five-minute call. Mr. Kelman explained that, although he agreed with some of Mr. Reffkin's points regarding pre-marketing and Zillow's negative insights, Redfin had agreed to follow Zillow's lead and would publicly announce as much. During the call, Mr. Kelman revealed information suggesting that Redfin and Zillow had conspired. Mr. Kelman asked Mr.

Reffkin whether Mr. Reffkin had spoken to Zillow's CEO before Zillow's announcement and implied that Mr. Kelman had spoken to Zillow before the announcement. Mr. Kelman then pushed Compass to listen to Zillow, telling Mr. Reffkin that it is "not good when Zillow and Compass are warring" and suggesting that Zillow or Redfin would reward Compass with pre-marketing options. Mr. Kelman also suggested that Zillow would make it up to Compass financially if Compass were to change or slow its pre-marketing strategies or follow the policies. Critically, Zillow then raised the same idea to Compass executives the next day on April 11, 2025. That Zillow suggested the same idea—so soon after Mr. Kelman told Compass that Zillow would do so—demonstrates the pre-existing conspiracy between Zillow and co-conspirator Redfin.

78.     Mr. Reffkin was shocked. He and other executives at Compass had anticipated that co-conspirator Redfin would take *the opposite* position from Zillow—eagerly welcoming listings that Zillow will ban as a way to competitively differentiate its platform from Zillow. Indeed, the Zillow Ban presented Redfin the opportunity to say that it had more listings than Zillow on its platform. And that is what would be in co-conspirator Redfin's economic self-interest, absent the conspiracy. This is precisely why Homes.com, an online listing platform trying to compete with Zillow, has refused to join the conspiracy, instead criticizing the Zillow Ban and offering free "listing boosts" to those home sellers and agents whose listings are banned by Zillow. Homes.com's CEO also called the Zillow Ban a "power play of epic proportion" and described it as a "heavy handed attempt to use their [Zillow's] market power."[10] He posted a link

---

[10] Vanessa Bowman, *Homes.com CEO Andy Florence Slams Zillow's New Listing Standards*, Now Bam, (Apr. 13, 2025) https://nowbam.com/homes-com-ceo-andy-florance-slams-zillows-new-listing-standards/.

to the Department of Justice Antitrust Division's website, encouraging brokerages, agents, and home sellers to "let the DOJ know" that the Zillow Ban is "anti-competitive."[11]

79.     On April 14, 2025, as Mr. Kelman had previewed during the phone call, co-conspirator Redfin publicly announced what it already had shared with Compass: that co-conspirator Redfin was promulgating a policy tracking the Zillow Ban. Specifically, in a post on co-conspirator Redfin's website, Mr. Kelman declared that "Redfin.com will not publish any listings that have been publicly marketed before being shared with all real estate websites via the MLS."[12]

80.     After the co-conspirators made their announcements, other brokerage competitors of Compass agreed to follow the policies, knowing they would benefit by neutralizing Compass's brand and competition. For example, on April 11, 2025 (the day after the Zillow Ban announcement), NextHome announced publicly that it would be following the Zillow Ban.[13] The Chief Executive Officer of Brown Harris Stevens, another competing brokerage, summarized Zillow's anti-Compass goals on Instagram, posting a photo of a Compass billboard with the phrase "NOPE, Love, Zillow" superimposed in large font, reproduced below as Figure 5.

---

[11] *Id.*

[12] Glenn Kelman, *Buyers Should See All the Listings, Sellers Should Control How Their Listing Appears Online*, Redfin News (Apr. 14, 2025) https://www.redfin.com/news/buyers-should-see-all-the-listings-sellers-should-control-how-their-listing-appears-online/.

[13] Stephanie Reid-Simmons, *The Latest on Zillow's New Listings Rules as 2nd Brokerage Commits*, Real Estate News (Apr. 11, 2025) https://www.realestatenews.com/2025/04/11/the-latest-on-zillows-new-listings-rules-as-2nd-brokerage-commits.

**Figure 5**



81.     Zillow also relied on NAR and the vast majority of local MLSs to further the aims of the conspiracy, knowing that they too benefit from Zillow forcing all listings onto MLS platforms—indeed, the Zillow Ban equally protects MLSs' business model and Zillow's listing supply chain. Unsurprisingly, California Regional Multiple Listing Service (CRMLS), the largest MLS in the country, quickly came to Zillow's aid in supporting the Zillow Ban. Within hours of the ban being announced, CRMLS boldly proclaimed that the rule was compliant with the unique MLS IDX syndication feed rules of operation, suggestive of pre-existing communications between Zillow and CRMLS about the Zillow Ban and how it would be enforced.

82.     The Zillow Ban—and the nearly identical policies adopted by Zillow's competitor co-conspirators—will force brokerages, agents, and home sellers to abandon new, innovative, and client-friendly business and selling models, restricting home seller choice. The rule will irreparably harm Compass and other brokerages with similar business models or others looking to innovate in different ways, as well as those brokerages' home seller and buyer clients.

**G.    Zillow has recognized that pre-marketing strategies like Compass's have substantial benefits for home sellers and buyers**

83.    Zillow has repeatedly acknowledged the benefits of pre-marketing strategies like Compass's 3-Phased Marketing Strategy. Indeed, Zillow has employed (and still employs today) many of the *exact same strategies* targeted by the Zillow Ban. For example, in 2014, Zillow launched its own "Coming Soon" listings, as illustrated in Figure 6. Zillow touted Coming Soons as a new listing type that would give "home buyers the ability to identify homes that will be listed for sale within 30 days" and help home sellers and their agents "pre-market homes to help sell homes more quickly." The announcement discussed several critical benefits for home buyers who would receive an "important leg up." These benefits to buyers included a "more comprehensive view of regional housing inventory" that would allow buyers to make "more informed" evaluations of properties, and a new head start for buyers to line up their agent, get pre-approved, and move quickly to place a competitive offer once the listing went active. It also recognized benefits to home sellers, explaining that a Coming Soon listing "helps agents and their sellers gauge buyer interest and test the list price against current market conditions, and can help reduce total time a home is on the market." However, Zillow failed to monetize this strategy and thus abandoned it.

**Figure 6**



June 12, 2014

**Zillow Introduces "Coming Soon" Inventory**

**Offers home buyers ability to identify homes that will be listed for sale within 30 days; Helps agents and sellers pre-market homes to help sell homes more quickly**

SEATTLE, June 12, 2014 /PRNewswire/ -- Zillow, Inc. (NASDAQ: Z), the leading real estate and home-related marketplace, today announced the introduction of Coming Soon inventory to its home shopping experience on mobile and Web. Now, for the first time on Zillow®, home shoppers can search for and find homes that are not yet on the market, but expect to be listed for sale within 30 days.

In competitive markets, where inventory moves quickly and bidding wars are common, access to Coming Soon inventory gives home buyers an important leg up. Buyers interested in a Coming Soon property are able to line up their agent and get pre-approved in order to move quickly to place an offer once the home is listed for sale. Additionally, buyers now have an even more comprehensive view of regional housing inventory, and are able to make a more informed evaluation of current for-sale properties against what will soon be available.

Starting today, home shoppers can choose to see Coming Soon inventory when searching within a neighborhood or city on Zillow, simply by choosing "Coming Soon" in the search filters. Shoppers will see Coming Soon listings on the map alongside traditional listings. Buyers and their agents interested in Coming Soon properties are able to directly connect with listing agents through the contact form alongside the listing.

Similar to a Coming Soon sign in the yard of the physical property, displaying a home as Coming Soon on Zillow helps agents and their sellers gauge buyer interest and test the list price against current market conditions, and can help reduce the total time a home is on the market. It also provides unparalleled marketing exposure to the more than 81 million home shoppers who visit Zillow every month.

84.     But that is not the only time Zillow hailed and employed similar strategies. In 2018, Zillow launched its "iBuyer" program called Zillow Offers, where Zillow bought over 20,000 homes over three and a half years, convincing homeowners to sell to them directly off the MLS. Zillow would buy these homes for cash, make minor repairs, and then resell them—effectively turning Zillow into a large-scale "home flipper." Zillow routinely touted the benefits of quick private sales, as shown below in Figure 7. Zillow explained that the program offered "transparency, convenience, and choice for sellers" and that some home sellers "value convenience and time over price." In addition, Zillow explained that consumers "get more control and face less stress" from this home-selling option. Zillow also pointed to informational benefits, explaining that it provided more "certainty about price…when it comes to selling their home." Zillow shut down Zillow Offers in 2021, in large part because (as home sellers have been trying to tell Zillow for years regarding its Zestimate) Zillow's pricing algorithms failed to accurately predict home prices, causing the program to lose hundreds of millions of dollars.

Rather than fix its algorithm, Zillow again abandoned the program because it could not effectively monetize it.

**Figure 7**

Zillow's research shows that 71 percent of sellers are simultaneously buying a home, adding stress, timing and financial complexity. With Zillow Offers, potential home sellers can request an offer and, within two business days, receive a free, no-obligation cash offer from Zillow - an opportunity to sell their home on their own timeline.

"Sellers love Zillow Offers, because it's a service that offers them more control and convenience - and less stress - when they sell their homes," said Zillow Brand President Jeremy Wacksman. "Zillow has delivered that to sellers in our first two markets, and we're excited to expand into Atlanta. Once we launch the program in the fall, we will be able to provide Atlanta-area homeowners with more choices, greater control, certainty about price, and transparency when it comes to selling their home - whether they take a cash offer or sell traditionally with a Premier Agent."

85.    Even today, Zillow is *still telling home sellers* to sell their homes off the MLS when Zillow can make money from it. To this day, Zillow partners with a company called Opendoor to continue buying homes off the MLS from homeowners. The Zillow-Opendoor joint press releases highlight the benefits of private, off-market sales, as shown in Figure 8. Unsurprisingly, Zillow and Opendoor point to the same benefits that Compass does for its 3-Phased Marketing Strategy, such as not having to prepare the home or make repairs, not having to deal with the inconvenience of scheduling and executing showings of the home, and allowing for the flexibility and timeline needed by the home seller.

**Figure 8**

> "A recent Zillow survey found nearly a third of Americans were surprised by the emotional toll of selling their home," said Matt Daimler, Zillow senior vice president of product. "We want to simplify the process by providing sellers all their home-selling options in one place. Customers can now easily get both a cash offer from Opendoor and a market-price estimate to sell on the open market with a local Zillow Premier Agent partner on Zillow– and then make the decision that works best for their situation."

> "Selling a home can be stressful and full of unknowns for many people, but selling to Opendoor is simple, certain, and on the homeowner's timeline," said Brian Tolkin, Opendoor vice president of product. "An Opendoor sale means no home showings, no home prep or making repairs and none of the hassle that can come with a traditional listing. With this new Opendoor experience on Zillow, consumers can explore their selling options and choose one that meets their needs."

86.     Zillow—now confronting a threat to its monopoly and revenue streams—has completely flip flopped, running away from the commonsense principles it previously pronounced. Zillow now wants to leverage its power to force the industry to abandon strategies that *by its own admission* offer significant benefits to home sellers *and* buyers to protect its market position. At bottom, Zillow's goal is clear: it wants to protect its competitive moat and revenue streams by crushing competition in the home search market and ensuring that *all* listings (and leads) come to Zillow. Zillow wants to eliminate competition so it can ensure that it makes money from any home that is sold in the United States.

87.     And, in doing so, it is *Zillow* who will be harming real estate consumers on its platform, as *Zillow* will be denying its users access to listings through the Zillow Ban. As explained above, the vast majority of Compass listings (94% of sold listings in 2024) go to Phase 3 and thus launch on MLSs and Zillow; but all those listings will nonetheless be blocked from

41

Zillow users under the Zillow Ban if they are marketed off Zillow for more than one day. Put simply, Zillow has it completely backwards—if Zillow cared about real estate consumers, then why is Zillow choosing to block its users from listings that otherwise will be on the Zillow platform?

## VI.    RELEVANT MARKET AND ZILLOW'S MONOPOLY POWER

### A.    Relevant Market

88.    The relevant product market is the market for residential real estate online search services. Online display of listings through Zillow has become a crucial channel for the industry and home sellers and buyers.

89.    Today, most home buyers begin their home search by searching listings on the internet. And, as Zillow itself acknowledges, it is by far the leading platform for searching such listings online. Zillow touts its brand as having become synonymous with the online search for residential real estate in the U.S., proclaiming that its consumer reach and user base is unparalleled. Zillow attracts billions of views per year and hundreds of millions of unique site visitors per month. In other words, Zillow is competing for real estate consumers to use its platform to search real estate listings online. Indeed, when the FTC investigated Zillow's acquisition of Trulia, the FTC considered whether the merger would reduce competition for consumers "interested in researching home buying or selling."

90.    Zillow's documents and its public statements, as well as industry sources more generally, confirm that Zillow competes in the market for residential real estate online search services. For example, when looking at its competitive set, Zillow compares itself to other online real estate search sites like co-conspirator Redfin and Realtor.com. And when Zillow assessed the strength of its brand for investors in 2024, it compared how often it was trending online

compared to Realtor.com and co-conspirator Redfin specifically—two competing platforms with which it competes for residential real estate online search services. Zillow ultimately concluded that it had "unrivaled unaided brand awareness" when compared to those two competitors.[14]

91.    Zillow and Compass are competitors in the market for residential real estate online search services, as both companies operate digital platforms on which consumers search online to view real estate properties offered for sale across multiple brokerages. Compass's platform allows consumers to see all types of Compass listings, including Private Exclusives, Coming Soons, and fully active ones, as well as non-Compass listings. As shown below in Figures 9 and 10 (Zillow) and Figures 11 and 12 (Compass), Zillow and Compass have nearly identical functionality, features, and user interfaces on their platforms.

**Figure 9**



---

[14] Zillow Group, Inc., February 2024 Zillow Investor Presentation ("2024 Investor Presentation") at 9 (2024), https://s24.q4cdn.com/723050407/files/doc_presentations/2024/Mar/13/zillow-investor-presentation-feb-2024.pdf (last visited June 21, 2025).

**Figure 10**



**Figure 11**



**Figure 12**



92.     The relevant geographic market is the United States because the Zillow Ban applies nationwide and impacts competition throughout the United States. It thus affects Compass, and other brokerages, in every region in which they operate or plan to operate. Similarly, real estate consumers across the United States—wherever they reside or are considering moving—use the same online search services platforms when browsing residential real estate. And the vast majority all start with Zillow. Application of the Zillow Ban is thus unavoidable for both all U.S. real estate brokerages, home seller and buyer consumers, and any other users of the Zillow platform.

**B.     Monopoly Power**

93.     Zillow has monopoly power in the U.S. market for residential real estate online search services. Zillow is by far the most popular residential real estate home search platform in the United States. Zillow has the largest user base (around 227 million average monthly unique users as of May 2025), the largest amount of traffic to its website and mobile application (nearly 2.4 billion visits during the first quarter of 2025), and the most well-known brand name in the

market. Indeed, Zillow considers itself an eponym synonymous with real estate, highlighting that the term "Zillow" is searched "more than the term 'real estate.'"[15] Its brand and dominance has grown so strong that Zillow is now part of the vernacular and cultural landscape, with Saturday Night Live performing a skit about consumers' Zillow use.

94.    Zillow has trumpeted its dominant position to the public and investors. Zillow's reach is so vast that, by its own estimates, Zillow has 66% of the U.S. real estate audience share[16] and 64% of the average daily app users in the real estate category.[17] In addition, Zillow 's analysis shows that "80% of consumers come direct to Zillow."[18] Given these statistics, Zillow describes itself as having a "leading category traffic position" and "market-leading audience,"[19] referring to itself as the "preeminent category app" within the real estate search category.[20] According to Zillow, 70% of all transactors in the category use Zillow[21]—giving it a "well-positioned brand with industry-leading engagement," a "leading internet brand position," and a "leading online real estate audience."[22] Comparatively, Zillow claims it has "4x the daily active app users of nearest competitor."[23]

95.    Importantly, financial analysts following the market, and Zillow's stock specifically, have reached the same conclusion. Wells Fargo characterized Zillow as having a "deep moat" due to its "material lead in organic traffic" and its "network effects" earlier this year. Another firm, William Blair, explained that "[w]hichever way you look at it, Zillow has by

---

[15] Zillow Group, Inc., February 2025 Zillow Investor Presentation ("2025 Investor Presentation") at 3 (2025), https://s24.q4cdn.com/723050407/files/doc_earnings/2024/q4/presentation/Zillow-4Q24-Investor-Presentation.pdf (last visited June 21, 2025).
[16] *Id.* at 6, 8.
[17] *Id.* at 7.
[18] *Id.*
[19] *Id.* at 6.
[20] *Id.* at 7.
[21] 2024 Investor Presentation at 13.
[22] *Id.* at 3, 8.
[23] 2025 Investor Presentation at 3, 7.

far the leading traffic market share in the home search market." And co-conspirator eXp—one of the largest brokerage firms in the country—referenced Zillow's "massive consumer reach" when agreeing to back the Zillow Ban. Reflective of this power, Zillow has had gross margins greater than 75% over the past three years.

96.     Other facts beyond its sheer size also show Zillow's monopoly power, including Zillow's adoption of the Zillow Ban and its expectation that the market will fall in line with it. Zillow's C-suite executives alluded to Zillow's power during an in-person meeting with Compass attended by Zillow senior executives Lloyd D. Frink (Co-Executive Chairman, Co-founder, and President), Jeremy Wacksman (Chief Executive Officer), Errol Samuelson (Chief Industry Development Officer), Jun Choo (Chief Operating Officer), Jeremy Hofmann (Chief Financial Officer), and Brad Owens (General Counsel) on April 1, 2025. During the meeting, Mr. Wacksman and Mr. Hofmann warned Compass multiple times that Zillow "will not allow Compass to have listings that are not on Zillow." Mr. Reffkin informed the Zillow executives that other brokerages also have expanded the use of private listings that are not on Zillow, pointing to Douglas Elliman, Corcoran, and Sotheby's as having recently launched their own internal listings systems with listings that are not on Zillow. Mr. Hofmann repeated "we will not allow that to happen." Mr. Reffkin then said the largest private listing network is not Compass, it is the sixth largest MLS in the country, MRED (in the state of Illinois), which created its own private listing network. Mr. Reffkin pointed out that the majority of listings in the state of Illinois are starting off in MRED's private listing network and are therefore not syndicated to Zillow. Mr. Hoffman then reiterated "we will no longer allow that to happen." When Mr. Reffkin asked how Zillow planned to prevent home sellers from choosing to market off Zillow, Mr. Hoffman said that Zillow was "making the bet" that they could force home sellers to fall in line when they

are "forced to choose" between using Zillow or pre-marketing strategies like Compass's 3-Phased Marketing Strategy.

97.     But the Zillow executives also tried to dangle a carrot for Compass before resorting to the Zillow Ban stick, offering Compass proposed financial upside if it abandoned its 3-Phased Marketing Strategy by agreeing to stop or slow its pre-marketing strategies. Like other monopolists trying to preserve their dominance, Zillow had offered to essentially pay off Compass not to compete. Indeed, the meeting ended with Mr. Frink saying that "Compass would have to choose" whether it wanted to be "a partner of Zillow or not be a partner of Zillow" and Mr. Wacksman suggesting that Zillow and Compass schedule weekly follow-up meetings to strike a deal through which Compass would ensure its listings were routed to Zillow.

98.     Nine days later, with Compass having refused the payoff not to compete, Zillow made good on its threat and announced the Zillow Ban. In response, financial analysts at Jefferies echoed the same views as Zillow's senior executives. They plainly stated that alternative listing networks will be harmed by the Zillow Ban because "the vast majority of sellers should prefer to maximize demand through Zillow exposure."

99.     If Zillow did not have monopoly power, then it never would have adopted the Zillow Ban in the first place. Adopting the ban without such power would create massive problems for Zillow's business. Brokerages and agents would switch to other platforms, taking those listings elsewhere, which would harm Zillow's bottom line. Also, as listings went elsewhere, consumers (the leads Zillow sells) would follow, and agents paying for those leads would stop doing so. In other words, absent market power, the Zillow Ban would cause Zillow to lose both short-term profits and long-term profits. Zillow, instead, is willing to risk its short-term profits and terminate a pre-existing, profitable course of dealing with Compass and other

brokerages precisely because it knows the eventual outcome—consumers will not leave and Zillow will not lose. Zillow knows that it is too big for the Zillow Ban to fail. And the industry knows it, too; as Brian Boero, co-founder of 1000Watt Consulting, a leading real estate consulting services firm, and former president of the industry's leading trade publication Inman, explained earlier this month: "Zillow is the most powerful brand in the history of housing…[y]ou just can't imagine not having your home on Zillow as a home seller."

100.    Zillow is so comfortable with its size and power that it has adopted a policy that governs what other real estate companies can do *on platforms other than Zillow*—it effectively is leveraging its power to promulgate and enforce industry-wide rulemaking like a government regulator, despite being a private company that does not even provide brokerage services, represent home sellers and buyers, or create the listings on which it profits.

101.    In addition, there are substantial entry barriers protecting Zillow's power. Building a platform and then recruiting over 200 million average monthly unique users would take significant financial investment and many years. Furthermore, given that Zillow benefits from the substantial network effects of its size and brand advantage, entry alone would be insufficient to diminish or constrain Zillow's power. Moreover, the evidence shows that competitors are not eroding Zillow's dominant position. Indeed, Homes.com already has spent over one billion dollars trying to compete with Zillow and has barely moved the needle— certainly not enough to constrain Zillow's power, as evidenced, at a minimum, by Zillow's belief that it can dictate the Zillow Ban's self-serving terms to the industry at large. Financial analysts at Wells Fargo have reached the same conclusion, explaining that Homes.com's investment has not translated to "meaningfully higher organic traffic" given Zillow's "strong first-mover

advantage and network effects." Wall Street's conclusion was clear: Zillow has a "massive competitive advantage" and is likely to hold its dominance for "at least the next few years."

102.    Zillow's market share of monthly active users, which has not dipped below 60% in several years, bears this out.  In fact, Zillow's share of average daily active app users within the real estate search category experienced 4% year-over-year growth.[24] And in the first quarter of 2025, Zillow's numbers kept climbing, with average monthly unique users increasing by 5% and overall visits to its site by 2%.[25]

103.    Put simply, Zillow is the dominant residential real estate search platform, access to which is a must-have for home sellers and their agents and brokerages. Foregoing access to all the potential home buyers who use Zillow is not a viable option for Compass or other brokerages trying to compete and grow within the real estate industry. Like fishermen who go where the fish are swimming, home sellers need the option to list their properties on sites where the home buyers are searching—and an inordinate number of them are searching on Zillow.

## VII.    ANTICOMPETITIVE EFFECTS, HARM TO COMPETITION, AND ANTITRUST INJURY

104.    If not stopped, the conduct challenged in this Complaint will cause substantial and market-wide harm to Compass, similarly situated brokerages, home sellers and buyers across the United States, and competition in the relevant market and across the real estate industry more broadly.

105.    The conduct challenged here also will devastate one of Compass's fundamental competitive advantages—its differentiated approach to marketing home listings and expanding its search platform. This innovative model has been critical to Compass's recent branding efforts

---

[24] *Compare* 2024 Investor Presentation at 10, *with* 2025 Investor Presentation at 6.
[25] Zillow Group, Inc., Form 10-Q 2025 (May 7, 2025).

and success, allowing it to successfully recruit home sellers and agents, increase its listing volumes, enhance the quality of its online search offering, and continue building its brand into one of the most popular and recognizable in the real estate industry. The conduct will result in significant harm to Compass's ability to continue recruiting agents at the same pace, growing its brand, and increasing its competitive presence in the home search market. As discussed above, Compass has branded itself as an innovator that can help home sellers, home buyers, and their agents achieve more success through its innovation and differentiated approach. The Zillow Ban seeks to essentially force Compass to remove from its search engine those features that are unique and that give it a method of differentiating itself from Zillow, materially watering down its competitive offerings and brand in the process. And, if not stopped, the Zillow Ban and related policies will have precisely that impact. As more and more Compass home sellers and their agents have their listings removed from Zillow, they will be forced to abandon the Compass selling model. Agents and home seller clients using the Compass model—which provides price discovery information and other significant benefits—will have to switch course because, when presented with a binary choice between the strategy and access to Zillow, the vast majority of home sellers will seek to maximize exposure (Zillow) over insight (Compass), undermining Compass's home search efforts.

106.    Additionally, the conduct will harm Compass's 3-Phased Marketing Strategy specifically. Compass has already invested millions of dollars, thousands of hours, and significant resources in developing and rolling out the strategy. The Zillow Ban destroys Compass's ability to do the first two phases of the strategy, leaving only the homogenized vanilla marketing that every other agent and brokerage can do without investing anything in innovation. Commitment from investors and to the brand will be harmed as well, as investors have

consistently pointed to Compass's differentiated selling model and inventory-oriented strategies as a distinguishing and desirable feature of its company and home search platform.

107.    Importantly, innovation will suffer too, resulting in fewer options in the home search market and for the consumer. Innovation will be, and already has, been chilled, as brokerages will believe that any resources invested into listing innovations will be wasted based on the whims of Zillow and other industry players. In turn, home sellers and home buyers will lose access to innovation. They will lose their ability to choose how they market their homes and instead be stuck with the traditional model—a model that has not given home sellers and buyers the benefits they deserve. Without the 3-Phased Marketing Strategy, and Compass's home search platform which it powers, home sellers will also suffer from lower home price sales and longer sale times. Buyers will have a decreased ability to find their perfect home and also pay more for the home they do buy as Zillow will continue to redirect them away from the listing agent and to a buyer agent that charges an incremental commission. Because Zillow misleadingly connects prospective buyers with paying agents unaffiliated with the property, the prospective buyers may have to sign buyer representation agreements, agreeing to pay the agents for finding the properties even though the buyers found the property themselves. By contrast, a prospective buyer who finds a property on Compass.com, or another similar website other than Zillow, can contact the listing agent directly to see the house by themselves (or represent themselves without paying said buying agent). Or the prospective buyer can execute a dual-agency agreement in which the listing agent represents them (Compass or otherwise). In either case, the outcome likely will benefit the prospective buyer financially, as the buyer would not pay a buyer agent fee at all in the first scenario or on average pay a lower fee in the second scenario. They also will be working with an agent who knows the property. This benefit to home buyers and sellers—lower

fees paid for buyer agent services—is another benefit that will be lost if Compass and other brokerages cannot pre-market their properties on their own sites to compete head-to-head with Zillow.

108.    Compass already has begun to feel the negative effects. Zillow's announcement has created misinformation and rumors in the market, causing panic and disrupting agents' existing relationships with home sellers. Multiple Compass agents have had their home seller clients ask if their listing will be banned from Zillow. Home sellers with properties currently in the Coming Soon phase have expressed unease that their listing could be banned from Zillow and have told Compass that they would have to consider switching to an agent at another firm because that would be the only way to get the property unbanned and listed on Zillow. One Compass Regional Vice President reported that she was receiving multiple text messages a day, including from top producing agents, asking how the rule will impact the 3-Phased Marketing Strategy and if they or their listings will be banned from Zillow. Eleven of the twelve Compass Regional Vice Presidents have noticed dips in their region's 3-Phased Marketing Strategy adoption rates since the Zillow Ban was announced. Moreover, this customer confusion has put Compass in a defensive position when pitching or trying to retain home seller clients, as competing agents have been using the Zillow Ban to stoke fear about Compass's model. Rather than receive all the benefits of the strategy discussed in this Complaint, consumers are now between a rock and a hard place—with no clear knowledge and a wave of disinformation—and are being forced to turn down using the new model that many sought from Compass intentionally.

109.    Financial analysts have also noticed and are watching closely. After the Zillow Ban was promulgated, analysts described it as "disruptive to the Private Exclusives," explaining

that it "likely complicates the messaging to clients around the 3-Phased marketing approach." The analyst did not mince words, calling the Zillow Ban what it is: a "direct shot at [Compass] and its 3-tiered marketing strategy." Another firm had to clarify its initial recommendations on Compass's stock, needing "to make sure that is still the case" that Compass can execute its inventory strategy post-Zillow ban.

110.    Zillow recently has begun to prepare to enforce the Zillow Ban. It has sent "listing violation notifications" to agents and even started to call them and leave voicemails. As of today, Compass agents have received roughly 80 violations for publicly marketing listings that are not on Zillow. Similarly, Zillow recently threatened to take down a Compass Coming Soon listing after it was posted on Compass's website. The client was adamant that she wanted to make certain improvements to the house before listing it publicly on Zillow and the MLS and thereby subjecting the listing to days-on-market figures that could negatively impact the final sale price of the home. In collaboration with Compass, she thus listed the property as Coming Soon, hoping to build demand and gain price insights while improving the property. Moreover, the Coming Soon listing provided the chance that a buyer seeing the listing might approach the selling agent with an offer to buy the home as-is. Despite this preferred approach by the Compass client, Zillow sent a warning letter to the agent which in effect forced the agent to take the listing down. The harmful results were twofold. First, the seller was not able to build anticipation for her home or test the water in a limited buyer pool. Second, the prospective buyers who would have seen the Coming Soon listing and considered making an offer now cannot learn of it at all; they must wait until the fall, after the repairs are completed and the price is higher. This scenario helped no one—except Zillow.

# VIII.    CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
## (CONSPIRACY TO RESTRAIN TRADE
## IN VIOLATION OF SHERMAN ACT SECTION 1)

111.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

112.    As alleged above, beginning at least as early as April 2025, and continuing thereafter, Zillow and its co-conspirators entered into and engaged in a horizontal contract, combination or conspiracy in restraint of trade to jointly boycott Plaintiff Compass and other entities that would introduce competition in the market for residential real estate online search services in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Such contract, combination or conspiracy constitutes a naked, per se violation of the federal antitrust laws that lacks any countervailing procompetitive rationale.

113.    Several additional facts corroborate the conspiracy between Zillow, co-conspirator eXp, and co-conspirator Redfin. First, the residential real estate online search services market is highly concentrated, with Zillow controlling the majority of the market. Zillow, co-conspirator eXp, and co-conspirator Redfin collectively account for over 70% of the market, and the top four residential real estate online search services platforms together likely account for well over 80% of the market. Second, as discussed above, inter-firm communications have occurred. Co-conspirator eXp and Zillow clearly communicated in advance of their joint press release, and Zillow and co-conspirator Redfin communicated since earlier this year about both their strategic partnership and the Zillow Ban in advance of its promulgation. In addition, co-conspirator Redfin made specific outreach to Compass, another competitor in the market. Third, co-conspirator Redfin's outreach to Compass constituted an invitation for Compass to join

the conspiracy and follow Zillow's, co-conspirator eXp's, and co-conspirator Redfin's policies, further reflective of the existing conspiracy between Zillow, co-conspirator eXp, and co-conspirator Redfin. Fourth, Zillow, co-conspirator eXp, and co-conspirator Redfin have a shared incentive to act together that differs from their incentives if they were to act unilaterally. These platforms should be competing for as many listings as possible to increase the quality of their sites; only together—and only after confirming that each would not be exposed to the downside competitive risk of the others displaying the banned listings—did they have the protection to take down their shared threat. Last, co-conspirator Redfin had motive to capitulate to Zillow's demand, not wanting to lose the $100 million windfall from the Zillow-Redfin rental revenue share partnership it had received months earlier.

114.    As a direct and proximate result of Zillow and its co-conspirators' scheme and concrete acts undertaken in the furtherance thereof, there will be decreased competition in the market for residential real estate online search services. And this reduced competition will harm Compass, other brokerages with similar business models, and consumers and home sellers alike. For instance, Compass's ability to effectively compete and offer innovative home search services and brokerage services to consumers, along with every other similarly situated competitor, has been constrained by the anticompetitive combination, agreement, and conspiracy to boycott and foreclose equal access to Zillow's prominent residential real estate listing service and co-conspirator Redfin's as well. Compass will be injured in its businesses and property. Compass's injuries are directly attributable to Zillow's conduct, are of the type the antitrust laws were designed to prevent, and flow from that which makes Zillow's conduct unlawful.

115.    Alternatively, the conspiracy alleged here is unlawful under either quick look review or the rule of reason. As alleged above, the agreements between Zillow and its

competitors have clear anticompetitive effects—they restrict choice for real estate consumers, degrade and handicap innovation launched by Compass (or other brokerages), and reduce competition and raise barriers to entry in the online residential real estate search services market. Moreover, these agreements do not have, and in any event are not outweighed by, any procompetitive benefits. The status quo is working just fine for home buyers and home sellers in every state, and there are no procompetitive benefits that justify Zillow, with over 60% market share of the home search market, creating a national policy banning listings that are not given to Zillow in one day. The Zillow Ban was not created to protect real estate consumers; it was created to protect Zillow's monopoly, listing supply chain, and listing lead revenue model. Indeed, the Zillow Ban will be even worse for Zillow's users because it will reduce output on the Zillow platform, making listings invisible that otherwise would have been searchable and viewable absent the ban.

### SECOND CLAIM FOR RELIEF
### (UNLAWFUL RESTRAINT OF TRADE
### IN VIOLATION OF SHERMAN ACT SECTION 1)

116.    Plaintiff hereby incorporates each preceding and succeeding paragraphs as though fully set forth herein.

117.    In the alternative, the Zillow Ban is unlawful under the rule of reason as an anticompetitive vertical restraint between Zillow and its partners, such that Zillow has violated Section 1 of the Sherman Act, 15 U.S.C. § 1. As explained above, the Zillow Ban will be applied and enforced via agreement between Zillow, on the one hand, and all brokerages, on the other hand, that agree to follow the Zillow Ban. Such contracts and agreements are unlawful because they involve a party with market power in the relevant market and because, as alleged in detail above, they restrict choice for real estate consumers, degrade and handicap innovation launched

by Compass (or other brokerages), and reduce competition and output and raise barriers to entry. Moreover, these agreements do not have, and in any event are not outweighed by, any procompetitive benefits.

## THIRD CLAIM FOR RELIEF
### (UNLAWFUL MONOPOLY MAINTENANCE IN VIOLATION OF SHERMAN ACT SECTION 2)

118.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

119.    Zillow has willfully maintained and abused its monopoly power in the residential real estate online search services market by adopting the anticompetitive and exclusionary policy that is the Zillow Ban and thus violated Section 2 of the Sherman Act, 15 U.S.C. § 2. The Zillow Ban denies home sellers (and their real estate brokerages and agents) a choice in how to list their homes and denies competitors the ability to differentiate and compete to challenge Zillow's monopoly. Instead, the Zillow Ban forces home sellers to list their homes in the way Zillow demands and competing home search platforms to display those listings in the way Zillow demands, otherwise denying access to the Zillow platform and the massive consumer demand it brings.

120.    Zillow intends for the Zillow Ban to, and knows that it will, maintain its monopoly in the market for residential real estate online search services platforms. Faced with losing access to Zillow, brokerages, agents, and home sellers will panic and retreat from the innovative selling models they would prefer to follow. This means that listings, instead of being posted on new or different listing platforms (which then could recruit more viewers and grow in competition with Zillow), will continue to be siphoned to Zillow first and always. In other words, competing home search platforms—like Compass—cannot launch new, exclusive, or

differentiated listings that would help build their home search brand to compete. Collectively, this phenomenon maintains Zillow's monopoly by preventing real estate search services competitors from gaining new, differentiated listings and, in turn, scaling up their userbase and features. Rather, the industry inertia will remain exactly how it is today—with users defaulting to Zillow and Zillow maintaining a dominant userbase and monopoly over the market for residential real estate online search services.

121.    To protect and maintain its monopoly, Zillow is choosing to sacrifice short-term profits and terminate a profitable and pre-existing course of dealing with Compass, as well as all the other brokerages that currently list properties on Zillow after pre-marketing off Zillow but now will face listing bans under the Zillow Ban. The Zillow Ban thus represents textbook monopolistic conduct, through which Zillow is taking actions that otherwise would be to its detriment to enhance and maintain its monopoly power.

## IX.    DEMAND FOR RELIEF

Based on the foregoing, Plaintiff Compass seeks:

a)    A trial by jury;

b)    A declaration that Zillow's conduct violates the antitrust laws, pursuant to Sherman Act Sections 1 and 2 and Clayton Act Section 16;

c)    An injunction prohibiting Zillow from implementing and enforcing the Zillow Ban, implementing and enforcing similar policies, and engaging in the conspiracy and other conduct alleged herein;

d)    An award of Compass's actual, consequential, and compensatory damages, trebled, and/or other damages, in an amount to be determined at trial, plus pre- and post-judgment interest in accordance with law;

e)    An award of Compass's reasonable attorneys' fees, costs of suit injured herein,

and prejudgment interest; and

f)    Any other relief that the Court deems just and reasonable.

Dated:  June 23, 2025                          Respectfully submitted,

                                                _/s/ Luke Taeschler_
                                               Luke Taeschler (NY Bar No. 5308325)
                                               CROWELL & MORING LLP
                                               Two Manhattan West
                                               375 Ninth Avenue
                                               New York, NY 10001
                                               Telephone: (212) 223-4000
                                               ltaeschler@crowell.com

                                               Kenneth Dintzer (NY Bar No. 2476687) (*pro
                                               hac vice* forthcoming)
                                               CROWELL & MORING LLP
                                               1001 Pennsylvania Avenue, NW
                                               Washington, DC 20004
                                               Telephone: (202) 624-2500
                                               kdintzer@crowell.com

                                               Daniel A. Sasse (*pro hac vice* forthcoming)
                                               Chahira Solh (*pro hac vice* forthcoming*)*
                                               CROWELL & MORING LLP
                                               3 Park Plaza, 20th Floor
                                               Irvine, CA 92614
                                               Telephone: (949) 263-8400
                                               dsasse@crowell.com
                                               csolh@crowell.com

                                               *Attorneys for Plaintiff Compass, Inc.*