**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COMPASS, INC.,

       *Plaintiff,*

     *v.*

ZILLOW, INC., ZILLOW GROUP, INC., and
TRULIA, LLC,

       *Defendants.*

Case No. 1:25-cv-05201-JAV

ORAL ARGUMENT REQUESTED

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

I.    TRADITIONAL INSTITUTIONS HAVE SET PUBLIC MARKETING RULES FOR RESIDENTIAL LISTINGS ........................................................................................... 3

II.   ZILLOW'S BUSINESS AND DOMINANCE .................................................. 4

III.  COMPASS'S TECHNOLOGICAL INNOVATION AND 3PS ............................ 5

LEGAL STANDARD ..................................................................................................... 8

ARGUMENT .................................................................................................................. 8

I.    ABSENT AN INJUNCTION, COMPASS, COMPETITION, AND CONSUMERS WILL SUFFER IRREPARABLE HARM ........................................................................... 8

    A.    The Zillow Ban Will Irreparably Harm Compass. ......................................... 9

    B.    The Zillow Ban Will Irreparably Harm Competition and Consumers. ........................ 12

       i.    *Pre-marketing is associated with better, more accurate sales prices.* ........................ 13

       ii.   *Pre-marketing can get houses to market faster and save costs for home sellers and buyers.* ................................................................................................................ 15

       iii.  *Pre-marketing gives home sellers a higher-privacy option.* ...................................... 15

II.   COMPASS IS MORE LIKELY THAN NOT TO SUCCEED ON ITS ANTITRUST CLAIMS ........................................................................................................................ 16

    A.    A Jury Will More Likely Than Not Find that Zillow Violated Section 1 of the Sherman Act By Leading an Unlawful Conspiracy. ...................................................... 16

       i.    *Zillow, with Redfin and eXp, engaged in a per se unlawful group boycott.* ................ 16

       ii.   *The Zillow agreements are also unlawful under a rule of reason or a quick look analysis.* ........................................................................................................................ 22

    B.    Compass is Likely to Succeed on Its Section 2 Claim. ................................... 22

       i.    *Compass is likely to prove a home search market.* ...................................... 22

       ii.   *Zillow has monopoly power in the home search market.* ............................... 24

       iii.  *The Zillow Ban Constitutes Unlawful Exclusionary Conduct.* ................................ 27

III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR THE INJUNCTION ........................................................................................................ 28

CONCLUSION .............................................................................................................. 29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010)...............................................................................16

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
  No. 21-cv-00351, 2023 WL 6006525 (S.D.N.Y. July 31, 2023)............................................20

*Brenntag Int'l Chems., Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999).....................................................................8

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)...........................................................................22, 23

*Cantor v. Multiple Listing Serv. of Dutchess Cnty., Inc.*,
  568 F. Supp. 424 (S.D.N.Y. 1983) ..................................................................11, 22

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)...........................................................................22

*Fed. Trade Comm'n v. Amazon, Inc.*,
  No. 23-cv-01495, 2024 WL 4448815 (W.D. Wash. Sept. 30, 2024) ....................................27

*Fed. Trade Comm'n v. Facebook, Inc.*,
  581 F. Supp. 3d 34, 46–47 (D.D.C. 2022) ..................................................................24

*Fed. Trade Comm'n v. Indiana Fed. of Dentists*,
  476 U.S. 447, 459 (1986) ....................................................................12

*Fed. Trade Comm'n v. IQVIA Holdings Inc.*,
  710 F. Supp. 3d 329 (S.D.N.Y. Jan. 8, 2024) ........................................................29

*Fed. Trade Comm'n v. Meta Platforms, Inc.*, No. 20-cv-3590, 2024 WL 4772423
  (D.D.C. Nov. 13, 2024) ......................................................................24

*Fed. Trade Comm'n v. Superior Ct. Trial Laws. Ass'n,*
  493 U.S. 411, 422 (1990) ....................................................................17

*Fed. Trade Comm'n v. Tapestry, Inc.*,
  755 F. Supp. 3d 386 (S.D.N.Y. 2024).............................................................23, 26

*fuboTV Inc. v. Walt Disney Co.*,
  745 F. Supp. 3d 109 (S.D.N.Y. 2024)...........................................................8, 16, 29

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,
   922 F. Supp. 2d 435 (S.D.N.Y. 2013)..............................................................28

*In re Google Digital Advertising Antitrust Litigation*,
   No. 23-cv-1530, 2024 WL 988966 (S.D.N.Y. Mar. 7, 2024)..............................25

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007)..............................................................................9

*Grunman Corp v. LTV Corp.*,
   527 F. Supp. 86 (E.D.N.Y. 1981) ..................................................................29

*Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*,
   476 F.2d 687 (2d Cir. 1973).............................................................................29

*Hayden Publishing Co., Inc. v. Cox Broadcasting Corp.*,
   730 F.2d 64 (2d Cir. 1984)..............................................................................25

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019)............................................................17

*Linseman v. World Hockey Ass'n*,
   439 F. Supp. 1315 (D. Conn. 1977)...............................................................22

*Lorain Journal Co. v. United States*
   342 U.S. 143 (1952)..........................................................................................27

*Mullins v. City of New York*,
   626 F.3d 47 (2d Cir. 2010).................................................................................9

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
   883 F.3d 32, 42 (2d Cir. 2018)........................................................................12

*N. Carolina State Bd. of Dental Examiners v. FTC*,
   717 F.3d 359 (4th Cir. 2013) ..........................................................................22

*New York by James v. Rescue*,
   705 F. Supp. 3d 104 (S.D.N.Y. 2023).............................................................16

*Norbrook Lab'ys Ltd v. G.C. Hanford Mfg. Co.*,
   126 F. App'x 507 (2d Cir. 2005) .................................................................9, 10

*PharmacyChecker.com, LLC v. Nat'l. Ass'n of Boards of Pharmacy*,
   530 F. Supp. 3d 301 (S.D.N.Y. 2021).............................................................21

*PLS.COM, Ltd. Liab. Co. v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) .....................................................................17, 21

*Primetime 24 Joint Venture v. National Broadcasting Co. Inc.*,
    219 F.3d 92 (2d Cir. 2000)........................................................................................18

*Realcomp II, Ltd. v. FTC*,
    635 F.3d 815 (6th Cir. 2011) ...................................................................................22

*Regeneron Pharms., Inc. v. HHS*,
    510 F. Supp. 3d 29 (S.D.N.Y. 2020).........................................................................9

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004)................................................................................9, 11

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).........................................................................................8

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)................................................................................8, 12

*Silver v. N.Y. Stock Exch.*,
    373 U.S. 341 (1963)................................................................................................18

*Starr v. Sony BMG Music Entertainment*,
    592 F.3d 314 (2d Cir. 2010)....................................................................................20

*State of New York v. Trump*,
    767 F. Supp. 3d 44 (S.D.N.Y. 2025)........................................................................13

*Team Rubicon Global, Ltd. v. Team Rubicon, Inc.*,
    828 Fed. Appx. 74 (2d Cir. 2020).............................................................................9

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999)..................................................................................9, 11

*U.S. v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)..................................................................................27

*United States v. Google LLC*,
    No. 23-cv-108, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ................................27

*United States v. H & R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ..........................................................................23

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001)......................................................................23

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2nd Cir. 2003)..................................................................................12

*US Airways Inc. v. Sabre Holdings Corp.*,
   No. 11-cv-2725, 202 ................................................................................................25, 26

*WatchItTechs., Inc. v. Big Apple Consulting USA, Inc.*,
   No. 08-cv-51, 2008 WL 1902113 (W.D.N.C. Apr. 25, 2008) ..................................................11

**Statutes**

Clayton Act Section 16 ................................................................................................8

Sherman Act Section 1 ................................................................................16, 17, 18, 19, 22

Sherman Act Section 2 ................................................................................16, 22, 27, 28

## INTRODUCTION

Zillow[1] owns the dominant home search platform in the United States. Compass, Inc. ("Compass") seeks to dent this dominance through an innovative selling approach and cutting-edge technological tools. Zillow has taken notice. But instead of meeting this competitive threat with a better product or increased investments, Zillow and its market rivals have conspired to strangle Compass's market innovations. At a trial on the merits, Compass will demonstrate the breadth of Zillow's misconduct; until then, Compass asks the Court to preliminarily enjoin Zillow's anticompetitive conduct and protect the status quo that has allowed these innovations to flourish.

Under the traditional method for selling a home in the United States, home sellers and their agents post information about their homes (known as "listings") on a local multiple listing services database (an "MLS") that is available to other agents, who may then show the house to potential buyers. Zillow has wedged itself in as a middleman for this process—it takes listings from the MLSs, then displays them on its search platform, amending and modifying the listings without the home sellers' approval or consent. For years, Zillow's search platform has been the first place that home buyers look when searching for a new home. Zillow profits by selling the prospective buyers' contact information to real estate agents.

Zillow thus has an enormous interest in ensuring that all houses for sale appear in Zillow's search platform as quickly as possible. But Zillow has no relationship with home sellers, and no obligation to act in their best interest. Still, due to Zillow's market dominance in home search, sellers see the platform as a "must-have" option for marketing their most valuable investment.

---

[1] Defendants are collectively referred to as "Zillow."

Compass, a technology-powered real estate brokerage, has threatened Zillow's market dominance by giving home sellers a different choice in how to market their properties. In November 2024, Compass launched the 3-Phased Marketing Strategy ("3PS"), based on "pre-marketing" efforts to sell a home before it is listed on Zillow and the MLSs for broad distribution. Under the new 3PS, home sellers "pre-market"[2] their home within Compass and its agent network, and then exclusively on Compass's public-facing home search platform, Compass.com. 3PS allows home sellers—before widely marketing the property—to generate interest, test prices, and have time to improve or stage the home. And 3PS allows Compass to provide a search alternative to Zillow, with unique, pre-marketed listings.

Home sellers have rapidly adopted 3PS. By early 2025, Compass sellers chose to employ 3PS on almost half of all new Compass listings. As Compass's 3PS accelerated, and as several other national brokerages and their agents began adopting similar strategies, Zillow reacted. Zillow would not get, and could not monetize, page views on rival home search platforms from buyers looking for pre-marketed homes.

Zillow thus orchestrated a conspiracy to block pre-marketing. First, Zillow developed new rules, banning from Zillow all listings that are pre-marketed (the "Zillow Ban"). These rules are, as Zillow admits, designed to force brokerages and home sellers to alter or end their pre-marketing strategies. Second, Zillow reached out to at least two search competitors—eXp and Redfin—and asked them to adopt the rules. Both agreed. On April 10, 2025, the same day Zillow announced the Zillow Ban, eXp issued a joint press release with Zillow referencing "our new agreement with Zillow" and the "partnership" between the companies related to the ban. Just a few hours later,

---

[2] "Pre-marketing" refers to any type of marketing of a listing done outside of the MLSs and aggregators like Zillow.

Redfin's CEO informed Compass's CEO that Redfin had agreed to adopt virtually the same policy as the Zillow Ban. During that call, Redfin's CEO acknowledged that the Zillow Ban would harm Compass, but pushed Compass to negotiate with Zillow, implying that Zillow and Redfin could find a way to negate that harm if Compass did not fight the new rules. Compass refused.

Zillow's anticompetitive scheme is already creating irreparable harm: Compass is losing its competitive advantage, losing agents and their home seller clients, and facing ongoing damage to its business reputation. But the ban's impact is much broader: competition and consumers are being irreparably harmed as well. Innovation is being chilled, and consumers are being forced to give up their ability to choose how they sell and buy homes. Compass thus asks the Court to protect the market from these irreparable harms by granting Compass—and the market as a whole—a preliminary injunction maintaining the status quo and preventing Zillow from enforcing the Zillow Ban until this case can be heard fully.

A preliminary injunction is further warranted because (1) Compass is more likely than not to show that Zillow violated the antitrust laws both by entering into an illegal conspiracy with eXp and Redfin and by abusing its monopoly power; (2) the balance of harms tip decidedly against Zillow as it leverages its power to rewrite the rules of the real estate industry, particularly since the requested injunction simply maintains the status quo as of the date of the complaint; and (3) the injunction would be in the public interest, protecting competition and consumers from irreparable harm.

## **BACKGROUND**

### I.    **TRADITIONAL INSTITUTIONS HAVE SET PUBLIC MARKETING RULES FOR RESIDENTIAL LISTINGS**

The National Association of Realtors ("NAR") and its local affiliates regulate much of how the residential real estate market works. Declaration of E. Ashton Alexander ("Alexander Decl."),

3

¶¶ 5-6. They do so by controlling MLSs—local databases of homes for sale. *Id.* Only registered real estate professionals can search MLSs for listings, and certain registered real estate companies can syndicate MLS listings for use on other websites and platforms. *Id.*

In 2020, NAR and the MLSs adopted a rule called Clear Cooperation Policy ("CCP") that governed home sellers' ability to pre-market their home. CCP required that within one business day of publicly marketing a property (*e.g.,* putting up a lawn sign, a social media posting, or showing the listing on a brokerage's website), agents send the listing to the local MLS. Declaration of Chahira Solh ("Solh Decl."), Ex. A. CCP, however, contains exemptions for certain types of pre-marketing strategies such as "office exclusives," which are listings marketed only within the home sellers' agent's firm or via one-to-one conversations to buyers' agents outside of the firm with interested clients. *Id.*

## II.    ZILLOW'S BUSINESS AND DOMINANCE

Zillow has the dominant platform in the market for residential real estate online search services ("home search"). According to Zillow, it has 66% of the real estate audience share and "80% of consumers come direct to Zillow." Solh Decl., Ex. B and Ex. C. Financial analysts have called Zillow the "clear leader" in the market and have stated that "Zillow's traffic share appears larger than that of its next three competitors combined." Solh Decl., Ex. D.

Zillow's business is essentially to act as a middleman—it takes listings it did nothing to develop from hundreds of MLSs nationwide, then aggregates and publishes them on its website. Zillow monetizes these listings primarily by routing potential buyers through webpage buttons to agents who pay Zillow for leads to interested buyers. Alexander Decl., ¶ 8. Zillow also layers onto each listing potentially misleading information, such as Zillow's estimated market price (the "Zestimate"), climate scores, and other negative "insights." *Id.,* ¶ 7. These features may delay the sale, mislead buyers as to the property's actual value, and inject unnecessary middlemen by

4

diverting buyers away from directly contacting the listing agent, which causes buyers to pay additional commissions they might not have otherwise had to pay. *See id.,* ¶¶ 7-8.

III.    **COMPASS'S TECHNOLOGICAL INNOVATION AND 3PS**

Compass has differentiated itself from other brokerages through its development and investments in technological tools to assist home sellers and their agents. Declaration of Will Hardy ("Hardy Decl."), ¶ 6. These tools include Compass.com, Compass's public-facing home search platform; Compass One, Compass's client-facing transaction management platform; and Compass Collections, Compass's platform for property listing curation. *Id.,* ¶¶ 8-9. In 2024, Compass launched across the entire brokerage its 3PS. *Id.,* ¶¶ 13, 15. This approach provides (1) home sellers with a choice of how to market their home and (2) agents with the options, knowledge, and tools to differentiate themselves from other real estate agents. For a typical listing, the strategy involves:

1.    Phase 1, Private Exclusives: Targeted marketing of a property as an office exclusive to test price points and get buyer feedback;

2.    Phase 2, Coming Soons: Publicly listing a property on Compass.com to increase exposure while retaining control of how the property will be presented; and

3.    Phase 3, Public Websites: Listing the property as active on an MLS, which makes it immediately available on Zillow and other aggregators, which then present the property as they see fit. *Id.,* ¶ 14.

This phased approach means a property can be launched multiple times in different formats, building excitement and demand like a movie trailer.

Home sellers and Compass agents have achieved remarkable success with 3PS across the country, both in terms of adoption and deployment and in positive results for home sales. By the first quarter of 2025, almost half of the home sellers working with a Compass agent chose to start

marketing their home by using 3PS. *Id.*, ¶ 25. Other brokerages such as Sotheby's International Real Estate, Corcoran, and Douglas Elliman have followed Compass's approach—ramping up internal marketing of properties before releasing the listings to Zillow and other aggregators— creating meaningful options for home sellers on how they market their homes. Declaration of Robert Reffkin ("Reffkin Decl."), ¶ 20. Zillow's own research has confirmed the popularity of these strategies, finding that "31% [of Americans] say they would prefer to have [their home] listed on a private listing network." Solh Decl., Ex. S.

## IV.    THE ZILLOW BAN

Compass's 3PS and similar strategies jeopardize Zillow's dominant search position and its profits. As home search platforms such as Compass.com grow, buyers will shift toward Compass and its digital services, diverting search traffic from Zillow—and reducing Zillow's monetization opportunities.

To stem the tide toward more home seller control of their listings, on September 6, 2024, Zillow formally petitioned NAR to ban all forms of pre-marketing, including office exclusives. Solh Decl., Ex. E. Leaving no doubt which rival Zillow sought to block, Zillow's NAR petition referenced Compass five times and criticized the CCP's "office exclusives" exemption for creating a "loophole" that "brokerages (such as Compass and others) have exploited." *Id.* NAR rejected Zillow's demands and on March 25, 2025 instead released a rule change that loosened the CCP's pre-marketing rules. Solh Decl., Ex. F.

Having failed to get NAR's support, on April 10, 2025, Zillow announced its Listing Access Standards (the "Zillow Ban"), which are significantly more restrictive for home sellers than the CCP: in addition to requiring that any listing that is "publicly marketed" be shared within one business day to Zillow via the local MLS (even where not required by the MLS), it also blocks

one-to-one marketing between agents of differing brokerages for listings not yet on the MLS; prohibits brokerages from publicly advertising the mere existence of office exclusives; and prohibits Coming Soon listings anywhere for more than one business day, even if the MLS allows for longer Coming Soon listings. Solh Decl., Exs. G and H.

Zillow did not announce the Zillow Ban in isolation. Zillow was joined by eXp, one of Zillow's home search rivals and the country's largest residential brokerage by transaction volume. In their joint announcement, eXp expressly committed to follow the ban, referencing its "new agreement" and "partnership" with Zillow. Solh Decl., ¶ I. It was also joined by Redfin, the third largest home search platform, which also competes with Zillow, Compass, and eXp. Forty-one minutes after the joint Zillow/eXp announcement, Redfin's CEO, Glenn Kelman, contacted Compass's CEO, Robert Reffkin, asking for an immediate call. Reffkin Decl., ¶ 13. Mr. Kelman and Mr. Reffkin spoke that evening, seven hours after the announcement. *Id.*, ¶ 14. Mr. Kelman said that Redfin had agreed to follow Zillow's lead and would publicly announce as much. Reffkin Decl., ¶ 15. Mr. Kelman asked Mr. Reffkin whether he had spoken with the CEO of Zillow before the Zillow Ban announcement and implied that Mr. Kellman had spoken to Zillow before the announcement. *Id.* Mr. Kelman then pushed Mr. Reffkin to listen to Zillow, saying it is "not good when Zillow and Compass are warring" and suggesting that Zillow or Redfin would reward Compass with pre-marketing options. *Id.* Mr. Kelman also suggested that Zillow would help Compass financially if Compass were to follow the policies. *Id.* The next day, Zillow also offered to work with Compass on a potential partnership relating to the Zillow Ban. Alexander Decl., ¶ 12. Two business days after the call between Mr. Kelman and Mr. Reffkin, Redfin publicly announced its version of the Zillow Ban. Solh Decl., Ex. J.

Since Zillow's announcement, Compass has engaged with Zillow to modify its policy to allow for continued competition, but Zillow has refused. Alexander Decl., ¶ 16. On May 28, 2025, Zillow began issuing warnings to agents for violations. *Id.*, ¶ 15. Zillow plans to begin enforcing the ban on June 30, 2025, with a rollout starting in particular regions. Solh Decl., Ex. H.

## LEGAL STANDARD

Section 16 of the Clayton Act entitles a party to obtain injunctive relief 'against threatened loss or damage by a violation of the antitrust laws. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). A preliminary injunction should be granted if the moving party can show: (1) irreparable harm; (2) a likelihood of success on the merits; (3) the balance of hardships weighs in favor of the injunction; and (4) the injunction is in the public interest. *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 133 (S.D.N.Y. 2024). Compass has met each of these factors.

## ARGUMENT

## I.  ABSENT AN INJUNCTION, COMPASS, COMPETITION, AND CONSUMERS WILL SUFFER IRREPARABLE HARM

Enforcement of the Zillow Ban—by Zillow alone or in conjunction with co-conspirators eXp and Redfin—will irreparably harm Compass, competition, and consumers in the home search market.

Irreparable injury exists where, without preliminary relief, "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *BrenntagInt'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). "Harm might be [irreparable] for many reasons, including that a loss is difficult to replace or difficult to measure." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010). A party need only show that there is a "threat of irreparable harm, not that irreparable harm [has] already occurred."

*Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010). If the Zillow Ban is allowed to go forward, the current market structure will be upended, causing numerous irreparable harms, including: (1) destruction of Compass's competitive advantage and reputation; (2) undermining of innovation and competition in the home search market by blocking pre-marketing models; and (3) harm to consumers who would benefit from competition in the home search market.

### A. The Zillow Ban Will Irreparably Harm Compass.

The Zillow Ban will irreparably harm Compass and other search competitors that attempt to pre-market listings outside of Zillow's platform. A variety of impacts may qualify as irreparable harm, particularly "where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). These harms include:

(1) Loss of the competitive "advantage of being a pioneer in [a] field." *Norbrook Lab'ys Ltd v. G.C. Hanford Mfg. Co.*, 126 F. App'x 507, 509 (2d Cir. 2005) (citation omitted).

(2) Loss of control over business reputation and "goodwill." *See Register.com*, 356 F.3d at 404.

(3) Customer confusion or fear leading to lost business opportunities or lost business relationships. *See Team Rubicon Global, Ltd. v. Team Rubicon, Inc.*, 828 Fed. Appx. 74, 75 (2d Cir. 2020).

(4) Loss "of a relationship with a client that would produce an indeterminate amount of business," *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999), particularly in situations where "customers are unlikely to return." *Regeneron Pharms., Inc. v. HHS*, 510 F. Supp. 3d 29, 40 (S.D.N.Y. 2020).

(5) Loss of current or future market share. *Grand River Enters. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007).

9

If the Zillow Ban is not enjoined, Compass will suffer each of these harms: it will lose its major competitive advantage, suffer serious harm to its reputation, and lose future business opportunities and clients.

**Competitive advantage.** The Zillow Ban irreparably harms Compass by stripping away its hard-fought competitive advantage earned by pioneering and investing heavily in its 3PS. *See Norbrook Lab'ys*, 126 F. App'x at 509 (recognizing that the "loss of the advantage of being the pioneer in the field and the market leader" may constitute irreparable harm). Compass spent millions of dollars and other resources building and rolling out its 3PS: the effort required hundreds of hours from Compass's product and engineering teams who have built technology to support 3PS, significant investment of time by executives, development of training modules and presentations for agents, and designing of marketing materials for home sellers. Hardy Decl., ¶¶ 10, 16. Compass's CEO has personally spent much of his recent time on 3PS, Reffkin Decl., ¶ 5, and it has been a focus of investors and investor-education efforts. Declaration of Soham Bhonsle ("Bhonsle Decl."), ¶ 6. In short, Compass has staked its future on 3PS. In turn, 3PS has become Compass's signature competitive advantage, with some home sellers expressing that they decided to work with a Compass agent specifically because of the pre-marketing options. Declaration of Kristy Hairston ("Hairston Decl."), ¶ 10. While other brokerages are now trying to promote similar strategies and programs, Reffkin Decl., ¶ 20, Compass has created a clear competitive advantage resonating with home sellers and their agents.

Zillow adopted the ban specifically to destroy this competitive advantage. Indeed, Zillow only pursued the ban after NAR refused to block Compass's efforts. Zillow knows that home sellers view Zillow as a must-have option and that the mere threat of having their listings banned will cause home sellers to not only stop using 3PS but also stop working with Compass agents. And Zillow's

10

efforts are working: while adoption of 3PS was steadily increasing before the Zillow Ban, adoption has dropped more than 23% since then. Alexander Decl., ¶ 15.

**Lost reputation, business opportunities, and clients.** Compass is *already* losing reputation, business opportunities, agents, and home sellers because of the Zillow Ban. *See Register.com*, 356 F.3d at 404; *see also Ticor*, 173 F.3d at 68-69 (finding irreparable harm where "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come"). Home sellers have already contacted Compass to pull their listings because of fears over the Zillow Ban. Reffkin Decl., ¶ 19; Hairston Decl., ¶ 14. Agents have been inundating Compass leadership with messages expressing concern about the Zillow Ban, with some reporting that they have lost listings because of it. Hairston Decl., ¶¶ 14-15. Relationships between agents and their home sellers, and between brokerages and their agents, rely on years of trust-building, Reffkin Decl., ¶ 17, and the Zillow Ban threatens to set Compass and its agents back years on those relationships. These lost relationships and lost opportunities are incalculable and immeasurable.

Additionally, at least one Compass region lost its top performing team because of fears regarding the Zillow Ban. Reffkin Decl., ¶ 19. Investors, too, have become confused and concerned about the impact of the Zillow Ban on Compass's business. Bhonsle Decl., ¶ 8; *WatchItTechs., Inc. v. Big Apple Consulting USA, Inc.*, No. 08-cv-51, 2008 WL 1902113, at *4 (W.D.N.C. Apr. 25, 2008) (finding that investor confusion and fear could constitute an irreparable harm).

Compass thus is faced with the impossible choice of stopping 3PS, thereby losing its competitive advantage, or losing clients and business opportunities. This is exactly how a monopolist—and its allies—strangle competition. *Cantor v. Multiple Listing Serv. of Dutchess Cnty., Inc.*, 568 F. Supp. 424, 430–31 (S.D.N.Y. 1983) (finding a trade rule anticompetitive that

"vitiated any competitive advantage which plaintiffs endeavored to obtain" and "was designed to have precisely that effect"). Thus, the Court should conclude that the Zillow Ban has caused (and will cause) Compass to suffer irreparable harm.

### B.    The Zillow Ban Will Irreparably Harm Competition and Consumers.

The Zillow Ban's harm will extend far beyond Compass. Harm to competition and consumers is an additional, independent basis for irreparable harm in antitrust cases. *See Actavis*, 787 F.3d at 661 (stating that conduct that threatens to reduce competition or threatens "economic harm to . . . consumers" constitute irreparable harm.).

Here, the Zillow Ban—enforced by several of the industry's dominant players—will irreparably harm both competition generally and individual consumers by killing innovation and differentiation, eliminating consumer choice, and erasing the benefits consumers might get through their choice. *See Fed. Trade Comm'n v. Indiana Fed. of Dentists*, 476 U.S. 447, 459 (1986) (recognizing that "an agreement limiting consumer choice" harmed competition); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2nd Cir. 2003) (affirming "that competition has been harmed" where "product innovation and output ha[d] been stunted by the challenged policies" and affirming the "finding that the exclusion of [competitors] from the ability to market their cards and programs . . . has harmed competition in the market"); *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018) (harm to competition can include "reduced output or market quality . . . or reduced consumer choice"). Competition will be irreparably harmed because the immediate effect of the Zillow Ban will be loss of product differentiation in home search; as noted above, home sellers are being forced to choose between Zillow and unique strategies by rival home search platforms and feel they must choose Zillow because of Zillow's dominance. This means those unique strategies will have to be halted. The Zillow Ban will also have long-term consequences, chilling investment in innovations out of concerns they may be banned by Zillow

and its allies. Indeed, other brokerages that created their own versions of 3PS are now also jeopardized by the Zillow Ban. For these reasons, as well as those explained below, the Zillow Ban harms competition. *See also infra* §§ II.A, II.B.iii.

Consumers in turn will be irreparably harmed by the loss of competition through loss of choice and control. This loss harms consumers monetarily, by causing slower and costlier home sales, and personally, by taking away their ability to preserve privacy and security. *See State of New York v. Trump*, 767 F. Supp. 3d 44, 77 (S.D.N.Y. 2025) (stating that future risks of disclosure of information that is reasonably expected to be private can amount to an irreparable harm).

### i.    *Pre-marketing is associated with better, more accurate sales prices.*

Home sales and purchases are rare and valuable milestones for home sellers and buyers. For most, their home is their most valuable asset. This means for a home seller, losing out on the best sales price, delaying a sale, or losing out on a sale altogether, can cause an incalculable and compounding harm on any home seller. Similarly, for home buyers, buying a home is a rare and huge milestone, and finding the right house for the right price at the right time is therefore a rare and important opportunity. Pricing accuracy, speed and timing, and efficiency of transaction on both sides is therefore paramount. The feedback and marketing benefits that home sellers receive from pre-marketing are invaluable for these purposes: homes that use 3PS before ultimately selling on an MLS are associated with better pricing ability and sell in 21% fewer days. Hardy Decl., ¶ 19. Similarly, buyers receive the opportunity to see homes listed with more accurate pricing, see homes earlier, and submit more accurate offers with higher chances of winning. *Id.*, ¶ 20. The Zillow Ban would block these benefits.

In addition to blocking the benefits of pre-marketing, the Zillow Ban also actively causes irreparable harm by forcing home sellers who do not wish to immediately market on Zillow to do

so, where they are then undermined by Zillow's inaccurate and biased information. For example, Zillow's listings appear with an algorithmic estimate of the property's value (a "Zestimate").



Solh Decl., Ex. K.

Buried deep in its website, Zillow acknowledges that these "Zestimates" can often have an error rate of 10% or even 20% off the final sales price and are likely even more inaccurate when compared to appraisal values—a key metric for mortgage qualification. Solh Decl. Ex. L. For example, in Delaware, Zillow admits that 5% of all Zestimates are **more than** 20% off, and similarly, more than 2% of listings in Philadelphia face a Zestimate more than 20% off. *Id.* These admittedly erroneous Zestimates can wreak havoc with a home seller's efforts to secure a fair price.

In short, home sellers get unfairly stuck with an inaccurate market estimate. This not only harms home sellers, but also misleads home buyers, who rely on admittedly (by Zillow) unreliable property value estimates. This inaccurate information can lead to failed offers.

        *ii.*        ***Pre-marketing can get houses to market faster and save costs for home sellers and buyers.***

For homeowners who fear their homes are not fully ready for sale or have other unique timing issues—and there are many—pre-marketing provides enormous advantages. Home sellers and their agents can build up buzz and interest in their property while having time for upgrades. Conversely, if a buyer is willing to take a house as-is, pre-marketing gives these buyers a chance to bid on properties before investments are made on repairs. For example, if a house is pre-marketed while the home seller prepares to upgrade the kitchen, a buyer may bid on the house as-is, regardless of the state of the kitchen, so they can renovate on their own terms. But the Zillow Ban blocks these options and robs every home seller and buyer of the choice over how they want to structure the sale.

        *iii.*        ***Pre-marketing gives home sellers a higher-privacy option.***

Finally, 3PS gives additional flexibility and protection to home sellers who value their privacy and security. Under 3PS, a home seller can choose how long to stay in a particular pre-marketing phase rather than going straight to broad public marketing on Zillow. This may be important for high-profile individuals, as well as those facing divorce, moving confidentiality for work, and experiencing countless other scenarios. The Zillow Ban removes these benefits and instead forces owners into an impossible choice: immediately give up their privacy and security by listing on Zillow or surrender the ability to do broader marketing on Zillow in the future.

All these harms to consumers are irreparable and imminent—indeed, home sellers and buyers are being harmed *right now*, particularly during the busy summer selling season, and cannot be compensated for these incalculable harms via monetary damages.  In short, the Zillow Ban chills innovators from investing in new strategies because they fear repercussions from Zillow and its co-conspirators, reduces choice, prevents home sellers from marketing and selling *their* home the way *they* want to, prevents buyers from getting accurate information that can help them with their

purchase, and takes away home sellers' options to protect privacy and security. This is, of course, why Zillow and its co-conspirators adopted the ban—so that home sellers and buyers have no choice but to list on Zillow and their platforms. Competition and consumers have therefore been irreparably harmed.

## II.    COMPASS IS MORE LIKELY THAN NOT TO SUCCEED ON ITS ANTITRUST CLAIMS

Preliminary injunctive relief is further appropriate here because Compass is "more likely than not" to prevail on at least one of its claims. *fuboTV*, 745 F. Supp. 3d at 133. To establish a likelihood of success, Compass need only demonstrate that a "reasonable . . . jury is more likely than not to rule for [it] following a trial on the merits." *Id.* (citation omitted). Although Compass is likely to prevail on both of its antitrust claims, "[t]o obtain a preliminary injunction, [it] need only demonstrate likelihood of success on *one claim* against each defendant." *New York by James v. Rescue*, 705 F. Supp. 3d 104, 133 n. 27 (S.D.N.Y. 2023) (citation omitted) (emphasis added). Compass is more likely than not to show (1) that Zillow violated Section 1 by leading an unlawful conspiracy; and (2) that Zillow violated Section 2 by abusing its monopoly power in home search.

### A.    A Jury Will More Likely Than Not Find that Zillow Violated Section 1 of the Sherman Act By Leading an Unlawful Conspiracy.

#### i.    Zillow, with Redfin and eXp, engaged in a per se unlawful group boycott.

A jury likely would conclude that Zillow entered into a *per se* unlawful group boycott by agreeing with eXp and Redfin that each would follow or adopt the Zillow Ban.

Section 1 of the Sherman Act prohibits agreements—"concerted action" by "separate economic actors"—that "unreasonably[] restrain trade." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186, 195–96 (2010). Because certain types of agreements are so pernicious, the antitrust laws treat these agreements as *per se* unlawful—unlawful on their face once existence is proven. Group

16

boycotts, agreements through which competitors (and sometimes other parties) jointly boycott a competitor or competitive threat, are generally *per se* unlawful under the antitrust laws. *Fed. Trade Comm'n v. Superior Ct. Trial Laws. Ass'n,* 493 U.S. 411, 422 (1990) (describing group boycott as a "classic restraint of trade within the meaning of Section 1 of the Sherman Act") (citation omitted); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 245 (S.D.N.Y. 2019) (citation omitted) (agreement through which participants "pressure[d] a supplier or customer to not deal with another competitor" was *per se* unlawful). And courts have recognized that a *per se* unlawful group boycott occurs when competitors in the real estate industry agree to adopt listing rules with similar intent and effect as the Zillow Ban. *See, e.g., PLS.COM, Ltd. Liab. Co. v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834–36 (9th Cir. 2022). Here, the evidence demonstrates that Zillow entered an unlawful group boycott with search competitors eXp and Redfin.

Starting with eXp, the brokerage clearly competes with Zillow in home search. Both eXp's and Zillow's home pages have prominent search boxes, with a call to action to type an address, neighborhood, area, or city:



Solh Decl., Ex. M.



Solh Decl., Ex. N.

Despite being competitors, Zillow and eXp expressly entered into an agreement regarding the Zillow Ban. This was not something done in the shadows. Within the same hour Zillow announced the Zillow Ban, on April 10, 2025, Zillow and eXp issued a ***joint press release***, touting their "new agreement" and "partnership" with respect to the Zillow Ban. Solh Decl., Ex. I. This constitutes a classic *per se* unlawful group boycott: an agreement between important competitors in the home search market not to work with Compass because it is a rising competitive threat to their businesses. The Supreme Court and this Circuit have long recognized that such group boycotts facially violate Section 1. *See Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 347 (1963) ("concerted action" of defendants constituted "a group boycott depriving petitioners of a valuable business service which they needed in order to compete effectively"); *Primetime 24 Joint Venture*

*v. National Broadcasting Co. Inc.*, 219 F.3d 92, 103 (2d Cir. 2000) ("A concerted refusal . . . in order to prevent competition from it is a boycott that, if proven, violates the Sherman Act.").

But Zillow was only getting started. It also entered into an agreement with another prominent home search competitor, Redfin. Just forty-one minutes after Zillow announced the Zillow/eXp partnership publicly, Redfin's CEO, Mr. Kelman, texted Compass's CEO, Mr. Reffkin, seeking an immediate conversation. Reffkin Decl., ¶ 13. This request was highly unusual; Mr. Reffkin agreed but insisted that Compass's counsel attend. *Id.* The call took place just seven hours after Zillow and eXp announced their ban. Reffkin Decl., ¶ 14.

Mr. Kelman told Compass that Redfin had agreed to follow Zillow's lead and would publicly announce a policy like the Zillow Ban. Reffkin Decl., ¶ 15. These statements—and their timing—are sufficient for a jury to find it more likely than not that Redfin had joined the Zillow conspiracy. But there is more. Mr. Kellman asked Compass to negotiate and fall in line with Zillow, suggesting that, for standing down, Zillow and Redfin might reward Compass with pre-marketing options and Zillow might reward Compass financially. *See* Reffkin Decl, ¶ 16. The fact that Mr. Kelman knew Zillow would be willing to compensate Compass for standing down and following the Zillow Ban demonstrates that Mr. Kelman had conversations with Zillow about the Zillow Ban, Compass's objections to it, and Zillow and Compass's discussions. Moreover, the very next day, Zillow raised a similar idea of Compass and Zillow potentially partnering on the Zillow Ban issues, Alexander Decl, ¶ 12, further suggesting that Mr. Kelman knew from Zillow that Zillow planned to do so.

Thus, the direct evidence satisfies Compass's burden here. Indirect evidence, however, also supports a strong inference that Zillow more likely than not conspired with Redfin and eXp. Indirect evidence can prove a conspiracy where, as here, the evidence shows "parallel conduct"—

two or more competitors taking similar actions—and other "plus factors" suggesting a conspiracy. *See, e.g.*, *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 323 (2d Cir. 2010) (reversing dismissal because "the allegations, taken together, place the parallel conduct 'in a context that raises a suggestion of a preceding agreement,' not merely parallel conduct"). These "plus factors" may include evidence showing a highly concentrated market, a common motive to conspire, conduct that is against the individual economic self-interest of the co-conspirators, and inter-competitor communications. *Id.*

Here, the parallel conduct is undisputed: (1) Zillow and eXp jointly announced the Zillow Ban on April 10, 2025, and (2) Redfin informed Compass *that same night* that it too would adopt a policy in line with the Zillow Ban (publicly announcing that decision two business days later). This parallel conduct regarding their search listing policies were aimed at Compass and other innovative brokerages and will restrict competition across the real estate market. *In re Amazon.com, Inc. eBook Antitrust Litig.*, No. 21-cv-00351, 2023 WL 6006525, at *21 (S.D.N.Y. July 31, 2023) ("adopting similar policies around the same time" is suggestive of "anticompetitive behavior") (citation omitted), *report and recommendation adopted*, 2024 WL 918030 (S.D.N.Y. Mar. 2, 2024).

The "plus factor" evidence is likewise clear. The online residential real estate search services market is highly concentrated, with four firms likely controlling nearly 90% of the market and Zillow and Redfin together likely controlling over 70%. Solh Decl., Ex. D. In addition, there is direct evidence of an invitation to conspire, with Redfin asking Compass to stand down from Zillow and strike a deal. Moreover, the evidence shows a collective motive to conspire that would not be served if at least one conspirator acted in its own self-interest. To competitively differentiate

its home search platform, Redfin could have taken the opposite position from Zillow.[3] But it did not. In short, the evidence demonstrates parallel conduct among competitors and several plus factors that demonstrate the strong inference of a conspiracy.

Courts have found conspiracies like the one here to be *per se* unlawful. Most notably, the Ninth Circuit found that a plaintiff had properly alleged that NAR's CCP, which is essentially a *less* restrictive version of the Zillow Ban, constituted an anticompetitive *per se* group boycott. *See PLS.COM*, 32 F.4th at 834–36; *see also PharmacyChecker.com, LLC v. Nat'l. Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 344 (S.D.N.Y. 2021) (recognizing group boycott when intent and effect of competitors' agreement was to harm plaintiff by cutting off traffic to its website). In *PLS*, MLSs agreed to adopt the CCP, which forced agents to provide their listings to local MLSs within one day of any public marketing. *PLS*, 32 F. 4th at 834-86. Plaintiff PLS.com, an upstart listing platform competing with MLSs, thus could not differentiate its product "on almost any dimension." *Id.* The Ninth Circuit reasoned that competitors in the same market agreeing to coerce suppliers to provide a product to them "only on 'unfavorable terms'" constitutes a group boycott. *Id.* Here, the co-conspirators have adopted a similar but *more restrictive* anti-competitive policy: they conspired to force Compass (and other brokerages) to provide listings to them on the same, unfavorable terms. Accordingly, Compass cannot use its listings—which are hard-earned and created by Compass—to increase the quality and differentiation of Compass's home search platform, thereby reducing head-to-head competition with the co-conspirators in the home search market. Compass is instead forced to turn over its hard-earned listings to its competitors almost immediately so that they can monetize them.

---

[3] The CEO of Homes.com has taken precisely this strategy, calling the Zillow Ban a "power play of epic proportion" and leaning into the Zillow Ban by offering agents and home sellers with listings blocked by the ban free listings on Homes.com. Solh Decl., Ex. R.

Because Compass is likely to prove that the Zillow, eXp, Redfin boycott is *per se* unlawful, a preliminary injunction is appropriate. *See Linseman v. World Hockey Ass'n*, 439 F. Supp. 1315, 1317 (D. Conn. 1977) (granting preliminary injunction against alleged *per se* unlawful boycott).

### ii. The Zillow agreements are also unlawful under a rule of reason or a quick look analysis.

Even if the Court decided not to apply the *per se* rule—though it should—Compass is likely to demonstrate that the conspiracy is anticompetitive under a quick look or rule of reason review as well. *See N. Carolina State Bd. of Dental Examiners v. Fed. Trade Comm'n* , 717 F.3d 359, 374 (4th Cir. 2013) (observing that the Supreme "Court has made clear that practices like group boycotts are amenable to the quick look approach-cases"), *aff'd*, 574 U.S. 494 (2015) (citations omitted); *Realcomp II, Ltd. v. Fed. Trade Comm'n* , 635 F.3d 815, 823 (6th Cir. 2011); *Cantor*, 568 F. Supp. at 431-32. As discussed above, *supra* § I.B, the Zillow Ban comes with serious anticompetitive and anti-consumer harms that are not outweighed by any procompetitive benefits.

### B. Compass is Likely to Succeed on Its Section 2 Claim.

Compass is more likely than not to prevail on its claim that, by adopting the Zillow Ban, Zillow abused its monopoly power. Under Section 2 of the Sherman Act, Compass must show that Zillow more likely than not: (1) possessed "monopoly power in the relevant market;" and (2) willfully "maint[ained]" that power through exclusionary conduct. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (citation omitted).

### i. Compass is likely to prove a home search market.

Compass is likely to prove its alleged relevant market in which to assess the challenged conduct for both its Section 1 and Section 2 claims: the market for residential real estate online search services ("home search") in which Zillow and Compass compete. Under the seminal *Brown Shoe* standard, courts must analyze and rely on the "commercial realities" of how the industry and

22

business operate to assess a relevant market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). Courts thus look to "practical indicia" of the market, such as industry or public recognition; the product's peculiar characteristics and uses; the product's sensitivity to price changes; and whether there are different customers, different price points, and/or specialized vendors. *Id.* (citing cases). Courts often rely heavily on statements and documents made by the defendant and other competitors or industry participants. *See, e.g.*, *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 337 (S.D.N.Y. 2001) (considering "large numbers of defendants' documents" that "explicitly recognize" the relevant market), *aff'd*, 344 F.3d 229 (2d Cir. 2003); *Fed. Trade Comm'n v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 453 (S.D.N.Y. 2024) (describing defendants' internal "ordinary-course documents" as "compelling evidence of commercial realities" when defining the relevant market).

Here, the "practical indicia" establish that the relevant market is home search. Zillow compares itself exclusively to other "real estate marketplaces" to investors. Solh Decl., Ex. B at 7. Zillow also tells investors it has the "#1 U.S. residential real estate app" and routinely references the real estate "category" in which it competes. *Id.* Market participants and analysts describe the market similarly: analyst KeyBanc Capital Markets calls Zillow the "leading real estate website and app in the U.S," and investment firm William Blair calls Zillow the "leading home search portal," the leader in "residential search," and the leading player "in the home search market." Solh Decl, Exs. D and O.

Similarly, the Zillow and Compass platforms have characteristics and uses that distinguish them from other ways in which consumers search for homes. Zillow and Compass are available and used online, Alexander Decl., ¶ 7 and Hardy Decl., ¶ 9, unlike billboards at brokerages' offices or physical listing publications. *See United States v. H & R Block, Inc.,* 833 F. Supp. 2d 36, 57

(D.D.C. 2011) (holding that pen-and-paper was not an alternative to tax software). Moreover, the platforms are accessible to the public, without cost or a required association membership, and include listings across regions all on the same platform. Alexander Decl., ¶ 7 and Hardy Decl., ¶ 9. They further have the same particular characteristics and uses, offering home search services through both websites and separate mobile applications and using nearly identical user interfaces and search functionalities. *Id.*

Local MLSs are not competitors within the home search market for multiple reasons. First, local MLSs are marketed to and used by distinct customers: real estate agents who pay and register for access to the system—MLSs are not available to the general public. Alexander Decl., ¶ 6. Second, unlike Zillow's and Compass's platforms, the local MLSs are precisely that—local. They contain listings within a particular region and allow paid access only for agents in that region. *Id.*

### ii.    *Zillow has monopoly power in the home search market.*

A plaintiff can demonstrate monopoly power by coupling a defendant's high market share with evidence showing the defendant's power in the relevant market. Several forms of evidence demonstrate Zillow's monopoly power.

First, in the context of online platforms like Zillow, courts have performed market share calculations based on the platform's userbase or traffic-related figures, finding such metrics to be "appropriate indicators" of market share. *See, e.g., Fed. Trade Comm'n v. Meta Platforms, Inc.*, No. 20-cv-3590, 2024 WL 4772423, at *19 (D.D.C. Nov. 13, 2024) (defining market share based on proxies of share of "daily average users (DAUs), monthly average users (MAUs), and time spent on app"); *Fed. Trade Comm'n v. Facebook, Inc.*, 581 F. Supp. 3d 34, 46–47 (D.D.C. 2022) (similar). Here, as in *Meta*, "whichever way the data is sliced…the story is the same," and Zillow's share exceeds "the level typically associated with monopoly power." *Id.* at 19. Indeed, Zillow's own analyses demonstrate its dominant share—66% of the real estate search audience, more than

its three next closest competitors *combined*. *See* Solh Decl., Exs. B and C. And Zillow likewise tells investors and the public that 64% of the average daily active mobile application users in the real estate category are on Zillow. Solh Decl., Ex. B. Market share this high reflects monopoly power, especially when, as here, the share is coupled with additional, suggestive evidence. *See, e.g.*, *Hayden Publishing Co., Inc. v. Cox Broadcasting Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) (explaining that a defendant may have monopoly power with even 50% share); *In re Google Digital Advertising Antitrust Litigation*, No. 23-cv-1530, 2024 WL 988966, at *4 (S.D.N.Y. Mar. 7, 2024) (52% market share sufficient when coupled with anticompetitive effects); *US Airways Inc. v. Sabre Holdings Corp.*, No. 11-cv-2725, 2022 WL 1125956, at *9 (S.D.N.Y. Apr. 15, 2022) (evidence of 49% to 52% likewise sufficient "to support a finding of monopoly power when combined with other evidence").

Second, Zillow also openly characterizes itself as the "most visited real estate website in the United States," Solh Decl., Ex. P, and tells investors and the public that "80% of consumers come direct to Zillow" when looking for real estate. Solh Decl., Ex. B. Zillow further contends that, as of the end of last year, it has four times the daily active app users and greater than two times the average monthly unique visitors compared to its nearest competitor. *Id.* at 7.

Third, other industry observers have concluded similarly. Earlier this year, Wells Fargo characterized Zillow as having a "deep moat" due to its "material lead in organic traffic" and "network effects." Sohl Decl., Ex. Q. Another firm, William Blair, explained "[w]hichever way you look at it, Zillow has by far the leading traffic market share in the home search market." Solh Decl., D. eXp too referenced Zillow's "massive consumer reach" when justifying why it worked with Zillow on the ban. Sohl Decl., Ex. I.

Fourth, Zillow's financial performance indicates monopoly power, with Zillow has increasing its revenues and market share recently. Sohl Decl., Ex. P. Analysts covering Zillow thus argue that Zillow's share price should trade at a premium given its "market share gains and structurally high margins." Sohl Decl., Ex. O at 2.

Fifth, the adoption of the Zillow Ban itself—that Zillow believes it can dictate terms to the industry at large to retaliate against competitive threats—demonstrates Zillow's monopoly power. Indeed, Zillow executives warned Compass that Zillow "will not allow" Compass and brokerages to launch their listings off Zillow, and that Zillow was "making the bet" that they could force people to use Zillow when home sellers are "forced to choose" between Zillow and using pre-marketing strategies. Reffkin Decl., ¶ 10. Courts have accepted evidence of such retaliatory efforts and willful assertions of power as useful evidence to support the exercise of monopoly power. *See, e.g., US Airways Inc.*, 2022 WL 1125956, at *9 (identifying evidence that defendant engaged in "retaliatory conduct against airlines that promote innovation" as in part indicative of defendant's monopoly power).

Last, the evidence demonstrates there are barriers to entry, such that there will not be timely or sufficient entry or expansion to constrain Zillow's power. Entry barriers include competitive advantages like "control of essential or superior resources'" and a "wealth of . . . data . . . that up-and-coming firms will lack." *Tapestry*, 755 F. Supp. 3d at 470. Here, the entry barriers protecting Zillow's power are similar. Indeed, Homes.com has spent hundreds of millions of dollars over the past few years trying to compete with Zillow in residential search but has barely moved the needle—certainly not enough to constrain Zillow's power. Sohl Decl., Ex. R. Financial analysts at Wells Fargo have agreed, explaining that Homes.com's investment has not translated to "meaningfully higher organic traffic" given Zillow's "strong first-mover advantage and network

effects," noting the challenges posed by "Zillow's entrenched market position." *Id.* Accordingly, the Court should conclude that it is more likely than not that Zillow has monopoly power.

### iii. *The Zillow Ban Constitutes Unlawful Exclusionary Conduct.*

The Zillow Ban constitutes unlawful exclusionary conduct for the reasons already discussed: it was adopted to harm a competitive threat, eliminates a new and innovative business model that creates competitive differentiation in the market, and reduces consumer choice. Courts have long held that such practices violate Section 2. In *Lorain Journal Co. v. United States*, the defendant newspaper reacted to new competition from a local radio station by adopting a policy to reject advertisements from any local business that advertised with the radio station. 342 U.S. 143, 148-49 (1952). The Supreme Court struck down the policy, holding that it was aimed at preserving the Journal's monopoly by choking off the rising radio station's access to critical advertisers. *Id.* at 149-50, 155-57.

The principle underlying *Lorain Journal* has been applied consistently in lower courts for decades, particularly in cases involving technology platforms like Zillow's. Indeed, earlier this year, a court relied on *Lorain Journal* to hold that Google violated Section 2 of the Sherman Act. *United States v. Google LLC*, No. 23-cv-108, 2025 WL 1132012, at *42 (E.D. Va. Apr. 17, 2025). There, Google adopted a contractual policy controlling how its customers operated on other competing advertising exchanges—the rules blocked customers from offering prices on third-party exchanges that were better than those offered on Google. *Id.* at *13-16. The court found the rule exclusionary because it "involved Google using its coercive monopoly power to deprive its publisher customers of a choice that they had previously exercised to promote competition." *Id.* at *42; *see also Fed. Trade Comm'n v. Amazon, Inc.*, No. 23-cv-01495, 2024 WL 4448815, at *6-7 (W.D. Wash. Sept. 30, 2024) (allowing monopoly maintenance claim challenging contractual restraint restricting how Amazon's suppliers sold products on competing platforms); *U.S. v.*

*Microsoft Corp.*, 253 F.3d 34, 74 (D.C. Cir. 2001) (finding exclusionary Microsoft's practices that prevented use of competing providers and thus reduced the rivals' "usage share").

The Zillow Ban operates in the same way and to the same effect as the restraints in those cases: it controls how brokerages behave competitively *off Zillow's platform on other competing platforms* to maintain Zillow's monopoly. The Zillow Ban thus forecloses competitive differentiation and choice, prohibiting home sellers and their agents from using other online search portals to compete with Zillow and instead forcing all listings through the Zillow funnel, entrenching Zillow's dominance.

The Zillow Ban therefore harms competition in the home search market for all the reasons described above. *See supra* § I.B. But the ban also hurts Zillow's *users*; it limits output on the Zillow platform, rendering thousands of listings that otherwise would be viewable entirely invisible. Zillow would not willingly sacrifice its short-term profits, jeopardize existing commercial relationships, and degrade the quality of its platform unless it knew that the Zillow Ban would succeed in protecting its monopoly and vaporizing competitive differentiation. Section 2 does not permit such anticompetitive and exclusionary conduct.

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR THE INJUNCTION

The balance of hardships decidedly favors Compass. As part of the preliminary injunction analysis, this inquiry asks "which of the two [sides] would suffer most grievously" if the injunction motion is wrongly decided. *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (citation omitted). If the Court grants this injunction, Zillow loses nothing—the Zillow Ban is new, and as Zillow has explained, enforcement of the rule will be rolled out "in phases starting with many large markets in the U.S. and expanding nationally throughout the summer." Solh Decl., Ex. H. Thus, even if the injunction was mistakenly granted,

Zillow would only suffer a slight delay in implementing a new rule that upends the status quo under which the industry has been operating. In short, an injunction would simply keep the market the way it is now, slightly slowing Zillow from implementing its enormous change. In contrast, as discussed above, if the Court does not grant an injunction, Compass will suffer severe and irreparable harm.

A preliminary injunction would also serve the public. Protecting the public from potential antitrust violations would clearly "serve the public interest," *see Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 698-99 (2d Cir. 1973), and "the public's interest in enforcement of the antitrust laws and in the preservation of competition" is "[f]ar more important than the interests of . . . the existing industry," *fuboTV Inc.*, 745 F. Supp. 3d at 133 (citation omitted).  As discussed above, enforcement of the Zillow Ban would irreparably harm competition, home sellers, and home buyers. Protecting the public from these harms by simply maintaining the status quo "weighs heavily" in favor of the preliminary injunction. *Grunman Corp v. LTV Corp.*, 527 F. Supp. 86, 105 (E.D.N.Y. 1981); *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 400 (S.D.N.Y. Jan. 8, 2024).

## CONCLUSION

For the reasons stated above, Compass asks this Court to grant Compass's motion and issue a preliminary injunction prohibiting Zillow from implementing the Zillow Ban until this case concludes.

Dated: June 27, 2025                                        Respectfully submitted,

<u> /s/ *Chahira Solh* </u>

Chahira Solh (*admitted pro hac vice*)
Daniel A. Sasse (*admitted pro hac vice*)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: (949) 263-8400

csolh@crowell.com
dsasse@crowell.com

Kenneth Dintzer (NY Bar No. 2476687)
(*admitted pro hac vice)*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
kdintzer@crowell.com

Luke Taeschler (NY Bar No. 5308325)
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000
ltaeschler@crowell.com

*Attorneys for Plaintiff Compass, Inc.*

**WORD COUNT CERTIFICATION PURSUANT TO**
**LOCAL RULE 7.1(c) AND INDIVIDUAL RULE 5.A**

Pursuant to Southern District of New York Local Rule 7.1(c) and Rule 5.A of this

Court's Individual Rules and Practices in Civil Cases, I hereby certify that the above

memorandum is 8,742 words.

*/s/ Chahira Solh*
Chahira Solh