## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

COMPASS, INC.,

        Plaintiff,

v.

ZILLOW, INC., ZILLOW GROUP, INC., and
TRULIA, LLC,

        Defendants.

Case No. 1:25-cv-05201-JAV

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................1

II. STATEMENT OF FACTS ..........................................................................................3

    A.    Zillow Has Dramatically Reduced Consumers' Barriers to Real Estate
        Information ........................................................................................................3

    B.    Zillow's Business Model Depends on Attracting Consumers Through
        Transparency and Innovation.............................................................................4

    C.    Compass Promotes Its Hidden Listing Scheme for Its Own Benefit, to the
        Detriment of Consumers ....................................................................................5

    D.    Compass Lobbies NAR to Dilute CCP and Advance Its Self-Interest in
        Hidden Listings...................................................................................................7

    E.    Zillow's Listing Access Standards Mitigate the Impacts of Hidden
        Listings................................................................................................................8

    F.    Zillow and eXp Did Not Conspire to Boycott Compass.....................................9

    G.    Zillow and Redfin Did Not Conspire to Boycott Compass ................................10

    H.    Zillow Tries to Partner with Compass While Compass Continues to
        Benefit from Zillow's Services...........................................................................11

    I.    Compass Announces New Policy to Block Hidden Listings from Zillow ............12

III. LEGAL STANDARD....................................................................................................12

IV. ARGUMENT...............................................................................................................13

    A.    Compass Has Not Shown a Likelihood of Success on the Merits.........................13

        1.    The Section 2 Claim Is Unlikely to Succeed ..............................................13

            a.    Zillow Has No Duty to Deal ........................................................ 13

            b.    Other Essential Aspects of the Section 2 Claim Fail.................... 15

        2.    The Section 1 Claim Is Unlikely to Succeed ..............................................18

            a.    Zillow and eXp Did Not Agree to Boycott Compass ................... 19

|  |  | b. | Zillow and Redfin Did Not Agree to Boycott Compass............... 20 |
|  | 3. | | Compass Lacks Antitrust Standing for All of Its Claims ..........................22 |
| B. | | | Compass Has Not Shown Irreparable Harm............................................................24 |
|  | 1. | | Compass's Conduct Is Inconsistent with Its Claims of Irreparable Harm ....................................................................................................................25 |
|  | 2. | | Compass's Delay in Seeking Injunctive Relief Belies Any Emergency .................................................................................................................25 |
|  | 3. | | Compass Has Not Shown That Any Cognizable Harm Would Not Be Compensable ...........................................................................................26 |
|  | 4. | | Compass's Speculative Harms to Competition or Consumers Provide No Basis for an Injunction...........................................................27 |
| C. | | | The Balance of the Hardships Favor Zillow ..........................................................28 |
| D. | | | The Public Interest Would Be Disserved by an Injunction....................................28 |
| V. | | | CONCLUSION.................................................................................................................29 |

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Absolute Recovery Hedge Fund, L.P. v. Gaylord Container Corp.*,
    185 F. Supp. 2d 381 (S.D.N.Y. 2002)....................................................................................28

*Am. Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010).............................................................................................................18, 19

*Arcesium, LLC v. Advent Software, Inc.*,
    2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ....................................................................24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)...............................................................................................................14

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*,
    843 F.3d 1225 (10th Cir. 2016) ...........................................................................................16

*Authenticom, Inc. v. CDK Glob, LLC*,
    874 F.3d 1019 (7th Cir. 2017) ..............................................................................................28

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994).....................................................................................................21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)................................................................................................................23

*Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*,
    708 F. App'x 29 (2d Cir. 2017) .............................................................................................15

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)....................................................................................................25

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
    236 F.3d 1148 (9th Cir. 2001) ...............................................................................................18

*Collins v. Assoc. Pathologists, Ltd.*,
    844 F.2d 473 (7th Cir. 1988) ................................................................................................22

*Compass, Inc., et al v. Northwest Multiple Listing Service*,
    Case No. 2:25-cv-00766, ECF 1 (W.D. Wash Apr. 25, 2025) ..........................................16

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016)......................................................................................................16

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.*,
    663 F.2d 405 (2d Cir. 1981)....................................................................................................19

*eBay, Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006)................................................................................................................27

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ............................................................................................19

*F.T.C. v. Amazon.com, Inc.*,
  2024 WL 4448815 (W.D. Wash. Sept. 30, 2024) .............................................................15

*F.T.C. v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986) ...................................................................................................21, 27

*F.T.C v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ......................................................................................18, 23

*F.T.C. v. Superior Court Trial Lawyers Association*,
  493 U.S. 411 (1990) .........................................................................................................22

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009) .............................................................................................24

*Flaa v. Hollywood Foreign Press Ass'n*,
  55 F.4th 680 (9th Cir. 2022) .............................................................................................21

*Fotobom Media, Inc. v. Google LLC*,
  719 F. Supp. 3d 33 (D.D.C. 2024) ...................................................................................23

*Grand River Ent. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) ...............................................................................................12

*Honey Bum, LLC, v. Fashion Nova, Inc.*,
  63 F.4th 813 (9th Cir. 2023) .............................................................................................21

*In re Adderall XR Antitrust Litig.*,
  754 F.3d 128 (2d Cir. 2014), *as corrected* (June 19, 2014) .............................................13

*In re Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016) .............................................................................................23

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ...............................................................................................14

*In re Inclusive Access Course Materials Antitrust Litig.*,
  2021 WL 2419528 (S.D.N.Y. June 14, 2021) ..................................................................24

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..............................................................................22

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  729 F. Supp. 3d 298 (E.D.N.Y. 2024) .......................................................................16, 17

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
  924 F.3d 57 (2d Cir. 2019) .....................................................................................22, 23, 24

*Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*,
  604 F.2d 755 (2d Cir. 1979) .............................................................................................28

*Jackson Dairy, Inc. v. H.P. Good & Sons, Inc.*,
   596 F.2d 70 (2d Cir. 1979)...............................................................................................26

*JTH Tax, LLC v. Agnant*,
   62 F.4th 658 (2d Cir. 2023) ............................................................................................26

*Life Techs. Corp. v. AB Sciex Pte. Ltd*,
   2011 WL 1419612 (S.D.N.Y. Apr. 11, 2011)................................................................25

*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951)..................................................................................................14, 15

*Massachusetts v. Microsoft Corp.*,
   373 F.3d 1199 (D.C. Cir. 2004)......................................................................................29

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)............................................................................................27

*New York v. Meta Platforms, Inc.*,
   66 F.4th 288 (D.C. Cir. 2023).................................................................................14, 15

*North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018)..............................................................................................27

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ......................................................................................14

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*,
   472 U.S. 284 (1985)..................................................................................................21, 22

*O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*,
   436 F. Supp. 3d 576 (E.D.N.Y. 2020) ............................................................................19

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018)........................................................................................................18

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009)........................................................................................................14

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002)............................................................................................17

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*,
   530 F. Supp. 3d 301 (S.D.N.Y. 2021).............................................................................22

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ...........................................................................................22

*Polk Bros. v. Forest City Enters., Inc.*,
   776 F.2d 185 (7th Cir. 1985) ..........................................................................................18

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
   173 F.3d 995 (6th Cir. 1999) ..........................................................................................16

*Rodriguez ex rel. Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir. 1999)............................................................................................24

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986).......................................................................................18

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010).............................................................................................24

*Sarieddine v. D & A Distrib., LLC*,
   2017 WL 6940537 (C.D. Cal. July 13, 2017).................................................................25

*Solus Alternative Asset Mgmt. LP v GSO Cap. Partners, L.P.*,
   2018 WL 620490 (S.D.N.Y. Jan. 29, 2018) ..................................................................27

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024).......................................................................................................12

*Students for Fair Admissions v. U.S. Mil. Acad. at W. Point*,
   709 F. Supp. 3d 118 (S.D.N.Y. 2024).............................................................................12

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006)...........................................................................................................19

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
   60 F.3d 27 (2d Cir. 1995)..............................................................................................26

*Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*,
   641 F. Supp. 1179 (S.D.N.Y. 1986)...............................................................................21

*Tough Traveler, Ltd. v. Outbound Prods.*,
   60 F.3d 964 (2d Cir. 1995)............................................................................................25

*U.S. v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015)..........................................................................................18

*U.S. v. Google LLC*,
   2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ................................................................15

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001).........................................................................................15

*U.S. v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003)..........................................................................................27

*United Asset Coverage, Inc. v. Avaya Inc.*,
   409 F. Supp. 2d 1008 (N.D. Ill. 2006)...........................................................................28

*Universal Grading Serv. v. eBay, Inc.*,
   2011 WL 846060 (N.D. Cal. Mar. 8, 2011)....................................................................14

*US Airways, Inc. v. Sabre Holdings Corp.*,
   2022 WL 1125956 (S.D.N.Y. Apr. 15, 2022).................................................................17

*USA Network v. Jones Intercable, Inc*.,
704 F. Supp. 488 (S.D.N.Y. 1989) ....................................................................................26

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)..................................................................................................13, 14

*WatchIt Technologies, Inc. v. Big Apple Consulting USA, Inc.*,
2008 WL 1902113 (W.D.N.C. Apr. 25, 2008) ...................................................................27

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)...................................................................................................26, 28

## STATUTES

15 U.S.C. § 26.................................................................................................................27

## GLOSSARY OF CITATIONS

| Short Citation | Document Description |
|---|---|
| Buffier Decl. | Declaration of Beau Buffier in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction with Exhibits A-V, dated July 17, 2025 |
| Hardy Decl. | Declaration of Will Hardy in Support of Plaintiff's Motion for Preliminary Injunction, dated June 26, 2025 (ECF 29) |
| Hofmann Decl. | Declaration of Jeremy Hofmann in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction with Exhibits A-C, dated July 16, 2025 |
| Reffkin Decl. | Declaration of Robert Reffkin in Support of Plaintiff's Motion for Preliminary Injunction, dated June 26, 2025 (ECF 25) |
| Samuelson Decl. | Declaration of Errol Samuelson in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction with Exhibits A-T, dated July 16, 2025 |
| Solh Decl. | Declaration of Chahira Solh in Support of Plaintiff's Motion for Preliminary Injunction, dated June 27, 2025 (ECF 30) |
| Wacksman Decl. | Declaration of Jeremy Wacksman in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, dated July 15, 2025 |
| Compl. | Plaintiff's Complaint, dated June 23, 2025 (ECF 15) |
| Mot. | Plaintiff's Memorandum of Law in Support of Motion for a Preliminary Injunction, dated June 27, 2025 (ECF 24) |

## I.    <u>INTRODUCTION</u>

Through its motion, Compass asks the Court to force Zillow to display Compass listings *on Compass's terms*. Compass has developed a three-phase Hidden Listing Scheme, through which it can control consumers' access to home listings, reduce competition, and increase commissions. During the first two phases of this Scheme, home buyers are dependent on Compass to learn about homes for sale because Compass prevents Zillow from displaying these hidden listings on Zillow's websites and apps. But Compass concedes that "almost all" of these hidden listings do not actually sell during these two phases. So in phase 3, Compass seeks to force Zillow to display its unsold listings, reaping (for free) the benefits of Zillow's investments to attract millions of consumers to its platform. But the antitrust laws do not permit Compass to force Zillow to deal with Compass on its preferred terms or support hidden listings which harm consumers and Zillow. Compass has not met its burden to obtain extraordinary relief at the outset of this case, and its motion should be denied.

For 20 years, Zillow has worked to democratize real estate information so that consumers have free, direct, and up-to-date access to accurate data about homes for sale in their area. Compass's Hidden Listing Scheme is antithetical to Zillow's mission to empower consumers to find their dream home: It harms consumers, who face balkanized and less liquid markets for homes, and Zillow, whose ability to attract and serve consumers depends on comprehensive, up-to-date listings. Zillow thus announced Listing Access Standards ("Standards") governing its *own* platforms on April 10, 2025. Under these unilateral Standards, Zillow will not display on Zillow or Trulia a listing, regardless of brokerage, that was not entered into a Multiple Listing Service ("MLS") within one business day of public marketing. Compass now seeks to bar Zillow from deciding which listings to display on its *own* platforms, but fails every requirement for a preliminary injunction.

-1-

First, Compass is unlikely to succeed on the merits. Compass simultaneously alleges both that Zillow is a monopolist able to use its power to harm Compass, and that Zillow needed and obtained the help of other home search platforms to conspire against Compass. Both theories are baseless. The Supreme Court has repeatedly held that businesses—even those with market power—have no duty to assist their competitors. And, among other fatal deficiencies, Compass has not shown that Zillow has power in a relevant market. Compass also cannot show that Zillow conspired with Redfin or eXp (or anyone else) to boycott Compass. Zillow acted independently of Redfin and has no agreement with Redfin regarding Compass's listings. Likewise, Zillow's vertical agreement with eXp says nothing about whether or how eXp will display Compass's listings on eXp's website.

Second, Compass's claimed irreparable harms are completely undermined by its contradictory conduct and statements and three-month delay in filing suit. Compass argues that Zillow's refusal to display its hidden listings is catastrophic to Compass's business. But the Standards do not harm competition or innovation as they apply only to Zillow's platform; they do not prevent Compass (or any other brokerage) from displaying listings anywhere else. Indeed Compass's CEO recently touted that Compass agents have "never had a moment as good as this." Just this weekend, he announced that Compass is using "all 3 phases of [t]he … 3 Phased Marketing Strategy as designed," thus conceding that Zillow's Standards have not foreclosed Compass's Scheme. And just last week, Compass announced a new policy to share its hidden listings, *except with platforms like Zillow*.

Third, Compass's allegations of consumer harm do not fare any better. Compass claims consumer harm because sellers are denied the chance to sell their homes for higher prices, but then it tells buyers that hidden listings help them pay less by avoiding bidding wars. Indeed,

Compass's claimed consumer harm rings hollow when its CEO told Zillow executives that "All I care about is agents. Taking care of consumers is what you do." The reality is that Compass's Scheme benefits only Compass. The Scheme harms consumers by reducing transparency and liquidity, as multiple consumer advocacy groups have concluded. Instead it is Zillow that faces irreparable injury from being compelled to assist an alleged competitor in inflicting harm on consumers.

Compass should not be allowed to have it both ways by forcing Zillow to share the benefits of its audience while at the same time withholding from Zillow and its customers the benefits of the latest listings. The law does not allow Compass to force such terms onto Zillow, and the motion should be denied.

## II.     STATEMENT OF FACTS

### A.     Zillow Has Dramatically Reduced Consumers' Barriers to Real Estate Information

Zillow was founded in 2004 as a technology-forward platform to help connect home buyers, sellers, and renters to real estate services. Samuelson Decl. ¶6. Zillow wants to "make home a reality" by breaking down information barriers in the housing market and helping consumers find their perfect home. *Id.*

Prior to the Internet, information about home sales was not widely available to consumers. *Id.* ¶8. Real estate brokerages formed regional MLSs to aggregate for-sale listings in their region, which were made available only to agents of the member brokerages. *Id.* ¶9. To find homes, consumers had to go through an agent and had limited information regarding location, features, and sales price. *Id.* ¶¶8-10.

Over the last 20 years, Zillow and other players democratized real estate information. *Id.* ¶11. Zillow has been successful because it combines accurate and up-to-date listings with innovative technology and critical insights that empower consumers. *Id.* ¶¶15-17.

### B.    Zillow's Business Model Depends on Attracting Consumers Through Transparency and Innovation

A key part of Zillow's business model is to display for-sale listings to consumers and connect them with professionals who can support their real estate transaction needs. *Id.* ¶¶13-14. Zillow does not have a large number of its own agents and therefore differs from brokerages such as Compass, Redfin, and eXp that each have thousands of agents who provide brokerage services to buyers and sellers. *Id.* ¶¶13-14. Zillow provides real estate professionals with advertising, software, and media solutions to help them connect with and serve consumers. *Id.* To provide high-quality leads, Zillow needs a strong base of high-intent consumers who want to buy or sell homes. *Id.* ¶15.

To attract and retain buyers and sellers, Zillow provides free services to both, including access to the latest for-sale listings. *Id.* ¶¶15-17, 20. Most of Zillow's listings data originates with brokerages, which share that data with their local MLS. *Id.* ¶23. MLSs maintain a shared database of listings and distribute them to members through data feeds. *Id.* ¶¶24-25. As an MLS member, Zillow can access these feeds and receive the same data available to all other members. *Id.* ¶26. Sharing listings in this manner promotes efficiency in real estate markets, provides exposure for sellers, allows buyers to see the broadest range of homes, and allows brokerages to compete for buyers. *Id*. ¶¶27-28.

Zillow invests in technology to make finding the perfect home easy. To start, Zillow displays listings locally: Its website's default view for consumers searching for a home is a map that shows listings nearby. *Id.* ¶18. Nearly 70% of consumers who save multiple homes to their

Zillow account save homes within 50 miles of each other. *Id.* ¶19. Zillow has also developed advanced search algorithms and makes publicly available information more accessible, including insights such as the "Zestimate" and scores for schools, neighborhood walkability, and climate risk that appear alongside the listing information provided by the MLS. *Id.* ¶17.

Zillow must continuously win over consumers with a high-quality experience because its competitors can access the same data feeds as Zillow by becoming a licensed brokerage and joining the MLS. Hofmann Decl. ¶6. Many of the same for-sale listings that Zillow displays are available on Compass's website, Homes.com, and realtor.com, among others. Buffier Decl., Exs. A-D. New entrants, such as addressUSA, are entering the market. Hofmann Decl. ¶6, Ex. B at 1-2. Although Zillow has a large audience, many consumers also use other home search platforms, and only some are actively looking to move. Samuelson Decl. ¶21.

Many of these search platforms use similar interfaces, prompting consumers to enter a location before viewing listings. *Id.*, Exs. A-B; Buffier Decl., Exs. T-U. Brokerage websites also display listings received through MLS, but often limit them to specific markets, rather than nationally. Samuelson Decl. ¶28. For example, Compass advertises buying services in 35 states, and displays no listings in Salt Lake City, Utah, where Compass is not a licensed brokerage. Buffier Decl., Exs. E, F at 1. Some brokerages also prioritize homes they are selling. For example, in San Diego, prospective buyers on Compass's website are first directed to listings sold by Compass. *Id.*, Ex. G. at 1-4.

### C. Compass Promotes Its Hidden Listing Scheme for Its Own Benefit, to the Detriment of Consumers

Compass is the largest real estate brokerage in the country, with annual revenue more than double Zillow's. *Id.*, Exs. I at 3, J at 1. Compass's Hidden Listing Scheme, or what it calls

3-Phase Marketing, is a prime example of how large brokerages have expanded hidden listings for their own benefit.

The Scheme works like this: In Phase One, a listing is marketed as a "Private Exclusive," but as Compass explains, "[p]rivate isn't hidden, exclusive isn't secret," Buffier Decl., Ex. K at 1, and buyers can only learn about these listings through a Compass agent. Compl. ¶57. In Phase Two, listings are publicly accessible on Compass's website, *id.*, in exchange for buyers providing their contact information and agreeing to "[c]onnect with an agent." Buffier Decl., Ex. L at 1. "Working with an agent from" Compass "grants you access to private listings before the competition." *Id.*, Ex. L at 2. These two phases give Compass an opportunity to represent both buyer and seller, increasing its revenue because it "generates substantially all of its revenue from commissions" paid to its agents. *Id.*, Ex. H at 10. However, "almost all" homes fail to sell initially and proceed to Phase Three. Hardy Decl. ¶24. In Phase Three, Compass enters the home on the MLS, where it can be accessed by other brokerages, Zillow, and others, Compl. ¶57, so Compass reaps the benefits of transparency and broad distribution by freeriding on others' investments.

Compass attracts buyers and sellers to the Hidden Listing Scheme in two ways. First, Compass uses double-speak to promote it. Compass claims that the Scheme helps sellers do better and increases competition. Reffkin Decl. ¶¶8-9. But it tells buyers the opposite: "Maximize your chance of beating out the competition and potentially avoid bidding wars." Buffier Decl., Ex. L at 3. Compass also claims that the Scheme helps sellers generate "demand among serious buyers" yet concedes that most homes sell in Phase Three. Reffkin Decl. ¶8; Compl. ¶¶58-59. And when a listing is published in Phase Three, the "days on market" and price history are a blank slate, misleading buyers. Compl. ¶57.c.

Second, Compass has set a goal to obtain "on average 30% market share in [its] top 30 cities." Buffier Decl., Ex. M at 5. As a Compass brokerage explains, having higher market share "gives clients of Compass access to more properties and buyers than any other broker," making Compass a must-have to see listings. *Id.*, Ex. N at 1.

Hidden listings harm buyers by limiting listing access and their choice of brokerage. Samuelson Decl. ¶30. At best, buyers visit multiple sites for a comprehensive view of their local market. *Id.* At worst, exclusivity cuts off access to listings unless buyers work with the listing agent or brokerage. *Id*. Sellers can also be harmed by reduced competition among buyers. *Id.* Accordingly, experts, consumer advocates, and Zillow's own analyses have concluded that hidden listings harm consumers. *Id.* ¶31, Exs. D-M.

### D.    Compass Lobbies NAR to Dilute CCP and Advance Its Self-Interest in Hidden Listings

Compass has been waging a campaign against transparency and listings access. This includes lobbying the National Association of Realtors ("NAR") to repeal its Clear Cooperation Policy ("CCP"). *Id.* ¶¶38, 41, Ex. N. Established in 2020, CCP generally requires brokerages to submit listings to the MLS within one business day of publicly marketing the home. *Id.* ¶37. CCP promotes competition among buyers' agents by allowing agents who are unaffiliated with the listing agent's brokerage to learn about homes and represent buyers in those transactions. *Id.*

Despite Compass's efforts, NAR maintained CCP but revised the policy in March 2025, Solh Decl., Ex. F, to create a new category of listings where sellers may delay public distribution of their listing in MLS data feeds for the period allowed by the MLS. Samuelson Decl. ¶40. The modified CCP also relaxed the meaning of public marketing to allow communication between different brokerages. *Id.* NAR-affiliated MLSs must implement these changes by September 30, 2025. *Id.* Compass has since announced that it "has not and will not adhere to CCP." *Id.*, Ex. N.

-7-

### E.    Zillow's Listing Access Standards Mitigate the Impacts of Hidden Listings

New for-sale listings are valuable to Zillow because they result in increased views compared with older listings. New listings tend to attract buyers who are actively looking for a home and are therefore likely to generate revenue for Zillow from its advertising and lead-generation services. *Id.* ¶32. If Zillow displays fewer new listings, its platform will be less valuable to prospective buyers, and transparency will be diminished. *Id.* ¶¶33-35. Moreover, allowing listing agents to withhold new-to-market listings from Zillow while sending stale, formerly-hidden listings with misleading information permits freeriding off of Zillow's investments. *Id.* ¶34.

Zillow developed the Listing Access Standards to help mitigate the damaging effects of hidden listings. *Id.* ¶42, Ex. O. Under the Standards, Zillow will not display on Zillow or Trulia a listing that a brokerage did not enter into an MLS for public display within one business day of public marketing. *Id.* ¶¶43-45. Only if the brokerage cannot disseminate the listing via MLS, Zillow will accept the feed directly. *Id.* ¶47. The Standards apply to all brokerages and are not specific to Compass. *Id.* ¶46. Zillow does not have an agreement with any other home search platform to apply a similar policy. *Id.* ¶¶53-54. And the Standards do not control what listings are displayed elsewhere. *Id.* ¶46. For example, search competitor Homes.com offers premium placement for listings Zillow does not display. Buffier Decl., Ex. O at 1.

The Standards preserve choice. Sellers are free to sell their homes privately, where the Standards do not apply. Sellers can list their homes publicly but exclusively with one brokerage. If those sellers later want their listing displayed on Zillow, they can do so by entering into a new listing agreement with another brokerage who distributes the listing in compliance with the Standards. Samuelson Decl. ¶¶48-49. Likewise, brokerages are free to provide any mix of private, exclusive, and public marketing services. *Id.* ¶50.

The Standards improve Zillow's listing quality by maintaining Zillow's promise to "turn on the lights" and empower consumers with timely, accurate, and complete information that has not been manipulated with misleading "days on market" and price history. They also reduce freeriding by brokerages who hoard and then release their failed hidden listings and leech off Zillow's audience of high-intent buyers. *Id.* ¶52. Further, the Standards communicate Zillow's perspective that hidden listings have negative effects on consumers, Zillow, and the real estate industry, and demonstrate that it is possible for the industry to succeed while avoiding those effects by increasing access to listing information. *Id.* ¶55. Zillow believed it was important to take this stand to counter an emerging narrative that hidden listings were an inevitable industry trend. *Id.*

Since Zillow's platform serves brokerages and agents, Zillow made an effort to garner their support for the Standards and asked some brokerages, including eXp, whether they would support the Standards. *Id.* Zillow then publicly announced its Standards on April 10, 2025. *Id.* ¶56. Zillow briefed the press the day prior on April 9 to encourage accurate coverage. *Id.* That same day, Zillow pre-briefed select customers and industry participants, including brokerages like Compass and Redfin. *Id.* Zillow often briefs customers, partners, and industry participants before certain public announcements. *Id.* Zillow also gave agents until June 30, 2025 before enforcing the Standards. *Id.* ¶57.

### F.    Zillow and eXp Did Not Conspire to Boycott Compass

Thousands of eXp agents are customers of Zillow's advertising and referral services. *Id.* ¶59. To seek feedback from a key partner, Zillow's Chief Industry Development Officer, Errol Samuelson, contacted eXp CEO Leo Pareja about Zillow's plans. Mr. Pareja expressed support for the Standards, and the parties began discussing a potential listing feed agreement. *Id.* ¶60.

Zillow and eXp executed a listing feed agreement on April 9, 2025, and announced it on April 10. *Id*. ¶61, Ex. Q. The agreement grants Zillow a non-exclusive feed and license to eXp's listing data and commits eXp to comply with the Standards for its own listings. *Id*. ¶62. It does not commit eXp to provide listings exclusively to Zillow, nor does it constrain whether or how eXp's website displays Compass's listings. *Id*. ¶62, Ex. Q. Indeed, eXp continues to display Compass listings on its website. Buffier Decl., Ex. P at 1-2.

### G.  Zillow and Redfin Did Not Conspire to Boycott Compass

Redfin is a brokerage with local agents who represent buyers and sellers. Samuelson Decl. ¶14. Redfin has publicly supported CCP for many years, with its CEO Glenn Kelman writing in 2019 that CCP "is a crucial protection for consumers, especially members of minority groups who, research shows, are often the last to find out about [private] listings." Buffier Decl., Ex. Q at 1.

On February 11, 2025, Zillow and Redfin announced that they had executed an agreement concerning syndication of multifamily *rental* listings from Zillow to Redfin, which has no relevance here. Hofmann Decl. ¶19, Ex. C at 1. The Standards apply only to for-sale listings, and the rental and for-sale markets are very different. *Id.* ¶19.

On April 9, 2025, as part of its broader outreach, Zillow CEO Jeremy Wacksman called Mr. Kelman to advise that Zillow had decided to implement the Standards and would make a public announcement the next day. Wacksman Decl. ¶8. During the call, Mr. Kelman expressed support for Zillow's decision and indicated that Redfin would likely consider a similar policy. *Id.* ¶9. By then, Zillow had already independently decided to proceed with its Standards. *Id.* ¶¶5-8. At no point did Mr. Wacksman and Mr. Kelman ever discuss or enter into any agreement to boycott Compass. *Id.* ¶10.

On April 14, 2025, Redfin announced that it "will not publish any listings that have been publicly marketed before being shared with all real estate websites via the MLS." Buffier Decl., Ex. R at 1. Mr. Kelman did not coordinate with Mr. Wacksman regarding Redfin's policy. Wacksman Decl. ¶¶8-11. The policy serves Redfin's self-interest because, like Zillow, its business model depends on access to accurate, up-to-date listings. To date, Redfin has not announced when or how it will implement its policy. Samuelson Decl. ¶¶65-66.

### H.    Zillow Tries to Partner with Compass While Compass Continues to Benefit from Zillow's Services

In March 2025, Compass requested a meeting with Zillow to discuss partnership opportunities. Hofmann Decl. ¶8. They met on April 1, 2025, and discussed ways Zillow could help Compass grow its business while adhering to Zillow's transparency principles. *Id.* ¶9. Zillow was clear that publicly marketed for-sale listings must be accessible to all, but remained open to other ways that they could partner. *Id.* Compass's CEO remarked "All I care about is agents. Taking care of consumers is what you do." *Id.* ¶10. The parties didn't reach an agreement. *Id.* ¶12.

As part of Zillow's outreach on April 9, 2025, Mr. Hofmann called to inform Mr. Reffkin about Zillow's decision to announce the Standards the next day. *Id.* ¶15. They discussed Compass's goal to grow its market share to at least 30% in its key regions and Mr. Reffkin expressed interest in opportunities to partner with Zillow. *Id.* ¶17. Mr. Hofmann explained that Zillow was still open to a partnership that could grow Compass's business while adhering to the Standards. *Id.* ¶¶17-18. Compass continues to benefit from Zillow's investments. As of July 15, 2025, there are over 55,000 Compass-affiliated listings on Zillow. Samuelson Decl. ¶67.

### I.    Compass Announces New Policy to Block Hidden Listings from Zillow

On July 11, 2025, Compass announced a new policy allowing any MLS or brokerage to access all of Compass's hidden listings, with two critical conditions. Samuelson Decl. ¶68, Ex. S. Specifically, the listings may not be displayed on any platform that "monetize[es]" them, such as referring buyers to a non-Compass agent, or "alters" them, such as by displaying information to consumers about the home or neighborhood. *Id.* ¶¶68-69, Exs. S, T. Thus, if a platform like Zillow provides consumers *more agent choice* and *more home information*, Compass will block it from displaying Compass's hidden listings.

Furthermore, despite Compass's claim that the Standards stymie the Hidden Listing Scheme, Reffkin Decl. ¶16, Compass's CEO announced on July 13, 2025 that Compass is currently using "all 3 phases of The Compass 3 Phased Marketing Strategy as designed," effectively conceding that the Standards have *not* affected the Hidden Listing Scheme. Buffier Decl., Ex. S.

## III.    LEGAL STANDARD

"[A] plaintiff seeking a preliminary injunction must make a clear showing that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 339-40 (2024) (cleaned up). "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Students for Fair Admissions v. U.S. Mil. Acad. at W. Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Ent. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "A preliminary injunction is … never awarded as of right." *Starbucks*, 602 U.S. at 345.

## IV.   ARGUMENT

### A.   Compass Has Not Shown a Likelihood of Success on the Merits

#### 1.   The Section 2 Claim Is Unlikely to Succeed

Compass's Section 2 claim is the core of this case: It seeks to bar Zillow from implementing the Standards and force Zillow to deal with Compass on *Compass's* terms. To succeed, Compass must show both (1) "monopoly power in the relevant market" and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014), *as corrected* (June 19, 2014). "[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*" *Id.* (cleaned up).

Compass is unlikely to succeed. First, Compass has not established that Zillow's Standards constitute anticompetitive conduct because "as a general matter, the Sherman Act does not restrict the long recognized right of a trader … freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("*Trinko*") (cleaned up). Second, Compass has not shown that its proposed nationwide market is appropriate, that Zillow has monopoly power in that market, or that any anticompetitive effects outweigh procompetitive benefits. Each of these deficiencies is fatal.

#### a.   Zillow Has No Duty to Deal

The antitrust laws do not require Zillow to display Compass's listings, whether or not Zillow has market power. A refusal to deal with competitors is not anticompetitive because "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the

prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

Compass's Section 2 claim indisputably seeks to impose a duty on Zillow to deal with Compass. Compl. 59. Courts regularly find that standards restricting platform access are not anticompetitive because there is no such duty. *See, e.g.*, *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) (policy limiting apps on Facebook not anticompetitive); *Universal Grading Serv. v. eBay, Inc.*, 2011 WL 846060, at *9 (N.D. Cal. Mar. 8, 2011) (eBay had no duty to deal with business that violated policies).

Compass does not argue that its claim "fall[s] within the sole exception to the right of refusal to deal" based on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), which sits "at or near the outer boundary of § 2 liability." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 54 (2d Cir. 2007) (quoting *Trinko*, 540 U.S. at 409). To establish that *Aspen Skiing* applies, Compass must show (1) "termination of a voluntary *(and thus presumably profitable)* course of dealing" that (2) "suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409. Here, there is no prior voluntary and profitable course of dealing because CCP limited hidden listings since 2020, Hardy Decl. ¶12, and recent changes do not take effect until later this year. Samuelson Decl. ¶40. Nor has Compass shown Zillow's Standards are "irrational but for [their] anticompetitive tendencies." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013). Zillow's Standards are rational and procompetitive, including by improving the quality of Zillow's platform and reducing freeriding. *See* Samuelson Decl. ¶¶34-35, 52.

Compass points instead to *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), which does not salvage its claim. There, a newspaper monopoly, with "the purpose and intent …

to destroy" an upstart radio station, instituted a policy to refuse *all* advertisements from customers who advertised with the radio station, effectively requiring customers to advertise exclusively with the newspaper. *Id.* at 147-49. Here, Zillow's Standards neither require that listings be exclusive to Zillow, nor prohibit or in any way control the supply of listings to another platform. *See Meta Platforms*, 66 F.4th at 304 (policy not contrary to *Lorrain Journal* where it "limits only how [] apps on Facebook operate, and leaves app developers entirely free to develop applications" elsewhere). Just as in *Meta Platforms*, the Standards limit only how listings are displayed on Zillow, and leave sellers free to list elsewhere. Indeed, it is *Compass* that caches hidden listings while Zillow seeks to make listings available to all.

Compass's other cases are unavailing and relate to theories it has not raised. *See U.S. v. Google LLC*, 2025 WL 1132012, at *42-43 (E.D. Va. Apr. 17, 2025) (discussing tying claims); *F.T.C. v. Amazon.com, Inc.*,, 2024 WL 4448815, at *6-7 (W.D. Wash. Sept. 30, 2024) (discussing policy that limited Amazon sellers' discounts on other platforms); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 74 (D.C. Cir. 2001) (discussing requirement that Microsoft's web browser be pre-installed on an exclusive basis). The Standards neither require exclusivity nor control how a listing is displayed anywhere else.

**b.    Other Essential Aspects of the Section 2 Claim Fail**

Numerous other defects are each fatal to Compass's Section 2 claim.

***Compass Has Not Shown a Valid Geographic Market.*** Compass will fail to show that any "home search" market is nationwide. *See Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*, 708 F. App'x 29, 31 (2d Cir. 2017). "[T]he geographic market analysis seeks to identify the precise geographic boundaries of effective competition … by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant

-15-

product." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52-53 (2d Cir. 2016) (quotations omitted).

Compass's motion nowhere explains why a nationwide market is appropriate, and the Complaint reverses the geographic analysis, claiming that a nationwide market is valid because "the Zillow Ban applies nationwide." Compl. ¶92. But that says nothing about how consumers use home search, and Compass does not and cannot show that customers search for homes nationally. Indeed, Compass has conceded in ongoing litigation that "[r]eal estate brokerage services are local." Compl. ¶79, *Compass, Inc.*, *et al v. Northwest Multiple Listing Service*, Case No. 2:25-cv-00766 (W.D. Wash Apr. 25, 2025); *see also Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1017 (6th Cir. 1999) ("geographic market for real-estate brokerage services" is "relatively small"). Compass's own platform prompts buyers to search in a specific location and does not offer listings in *fifteen states*. Buffier Decl., Exs. E, T at 1. That is fatal to a nationwide market because it fails to "reflect[] the total market demand for plaintiffs' product." *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1245 (10th Cir. 2016).

***Compass Has Not Shown That Zillow Has Market Power in a Valid Market.*** "[Market] power is the power to control prices or exclude competition. Defendants with monopoly power have the ability (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298, 322 (E.D.N.Y. 2024) ("*In re Payment Card*") (cleaned up). Here, Compass advances no direct evidence of market power such as increased prices or reduced output. Instead, Compass principally alleges that 64-66% of home buyers and sellers visit Zillow. Mot. 24-25. Those figures are not market shares and

disregard the fact that Zillow facilitates only a single digit share of for-sale transactions. Hofmann Decl. ¶5, Ex. A at 4-5. Nor can "market share alone … conclusively establish monopoly power." *In re Payment Card*, 729 F. Supp. 3d at 322 (cleaned up). "Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002).

Compass gestures to barriers to entry, Mot. 26, but fails to show any. Zillow faces intense competition because MLS listings are widely available and new competitors continue to enter the market. Hofmann Decl. ¶6 & Ex. B at 1-2. Indeed, Compass concedes that it obtains MLS listings for its own platform. *See* Hardy Decl. ¶9. *US Airways, Inc. v. Sabre Holdings Corp.* is inapposite, Mot. 26, as there is no allegation here that "net pricing … approached double the competitive level." 2022 WL 1125956, at *9 (S.D.N.Y. Apr. 15, 2022).

***Compass Cannot Survive Burden Shifting.*** Compass has not shown that its Section 2 claim survives the burden-shifting framework for anticompetitive conduct. If the plaintiff proves that a monopolist's conduct is anticompetitive, the defendant may proffer procompetitive justifications, and plaintiff must "either rebut those justifications" or "demonstrate that the anticompetitive harm outweighs the procompetitive benefit." *In re Payment Card*, 729 F. Supp. 3d at 327.

Compass makes no such required showing. Mot. 22. First, Compass offers no evidence of anticompetitive conduct in the relevant market because Zillow's Standards do not constrain Compass's platform—or any other. Indeed, Compass's July 11 announcement demonstrates that Compass remains free to share its listings. Samuelson Decl. ¶¶68-69. Likewise, Homes.com announced it will promote listings Zillow does not display. Buffier Decl., Ex. O at 1. That new players have recently entered the market and are able to obtain MLS listings is also inconsistent

with reduced competition. *See* Hofmann Decl. ¶6. Second, the Standards have numerous

procompetitive benefits, such as discouraging freeriding by requiring brokerages to share listings

in order to enjoy (for free) the benefits of Zillow's investments. *See, e.g.*, *Polk Bros. v. Forest

City Enters., Inc.*, 776 F.2d 185, 190 (7th Cir. 1985) ("[C]ontrol of free riding is a legitimate

objective"); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 222 (D.C. Cir.

1986) (forced sharing undermines antitrust enforcement). The Standards also improve the quality

of Zillow's listings by discouraging "stale" listings, Compl. ¶72, another procompetitive benefit.

*See F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (enhanced "consumer appeal" is

procompetitive); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001)

(improving quality is procompetitive). Finally, Compass does not and cannot rebut any

procompetitive benefits or show that balancing weighs in its favor.

### 2. The Section 1 Claim Is Unlikely to Succeed

Compass's Section 1 claim does not fare any better. To prevail, Compass must show that

"the evidence 'reasonably tends to prove that the [defendant] and others had a conscious

commitment to a common scheme designed to achieve an unlawful objective.'" *U.S. v. Apple,

Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (citation omitted). Section 1 "applies only to concerted

action that restrains trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010);

*see also Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (restraint must be "unreasonable").

Compass's motion fails as to the alleged agreements with either eXp or Redfin.[1]

---

[1] Compass's motion does not discuss Compass's Section 1 claim as to "other brokerages" (Count 2).

### a.    Zillow and eXp Did Not Agree to Boycott Compass

Compass's Section 1 claim fails because the agreement between Zillow and eXp does not restrain trade. Nor is the vertical supply agreement subject to *per se* or "quick look" treatment.

***The eXp Partnership Does Not Restrain Trade.*** Compass has grossly mischaracterized Zillow's agreement with eXp. Their agreement does not relate to Compass at all, nor affect how Compass distributes or obtains listings. The written agreement (1) grants a license from eXp to Zillow to use a feed of eXp's home sale listings and (2) commits eXp to comply with the Standards *as to eXp's listings.* Samuelson Decl. ¶62 & Ex. Q. Neither the agreement nor the Standards dictate how eXp operates its own website and eXp remains free to display all Compass listings to prospective buyers. In the absence of a restraint, the agreement is not unlawful. *See Am. Needle*, 560 U.S. at 190.

***The eXp Agreement Passes Muster Under the Rule of Reason.*** The eXp agreement is subject to the rule of reason because it is a vertical agreement between a supplier of listings (eXp) to a distributor (Zillow). "Vertical restraints … are generally subject to rule of reason analysis," *O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 588 (E.D.N.Y. 2020) (cleaned up), because "*[p]er se* liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *see also Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 408 (2d Cir. 1981) (applying rule of reason to hybrid agreement with vertical and horizontal relationships). Likewise, "quick look" applies only to plainly anticompetitive agreements that require a mere "cursory examination." *Texaco*, 547 U.S. at 7 n.3 (2006). Here, Zillow's efforts to reduce freeriding and improve listings quality are not plainly anticompetitive. Properly analyzed under the rule of reason, Compass's conspiracy theory suffers all of the same defects as its Section 2 claim. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946,

998 (9th Cir. 2023) (Section 1 rule-of-reason test and Section 2 anticompetitive conduct test are "essentially the same").

<b>b.    Zillow and Redfin Did Not Agree to Boycott Compass</b>

Compass's Section 1 claim also fails because there was no agreement between Zillow and Redfin to boycott Compass and any claim premised on such an agreement would fail because the alleged agreement is not anticompetitive.

***There Is No Agreement with Redfin to Boycott Compass or Restrain Trade.*** Compass cannot establish an agreement between Zillow and Redfin to boycott Compass or otherwise restrain trade because no such agreement exists. Zillow unilaterally created and launched its Standards. Samuelson Decl. ¶53. Consistent with past announcements, the day before the announcement, Zillow briefed Redfin, along with customers, industry participants, the press, and others, *including Compass*. Hofmann Decl. ¶¶14-15. Redfin subsequently and independently announced its own policy discouraging hidden listings. Wacksman Decl. ¶11. However, at no point did Redfin and Zillow discuss or agree to collectively boycott Compass or hidden listings. *Id.* ¶¶10-11.[2]

***Any Alleged Agreement with Redfin Will Pass Muster Under the Rule of Reason.*** Even if the Court assumes, counterfactually, that Zillow and Redfin agreed to exclude certain Compass listings from their platforms, which they did not, that agreement would be subject to the rule of reason.

*Per se* treatment is limited to "cases where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are

---

[2] Compass also points to a partnership between Zillow and Redfin, but that partnership relates to multifamily *rental* listings and is irrelevant to the Standards, which apply only to home *sale* listings. Hofmann Decl. ¶19.

conclusively presumed illegal." *Balaklaw v. Lovell*, 14 F.3d 793, 800 n.14 (2d Cir. 1994) (quotations omitted). Indeed, group boycotts are *per se* unlawful only in "some limited circumstances," *id.* at 800, and *per se* analysis is inappropriate "where the economic impact … is not immediately obvious." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986). Thus, *per se* treatment of group boycotts is reserved for when a boycott "had no purpose other than disadvantaging the target." *Honey Bum, LLC, v. Fashion Nova, Inc*., 63 F.4th 813, 820 (9th Cir. 2023).

The alleged agreement with Redfin is nothing like a "classic boycott." *Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*, 641 F. Supp. 1179, 1188 (S.D.N.Y. 1986) (courts "almost without exception have held the *per se* rule inapplicable" outside classic group boycotts). The Standards neither target Compass specifically, nor prevent Compass from doing business with any of the myriad competing home search providers. Samuelson Decl. ¶46. Nor would the alleged agreement "exclude other competitors or potential competitors," *Topps*, 641 F. Supp. at 1187, because competitors can obtain listings from the MLS and display any listings they want.

Moreover, the alleged conduct has none of the characteristics that might call for *per se* analysis. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co*., 472 U.S. 284 (1985). First, Compass has not been "cut off" from anything it needs to compete as a home search provider; the alleged agreement does not prevent Compass from obtaining or displaying listings. *See, e.g.*, *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 690-91 (9th Cir. 2022) (*per se* inappropriate where defendants did not control access to a supply necessary to compete). Second, Compass has not established that Zillow (or Redfin) have market power in any valid market. Third, the alleged agreement would be justified by "plausible arguments that they were

intended to enhance overall efficiency and make markets more competitive." *Nw. Wholesale Stationers*, 472 U.S. at 294. Efforts to discourage the negative effects of hidden listings on consumers, improve quality, and reduce freeriding are procompetitive, as explained above.

Nor do Compass's cases support *per se* treatment. In *F.T.C. v. Superior Court Trial Lawyers Association*, the Court applied *per se* treatment where court-appointed counsel agreed to refuse cases absent a rate increase, which the Court deemed "the essence of price-fixing." 493 U.S. 411, 416-23 (1990). Here, Compass does not allege price fixing. *See Collins v. Assoc. Pathologists, Ltd*., 844 F.2d 473, 479 (7th Cir. 1988) ("boycotts are illegal per se only if used to enforce agreements that are themselves illegal per se—for example price fixing"); *cf. In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 216 (S.D.N.Y. 2019) (conduct "caused consumers to pay supra-competitive prices"). Also, Compass's customers are not required to share listings with Zillow to use its search platform, so Compass is free to differentiate itself with exclusivity. *Cf. PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 835-36 (9th Cir. 2022) (*per se* rule applied where "express purpose" of policy was to prevent new entrant and impair competition "on almost any dimension"). Finally, Compass does not allege that its platform relies on Zillow or Redfin directing users *to* Compass, such that it will lose a supply of traffic. *Cf. PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 344 (S.D.N.Y. 2021) (alleged boycott resulted in 76% reduction in website traffic).

Any alleged agreement between Zillow and Redfin must be analyzed under the rule of reason, where Compass's claim will fail for the same reasons as its Section 2 claim.

### 3. Compass Lacks Antitrust Standing for All of Its Claims

Compass cannot prevail on its claims because it lacks antitrust standing. *See IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019). Compass must show it

-22-

suffered antitrust injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful" because the antitrust laws are intended to "protect[] … competition, not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To assess antitrust injury, "(1) the court must identify the practice complained of and the reasons such a practice is or might be anticompetitive; (2) the court must identify the actual injury the plaintiff alleges which requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct; [and] (3) the court compares the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *IQ Dental Supply*, 924 F.3d at 62-63 (cleaned up). Compass fails at least the second and third steps.

Step Two. The injuries that Compass alleges are (1) fewer customers and agents using Compass's brokerage services; (2) an inability to "differentiate"; and (3) a vague reduction in "listing innovations." Compl. ¶¶105-07. None is sufficient.

First, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016); *see also Qualcomm*, 969 F.3d at 992 ("Courts must focus on anticompetitive effects in the market where competition is allegedly being restrained" (cleaned up)). That some sellers may not want to use Compass *as a brokerage* does not establish any injury to competition in the alleged market for *online home search*. *See Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 48 (D.D.C. 2024) (dismissing claims where harms were in another market).

Second, none of Compass's alleged injuries are "market-wide harm, as opposed to harm only to [Compass]." *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at \*7 (S.D.N.Y. Mar. 31, 2021); Mot. 10-11 (noting harms to Compass only).

Step Three. Compass fails to demonstrate that "anticompetitive behavior caused the injury," *IQ Dental Supply*, 924 F.3d at 64-65, meaning its injury "stems from a competition-reducing aspect or effect" of the behavior. *In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2419528, at \*7 (S.D.N.Y. June 14, 2021).

Compass fails to show how Zillow's Standards reduce *competition* among home search platforms. Compass alleges only that the Standards "destroy[] Compass's ability to do the first two phases." Compl. ¶106. But the Standards merely set rules for listings displayed on Zillow's own platform, leaving other platforms free to display any listings. Indeed, Compass's platform displays its hidden listings, demonstrating that the Standards do not prevent differentiation. *Id*. ¶57.

### B.   Compass Has Not Shown Irreparable Harm

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999). Compass must demonstrate it "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp*., 559 F.3d 110, 118 (2d Cir. 2009). Harm is only irreparable where "remedies … at law, such as monetary damages, are inadequate to compensate" for the harm. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). Compass cannot satisfy this demanding standard.

1.    <u>Compass's Conduct Is Inconsistent with Its Claims of Irreparable Harm</u>

Compass's claims of irreparable harm cannot be reconciled with its recent conduct and

statements. *See Sarieddine v. D & A Distrib., LLC*, 2017 WL 6940537, at \*12-15 (C.D. Cal. July

13, 2017) (denying preliminary injunction where post-motion conduct was inconsistent with

irreparable harm). On July 13, 2025, Compass's CEO announced that Compass is currently

implementing the Hidden Listing Scheme "as designed," meaning the Standards did not require a

change to Compass's strategy. Buffier Decl., Ex. S. Furthermore, on July 11, 2025, Compass

announced that it now will share its hidden listings provided the brokerage or MLS agrees not to

"alter" or "monetize" the listing, effectively targeting platforms like Zillow's. Samuelson Decl.,

Exs. S-T. That is flatly at odds with Compass's claimed need to access Zillow as a purportedly

"must-have option" for sellers. Mot. 10. Compass cannot claim irreparable harm from exclusion

from Zillow's platforms when it now demands precisely that same exclusion.

2.    <u>Compass's Delay in Seeking Injunctive Relief Belies Any Emergency</u>

A preliminary injunction is appropriate only where "there is an urgent need for speedy

action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.

1985). Delay in moving for injunctive relief "undercuts the sense of urgency … and suggests that

there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods*., 60 F.3d 964,

968 (2d Cir. 1995). That Compass waited nearly three months, since April 10, Reffkin Decl. ¶12,

before seeking an injunction shows that it has no "urgent need for speedy action." *Citibank, N.A*.,

756 F.2d at 276. This months-long delay "alone … preclude[s] the granting of preliminary

injunctive relief." *Tough Traveler*, 60 F.3d at 968. *See also Citibank, N.A*., 756 F.2d at 276-77

(delay of ten weeks defeated claim of irreparable harm); *Life Techs. Corp. v. AB Sciex Pte. Ltd*,

2011 WL 1419612, at \*7-8 (S.D.N.Y. Apr. 11, 2011) ("Courts typically decline to grant

preliminary injunctions in the face of unexplained delays of more than two months.") (cleaned up).

### 3.    Compass Has Not Shown That Any Cognizable Harm Would Not Be Compensable

"[I]rreparable injury means injury for which a monetary award cannot be adequate compensation." *Jackson Dairy, Inc. v. H.P. Good & Sons, Inc*., 596 F.2d 70, 72 (2d Cir. 1979). Compass alleges that the Standards will harm its "competitive advantage" and cause "lost reputation, business opportunities, and clients." Mot. 10-11. But Compass fails to show that these harms are not compensable.

First, Compass cites "hundreds of hours" of executive time, the development of "training and marketing materials" and purchases of "digital ads" and "media blitzes," Hardy Decl. ¶16, but does not explain why these costs are not compensable.

Second, Compass offers only bare allegations that it will lose customers. *See JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (no irreparable harm where plaintiff "presented no evidence" of harm to goodwill). Compass contends that some sellers and agents have contacted Compass to inquire about the Standards, Mot. 11, but fails to establish the purported losses or that such losses were caused by the Standards, which is insufficient for a "clear showing" of harm. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Moreover, loss of goodwill is irreparable only when "the very viability of the plaintiff's business, or substantial losses of sales … have been threatened." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc*., 60 F.3d 27, 38 (2d Cir. 1995) (cleaned up). "If the wrongful activity threatens only the disruption as opposed to the destruction of an ongoing business there is no irreparable injury." *USA Network v. Jones Intercable, Inc*., 704 F. Supp. 488, 491 (S.D.N.Y. 1989). Compass does not try to meet this standard.

Finally, Compass's claim that investors are "confused and concerned" is insufficient. In *WatchIt Technologies, Inc. v. Big Apple Consulting USA, Inc.*, the court found irreparable harm from plaintiff's loss of financing and plummeting share price. 2008 WL 1902113, at *4 (W.D.N.C. Apr. 25, 2008). Nowhere does Compass allege a drop in stock price.

### 4. Compass's Speculative Harms to Competition or Consumers Provide No Basis for an Injunction

Unable to show irreparable harm, Compass argues that Zillow's Standards will injure competition. Accepting Compass's argument would create a presumption that a likelihood of success on an antitrust claim establishes irreparable harm, which the Supreme Court has rejected. *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also* 15 U.S.C. § 26 (injunctive relief in private-plaintiff antitrust lawsuits no different than any other lawsuit).

The cases relied on by Compass are inapposite because they do not involve preliminary injunctions, evaluate irreparable harm, or involve a private plaintiff. *See Indiana Fed'n of Dentists*, 476 U.S. at 459 (review of ALJ findings); *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (appeal following bench trial); *North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018) (no analysis of irreparable harm); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 662 (2d Cir. 2015) (filed by state on behalf of consumers). None of Compass's authorities suggests that an alleged impact on competition alone warrants injunctive relief. *See Solus Alternative Asset Mgmt. LP v GSO Cap. Partners, L.P.*, 2018 WL 620490, at *6 (S.D.N.Y. Jan. 29, 2018) (finding no "authority in which a court has found irreparable injury based solely on public harm without any demonstrated irreparable harm to the plaintiff").

Further, Compass's alleged harms to consumers are speculative. Compass contends that the Hidden Listing Scheme helps "with better pricing," Mot. 13, but that does not show actual

-27-

harm. Indeed, consumer advocacy groups have concluded the opposite. Samuelson Decl. ¶31, Exs. J-L. Finally, Compass's complaints about Zillow's informational features, Mot. 15, are undermined by the relief it seeks: *to force Zillow to display its listings*.

### C.    The Balance of the Hardships Favor Zillow

"[T]he balance of hardships inquiry asks which of the two [sides] would suffer most grievously if the preliminary injunction motion were wrongly decided." *Absolute Recovery Hedge Fund, L.P. v. Gaylord Container Corp.*, 185 F. Supp. 2d 381, 388 (S.D.N.Y. 2002) (cleaned up). The balance heavily favors Zillow because an injunction would force Zillow to deal and display Compass's listings, while Compass seeks to prevent Zillow from earning a return on its investments and impair its promise of transparency to consumers. Samuelson Decl. ¶¶34-35. Forcing a defendant to assist a competitor is "the epitome of irreparable harm." *United Asset Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008, 1042 (N.D. Ill. 2006); *see also Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 764 (2d Cir. 1979) (balance of hardships favor defendant where it would be "frozen into an intimate and continuous relationship with a dealer it no longer wishes to be associated with").[3]

### D.    The Public Interest Would Be Disserved by an Injunction

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 23-24 (citation omitted). Here, the public interest weighs against an injunction.

---

[3] Accordingly, if the Court finds a likelihood of success only as to Compass's Section 1 claim, any injunction should be limited to the alleged conspiracy, not to Zillow's unilateral Standards. *See Authenticom, Inc. v. CDK Glob, LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017) (injunction must remove offending restraint, not force parties to "do business … on terms to which they did not agree").

The status quo is not, as Compass argues, hidden listing networks. For *years*, the status quo has been reciprocal access, to the benefit of consumers. An injunction would encourage brokerages to upend this status quo by hoarding listings and reducing consumer choice. Denying Compass's injunction would further the public interest in an accessible, competitive market. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1211 (D.C. Cir. 2004) (rejecting injunction that would be "likely to harm consumers"). It is thus no surprise that consumer advocacy groups oppose hidden listings and favor accessible, transparent listings. Samuelson Decl., Exs. J-L.

## V.    <u>CONCLUSION</u>

Defendants respectfully request that the Court deny Plaintiff's motion for a preliminary injunction.

Dated: July 17, 2025                   Respectfully submitted,

                                        WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation

                                        s/ *Beau W. Buffier*
                                        Beau W. Buffier (NY Bar No. 3932050)
                                        1301 Avenue of the Americas, 40th Floor
                                        New York, New York 10019
                                        Telephone: (212) 999-5800
                                        Facsimile: (866) 974-7329
                                        Email: bbuffier@wsgr.com

                                        Bonnie Lau (admitted *pro hac vice*)
                                        One Market Plaza, Spear Tower, Suite 3300
                                        San Francisco, California 94105
                                        Telephone: (415) 947-2000
                                        Facsimile: (866) 974-7329
                                        Email: blau@wsgr.com

Eric P. Tuttle (admitted *pro hac vice*)
Nicholas R. Sidney (admitted *pro hac vice*)
701 Fifth Avenue, Suite 100
Seattle, Washington 98104
Telephone: (206) 883-2500
Facsimile: (866) 974-7329
Email: eric.tuttle@wsgr.com
Email: nsidney@wsgr.com

*Counsel for Defendants Zillow, Inc., Zillow Group, Inc., and Trulia, LLC*

## WORD COUNT CERTIFICATION PURSUANT TO
## LOCAL RULE 7.1(c) AND INDIVIDUAL RULE 5.A

Pursuant to Southern District of New York Local Rule 7.1(c) and Rule 5.A of this

Court's Individual Rules and Practices in Civil Cases, I hereby certify that the above

memorandum is 8,724 words.

s/ *Beau W. Buffier*
Beau W. Buffier