**EXHIBIT F**

# FAIR HOUSING SOLUTIONS:

## OVERCOMING REAL ESTATE SALES DISCRIMINATION



**DECEMBER 2019**

**National Fair Housing Alliance**

**Cat Cloud**
**Debby Goldberg**
**Lisa Rice**
**Jorge Soto**
**Morgan Williams**



# Table of Contents

**INTRODUCTION**                                                      **3**

**HISTORY OF REAL ESTATE SALES DISCRIMINATION**    **4**

**NATIONAL DATA**                                                      **6**

**THE COST OF DISCRIMINATION**                         **7**

**SOLUTIONS**                                                            **9**

**ABOUT THE NATIONAL FAIR HOUSING ALLIANCE**

Founded in 1988 and headquartered in Washington, DC, the National Fair Housing Alliance is the only national organization dedicated solely to ending all forms of housing discrimination. NFHA is the voice of fair housing and works to eliminate housing discrimination and to ensure equal housing opportunity for all people through leadership, education, outreach, membership services, public policy initiatives, community development, advocacy, and enforcement. NFHA is a consortium of more than 220 private, non-profit fair housing organizations, state and local civil rights agencies, and individuals from throughout the United States.

**ACKNOWLEDGEMENTS**

NFHA would like to recognize the following for their various roles in completing the outstanding real estate sales investigation on Long Island, New York, including designing the methodology; implementing, analyzing, and documenting the investigation; and reporting on the profound and compelling results.

- Newsday
- Fred Freiberg, Fair Housing Justice Center
- Robert Schwemm, University of Kentucky College of Law
- Thomas Silverstein, Lawyers' Committee for Civil Rights Under Law

# Introduction

On November 17, 2019, Newsday released a scathing report detailing an investigation into the nature and extent of real estate sales practices on Long Island in New York.  The report, entitled *Long Island Divided*, was the culmination of a three-and-a-half year comprehensive investigation entailing 240 hours of secretly recorded meetings with real estate agents and analysis of 5,764 house listings.  It revealed a 19 percent rate of discrimination against Asian Americans, 39 percent rate of discrimination against Latinos, and 49 percent rate of discrimination against African Americans.  Altogether, the agents in the Newsday investigation gave White testers 50 percent more listings than those given to their equally qualified Black counterparts.

> *"But you don't want to go there.  It's a mixed neighborhood."*
> *Century 21 agent warning a White tester*
> *~Newsday Report*

The findings in the Newsday report are startling, but they are not new.  They mirror the results of a multi-year, multi-city real estate sales investigation the National Fair Housing Alliance (NFHA) conducted in the mid-2000s.  In that investigation, which consisted of 145 matched pair tests in 12 cities, we found an 87 percent rate of racial steering, meaning the testers were given listings or shown homes only in neighborhoods occupied predominantly by people of the tester's race.  In one test in Atlanta, an agent actually brought two sets of listings to a meeting with a tester explaining that he could not tell if the tester was White or Black over the phone.  When he saw the tester was White, he threw one set of listings into the back seat of his car and said he wouldn't be needing those.  That tester only saw homes in White neighborhoods, even after asking to see a home that was located in an integrated neighborhood.  A real estate agent in Brooklyn pulled out a map and drew red lines around White neighborhoods in which the White tester's housing search should be limited, and he drew red arrows to indicate to the tester the neighborhoods that were "changing."

Like the Newsday investigation, NFHA's multi-year investigation revealed that real estate agents: used schools as a proxy for race and a means to steer people based on race; refused to provide services to consumers of color; showed borrowers of color far fewer homes than their White counterparts; provided inaccurate information to borrowers of

color; made inappropriate statements based on race; placed higher requirements on borrowers of color; and steered potential consumers based on race.

> *"I made two different sets of listings, one set in case you were white and one set in case you were black."*
> *~Real estate agent in Atlanta during NFHA's investigation*

The NFHA investigation resulted in the filing of eleven enforcement actions with the U.S. Department of Housing and Urban Development (HUD) and one lawsuit against real estate firms that engaged in discriminatory activities. After years of unfruitful administrative investigations and only two case resolutions, NFHA was left with serious concerns about the ability and willingness of federal enforcement agencies to enforce our nation's fair housing laws. In the one lawsuit NFHA filed, the defendant declared bankruptcy and closed its doors to avoid proceeding with the litigation. This means that most of the companies and agents were free to continue discriminatory practices.[1]

More than a decade later, Newsday's investigation of real estate sales practices on Long Island sends a clarion call to elected officials, state Attorneys General, federal regulators, and the housing industry that there is much to do to put an end to discrimination in the business of real estate. The dual goals of the Fair Housing Act to end housing discrimination and create diverse communities are far from realized.

This report highlights the solutions that we know are effective for curtailing discriminatory real estate sales practices. We provide a brief historical backdrop of the nature and extent of discrimination in the real estate sales industry; outline some of the costs related to discrimination and segregation; and itemize the remedies our society must pursue to exact real, meaningful, and lasting change. Discrimination costs us dearly. It stifles economic progress and harms families and communities. We must eliminate it if we are to provide people with the opportunities that are theirs by right.

# Brief History of Real Estate Sales Discrimination

Discrimination in the sale of real property has a long history in the United States. In fact, this form of discrimination was for decades explicitly sanctioned by federal, state, and local

---

[1] For more information on NFHA's investigation, see both the NFHA 2007 Fair Housing Trends Report and 2008 Fair Housing Trends Report.

governments.  It was also promulgated and perpetuated by the private market.  The National Association of Real Estate Boards (the precursor to the National Association of Realtors®) encouraged racial segregation and discrimination.  It even prescribed a Code of Ethics that mandated that its members work to segregate communities and oppose integration.

Housing developers, real estate professionals, and governments all promoted the use of racially restrictive covenants that precluded people of color from being able to purchase homes in the communities of their choice, based solely on race or national origin.  The Homeowners Loan Corporation (HOLC), established in 1933, implemented a system that rated neighborhoods based on a number of factors, including race.  The HOLC hired local real estate professionals in more than 200 cities to complete "Residential Security Surveys" which were used to create "Residential Security Maps," which ultimately became standardized redlining maps.  In each survey, the real estate professional would have to designate the percentage of Blacks living in a neighborhood, and this piece of information significantly formed the basis of whether or not the neighborhood would be designated as "desirable" or "hazardous."  Typically, neighborhoods with any percentage of Black residents were labeled as hazardous.

Real estate agents also engaged in discriminatory practices, such as real estate steering and blockbusting, which were extremely harmful to consumers and communities of color.  As a result, U.S. neighborhoods are highly segregated.  Our cities are more segregated today than they were in 1920.  Most hyper-segregated cities are located in northern locales such as Milwaukee, Chicago, New York, and Cleveland.  However, some southern cities, like Atlanta, Baltimore, Memphis, and Montgomery, are hyper-segregated as well.

> *"Follow the school bus; see the moms that are hanging out on the corners."*
> *Coldwell Banker Residential Brokerage Agent*
> *~ Newsday*

Segregation is key because it is the bedrock of all other inequalities in our nation.  Segregation drives discriminatory outcomes, such as disparities in health, employment, credit access, income, environmental quality, wealth, and education.  Schools are segregated because neighborhoods are segregated.  That is why schools can so easily be used as a means of steering prospective buyers based on race or national origin, as

evidenced in the Newsday investigation and NFHA's multi-state investigation.  In fact, when discrimination occurs, real estate agents often use schools to send signals to consumers about the racial composition of a neighborhood as a means of primarily discouraging White consumers from purchasing homes in communities of color.

## National Data

Each year, NFHA conducts an analysis of fair housing data compiled from fair housing organizations from throughout the country, the Department of Justice, and the Department of Housing and Urban Development.  This data is a component of our annual Fair Housing Trends Report.  The 2019 Trends Report, which is based on 2018 data, revealed that discrimination in the real estate sales industry remains intransigent.

In 2018, complaints of real estate sales discrimination increased to 819, up slightly from the 805 complaints filed in 2017.  The complaints filed in 2018 represented an 11.7 percent increase over the number of complaints filed in 2014 as the chart below illustrates.  These complaints represent only the tip of the iceberg of real estate sales discrimination.  It is often difficult for buyers to recognize discrimination, as they do not know what properties are available, what reasonable qualification standards should be acceptable, whether or not properties have actually already been sold, or what happens to other buyers who have similar qualifications and housing needs – phenomena borne out in the Newsday investigation.



Data based on NFHA Fair Housing Trends Reports available at: https://nationalfairhousing.org/reports-research/

# The Cost of Discrimination

The discrimination revealed by the Newsday investigation illustrates one of the many potent forces that perpetuates residential segregation in the United States.  This type of discrimination results in great harm, not only to individuals and families whose choices about where to live are restricted by discriminatory practices, but also to communities, regions, and the nation as a whole.  As described in more detail in NFHA's 2017 Fair Housing Trends Report, "The Case for Fair Housing,"[2] these costs are felt in many ways.

For example, because the neighborhood in which a child lives often determines where that child goes to school, we see the cost of discrimination reflected in the nature and quality of the schools to which children have access, and their subsequent educational attainment.  In 1991, the average Black student attended a school in which 35 percent of his or her fellow classmates were White.  By 2013, only 28 percent of those classmates were White.[3] Looking just at poor households, all of which are most likely to live near underperforming schools, we find that children in poor Black and Latino households live near schools whose median math and reading scores are in the 17th and 27th percentiles, respectively.  In contrast, the media test scores for the schools closest to poor White children were in the 47th percentile.[4]

It comes as no surprise, then, that we see significant racial and ethnic disparities in high school and college graduation rates.  In 2014, 87.2 percent of White students graduated from high school, compared to 72.5 percent of Black students and 76 percent of Latino students.[5]  And among adults age 25 and older, 33 percent of Whites have a bachelor's degree, compared to only 19 percent of Black adults and 14 percent of Latino adults.

These disparities in educational attainment translate into employment disparities.  According to the Georgetown Center on Employment and the Workforce, "By 2020, 65 percent of all jobs in the economy will require postsecondary education and training beyond high school."[6]   The differences in educational attainment mean there are

---

[2] Please see the NFHA 2017 Fair Housing Trends Report.

[3] Rothstein, Richard, "The Racial Achievement Gap, Segregated Schools and Segregated Neighborhoods – A Constitutional Insult."  Economic Policy Institute, November 12, 2014.  Available online at http://www.epi.org/publication/the-racial-achievement-gap-segregated-schools-and-segregated-neighborhoods-a -constitutional-insult/.

[4] Ellen, Ingrid Gould and Keren Mertens Horn, "Do federally assisted households have access to high performing public schools?"  Poverty & Race Research Action Council, November 2012.  Available online at: http://furmancenter.org/files/publications/PRRACHousingLocationSchools.pdf.

[5] https://ed.gov/news/press-releases/us-hgih-school-graduation-rate-hits-new-record-high-0.

[6] Carnevale, Anthony P., Nicole Smith and Jeff Strohl, "Recovery: Job Growth and Educational Requirements Through 2020."  Georgetown University center on Employment and the Workforce, Washington, DC.  Available at https://cew.georgetown.edu/wp-content/uploads/2014/11/Recovery2020.ES_.Web_.pdf.

enormous disparities in the level of unemployment between White workers and workers of color, with the unemployment rate for African American workers remaining stubbornly and persistently higher – often two times higher - than that for White workers.  The unemployment rate for Latino workers is somewhat lower than that for African Americans, but significantly higher than that for Whites.[7]

Along with discriminatory practices in the lending, insurance, and real estate industries, the factors combine to undermine the ability of families of color to buy a home and build wealth.  According to the U.S. Census Bureau, as of the third quarter of 2019, 73.4 percent of non-Hispanic White households owned their home, well above the national rate of 64.8 percent.  For Asian, Pacific Islander and Native Hawaiian households, that rate was 58.5 percent.  For Hispanic households, it was 47.8 percent, and for Black households, the homeownership rate was 42.7 percent – essentially the same rate as when the Fair Housing Act was passed in 1968.[8]

Even when families of color are able to purchase homes, the kinds of real estate practices uncovered by the Newsday investigation mean that they are more likely to purchase homes in segregated communities.  Our experience at the National Fair Housing Alliance suggests that the market often places a lower value on homes in communities of color than on comparable homes in White communities.  This is borne out by research from the Brookings Institution, which sought to "understand how much money majority-black communities are losing in the housing market stemming from racial bias, [and found] that owner-occupied homes in black neighborhoods are undervalued by $48,000 per home on average, amounting to $156 billion in cumulative losses.[9]

Since for most families in the U.S. wealth is tied directly to their equity in their homes, there is a substantial wealth gap between families based on race and national origin.  According to recent research by the Federal Reserve Bank of St. Louis, in 2016 the typical White family had about ten times the wealth ($163,000) of the typical Black family ($16,000), and over seven times the wealth of the typical Hispanic family ($22,000).[10]

---

[7] See, for example, Wilson, Valerie, "Black unemployment is at least twice as high as white unemployment at the national level and in 14 states and the District of Columbia."  Economic Policy Institute, Washington, DC, April 4, 2019.  Available at https://www.epi.org/publication/valerie-figures-state-unemployment-by-race/.

[8] US Census Bureau, Release Number CB19-157, "Quarterly Residential Vacancies and Homeownership, Third Quarter 2019."  Available at https://www.census.gov/housing/hvs/files/currenthvspress.pdf.

[9] Perry, Andre, Jonathan Rothwell and David Harshbargar, "The Devaluation of Assets in Black Communities: the Case of Residential Property."  Brookings Institution, Washington, DC, November 27, 2018.  Available at https://www.brookings.edu/research/devaluation-of-assets-in-black-neighborhoods/.

[10] Kent, Anna, et al., "What Wealth Inequality in America Looks Like: Key Facts & Figures." Open Vault Blog, Federal Reserve Bank of St. Louis, August 14, 2019.  Available at https://www.stlouisfed.org/open-vault/2019/august/wealth-inequality-in-america-facts-figures.

These disparities in household wealth affect the ability of families with color to purchase homes, start or expand small businesses, send their children to college, or pass wealth along to the next generation.

Individual households are not alone in bearing the costs of the kind of discrimination uncovered by Newsday.  The cumulative effects can have an enormous impact on neighborhoods, cities, and regions.  Recently, the Metropolitan Planning Council, in partnership with the Urban Institute, examined this cost for the Chicago metropolitan area, which has a high level of racial segregation. They found that by simply bringing the levels of racial and economic segregation in the region down to the national median, "Incomes for African Americans would rise by an average of $2,982 per person per year – an overall increase of $4.4 billion in [the] region."  This would boost the region's gross domestic product by some $8 billion.  They also found that 83,000 more people in the region would have bachelor's degrees, leading to an increase of $90 billion in lifetime earnings.  In addition, they found the homicide rate would drop by 30 percent, with an ancillary reduction in the combined cost of policing and corrections of $283 million in 2016 and an increase in property values of at least $8 billion.[11]

Jaw dropping as they are, these figures merely scratch the surface of the costs that our communities and our country suffer as the result of discrimination in the housing market. If we are to create or sustain vibrant, healthy neighborhoods in all communities, we must find ways to eliminate housing discrimination.

> *"Denial of access to housing is arguably the single most powerful tool to undermine and marginalize the upward mobility of people."*
> *James H. Carr and Nandinee Kutty – Segregation: The Rising Costs for America*

# Solutions

Discrimination in the real estate sales industry has existed in this country since its inception.  After centuries of socially and government sanctioned bias, discriminatory practices are deeply embedded and all too common.  It will take a concerted and coordinated effort to eliminate discrimination in the marketplace, from the housing industry, real estate associations, and state and federal government.  Below are solutions

---

[11] Metropolitan Planning Council, "The Cost of Segregation."  Chicago, IL, March 2017.  Available at https://www.metroplanning.org/uploads/cms/documents/cost-of-segregation.pdf.

that must be implemented if we are to make a real dent in dissipating discrimination in the real estate sales industry.

## Solutions for the Real Estate Industry

**Promote Diversity in the Real Estate Industry**

One of the disturbing trends NFHA found in its real estate sales investigation was an extensive lack of diversity in real estate offices.  In real estate agencies located in predominantly White communities, there were very few agents of color and few, if any, real estate offices in communities of color.  Newsday identified the same pattern in its investigation.  In fact, the Newsday investigation found that of the 12 largest real estate brands in Long Island, none had offices in communities of color.  This trend stems from longstanding practices of discrimination against real estate agents of color.  Indeed, at one time the National Association of Realtors (NAR) prohibited African American membership in its association.  NAR abandoned this practice and allows any qualified professional to be a member of the organization.  NAR created a Fair Housing Policy Committee designed to ensure NAR is focusing more attention on the public policy issues surrounding fair housing and equal opportunity (in addition to its longstanding Diversity Committee).  While continuing its work to rectify acknowledged mistakes of the past, NAR is engaged in a renewed focus on promoting inclusion of diversity in all Realtor® Associations while supporting programs and services geared toward meeting the needs of African American, Latino, Asian American, and other members.

The NAR, local real estate boards, and real estate agencies must adopt aggressive, meaningful, and impactful initiatives to increase racial diversity in the organizations and in local real estate sales offices.  To effect change, these organizations must have significant staff in senior leadership positions that reflect the diversity that is America.  Diversity initiatives should include extensive and deep partnerships with the National Association of Real Estate Brokers (NAREB), National Association of Hispanic Real Estate Professionals (NAHREP), and Asian Real Estate Association of America (AAREA).  They should also include providing paid internship and mentorship opportunities and programs for young real estate professionals of color.  In addition, the diversity initiatives must include special partnerships with Historically Black Colleges and Universities and colleges and universities with extensive Latino and Asian American student bodies.

**Encourage the Establishment of Sales Offices in Communities of Color**

NFHA has written extensively about the need for increased opportunities in communities of color.  Where one lives determines so much about the opportunities and advancements one will make, primarily because in the U.S., race is inextricably linked with both place and

opportunity. Communities of color disproportionately lack critical resources, including banks, economic centers, full-service grocery stores, health centers, and other amenities that make communities thrive. The same holds true with the presence of small businesses, like real estate sales offices.

Since most real estate agents "specialize" in certain delineated communities, establishing an office in underserved communities means that there would be a cadre of agents serving these markets – something long-neglected communities sorely need. However, it should not be the case that agents of color serve communities of color and White agents serve White communities. Offices should be diverse, and all agents should be conversant with neighborhoods in their region and willing to show homes and encourage buyers in every community. Territories should never be delineated by race or ethnicity of agent or community. That would only perpetuate segregation.

**Provide Financial Support for Fair Housing Testing, Research, and Education**

The real estate industry has rarely, if ever, provided financial support for the work of private fair housing organizations to conduct testing, research about discrimination in real estate and mortgage lending markets, or education and outreach materials and activities designed to inform consumers about their rights or industry about its fair housing obligations. National real estate associations should support these efforts on a national level, and local real estate boards and offices should be closely aligned and financially supportive of efforts at the local level. Local real estate organizations could also play an important role in establishing and supporting new full-service fair housing organizations in unserved areas. Partnerships between industry and advocates can lead to better understanding of the history and current manifestations of discrimination, motivate improved compliance by industry, and promote better outcomes for consumers and communities. Real estate players should not continue to profit from discriminatory behavior; instead, they should be aligned with those who support fair housing principles and demonstrate that commitment with financial support.

**Provide Better Comprehensive Training for Real Estate Professionals**

The real estate industry has long advocated for training as the primary tool to promote compliance by real estate agents with fair housing laws. However, the Newsday investigation brings to focus yet again that training is not enough, particularly when industry-friendly entities provide the training. Agents should be required to go through comprehensive training prepared by experts in housing discrimination and fair housing. At a minimum, the training should include the history of discrimination and segregation and the role of industry in establishing and perpetuating both; fair housing laws and implementing regulations; recent case examples of discrimination; information about the

11

costs of segregation for families, communities, and the nation; and best practices to ensure compliance with fair housing, both in spirit and in intent.

**Implement Serious Consequences for Violations of Fair Housing Laws**

Education and training alone have been and always will be inadequate to achieve compliance by the industry. There is too much deep-seated and unwarranted bias and too few consequences for failure to comply. There must be significant consequences for agents found to violate fair housing laws. Many of the behaviors are not just ethical deviations; they are serious and deliberate violations of laws with which all real estate agents are required to be familiar, and they have serious implications for consumers and communities, especially consumers and communities of color. Those who violate the law should face license restrictions or revocations, financial penalties, and other consequences. There should be a formal national neutral entity that adjudicates allegations of violations with one set of standards of behavior, rather than local real estate boards that consider the actions of local agents.

**Provide Fair Housing Policies and Best Practices for Professionals**

Real estate professionals, just like doctors, lawyers or teachers, need to have established protocols and best practices for how to engage with customers and the public. The decisions and choices of real estate professionals directly affect the housing opportunities available to consumers; therefore, it is imperative that they have guidelines on how to advance fair housing through their business conduct. Policies should cover everything from providing information and assistance to consumers in a consistent fashion, treating every consumer fairly, and requiring that consumers be shown houses that fit their needs.

Protocols should also include how to market schools and neighborhoods appropriately. The inconsistent, and sometimes misleading, characterization of schools and neighborhoods drives steering and discriminatory practices, which can make real estate professionals open to liability under anti-discrimination and other laws.

**Establish Transparency around Pocket Listings**

A pocket listing is a listing of a home for sale that an agent keeps in a metaphorical pocket. The listing is not placed on the MLS or otherwise made public; instead, it is shared with a limited number of agents who the selling agent believes will bring the right clientele to the deal. Pocket listings can make it easy to support discrimination by shielding properties that are available for sale from most potential buyers. Sellers or real estate agents who want to engage in discrimination can use this tactic easily to hide properties from borrowers of color, in violation of both the Civil Rights Act of 1866 and the Fair Housing Act.

The real estate industry should adopt systems and rules to bring pocket listings into the open to ensure that all eligible buyers, irrespective of race or national origin, have a fair opportunity to submit bids.  Moreover, the industry should sponsor research into this issue to shed light on whether or not buyers of color have equal and fair access to these clandestine listings and how they affect fair housing outcomes.

**Support Fair Housing Policies and Initiatives, Including AFFH**

Real estate professionals must be actively engaged in the efforts of states and local communities to Affirmatively Further Fair Housing (AFFH).  Every three to five years, in conjunction with their plans for allocating their housing and community development funding and related resources, jurisdictions that receive federal funds must engage in an analysis of the impediments and barriers to fair housing experienced by their residents. After identifying the fair housing barriers, jurisdictions must complete a Fair Housing Plan – a comprehensive strategy for overcoming those barriers and fostering an environment that provides true fair housing opportunities for groups protected by fair housing laws.  That plan must identify fair housing priorities, articulate strategies for addressing them, and establish metrics and timelines for measuring progress toward their achievement. Real estate professionals and trade associations, including local real estate boards, must be fully involved in the process of conducting an honest assessment of the barriers that communities face and identifying meaningful solutions to overcome those barriers.  The real estate community must also be fully committed to supporting, funding, and helping to implement the strategies and activities in the Fair Housing Plans generated by local and state jurisdictions to overcome fair housing barriers.

## Government

**Reinstate and Vigorously Enforce the 2015 Affirmatively Furthering Fair Housing Rule**

In 2018, HUD suspended implementation of a comprehensive fair housing planning regulation, the Affirmatively Furthering Fair Housing rule, that it had adopted a mere three years earlier.  That rule was developed with extensive input from local government officials, housing authorities, fair housing advocates, and other stakeholders.  It was based on extensive piloting in 74 communities through the Fair Housing and Equity Assessments of the Sustainable Communities Initiative.  It responded to the requests of local officials for more guidance about how to fulfill their fair housing obligations and the recommendations made by the Government Accountability Office in its 2010 review of HUD's enforcement of its fair housing mandate.

The 2015 AFFH rule provided jurisdictions with a framework for analyzing the fair housing issues in their communities and a robust data and mapping tool with which to inform that analysis.  It required extensive consultation with and input from local stakeholders,

13

ensuring that the resulting plan would reflect local priorities and garner local support.  It created a link between the most pressing fair housing problems jurisdictions identified and their plans for spending the funds they receive from HUD, along with other housing and community development resources.  Finally, it created a mechanism by which to hold local jurisdictions accountable for making progress toward achieving their fair housing goals.

The 2015 AFFH regulation represented the first time since the passage of the Fair Housing Act in 1968 that HUD put in place an effective system for ensuring that both HUD itself and the cities, counties, states, and public housing authorities to which it provides federal funds would fulfill their obligation to affirmatively further fair housing.

The early results of the rule's implementation were promising, with jurisdictions engaging more robustly and effectively with local stakeholders, identifying clear fair housing priorities, setting goals to address them, identifying strategies for achieving them, and developing timelines and metrics for measuring progress.

If the AFFH rule had not been suspended, it would have provided a platform through which jurisdictions on Long Island could identify the patterns of residential segregation that Newsday found, and the real estate industry practices that reinforced them.  It would have enabled those jurisdictions and their residents to determine the most appropriate steps to take to dismantle those practices and provide all home seekers with true choices about where to live.  In addition, it would have enabled local residents to ensure that their leaders followed through on carrying out those strategies.

HUD offered no meaningful rationale for suspending the rule and is currently drafting a new AFFH regulation.  HUD should abandon this misguided effort, reinstate the 2015 AFFH regulation, and resume its implementation.

**Retain the Existing Disparate Impact Rule**

Real estate professionals are the gatekeepers to housing markets.  Their industry policies determine whether home sale practices promote open housing markets or perpetuate entrenched segregation.  One of the most powerful legal tools to challenge housing industry discrimination is disparate impact claims, which require banks, insurance companies, and real estate brokers to choose policies that apply fairly to all people, rather than practices that have an unjustified discriminatory effect.[12]

Courts have allowed disparate impact claims under the Fair Housing Act for over 45 years, and the use of disparate impact was affirmed in 2015 by the Supreme Court in *Texas Dept.*

---

[12] https://nationalfairhousing.org/disparateimpact/.

*of Housing & Community Affairs v. Inclusive Communities Project.*[13]  The National Association of Real Estate Brokers (NAREB), National Association of Hispanic Real Estate Professionals (NAHREP), and Asian Real Estate Association of America (AREAA) filed an amicus brief[14] in the *Inclusive Communities* case arguing that open markets, free from discrimination, are critical to the prosperity of the real estate industry because discrimination creates inefficiencies in housing and financial markets, while disparate impact liability promotes market efficiencies.

For example, disparate impact cases have been brought against banks that refuse to make loans under a certain dollar amount, unnecessarily limiting services to African American and Latino communities.  They have been brought against insurance companies that refuse to insure homes under certain market values, which had the effect of denying coverage for homeowners of color.  Real estate professionals should be cautious about sales practices that limit services based on characteristics or criteria that are highly correlated with race, such as minimum purchase price policies.  They should also be cautious about the use of targeted advertising or client farming, "pocket" listings, and crime or school data reports.

Unfortunately, HUD is currently proposing to gut this longstanding legal tool in one of the Trump administration's most extreme moves to dismantle anti-discrimination laws.[15]  A HUD proposed rule would allow financial institutions, insurance companies, and real estate brokers to engage in covert discriminatory practices by dramatically weakening disparate impact liability.  In October 2019, HUD received more than 45,000 comment letters[16] in response to the proposed rule and is considering the comments as it formulates a final rule.

Real estate trade groups denounced HUD's proposed disparate impact rule.  NAREB, NAHREP, and AREAA submitted a letter arguing that disparate impact is critical for driving marketplace innovations and helping to create a strong business environment.  They added that HUD's proposed rule violates the Fair Housing Act, creates unjustified burdens on complainants, and creates untenable administrative procedures that depart from settled practice and increase the costs of compliance.[17]  The NAR also submitted a letter in opposition to HUD's proposed departure from the existing burden-shifting standard and

---

[13] https://casetext.com/case/texas-dept-of-housing-and-community-affairs-v-inclusive-communities-project-inc.
[14] https://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/BriefsV4/13-1371_amicus_resp_RETradeOrgs.authcheckdam.pdf.
[15] https://www.defendcivilrights.org/.
[16] https://www.federalregister.gov/documents/2019/08/19/2019-17542/huds-implementation-of-the-fair-housing-acts-disparate-impact-standard.
[17] http://www.nareb.com/site-files/uploads/2019/10/Real-Estate-Trade-Associations-Disparate-Impact-Comment-Letter.pdf.

defenses.[18] HUD should heed the recommendation of these groups and others to abandon ongoing efforts to undermine disparate impact.

**Improve Investigation of Real Estate and other Complex Discrimination Cases**

NFHA learned first-hand that HUD staff had great difficulty in conducting comprehensive analysis and investigation of systemic real estate discrimination complaints.  This is the result of years of significant drops in HUD staffing levels and a continued lack of sufficient funds for extensive training.  When NFHA filed real estate discrimination complaints with HUD, all but two languished for years without meaningful resolutions.  There is also significant concern in the private fair housing movement that HUD and Fair Housing Assistance Program (FHAP) agencies (state and local government enforcement agencies) lack the expertise generally to investigate and adjudicate complex cases, such as real estate sales, algorithmic bias, mortgage lending, insurance redlining, etc.  Complex cases often require knowledge of sophisticated practices and disparate impact analysis, as well as the completion of regression and other statistical analyses.  HUD, FHAPs, and private fair housing organizations as well need more and better training on these complex issues and the funding to make that happen.

**Increase Funding for Fair Housing Enforcement**

The primary source of funding for private fair housing enforcement is the Fair Housing Initiatives Program (FHIP).  FHIP is a vital resource that empowers mission-driven private fair housing organizations to conduct intake and investigation of housing discrimination complaints.  It also supports the provision of education and outreach activities to the public about their rights and to the local housing industry about how to comply with fair housing and fair lending laws.  When sufficient funds are allocated, FHIP supports the creation of new organizations where a full-service fair housing organization does not exist.

FHIP funding has decreased from an all-time high of $42.5 million in FY10 to $39.6 million in the most recently passed FY19 federal appropriations cycle.  Funding for FHIP must be increased to at least $55 million annually to ensure greater availability of fair housing services for victims of housing discrimination across housing markets.  This increase is also critical to ensuring that fair housing practitioners can develop expertise in testing and investigation procedures in a rapidly changing housing market, a market in which the increasing use of artificial intelligence technology and machine-learning based services is perpetuating segregation and enabling discrimination in new ways.

In addition to increased funding for FHIP, Congress must increase funding for FHAP organizations.  This is critically important since many states and local governments have

---

[18] https://narfocus.com/billdatabase/clientfiles/172/3/3449.pdf.

additional protected classes beyond those contained in the Fair Housing Act.  FHAP organizations need additional funding to fully enforce state anti-discrimination laws.

Moreover, according to the Report of the National Commission on Fair Housing and Equal Opportunity, HUD's FHEO division is understaffed by approximately 300 employees. Congress must provide funding to effectively staff the FHEO division and provide effective and continued training and staff development for the division.

**Pass and Fund the Housing Fairness Act**

Federal funding for fair housing enforcement continues to lag behind demand for fair housing services, and currently the FHIP program's enforcement component primarily supports direct services for victims of housing discrimination.  Private nonprofit fair housing organizations spend enforcement grant dollars to conduct intake of potential victims of discrimination, fair housing testing and investigation, and advocacy services for clients who choose to proceed with a complaint.  These services are vitally important and are proven to improve outcomes greatly for victims of discrimination.  However, this focus on direct services means that fair housing organizations are limited in their capacity to conduct systemic investigations that change housing market behavior on a larger scale or to work cooperatively with other FHIP recipients to address regional and national discriminatory systems and practices.  FHIP must be increased to support greater direct services to victims of discrimination and to empower local groups working in their communities to challenge widespread discriminatory practices, such as those observed on Long Island in Newsday's investigation.

NFHA recommends that Congress pass and fund H.R. 149, sponsored by Rep. Al Green (D-TX-9).  "The Housing Fairness Act" would increase FHIP funding and create dedicated funding for systemic investigations, such as that conducted by Newsday and its fair housing partners.

The Housing Fairness Act:

- Authorizes FHIP funding at $42.5 million, an increase of $2.9 million above the FY19 level.  However, FHIP needs to be authorized to between $55 million and $65 million annually during the next decade;
- Authorizes a dedicated funding stream for systemic national testing investigations at $15 million annually during the next 5 years; and
- Authorizes a match-grant program at $5 million annually to support comprehensive research to examine:
  - The causes of housing discrimination and segregation or
  - The effects of housing discrimination and segregation on education, poverty, economic development, health, and other socioeconomic factors.

**State Real Estate Commissions Must Step Up Enforcement of Fair Housing**

State real estate commissions have failed to enforce fair housing compliance among their memberships across the country.  Accordingly, there remains the severe need for state boards to take a leadership role in rooting out the discriminatory conduct endemic to the industry.  The ethical codes of most housing industry groups include a commitment to fair housing, and state real estate licensing laws require fair housing training and continuing education.  However, real estate industry enforcement of these fair housing commitments is scant or nonexistent in many areas, and the educational commitments of state commissions often only provide a summary of the dictates of the law, without addressing the nuanced agent conduct featured in recent reporting.

Ultimately, state real estate commissions are complicit in the sort of discrimination laid bare in the Newsday reporting.  In the absence of a national authority to adjudicate industry complaints, they must take meaningful steps to curb these practices, including:

- State boards and commissions should institute fair housing-specific complaint processes, where members of the public can file complaints of alleged discriminatory conduct with the commissions themselves, initiating an investigation to determine whether the complaint has merit.  Where state industry authorities identify discriminatory conduct, agents should be sanctioned and suspended.
- State commissions should also consider adopting industry reporting requirements, similar to Home Mortgage Disclosure Act requirements in the mortgage lending industry, that require agents to identify the sales services provided.  This would establish a publicly available record of the scope of agents' services, which may enable greater oversight of industry services and enhance fair housing compliance.

The troubling consistency between NFHA's sales discrimination findings in the late-2000s and the Newsday coverage documented over the last several years will remain constant until state commissions and national trade groups make fair housing compliance a real priority.