**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

COMPASS, INC.,

         *Plaintiff,*

     *v.*

ZILLOW, INC., ZILLOW GROUP, INC., and
TRULIA, LLC,

         *Defendants.*

Case No. 1:25-cv-05201-JAV

---

**PLAINTIFF'S PRE-HEARING BRIEF IN SUPPORT OF**
**<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

KEY FACTS ........................................................................................................................ 8

ARGUMENT ..................................................................................................................... 10

I.     COMPASS IS LIKELY TO SUCCEED ON THE MERITS .......................................... 10

     A.     COMPASS IS LIKELY TO SUCCEED ON ITS SECTION 1 CLAIM ............. 11

           1.     ZILLOW CONSPIRED WITH REDFIN TO HARM SEARCH COMPETITION ................................................................................ 11

           2.     THE ZILLOW-REDFIN AGREEMENT IS A *PER SE* ANTICOMPETITIVE GROUP BOYCOTT ........................................... 14

           3.     THE ZILLOW-REDFIN AGREEMENT IS UNLAWFUL UNDER A QUICK LOOK OR RULE OF REASON ANALYSIS ........ 16

     B.     COMPASS IS LIKELY TO SUCCEED ON ITS SECTION 2 CLAIM ............. 18

           1.     COMPASS IS LIKELY TO PROVE A NATIONAL ONLINE HOME SEARCH MARKET ..................................................... 18

           2.     ZILLOW HAS MONOPOLY POWER IN THE NATIONWIDE ONLINE HOME SEARCH MARKET ................................................. 20

           3.     THE ZILLOW BAN CONSTITUTES UNLAWFUL EXCLUSIONARY CONDUCT ............................................................. 22

           4.     ZILLOW'S PRETEXTUAL JUSTIFICATIONS ARE IRRELEVANT ................................................................................ 23

II.    COMPASS, COMPETITION, AND CONSUMERS ARE SUFFERING IRREPARABLE HARM ................................................................................ 24

     A.     COMPASS'S IRREPARABLE HARMS ......................................................... 25

           1.     COMPASS'S LOSS OF ITS COMPETITIVE ADVANTAGE AND COMPETITIVE ABILITY TO GROW ITS BUSINESS ............. 25

           2.     COMPASS'S LOSS OF GOODWILL AND BUSINESS REPUTATION WILL LIKELY LEAD TO LOSS OF CLIENTS AND FUTURE BUSINESS OPPORTUNITIES .................................... 27

           3.     ZILLOW'S CLAIM THAT COMPASS IS A SUCCESSFUL BUSINESS IS IRRELEVANT TO THE IRREPARABLE HARM ANALYSIS ..................................................................................... 29

     B.     COMPETITION AND CONSUMERS ARE IRREPARABLY HARMED ....... 29

III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR THE INJUNCTION ......................................................................... 31

CONCLUSION.................................................................................................................... 32

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
   21-cv-00351 (GHW) (VF), 2023 WL 6006525 (S.D.N.Y. July 31, 2023)............................14

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)..............................................................................................................19

*Costar Grp., Inc. v. Com. Real Est. Exch.*,
   141 F. 4th 1075 (9th Cir. 2025) ...........................................................................................23

*In re Currency Conversion Fee Antitrust Litig.*,
   773 F. Supp. 2d 351 (S.D.N.Y. 2011)............................................................................11, 12

*Davitashvili v. Grubhub Inc.*,
   20-cv-3000 (LAK), 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022)...................................19, 20

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)..............................................................................................................18

*Fed. Trade Comm'n v. Amazon.com, Inc.*,
   No. 23-cv-01495, 2024 WL 4448815 (W.D. Wash. Sept. 30, 2024) .....................................23

*Fed. Trade Comm'n v. IQVIA Holdings Inc.*,
   710 F. Supp. 3d 329 (S.D.N.Y. 2024)...................................................................................31

*Fed. Trade Comm'n v. Meta Platforms, Inc.*,
   No. 20-cv-3590, 2024 WL 4772423 (D.D.C. Nov. 13, 2024) ...............................................21

*Fed. Trade Comm'n v. Tapestry*,
   755 F. Supp. 3d 386 (S.D.N.Y. 2024)...................................................................................22

*Fed. Trade Comm'n v. Zillow Grp., Inc.*,
   No. 1:25-cv-1638 (E.D. Va. Sep. 30, 2025) ...............................................................6, 9, 12

*FuboTV Inc. v. Walt Disney Co.*,
   745 F. Supp. 3d 109 (S.D.N.Y. 2024)............................................................................ *passim*

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
   386 F.3d 485 (2d Cir. 2004)............................................................................................20, 21

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,
   922 F. Supp. 2d 435 (S.D.N.Y. 2013)...................................................................................31

*In re: Google Digit. Advert. Antitrust Litig.*,
    Case No. 21-md-3010 (PKC), 2025 WL 3012840 (S.D.N.Y. Oct. 27, 2025) ........................23

*In re Google Digit. Advert. Antitrust Litig.*,
    No. 23-cv-1530, 2024 WL 988966 (S.D.N.Y. Mar. 7, 2024) .................................................21

*Grumman Corp v. LTV Corp.*,
    527 F. Supp. 86 (E.D.N.Y. 1981) .........................................................................................31

*Hayden Publ'g Co., Inc. v. Cox Broadcasting Corp.*,
    730 F.2d 64 (2d Cir. 1984)....................................................................................................21

*Heerwagen v. Clear Channel Commc'ns.*,
    435 F.3d 219 (2d Cir. 2006)..................................................................................................19

*Laumann v. Nat'l Hockey League*,
    56 F. Supp. 3d 280 (S.D.N.Y. 2014).....................................................................................12

*Lorain J. Co. v. United States*,
    342 U.S. 143 (1951)...............................................................................................................22

*Muze, Inc v. Digit. On-Demand, Inc.*,
    123 F. Supp. 2d 118 (S.D.N.Y. 2000)..............................................................................25, 28

*N. Carolina State Bd. of Dental Examiners v. Fed. Trade Comm'n*,
    717 F.3d 359 (4th Cir. 2013) ................................................................................................16

*Norbrook Lab'ys Ltd v. G.C. Hanford Mfg. Co.*,
    126 F. App'x 507 (2d Cir. 2005) ..........................................................................................25

*Palmieri v. Lynch*,
    392 F.3d 73 (2d Cir. 2004)....................................................................................................18

*PLS.COM, LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) .......................................................................................*passim*

*Primetime 24 Joint Venture v. Nat'l Broadcasting Co. Inc.*,
    219 F.3d 92 (2d Cir. 2000)....................................................................................................14

*Realcomp II, Ltd. v. Fed. Trade Comm'n*,
    635 F.3d 815 (6th Cir. 2011) ................................................................................................16

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004)..................................................................................................27

*Reuters, Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990)............................................................................................27, 29

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015)..................................................................10, 24

*Starr v. Sony BMG Music Ent.*,
  592 F.3d 314 (2d Cir. 2010)............................................................................13

*State of New York v. Trump*,
  767 F. Supp. 3d 44 (S.D.N.Y. 2025)..............................................................24, 29

*Tom Doherty Assocs. v. Saban Ent., Inc.*,
  60 F.3d 27 (2d Cir. 1995) ............................................................25, 26, 29

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015)..........................................................................11, 17

*United States v. Apple, Inc.*,
  Civil Action No. 24-cv-4055 (JXN)(LDW), 2025 WL 1829127 (D.N.J. June
  30, 2025) ...............................................................................................23

*United States v. Columbia Pictures Indus., Inc.*,
  507 F. Supp. 412 (S.D.N.Y. 1980)..........................................................14, 15, 16

*United States v. Google LLC*,
  778 F. Supp. 3d 797 (E.D. Va. 2025) ............................................................22, 23

*United States v. H & R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) .................................................................19

*United States v. Microsoft*,
  253 F. 3d 34 (D.C. Cir. 2001) ...............................................................18, 21, 22

*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001).............................................................18

*US Airways Inc. v. Sabre Holdings Corp.*,
  11 Civ. 2725 (LGS), 2022 WL 1125956 (S.D.N.Y. Apr. 15, 2022).......................21

**Statutes**

Clayton Act Section 16 ..................................................................................10

Sherman Act Section 1...................................................................................11

Sherman Act Section 2 .............................................................................11, 18, 22

iv

## INTRODUCTION

Just three weeks ago, on October 13, in a public announcement on its website, Zillow[1] confirmed that it has successfully quashed competition. The announcement proclaimed that Zillow used its immense power to block approximately 90% of the agents from *publicly* marketing properties off Zillow's website—something agents across the country were previously doing at their clients' express request and instruction.[2] As Zillow stated:

> Since Zillow began sending [email] notifications to agents over the summer . . . ≈90% of agents who received a Listing Access Standards notice from Zillow only received one, meaning the initial notice resulted in most agents making sure their next listing was available widely and aligned with the Zillow standards.[3]

Zillow's announcement shows Zillow is so powerful that by sending just an email threatening to punish agents for marketing off Zillow's website, Zillow stopped competition in the online home search market and destroyed a significant challenge to its monopoly through intimidation and punishment instead of competing fairly for the home seller listings that fuel its website.

Under Zillow's new listing rules (the "Zillow Ban"), Zillow bans any listing that was not provided to it within one day of any public marketing (including being on a competing website, social media, email newsletter, or even a sign in front of the home). Zillow's recent announcement shows that it has the power to intimidate agents into depriving home sellers of options they want. And agents should be terrified: if a home seller wants to publicly market her property outside of Zillow and later put that listing on Zillow, the home seller must fire both her agent and her agent's brokerage company, terminate the listing agreement, and hire a new agent and brokerage. In that situation, the agent would have done significant work and paid upfront marketing expenses but be

---

[1] Defendants in this case are referred to collectively as "Zillow."
[2] PX-142.
[3] *Id.*

1

paid nothing. This is a huge ████[4], as Zillow recognizes, to get agents to do Zillow's dirty work and force home sellers to submit their listings to Zillow instead of Zillow trying to attract those listings by competing with differentiated home marketing products and offerings for home sellers. Zillow's ability to force agents to deny their clients the choice that Compass, Inc. ("Compass") and other brokerages now provide demonstrates Zillow's monopoly power, and the continuing irreparable harm caused by the Zillow Ban.

In short, the antitrust problem with Zillow's anticompetitive conduct is clear:

1. Zillow's ability to successfully force agents and home sellers to market homes on Zillow from the beginning, when home sellers previously chose to begin by marketing those homes off of Zillow, shows the power of its monopoly and conspiracy with Redfin Corp. ("Redfin").

2. Unlike Zillow, which has a mandatory submission policy that if not followed results in a ban, Compass provides options, not a mandatory policy. Compass cannot force agents or home sellers to market their property in any particular way and instead only wants to provide agents and home sellers with choice—choice the Zillow Ban blocks.

3. Zillow is controlling the entire real estate industry. Zillow is not just dictating how home sellers market on Zillow but is dictating how home sellers market properties *outside* of Zillow and forcing home sellers to provide listings to the Multiple Listing Services ("MLSs").

4. Contrary to Zillow's claims of transparency, Zillow does not actually ban private listings—it bans *public* marketing of listings that are not yet on Zillow. Under the Zillow Ban, a listing cannot be publicly marketed *anywhere* if it is not immediately also on Zillow.

5. To preserve its monopoly, Zillow is using collusion, industry-changing rules, threats, financial penalties, and bans to eliminate differentiated marketing strategies; if competition and the free market agreed with Zillow, Zillow would not need the Zillow Ban at all.

At the preliminary injunction hearing, Compass will prove that:

---

[4] PX-021 at -747.

**Irreparable Harm, Public Interest, and Balance of Harm All Favor a Preliminary Injunction.** Zillow's monopolistic behavior irreparably harms competition and consumers by depriving them of the benefits of competition and choice. It also has and will irreparably harm Compass. Since June 2025, ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ Zillow and Redfin in fact *intended* to irreparably harm Compass, competition, and consumers through its use of the █████[6] Indeed, ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ Moreover, if a preliminary injunction is not granted, an emboldened Zillow will escalate enforcement of its anticompetitive scheme and multiply the harms.

With its Ban, Zillow has appointed itself industry regulator, even though it is a private company with no such mandate. Instead of allowing agents and home sellers to make their own decisions through the competitive process, without intimidation or fear of retribution, Zillow is dictating what every agent and home seller should do and threatening to ban everyone that does not do it. For example, Zillow claimed in a blog post that every "[s]eller[] want[s] maximum visibility" and "Zillow's Listing Access Standards reinforce that standard and most agents agree."[8] But Zillow does not get to tell home sellers, home buyers, and agents what they want. Contrary to Zillow's claims, it is obvious that home sellers want options. Even Zillow's own research found that "Americans are split on where they prefer their home to be listed," with 31% of home sellers

---

[5] *See* PX-056.
[6] PX-021 at -747.
[7] PX-009 at -307-08.
[8] PX-142.

preferring to start the marketing of their home off Zillow.[9] And that choice makes sense: in almost every industry, sellers carefully select the marketing channels for their product, and in residential real estate, home builders have long marketed their properties off of Zillow (indeed, Zillow exempts home builders from the Zillow Ban and allows them, but not the individual American home seller working with an agent, to publicly market off Zillow and then market on Zillow at a later time). If home sellers always wanted to market their homes on Zillow immediately, then Zillow would not have needed to adopt its ███████[10] to force agents and home sellers to place listings on Zillow. The antitrust laws reject Zillow's decision to ignore consumer demand, set a "standard" neutralizing competition, and then use its monopoly and conspiracy to reinforce its preferred competitive outcome (with Zillow always the winner). A competitive market should decide who wins, and Zillow should have to compete for listings. The fact that Zillow is forcing agents and home sellers to do what it wants is strong evidence that Zillow is irreparably harming Compass, consumers, and competition.

Finally, while Compass, agents, and home sellers are irreparably harmed by the Zillow Ban, no harm would come to Zillow from a preliminary injunction (other than it would actually have to compete).

**Compass is Likely to Succeed on the Merits.** Zillow is violating the antitrust laws by controlling competition. Zillow is not just controlling what agents and homes sellers do on Zillow—Zillow is controlling what they do *off* Zillow. In fact, Zillow's control of listings off Zillow is shown by the fact that the Zillow Ban forces agents and home sellers to send listings to entities that are completely separate from Zillow: the MLSs.

In Zillow and the MLSs, you have one monopoly protecting another monopoly. In

---

[9] PX-150.
[10] PX-021 at -747.

4

protecting the MLS, Zillow is protecting its free listing supply chain. This Zillow-MLS mutual monopolistic backscratching to block competition has a long history. Until this year, NAR's Clear Cooperation Policy ("CCP") protected Zillow from having to fight for listings to power its home search website because it required that any listing that is publicly marketed must be submitted to an MLS within one day—meaning Zillow could almost immediately access listings through the MLSs for real-time display on its own site. In short, Zillow and the MLSs were reinforcing monopolies. But, earlier this year, after market participants, courts, and Compass raised concerns about CCP's legality— and despite Zillow's vigorous protests—NAR significantly weakened CCP to offer more marketing options to home sellers. [11] *See PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833–37 (9th Cir. 2022) (holding that the plaintiff had properly alleged that CCP was an antitrust violation)NAR even called its new policy "Multiple Listing Options for Sellers."

Less than two months after NAR expanded CCP to offer more options for sellers, Zillow announced the Zillow Ban, restricting options for sellers and controlling how agents compete and how home sellers market their homes. Zillow decided to implement a ███████████ [12] plan. At the center of this plan was Zillow's own, more restrictive, version of CCP. Developed and refined in consultation with one of Zillow's closest online home search competitors, Redfin, the Zillow Ban banned any listings that had been marketed at all before they arrived at Zillow and the MLS. Further, ████████████████████████████████████████████ ████████████████████████████████ [13] ████████████████████████████ ██████████████████████████████████████████████ [14] Zillow

---

[11] *See* PX-138 at -265.
[12] PX-021 at -747.
[13] *Id.*
[14] *Id.*

██████████████████████████████████████████"[15] Zillow feared that

████████████████████████████████████████████████████

████████████████████████████[16]

To be absolutely sure that its plan would succeed, Zillow also conspired with its largest online home search competitor, Redfin. Zillow and Redfin know each other well—they were sued recently by the Federal Trade Commission ("FTC") for colluding regarding their home rentals businesses.[17] Calling upon their friendly competitor Redfin, Zillow and Redfin ██████[18]

████████████████████████████████████████████████████

████████ In a phone call between CEOs—no lawyers, no notes—the CEOs of the two companies agreed to implement versions of the Zillow Ban within two business days of each other ████

██████████████████████████████████

Zillow's purported justifications are pretextual and irrelevant. First, Zillow does not have carte blanche to adopt industry-changing rules and act like an industry regulator under the guise of "refusal to deal" doctrine. Like the conduct of other technology companies that have recently made and lost that argument, the anticompetitive nature of the Zillow Ban is that it controls what competitors and consumers do *outside of Zillow.* Otherwise stated, Zillow's argument that a dominant platform can ban and punish people for using any alternative has been rejected time-and-time again in antitrust cases against NAR, Google, Apple, Amazon, and Meta. Second, while Zillow claims to care about transparency, the Zillow Ban is the exact opposite—it blocks consumers from seeing banned listings simply because Zillow and the MLSs did not get those

---

[15] *Id.; see also* PX-028 at -971 █████████████████████████████████

[16] PX-001 at -116 ██████████████████████████████████████████

[17] *Fed. Trade Comm'n v. Zillow Grp., Inc.*, No. 1:25-cv-1638 (E.D. Va. Sep. 30, 2025).
[18] PX-006.

listings first. Third, despite Zillow's claims that its rule keeps the world of residential real estate together, this is not true: before NAR's CCP and the Zillow Ban, the world did not fall apart. In fact, certain states such as Massachusetts never implemented any version of CCP and the market works perfectly fine. Lastly, Zillow's claims that home buyers are hurt by off Zillow marketing is wrong. Home buyers benefit from home sellers having options to publicly market off of Zillow. In fact, Zillow's charges, approximately 1% of the home purchase price (40% of the buyer agent commission), could be avoided if the home buyer had found the home through direct-to-consumer listing agent marketing off of Zillow. Moreover, public marketing off Zillow brings more homes onto the market by introducing homes that might not yet be ready for wide publication where they might suffer negative insights like days on market or prices drops because they are not fully remodeled or staged for sale. Zillow's claim also ignores that *buyers can still see the off-Zillow listings*, on competing websites like Compass.com.

**A Preliminary Injunction Will Preserve the Status Quo.** As Compass will show at the hearing, the evidence shows Compass, agents, competition, and home sellers and home buyers are all being irreparably harmed. Only a preliminary injunction will force Zillow to stop its anticompetitive conduct and protect Compass and the public from further irreparable harm. A preliminary injunction preserves the status quo prior to the challenged conduct pending trial: before the Zillow Ban, home sellers had choices of how to publicly market their home, home sellers had choices of which online websites to place their listings, online search websites had to compete to attract listings, and agents could compete with each other by providing public marketing options to home sellers. As Zillow's October 13 announcement shows, Zillow has already disrupted that status quo, and only a preliminary injunction can return and protect the status quo pending trial.

Therefore, Compass respectfully requests that the Court enjoin Zillow from enforcing the Zillow Ban or anything similar until this case can be tried.

**KEY FACTS**

At the upcoming hearing, Compass will show the following facts:

1.      Compass is a real estate brokerage that competes for home listings. Compass agents have a fiduciary duty to their home seller clients. Compass operates an online real estate search portal at Compass.com, which is an alternative to Zillow and other portals for online search users.

2.      Zillow does not compete to list homes for sale; it has virtually no relationships with home sellers. Instead, it receives, for a nominal fee, a data feed from MLSs of the listings generated by real estate brokerages like Compass. Without that feed, Zillow's website would have to compete to attract to its website listings of homes for sale.

3.      In early 2025, with mounting legal pressure, NAR decided to weaken CCP by adopting a new policy called "Multiple Listing Options for Sellers." This policy opened the door (a crack) to innovation by allowing agents and home sellers to market listings before sending them to MLSs (and thus Zillow) for wide distribution.

4.      This change led to Compass and other brokerages proliferating and strengthening marketing strategies that would put listings on brokerage websites before they arrived on the MLSs and Zillow. Compass's marketing strategy was called the 3-Phased Marketing Strategy ("3PM"). With the rise of these strategies, particularly 3PM and copycats of 3PM, Zillow faced the loss of ██████████████[19] which would lead home buyers to explore competing home search sites and force Zillow to compete for access to listings, thereby reducing Zillow's revenue.[20]

---

[19] PX-020 at -457.
[20] *See* PX-017 at -232.

5.    To protect its monopoly and stem the tide of competing websites, Zillow adopted the Zillow Ban: "A listing publicly marketed to some buyers must be entered in the MLS within one business day and published on Zillow as well as other sites that receive MLS feeds. Listings that don't meet these standards won't be published on Zillow or Trulia for the life of the listing agreement between that listing broker and seller."[21]

6.    Zillow implemented the Zillow Ban through its ███████████[22] strategy. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████[23] If a home seller did not want their listing on Zillow at the beginning of marketing the home, but later wanted the home to appear on Zillow's websites, the only way to avoid the Zillow Ban would be for the home seller to fire her agent and broker (who then would be deprived of any payment for their hard work). The stated goal of the Ban was to quash competition from any brokerage that might be interested in off Zillow public marketing.

7.    Redfin is the third largest online home search engine—and a direct competitor of Zillow. Still, Zillow recruited Redfin to conspire in both the online home search market and rentals market (which is the subject of a recent Federal Trade Commission lawsuit).[24] Under the search agreement, each rival forewent an advantage they could have gained on the other: (1) by allowing previously marketed listings on its site, Redfin could have obtained a strategic, listings advantage—████████████████████████████████████████████ ████████[25] and (2) by taking direct feeds from brokerages, Zillow could have obtained a strategic,

---

[21] PX-143.
[22] PX-021 at -747; PX-002 at -168.
[23] PX-021 at -747.
[24] *Fed. Trade Comm'n v. Zillow Group, Inc.*, No. 1:25-cv-1638 (E.D. Va. Sep. 30, 2025).
[25] PX-121 at -105██████████████
      *see also* PX-133 at -66████
      ███████████████████████████

9

listing advantage over Redfin—but ████████████████████████████████████
████████████████████████ [26]

      8.     The Zillow Ban has been remarkably successful. As one Redfin executive noted,

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████ [27] The result has done more than give agents pause; upon receiving a threat from Zillow of

being banned nearly ***every real estate agent in the country*** has fallen in line.

      9.     For both Compass and competition, the impact has been severe. Because of the

Zillow Ban, Compass has lost its competitive, first-mover advantage over Zillow and other real

estate websites and has suffered a suffered a steep drop in adoption of its innovative marketing

strategies. Compass's agents also have had their listings banned. Agents and customers, fearful of

the Zillow Ban,[28] have essentially lost the option to engage in marketing listings off-Zillow.

## ARGUMENT

Section 16 of the Clayton Act entitles a party to obtain injunctive relief against threatened

loss or damage under the antitrust laws. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d

638, 650 (2d Cir. 2015). A preliminary injunction should be granted if the moving party shows:

(1) a likelihood of success on the merits; (2) irreparable harm is likely; (3) the balance of hardships

weighs in favor of the injunction; and (4) the injunction serves the public interest. *See FuboTV Inc.*

*v. Walt Disney Co.*, 745 F. Supp. 3d 109, 133 (S.D.N.Y. 2024). Compass will show at the hearing

that it has met each factor.

## I.    <u>COMPASS IS LIKELY TO SUCCEED ON THE MERITS</u>

---

[26] *See* PX-007; PX-008.
[27] PX-125 at -231.
[28] PX-114; PX-135.

At the preliminary injunction phase, Compass need only demonstrate that it is "more likely than not" to prevail on at least one of its claims following a trial on the merits. *Id.* Compass is likely to prevail on both of its claims: (1) that Zillow violated Section 1 by entering into an unlawful conspiracy with its competitor, Redfin, to stop competition; and (2) Zillow violated Section 2 by monopolizing the online home search market.

## A.    Compass Is Likely To Succeed On Its Section 1 Claim

Compass is likely to demonstrate that Zillow violated Section 1 of the Sherman Act by entering into an anticompetitive agreement with Redfin to stop competition.[29] A defendant violates Section 1 of the Sherman Act when it enters (1) an agreement (2) that unreasonably restrains trade. *United States v. Apple, Inc.*, 791 F.3d 290, 320-21 (2d Cir. 2015). To determine whether an agreement unreasonably restrains trade, courts apply one of three methods: the *per se* rule, quick look review, or the rule of reason. *See id.* at 322, 329-30.

### 1.    Zillow Conspired with Redfin to Harm Search Competition

Compass is likely to succeed in showing that Zillow and Redfin entered an agreement to protect their current business models and prevent competitors like Compass from developing marketing systems that could grow into strong search competitors.

Where there are numerous communications between purported conspirators, an agreement can be shown based on the nature, timing, and characteristics of those communications. *See In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 368-71 (S.D.N.Y. 2011). The sharing of sensitive information such as future business plans during communications, the fact that the communications took place between high-level executives, and that the communications took

---

[29] Zillow entered into a similarly anticompetitive agreement with eXp Realty, LLC ("eXp") whereby eXp agreed not to compete with Zillow in the online home search market via pre-marketing or private marketing. To simplify proofs at the hearing, Compass will focus on Zillow's agreement with Redfin, which is sufficient to trigger antitrust liability and support the requested injunction.

place shortly before each company announced a major decision can all be evidence that the conspirators entered into an agreement. *See id.* A strong motive to conspire, knowledge of assured enforcement, and efforts to enforce the agreement can also be evidence of an agreement. *Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 305-307 (S.D.N.Y. 2014). Such evidence of an agreement "must be examined holistically" rather than evaluated in isolation. *See In re Currency Conversion*, 773 F. Supp. 2d at 370-71.

The documents and forthcoming testimony will show that:

1. Before implementing the Zillow Ban, ███████████████████████████████ ███████████████[30]

2. Zillow and Redfin have a history of collusion: as the FTC has alleged, they entered into an agreement whereby Redfin exited the rentals market in exchange for an initial payment of $100 million from Zillow;[31]

3. Zillow's and Redfin's CEOs ██████████████████████████████ ███████████████████████████████[32]

4. Zillow's and Redfin's CEOs ███████████████████████[33] ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████[34] ████████████████████

---

[30] PX-046 at -332.
[31] *Fed. Trade Comm'n v. Zillow Grp, Inc.*, No. 1:25-cv-1638 (E.D. Va. Sep. 30, 2025)
[32] PX-006; *see also* PX-038 at -693 ████████ ██████████ PX-123; PX-127; PX-132.
[33] PX-006.; PX-133 at -662; PX-033 at -846 ██████████████████████████████
[34] *See* PX-133 at -662.

6. Shortly after Zillow and Redfin announced their bans, ████████████████████
████ [35] and

7. After Zillow published FAQs about the Zillow Ban and its Zillow Listing Access Standards
that laid out some the parameters of the Zillow Ban, ████████████████████████
████████████████████████████████████████████████████████████
████████████████████ [36]
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████ [37] ████████████████"[38]
████████████████ Facing a threat to their free access to listings, Zillow and Redfin entered
an agreement to ████████████████████████████████████████████████
████████████████ [39]

In addition to this direct evidence of a conspiracy, indirect evidence showing "parallel conduct"—two or more competitors taking similar actions—and other plus factors proves a conspiracy. *See, e.g.*, *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 323 (2d Cir. 2010) (reversing dismissal because "the allegations, taken together, place the parallel conduct 'in a context that raises a suggestion of a preceding agreement, not merely parallel conduct" (citation omitted)). These plus factors may include evidence showing a highly concentrated market, a common motive to conspire, conduct that is against the individual economic self-interest of the co-conspirators, and inter-competitor communications. *See id.*

---

[35] PX-122.
[36] *See* PX-008.
[37] PX-006.
[38] PX-133 at -662.
[39] PX-006.

Here, the parallel conduct is undisputed: Zillow publicly announced the Zillow Ban on April 10, 2025, and Redfin informed Compass *that same night* that it too would be adopting a similar policy (which it publicly announced four days later). *See In re Amazon.com, Inc. eBook Antitrust Litig.*, 21-cv-00351 (GHW) (VF), 2023 WL 6006525, at *20 (S.D.N.Y. July 31, 2023) (stating that "adopting similar policies around the same time" is suggestive of "anticompetitive behavior").

The plus factor evidence is likewise clear. The online home search market is highly concentrated, with four large competitors making up the vast majority of the market and with Zillow having double the website traffic of its next largest competitor.[40] Zillow and Redfin also acted against their own self-interests: executives at Redfin explained ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████[41] But Redfin did not capitalize on its opportunity; instead, it conspired with its largest rival, Zillow, to impose even more restrictive policies.

2. The Zillow-Redfin Agreement is a *Per Se* Anticompetitive Group Boycott

The "classic" *per se* illegal group boycott is "a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 428 (S.D.N.Y. 1980) (citation omitted); *see also Primetime 24 Joint Venture v. Nat'l Broadcasting Co. Inc.*, 219 F.3d 92, 102 (2d Cir. 2000). Similarly, group boycotts "designed to influence coercively the trade practices of boycott victims, rather than to eliminate them as competitors" are also *per se* illegal.

---

[40] Aron Decl. ¶ 16.
[41] PX-121 (emphasis in original).

*Columbia Pictures*, 507 F. Supp. at 428 (citation omitted). The touchstone of a *per se* unlawful group boycott is when the purpose and effect of the arrangement is exclusionary or coercive. *Id.*

Importantly, Zillow and Redfin conspired to adopt their policies as a substitute for a part of the CCP already recognized as anticompetitive by the Ninth Circuit. Before NAR modified the CCP in March 2025, the rule prohibited most marketing off of the MLS by requiring that all listings be immediately sent to the local MLS (just like the Zillow Ban does now). The Ninth Circuit held that by mandating use of the MLS, the CCP constituted a *per se* unlawful group boycott. *PLS*, 32 F.4th at 833–37. In response, NAR loosened its rules regarding off MLS marketing; Zillow and Redfin, which opposed any change to the CCP, then sought to fill the gap with the Zillow Ban.

First, the evidence demonstrates that, as in *PLS*, the purpose and intended effect of the agreement between Zillow and Redfin was to protect the conspirators (Zillow and Redfin) from competition. Indeed, the conspirators targeted Compass and other brokerages using off-Zillow and off-Redfin public marketing strategies and coerced them to abandon such strategies to protect Zillow's and Redfin's position in the online home search market. ███████████

████████████████████████████████

████████████████████████████████

████████████[42]███████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████"[43]

---

[42] PX-002 at -159 and -164; *see also* PX-046 at -296.
[43] PX-125 at -231.

Second, the Zillow Ban and the Zillow-Redfin Agreement were explicitly designed to "influence coercively the trade practices of boycott victims," *Columbia Pictures*, 507 F. Supp. at 428, by forcing brokerages to provide Zillow with unfettered access to those brokerages' valuable listings, even when the brokerages and their clients did not want to provide that access. ████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████[44] Thus, as in *PLS*, Zillow and Redfin conspired to force their suppliers to give over their products (here, listings) to Zillow and Redfin on the same, unfavorable terms.

3.    <u>The Zillow-Redfin Agreement is Unlawful Under a Quick Look or Rule of Reason Analysis</u>

The Zillow-Redfin agreement is *per* se illegal. If, however, the Court applies the quick-look or rule-of-reason analyses, the Court should similarly conclude that Compass is likely to demonstrate that the Zillow-Redfin Agreement is anticompetitive. *See N. Carolina State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 717 F.3d 359, 373 (4th Cir. 2013) (stating that although *per se*, quick look, and rule of reason exist on a "continuum," ultimately, "the criterion to be used in judging the validity of a restraint on trade is its impact on competition" (citations omitted)); *Realcomp II, Ltd. v. Fed. Trade Comm'n*, 635 F.3d 815, 826 (6th Cir. 2011).

The Zillow Ban was intended to create deep anticompetitive harms, as it was designed to ████████████████████.[45] And Zillow's proffered procompetitive justification that Zillow simply wanted to increase listing transparency so customers could see more listings, is pretextual and undercut by Zillow's own words and actions. Zillow documents ████████████████████████

---

[44] PX-021 at -747.
[45] PX-028 at -971.

████████████████████████████████████████████████████

████████████████████████████████████████ [46]

Moreover, the Zillow Ban actually *reduces* transparency. First, marketing off of Zillow and the MLSs allows sellers to draw attention to their properties while they get their homes ready to sell, but the Zillow Ban forces these listings to not be marketed publicly at all before going to Zillow and the MLSs. Second, Zillow has routinely recognized the benefits of marketing outside of the MLSs and even itself created its own off-MLS marketing strategies and listings.

In any event, even if credited, Zillow's justification would not be sufficient to outweigh the anticompetitive effects of the Zillow Ban. The Second Circuit has rejected this type of justification because it "reflects a basic misunderstanding of the nature of the competition that antitrust law protects." *Apple,* 791 F.3d at 331 (rejecting the argument that the defendant had created a cartel "at one level of the market" to "promote[] market entry at another," and had therefore enhanced competition). Zillow cannot conspire with its search competitors to dictate what "transparency" means.

Indeed, in *PLS*, the Ninth Circuit rejected nearly identical justifications to Zillow's in a nearly identical context. There, NAR argued, as Zillow does here, that CCP was procompetitive because it reduced search and transaction costs and prevented agent from having to "consult competing services" to view listings. *PLS*, 32 F.4th at 837. The Ninth Circuit rejected NAR's argument outright, holding that "sparing consumers the need to patronize competing firms is not a procompetitive justification for a group boycott." *Id.* at 836. Here, too, Zillow's procompetitive justification is insufficient to outweigh the anticompetitive effects of its conspiracy.

---

[46] *See, e.g.*, PX-001 at -114 and -116.

**B.     Compass Is Likely To Succeed On Its Section 2 Claim**

Compass is likely to prove that Zillow monopolized the national market for residential real estate online search services ("online home search"). Under Section 2, Compass must show that Zillow more likely than not: (1) possessed monopoly power in a relevant market; and (2) willfully maintained that power through exclusionary conduct. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).

<u>1.     Compass is Likely to Prove a National Online Home Search Market</u>

Compass is likely to prove a national market for online home search in which Zillow, Redfin, and Compass compete.

a.     *The relevant product market is online home search.*

The evidence will confirm that the relevant product market is online home search. "Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the relevant market must include all products reasonably interchangeable by consumers for the same purposes." *United States v. Microsoft*, 253 F. 3d 34, 51-52 (D.C. Cir. 2001) (citations omitted). Any website or app providing public access to for sale residence listings in a digitally searchable format is in the relevant product market.

Courts routinely rely on statements and documents made by the defendant and other competitors or industry participants to determine a relevant product market.[47] *See, e.g.*, *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 337-38 (S.D.N.Y. 2001). Zillow recognizes that it competes in the online home search market, comparing itself exclusively to other online real estate marketplaces to investors.[48] Market participants and analysts describe the market similarly,

---

[47] Zillow did not contest this product market in its initial opposition brief to Compass's motion, ECF No. 50, and thus waived its ability to contest Compass's relevant product market. *See, e.g.*, *Palmieri v. Lynch,* 392 F.3d 73, 87 (2d Cir. 2004) (holding that a party waived arguments that it had not raised in its opposition).
[48] *See* Aron Decl. ¶¶ 178-79.

calling Zillow the leading home search portal and the leading player in the "online home search platforms market."[49]

Additionally, in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), the Court explained that a market can be evaluated by "practical indicia." Here, these indicia will show that:

- the market consists of online (rather than physical) platforms, *see United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 57 (D.D.C. 2011) (rejecting argument that physical alternatives for tax preparation such as pen-and-paper were a reasonable alternative to tax preparation software);

- these platforms all get their listings from the same IDX feeds;[50]

- these platforms are accessible to the public without cost or required association membership; and include listings across regions all on one platform;[51] and

- these platforms have nearly identical user interfaces and search functionalities.[52]

b. *The relevant geographic market is nationwide.*

Compass is likely to demonstrate that a relevant geographic market for online home search is nationwide. The Second Circuit has said that "[c]ourts generally measure a market's geographic scope . . .by determining the areas in which the seller operates and where consumers can turn . . . for supply of the relevant product." *Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219, 227 (2d Cir. 2006) (citations omitted) *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 201 (2d Cir. 2008). A national market can exist "even when market participants in some sense operate locally." *Davitashvili v. Grubhub Inc.*, 20-cv-3000 (LAK), 2022 WL 958051, at *9 (S.D.N.Y. Mar. 30, 2022). Courts consider whether the defendants operate and compete nationally, such as by creating a national network of consumers

---

[49] *See* Aron Decl. ¶¶ 109-11, 182.
[50] Aron Decl. ¶ 46.
[51] Aron Decl. ¶¶ 112-21
[52] *Id.*

or partners, providing the same services nationwide on websites and mobile applications, or imposing policies nationwide. *See id.*

Here, Zillow and its largest rivals—such as Redfin, Homes.com, and Realtor.com—operate nationwide platforms, with the same websites and app for all customers nationwide. Moreover, the platforms can be and are used by customers anywhere in the United States to look for listings across the United States. The platforms also engage in national planning and strategy.[53] Indeed, the Zillow Ban itself was designed to be applied identically nationwide.[54]

        2.      <u>Zillow has Monopoly Power in the Nationwide Online Home Search Market</u>

Compass is likely to prove that Zillow has monopoly power in the national, online home search market. Courts assess monopoly power using both direct and indirect evidence. *See Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). Here, the evidence shows that Zillow has excluded competition via the Zillow Ban, acting as a pseudo regulator and using ▮▮▮▮ and ▮▮▮▮ to dictate competition rules to the industry at large. Only a firm with monopoly power could move the pieces around the competitive chess board at will.[55] ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[56]▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[57]

Zillow has not been shy about flexing its power. Zillow has crowed that its Ban has been extremely effective, with 90% of all agents who received a warning not receiving another[58]—

---

[53] Aron Decl. ¶¶ 144-60.
[54] PX-112 at 181-82; PX-113.
[55] Aron Decl. ¶¶ 167-75.
[56] PX-028 at -971.
[57] PX-019 at -122; PX-035 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[58] PX-142.

presumably because they were worried about getting banned from Zillow.[59] Courts have accepted evidence of such retaliatory efforts and willful assertions of power as useful evidence to support the exercise of monopoly power. *See, e.g.*, *US Airways Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS), 2022 WL 1125956, at *9 (S.D.N.Y. Apr. 15, 2022).

Indirect evidence also shows Zillow's monopoly power. *See Geneva*, 386 F.3d at 500-01. "[M]onopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51. Here, Zillow has high market share, as shown by "appropriate indicators" like userbase, website and mobile app traffic, and time spent on site.[60] *See, e.g.*, *Fed. Trade Comm'n v. Meta Platforms, Inc.*, No. 20-cv-3590, 2024 WL 4772423, at *19 (D.D.C. Nov. 13, 2024) (defining market share based on usage metrics).

Zillow's own analyses demonstrate its dominant share using these indicators. Compass will also call Dr. Debra Aron (an economic expert) to explain that Zillow has 66% of the real estate search audience, more than its three next closest competitors *combined*.[61] Market share this high reflects monopoly power, especially when, as here, the share is coupled with additional, suggestive evidence. *See, e.g.*, *Hayden Publ'g Co., Inc. v. Cox Broadcasting Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) (stating that "Appellants also note correctly that a party may have monopoly power in a particular market, even though its market share is less than 50%."); *In re Google Digit. Advert. Antitrust Litig.*, No. 23-cv-1530, 2024 WL 988966, at *4 (S.D.N.Y. Mar. 7, 2024).[62] For example, one Compass agent explained that "sellers are very attached to having their homes on Zillow" and

---

[59] *Id.* (stating that "agents who receive a notification about a listing that doesn't meet the [ZLAS] decide to broadly market their next listing . . ." and that "[r]epeated issues are the rare outlier.")
[60] Aron Decl. ¶¶ 176-82.
[61] Aron Decl. ¶¶ 178-80.
[62] *Id.* at ¶ 181.

that "sellers will not understand . . . they are constantly focusing on Zillow to see how their properties are doing, etc."[63]

Industry observers have also recognized Zillow's dominance, discussed its "deep moat" and "network effects" advantages, and stated that Zillow "is likely to hold a leading position in this category for at least the next few years."[64]

Significant barriers to entry in the online home search market protect Zillow's monopoly power.[65] *See Microsoft*, 253 F.3d at 51. Entry barriers include competitive advantages like "control of essential or superior resources" and a "wealth of . . . data that up-and-coming firms will lack." *Fed. Trade Comm'n v. Tapestry*, 755 F. Supp. 3d 386, 470 (S.D.N.Y. 2024). Here, Zillow's massive userbase and brand strength, combined with its network effects, operate as such entry barriers. Indeed, ███████████████ despite Homes.com spending hundreds of millions of dollars over the past few years trying to compete with Zillow, Homes.com has barely moved the needle in online home search.[66]

3.    The Zillow Ban Constitutes Unlawful Exclusionary Conduct

The Zillow Ban blocked brokerages from innovating in the online home search market. By threatening brokerages and agents, Zillow has succeeded in limiting competition for listings, choices for home sellers, and a new and innovative business model that could create competitive differentiation in the market. Courts have long held that such practices violate Section 2. *See Lorain J. Co. v. United States*, 342 U.S. 143, 148-49 (1951). Indeed, earlier this year, a court held that Google violated Section 2 of the Sherman Act for this type of behavior. *United States v. Google LLC*, 778 F. Supp. 3d 797, 864-65 (E.D. Va. 2025). The court there found that Google's

---

[63] PX-100 at -601, -604.
[64] Aron Decl. ¶ 182.
[65] Aron Decl. ¶¶ 183-207.
[66] PX-147 at -400-15.

policy controlling how its customers operated on other competing advertising exchanges were anticompetitive because it "involved Google using its coercive monopoly power to deprive its publisher customers of a choice that they had previously exercised to promote competition." *Id.* at 865; *see also Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 23-cv-01495, 2024 WL 4448815, at *6-7 (W.D. Wash. Sept. 30, 2024) (allowing monopoly maintenance claim challenging contractual restraint restricting how Amazon's suppliers sold products on competing platforms).

The Zillow Ban operates in the same way and to the same effect: as the evidence will show, to protect Zillow's monopoly, the Zillow Ban controls how brokerages behave competitively *off Zillow's platform*. The Zillow Ban therefore harms competition and Zillow's *own users* by limiting output on the Zillow platform.

### 4.     Zillow's Pretextual Justifications are Irrelevant

Contrary to Zillow's claim, its conduct is not simply a permissible "refusal to deal"— rather, Zillow is restricting how *others*, such as agents and home sellers, deal with Zillow's competitors like Compass. A monopolist's efforts "to limit the abilities of third parties to deal with rivals" is not a refusal to deal. *Costar Grp., Inc. v. Com. Real Est. Exch.*, 141 F. 4th 1075, 1090 (9th Cir. 2025) (citation omitted); *see also United States v. Apple, Inc.*, Civil Action No. 24-cv-4055 (JXN)(LDW), 2025 WL 1829127, at *12 (D.N.J. June 30, 2025) (refusal to deal doctrine did not apply because Apple's challenged conduct imposed restrictions on suppliers and users of the platform); *In re: Google Digit. Advert. Antitrust Litig.*, Case No. 21-md-3010 (PKC), 2025 WL 3012840, at *12 (S.D.N.Y. Oct. 27, 2025) (refusal to deal doctrine did not apply because Google was imposing restraints on *customers'* abilities to deal with rivals rather than merely refusing to deal with a rival). Indeed, the name of Zillow's rule (the "Zillow Listing Access Standards") gives the game away: claiming to set "standards" for an entire industry is on its face a plan to control, not a refusal to deal. Zillow is not seeking merely to govern its own relationship with a specific

23

brokerage or market participant—it seeks to establish the Zillow Ban as a new version of CCP[67] that regulates the *entire* market.

Further, as discussed above, Zillow's self-serving claims that the Zillow Ban is "pro-consumer" and meant to encourage "transparency" are contrary to the case law and the facts demonstrating the opposite. *See* supra § I.A.3.

## II.    COMPASS, COMPETITION, AND CONSUMERS ARE SUFFERING IRREPARABLE HARM

The Zillow Ban has reshaped the competitive landscape in the home search market. And while Compass and competition have been irreparably harmed between April and now, without injunctive relief, that irreparable harm will only increase because Zillow will be empowered to ramp up enforcement of the Ban.

A plaintiff seeking a preliminary injunction must show that they are "likely" to suffer irreparable harm in the absence of preliminary relief. *State of New York v. Trump*, 767 F. Supp. 3d 44, 70 (S.D.N.Y. 2025). "Although the mere possibility of irreparable harm is insufficient, Plaintiffs need only show that there is a threat of irreparable harm, not that irreparable harm has already occurred.". *Id.* at 83 (citation omitted).

Further, in antitrust cases, courts also weigh the risks of irreparable harm to competition and consumers. *See FuboTV*, 745 F. Supp. 3d at 150; *see also Actavis*, 787 F.3d at 661 (stating that "[t]hreaten[ed] economic harm to consumers is plainly sufficient to authorize injunctive relief." (citation modified)). For example, "allowing horizontal competitors to coordinate rather than compete" or "to monopolize a segment of the market" can constitute irreparable harm, as those harms can lead to consumers being vulnerable to "price increases, decreased quality, and

---

[67] PX-037 at -383 ███████████████████████████████████
███

decreased options in the market." *FuboTV*, 745 F. Supp. 3d at 150. The evidence will show that a range of harms will flow from Zillow's conduct if that conduct is not enjoined.

### A.    Compass's Irreparable Harms

Compass is likely to suffer two forms of irreparable harm if injunctive relief is not granted: (1) an indeterminate loss of business reputation and competitive advantage, including its first-mover advantage, and (2) the loss of clients and business relationships that would produce future business.

### 1.    Compass's Loss of Its Competitive Advantage and Competitive Ability to Grow Its Business

Without injunctive relief, Compass is losing and will continue to lose a vital competitive advantage that it has invested heavily to attain. Courts recognize the loss of the competitive "advantage of being the pioneer in the field" as an irreparable harm. *Norbrook Lab'ys Ltd v. G.C. Hanford Mfg. Co.*, 126 F. App'x 507, 509 (2d Cir. 2005) (citation omitted); *see also Muze, Inc v. Digit. On-Demand, Inc.*, 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000) (recognizing that the "risk of harm to [the plaintiff's] reputation as a leader in its field" and the "loss of market advantage" constituted irreparable harm). Similarly, the Second Circuit has recognized that an irreparable harm is likely to occur "[w]here the availability of a product . . . increases business of the plaintiff beyond sales of that product" because "the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss." *Tom Doherty Assocs. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995).

Here, Compass was the first mover in its challenge to the Zillow monopoly. By blocking those efforts, Zillow has harmed—and will continue to harm—Compass by eliminating its first mover advantage and undermining its ability to offer 3PM to its agents and home sellers. Agents and the industry at large recognized the competitive edge 3PM was giving Compass and Compass

25

agents.[68] The Zillow Ban and loss of 3PM cuts to the core of Compass's business, which is using its innovative strategies, tools, and technologies to compete in online home search, compete for listings, and build its brand.[69]

And Zillow's plans are working. Because of the Zillow Ban, Compass's 3PM strategy has lost steam, and its pioneer advantage is stuck in limbo. Compass has been limited in its ability to turbocharge and drive traffic to its own search portal with unique listings. Internal Compass documents question whether there should be further investment in the 3PM strategy.[70] Further, the threat of the Zillow Ban has made agents and sellers reluctant to pursue the 3PM strategy for fear of being banned from Zillow.[71] This has led to a significant drop in 3PM usage.[72] Indeed, 90% of agents who receive a warning give up marketing off of Zillow and the MLS altogether.[73] Even if the Zillow Ban is ultimately revoked after trial, Compass will have lost the crucial first-mover advantage, with other competitors having had ample time to study and copy Compass's strategies.

Similarly, Compass has lost the ability to use 3PM to drive traffic and growth in other parts of its business. *See Tom Doherty*, 60 F.3d at 38 (stating that "[w]here the availability of a product . . . increases business of the plaintiff beyond sales of that product," the damages caused by the loss of a product would be irreparable because they "will be far more difficult to quantify"). From the beginning, 3PM was a means for Compass to grow its business more broadly, including its website and online search platform in particular.[74] This is the *exact* business that Zillow sought to protect from competition. Compass was also using 3PM to grow other parts of its business.[75] And most

---

[68] PX-091; PX-096; PX-081 at -689-90 (explaining how 3PM was creating a "competitive advantage" for Compass and its customers).
[69] *See* PX-116.
[70] PX-099 at -010.
[71] *See, e.g.*, PX-114 at -879.
[72] PX-083 at -060.
[73] *See* PX-142.
[74] PX-093; PX-118.
[75] PX-086; PX-084.

importantly, Compass has been using 3PM to gain agent and client trust and loyalty by offering them choice and control over their listings and a differentiated strategy, which in turn has led to Compass's overall growth across its business.[76]

Zillow argues that consumers still can choose to work with Compass and market listings not on Zillow, so long as they accept the consequence of not being on Zillow—an argument rejected by the Ninth Circuit in *PLS*. *See PLS*, 32 F.4th at 836. The Ninth Circuit explained that CCP, the precursor to the Zillow Ban, presented "precisely the dilemma the Sherman Act is designed to prevent" wherein "dominant firms force their suppliers or customers to choose between assisting the dominant firms in injuring their competitors or working exclusively with those competitors . . ." *Id.* at 836. Forcing Compass's agents and clients to make this choice—either market their property in the way they want to or sacrifice their strategy so as not to be banned from Zillow's dominant platform—irreparably harms Compass's relationships with those agents and clients and fully supports the requested injunction.

2. Compass's Loss of Goodwill and Business Reputation Will Likely Lead to Loss of Clients and Future Business Opportunities

The Second Circuit has explained that loss of goodwill and business reputation qualify as an irreparable harm, particularly where such harms would be difficult to quantify. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *see also Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907-08 (2d Cir. 1990). One specific example when lost goodwill is an irreparable harm is when a defendant "terminat[es] the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product." *See Reuters*, 903 F.2d at 907-08. Here, the Zillow Ban will cause harm to Compass's reputation as a leader in the field and will lead to a loss of market advantage that goes much further than merely lost sales.

---

[76] PX-081 at -693; PX-082 at -622-23; PX-085 at -640-41; PX-090; PX-104; PX-111.

*See Muze*, 123 F. Supp. 2d at 131 (finding loss of competitive advantage to be an irreparable harm because the movant's "goodwill and market position" were being damaged in addition to the loss of discrete fees). ████████████████████████████████████████

████████████████████████████████████ ██ ███████████████████████████

████████████████████████████████████████████████████████████████ █

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████[9]

Compass agents and their clients demand they have access to Zillow as a tool for marketing listings.[80] If Compass agents cannot offer their clients access to Zillow, they will lose clients—and in turn, Compass will lose agents. Zillow's own documents show ████████████████████████

████████████████████████████████████████████████████[81] A specific objective for the ban was to ████████████████████████████████████████

██████████████████[82] ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[77] *See e.g.* PX-003; PX-004; PX-005 at -124-26.
[78] PX-001 at -116; PX-018 at -803 ████████████████████████████
████████████████████████████ PX-025
████████████████████ PX-039 at -426 ███████████████
PX-120.
[79] PX-056.
[80] PX-101; PX-100.
[81] *See* PX-028.
[82] PX-021 at -747.

███████████████ This harm will only accelerate if Zillow is not stopped by a preliminary injunction.

### 3. Zillow's Claim that Compass is a Successful Business is Irrelevant to the Irreparable Harm Analysis

That Compass continues to be successful is not relevant to the irreparable harm analysis here. First, without injunctive relief, Zillow will be emboldened to fully enforce the Zillow Ban, accelerating the harms exponentially. Second, *destruction* of a business is *not* a requirement to show the types of irreparable harm Compass is suffering. *See Tom Doherty*, 60 F.3d at 38 (stating that loss of access to a product is an irreparable harm when it is "essential to the life of the business *or* increases business of the plaintiff beyond sales of the product" (emphasis in original)); *see also Reuters*, 903 F.2d at 908-09 (recognizing that a competitive disadvantage could constitute an irreparable harm if the injury would be "incalculable in dollars and cents"). Third, Compass would have been more successful but for the Zillow Ban. Finally, a movant need not show that irreparable harms have *already* occurred, just that there is a threat that it will occur. *State of New York*, 767 F. Supp. 3d at 83.

### B. Competition And Consumers Are Irreparably Harmed

The Zillow Ban will also more likely than not irreparably harm competition and consumers.[84] As one court explained, "[a]llowing horizontal competitors to coordinate rather than compete," allowing monopolization of a market, and "creating incentives" for defendants to "raise prices" all can "greatly increase the risk that consumers will be vulnerable to price increases, decreased quality, and decreased options in the market." *FuboTV*, 745 F. Supp. 3d at 150.

---

[83] PX-013 at -811 (emphasis in original); *see also* PX-136 ██████

████████████████████████████████████████████

PX-134 at -107.

[84] Aaron Decl. ¶¶ 229-34.

Again, harming competition was a feature of the Zillow Ban. ███████████████████
█████████████████████████████████████████████████████████████████████████
████████████████████████████████ [85] A week after the Ban was announced,
█████████████████████████████████████████████████████████████████████████
████████████████████████████████ [86] And by October 13, Zillow was publicly bragging
about the fact that 90% of agents who had received a Zillow Ban warning only received one and
that "[r]epeated issues are the rare outlier."[87] Thus, Zillow has (and will continue) to chill
competition in home search—competition that would otherwise provide choices to sellers.

Every home seller is thus harmed by the Zillow Ban—even those not interested in 3PM.
Competition makes *all* market participants offer better products and innovate. By protecting itself
from competition from brokerages with unique listings, Zillow has avoided the necessary efforts
that would have followed that competition. This is a market-wide harm, which clearly can never be
remedied.

Home sellers and agents, moreover, recognize that there are many benefits to 3PM such as
better prices, faster sales, and flexibility that some home sellers require.[88] This includes agents and
sellers from other brokerages, not just Compass.[89] Indeed, even Zillow's executives have
recognized ████████████████████████████████████████████████████████
█████████████████████████████████████████████████

---

[85] PX-028 at -971; *see also* PX-029 at 029-30 ████████████████████████████████
█████████████████████████████████████████

[86] PX-009 at -307-08.
[87] PX-142.
[88] PX-097; PX-092.
[89] PX-134 █████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
████████████████████████████████████████

[90] *See* PX-010 at 725-26, -739; PX-015; PX-051; PX-024 at -171-73.

██████████████████ If agents and sellers were not interested in off Zillow marketing, Zillow would not have needed to issue industry standards banning it. Instead, competition and the free market would have made that decision. Because of the Zillow Ban, however, sellers and agents face an impossible choice: use off-Zillow marketing such as 3PM and risk being banned from Zillow forever, or give up the benefits of premarketing so that they can appear on Zillow. These sellers that might have benefited from the off-Zillow option are further harmed by Zillow's Ban.

## III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR THE INJUNCTION

As part of the preliminary injunction analysis, courts also consider "which of the two [sides] would suffer most grievously" if the injunction motion is wrongly decided. *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (citation omitted). Courts also consider whether the public interest favors the injunction, with maintaining the status quo protecting the public from harms "weigh[ing] heavily" in favor of granting the injunctive relief. *Grumman Corp v. LTV Corp.*, 527 F. Supp. 86, 105 (E.D.N.Y. 1981); *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 400 (S.D.N.Y. 2024). First, as discussed above, Compass and the public are harmed by the Zillow Ban. Second, Zillow would not suffer any harm from a preliminary injunction. ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████ At most, Zillow would be forced to compete for home seller listings to fuel its dominant search website—which facially is not a relevant harm.

---

[91] PX-015 at -340.
[92] *See* PX-056.

## CONCLUSION

For the reasons stated above, Compass asks this Court to grant Compass's motion and issue a preliminary injunction prohibiting Zillow from enforcing the Zillow Ban until this case concludes.

Dated: October 31, 2025

Respectfully submitted,
 /s/ *Chahira Solh*
_____
Chahira Solh (*admitted pro hac vice*)
Daniel A. Sasse (*admitted pro hac vice*)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: (949) 263-8400
csolh@crowell.com
dsasse@crowell.com

Kenneth Dintzer (NY Bar No. 2476687)
(*admitted pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
kdintzer@crowell.com

Luke Taeschler (NY Bar No. 5308325)
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 223-4000
ltaeschler@crowell.com

*Attorneys for Plaintiff Compass, Inc.*

## WORD COUNT CERTIFICATION PURSUANT TO
### ECF NO. 107

Pursuant to the Court's order regarding word count, ECF No. 107 at 2, I hereby certify that the above memorandum is 9854 words.

　　　　　　　　　　　　　　　　　　　　 /s/ *Chahira Solh*
　　　　　　　　　　　　　　　　　　　　Chahira Solh