**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COMPASS, INC., | |
| Plaintiff, | Case No. 1:25-cv-05201-JAV |
| -against- | |
| ZILLOW, INC., ZILLOW GROUP, INC., and TRULIA, LLC, | |
| Defendants. | |

**DEFENDANTS' PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW DENYING**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

I.  PROPOSED FINDINGS OF FACT ............................................................... 1

    A.  The Parties ........................................................................................... 1

        1.  Compass ................................................................................... 1

        2.  Zillow ...................................................................................... 2

    B.  Industry Background ............................................................................ 4

    C.  Compass's Three-Phase Marketing Strategy ....................................... 5

    D.  Zillow's Listing Access Standards ...................................................... 7

        1.  Zillow's Concerns Animating the Standards .............................. 7

        2.  Zillow's Development and Announcement of the Standards ...... 8

        3.  Zillow's Implementation and Enforcement of the Standards ..... 9

    E.  Effect of Zillow's Standards on Compass ........................................... 10

    F.  Redfin's Listing Policy Announcement ............................................... 13

    G.  Relevant Market ................................................................................... 17

        1.  Product Market ......................................................................... 17

        2.  Geographic Market ................................................................... 17

    H.  Monopoly Power .................................................................................. 18

        1.  Direct Evidence ........................................................................ 18

        2.  Indirect Evidence ..................................................................... 20

II.  PROPOSED CONCLUSIONS OF LAW ....................................................... 22

    A.  Irreparable Harm ................................................................................. 23

        1.  Diminished Adoption of 3PM ................................................... 24

        2.  Harm to Compass's Goodwill or Reputation ............................ 27

        3.  Loss of Competitive Advantage ............................................... 28

4.     Harm to Competition or Consumers ........................................................ 30

5.     Self-Inflicted Harms............................................................................... 31

B.     Likelihood of Success ...................................................................................... 32

1.     Section 1................................................................................................. 33

2.     Section 2................................................................................................. 34

a.     Possession of Monopoly Power in The Relevant Market............. 35

i.     Geographic Market ............................................................. 36

ii.     Monopoly Power................................................................. 38

b.     Anticompetitive Conduct .............................................................. 42

i.     Refusal to Deal................................................................... 43

ii.     Anticompetitive Effects ..................................................... 53

iii.     Procompetitive Benefits..................................................... 55

3.     Antitrust Standing ................................................................................. 62

C.     Balance of the Equities ..................................................................................... 66

D.     Public Interest ................................................................................................... 67

**III.     CONCLUSION ............................................................................................................. 69**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1-800 Contacts, Inc. v. FTC,*
    1 F.4th 102 (2d Cir. 2021) ................................................................................. *passim*

*Absolute Recovery Hedge Fund, L.P. v. Gaylord Container Corp.,*
    185 F. Supp. 2d 381 (S.D.N.Y. 2002) ................................................................... 66

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
    181 F.3d 216 (2d Cir. 1999) .................................................................................. 38

*Allen-Myland, Inc. v. Int'l Bus. Machines Corp.,*
    33 F.3d 194 (3d Cir. 1994) .................................................................................... 42

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.,*
    190 F.3d 1051 (9th Cir. 1999) .............................................................................. 64

*Am. Needle, Inc. v. Nat'l Football League,*
    560 U.S. 183 (2010) ............................................................................................. 33

*Am. Patriot Express v. City of Glens Falls,*
    474 F. Supp. 3d 508 (N.D.N.Y. 2020) .................................................................. 23

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    899 F.3d 87 (2d Cir. 2018) ................................................................................... 34

*Anti-Monopoly, Inc. v. Hasbro, Inc.,*
    958 F. Supp. 895 (S.D.N.Y.) ........................................................................... 34, 42

*Arcesium, LLC v. Advent Software, Inc.,*
    2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ..................................................... 65

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) ........................................................................................ *passim*

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC,*
    843 F.3d 1225 (10th Cir. 2016) ............................................................................ 36

*Biocon Ltd. v. Abraxis Bioscience, Inc.,*
    2016 WL 5817002 (S.D.N.Y. Sept. 26, 2016) ..................................................... 30

*Breaux Bros. Farms, Inc. v. Teche Sugar Co.,*
    21 F.3d 83 (5th Cir. 1994) .................................................................................... 56

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ......................................................................................... 43, 63

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
    996 F.2d 537 (2d Cir. 1993) ................................................................................. 65

*Chase Mfg., Inc. v. Johns Manville Corp.*,
   84 F.4th 1157 (10th Cir. 2023) ......................................................................................47

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
   817 F.3d 46 (2d Cir. 2016)..............................................................................................36

*Convergen Energy WI, LLC v. L'Anse Warden Elec. Co.*,
   2020 WL 5894079 (S.D.N.Y. Oct. 5, 2020) ....................................................................31

*CoStar Grp., Inc. v. Com. Real Estate Exch., Inc.*,
   141 F.4th 1075 (9th Cir. 2025) .......................................................................................47

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
   96 F.4th 351 (2d Cir. 2024) ............................................................................................32

*Daniel v. Am. Bd. of Emergency Med.*,
   428 F.3d 408 (2d Cir. 2005)............................................................................................63

*Dexter 345 Inc. v. Cuomo*,
   663 F.3d 59 (2d Cir. 2011)..............................................................................................28

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992).........................................................................................................46

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006).........................................................................................................31

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
   612 F. Supp. 2d 330 (S.D.N.Y. 2009)..............................................................................38

*FTC v. Amazon.com, Inc.*,
   2024 WL 4448815 (W.D. Wash. Sept. 30, 2024)............................................................47

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ..........................................................................................64

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
   711 F.3d 68 (2d Cir. 2013)..............................................................................62, 63, 64, 65

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
   386 F.3d 485 (2d Cir. 2004)............................................................................................38

*Goldwasser v. Ameritech Corp.*,
   222 F.3d 390 (7th Cir. 2000) ..........................................................................................58

*Grand River Enterprise Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007)..........................................................................................24, 32

*In re ACTOS Antitrust Litig.*,
   783 F. Supp. 3d 749 (S.D.N.Y. 2025)..............................................................................39

*In re Adderall XR Antitrust Litig.*,
   754 F.3d 128 (2d Cir. 2014)................................................................................... *passim*

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)......................................................................................63, 64

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
361 F. Supp. 3d 324 (E.D.N.Y. 2019) ............................................................................38

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)........................................................................................45, 46

*In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*,
2014 WL 12778832 (S.D.N.Y. Sept. 19, 2014)..............................................................28

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019)............................................................................63

*In re Mylan N.V. Sec. Litig.*,
666 F. Supp. 3d 266 (S.D.N.Y. 2023).............................................................................33

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
729 F. Supp. 3d 298 (E.D.N.Y. 2024) .................................................................... *passim*

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*,
812 F.2d 786 (2d Cir. 1987).....................................................................................41

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
924 F.3d 57 (2d Cir. 2019)................................................................62, 63, 64, 65

*Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*,
604 F.2d 755 (2d Cir. 1979).....................................................................................67

*JTH Tax, LLC v. Agnant*,
62 F.4th 658 (2d Cir. 2023) .....................................................................................23

*Juster Assocs. v. City of Rutland, Vt.*,
901 F.2d 266 (2d Cir. 1990).....................................................................................65

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) .....................................................................................30

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007).................................................................................................59

*Lorain J. Co. v. United States*,
342 U.S. 143 (1951).................................................................................................46

*Mahmud v. Kaufmann*,
607 F. Supp. 2d 541 (S.D.N.Y. 2009).....................................................................36, 38

*Mason v. Jews for Jesus*,
2006 WL 3230279 (S.D.N.Y. Nov. 8, 2006)..........................................................67

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).................................................................................................67

-v-

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
364 F.3d 1288 (11th Cir. 2004) ................................................................59, 60

*Muze, Inc v. Digital On-Demand, Inc.*,
123 F. Supp. 2d 118 (S.D.N.Y. 2000)...............................................................29

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
296 F. Supp. 3d 442 (E.D.N.Y. 2017) ...............................................................34

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018)..............................................................22, 56, 59

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978)............................................................................56

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015).........................................................23, 35, 55

*New York v. Trump*,
767 F. Supp. 3d 44 (S.D.N.Y. 2025)................................................................24

*Norbrook Lab'ys Ltd v. G.C. Hanford Mfg. Co.*,
126 F. App'x 507 (2d Cir. 2005) ......................................................................29

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 ......................................................................... *passim*

*Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
322 F.3d 147 (2d Cir. 2003)..........................................................................61

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018).......................................................................36, 39, 54

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009).......................................................................43, 46, 48

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002)..........................................................................35, 41

*Person v. N.Y. Post Corp.*,
427 F. Supp. 1297 (E.D.N.Y. 1977) ..................................................................67

*Pirtek USA, LLC v. Zaetz*,
408 F. Supp. 2d 81 (D. Conn. 2005)................................................................30

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
776 F.2d 185 (7th Cir. 1985) ..........................................................................59

*Pool Water Prods. v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001) ........................................................................65

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
507 F.3d 117 (2d Cir. 2007)..........................................................................45, 51

*Pulse Network, L.L.C. v. Visa, Inc.*,
   30 F.4th 480 (5th Cir. 2022) ....................................................................................65

*Reuters Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990)......................................................................................27

*Rodriguez ex rel. Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir. 1999).......................................................................................23

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010)..................................................................................22, 24

*Seagood Trading Corp. v. Jerrico, Inc.*,
   924 F.2d 1555 (11th Cir. 1991) .................................................................................66

*Solus Alternative Asset Mgmt. LP v. GSO Cap. Partners L.P.*,
   2018 WL 620490 (S.D.N.Y. Jan. 29, 2018) .............................................................30

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
   131 F.4th 102 (2d Cir. 2025) ...............................................................................22, 32

*Sterling Merch., Inc. v. Nestlé, S.A.*,
   656 F.3d 112 (1st Cir. 2011) .....................................................................................57

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
   60 F.3d 27 (2d Cir. 1995).................................................................................. *passim*

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998).............................................................................41, 53, 55

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
   964 F.2d 186 (2d Cir. 1992).................................................................................35, 61

*U.S. Football League v. Nat'l Football League*,
   842 F.2d 1335 (2d Cir. 1988)...............................................................................39, 58

*United Asset Coverage, Inc. v. Avaya Inc.*,
   409 F. Supp. 2d 1008 (N.D. Ill. 2006) ......................................................................67

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health &
   Welfare Fund v. Takeda Pharm. Co.*,
   11 F.4th 118 (2d Cir. 2021) .......................................................................................35

*United States v. Apple, Inc.*,
   2025 WL 1829127 (D.N.J. June 20, 2025) ................................................................47

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015).......................................................................................33

*United States v. Google LLC*,
   747 F. Supp. 3d 1 (D.D.C. 2024) ...............................................................................35

*United States v. Google LLC*,
   778 F. Supp. 3d 797 (E.D. Va. 2025) ........................................................................47

*United States v. Grinnell Corp.*,
        384 U.S. 563 (1966)..................................................................................................35

*United States v. Microsoft Corp.*,
        253 F.3d 34 (D.C. Cir. 2001)..........................................................43, 58, 60, 62

*United States v. Visa, Inc.*,
        788 F. Supp. 3d 585 (S.D.N.Y. 2025)....................................................................47

*Verizon Commc'ns Inc. v. Law Offs. of Curtis v. Trinko, LLP*,
        540 U.S. 398 (2004)................................................................................. *passim*

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
        549 U.S. 312 (2007)..................................................................................................56

*Winter v. Nat. Res. Def. Council, Inc.*,
        555 U.S. 7 (2008)......................................................................................................68

*ZF Meritor, LLC v. Eaton Corp.*,
        696 F.3d 254 (3d Cir. 2012)....................................................................................56

**STATUTES**

15 U.S.C. § 26..................................................................................................................31

**MISCELLANEOUS**

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure (3d ed.
        2025) ..........................................................................................................................32

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (2025) .....................................56, 57, 62

## I.    PROPOSED FINDINGS OF FACT

### A.    The Parties

#### 1.  Compass

1.      Compass is the largest real estate brokerage in most major U.S. markets and views itself as an agent-focused company. Tr. 49:11–12, 50:2–9 (Reffkin); DX674. Compass operates in some but not all states, depending on where it is licensed to provide real estate services. Tr. 121:12 (Reffkin). Compass derives its revenue from its agents representing buyers or sellers in real estate transactions, and it views this business model as distinct from that of online home search portals that derive revenue from selling leads or advertising. Tr. 50:10–51:20 (Reffkin). Compass agents are independent contractors who represent consumers in home sale transactions (as buyer, seller, or both). Tr. 48:5–8 (Reffkin). Sellers, however, contract directly with Compass and for-sale listings belong to Compass. Tr. 162:10–14 (Samuelson); Carr Dep. Tr. 64:21–65:6; DX268. On September 22, 2025, Compass announced that it had agreed to acquire one of its largest competitors, Anywhere Real Estate, in an all-stock transaction, which would result in a combined entity worth approximately $10 billion with over 340,000 real estate agents worldwide. DX528 at 1–2; Tr. 103:13–104:8 (Reffkin).

2.      Compass also operates a website, Compass.com, that displays for-sale listings from Compass and from other brokerages via data feeds from local Multiple Listing Services ("MLSs"). DX668; Tr. 50:6–14, 62:14–63:8 (Reffkin). Compass did not view itself as operating in home search alongside other online platforms, such as Zillow and Realtor.com, as recently as April 2024. DX175 at 9. It has not made substantial investments in attracting users to its website, nor has it viewed web traffic as a key revenue driver. Tr. 93:12–94:15 (Reffkin); DX674 at 1:44–2:08. Before filing this lawsuit, Compass's CEO proposed to Zillow executives that Zillow provide technology to power Compass's website. Tr. 384:1–15 (Hofmann).

3.      Compass.com is also used by Compass agents to collaborate with clients during the home sale process, although Compass agents rarely receive leads to prospective clients via Compass.com. Tr. 145:9–25 (Carr). Clients typically use other sites to search for home listings before becoming Compass clients, but after Compass agents develop relationships with the clients, they then direct their clients to use Compass.com. Tr. 146:1–15 (Carr).

### 2.      Zillow

4.      Zillow is a real estate technology company that provides a multisided platform for home sellers, buyers, and real estate agents, including an online home search website. Tr. 216:15–217:7 (Samuelson). Zillow views itself as primarily consumer-oriented and its founding mission was "power to [the] people, turn on the lights." Tr. 332:23–333:2 (Wacksman). Zillow does not view itself as competing with Compass (or other brokerages) in online home search. Tr. 293:6–8, 336:9–337:5 (Wacksman); 163:17–164:3, 221:21–222:3 (Samuelson). Instead, Zillow views its competitors as other technology-focused real estate websites, such as Realtor.com, Homes.com, and Redfin.com, which it competes with on the basis of providing a high-quality user experience. Tr. 293:6–8, 336:18–20, 338:13–22 (Wacksman); 384:8–385:10 (Hofmann).

5.      Zillow does not typically represent consumers in real estate transactions and obtains the majority of its for-sale listings from local MLSs by virtue of being a registered brokerage. Tr. 162:7–164:12, 221:21–222:3 (Samuelson). Zillow's primary business model is to display those listings on its websites and apps—at no cost to consumers—in conjunction with paid advertising services to connect consumers to real estate professionals, such as agents and lenders. Samuelson Decl. ¶¶ 13–14; Tr. 220:19–221:10, 262:13–263:3, 278:18–279:3 (Samuelson); 295:16–17, 333:10–335:3 (Wacksman). Zillow attracts users to its online home search platform by augmenting listings with additional information—such as its Zestimate automated valuation tool, neighborhood information, and tax information—and other technology

products like 3D walkthroughs and virtual home staging. Samuelson Decl. ¶¶ 17–21; Tr. 167:17–168:4 (Samuelson); 333:10–25 (Wacksman).

6.      Zillow does not monetize listings on a per-listing basis and instead generates advertising revenue when a real estate agent either successfully completes a transaction or pre-pays for leads through Zillow's market-based pricing product. Tr. 334:21–335:5 (Wacksman); 382:6 (Hofmann); 624:15–20, 650:9–19 (Wu). A combination of quantity and quality of listings attracts users to Zillow to facilitate those connections. Tr. 230:24–231:21, 238:20–240:5 (Samuelson); 334:6–20 (Wacksman); 625:14–22 (Wu); DX576 at 3–4. Zillow also offers other software services to agents, such as a customer relationship management tool and tour appointment scheduling software. Tr. 216:25–217:7 (Samuelson); Samuelson Decl. ¶ 14. Although Zillow holds brokerage licenses, it does not operate as a traditional brokerage. Tr. 221:21–222:3 (Samuelson). Because of Zillow's business model, Zillow views brokerages that represent buyers or sellers (like Compass) as its partners or customers, and not as competitors. Tr. 337:6–338:1 (Wacksman); 384:22–385:10 (Hofmann); 250:23–251:11 (Samuelson).

7.      Zillow's online home search platform attracts a large number of monthly viewers—approximately 200 million per month—but Zillow's services facilitate only a small fraction of real estate transactions in the United States. Tr. 205:24–206:2 (Samuelson); 119:12–20 (Reffkin). Many users who visit Zillow's online home search platform do so for reasons other than to purchase or sell a home, such as for entertainment. Tr. 265:10–19 (Samuelson); DX384 at 1; DX657 ¶ 191. Many of the users that visit Zillow also cross-shop and visit other online home search platforms, including Realtor.com, Homes.com, Redfin.com, and brokerage websites. Tr. 223:20–224:10, 229:8–15, 264:2–265:9 (Samuelson).

### B.    Industry Background

8.    Online home search platforms generally receive for-sale listings from local MLSs. Tr. 218:9–219:3 (Samuelson). There are over 500 local MLSs in the United States, which typically allow only MLS members to view their listing databases. Tr. 52:12–53:2 (Reffkin); 218:9–20 (Samuelson); Samuelson Decl. ¶ 9. Zillow receives listings through IDX and VOW data feeds from local MLSs as a licensed brokerage and member of those MLSs. Tr. 162:21–163:4, 218:21–24 (Samuelson). Other online home search platforms typically receive listings from MLSs the same way. Tr. 218:25–219:3 (Samuelson); Kelman Dep. Tr. 43:9, 43:17–44:2. As such, online home search platforms generally have access to the same listings inventory, and compete with each other on user experience and brand. Tr. 338:13–22 (Wacksman); 375:22–376:3 (Hofmann); Kelman Dep. Tr. 151:11–152:3, 170:6–9, 211:21–212:21.

9.    The MLS system—where all MLS members have insight into essentially all for-sale listings—does not exist in all global real estate markets. For example, in Australia, home buyers often have extremely limited information regarding what homes are for sale and at what price. Tr. 343:3–21 (Wacksman). In other countries, a home buyer must go to multiple brokerages to find all available homes for sale in a local market. Pareja Dep. Tr. 129:9–18. In contrast, because of the MLS system in the United States, a home buyer can access a transparent database of all listings when working with any brokerage. Tr. 343:22–344:2 (Wacksman).

10.    Starting in 2020, the National Association of Realtors ("NAR") required its member MLSs to implement the Clear Cooperation Policy ("CCP"), which requires brokerages generally to submit listings to their local MLS within one day of publicly marketing the listing.

Samuelson Decl. ¶ 37. CCP never prohibited pocket listings or office exclusives,[1] which by definition are not publicly marketed. DX657 ¶ 32. Local MLSs also implement many other rules that affect how brokerages conduct their business. Tr. 491:2–23 (Navab-Boshehri); DX590 at tab 2 ("MLS Restrictiveness"); DX339 at 1 (discussing MLS rules by state).

11.      In 2024, Compass lobbied NAR and local MLSs to repeal CCP, while Zillow lobbied NAR to strengthen it. PX119; Samuelson Decl. ¶¶ 38–39; Tr. 397:8–21 (Alexander); 172:11–24, 173:12–16 (Samuelson). On March 25, 2025, NAR announced a change to CCP to allow "delayed marketing" of listings and to loosen the definition of public marketing, which opened the doors for a significant increase in off-MLS listings that were not traditional office exclusives. Samuelson Decl. ¶ 40; Tr. 64:23–65:3 (Reffkin). Even after NAR weakened CCP in response to Compass's lobbying, Compass announced in July 2025 that it would not adhere to CCP. Tr. 244:19–22 (Samuelson).

### C.      Compass's Three-Phase Marketing Strategy

12.      Compass launched its Three-Phase Marketing Strategy ("3PM") in November 2024. Tr. 394:8–9 (Alexander). Phase 1 is the "Compass Private Exclusive" phase, in which Compass markets the property to other Compass agents, their clients, and agents at other brokerages in a 1:1 manner. Hardy Decl. ¶ 14(a). Compass also publicly markets the existence of specific numbers of Private Exclusive listings on its website through a "black box," and allows potential buyers to view such listings by clicking on the "black box" and contacting a Compass agent. Tr. 58:4–9 (Reffkin); 463:10–465:10 (Alexander); DX668. Compass often does not

---

[1] Pocket listings" or "office exclusives" are listings kept off of the MLS and not publicly marketed. Tr. 202:12–18 (Samuelson); DX033. Some home sellers, such as public figures, may prefer not to publicly advertise their sale due to privacy concerns. Tr. 202:12–18 (Samuelson), 55:10–14 (Reffkin). But most sellers do not have these privacy concerns. Tr. 55:10–14, 58:21–23 (Reffkin); Pareja Dep. Tr. 9:5–13.

respond to inquiries regarding Private Exclusives unless they originate from Compass agents or unrepresented buyers. Tr. 467:2–6 (Alexander); DX176 at 3. Listings in Phase 1 are not submitted to the local MLS, and therefore are not distributed to and do not appear on any online home search platform other than Compass.com. Tr. 171:18–21 (Samuelson).

13.     Phase 2 is the "Compass Coming Soon" phase, in which the listing is publicly displayed on Compass's website. Hardy Decl. ¶ 14(b); Tr. 60:18–22 (Reffkin). Compass Coming Soon listings are not submitted to the MLS and are only available on Compass.com. Hardy Decl. ¶¶ 14(b)–(c); Tr. 60:18–22 (Reffkin); 133:4–8 (Carr). In markets representing roughly 50% of Compass listings volume, existing MLS rules already limit the duration of "coming soon" listings to one business day before they must be shared via the MLS. DX018 at 29; Tr. 133:4–8, 148:14–16 (Carr); 398:2–11 (Alexander).

14.     In Phase 3, Compass submits the listing to the local MLS, which distributes it to all member online home search platforms through IDX and VOW feeds. Hardy Decl. ¶ 14(c); Tr. 133:4–8 (Carr). 94% of all Compass listings that are marketed through 3PM are ultimately sold in Phase 3. Hardy Decl. ¶ 24; Tr. 61:5–7 (Reffkin).

15.     Compass's 3PM is not a unique offering. Competing brokerages, including Douglas Elliman, Coldwell Banker, Sotheby's, and Corcoran, launched similar pre-marketing programs before Zillow announced its Listing Access Standards (the "Standards"). Tr. 396:12–16 (Alexander); 487:18–488:8 (Navab-Boshehri). Since April 2025, more brokerages have announced their own pre-marketing programs, including Long & Foster and Keller Williams. Tr. 87:20–25, 112:2–113:19 (Reffkin).

### D.     Zillow's Listing Access Standards

#### 1.   Zillow's Concerns Animating the Standards

16.     Zillow was concerned that private listing networks ("PLNs") would proliferate and began planning its Standards in anticipation of NAR repealing or weakening CCP. Tr. 241:11–242:23 (Samuelson); 341:3–18 (Wacksman). Zillow believed that "if companies like Compass were holding their inventory back from the[] marketplace … it was going to create pressure for other brokerages to do the same." Tr. 342:16–23 (Wacksman)

17.     Zillow was concerned that such an increase in PLNs would fragment the market, limit transparency, and harm consumers and the real estate industry. Tr. 237:19–238:19, 240:6–16, 242:14–244:1 (Samuelson); 380:20–381:7 (Hofmann); 342:23–343:4 (Wacksman) (describing a world without transparency and access to all inventory as "terrible for consumers"). Zillow was also concerned that a spread of PLNs would degrade Zillow's platform, harm Zillow's ability to obtain fresh, comprehensive, and accurate listings, and encourage free riding. Tr. 237:19–238:19, 240:6–16, 242:14–244:1 (Samuelson); PX001 at -114–17.

18.     Zillow witnesses testified to Zillow's longstanding goals of maintaining comprehensive, fresh and accurate listing data in order to attract and maintain its audience. *See* Tr. 165:19–167:2, 227:2–230:13 (Samuelson); 344:7–10 (Wacksman). Zillow's contemporaneous documents predating this lawsuit reflect these goals. *See, e.g.*, PX002 at -159; DX591 at 1–3; DX576 at 1–7; DX612 at 3–9; PX001 at -114; DX302 at 2–14; DX372 at 6, 22; Tr. 230:14–231:21, 238:20–240:5 (Samuelson). Ms. Alexander also attested at the outset of this lawsuit that she understood that Zillow was concerned about degradation of its platform from private listings. Alexander Decl. ¶ 9. Zillow's concerns are especially important given the multisided nature of its platform: displaying comprehensive, up-to-date, and accurate listing

information and insights is vital for each of the services Zillow provides to buyers, sellers, and agents. Tr. 623:2–624:14 (Wu); DX657 ¶¶ 95–101.

### 2. Zillow's Development and Announcement of the Standards

19. Due to its concerns about a proliferation of PLNs, Zillow began developing the Standards in January 2025. DX591 at 1–3; PX002 at -159; PX021 at -747; Tr. 174:15–23, 177:12–22, 179:9–17 (Samuelson); 301:13–23, 341:5–6 (Wacksman). Zillow considered several potential approaches to address PLNs but ultimately settled on the Standards as the most tailored way to achieve its goals of ensuring fair and transparent access to listing information, encouraging informed seller choice, and protecting Zillow's platform. PX002 at -159, -167; Tr. 245:6–11, 249:8–250:7, 257:13–258:19 (Samuelson). Although Zillow recognized there was a risk to enacting the Standards, it believed the Standards would discourage PLNs because sellers would choose access to the MLS and Zillow over restricted options like Compass's 3PM. Tr. 345:7–14 (Wacksman). As a result, Zillow did not anticipate any revenue loss as a result of implementing the Standards. Tr. 367:25–368:2 (Hofmann).

20. On April 10, 2025, Zillow announced the Standards. DX381 at 1–2; Tr. 246:9–12 (Samuelson). The Standards provide that Zillow will not display on Zillow's own platforms listings that are selectively marketed—that is, publicly marketed for more than one business day to select buyers but withheld from the MLS. DX381 at 1–2; DX572. However, the Standards still allow brokerages to use office exclusives and other forms of premarketing. Tr. 347:20–349:8 (Wacksman). The Standards are similar to the rules of multiple MLSs, and some MLSs impose stricter rules than the Standards. Tr. 247:9–15 (Samuelson). The Standards do not seek submission of listings to Zillow directly, but rather to the MLS, where they are available "for distribution and display on other MLS participants' websites, including … Zillow.com …" DX572 ¶ 3. Zillow allows listings to be submitted directly to Zillow as a backup option only in

cases where a brokerage cannot supply listings to Zillow through the MLS. Tr. 251:20–252:3, 252:19–253:5 (Samuelson); 324:17–20, 328:10–329:2 (Wacksman); DX428 at 3. Zillow structured the Standards this way because Zillow believes full market transparency allows online home search platforms to compete based on their quality, rather than on their inventory of scarce listings. Tr. 248:8–19 (Samuelson).

### 3. Zillow's Implementation and Enforcement of the Standards

21.     Zillow's Standards apply only to Zillow's own websites and platforms: they do not control what listings are displayed anywhere else, including on MLSs, other home search platforms, or brokerage websites. Tr. 248:3–7, 248:20–23 (Samuelson); Gold Dep. Tr. 104:20–22, 104:24–105:1, 105:3–5, 105:7. The Standards also apply listing-by-listing: an agent or brokerage that previously violated the Standards can subsequently list homes on Zillow that do not violate the Standards. DX428 at 2 ("Listings that align with the listing access standards will be on Zillow … regardless of an agent's past violations."); Tr. 248:3–7, 248:20–23 (Samuelson). Furthermore, Zillow will display a home that was truly privately marketed if the seller provides written consent not to disseminate through the MLS after disclosure of the risks of private listings. Tr. 246:23–247:8 (Samuelson); 407:6–7 (Alexander). Zillow's disclosure requirement tracks NAR's modified CCP to help ensure sellers make informed premarketing choices. Tr. 246:23–247:8 (Samuelson); 381:13–24 (Hofmann).

22.     Zillow's Standards apply to all brokerages' for-sale listings. DX572. They do not boycott Compass, nor are they specific to Compass or any other brokerage. Tr. 247:16–18 (Samuelson); 115:6–17 (Reffkin). Zillow provides agents two warnings before a violative listing is not displayed on Zillow. DX428 at 4. Because it took Zillow additional time to determine how

the Standards would apply in "edge cases," Tr. 245:25–246:12 (Samuelson), on May 20, 2025, Zillow released a more detailed FAQ concerning application of the Standards. DX428.[2]

23.    In May, Zillow began applying the Standards and warning agents of violations but still displayed all listings to ensure agents understood the application of the Standards. Tr. 254:23–255:14 (Samuelson). Zillow began enforcing the Standards on June 30, 2025, rolling out enforcement mechanisms region-by-region. Tr. 254:23–255:14 (Samuelson); 350:20–351:11 (Wacksman); Samuelson Decl. ¶ 57; DX662. Zillow has been fully enforcing the Standards and has not held back its efforts in light of this litigation. Tr. 351:8–14 (Wacksman); DX662.

24.    Zillow's enforcement data supports that Zillow has applied the Standards to all brokerages, not just Compass. DX662. Through November 14, 2025, Zillow has sent warnings to agents at 24 brokerages who have violated the Standards. DX662 at 2; Tr. 288:15–289:6, 290:3–11 (Samuelson). Only 2.04% of Compass's listings have received violation warnings. DX662 at 2. To date, Zillow has declined to display a small number of listings (less than 50) from two brokerages. DX662 at 4–5. These listings not displayed on Zillow have continued to appear on Compass.com and every other online home search and brokerage website. Tr. 119:25–120:9 (Reffkin); 248:3–7 (Samuelson); DX657 ¶ 50. Zillow continues to display tens of thousands of active Compass listings. Tr. 255:24–256:1 (Samuelson).

**E.    Effect of Zillow's Standards on Compass**

25.    Zillow's Standards do not "block" Compass's ability to use 3PM, and Compass continues to use Private Exclusives and Coming Soons to this day. Tr. 62:6–8, 63:11–15, 65:20–

---

[2] Mr. Samuelson also explained the reasoning behind certain exceptions to the Standards. *See* Tr. 168:20–169:7 (Standards do not apply to development communities since unbuilt communities cannot be submitted to the MLS); 247:19–248:2 (Standards do not apply to For-Sale-By-Owner listings, as individuals typically do not have MLS access).

24 (Reffkin); Reffkin Dep. Tr. 113:10–18 (Dkt. 127-2). However, based on the way the Standards define public marketing, they impact how Compass chooses to display its listings through its "black box" if it wishes for these listings to later appear on Zillow. DX572 at 2; DX428 at 3–4. Despite having been repeatedly informed by Zillow between April and June 2025 that Zillow viewed the black box as a violation of the Standards, Compass continues to use the black box today. DX033 at 1 ("Z takes issue with 'black box' showing # of private exclusives with click through to learn more"); DX034; Tr. 107:20–23, 110:24–25 (Reffkin); 308:1–5 (Wacksman); 389:12–390:9 (Hofmann); 441:11–14 (Alexander); Alexander Decl. ¶ 14.

26.    At Phase 2, the Standards limit the use of Compass Coming Soons to one business day before the listing must be submitted to the relevant MLS. PX112. However, because many MLSs already impose the same one-day limitation, the Standards do not impose any additional restrictions on Compass Coming Soons in MLSs representing approximately 50% of Compass listing volume. Tr. 111:19–22 (Reffkin); 133:4–8, 148:14–23 (Carr); DX018.

27.    Compass asserts that the Standards have caused a decline in the seller adoption rate of 3PM, which Compass views as its key metric on the success of 3PM. Tr. 395:8–11 (Alexander). According to Compass, in April 2025, 40% of Compass listings were marketed through 3PM, but that adoption rate "dropped off" after the Standards were announced. Tr. 396:3–5, 413:2–8 (Alexander). Compass attributes this decline to purported "chaos and confusion" from Zillow's initial announcement of the Standards. Tr. 479:23–480:3 (Navab-Boshehri). Compass also claims that agents are choosing not to discuss 3PM in pitches. Tr. 413:9–15 (Alexander).

28.    However, Compass concedes that a decrease in 3PM adoption rate does not show that Compass has lost listings—just that sellers are choosing not to use 3PM. Tr. 451:18–24

(Alexander). Nor did Compass identify any analysis showing that 3PM—or its adoption rate—impacts Compass's revenue. Tr. 594:25–595:11 (Bhonsle). Compass could not identify any specific agents or properties that were lost due to the Standards and did not offer data tracking listings that were purportedly lost due to the Standards. Tr. 506:9–10, 506:13–507:7 (Navab-Boshehri); 156:9–11 (Carr). Compass also does not view the Standards "as a source of meaningful retention risk" for Compass agents. Tr. 506:7–8 (Navab-Boshehri).

29.    Compass newly contends that the Standards caused online traffic to Compass.com to fall from a high of 7 million monthly average users in April 2025 to 5 million in November 2025. Tr. 399:14–22 (Alexander). Ms. Alexander admitted, however, that there are "many variables," including seasonality, that impact Compass's web traffic, and Compass documents showed a nearly identical seasonal trend in 2024, before the Standards were announced. Tr. 399:24–400:4, 456:22–457:4 (Alexander); DX664 at 1, 3 (decline from 6.5 million monthly active users in April 2024 to 3.9 million in November 2024). Compass's claim that the decrease in web traffic in 2025 was caused by the Standards is therefore speculative.

30.    Beyond a purported drop in adoption of 3PM, the evidence shows that the Standards have not negatively affected Compass's business. Compass concedes that it can continue running its core strategy (*i.e.*, its brokerage business) today. Tr. 594:9–12 (Bhonsle). In Q2 2025, while Zillow's Standards were in place, Compass achieved all-time highs in market share, revenue, adjusted EBITDA, and other metrics. Tr. 103:3–6 (Reffkin); 597:2–15 (Bhonsle); DX004 at 1–2 ("Compass delivered the best quarterly results in our history [in Q2 2025] …."); DX006 at 4 (similar). The next quarter, during which Zillow was actively enforcing the Standards, Compass's results were the "strongest Q3 results in company history." Tr. 100:2 (Reffkin); DX655 at 4. In Q3 2025, Compass exceeded its projected revenue and profitability by

-12-

over $10 million. Tr. 603:24–4, 604:17–605:1 (Bhonsle); DX615 at 1. Compass's Q3 2025 organic and total transactions also outgrew the market by five and twenty percentage points, respectively. Tr. 605:7–10 (Bhonsle).

31.     Similarly, Compass's financial disclosures confirm that Compass does not view the Standards as a material risk to its business. Compass's Q2 and Q3 Form 10-Qs filed with the SEC did not disclose any risk factors relating to Zillow's Standards. Tr. 607:12–15, 608:5–8 (Bhonsle); DX010 at 42; DX659 at 47–53. Nor did Compass disclose any risks arising from the Standards in its acquisition of Anywhere. Tr. 104:9–16 (Reffkin); DX531 at 6–8.

### F.    Redfin's Listing Policy Announcement

32.     On April 14, 2025, Redfin announced that because it "[b]elieve[s] all buyers should be able to see all listings, Redfin.com will not publish any listings that have been publicly marketed before being shared with all real estate websites via the MLS." DX202 at 1. Redfin also announced, in the next sentence, that it would ask MLSs to create a coming-soon designation for listings that precludes search sites from showing how long a home has been for sale and at what prices, which was different from Zillow's Standards and inspired by Compass. DX202; Tr. 358:4–14 (Wacksman); Kelman Dep. Tr. 74:8–17, 172:8–15.

33.     The CEOs of Redfin and Zillow each testified that they developed their standards independently and did not enter into any agreement to boycott Compass or to coordinate their respective standards. Kelman Dep. Tr. 126:6–22, 166:2–167:11, 174:9–16; Tr. 355:22–25, 357:22–24, 358:17–19, 362:3–5, 362:11–13 (Wacksman). Redfin first learned of Zillow's Standards on April 9, when Zillow pre-briefed the media and numerous industry participants (including both Compass and Redfin) on its Standards the day before publicly announcing them. Kelman Dep. Tr. 161:13–162:03; Tr. 355:22–25 (Wacksman); 140:07–15 (Hofmann); *see also* Tr. 253:6–254:4 (Samuelson). Mr. Wacksman informed Mr. Kelman of Zillow's plan to

announce the Standards after Zillow had already begun disclosing the Standards to media outlets. Kelman Dep. Tr. 61:10–62:18, 161:13–162:3; Tr. 357:1–21 (Wacksman); DX379 at 1. Mr. Kelman testified that he "thought it was a good idea" and consistent with his longstanding public support for listing transparency, but Redfin was "still processing it" and "had to figure out [its] own approach to it." Kelman Dep. Tr. 61:22–62:10, 135:2–17. Mr. Wacksman reported to his colleagues shortly after his call with Mr. Kelman: "great chat with Glenn [Kelman]. He is THRILLED we are doing this – and said he likely will do the same." DX379 at 3. Mr. Wacksman testified that Mr. Kelman "was very pleased" and his "immediate reaction was support," but that he was also "surprised" and would have to "talk to his team and think about it." Tr. 318:20–320:3 (Wacksman). Mr. Wacksman did not ask Mr. Kelman to implement the Standards or seek his feedback on the April 9 call, nor did Mr. Kelman agree to implement the same policy. Kelman Dep. Tr. 162:21–167:11; Tr. 356:1–3, 356:12–13 (Wacksman).

34.    Redfin and Zillow did not discuss Redfin's ultimate decision to announce its own policy. Tr. 358:17–19 (Wacksman); Kelman Dep. Tr. 168:16–18. Mr. Kelman testified that Redfin decided to announce its policy "minutes or hours" before its announcement. Kelman Dep. Tr. 70:20–71:15, 168:16–169:5. Redfin announced its policy to further support listing transparency, which it has historically supported publicly and vocally. Kelman Dep. Tr. 170:21–171:5, 135:2–17, 126:14–22; DX212 (Redfin statement supporting original CCP rule in 2019); DX208 (Redfin statement regarding pocket listings in 2021); DX213 ("Don't End Clear Cooperation," September 2025); DX214 ("In a World Without [CCP], Big Brokers Win, Agents and Consumers Lose," October 2024).

35.    Two other phone calls occurred between Zillow and Redfin on topics related to Zillow's Standards, and neither call shows or even suggests a conspiracy. First, on April 14,

2025, Redfin's head of brokerage (Mr. Rath) contacted Mr. Samuelson, and Mr. Samuelson clarified how Zillow would apply Zillow's own standards. PX125 at -232. Many of Zillow's other brokerage customers asked Zillow for clarification around the same time. Tr. 202:1–11 (Samuelson). Although this call occurred on the same day that Redfin announced its planned policy, no evidence suggests that Zillow played any role in Redfin's unilateral announcement, which did not address this level of implementation detail, or that this call had any impact on *Zillow's* implementation of its Standards. *See, e.g.*, PX125 at -232.

36.    Second, on May 20, 2025, after Zillow posted its FAQs, DX428, Mr. Kelman contacted Mr. Wacksman to seek further clarification on how brokerages such as Redfin could comply with Zillow's Standards by sending Zillow a direct feed of listings without sharing those listings with an MLS, an issue not directly addressed by Zillow's original FAQs. PX007; PX177; Tr. 321:4–12, 324:4–7, 324:15–325:1, 358:20–360:14 (Wacksman); Kelman Dep. Tr. 103:7–105:8. Mr. Wacksman took the call from a public place in the presence of others—inconsistent with a secret conspiracy—and relayed the same information that Zillow was sharing broadly in the industry: that Zillow's Standards required sharing listings through the MLS, and that feeds to Zillow were intended only as a backup if an MLS were to cut off Zillow's listing feeds. Tr. 327:4–5, 358:23–359:7, 360:1–3 (Wacksman); Kelman Dep. Tr. 104:15–105:8. Around the same time, Zillow updated its FAQs to make clear that a direct feed was a backup option and not a substitute to sharing listings with an MLS. Tr. 326:20–25, 359:13–15 (Wacksman). The evidence shows that this was not a change in position but rather had long been Zillow's intention. Tr. 359:9–12, 360:4–12 (Wacksman); DX591 at 2 ("Should CCP be weakened or eradicated Zillow will support efforts to maintain listing transparency for consumers by maximizing listings in the MLS, and thus in the IDX feed and on Zillow (and all other MLS members' IDX websites)");

PX002 at -159 (proposing that "listings continu[e] to go into the MLS and be[] distributed to all brokers – even over getting these listings for Z[illow] directly from brokers."). The evidence also indicates that other brokerages had raised similar questions in response to the initial FAQs, which were clarified in response to these inquiries. Tr. 325:2–7, 326:20–25 (Wacksman); 254:18–22 (Samuelson). The May 20 phone call and subsequent updates to the FAQs do not suggest any conspiracy.

37.    Compass also cast suspicion on additional calls between Mr. Wacksman and Mr. Kelman in March 2025, before Zillow announced the Standards, but contemporaneous records and testimony show that these calls did not involve discussion of Zillow's or Redfin's potential plans with respect to listing policies. PX006 (memorializing March 13 call); PX038 at -693–94 (memorializing March 25 call); Tr. 313:25–316:13 (Wacksman).

38.    Redfin was recently acquired and its new owners have not decided whether to implement a listing policy, so Redfin has not taken any steps toward implementation. Kelman Dep. Tr. 74:18–75:12. Compass listings that violate Zillow's Standards remain available on Redfin.com. Kelman Dep. Tr. 201:13–22; Tr. 256:2–257:12 (Samuelson); Golod Dep. Tr. 104:20–22, 104:24–105:1, 105:3–5, 105:7. No evidence has been presented that anyone at Compass, or any Compass agent, understood Redfin's short and general announcement to apply to Compass's 3PM program or that Redfin's announcement had any effect on Compass or its agents or sellers.[3]

_____

[3] Even as to *Zillow's* Standards, Compass witnesses testified that they initially believed that 3PM complied, and it was only after Zillow issued more detailed clarification that at least some Compass witnesses understood that 3PM would not comply with Zillow's Standards; and at least some agents only became aware that Zillow's Standards conflicted with 3PM after receiving warning letters from Zillow. Tr. 110:9–112:6 (Reffkin); 149:6–150:1, 152:19–153:7 (Carr); 441:11–443:25 (Alexander). There is no evidence that Redfin, by contrast, ever issued any further details about its announcement or any warning letters.

### G.    Relevant Market

#### 1.    Product Market

39.    There is no dispute for purposes of Compass's PI motion that the relevant product market is online home search platforms. Tr. 522:14–19 (Aron); 685:15–19 (Wu). This market comprises multi-sided online platforms that bring together home buyers, home sellers, and agents seeking to facilitate home sale transactions. Tr. 525:7–526:1 (Aron); 622:20–624:6 (Wu).

40.    Both experts agreed that Compass's 3PM, as well as other PLNs, operate in a separate market for brokerage services. Tr. 560:9–20 (Aron); 677:6–678:20 (Wu).

#### 2.    Geographic Market

41.    Online home search platforms compete at a sub-national level. Though large platforms may use national pricing, policies, and metrics, Tr. 526:23–529:12 (Aron), buyers search for homes in a specific area rather than nationally. Tr. 258:22–261:20, 279:24–280:2 (Samuelson); 666:23–667:1 (Wu); DX657 ¶¶ 141–42. It follows that sellers want exposure to buyers looking for homes in their specific area. Tr. 666:15–667:1, 667:11–20 (Wu); DX657 ¶ 144.

42.    This means that consumers must use online home search platforms that provide services in specific geographies. In other words, if a platform does not serve a specific area well, it is not a viable alternative for consumers there. Tr. 667:21–669:3 (Wu). Some platforms like Zillow and Homes.com display home sale listings in every region in the country, but others only display listings in a certain region or set of regions. Tr. 583:13–17 (Aron); 668:2–16 (Wu). Compass, for instance, does not display listings nationwide and thus cannot serve as a substitute for other online home search platforms in certain local areas, such as Salt Lake City, Utah. Tr. 262:13–23 (Samuelson); 584:22–585:5 (Aron); 667:11–668:1 (Wu). Indeed, Compass.com

operates in only approximately 200 of the over 500 MLSs in the country. Tr. 121:11–122:17 (Reffkin); DX590 (listing 172 MLSs); DX527 at 9; Golod Dep. Tr. 9:25–11:16, 26:2–19.

43.    Even in regions where a platform competes, its presence and strength often differs from region to region. For example, Redfin's online home search platform has "significantly more traffic" in certain markets. Kelman Dep. Tr. 220:11–16; DX657 ¶ 155. Compass's ability to implement 3PM varies by local geography—and thus so does (1) its ability to develop exclusive inventory for its website, and (2) the impact of Zillow's Standards on Compass. Tr. 460:13–18 (Alexander); 490:2–4, 491:24–492:8 (Navab-Boshehri); 585:7–586:1 (Aron); 669:5–670:9 (Wu); DX590 at tab 2 ("MLS Restrictiveness"); DX019 at 2; DX384 at 1; Golod Dep. Tr. 63:22–64:13, 156:24–157:14. Unsurprisingly, Compass tracks the adoption of 3PM by region and subareas within those regions. Tr. 490:17–491:1 (Navab-Boshehri); DX630–DX653. Likewise, Zillow's implementation of the Standards has depended and varied based on local MLS rules. Tr. 329:11–14, 350:23–351:3 (Wacksman).

### H.    Monopoly Power

#### 1.    Direct Evidence

44.    Compass offered no empirical evidence that Zillow's Standards led to market-wide harm in online home search, such as increased prices, reduced output, decreased quality or innovation, or exclusion from the market. Tr. 559:20–560:7 (Aron); 674:25–675:12 (Wu). Though Dr. Aron claimed that the Standards "discourage" agents from using premarketing strategies, Tr. 534:5–17 (Aron), there is no evidence that any brokerage stopped offering premarketing programs after Zillow's Standards. Tr. 560:21–561:12, 561:21–562:3 (Aron). Rather, brokerages have launched or expanded premarketing programs since Zillow's Standards. Tr. 87:20–25, 112:22–113:19 (Reffkin). Compass itself has continued to use 3PM. Tr. 480:9–13

-18-

(Navab-Boshehri). And Mr. Reffkin recently told investors that agents pitching Compass's 3PM strategy to sellers "increase[s] their chances" of winning listings. DX655 at 12.

45.     Instead of offering empirical evidence, Dr. Aron opined that Zillow's decision to implement the Standards is itself direct evidence of Zillow's market power. Tr. 514:13–23 (Aron). To reach this opinion, Dr. Aron compared the current world with a hypothetical world where Zillow implemented the Standards in the absence of market power. Tr. 517:3–14 (Aron). Dr. Aron claimed that in this hypothetical world, sellers and agents would not hesitate to choose premarketing strategies because they would not feel the need to be on Zillow. Tr. 517:18–518:1 (Aron). Dr. Aron said that there is no legitimate rationale for the Standards in the hypothetical world because Zillow would only be harmed by foregoing all the additional listings sellers and agents would premarket before putting the listings on the MLS. Tr. 518:2–20 (Aron).

46.     Dr. Wu disputed the economic theory behind Dr. Aron's hypothetical and opined that it does not constitute direct evidence of market power because it does not show market-wide harm and is not based on any observations or evidence of actual market outcomes. Tr. 675:6–12 (Wu). Dr. Wu observed that Dr. Aron's hypothesis is built on several unsupported assumptions. First, it ignores the legitimate business justifications for Zillow's Standards. Regardless of whether Zillow has market power, the Standards are rational because they support Zillow's efforts to maintain its listings supply and the quality of information on its platform, and to prevent free riding on Zillow's platform investments. Tr. 675:13–676:1, 627:23–25, 655:19–659:8 (Wu). Indeed, Realtor.com has expressed concerns about free riding on its platform and neither party contends that Realtor.com has market power in online home search. Tr. 655:23–657:14 (Wu).

-19-

47.    Second, Dr. Aron assumed with no evidence that agents and sellers would not hesitate to choose premarketing strategies in her hypothetical world. Tr. 676:2–14 (Wu). To the contrary, the evidence shows that sellers benefit from listing through the MLS, Tr. 676:15–23 (Wu), and Dr. Aron agreed that, even if Zillow did not have market power, many agents and homeowners would choose to put their new listings directly on the MLS (and thus indirectly on Zillow) without adopting a premarketing strategy. Tr. 588:1–589:1, 589:3–7 (Aron).

48.    Third, Dr. Aron's hypothetical is circular. She claimed that if Zillow did not have market power many more sellers and agents would have used premarketing—so the fact that sellers and agents did not increasingly use premarketing (evidenced only by Compass's claims of decreasing 3PM adoption) must be evidence of Zillow's market power. PX208 ¶ 168. This simply repeats the hypothetical premise rather than showing a causal link between Zillow's purported market power and a decrease in the use of premarketing. Tr. 676:2–14 (Wu).

## 2.  Indirect Evidence

49.    Compass's indirect evidence of Zillow's market power does not fare any better. Dr. Aron presented several metrics that she claims indicate that Zillow possesses high market share in online home search—audience share, daily active mobile users, and time spent on platform. Tr. 535:3–540:13 (Aron). However, the evidence showed that correlating these metrics with market share is flawed and unfounded. Compass also has not established that barriers to entry would prevent a new or existing competitor from eroding Zillow's market share.

50.    First, Dr. Aron opined on data that purportedly showed Zillow possesses approximately 66% of the "audience share" in online real estate as of August 2024. Tr. 535:22–537:7 (Aron) (referencing graph in PX045 at -717). However, Dr. Aron conceded that this metric is *not* equivalent to market share. Tr. 576:10–17 (Aron). Instead, Zillow's "audience share" is calculated as the percentage of unique users that visited *any real estate website* and also visited a

Zillow website. Since consumers can and often do visit more than one real estate website, the combined shares from this metric add up to well over 100% and cannot be interpreted as market shares. Tr. 537:8–15 (Aron); 674:2–13 (Wu). Dr. Aron also conceded that "audience share" captures user traffic unrelated to online for-sale home search, such as visitors to Zillow's online rentals platform. Tr. 538:4–17, 574:20–575:14, 576:18–577:16 (Aron); DX657 ¶ 190.

51.    Second, Dr. Aron admitted that data purportedly showing Zillow's share of daily active app users as 64% does not distinguish between customers visiting Zillow's apps for online home search and other purposes, such as online rental search. Tr. 539:19–23 (Aron). That data also does not control for how much time a user spends on the platform—someone who uses Zillow's app for three seconds but spends three hours on Realtor.com will be counted the same. Tr. 539:24–540:3 (Aron). Moreover, the time-on-platform data also captures traffic unrelated to online for-sale home search. Tr. 539:14–541:1 (Aron).

52.    Finally, Compass failed to show that there are high barriers to entry in online home search such that Zillow is unconstrained by competition. Recent entrants to the market undermine arguments that there are significant barriers to entry. For example, CoStar acquired Homes.com in 2021 and its platform has grown rapidly in the four years that followed, from 2.4% to 19% audience share. Tr. 672:17–25 (Wu); DX657 ¶¶ 197–98; Kelman Dep. Tr. 148:17–149:4. In July 2025, AddressUSA partnered with Gannett (one of the largest news publishers in the country) to launch a new online home search platform which can take advantage of Gannett's 195 million average monthly unique visitors. DX657 ¶ 199; Tr. 264:4–12 (Samuelson).

53.    Nor has Compass shown that significant barriers limit expansion by Zillow's existing online home search rivals. Dr. Aron conceded that her analysis does not account for the relative strengths and weaknesses of two major rivals, Realtor.com and Redfin.com. Tr. 580:17–

23 (Aron). Audience share data also shows Realtor.com and Homes.com maintaining or growing their traffic in recent months, which is inconsistent with Zillow holding durable market power. Tr. 580:24–582:4 (Aron); 671:6–672:2, 672:17–25 (Wu). The CEOs of Redfin and eXp Realty both testified that Homes.com is a "formidable" competitor, and that competition in online home search continues to be vigorous. Kelman Dep. Tr. 219:2–8, 148:21–149:4, 215:10–14; Pareja Dep. Tr. 154:12–14, 154:22–155:2.

## II.    PROPOSED CONCLUSIONS OF LAW

54.    Injunctive relief "is an extraordinary and drastic remedy and should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (summary order) (cleaned up). Courts must consider the plaintiff's showing of "(1) a likelihood of success on the merits," (2) "that [the plaintiff] is likely to suffer irreparable injury in the absence of an injunction," (3) that "the balance of hardships tips in the plaintiff's favor," and (4) "that the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (citation modified).

55.    Here, Compass must meet a heightened standard for two reasons. First, Compass seeks a mandatory injunction that would disrupt the status quo by removing Zillow's existing discretion to determine the content of its own platform and effectively forcing Zillow to display listings that undermine its long-held transparency mission. *See Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (a mandatory injunction attempts to "alter the status quo by commanding [a] positive act"); *N. Am. Soccer League , LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 27 (2d Cir. 2018) (status quo was federation's right to reject league's application each year, notwithstanding that federation had accepted league's application in prior years); Tr. 338:23–340:17 (Wacksman).

56.     Second, Compass's injunction seeks substantially all the relief sought in the litigation, which "cannot be undone" if Zillow prevails on the merits. *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023). "[I]f a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits," the heightened standard applies. *Tom Doherty*, 60 F.3d at 34–35; *see also New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650–51 (2d Cir. 2015) (injunction that would prevent defendant's business plan from succeeding subject to heighted standard). Here, Compass's injunction would curtail Zillow's right to curate the advertisements (listings) its platform carries, in violation of the First Amendment. This harm is irreversible. *Am. Patriot Express v. City of Glens Falls*, 474 F. Supp. 3d 508, 525 (N.D.N.Y. 2020) ("Violations of the First Amendment are presumed irreparable.") Moreover, the injunction would prevent the success of Zillow's strategy for maintaining its supply of listings. Zillow presented evidence that, in the absence of the Standards, PLNs will propagate and the free sharing of listings that exists today will fragment into separate exclusive inventory, harming Zillow's business model. *See infra* § II.B.b.iii. Such a marketplace could look very different from the one today, *see* Tr. 342:11–344:2 (Wacksman), and it is far from clear that Zillow could implement its Standards to the same effect in that different marketplace if Zillow were eventually to prevail in the litigation.

57.     Accordingly, Compass must make a "strong showing of irreparable harm" and a "clear or substantial likelihood of success on the merits." *JTH Tax*, 62 F.4th at 667 (quoting *Actavis*, 787 F.3d at 650). The Court finds that Compass has failed to meet both the ordinary and heightened standards for a preliminary injunction.

### A.     Irreparable Harm

58.     "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir.

-23-

1999) (citation modified). A party seeking a preliminary injunction must show it "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation modified).[4] Harm is only irreparable where "remedies … at law, such as monetary damages, are inadequate to compensate" for the harm. *Salinger*, 607 F.3d at 80.

59.    Compass contends that it will suffer several harms absent an injunction: (1) reduced adoption of 3PM; (2) harm to its goodwill and reputation; and (3) loss of first-mover advantage in brokerage pre-marketing programs.[5] The Court finds that Compass has failed to make a clear showing that any of these purported harms are irreparable.

### 1.   Diminished Adoption of 3PM

60.    In the Second Circuit, a plaintiff may establish irreparable harm from the inability to sell a product only upon a "clear showing" that: (1) "the availability of a product is essential to the life of the business"; or (2) the product "increases business of the plaintiff beyond sales of that product," because in those circumstances a plaintiffs' losses are likely to be both nonquantifiable and nonspeculative. *Tom Doherty*, 60 F.3d at 38. The product must represent a "truly unique opportunity" that has no "reasonable substitutes." *Id*. This standard is "infrequently

---

[4] Although this Court has found that an increased risk of substantial future injury can constitute irreparable harm in cases involving the disclosure of private personal information, *see New York v. Trump*, 767 F. Supp. 3d 44, 83 (S.D.N.Y. 2025), Compass cites no authority suggesting that this standard applies in commercial cases.

[5] In its original motion and verified interrogatory responses, Compass asserted irreparable harms related to the investments it made in developing 3PM, investors' alleged fear and confusion following the announcement of the Standards, and lost market share. Dkt. 24 at 9–11; DX658 at 16–18. However, Compass did not present any evidence or argument related to these purported harms either in its supplemental brief or during the evidentiary hearing. *See* Dkt. 110 (P.'s Pre-Hrng Br.) at 25–29. The Court therefore finds that Compass has abandoned these alleged harms.

met." *Id*. Here, because the evidence shows that 3PM is neither essential to Compass's business nor increases Compass's sales of other products, Compass has not shown irreparable harm from diminished adoption of 3PM.

61.    First, the evidence shows that the Standards do not threaten the viability of Compass's business.[6] Following Zillow's April 10 announcement of the Standards, Compass reported record-breaking Q2 2025 results, including all-time highs in revenue, adjusted EBITDA, and market share. DX004 at 1–2; DX006 at 4–5. Compass's success continued in Q3 2025—during which Zillow was enforcing its Standards and no longer displaying non-compliant listings—with Compass reporting the best third quarter in the company's history. DX655 at 4–7. And Compass is projecting year-over-year growth for Q4 2025 while the Standards remain in effect. *Compare* DX614 at 5 (projecting approximately $1.6-$1.7 billion in revenue for Q4 2025), *with* DX617 at 5 (reporting approximately $1.4 billion in revenue for Q4 2024). The evidence is clear that Compass's viability is not at risk.

62.    Moreover, contrary to Mr. Reffkin's claim that 3PM "is critical to [Compass's] future," Tr. 85:16–17 (Reffkin), Compass's investor statements and financial disclosures confirm that Compass does not view reduced adoption of 3PM as a threat to its long-term success. Compass did not disclose that the Standards present a material risk to its business either to investors in its SEC filings, Tr. 607:12–15, 608:5–8 (Bhonsle); DX010 at 42; DX659 at 47–53, or when Compass agreed to acquire Anywhere, Tr. 104:9–16 (Reffkin); DX531 at 6–8.

63.    Second, Compass presents no evidence that 3PM "increases business of the plaintiff beyond sales of that product." *Doherty*, 60 F.3d at 38. Ms. Alexander testified that she believed Zillow's Standards were a reason that monthly user traffic to Compass's website has

---

[6] Indeed, Compass concedes that it "continues to be successful." Dkt. 110 at 29.

declined, but acknowledged that multiple variables affect web traffic including the seasonality of the housing market, and that Compass.com traffic experienced a similar decline in the prior year before 3PM or the Standards existed. Tr. 458:25–460:10, 470:23–471:3 (Alexander). Other than belief, there is no evidence that the Standards were the reason for the decline in Compass.com's traffic. Quite the opposite: Compass did not forecast traffic to its home search platform that would flow from 3PM. Tr. 95:18–20 (Reffkin); DX658 at 16.[7] And Compass offered no analysis connecting 3PM to increased revenue or adjusted EBITDA. *See* Tr. 595:5–20 (Bhonsle).

64.      Nor was any evidence presented, beyond speculative belief, that Zillow's Standards and any resulting decreased adoption of 3PM has caused Compass to lose listings. Compass's agent denied losing listings as a result of Zillow's Standards, Tr. 156:9–11 (Carr), and Compass acknowledged that a drop in adoption of 3PM does not mean that it has lost any listings, Tr. 451:18–24 (Alexander); *see also* Alexander Dep. Tr. 183:4–14 (Dkt. 127-8). Indeed, Compass could not identify a single listing lost due to the Standards. Tr. 506:13–507:7 (Navab-Boshehri). Compass relies on a June 2025 email from a customer who decided not to use 3PM, but the email itself confirms that Compass did not lose the listing. PX114 at -879. In any event, harm from listings lost due to the Standards, if any, would be readily calculable based on Compass's history of operations in the brokerage market and would therefore be compensable.

---

[7] Compass argues that the Standards prohibit it from displaying unique inventory on Compass.com, which could draw additional audience. Tr. 91:1–3 (Reffkin). But this is speculation unsupported by evidence. No analysis of user traffic supports this, and the Compass agent who testified at the hearing was unaware of Compass's black box, believed buyers generally begin using Compass.com only after working with a Compass agent, and had received only one or two leads that closed in the past two years. Tr. 145:19–146:15 (Carr). Moreover, as Compass admits, the Standards do not prevent any brokerage—including Compass—from displaying exclusive listings on its own website and differentiating its inventory. Tr. 589:9–590:2 (Aron). And Compass continues to display its exclusive inventory on Compass.com today. Tr. 62:6–8 (Reffkin); 256:20–23 (Samuelson).

*See Doherty*, 60 F.3d at 38 (no irreparable harm where lost profits "could be compensated with money damages determined on the basis of past sales … and of current and expected future market conditions").

65.     In short, Compass has not made a "clear showing" that diminished adoption of 3PM will threaten the viability of its business or cause indeterminate losses in other product lines. *Id.* Reduced adoption of 3PM is therefore not an irreparable harm that would entitle Compass to preliminary injunctive relief.

### 2.    Harm to Compass's Goodwill or Reputation

66.     Compass next claims that it has suffered a loss of goodwill because it is unable to continue offering 3PM in the way that it prefers. Where "the alleged loss of goodwill [is] doubtful" and any lost profits are calculable by "past sales of [a] product and of current and expected future market conditions," the harm is not irreparable. *Doherty*, 60 F.3d at 38.

67.     Compass's purported loss of goodwill is entirely speculative. Compass has not shown how its brand, reputation, or goodwill has been tarnished in the eyes of consumers because of Zillow's Standards when Compass is having record-breaking quarters. As discussed above, there is no nonspeculative evidence that that the Standards have caused Compass to lose any listings, and it is difficult to see how Compass's goodwill is being irreparably harmed when sellers continue to choose Compass notwithstanding the Standards. Compass thus falls far short of the "clear showing" necessary to establish that Compass's harm is not speculative. *Id.*; *cf. Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (loss of goodwill irreparable based on "uncontested testimony" that the plaintiff might lose *all* its customers).

68.     Compass also alleges loss of goodwill based on its purported inability to run a billboard campaign advertising exclusive inventory. Tr. 90:5–91:7 (Reffkin); DX098 at 47. This theory of harm is entirely speculative. The billboard itself is speculative, as it was a "mockup."

-27-

Tr. 90:8–15 (Reffkin). No evidence supports Mr. Reffkin's claim that the Standards prevented Compass from running a billboard advertising campaign in April 2025, or that such a campaign would have resulted in more traffic to Compass.com, more buyers, or more brand value. Tr. 92:2–11 (Reffkin). Indeed, this claim is belied by Mr. Reffkin's videotaped statement on June 3, 2025, when he displayed the billboard mockup and told an audience of Compass agents, "We're going to give [Zillow] this billboard. So, my ask of you if you're in one of our major markets and you know the perfect location of a billboard, take a photo, you email me … so we can put this up there." DX438 at 36:25–36:46. In any event, Compass offers no evidence that the Standards prevent it from advertising Compass.com via a billboard campaign if it wishes.

69.    Further, "any loss of goodwill would result from [Compass's] inability to continue operating [3PM] as it had in the past," and therefore its "history of operation … ensures that it will be able to calculate money damages for any loss of goodwill it may have suffered." *In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*, 2014 WL 12778832, at *10 (S.D.N.Y. Sept. 19, 2014) (citation modified) (quoting *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011)).

### 3. Loss of Competitive Advantage

70.    Compass next claims that the Standards have harmed its "first-mover advantage" in brokerage pre-marketing programs. Tr. 489:12–14 (Navab-Boshehri). This argument relies on a series of unproven assumptions: first, that Compass's 3PM enjoyed a competitive advantage over rival brokerages; second, that Zillow's Standards harmed any such competitive advantage; and third, that an injunction would prevent this harm from occurring. Even assuming that loss of first-mover advantage is a legally sufficient harm outside of the trade secret context, none of Compass's assumptions are supported by evidence in the record.

71.     At the outset, Compass's theory of irreparable harm finds no support in the law. Compass relies on *Norbrook Laboratories Ltd v. G.C. Hanford Manufacturing Co.*, 126 F. App'x 507 (2d Cir. 2005) and *Muze, Inc v. Digital On-Demand, Inc*., 123 F. Supp. 2d 118 (S.D.N.Y. 2000), but neither case supports that mere loss of a general competitive advantage constitutes irreparable harm. In both cases, the defendant misused or misappropriated the plaintiff's trade secrets or proprietary data to advance the defendant's own rival position, thereby directly damaging the plaintiff's customer goodwill and market position. Compass does not (and cannot) argue that its purported first-mover advantage was the result of trade secret or proprietary information, or that Zillow misappropriated any such information to undermine Compass's competitive position.

72.     Even if legally cognizable, Compass fails to demonstrate it had any first-mover advantage. PLNs like 3PM are not new; as early as 2013, NAR had expressed concerns about the proliferation of pocket listings and "coming soon" marketing techniques. DX657 at 18. Other market participants like Opendoor had experimented with exclusive inventory strategies well before Compass's 3PM. Tr. 335:6–8 (Wacksman). Moreover, within months of the November 2024 launch of 3PM, any Compass first-mover advantage was already being eroded by multiple other brokerages launching or announcing their own PLNs. Tr. 396:12–16 (Alexander); 487:18–488:8 (Navab-Boshehri). Compass conceded in an April 1, 2025 email that any advantage Compass may have enjoyed was short-lived due to increased competition. PX160.

73.     Nor does Compass offer evidence that Zillow's Standards were the cause of any loss of competitive advantage. To the contrary, Compass's competitors were developing programs similar to 3PM before the Standards were even announced. On April 7, Compass acknowledged that "nearly every major competitor" had launched a pre-marketing program and

that PLNs were "about to be everywhere." DX375; Tr. 487:18–488:11 (Navab-Boshehri); *see also* DX271 at 1 ("Every firm will have their version of The Compass 3 Phased Marketing Strategy by Fall market"). Compass offers no evidence explaining how Zillow's Standards, which apply neutrally to all brokerages and all PLNs, blunted Compass's ability to compete against its brokerage rivals.

74.     For similar reasons, any purported loss of Compass's competitive advantage is a past harm that cannot be remedied by a preliminary injunction. "[P]reliminary injunctions are appropriate only to prevent *prospective* harm until the trial court can decide the case on the merits." *Kane v. De Blasio*, 19 F.4th 152, 172 n.20 (2d Cir. 2021). Because Compass's competitors launched pre-marketing programs months before this lawsuit was filed, an injunction prohibiting Zillow from enforcing the Standards would not restore Compass's purported first-mover advantage. *See Pirtek USA, LLC v. Zaetz*, 408 F. Supp. 2d 81, 84 (D. Conn. 2005) ("A past injury is insufficient to establish irreparable harm.").

### 4.  Harm to Competition or Consumers

75.     Lastly, Compass argues that competition and consumers would be irreparably harmed absent an injunction. This argument fails for at least three reasons.

76.     First, it is Compass's burden to show that *Compass* will suffer irreparable harm, but it fails to do so for the reasons explained above. Compass cites no cases in which third-party harms to the public or to competition were sufficient to satisfy plaintiff's showing of irreparable harm. *See Solus Alternative Asset Mgmt. LP v. GSO Cap. Partners L.P.*, 2018 WL 620490, at *6 (S.D.N.Y. Jan. 29, 2018) (finding no "authority in which a court has found irreparable injury based solely on public harm without any demonstrated irreparable harm to the plaintiff"); *Biocon Ltd. v. Abraxis Bioscience, Inc.*, 2016 WL 5817002, at *4 (S.D.N.Y. Sept. 26, 2016) ("Any potential harm to [customers] who are not plaintiffs in this action is not controlling.").

77.     Second, harm to competition is required to succeed on the merits of Compass's antitrust claims. *See infra* §§ II.B.2.b.ii and II.B.3. Compass's argument that harm to competition is sufficient to show irreparable harm would collapse the likelihood-of-success inquiry with the irreparable-harm inquiry, creating a presumption that likelihood of success establishes irreparable harm. The Supreme Court has expressly rejected such a presumption. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also* 15 U.S.C. § 26 (injunctive relief in private-plaintiff antitrust lawsuits are no different than any other lawsuit). The Court declines to adopt one here.

78.     Third, as explained *infra* sections II.B.2.b.ii and II.B.3, the evidence shows that Zillow's Standards do not harm competition in the relevant market for online home search. Dr. Aron conceded that harm to competition requires market-wide harm, but admitted that Zillow's Standards neither raised prices nor reduced output or quality in the online home search market. Tr. 559:4–15, 559:25–560:2, 560:6–7 (Aron). Dr. Aron further conceded that no online home search provider has stopped offering a pre-marketing program or home-search differentiation strategy due to the Standards. Tr. 560:21–561:12, 561:21–562:3 (Aron). Zillow's Standards do not restrict or prevent buyers from visiting Compass's website, nor prevent Compass from displaying unique listings on its own platform. Tr. 563:6–14, 589:9–590:2 (Aron). In short, Compass has not shown that the Standards create any market-wide injury in the online home search market.

### 5.  Self-Inflicted Harms

79.     Compass's claims of irreparable harm are unfounded for the additional reason that they are self-inflicted and avoidable. "If the harm complained of is self-inflicted, it does not qualify as irreparable" and "irreparable harm does not exist where alternatives are available." *Convergen Energy WI, LLC v. L'Anse Warden Elec. Co.*, 2020 WL 5894079, at *5 (S.D.N.Y.

Oct. 5, 2020) (citation modified); *see* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2025) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted"). Here, the record shows that seller or agent confusion about whether the Standards affect 3PM falls squarely at Compass's feet. Compass repeatedly told its agents that Private Exclusives comply with Zillow's Standards and induced them to sign up sellers to 3PM, even as Compass knew otherwise. Tr. 441:11–14, 443:21–25, 445:5–11, 447:20–449:7 (Alexander); Alexander Decl. ¶ 14; Tr. 149:6–8, 153:8–10 (Carr); DX033. Indeed, on the same day Compass filed this lawsuit, Compass told its sales managers, "Private Exclusives and [3PM] are still allowed under Zillow's ban and we encourage every agent to share the benefits of them with their clients." DX021 at 1. Compass agents relied on Compass's misrepresentations in advising their clients to use 3PM. Tr. 149:2–150:1, 151:11–152:4 (Carr). Accordingly, any harms flowing from Compass's duplicity were self-inflicted, and do not warrant preliminary injunctive relief.

80.    In sum, Compass has not shown that it will suffer "actual and imminent harm that cannot be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr.*, 131 F.4th at 108 (citation modified). On this basis alone, Compass's preliminary injunction motion must be denied.

## B.    Likelihood of Success

81.    While a "finding of no showing of irreparable harm is dispositive," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007), Compass also has not demonstrated that it is more likely than not to prevail at trial on its antitrust claims, which provides an independent basis to deny the motion. *See Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 359 (2d Cir. 2024).

### 1. Section 1

82.    Compass has not shown that it is likely to succeed on the merits of its Section 1 claim. A Section 1 claim requires a showing that Zillow and Redfin had "a conscious commitment to a common scheme designed to achieve an unlawful objective," *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015), *i.e.*, to "restrain trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). Compass has not shown that Redfin and Zillow entered into any agreement to boycott Compass or to coordinate their listing policies.[8]

83.    "Direct evidence in a Section 1 conspiracy must be … explicit and require[] no inferences to establish the proposition or conclusion being asserted." *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 319 (S.D.N.Y. 2023) (citation modified), *aff'd sub nom. Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024). Here, there is no direct evidence of a conspiracy. Instead, the documents and testimony show that Zillow and Redfin independently developed and announced their respective listing policies. Tr. 355:22–25, 362:3–18 (Wacksman); 250:8–22, 198:18–199:1, 201:21–202:11 (Samuelson); Kelman Dep. Tr. 166:2–167:11, 126:6–12, 174:9–16. The evidence shows that neither Zillow nor Redfin even knew of their respective plans to announce listing standards for their platforms. Kelman Dep. Tr. 161:13–162:3, 164:23–165:3, 168:16–169:5, 70:20–71:15; Tr. 357:1–4 (Wacksman); DX379 at 3. Documents and testimony show Zillow developing its Standards from December 2024 until Zillow prebriefed the media and industry participants on April 9, 2025 (PX002; DX591; DX576; DX612; PX001), but no discussion of a similar policy at Redfin until *after* Mr. Wacksman

---

[8] For purposes of its PI Motion, Compass abandoned its theory that Zillow and eXp conspired to boycott Compass (Dkt. 110 at 11 n.29) and presented no evidence to support this claim at the hearing. Thus, Compass cannot show that it is likely to succeed on its Section 1 claim related to an alleged conspiracy with eXp.

prebriefed Mr. Kelman on April 9 (e.g., PX170; PX178; PX179; PX176; PX133; Kelman Dep. Tr. 62:11–18 (no internal discussion at Redfin about adopting listing standards before April 9 because "[i]t hadn't occurred to us")). By the time of the Redfin prebriefing call, Zillow had already committed to its Standards and disclosed them to the media. Tr. 357:1–21 (Wacksman); DX379 at 1, 3.

84.    Substantive differences between Zillow's and Redfin's announcements and Redfin's subsequent decision to indefinitely delay implementation of a listing policy further undermine any agreement. DX202; Tr. 358:4–14 (Wacksman); Kelman Dep. Tr. 74:18–75:12, 201:17–22. Indeed, Compass fails to even establish parallel conduct between Zillow and Redfin, which in any event would not be sufficient to establish likelihood of success on the conspiracy claim. *See N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 468 (E.D.N.Y. 2017) (denying preliminary injunction where plaintiff failed to exclude the possibility of independent action); *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (holding a party must present evidence that "tends to exclude the possibility that the alleged conspirators acted independently" to prevail on summary judgment).

85.    Compass offered no evidence from its fact witnesses or expert to prove the alleged conspiracy. Tr. 557:21–558:3 (Aron). Accordingly, Compass is unlikely to prevail on its claim that Zillow and Redfin entered into an agreement to boycott Compass. *See Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 906–07 (S.D.N.Y.) ("A lack of factual support is fatal to … conspiracy claims."), *aff'd*, 130 F.3d 1101 (2d Cir. 1997).

## 2.  Section 2

86.    "The offense of monopoly under Section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a

superior product, business acumen, or historic accident." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co.*, 11 F.4th 118, 137 (2d Cir. 2021) (citation modified) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). The second element is often shorthanded as "anticompetitive conduct." *Actavis*, 787 F.3d at 651.

87.     The plaintiff bears the burden to establish the first element (monopoly power in the relevant market) and to make out a *prima facie* case on the second element (anticompetitive conduct) by showing that the defendant's conduct resulted in anticompetitive effects. *Actavis*, 787 F.3d at 651-52; *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188-189 (2d Cir. 1992); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298, 326-27 (E.D.N.Y. 2024) ("*Payment Card*"); *United States v. Google LLC*, 747 F. Supp. 3d 1, 106 (D.D.C. 2024). But anticompetitive conduct requires more than anticompetitive effects; it is "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) ("*Adderall*"). Thus, if the plaintiff establishes a *prima facie* case of anticompetitive effects, the burden shifts to the defendant to show procompetitive justifications for the conduct. *See Actavis*, 787 F.3d at 652; *Payment Card*, 729 F. Supp. 3d at 326-27; *Google*, 747 F. Supp. 3d at 106. If the defendant does so, the plaintiff must either "rebut those justifications" by showing they are pretextual, *Actavis*, 787 F.3d at 652, or "that a less restrictive alternative exists that achieves the same legitimate competitive benefits," *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 120–21 (2d Cir. 2021).

### a.     Possession of Monopoly Power in The Relevant Market

88.     "As an initial matter, it is necessary to define the relevant product and geographic market [the defendant] is alleged to be monopolizing." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). "[C]ourts must start by defining the relevant market because, '[w]ithout

a definition of [the] market there is no way to measure [a defendant's] ability to lessen or destroy

competition.'" *Payment Card*, 729 F. Supp. 3d at 320 (quoting *Ohio v. Am. Express Co.*, 585

U.S. 529, 543 (2018) ("*Amex*")). Zillow does not dispute, for purposes of the PI Motion, the

product market that Compass has identified: online home search. Accordingly, the Court first

analyzes the relevant geographic market and then turns to whether Zillow has monopoly power

in a properly defined market.

### i.    Geographic Market

89.     A plaintiff "bears the burden of establishing and proving the relevant market."

*Mahmud v. Kaufmann*, 607 F. Supp. 2d 541, 555 (S.D.N.Y. 2009), *aff'd*, 358 F. App'x 229 (2d

Cir. 2009). "[T]he geographic market analysis seeks to identify the precise geographic

boundaries of effective competition in order to reach a more informed conclusion on potential

harm to the market." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52–53 (2d Cir.

2016). "Courts generally measure a market's geographic scope, the 'area of effective

competition,' by determining the areas in which the seller operates and where consumers can

turn, as a practical matter, for supply of the relevant product." *Id.* at 53. "[T]he geographic

market is the narrowest market which is wide enough so that products from adjacent areas cannot

compete on substantial parity with those included in the market." *Auraria Student Hous. at the

Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1245 (10th Cir. 2016).

90.     Compass asserts that the market for online home search platforms is nationwide,

Tr. 526:23–529:12 (Aron), while Zillow argues that the geographic market is sub-national

because consumers search for homes locally, Tr. 666:15–667:1 (Wu). The evidence establishes

that Compass is not likely to succeed in proving a nationwide market because it has failed to

account for where competitors in its alleged market "operate[]" and "where consumers can turn

… for supply" of home search platforms. *Concord Assocs.*, 817 F.3d at 53. It is undisputed that

the vast majority of consumers who are looking to buy a home search for homes within a particular region, and not nationwide. Tr. 258:22–261:20, 279:24–280:2 (Samuelson); 666:23–667:1 (Wu); DX657 ¶¶ 141–42. Thus, a consumer looking to buy a home near Salt Lake City, Utah, will turn to a home search platform that provides good coverage of homes for sale in that area, but will not view as a substitute a home search platform that generally has good coverage around the country but does not have listings in the Salt Lake City area. Tr. 262:13–23 (Samuelson); 667:11–668:16 (Wu). Sellers similarly want their listings exposed to buyers searching for properties in their specific area. Tr. 666:15–667:1, 667:11–20 (Wu); DX657 ¶ 144.

91.    It is also undisputed that not all home search platforms offer services nationwide. Compass concedes that it does not operate in approximately half of the nation's MLSs and displays no listings in the regions in which it does not operate (such as Salt Lake City). Tr. 121:11–122:17 (Reffkin); DX590; DX527 at 9; Golod Dep. Tr. 9:25–11:16, 26:2–19. Those facts alone show that consumers are not likely to view Compass's platform (or those of regional brokerages) as interchangeable with Zillow's because consumers cannot turn to platforms that display no listings in the area where the user is searching for a home. Tr. 667:21–669:3 (Wu).

92.    Relatedly, no evidence shows that home search platforms—even those that operate in every region—have the same audience or market share across all regions in the country. To the contrary, there is evidence that at least some major platforms have a substantially greater presence in some regions than in others. Kelman Dep. Tr. 220:4–16; DX657 ¶ 155. The evidence also shows that Compass's ability to implement 3PM, and the impact of Zillow's Standards on 3PM, varied by MLS region. DX019 at 2 (Zillow's standards "mean[] nothing for the 50% of our listing volume in MLSs that do not have rulesets that allow Compass Coming Soons" for more than one day); DX384 at 1; DX590 at tab 1 ("Z Impact on MLSs"); Golod Dep.

Tr. 156:24–157:14, 63:22–64:13; Tr. 460:13–18 (Alexander); 490:2–4, 491:24–492:8 (Navab-Boshehri); 585:7–586:1 (Aron); 669:5–670:9 (Wu). Compass also tracks the adoption of 3PM by region and subregion. Tr. 490:17–491:1 (Navab-Boshehri); DX630–53. Zillow's implementation of its Standards has varied by MLS region. Tr. 329:9–14, 350:20–351:7 (Wacksman).

93.    For all of these reasons, the Court concludes that Compass is unlikely to succeed in proving its alleged national geographic market, which is fatal to its Section 2 claim. *See, e.g.*, *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 335 (E.D.N.Y. 2019) (granting summary judgment where plaintiff failed to establish relevant market); *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 359 (S.D.N.Y. 2009) (collecting cases and noting that "our Circuit and other courts have approved summary judgment dismissing antitrust cases for failure to come forward with sufficient evidence to define and raise a genuine issue of fact material to the definition of a relevant market"); *Mahmud*, 607 F. Supp. 2d at 558 (granting summary judgment due to failure to prove relevant market).

## ii.    Monopoly Power

94.    Compass is not likely to prevail on its Section 2 claim on the additional basis that Compass has not shown that Zillow has monopoly power in the relevant market.

95.    "Defendants with monopoly power have the ability '(1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion.'" *Payment Card*, 729 F. Supp. 3d at 322 (quoting *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999)). Monopoly power "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). However, when market share data is lacking, "unambiguous" and "definite evidence of monopoly power is needed" to provide a basis

-38-

for antitrust liability. *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1362 (2d Cir. 1988). Compass claims to offer both direct and indirect evidence of monopoly power but falls short in both respects.

96.     Direct Evidence: To establish direct evidence of monopoly power, the plaintiff "must point to 'actual detrimental effects on competition,' such as evidence that [the defendant] was restricting output, charging supracompetitive prices or causing decreased quality in the market." *In re ACTOS Antitrust Litig.*, 783 F. Supp. 3d 749, 772 (S.D.N.Y. 2025) (quoting *Amex*, 585 U.S. at 542); *see also* Tr. 675:6–12 (Wu). Direct evidence based on actual harm to competition must be "empirical" and not "theoretical and anecdotal." *1-800 Contacts*, 1 F.4th at 118. Dr. Aron opined that Zillow's Standards are themselves direct evidence of monopoly power because, in her view, Zillow would only implement the Standards if it had monopoly power. Tr. 533:5–534:17 (Aron). Her hypothetical analysis is insufficient because it does not show actual detrimental effects on the market and "is theoretical and anecdotal; it is not direct." *See 1-800 Contacts*, 1 F.4th at 118. Dr. Aron's analysis is additionally defective because it is based on assumptions that Compass did not show to be true. Tr. 676:2–14 (Wu); 588:9–589:1 (Aron) (acknowledging unsupported assumptions).

97.     Moreover, as the evidence shows, the fact that many home sellers would rationally choose to forgo Compass's 3PM program in favor of broader exposure on Zillow (and all other platforms) does not mean that Zillow necessarily has market power; it just means that sellers value the option to display their homes on Zillow *more* than they value the incremental benefits of 3PM over other marketing options that would allow their home to appear on Zillow and all other platforms. *See* Tr. 347:20–348:21 (Wacksman) (explaining various private listing options consistent with Zillow's Standards); 344:13–345:14 (Wacksman) (explaining why

Zillow expected consumers to value access to broad marketing over 3PM); 589:3–7 (Aron). And thus a rational home search platform, even one without market power, could choose to implement a policy like the Standards as long as it saw net benefits from such a policy and predicted that many sellers would value broader exposure *more* than any incremental benefits of 3PM. Tr. 675:6–676:23 (Wu).[9] And in fact, Zillow predicted (correctly) that many sellers would value broader exposure (including on Zillow) more than they valued 3PM; that Zillow would not lose profit from declining to display a small number of noncompliant listings; and that the Standards would provide Zillow with important business benefits, including maintaining listing supply, protecting platform quality, and preventing freeriding. Tr. 674:25–676:1 (Wu); 237:19–240:16, 242:14–244:1 (Samuelson); 342:11–345:20 (Wacksman); 380:4–382:10 (Hofmann).

98.    At bottom, Compass has not shown that by enacting the Standards, Zillow has restricted output, charged supracompetitive prices, or decreased quality in the market for online home search. Indeed, Dr. Aron conceded that she had no empirical evidence of market-wide increased prices or reduced output. Tr. 559:21–560:7 (Aron). There is no evidence that there has been or is likely to be any market-wide reduction in competition for online home search, or a reduction in investment in home search platforms.

---

[9] A hypothetical example raised in oral argument illustrates this point. Tr. 722:5–723:7 (Closing Argument). In a world with five home search platforms each having 20% of the buyer audience and fiercely competing with the others for that audience, none would appear to have market power. But if one platform chose to announce a policy like Zillow's Standards, rational sellers would reject 3PM and instead choose options that enabled them to appear on that one platform so long as they valued the potential exposure to 20% of home buyers more than the incremental value of 3PM. And the platform could rationally decide to announce the policy if it predicted that the vast majority of sellers would prefer the exposure to 20% of buyers more than 3PM, and that the benefits of the policy in encouraging a steady supply of fresh listings outweighed any potential downside from declining to display a few listings under the policy.

99.    Indirect Evidence: Compass next attempts to establish Zillow's monopoly power with indirect evidence, namely a high market share. In the Second Circuit, "market share alone cannot conclusively establish monopoly power," *Payment Card*, 729 F. Supp. 3d at 322 (cleaned up), and "[a] court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics," including the "strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (quoting *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987)).

100.    Compass's principal indirect evidence of market power is Dr. Aron's testimony that Zillow enjoys a purported 66% "market share." Tr. 536:19–537:7 (Aron). However, Dr. Aron conceded that the 66% metric is *not* a market share, but an audience share, which shows only the percentage of users who visit any real estate website who *also* visit Zillow (such that audience shares for the various home search platforms add up to well over 100%). Tr. 574:24–575:5 (Aron); DX657 ¶ 189. Moreover, Dr. Aron also conceded that the 66% metric includes web traffic for visits outside of the online for-sale home search market, such as for rental properties. Tr. 538:4–17, 574:20–575:14, 576:18–577:16 (Aron).

101.    In any event, even a 66% market share would not establish that Zillow has monopoly power. First, "a market share of over 70 percent is usually 'strong evidence' of monopoly power," *Tops Mkts.*, 142 F.3d at 99, but "[a]bsent additional evidence … a 64 percent market share is insufficient," *PepsiCo*, 315 F.3d at 109.

102.    Second, the evidence shows that the market for online home search remains highly competitive. "Unrebutted evidence that actual competitors have entered the market is a

strong indicator that [the defendant] lacks market power." *Hasbro*, 958 F. Supp. at 904; *see also Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 209 (3d Cir. 1994) (the "ease or difficulty with which competitors enter the market is an important factor in determining whether the defendant has true market power"). Here, the unrebutted evidence established that Homes.com entered the market relatively recently—in the last four years—and has grown significantly in audience share. Tr. 672:20–25 (Wu); PX045 at -717. Likewise, new entrant AddressUSA entered the market just this year, after Zillow announced its Standards. DX657 ¶ 199. Moreover, data from Realtor.com suggests that Zillow's audience share is falling, rather than rising, which is inconsistent with Zillow's ability to exclude competition or maintenance of durable monopoly power. DX657 ¶ 217; Tr. 671:18–672:2 (Wu).

103.    The evidence also indicates that competition in home search remains fierce and produced competitive responses to Zillow's Standards. Homes.com took a contrary approach, offering to boost listings that were not displayed by Zillow (and claiming that boosted listings get the same or more traffic as Zillow listings), and marketing its stance against Zillow's Standards (while claiming that Zillow accounts for less than half of the home search audience). DX024; DX388 at 3. Redfin announced a middle-ground position that partly borrowed from Zillow and partly borrowed from Compass, and its CEO testified to the fierce competition in home search. DX202; Tr. 358:4–14 (Wacksman); Kelman Dep. Tr. 74:8–17, 172:8–173:11, 215:10–217:15.

104.    The Court thus concludes that Compass is not likely to succeed in establishing that Zillow has market power in a national market for online home search.

### b.    Anticompetitive Conduct

105.    To make out a *prima facie* case of anticompetitive conduct, the plaintiff must show that the conduct has an "anticompetitive effect," *i.e.*, "harm[s] the competitive *process* and

thereby harm[s] consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001);

*Payment Card*, 729 F. Supp. 3d at 326. Accordingly, the plaintiff must "demonstrate that the

monopolist's conduct harmed competition, not just a competitor." *Microsoft*, 253 F.3d at 59; *see

also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (the antitrust laws

were enacted for "the protection of *competition*, not *competitors*"); *Payment Card*, 729 F. Supp.

3d at 326 ("harm to one or more *competitors* will not suffice").

106.    In cases where the plaintiff's claim rests on the defendant's refusal to deal with a

rival, Courts apply an even more heightened standard and require additional factors. *See, e.g.*,

*Adderall*, 754 F.3d at 134-35. As discussed below, Compass is unlikely to succeed under either a

refusal to deal theory or any other Section 2 theory.

### i.    Refusal to Deal

#### a)    This is a duty to deal case that must be analyzed under *Aspen Skiing*.

107.    Compass's Section 2 claim is based on Zillow's alleged refusal to deal with a

competitor, and as such must be analyzed under *Aspen Skiing* and its progeny.

108.    The Supreme Court has long recognized that a business generally has "no duty to

aid competitors," *Verizon Commc'ns Inc. v. Law Offs. of Curtis v. Trinko, LLP*, 540 U.S. 398,

411 (2004) ("*Trinko*"), which means that a business generally "has no duty to deal under the

terms and conditions preferred by [its] rivals," *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555

U.S. 438, 457 (2009). *See also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585,

600 (1985) ("even a firm with monopoly power has no general duty to engage in a joint

marketing program with a competitor"). The Court has provided several rationales for this rule:

(1) monopolies can arise appropriately when firms are good at providing what consumers want,

and "[c]ompelling such firms to share the source of their advantage … may lessen the incentive

-43-

for the monopolist, the rival, or both to invest"; (2) "[e]nforced sharing also requires antitrust courts to act as central planners, … a role for which they are ill suited"; and (3) "compelling negotiation between competitors may facilitate … collusion." *Trinko*, 540 U.S. at 407–08; *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (Gorsuch, J.).

109.    The Supreme Court recognized an exception to this general rule in *Aspen Skiing*, holding that the defendant could face antitrust liability for refusing to deal with a rival on the facts of that case. The Court has described its decision in *Aspen Skiing* as follows:

> The Aspen ski area consisted of four mountain areas. The defendant, who owned three of those areas, and the plaintiff, who owned the fourth, had cooperated for years in the issuance of a joint, multiple-day, all-area ski ticket. After repeatedly demanding an increased share of the proceeds, the defendant canceled the joint ticket. The plaintiff, concerned that skiers would bypass its mountain without some joint offering, tried a variety of increasingly desperate measures to re-create the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price. The defendant refused even that. We upheld a jury verdict for the plaintiff, reasoning that "[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition … over the long run by harming its smaller competitor."

*Trinko*, 540 U.S. at 408–09 (quoting *Aspen Skiing*, 472 U.S. at 593–94). The Court particularly emphasized the defendant's refusal to sell "*even if compensated at retail price*," revealing "a distinctly anticompetitive bent" and "suggesting a calculation that its future monopoly retail price would be higher." *Id.* at 409.

110.    The Court distilled the key facts relevant to finding liability in refusal to deal cases, and present in *Aspen Skiing*, as (1) a defendant's "unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing," that (2) "suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.*

111.    The Supreme Court has said that "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. And the Second Circuit has twice held that "the sole exception to the broad right of a firm to refuse to deal with its competitors" is the exception set

-44-

out in *Aspen Skiing*. *See Adderall*, 754 F.3d at 134; *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52–54 (2d Cir. 2007). Where the facts of *Aspen Skiing* are not present, the Second Circuit has rejected Section 2 claims based on a defendant's refusal to deal or share with a rival on the rival's preferred terms. *See id.* The Second Circuit has also made clear that the defendant's refusal to deal must be "without a legitimate business purpose that makes sense only because it eliminates competition." *Adderall*, 754 F.3d at 133; *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007) ("A refusal to deal is generally not unlawful unless it is done for the purpose of monopolization," which is shown by the "absence of a legitimate business purpose for the defendant's refusal to deal"); *see also Novell*, 731 F.3d at 1075 ("Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect").

112.    Compass alleges that it seeks to compete with Zillow in online home search by developing an exclusive inventory of listings to attract consumers to Compass's website. Dkt. 15 ("Compl.") ¶¶ 4, 8, 91, 105, 107, 119–21. The Zillow conduct that Compass alleges to be anticompetitive is what Compass calls the "Zillow Ban"—a policy under which Zillow will decline to display listings from Compass or others that do not comply with Zillow's Standards. *See id.* ¶¶ 43–44, 46, 105, 119–21. In essence, Compass alleges that to continue growing its exclusive inventory of listings that will enable it to compete with Zillow for online home search, Compass needs to be able to have those listings displayed on Zillow if and when it chooses to share the listing with Zillow; and that Zillow has engaged in anticompetitive conduct by refusing to display Compass's formerly-exclusive listings—with the intent or effect of quashing a home search competitor. Tr. 788:21–792:4 (Closing Argument); Dkt. 110 at 9–10, 26, 28–29). This is a claim against Zillow for refusing to deal with a rival, and it is controlled by the precedent discussed above.

113.    Compass argues that this is not a refusal to deal case, and is not governed by the precedents above, citing a number of recent decisions involving technology platforms. But Compass misses the key distinction. In all of the cases cited by Compass, the defendant was accused of anticompetitive conduct *not* for refusing to deal (or conditioning its dealings) with a *competitor*, but rather because of the terms on which the defendant dealt with its *customers*.

114.    That distinction is critical. Cases like *Aspen Skiing*, *Trinko*, *linkLine*, *Adderall*, *Elevator*, and *Novell* all expressly involve circumstances where a defendant was refusing to deal or share with a *competitor* on the terms preferred by the competitor. The Supreme Court and the lower courts have developed other lines of cases, with other recognized categories of potentially anticompetitive conduct, where the claim is based on how the defendant deals with its *customers*. *See, e.g.*, *Lorain J. Co. v. United States*, 342 U.S. 143 (1951) (liability for exclusive dealing, where defendant refused to deal with customers who also purchased advertising from rival); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) (liability for tying, where defendant required customers to purchase service in order to purchase parts). The Supreme Court and the appellate courts have repeatedly recognized this distinction. *See, e.g.*, *Eastman Kodak*, 504 U.S. at 463 n.8 ("Assuming, *arguendo*, that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not."); *Novell*, 731 F.3d at 1072, 1076 (distinguishing unilateral refusal to deal with rival from other "more direct interference" such as "limit[ing] the abilities of third parties to deal with rivals (exclusive dealing)" and "requir[ing] third parties to purchase a bundle of goods rather than the ones they really want (tying)"); *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) (distinguishing "refusal-to-deal-with-rivals caselaw" from exclusive dealing caselaw).

-46-

115.    Indeed, several of the cases that Compass cites expressly note this distinction. *See United States v. Google LLC*, 778 F. Supp. 3d 797, 866 (E.D. Va. 2025) ("The refusal to deal doctrine in *Trinko* does not apply to Google's conduct at issue. Courts have declined to 'extend[] a refusal-to-deal-with-rivals analysis' to anticompetitive restraints that a monopolist places on its customers, as opposed to its competitors."); *CoStar Grp., Inc. v. Com. Real Estate Exch., Inc.*, 141 F.4th 1075, 1082, 1090 (9th Cir. 2025) ("CoStar's contracts with brokers" "kept CoStar's broker customers … from dealing with [competitor] CREXi"; "exclusive dealing with the monopolist's customers" is "not a refusal to deal with the monopolist's competitors"); *United States v. Apple, Inc.*, 2025 WL 1829127, at *12 (D.N.J. June 20, 2025) ("The Court finds the refusal to deal doctrine does not apply to Apple's alleged conduct in this case because Plaintiffs do not allege Apple is failing to deal with its smartphone rivals, but rather that Apple's conduct is imposing restrictions on developers and smartphone users."). All of Compass's cases involved charges of anticompetitive conduct based on the defendant's dealings with its *customers*, and not a refusal to deal with its *rival*. *See Google*, 778 F. Supp. 3d at 867 (tying in customer deals); *CoStar*, 141 F.4th at 1082, 1090 (customers constrained by exclusive deals and technological barriers); *FTC v. Amazon.com, Inc.*, 2024 WL 4448815 (W.D. Wash. Sept. 30, 2024) (prohibiting or deterring customers from offering lower prices to competitor); *Apple*, 2025 WL 1829127, at *11–12 (contractual and technological limitations on developer customers); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 614 (S.D.N.Y. 2025) (customers constrained by exclusive contracts).

116.    As discussed above, Compass's theory in this case is that Zillow is refusing to deal with Compass, an online home search rival,[10] by refusing to display certain listings that Compass wants Zillow to display.[11] Compass argues that it needs this assistance from Zillow— *i.e.*, access to Zillow's platform for its listings—to be able to better compete with Zillow. That is squarely within the refusal-to-deal-with-a-rival precedent. This is not a situation like *Lorain Journal* or Compass's other cases where Zillow is alleged to be demanding exclusivity from its customers to the exclusion of Compass, or engaging in tying, or otherwise preventing potential common customers or suppliers from working with Compass. To the contrary, Zillow's Standards encourage other brokerages to share listings with everyone, including Compass.

117.    Nor can Compass semantically recast Zillow's refusal to deal as "an 'affirmative' act of interference with a rival." *See Novell*, 731 F.3d at 1078–79. Any withdrawal of assistance can always be characterized as an "'affirmative' act[] of interference with the plaintiff's efforts to win customers" by "forcing [the plaintiff] to forgo reliance on the [alleged] monopolist's facilities or intellectual property and compete on its own." *Id.* at 1079. Whether labeled "an act

---

[10] That Compass also has other relationships with Zillow, in addition to being an alleged competitor in home search, is irrelevant. In many refusal-to-deal-with-a-rival cases, the plaintiff is also a customer or supplier of the defendant in addition to being a rival. *See linkLine*, 555 U.S. at 443, 449–50 (plaintiff was defendant's wholesale customer and retail competitor); *Novell*, 731 F.3d at 1067–69 (plaintiff was supplier of applications for defendant's operating system business and competitor of defendant's application business).

[11] There is no dispute that the listings Zillow is accused of refusing to display belong to Compass. *See, e.g.*, Tr. 162:10–14, 256:2–8 (Samuelson); Carr Dep. Tr. 64:21–65:6; Dkt. 24 at 21 ("Compass cannot use its listings—which are hard-earned and created by Compass—to increase the quality and differentiation of Compass's home search platform …."); Compl. ¶¶ 43–44. The Complaint further alleges that Zillow has terminated a "course of dealing *with Compass*," an alleged "competing home search platform" to Zillow. Compl. ¶¶ 120–21 (emphasis added).

or omission, interference or withdrawal of assistance, the substance is the same and it must be analyzed under the traditional test." *Id.*

**b)   Compass is unlikely to show a duty to deal under *Aspen Skiing*.**

118.   Having established that the *Aspen Skiing* framework applies, the next question is whether Compass is likely to show that its claim falls within that limited exception. The answer is no.

119.   First, Compass has all but abandoned any argument that it can meet the *Aspen Skiing* exception. In neither its supplemental brief nor its oral argument did Compass make any substantive argument that Compass falls within the *Aspen Skiing* fact pattern or that Zillow has a duty to deal. Instead, Compass exclusively argued that this case is not a refusal to deal case and that it does not need to meet the *Aspen Skiing* exception. Tr. 834:12–23 (Closing Argument); Dkt. 110 at 23–24. That is effectively a concession that Compass is unlikely to succeed if this is a refusal to deal case, as the Court has determined it is.

120.   Second, Compass is unlikely to show that Zillow terminated an ongoing, voluntary, and presumably profitable course of dealing with Compass with respect to displaying its formerly private listings. The evidence shows that Zillow began taking steps to discourage PLNs such as Compass's 3PM even before Compass first launched them in November 2024. Compl. ¶ 57; Hardy Decl. ¶ 15; Tr. 394:8–9 (Alexander). Zillow began publicly supporting listing transparency at least by February 2024. Tr. 340:18–25 (Wacksman). In September 2024, Zillow submitted a proposal to NAR to strengthen CCP and eliminate exceptions such as office exclusives. PX119 at -420–21; Tr. 172:16–173:2 (Samuelson); Compl. ¶ 39. Throughout 2023 and 2024, Zillow conducted research studies on seller choice and the harmful impacts of private listings, publishing its findings in early 2025. *See, e.g.*, DX326; DX318; DX362; Tr. 225:24–

227:1, 234:10–237:17 (Samuelson). In late 2024 and early 2025, just weeks after Compass launched its 3PM program, Zillow began developing what became its Standards as a backup if, as Zillow began to expect, NAR weakened rather than strengthened CCP. DX591 at 1–3; PX002 at -159; PX021 at -747; Tr. 174:15–23, 177:12–22, 179:9–17 (Samuelson); 301:13–23 (Wacksman). NAR in fact announced its changes to CCP on March 25, Samuelson Decl. ¶ 40, and shortly thereafter Compass began accelerating its use of 3PM. Hardy Decl. ¶ 25. Within less than three weeks of NAR's announcement, Zillow announced its Standards. DX381 at 1–2. To the extent Zillow has displayed Compass listings that were formerly private, the evidence indicates that Zillow did so for a brief, temporary period with the belief that such listings should not be allowed, while it was lobbying NAR to preclude such listings and developing a plan to discourage such listings, detect them, and (after two warnings) no longer display them on Zillow. This is far from the entirely voluntary and "presumably profitable" course of dealing that "persisted for several years" in *Aspen Skiing*. *See Adderall*, 754 F.3d at 135.

121.    Third, the evidence shows that Zillow did not, nor did it expect to, sacrifice short term profits to achieve an anticompetitive end when it announced the Standards. *See, e.g.*, Tr. 367:21–368:2, 381:8–382:10 (Hofmann). Rather, the evidence indicates that Zillow adopted the Standards with the expectation that it would immediately be better off compared to not announcing them. Tr. 342:11–345:20 (Wacksman); 380:20–381:7 (Hofmann). Zillow's documents and testimony show that Zillow predicted that, in the absence of the Standards, PLNs would quickly proliferate and Zillow could lose a substantial number of listings from multiple brokerages; but if Zillow announced the Standards, Zillow predicted that most sellers would opt for broad distribution through the MLS, so Zillow would end up declining to display only a small number of stale listings—fewer and less valuable than the fresh listings it would lose if it did

nothing. Tr. 287:17–288:5 (Samuelson); 342:11–345:20 (Wacksman); 380:4–381:24 (Hofmann); PX001 at -116–17; PX021 at -747. Those predictions have been borne out. The evidence shows that, to date, Zillow has declined to display only a small number of listings and has lost no profits as a result, including because Zillow does not monetize listings on a listing-by-listing basis. DX662 at 4–5; Tr. 334:6–335:5 (Wacksman); 381:25–382:10 (Hofmann); 624:16–20, 650:11–14 (Wu). Rather, Zillow is able to attract consumers and monetize its platform so long as it has a substantial enough portion of the available listings to maintain consumer trust. Tr. 382:3–10 (Hofmann); 334:6–20, 345:15–20 (Wacksman); 624:16–20 (Wu).

122.    The evidence does not show that Zillow was concerned about competition in home search from Compass or other brokerages, or that Zillow announced the Standards to put a home search rival out of business and thereby create or strengthen a monopoly in home search. *See* Tr. 345:21–346:18 (Wacksman); *Port Dock*, 507 F.3d at 124 ("A refusal to deal is generally not unlawful unless it is done for the purpose of monopolization."); *cf. Aspen Skiing*, 472 U.S. at 608 (jury could conclude from defendant's willingness to forgo sales at full retail price and "failure to offer any efficiency justification whatever for its pattern of conduct" that "it was more interested in reducing competition in the Aspen market over the long run by harming its competitor"). Rather, the evidence shows that Zillow adopted the Standards for the legitimate— and profit-maximizing—business purpose of maintaining its supply of as many timely listings as possible, a crucial input to its home search platform. *See Adderall*, 754 F.3d at 133 ("[A]nticompetitive conduct is 'conduct without a legitimate business purpose that makes sense only because it eliminates competition.'"); *see also supra* ¶ 121; *infra* ¶ 124 & § II.B.2.b.iii. Indeed, Compass admits as much in its Complaint. *See* Compl. ¶ 72.

123.    Zillow's Standards are at least as rational, legitimate, and profit-maximizing as the decision by Microsoft in *Novell*. There, Microsoft was preparing to launch a new operating system, Windows 95, and initially chose to share its application programming interfaces (APIs) with independent software vendors to help them develop applications for Windows 95. But Microsoft later withdrew that support because it would have a leg up in developing its own applications for Windows 95 if only Microsoft had early access to the APIs. *Novell*, 731 F.3d at 1067–69. The court held that this was rational, legitimate, profit-maximizing behavior. While Microsoft's decision might hinder the development of applications for Windows 95 (and thus hurt Microsoft's operating system business), vendors already had strong incentives to write applications "given Microsoft's significant presence in the operating systems market," *id.* at 1076–77, and withdrawal of the APIs helped Microsoft's application business by giving it an early edge over other developers, *id.* at 1076–77. Thus, any losses in making Windows 95 marginally less successful were offset by immediate gains in the application business, and there was "no evidence that Microsoft took any course other than seeking to maximize the company's net profits in the short as well as long-term." *Id.* Giving itself "a leg up" did not suggest intent to forgo profits but rather a "wish to *increase* the firm's immediate profits," and was "hardly irrational but for its exclusionary tendencies." *Id.* at 1078.

124.    Likewise, the contemporaneous documents and testimony here show that Zillow made a rational and legitimate business decision to announce a policy that it predicted would result immediately in more listings for Zillow overall, compared to doing nothing, and thus would improve Zillow's position in the short as well as long term. *See generally infra* § II.B.2.b.iii. Zillow predicted that any small loss in listings not displayed under its Standards would be more than offset by more listings flowing to Zillow because fewer sellers, agents, and

brokerages would choose PLNs following the Standards. Tr. 287:23–288:5 (Samuelson); 342:11–345:20 (Wacksman); 380:20–381:7 (Hofmann); 659:14–662:2, 676:8–23 (Wu). The evidence also confirms that Zillow's prediction was correct: Zillow has declined to display only a small number of stale listings under its Standards, has suffered no loss in profits, has observed that brokerage announcements of new PLNs has decreased, and has maintained a stable supply of fresh, comprehensive listings. DX662 at 4–5; PX009 at -307; Tr. 381:25–382:10 (Hofmann); 650:9–651:18, 660:2–18 (Wu).

125.    Accordingly, Compass is unlikely to show that Zillow had any duty to deal with Compass by displaying Compass's stale listings on Compass's preferred terms, and thus Compass is unlikely to show any cognizable anticompetitive conduct by Zillow.

### ii.    Anticompetitive Effects

126.    Even if this is not a refusal to deal case, Compass still would be unlikely to succeed in showing anticompetitive conduct because it has not shown anticompetitive effects, *i.e.*, market-wide harm to competition. *See supra* ¶ 105105105. "Anticompetitive effects … may be shown through direct evidence of output reductions, increased prices, or reduced quality in the relevant market." *1-800 Contacts*, 1 F.4th at 118; *see also Payment Card*, 729 F. Supp. 3d at 327 ("As the Supreme Court explained in *Amex*, a plaintiff may show anticompetitive effect at the first step by offering evidence of 'reduced output, increased prices, or decreased quality in the relevant market.'"); *Tops Mkts.*, 142 F.3d at 96 ("a plaintiff initially must show that 'the challenged action had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice'"). As Dr. Aron conceded, Compass offered no evidence that Zillow's Standards have caused any market-wide impact on prices or output in online home search. Tr. 559:20–560:7 (Aron); *see also* 622:15–19 (Wu); DX657 ¶ 12.

127.    More generally, there is no evidence of market-wide harm to competition in the market for online home search. For example, there is no evidence that home search platforms overall have fewer listings or visitors, or have engaged in less innovation, or that buyers and sellers are connecting or transacting at a reduced rate. To the contrary, the evidence shows that overall traffic has remained steady and Google searches for various platforms have increased, DX657 ¶ 229, and that there has been a competitive response to Zillow's Standards. Homes.com, for example, offered to "boost" the listings that Zillow chooses not to display and began touting itself as the new "No. 1" in home search portals. DX024; Tr. 120:13–14 (Reffkin); 256:11–15 (Samuelson); DX657 ¶ 198. Likewise, AddressUSA announced its entry into the market in July 2025. DX657 ¶ 199. And testimony confirms that competition among the platforms remains fierce. Kelman Dep. Tr. 148:21–149:4, 215:10–216:10; Pareja Dep Tr. 153:2–154:14; Tr. 338:13–15 (Wacksman).

128.    The parties also agree that the market for online home search is multisided and serves home buyers, sellers, and agents. Tr. 763:14–764:10, 765:11–766:4, 779:4–17 (Closing Arguments). In a multisided market, the Court must "analyze the … market … as a whole to determine whether" Compass has shown that the Standards have had an anticompetitive effect. *Amex*, 585 U.S. at 547. Even if Compass could show harm to one side of the market—such as to sellers who prefer to use 3PM—that "misses the mark" because "the competitive effects of a restraint on transactions cannot be judged by looking at [one side] alone." *Id.* Rather, in a multisided market, Compass must show that the Standards "increased the cost of [online home search] transactions above a competitive level, reduced the number of [such] transactions, or otherwise stifled competition in the [online home search] market." *Id.* Compass has failed to offer such evidence.

129.    Moreover, any alleged harm to sellers in the form of reduced home prices or longer times to sell without 3PM misses the mark because it is directed to the wrong market. *See, e.g.*, *Tops Mkts.*, 142 F.3d at 96 (plaintiff must show actual adverse effect in the relevant market). The parties' experts agree that 3PM and home sale transactions occur in a separate, distinct market for brokerage services. Tr. 560:9–12 (Aron), DX657 ¶¶ 78–85. Harms related to home sale prices or the like are not harms that occur in the market for home search. And the evidence shows that broad exposure of listings generally results in the most successful matches between buyers and sellers. Tr. 662:13–20 (Wu); DX307 at 4–8; DX657 ¶¶ 256–58. Compass has not shown that adoption of 3PM results in more listings being available to buyers, or more buyers finding listings, or more successful matches in the online home search market. Nor has Compass shown that Zillow's Standards have reduced the overall number of listings available to buyers, the overall size of the buyer audience who sees those listings, or the overall matching of buyers and sellers in the home search market.

130.    Compass has thus failed to demonstrate market-wide anticompetitive effects.

### iii.    Procompetitive Benefits

131.    Even if Compass had demonstrated that the Standards are *prima facie* anticompetitive conduct, Compass is still unlikely to succeed on its Section 2 claim because Zillow presented evidence that the Standards advance procompetitive benefits and Compass has not rebutted those benefits by showing they are pretextual or achievable through less restrictive alternatives. *See 1-800 Contacts*, 1 F.4th at 120; *Actavis*, 787 F.3d at 652. In applying the burden-shifting framework, the Court need not decide whether Compass or Zillow is correct about the best way to market homes for sale. Rather, the framework gives effect to the "true test of legality": whether the conduct "merely regulates and perhaps thereby promotes competition or

-55-

whether it is such as may suppress or even destroy competition." *N. Am. Soccer League*, 883

F.3d at 42 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691 (1978)).

**a)      Zillow's Procompetitive Rationales**

132.    Zillow has advanced three principal rationales for the Standards.

133.    First, the Standards help Zillow maintain its supply of home sale listings, which

are a key input for Zillow's home search platform and other parts of Zillow's business. PX001 at

-114 ("Listing inventory is **critical** to our value proposition, and our business") (emphasis in

original); PX017 at -232 ("Listings are the lifeblood of our company. No listings, no eyeballs, no

sales."); DX302 at 5–7; DX372 at 6, 22, 24; DX576 at 5; Tr. 295:16–17, 334:6–12 (Wacksman);

518:13–17 (Aron); 623:7–624:14, 625:4–7, 651:8–652:18 (Wu); Samuelson Decl. ¶ 22. A firm's

efforts to maintain access to critical inputs is generally procompetitive because increasing inputs

tends to increase output and lower prices for consumers. *See, e.g.*, *Weyerhaeuser Co. v. Ross-*

*Simmons Hardwood Lumber Co.*, 549 U.S. 312, 323 (2007) (finding "nothing illicit" about

decision to "acquire more inputs as a part of a procompetitive strategy to gain market share in the

output market" or "acquire the inputs necessary for its process"); *ZF Meritor, LLC v. Eaton*

*Corp.*, 696 F.3d 254, 279 (3d Cir. 2012) ("acquisition of more inputs … will generally lead to the

manufacture of more outputs, and an increase in outputs generally results in lower prices for

consumers"); *Breaux Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83, 89 (5th Cir. 1994)

(policy that secured defendant's access to key input had procompetitive effects); Phillip E.

Areeda & Herbert Hovenkamp, Antitrust Law ¶ 651e (2025) ("Consumers are generally

benefitted by higher output, which is nearly always accompanied by lower prices. As a result,

considerable care must be exercised before conduct that clearly increases the defendant's output

is condemned as monopolistic."). The parties' experts agree that reducing a key input is likely to

cause a reduction in the amount and quality of a firm's output, which harms consumers and thus

-56-

does not promote competition. Tr. 566:10–22, 570:22–571:15 (Aron); 625:10–22, 651:8–654:10 (Wu). Conversely, then, Zillow taking steps to maintain a key input is likely to increase the amount and quality of a firm's output, to the benefit of consumers and competition.

134.    The Standards help maintain Zillow's access to listings by reducing fragmentation of listing supply by brokerages who would otherwise be incentivized to hoard listings from the MLS, and thus home search platforms like Zillow. Samuelson Decl. ¶¶ 42, 55; Tr. 185:11–186:15 (Samuelson); 342:14–23 (Wacksman); 380:20–381:7 (Hofmann); 651:5–652:18, 659:14–664:13 (Wu); DX657 ¶¶ 45, 119–27; DX576 at 5; DX591 at 2 ("Should CCP be weakened or eradicated it will likely result in a fragmented ex-post landscape of listing rules at the MLS level … we generally expect the fragmentation and large brokerage pressure could result in less listings available on Zillow over time."). If that were to occur, it would likely cause Zillow and other similar platforms either to lose substantial numbers of listings or spend more resources acquiring listings rather than improving the quality of their platforms through innovation. Tr. 346:19–347:10 (Wacksman); Tr. 91:1–6 (Reffkin); Samuelson Decl. ¶¶ 32–35.

135.    Zillow saw the spread of PLNs and resulting fragmentation as a significant risk to its supply of listings, a critical input, which could lead to loss of consumer trust. Tr. 185:19–23 (Samuelson); 342:16–19 (Wacksman); DX657 ¶ 258. Zillow was entitled to take steps to maintain that listing supply in order to compete. *See, e.g.*, *Sterling Merch., Inc. v. Nestlé, S.A.*, 656 F.3d 112, 123 (1st Cir. 2011) ("legitimate economic benefits" include "reduced cost" and "stable long-term supply"); Areeda & Hovenkamp ¶ 651d1 ("[H]igher output, improved product quality, energetic market penetration, … and the like are welcomed by the Sherman Act. They are therefore not to be considered 'exclusionary' for § 2 purposes even though they tend to exclude rivals and may even create a monopoly."). Indeed, "even a monopolist is entitled to

compete; it need not lie down and play dead, as it watches the quality of its products deteriorate and its customers become disaffected." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000); *see also U.S. Football League*, 842 F.2d at 1360 ("[A] firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches.").

136. Second, the Standards help Zillow protect its value proposition and brand promise by maintaining a high quality supply of listings. Tr. 237:19–240:16 (Samuelson); 334:13–20 (Wacksman); 652:19–655:18, 682:17–683:7, 681:16–18 (Wu). The most recent and timely listings are the most valuable to customers, and thus to Zillow's platform. DX600; DX302 at 5–7; Tr. 227:2–231:21, 237:19–240:5 (Samuelson); 709:11–710:17 (Wu); Samuelson Decl. ¶¶ 32–35. Compass agrees. Tr. 414:6–10 (Alexander); Compl. ¶ 72. Thus, degrading the quality of Zillow's listings—such as by hosting stale, failed listings—will cause degradation in the quality of Zillow's platform. Tr. 237:19–238:20, 240:6–16, 242:14–244:1 (Samuelson); 625:10–22 (Wu); Samuelson Decl. ¶¶ 34–35. Zillow's efforts to prevent such degradation are procompetitive because they advance "competition on the merits" such as "enhanced consumer appeal." *Microsoft*, 253 F.3d at 59.

137. As Dr. Wu explained, the multisided nature of Zillow's platform requires close attention to any possible degradation in quality. Multisided platforms like Zillow's experience indirect network effects—the value of the platform to buyers increases when more sellers display their listings on Zillow; having more buyers increases the value to sellers by providing increased exposure to their listings; and having more buyers and sellers attracts more agents to facilitate their real estate transactions. Tr. 622:20–624:6 (Wu); DX657 ¶¶ 95, 99–100. Maintaining the value of Zillow's platform requires consistent investment to ensure that the selection of listings

and value-added features continue to serve the different needs of buyers, sellers, and agents. Tr. 623:2–624:14 (Wu); DX657 ¶¶ 101–03; DX576 at 1–7; DX302 at 2–14. Thus, enjoining the Standards would trigger a harmful feedback loop that would degrade Zillow's platform: as the quality of Zillow's platform decreases with fewer listings and/or a greater proportion of stale listings, fewer buyers would likely visit the site, decreasing Zillow's value for sellers and agents, in turn further reducing the value to buyers. Tr. 659:14–662:6 (Wu); DX657 ¶¶ 106, 182–87; Samuelson Decl. ¶¶ 34–35.

138.    Finally, the Standards prevent freeriding by requiring brokerages to supply fresh, valuable listings in exchange for receiving the benefits of exposure to Zillow's hard-won audience. Tr. 655:19–659:8 (Wu); DX657 ¶¶ 61–62, 114–16; Samuelson Decl. ¶¶ 34–35. Eliminating free riding is procompetitive because it helps to preserve firms' incentives to invest in higher quality for consumers. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890-91 (2007) (preventing freeriding can promote competition by preventing competitors from undercutting the investments made by others to provide services to consumers or promote a quality reputation); *N. Am. Soccer League*, 883 F.3d at 43-44 (league's standards advanced procompetitive interest in reducing sport teams' incentives to freeride on league's efforts to generate fan interest in the sport); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 190 (7th Cir. 1985) (control of freeriding is a procompetitive benefit). Indeed, "Section 2 of the Sherman Act does not require [a defendant] to *give* its product freely to its competitors." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295-96 (11th Cir. 2004) (defendant "met its business justification burden by showing that it seeks to prevent [the plaintiff] from 'free-riding' on" defendant's technology). Both experts agree that limiting freeriding can be procompetitive. Tr. 571:25–25 (Aron); 650:20–651:4, 675:13–25 (Wu).

139.    Here, Compass claims it could degrade the quality of its home search platform to the functionality of a spreadsheet if it held sufficient exclusive inventory to attract prospective buyers. Tr. 91:1–6 (Reffkin); *see also* Tr. 337:2–338:22 (Wacksman). The antitrust laws do not condone efforts to reduce quality for consumers. *Amex*, 838 F.3d at 195 ("The overarching standard is whether defendants' actions diminish *overall* competition, and hence consumer welfare."). Thus, taking steps to prevent the freeriding that would precipitate such a decline in quality is procompetitive because it promotes "greater efficiency" in the market, *Microsoft*, 253 F.3d at 59, and incentivizes competitors to invest in improved quality.

140.    The Court finds that Zillow has shown the procompetitive effects of the Standards.

### b)    Pretext

141.    "Once the defendant has met its burden to show its valid business justification, the burden shifts to the plaintiff to show that the proffered business justification is pretextual." *Morris Commc'ns*, 364 F.3d at 1295.

142.    Compass's claims that Zillow's procompetitive rationales are pretextual are unlikely to succeed in two respects. First, Compass conceded in the Complaint that Zillow's Standards were *in fact* enacted to preserve Zillow's access to fresher, higher quality listings that Compass seeks to withhold from Zillow: "If Compass continues to scale its [3PM], then Zillow in turn will not have access to Compass's (and other brokerages') newest and most in-demand listings … Zillow thus fears it will be relegated to listing 'stale bread,' which would mean … reduced overall inventory and quality on the Zillow platform, and fewer or less serious users on the platform…. The threat of [3PM], and its contagion market wide, thus imperils Zillow's primary business model." Compl. ¶ 72. Thus, Zillow created the Standards, *inter alia*, "to protect Zillow's … listing supply chain[]." *See id.* ¶ 115. These Complaint allegations "are judicial

admissions" that bind Compass throughout this litigation. *See Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003). A Compass declaration also attested that Zillow was concerned that Compass's 3PM strategy "could significantly delay or limit the listings available on Zillow, especially if the model … spreads beyond Compass, as it has begun to do" such that "its search platform would be degraded and thought of as having only 'the stale bread.'" Alexander Decl. ¶ 9. Having conceded that Zillow enacted the Standards for the very procompetitive purposes Zillow puts forward in this litigation, Compass's claims of pretext are unfounded. *See Trans Sport*, 964 F.2d at 191 (rejecting pretext where plaintiff acknowledged defendant preserved its business interests).

143.    Second, contemporaneous evidence demonstrates that Zillow was in fact motivated by a desire to maintain its listing quality and supply, not to harm competition in online home search. Zillow witnesses testified that Zillow was concerned that a proliferation of PLNs among brokerages would impair Zillow's ability to obtain high quality listings, and that it was not concerned about online home search competition from brokerage sites like Compass.com. Tr. 342:11–346:18 (Wacksman); 369:25–370:13 (Hofmann); 185:16–186:15 (Samuelson). Zillow's internal strategy documents and public statements reflect the same. PX001 at -114–17; PX002 at -159; DX323 at 18; DX372 at 6, 22; DX576 at 3–5; DX591 at 1–3; DX612 at 3–9.

144.    Compass points to documents indicating that Zillow intended to "isolate" Compass through "hardline tactics." However, the evidence shows that Zillow did not consider Compass to be a serious competitor in online home search and was instead concerned with promotion of private listings *as a brokerage strategy*, which threatened Zillow's supply of listings. Tr. 240:6–16, 241:17–242:23 (Samuelson); 293:4–18, 334:4-20, 336:9–338:1, 342:11–344:10 (Wacksman). Moreover, the Court must be cautious to avoid over-reading such

documents because "competition is the process of trying to prevail over rivals…. [and] [a]n aggressive state of mind is fully consistent with antitrust objectives when the behavior is proper." Areeda & Hovenkamp ¶ 1506. Indeed, "[e]ven an act of pure malice by one business competitor against another"—which Compass does not claim—"does not, without more, state a claim under the federal antitrust laws." *Microsoft*, 253 F.3d at 58; *see also Novell*, 731 F.3d at 1078.

145.    The Court thus concludes that Zillow's proffered procompetitive justifications for the Standards are not pretextual.

### c)    Less Restrictive Alternatives

146.    In the Second Circuit, the plaintiff "must show that a less restrictive alternative exists that achieves the same legitimate competitive benefits." *1-800 Contacts*, 1 F.4th at 120–21. Compass presented no evidence or argument that there are less restrictive means to accomplish Zillow's procompetitive objectives. *See* Dkt. 110 at 23 (no discussion of less restrictive alternatives). Its only response is that Zillow's procompetitive rationales are "irrelevant," but it cites no authority excusing it from the burden of rebutting those rationales. *Id.* at 23–24.

147.    Compass thus fails to meet its burden and the Court concludes that Compass is not likely to establish that the Standards violate Section 2.

### 3.  Antitrust Standing

148.    "[A]n antitrust plaintiff must demonstrate that it has 'antitrust standing.'" *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019). Plaintiff must show: "(1) 'that it suffered a "special kind of antitrust injury,"' and (2) 'that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an "efficient enforcer" of the antitrust laws.'" *Id.* (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013)). The antitrust standing requirement applies regardless of whether the plaintiff "seek[s] monetary or

-62-

injunctive relief." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 221 (S.D.N.Y. 2019) ("*Keurig*"); *see also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (affirming dismissal of injunctive relief claims for failure to establish antitrust standing); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 437 (2d Cir. 2005) (antitrust standing requirement "applies to claims for injunctive relief under Section 16 of the Clayton Act"). While "the extent to which the efficient enforcer factors apply when plaintiffs sue for injunctive relief depends on the circumstances of the case," *Keurig*, 383 F. Supp. 3d at 221 (cleaned up), the Court need not reach that issue because Compass "fail[s] to satisfy the first requirement of antitrust standing: that [it] suffered an antitrust injury." *Aluminum Warehousing*, 833 F.3d at 158.

149.    "In order to establish antitrust injury, the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* at 157 (quoting *Brunswick Corp.*, 429 U.S. at 489). In *Gatt Communications*, the Second Circuit "established a three-part test for determining whether the plaintiff has alleged an antitrust injury: (1) the court must identify the practice complained of and the reasons such a practice is or might be anticompetitive, (2) the court must identify the actual injury the plaintiff alleges, which requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct, and (3) the court compares the anticompetitive effect of the specific practice at issue' to the actual injury the plaintiff alleges." *IQ Dental Supply*, 924 F.3d at 62-63 (citation modified).

150.    Step One: "At the first step of the *Gatt* analysis, [the plaintiff] need allege only that the Defendants have engaged in unlawful anticompetitive conduct." *Id.* at 63. As discussed above, the Court finds that Compass has not established that the Standards were anticompetitive,

which ends the antitrust injury analysis. However, in the interest of completeness, the Court will proceed *arguendo* to the remaining steps.

151.    Step Two: "The second *Gatt* step requires us to isolate and identify [the plaintiff's] actual injury or the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct." *Id.* (cleaned up). Here, Compass claims that it is in a worse position in two principal ways. First, Compass asserts that fewer sellers will choose to adopt 3PM in light of the Standards because sellers will prefer for their home to remain on Zillow rather than enjoy whatever benefits 3PM claims to offer. Tr. 88:13–19 (Reffkin); 451:3–10 (Alexander); 479:20–480:8 (Navab-Boshehri); 600:8–601:13 (Bhonsle). However, "only those that are participants in the defendants' market can be said to have suffered antitrust injury" and "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." *Aluminum Warehousing*, 833 F.3d at 158 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999)). The problem for Compass is that reduced adoption of 3PM is a harm that occurs in a separate market for brokerage services, not in the relevant market for online home search platforms. Tr. 560:9–12 (Aron); 678:11–20 (Wu). This harm is therefore not sufficient to confer antitrust standing.[12] *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("[A]ctual or alleged harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law.").

152.    Second, Compass asserts that if fewer sellers choose to adopt 3PM, Compass will have a decreased ability to differentiate its home search platform with unique inventory (i.e.,

---

[12] Even if the Court were to proceed to *Gatt's* third step as to reduced adoption of 3PM, Compass has not shown that Standards have caused its actual injury because there is no evidence that reduced adoption of 3PM causes fewer overall sellers to use Compass's brokerage services. Indeed, Ms. Alexander disclaimed any correlation, Tr. 451:18–24 (Alexander) (playing Alexander Dep. Tr. at 183:4–14 (Dkt. 127-8)).

listings not available on the MLS or Zillow), thus resulting in reduced traffic to its website. Tr. 91:25–92:5 (Reffkin); 400:13–21 (Alexander); 561:14–20 (Aron). This harm, however, is not "market-wide harm, as opposed to harm only to Plaintiff," and is therefore not sufficient to confer antitrust standing. *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *7 (S.D.N.Y. Mar. 31, 2021); *see also Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.").

153.    Step Three: "[A]t *Gatt*'s third step [the plaintiff] must demonstrate that the [d]efendants' anticompetitive behavior caused its actual injury." *IQ Dental Supply*, 924 F.3d at 64–65. "It is not enough for the actual injury to be causally linked to the asserted violation. Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful." *Gatt Commc'ns*, 711 F.3d at 76 (citation modified). "Loss from competition itself—that is, loss in the form of customers' choosing the competitor's goods and services over the plaintiff's—does not constitute antitrust injury." *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 489 (5th Cir. 2022); *see also Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir. 1990) (that plaintiff "may … be 'in a worse position' … does not by itself establish an antitrust injury" (citations omitted)); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) (shifting sales to "other competitors in the market does not directly affect consumers and therefore does not result in antitrust injury").

154.    Compass's inventory differentiation theory fails at Step Three. The crux of Compass's theory is that, when faced with the choice between selective marketing via 3PM and

broad public marketing via the MLS that complies with Zillow's Standards, most sellers will choose the latter. Tr. 140:7–141:9 (Carr); 413:1–8 (Alexander); 534:7–17 (Aron); DX658 at 15 ("But for the Zillow Ban, Compass would have continued to grow and expand its use of [3PM] at a rate higher than it currently has …"). But that is a choice that sellers are free to make: the Standards neither prevent Compass from offering that choice nor prevent sellers from selecting the option that better meets their needs on a listing-by-listing basis. Tr. 146:20–148:10 (Carr); 347:20–348:21 (Wacksman); 589:9–590:2 (Aron); DX027 (predicting in July 2025 that sellers "will choose to use 3-Phased Marketing more over the coming months"). In essence, that is competition on the merits and not an injury of the type the antitrust laws were intended to prevent. *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) ("The antitrust laws are not intended to support artificially firms that cannot effectively compete on their own."). Moreover, as discussed *supra* ¶¶ 29, 63, Compass has provided only speculation, not evidence, that Zillow's Standards and decreased adoption of 3PM have impacted Compass.com's home search traffic.

155.    The Court concludes that Compass is not likely to establish antitrust standing.

### C.    Balance of the Equities

156.    "[T]he balance of hardships inquiry asks which of the two [sides] would suffer most grievously if the preliminary injunction motion were wrongly decided." *Absolute Recovery Hedge Fund, L.P. v. Gaylord Container Corp.*, 185 F. Supp. 2d 381, 388 (S.D.N.Y. 2002). Here, the balance of the equities weighs in Zillow's favor.

157.    First, Zillow will be harmed if it is forced to carry listings with which it disagrees. Tr. 266:20–267:13 (Samuelson); 338:23–341:2 (Wacksman). Forcing a defendant to assist a competitor is "the epitome of irreparable harm." *United Asset Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008, 1042 (N.D. Ill. 2006); *see also Jack Kahn Music Co. v. Baldwin Piano &*

*Organ Co.*, 604 F.2d 755, 764 (2d Cir. 1979), *superseded by statute on other grounds* (balance of hardships favors defendant where it would be "frozen into an intimate and continuous relationship with a dealer it no longer wishes to be associated with"). Additionally, an injunction that "restrict[s] … [d]efendant's constitutionally protected speech causes the balance of hardships to favor [d]efendant." *Mason v. Jews for Jesus*, 2006 WL 3230279, at *5 (S.D.N.Y. Nov. 8, 2006). Enjoining the Standards would force Zillow to "accommodate messages it would prefer to exclude" and "overrid[e] [its] expressive choices," which "confronts the First Amendment." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731–32 (2024); *see also Person v. N.Y. Post Corp.*, 427 F. Supp. 1297 (E.D.N.Y. 1977) (denying antitrust preliminary injunction where defendant refused to publish plaintiff's content), *aff'd*, 573 F.2d 1294 (2d Cir. 1977).

158.    Second, Zillow would be harmed by an injunction because its platform would be damaged by a lack of access to timely or comprehensive listings. Listings are Zillow's "core input." Tr. 295:16–17 (Wacksman). Customers trust that Zillow is able to provide high-quality content on all available listings. Tr. 334:16–20 (Wacksman). As a result, maintaining access to listings, and particularly new listings, is critical to Zillow and is necessary to ensure continued consumer trust. Tr. 165:19–167:2, 227:2–230:5, 266:23–267:13 (Samuelson). An injunction would thus degrade Zillow's customer experience, erode consumer trust, and diminish Zillow's ability to compete. *See, e.g.*, DX 372 at 6, 22.

159.    On the other side of the scales, as explained above, Compass has not shown that it will suffer irreparable harm absent injunctive relief. Accordingly, the substantial harms to Zillow outweigh the inconvenience to Compass of postponing relief to final judgment.

### D.    Public Interest

160.    Finally, the Court must consider "the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24

-67-

(2008). Here, an injunction is not in the interest of any market participants—buyers, sellers, agents, or smaller or independent brokerages—because PLNs like 3PM erode the transparent access to listings on which all participants rely. Tr. 342:14–16 (Wacksman); 659:14–661:13 (Wu); DX657 ¶ 45.

161.    Requiring Zillow to carry Compass listings that do not align with Zillow's mission would quicken the spread of PLNs, Tr. 342:16–19 (Wacksman), leading to a fragmented real estate market that would make it more difficult for home buyers to find all available listings, decrease liquidity in the home search market, and increase search costs. Carr Dep. Tr. 8:15–13:1; Tr. 340:1–7 (Wacksman); 661:15–664:13 (Wu); DX097 at 1–2; DX424 at 1; DX657 ¶¶ 244–58. This fragmentation could disproportionately impact minority or low-income buyers who often are not shown the same listings as others. Tr. 234:7–17 (Samuelson); Kelman Dep. Tr. 128:13–22; Pareja Dep. Tr. 129:1–130:24; DX362 at 2–3. Buyers are better served when home search platforms compete based on user experience rather than inventory scarcity. Tr. 346:19–347:10 (Wacksman); 91:1-7 (Reffkin explaining that Compass's website "could be a Google spreadsheet" and users would still come to the website for unique inventory, demonstrating that Compass would have little incentive to invest in innovation or improving user experience).

162.    An injunction would also harm sellers because listing fragmentation hurts sellers' ability to maximize price. Tr. 340:8–11 (Wacksman); 380:20–381:7 (Hofmann); 219:4–23 (Samuelson); 662:10–20 (Wu). Multiple witnesses testified that broad exposure to a pool of qualified buyers is the most effective way to obtain the most competitive price for a property. Tr. 626:4–13 (Wu); Kelman Dep. Tr. 157:2–159:3 ("[t]he most effective way to sell your home and reach as many buyers as possible is to list it publicly in the [MLS]"); DX215 at 3; Pareja Dep. Tr. 137:11–142:09 ("limited exposure reduces the pool of qualified buyers"); DX239; DX657

¶¶ 53–55. Indeed, Compass's seller disclosure form concedes that choosing 3PM "could reduce (i) the number of potential buyers who can learn about the property; (ii) the number of showings; (iii) the number of offers; and (iv) the final sale price for the property." DX541 at 1. Yet Compass promoted 3PM to buyers in part as a way to "avoid bidding wars," DX560 at 4, which may benefit certain buyers but harm sellers by not maximizing the selling price of their home. *See* Tr. 461:19–462:8 (Alexander).

163. For all these reasons, numerous studies have shown that a transparent marketplace is fairer and more efficient, and that PLNs negatively impact consumers. *See, e.g.*, Samuelson Decl. ¶ 48; Tr. 232:1–11 (Samuelson); DX301; DX303; DX317; DX370; DX391; DX397.

164. Transparency also benefits agents and small brokerages. Broad exposure to listings allows smaller brokerages to compete on a "level playing field" with large brokerages. Tr. 225:10–23 (Samuelson). Conversely, PLNs threaten increased consolidation in the brokerage industry, as large brokerages are able to recruit agents from smaller rivals with the promise of unique inventory. Kelman Dep. Tr. 132:12–133:3; Tr. 233:8–19 (Samuelson). PLNs also harm agents by making it difficult or impossible for them to show their clients all available properties. Tr. 340:12–17 (Wacksman); 232:1–11 (Samuelson); 144:22–145:2 (Carr); DX214; PX067 at -454; DX391; DX397; DX657 ¶ 113.

165. The public is not served by an arms race among brokerages that would fracture the transparent and liquid real estate market. The final factor weighs against an injunction.

## III.    CONCLUSION

166. For the foregoing reasons, Compass's motion for a preliminary injunction is DENIED.

Dated: December 5, 2025                    Respectfully submitted,

                                           WILSON SONSINI GOODRICH & ROSATI
                                           Professional Corporation

                                           s/ *Beau W. Buffier*
                                           Beau W. Buffier (NY Bar No. 3932050)
                                           31 West 52nd Street, Fifth Floor
                                           New York, New York 10019
                                           Telephone: (212) 999-5800
                                           Facsimile: (866) 974-7329
                                           Email: bbuffier@wsgr.com

                                           Bonnie Lau (admitted *pro hac vice*)
                                           One Market Plaza, Spear Tower, Suite 3300
                                           San Francisco, California 94105
                                           Telephone: (415) 947-2000
                                           Facsimile: (866) 974-7329
                                           Email: blau@wsgr.com

                                           Eric P. Tuttle (admitted *pro hac vice*)
                                           Nicholas R. Sidney (admitted *pro hac vice*)
                                           701 Fifth Avenue, Suite 5100
                                           Seattle, Washington 98104
                                           Telephone: (206) 883-2500
                                           Facsimile: (866) 974-7329
                                           Email: eric.tuttle@wsgr.com
                                           Email: nsidney@wsgr.com

                                           *Counsel for Defendants Zillow, Inc., Zillow*
                                           *Group, Inc., and Trulia, LLC*

-70-