**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COMPASS, INC.,

               *Plaintiff,*

        *v.*

ZILLOW, INC., ZILLOW GROUP, INC., and
TRULIA, LLC

               *Defendants.*

Case No. 1:25-cv-05201-JAV

Hon. Jeannette A. Vargas

**PLAINTIFF'S POST-HEARING [PROPOSED] FINDINGS OF FACT AND
<u>CONCLUSIONS OF LAW</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

   I.   ZILLOW ADOPTED ITS STANDARDS TO MAINTAIN ITS MONOPOLY ....................................................................................... 4

   II.  ZILLOW'S STANDARDS IRREPARABLY HARMED COMPASS, AGENTS, AND HOME SELLERS AND HOME BUYERS ................................ 8

   III.  THE NARROW DUTY-TO-DEAL DOCTRINE DOES NOT PROTECT ZILLOW'S STANDARDS ................................................................. 12

   IV.  A PRELIMINARY INJUNCTION WILL PRESERVE THE STATUS QUO .................................................................................................... 14

PLAINTIFF'S PROPOSED FINDINGS OF FACT ...................................................... 15

   I.   BACKGROUND ................................................................................... 15

      A.   Compass Launches Its Successful And Innovative 3-Phased Marketing Strategy ................................................................. 15

      B.   Compass Has Invested Heavily In Its 3-Phased Marketing Strategy ........ 20

      C.   The 3-Phased Marketing Strategy Was An Immediate Success .............. 20

      D.   3-Phased Marketing Was Successful Because It Benefits Consumers ................................................................................. 23

         i.   3-Phased Marketing Benefits Home Sellers .............................. 23

         ii.   3-Phased Marketing Benefits Home Buyers ............................. 26

         iii.  3-Phased Marketing Benefits Agents ...................................... 28

      E.   3-Phased Marketing Was A Critical Driver For Compass' Home Search Portal, Compass.com ................................................... 30

         i.   Online Home Search Websites Generally .................................. 30

         ii.   Compass.com Competes in Online Home Search by Offering Unique Inventory Powered by 3-Phased Marketing ....... 33

   II.  WHEN CHALLENGED BY 3-PHASED MARKETING AND COMPASS.COM, ZILLOW ADOPTS ITS "STANDARDS" TO CONSTRAIN COMPASS, CONTROL THE FUTURE OF THE ONLINE HOME SEARCH, AND DIRECT HOW THE REAL ESTATE INDUSTRY WILL WORK ................................................................... 39

      A.   NAR Provided More Options To Home Sellers ........................... 40

      B.   Zillow Intentionally Blocked The New Home Seller Options And Any Online Home Search Website From Having Unique Inventory ........ 44

# TABLE OF CONTENTS
### (continued)

C.    Zillow Also Intentionally Sowed Confusion To Stop Off-Zillow Public Marketing ...................................................... 49

D.    Zillow Tried To Buy Off Compass In Exchange For Reducing Home Seller Options And Competition, And When Compass Refused, Zillow Targeted Compass ......................................... 51

E.    Zillow's Standards Successfully Reduced Off-Zillow Marketing ........... 55

III.    ZILLOW HAS MONOPOLY POWER .................................................. 57

A.    Zillow Is A Critical Tool For Home Sellers And Agents, Even If They Use 3-Phased Marketing .................................... 57

B.    Zillow And Others In The Industry Publicly Describe It As A Dominant Online Home Search Platform ..................... 60

C.    Zillow Acts Like A Monopolist ................................................. 62

D.    Zillow Is Protected By High Barriers To Entry ......................... 63

IV.    ZILLOW ENTERED INTO AN ANTICOMPETITIVE AGREEMENT WITH REDFIN ................................................................. 65

PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW ...................................... 70

I.    JURISDICTION AND VENUE ARE PROPER ........................................ 70

II.    THE PRELIMINARY INJUNCTION STANDARD ................................... 71

III.    COMPASS, AGENTS, HOME SELLERS AND BUYERS, AND COMPETITION ARE SUFFERING IRREPARABLE HARM ...................... 71

A.    Irreparable Harm To Compass, Other Brokers, And Agents ................... 72

i.    Loss of 3-Phased Marketing to Drive Other Business Lines and Growth More Broadly ........................................... 72

ii.    Compass is Losing Goodwill and Business Reputation ................ 73

iii.    Compass is Losing Its First-Mover Advantage .......................... 75

B.    Irreparable Harm To Consumers And Competition ................................. 76

C.    Zillow's Arguments Regarding Irreparable Harm Are Unpersuasive ....... 77

D.    Zillow Would Not Suffer Irreparable Harm If It Were Enjoined ............. 79

IV.    COMPASS IS LIKELY TO SUCCEED ON THE MERITS, OR AT LEAST HAS RAISED SERIOUS QUESTIONS ...................................... 81

A.    Compass Is Likely To Succeed On Its Section 2 Claim ......................... 81

i.    Direct Evidence of Zillow's Market Power ............................ 82

ii.    Indirect Evidence of Zillow's Market Power ........................... 83

# TABLE OF CONTENTS
### (continued)

**Page**

    iii.    The Relevant Product Market is Online Home Search ................. 83

    iv.    The Geographic Market is Nationwide .......................................... 84

    v.    Practical indicia show that Zillow has monopoly power in the nationwide online home search market ................................... 85

    vi.    Zillow's Standards Constitutes Unlawful Exclusionary Conduct ....................................................................................... 87

    vii.    The Narrow Duty-to-Deal Doctrine Does Not Protect Zillow's Standards .................................................................... 88

    viii.    Zillow's Proffered Justifications are Pretextual and Insufficient to Counterbalance the Anticompetitive Harms .......... 96

B.    Compass Is Likely To Succeed On Its Section 1 Claim ......................... 101

    i.    The Evidence Shows Zillow and Redfin Reached an Agreement ................................................................................ 102

    ii.    The Zillow-Redfin Agreement is a *Per Se* Anticompetitive Group Boycott ............................................................................ 108

    iii.    The Zillow-Redfin Agreement is Independently Unlawful Under a Quick Look or Rule of Reason Analysis ...................... 109

V.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY SUPPORT A PRELIMINARY INJUNCTION ........................... 110

A.    The Balance Of The Equities Weighs Heavily In Favor Of Compass, As Zillow Would Suffer No Harm From the Injunction ........ 110

B.    The Public Interest Weighs In Favor Of The Injunction ........................ 111

CONCLUSION ...................................................................................................... 112

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*725 Eatery Corp. v. City of New York*,
    408 F. Supp. 3d 424 (S.D.N.Y. 2019) ................................................................. 81

*Alexander v. Phoenix Board & Indem. Co.*,
    149 F. Supp. 2d 989 (N.D. Ill. 2001) ................................................................. 106

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    No. 21-cv-00351 (GHW) (VF), 2023 WL 6006525 (S.D.N.Y. July 31, 2023) .................... 104

*Anderson News, LLC v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ........................................................ 6, 101, 102, 108

*Apex Oil Co. v. Di Mauri*,
    822 F.2d 246 (1987) ..................................................................................... 103

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ...............................................................................*passim*

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ......................................................................... 87

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ..................................................................................... 84

*Cantor v. Multiple Listing Service of Dutchess County, Inc.*,
    568 F. Supp. 424 (S.D.N.Y. 1983) ............................................................. 73, 88

*Cargill, Inc. v. Monfort of Colo., In*c.,
    479 U.S. 104 (1986) ..................................................................................... 88

*Chase Mfg. Inc. v. Johns Manville Corp.*,
    84 F.4th 1157 (10th Cir. 2023) ........................................................... 87, 90, 92

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) ......................................................................... 70

*In re Currency Conversion*,
    773 F. Supp. 2d 351 (S.D.N.Y. 2011) ...................................................... 102, 104

*Davitashvili v. Grubhub Inc.*,
    20-cv-3000 (LAK), 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022) .......................... 85

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ................................................................................. 14, 81, 95

*Eng v. Smith*,
    849 F.2d 80 (2d Cir. 1988) ...................................................................................... 79

*Fed. Trade Comm'n v. Amazon.com, Inc.*,
    No. 23-cv-01495, 2024 WL 4448815 (W.D. Wash. Sept. 30, 2024) ....................... 14, 91, 94

*Fed. Trade Comm'n v. IQVIA Holdings Inc.*,
    710 F. Supp. 3d 329 (S.D.N.Y. 2024) ..................................................................... 86

*Fed. Trade Comm'n v. Meta Platforms, Inc.*,
    775 F. Supp. 3d 16 (D.D.C. Nov. 13, 2024)............................................................. 85

*Fed. Trade Comm'n v. Shkreli*,
    581 F. Supp. 3d 579 (S.D.N.Y. 2022) ..................................................................... 97

*Fed. Trade Comm'n v. Tapestry*,
    755 F. Supp. 3d 386 (S.D.N.Y. 2024) ..................................................................... 86

*FuboTV Inc. v. Walt Disney Co.*,
    745 F. Supp. 3d 109 (S.D.N.Y. 2024) ...............................................................*passim*

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
    386 F.3d 485 (2d Cir. 2004) ............................................................................. 82, 83

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,
    922 F. Supp. 2d 435 (S.D.N.Y. 2013) ................................................................... 111

*Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*,
    476 F.2d 687 (2d Cir. 1973) ................................................................. 76, 77, 111, 112

*Hamilton Chapter of Alpha Delta Phi v. Hamilton Coll.*,
    128 F.3d 59 (2d Cir. 1997) ............................................................................... 70, 71

*Heerwagen v. Clear Channel Commc'ns.*,
    435 F.3d 219 (2d Cir. 2006) .................................................................................. 84

*Hercules Pharms., Inc. v. Cherne*,
    No. 24-2545-cv, 2025 WL 1099431 (2nd Cir. Apr. 14, 2025) ............................... 71

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997).............................................................................. 97

*Laumann v. Nat'l Hockey League*,
    56 F. Supp. 3d 280 (S.D.N.Y. 2014) .................................................................... 103

*Lorain Journal Co. v. United States*,
　　342 U.S. 143 (1951) ............................................................ 89

*Mastrio v. Sebelius*,
　　768 F. 3d 116 (2d Cir. 2014) ..................................... 14, 80

*W. Va. ex rel. McGraw v. Bank of America, N.A.*,
　　790 F. Supp. 2d 106 (S.D.N.Y. 2011) ............................ 107

*Merced Irrigation District v. Barclays Bank PLC*,
　　165 F. Supp. 3d 122 (S.D.N.Y. 2016) ............................. 81

*Muze, Inc v. Digit. On-Demand, Inc.*,
　　123 F. Supp. 2d 118 (S.D.N.Y. 2000) ......................... 75, 78

*N. Carolina State Bd. of Dental Examiners v. Fed. Trade Comm'n*,
　　717 F.3d 359 (4th Cir. 2013) ........................................ 110

*Nat'l Society of Prof. Engineers v. United States*,
　　435 U.S. 679 (1978) ..................................................... 3, 101

*New York v. Trump*,
　　767 F. Supp. 3d 44 (S.D.N.Y. 2025) ..................... 71, 72, 74

*Norbrook Lab'ys Ltd. v. G.C. Hanford Mfg. Co.*,
　　126 F. App'x 507 (2nd Cir. 2005) ................................... 75

*Novell, Inc. v. Microsoft Corp.*,
　　731 F.3d 1064 (10th Cir. 2013) ................................. 90, 91

*Ohio v. Am. Express Co.*,
　　585 U.S. 529 (2018) ......................................................... 84

*Pac. Steel Grp. v. Com. Metals Co.*,
　　Case No. 20-cv-07683-HSG, 2025 WL 2772618 (N.D. Cal. Sept. 29, 2025) ...................... 86

*Panini Am., Inc. v. Fanatics, Inc.*,
　　23-CV-9714-LTS-VF, 2025 WL 753954 (S.D.N.Y. Mar. 10, 2025) ......................... 83, 87

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
　　714 F. Supp. 3d 65 (E.D.N.Y. 2024) .............................. 110

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds of Pharm.*,
　　530 F. Supp. 3d 301 (S.D.N.Y. 2021) ........................... 108

*Phillip v. Fairfield University*,
　　118 F.3d 131 (2d Cir. 1997) ........................................... 79

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2025) ...................................................................*passim*

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
  940 F. Supp. 2d 367 (E.D. La. 2013) ......................................................... 85

*Primetime 24 Joint Venture v. Nat'l Broadcasting Co.*,
  219 F.3d 92 (2d Cir. 2000) ........................................................................ 109

*Realcomp II, Ltd. v. Fed. Trade Comm'n*,
  635 F.3d 815 (6th Cir. 2011) .................................................................... 110

*Regeron Pharms, Inc. v. United States Dep't of Health & Hum. Servs.*,
  510 F. Supp. 3d 29 (S.D.N.Y. 2020) .......................................................... 74

*Register.com Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ................................................................ 73, 74

*Reuters, Ltd. v. United Press Int'l Inc.*,
  903 F.2d 904 (2d Cir. 1990) ................................................................ 73, 74

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) ................................................ 12, 71, 72, 97

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) .................................................................... 108

*St. Joseph's Hospital Health Center v. Am. Anesthesiology of Syracuse, P.C.*,
  131 F.4th 102 (2d Cir. 2025) ...................................................................... 81

*Starr v. Sony BMG Music Ent.*,
  592 F.3d 314 (2d Cir. 2010) .............................................................. 102, 103

*Ticor Title Ins. Co. v. Cohen*,
  173 F.3d 63 (2d Cir. 1999) ........................................................................ 74

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .............................................................. 102, 103

*Tom Doherty Assocs, Inc. v. Saban Ent., Inc.*,
  60 F.3d 27 (2d Cir. 1995) .................................................................... 71, 72

*U. S. v. Columbia Pictures Indus., Inc.*,
  507 F. Supp. 412 (S.D.N.Y. 1980) ........................................................... 109

*U.S. v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ...................................................... 101, 107, 110

*U.S. v. Apple, Inc.*,
  Civil Action No. 24-cv-4055, 2025 WL1829127 (D.N.J. June 30, 2025) ................. 14, 92, 95

*U.S. v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .................................................................................... 4, 86, 87

*U.S. v. Visa, Inc.*,
  788 F. Supp. 3d 585 (S.D.N.Y. 2025) ............................................................................... 5

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) ........................................................................................................ 13

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2024) ............................................................................... *passim*

*United States v. Google LLC*,
  778 F. Supp. 3d 797 (E.D. Va. 2025) .......................................................................... *passim*

*United States v. H & R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) .................................................................................. 84

*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001) ...................................................................... 83, 106

*US Airways Inc. v. Sabre Holdings Corp.*,
  11 Civ. 2725 (LGS), 2022 WL 1125956 (S.D.N.Y. Apr. 15, 2022) ............................... 82, 83

*Verizon Commc'ns., Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................................... 93, 94, 95

**Statutes**

15 U.S.C. § 15 .......................................................................................................... 70

15 U.S.C. § 16 .......................................................................................................... 71

15 U.S.C. § 22 .......................................................................................................... 70

15 U.S.C. § 26 .................................................................................................... 70, 71

28 U.S.C. § 1331 ..................................................................................................... 70

28 U.S.C. § 1391 ..................................................................................................... 70

Sherman Act .............................................................................. 70, 78, 100, 110

Sherman Act Section 1 ....................................................................................... 6, 101

Sherman Act Section 2 ................................................................................... *passim*

## INTRODUCTION[1]

When the National Association of Realtors ("NAR") adopted its "Multiple Listing Options for Sellers" and opened the door (at least a crack) to home seller choice, agent options, and online home search competition, Zillow slammed that door shut to maintain its monopoly, causing irreparable harm to Compass, real estate agents, home sellers, home buyers, and competition.

The new NAR policy was making Compass' 3-Phased Marketing Strategy (where, in the first two phases, home sellers publicly market off-Zillow and off-MLS) more successful and more competitive. It also allowed all agents and all brokerages to meet the strong consumer demand for publicly marketing off-Zillow and off-MLS. In turn, home sellers choosing those marketing strategies were generating unique listing inventory for Compass.com and other online home search websites. But this development was creating unprecedented competition for Zillow in online home search. So, as Zillow's CEO wrote on April 8, 2025, ███████████████████ ████████████████████████████ PX-010 at -753. Two days after that direction, Zillow announced it would punish any home seller or agent who did not comply with its Standards, *see* PX-143 (Zillow's Standards), thus blocking home seller choice and agent options. And, contrary to Zillow's post hoc claims about those Standards being for consumers, Zillow's own internal documents show that the purpose was to insulate Zillow from competition by Compass.com and other online home search websites.

Simply stated, home seller choice is a direct challenge to Zillow's dominance.

***Step 1: more listing options for home sellers and agents means more off-Zillow and off-MLS listings.*** Zillow's own research shows that 31% of home sellers "say they would prefer to have it [their home] listed on a private listing network," instead of listing their home on a website

---

[1] To assist the Court, Exhibit A is a table that includes certain comments and questions raised by the Court during closing arguments and identifies where in this filing the relevant facts, law, and arguments can be found.

like Zillow. DX-318, at 3. That means if all home sellers could choose how to market their own homes without fear of punishment by Zillow, more than 3 of every 10 would choose to market only within the brokerage. And Compass' 3-Phased Marketing Strategy gave home sellers even more options to market than a private listing network, including "Private Exclusives" and "Compass Coming Soons," which are publicly marketed outside of Compass but not on Zillow.

*Step 2: more off-Zillow and off-MLS listings means more unique inventory on competing home search websites.* As Compass' SVP of Strategy testified, "the [3]-[P]hase[d] [M]arketing [S]trategy has immediate benefits for sellers, agents, and even buyers, but—the fact that it creates these unique listings on our website is really the core differentiating part of our strategy on [C]ompass.com. . . ." Hr'g Tr. 400:15-21 (Alexander).

*Step 3: more unique inventory on home search websites means more competition against Zillow's monopoly.* As Zillow executives recognized, "Compass One [which includes its online home search] might pose the greatest risk to Zillow's ASA [Agent Software and Advertising] platform if . . . Compass convinces a substantial percentage of their sellers to list through the 3-phased marketing strategy." PX-004 at -331. As Compass' CEO testified, "[i]f Compass is able to say that we have listings that Zillow doesn't have, then people would search Compass." Hr'g Tr. 91:1-3 (Reffkin).

Instead of competing on the merits, Zillow has used its immense power to exclude competition based on unique inventory. When asked by his own lawyers, "[w]hich is better for consumers, when home search sites compete based on user experience or when they compete based on inventory?," Zillow's CEO testified "I'm laughing because it seems so obvious. Competing on user experience is far better." *Id.* 346:19-23 (Wacksman). Zillow's Chief Industry Development Officer similarly testified: "Q. Zillow's executives prefer to compete on features

and functionality rather than on scarcity of listings; isn't that right? A. I'm not sure if you're reading from the deposition, but the concept is right, yeah." *Id.* at 167:25-168:4 (Samuelson). But the correct answer to the question is that ***all*** competition is better for consumers, not just the competition that Zillow prefers. *See Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695-96 (1978) (holding that a trade association was not allowed to make the determination that competition on price was bad for safety).

It is not surprising that Zillow does not want to compete on inventory. Other industry participants are strong on inventory, and Zillow has chosen to be weak. Unlike Compass and other brokerage firms (who also have online home search websites), Zillow has almost no inventory of its own. It has virtually no fiduciary relationships with home sellers or home buyers. Instead, Zillow receives almost all of its inventory from listing agents through the MLS, at almost no cost to Zillow. *Infra* ¶ 94.

Therefore, Zillow responded to the competitive challenge presented by NAR's "Multiple Listing Options for Sellers," Compass' 3-Phased Marketing, and the "contagion" they would cause by adopting an industry-wide standard that blocked those options to exclude competition in online home search. In its Zillow Standards, Zillow issued a command to home sellers and agents: "when a listing is publicly marketed to consumers . . . it must be submitted to a Multiple Listing Service (MLS) within one day and published on Zillow and other sites that receive listing feeds." PX-143 at 1. Zillow enforced its Standards by banning from Zillow's critical website any home seller or agent who dared to publicly market their home in a different way—unless the home seller fired her agent and broker—a huge punishment to the home seller, agent, and broker. *Infra* ¶¶ 119-20. With its Standards, Zillow appointed itself judge, jury, and executioner for how home sellers and buyers market and shop for real estate, how agents pitch for listings and perform their

fiduciary duties, and how online home search websites compete, even though Zillow is a private company with no such mandate.

## I.     ZILLOW ADOPTED ITS STANDARDS TO MAINTAIN ITS MONOPOLY

"The Supreme Court defines monopoly power as the power to control prices or exclude competition." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (quoting *United States v. EI du Pont de Nemours & Co.*, 351 U.S. 377, 392 (1956)). *First*, Zillow has such power because it is a critical marketing tool, even when home sellers and agents choose to begin marketing off-Zillow. As Compass' CEO explained, "[i]t's not called the one-phase marketing strategy. . . . It's the three phase. You're suppose[d] to test price, build momentum and demand and go, just like the builders do, to the third phase." H'rg Tr. 61:11-14 (Reffkin). He further explained that "94 percent of our listings that are private exclusives end up going to the third phase," where the listings are on Zillow, the MLS, and other websites. *Id.* at 61:6-7 (Reffkin).

*Second*, Zillow executives touted their ability to exclude competition. In its internal "Strategy Synthesis" about off-MLS listings, Zillow was confident it could use its "hammer to keep sellers and agents on our site" and "be more aggressive with hardline tactics to keep ALL listings in IDX, on Zillow." PX-002 at -187; *see also id.* ("Everything about the hardline plan assumes we can be successful at using a hammer to keep sellers and agents on our site.").

Third, Zillow used its hammer to stop off-Zillow public marketing and exclude competition. Just weeks before the hearing, on October 13, Zillow proclaimed that it blocked approximately 90% of the agents from publicly marketing properties off Zillow's website—something agents across the country were previously doing at their clients' express request and instruction. PX-142 at 1. As Zillow stated:

> Since Zillow began sending [email] notifications to agents over the summer . . .
> ≈90% of agents who received a Listing Access Standards notice from Zillow only

received one, ***meaning the initial notice resulted in most agents making sure their next listing was available widely and aligned with the Zillow standards***.

*Id.* (emphasis altered). In short, Zillow is so powerful that by merely sending an email threatening to punish agents for marketing off-Zillow—when home sellers and agents wanted to begin by marketing those homes off-Zillow—Zillow stopped off-Zillow marketing and the resulting competition in online home search.

Moreover, there is substantial indirect evidence of Zillow's monopoly power. Zillow touts in its annual report that it is "the most visited real estate website in the United States," which has become "synonymous with residential real estate with Zillow being searched online more than the term 'real estate' in the United States." PX-165 at 3.

To preserve its monopoly, Zillow is using collusion, industry-changing rules, threats, financial penalties, and bans to eliminate differentiated marketing strategies. This is textbook illegal monopolization. *See United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 614 (S.D.N.Y. 2025) (holding that monopolization is when a dominant firm "use[s] its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice."). One Zillow executive reported that Zillow's Co-founder, Co-Executive Chairman, and President, "wants us to try and *maintain/force the status quo*. i.e. listings continuing to go into the MLS and being distributed to all brokers. . . ." PX-002 at -159 (emphasis added). Elsewhere in the same Strategy Synthesis document, Zillow states "[w]e want to punish the agent for choosing to put their listings on alternate networks." *Id*. at -185. And these sentiments were shared across Zillow:

- On April 3, one week before Zillow announced its standards, Zillow's Chief Industry Development Officer wrote, "[a]lmost daily we see another PLN [private listing network]. We need to give people pause." PX-013 at -810.

- That same day, Zillow's CFO texted Zillow's CEO: "here are my concerns . . . these pln's are going to start popping up everywhere very quickly[,] they are only popping up bc of compass[,] we have to say we are going to stomp that out[,] we probably need to say publicly what the policy is going to be to send a chilling

effect. . . ." PX-028 at -971.

- On April 5, Zillow senior executives wrote, "Goals: . . . Deter other brokerages from creating their own Private Listing Networks (PLNs) . . . ." PX-029 at -032.

- On April 17, one week after Zillow announced the standards, senior Zillow executives cheered that they excluded competition: "Not a lot of new PLN announcements this week …: That was our goal. .. to stop the PLNs." PX-009 at -307-08.

In fact, two days before Zillow announced its Standards, its CEO wrote: ███████████
████████████████████████████████████████████████████
████████████████████████████████████████
█████████████████████████          PX-010 at -753 (emphasis added).

Zillow bolstered its monopolization by agreeing with Redfin not to display listings that were previously marketed publicly off-MLS. To prevail on its Section 1 claim, Compass need only show that the evidence "reasonably tends to prove" that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). After numerous secret conversations between senior executives, and within four days of Zillow's Standards, Redfin adopted a substantially identical standard. *Infra* ¶¶ 207-21. Among many "plus factors" showing this was the product of a "conscious commitment to a common scheme," Redfin's standards were against its short-term economic interest in displaying inventory that Zillow did not have on its site (the banned listings). *Infra* ¶ 219.

Zillow's anticompetitive conduct was tremendously successful. By announcing the Standards, intentionally creating confusion, and sending only about 1,000 warning notices (95% of which Zillow issued to Compass agents), Zillow stopped off-Zillow public marketing in its tracks. For example, Compass' 3-Phased Marketing had ramped up rapidly from 5% of Compass

home seller clients using 3-Phased Marketing in November 2024 (when Compass launched the program) to approximately 40% of Compass home sellers using it in April 2025 (when Zillow announced its Standards). PX-083 at -060; Hr'g Tr. 396:1-5 (Alexander). This significant uptick indicated how much the strategy was resonating with home sellers and agents, and Compass' SVP of Strategy testified that this was "one of the[,] if not the[,] most successful product launches that I've seen." Hr'g Tr. 394:12–14 (Alexander). But, as she also testified, "One of the results of the Zillow ban is that… a lower percentage of the sellers who are listing with us are using these strategies, which means that we have a lower percentage of unique listings on our platform." *Id.* at 410:20-411:1 (Alexander). "We saw that adoption drop off pretty precipitously," *Id.* at 415:25-416:1 (Alexander), from 39% in April 2025 to 22% just three months after Zillow announced its standards:




**We've Seen a Considerable Decline in the % of Sellers Choosing Compass' 3-phased Marketing.**

Pre-marketing of Compass listings declined measurably given confusion/fear seeded by Zillow Ban.

| Compass Markets | Difference (% points) from April '25 to July '25 |
|---|---|
| Philadelphia Area | -20.1% |
| Greater Nashville | -18.7% |
| New England | -18.0% |
| Washington, DC Area | -17.8% |
| San Francisco Bay Area | -16.7% |

3-Phased Marketing — % of Sellers Choosing Compass 3-Phased Marketing[1]: Nov '24: 5%, Dec '24: 8%, Jan '25: 13%, Feb '25: 33%, Mar '25: 38%, Apr '25: 39%, May '25: 35%, Jun '25: 26%, Jul '25: 22%

1. "Listings following 3-Phased Marketing" consist of all listings that were previously in a Private Exclusive status AND a Compass Coming Soon status during its' lifespan.

COMPASS    July 2025    Board Materials, Confidential, Do Not Forward

PX-083 at -060. She further emphasized that Compass.com's online home search website traffic was hurt as well: "we're seeing a decline in both engagement and users on our platform." *Id.* at 410:19-411:2 (Alexander). Therefore, Zillow's Standards harmed Compass and Compass.com,

home sellers and home buyers, and competition, all of which are relevant to Compass' antitrust claims.

## II.    ZILLOW'S STANDARDS IRREPARABLY HARMED COMPASS, AGENTS, AND HOME SELLERS AND HOME BUYERS

Zillow's standards caused at least four irreparable harms, in addition to any financial damages that Compass may seek at trial.

*1. Zillow deprived Compass of its First-Mover Advantage in both brokerage and online home search.* Regarding its brokerage business, Compass' Co-President wrote to her team just before Zillow announced its standards, "[i]t's so clear that Compass agents have an outsized advantage at winning listings by pitching the Compass 3-Phased Marketing Strategy, while the competition is not. This advantage won't last forever." PX-160 at -732. And, at the hearing, she testified similarly: "we started to hear of other brokerages trying to create programs that sound like 3-phased marketing, and so our agents' unique advantage in the living room when pitching to a homeowner wouldn't last forever." Hr'g Tr. 479:2-5 (Navab-Boshehri).

Regarding online home search, the unique inventory resulting from Compass' first-mover advantage in brokerage services directly translated to a first-mover advantage in online home search. Compass then furthered its first-mover advantage in online home search with its innovative Black Box, which without requiring online registration showed anyone—any consumer (whether they hire a Compass agent or not) and any agent (whether affiliated with Compass or another brokerage)—how many homes met their particular online home search criteria. *Infra* ¶¶ 12, 77. Compass' innovations in brokerage services and online home search were valuable and gave Compass a huge head start on its competitors.

But that lead is being destroyed by Zillow's monopolistic conduct. ██████████

████████████████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████ PX-010 at -726, -740. Many brokerages have launched programs that, while not yet at the level of Compass' 3-Phased Marketing, are catching up. *Id.* at 487:18–488:8 (Navab-Boshehri); DX-375. Compass already has lost eight months of its first-mover advantage is irreparable harm, and Compass will suffer more irreparable harm if Zillow is not preliminarily enjoined.

***2. Zillow Diminished Compass' New 3-Phased Marketing Product.*** Compass' SVP of Strategy testified that Compass' new 3-Phased Marketing product was successful in driving home sellers to Compass agents and home buyers to Compass.com. Hr'g Tr. 398:14-24 (Alexander). By blocking this benefit, Zillow exponentially harmed Compass and its agents. As real estate professional Kerry Carr testified: "[f]rom one listing, we get the neighbor down the street that also wants to list. We get buyers that call us on the listing that are unrepresented. It's exponential income for us. One listing turns into family and friends referrals as well. So one listing could be ten in ten years." *Id.* at 141:22-142:1 (Carr).

Moreover, unique inventory on Compass.com would benefit Compass through more visits to Compass.com, more leads for Compass agents, and more brand equity. *Infra* ¶¶ 65-85. In fact, Compass created a billboard that it planned to use in multiple markets across the United States, and shared the billboard with the entire company:



DX-098, at -963. This would have been the world without Zillow's Standards—a direct competitive challenge by Compass.com to Zillow. Compass and other websites would compete with Zillow on unique listing inventory. But that world was blocked. And, once blocked, the harm was irreparable. As Compass' CEO testified,

> The harm to Compass from Zillow is unquantifiable. I can't imagine how many buyers or how much more traffic we would have if this billboard was in every market in the country over the last eight months. How much more traffic would we have had? How many more buyers would we have had? How many more agents would we have had? How many more sellers would we have had? It's unquantifiable. How much more trust would we have had? How much more brand value would we have had if this billboard could have been in every market in the country? So, from that perspective, it's unquantifiable.

Hr'g Tr. 92:2-11 (Reffkin). Thus, Compass has lost a large, but unknowable and incalculable, number of incremental clients (both home sellers and home buyers) and traffic on Compass.com (and the consequently lost clients).

*3. Undermining Compass' Goodwill.* As discussed, Zillow blocking 3-Phased Marketing and unique inventory on Compass.com is hurting Compass' brand equity. And that was Zillow's goal. It is undisputed that Zillow was and is targeting Compass. *See, e.g.*, DX-662 (showing that Zillow has almost exclusively sent notices to Compass agents); PX-001 at -114 (claiming that

Compass is "[a]gitating throughout the industry"); PX-002 at -165 ("Compass is agitating, and has a clear plan of attack for a post-CCP market"). In fact, the Zillow Strategy Synthesis identified Compass by name and provided, "Desired Outcomes (by targeting). . . get sellers to switch agents . . . get agents to switch brokerages." PX-002 at -184. And that document further said, "[w]e want agents to leave these offending brokerages," like Compass. *Id.* at -186.

Finally, Compass' CEO testified that, as the company's number one priority, he personally spent months promoting 3-Phased Marketing to agents, speaking to "over 10,000 agents in person," outlining the benefits it would have to home sellers, agents, and Compass.com's online home search platform (including the Compass.com billboard). Hr'g Tr. 89:6-90:4 (Reffkin). It is unquantifiable how much damage Zillow did to Compass' reputation and goodwill when Zillow prevented Compass from fully pursuing these products.

***4. Blocking competition and choice.*** The irreparable harm from Zillow's Standards is not limited to Compass: Zillow is blocking all online search websites from competing on unique inventory; Zillow is blocking all real estate agents and all brokerages from using innovative public marketing strategies to compete for listings; and Zillow is controlling how all consumers buy and sell their own homes. Based on Compass research, Zillow is also economically harming home sellers by preventing them from receiving 2.9% more for their homes and selling them more quickly by using 3-Phased Marketing, PX-082 at -622, and home buyers by forcing them into a hidden tax assessed when they click certain buttons on Zillow's website. Hr'g Tr. 50:25-51:2 (Reffkin) ("And so that button is the most expensive click in real estate and the buyer doesn't know. You push the button and thousands of dollars is the result."). This type of "[t]hreaten[ed] economic harm to . . . consumers . . . is plainly sufficient to authorize injunctive

relief." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 661 (2d Cir. 2015) (quoting *California v. Am. Stores Co.*, 495 U.S. 271, 283 (1990)).

Finally, while Compass, agents, home sellers, and home buyers are irreparably harmed by the Zillow Standards, no harm would come to Zillow from a preliminary injunction (other than that it would actually have to compete). Zillow currently does *not* punish many types of listings that were initially marketed publicly off-MLS and off-Zillow, often for much longer than the first two phases of 3-Phased Marketing: (1) Zillow does not ban listings where the home seller fired both the brokerage and agent who did the off-Zillow marketing; (2) Zillow does not ban builder listings that did off-Zillow marketing; (3) Zillow does not ban listings that are marketed only privately within a brokerage; (4) Zillow does not ban for sale by owner listings that did off-Zillow marketing; and (5) Zillow does not ban listings by agents who have received less than 3 warnings from Zillow for off-Zillow marketing. *Infra* ¶ 119. And there is no evidence that other large online home search websites, such Realtor.com, Redfin.com and Homes.com, have been harmed by displaying listings that went through 3-Phased Marketing.

## III.    THE NARROW DUTY-TO-DEAL DOCTRINE DOES NOT PROTECT ZILLOW'S STANDARDS

Just like Zillow, three of the largest tech companies in the world recently tried to hide behind the duty to deal doctrine—but all three lost. Technology monopolists frequently try to resort to the duty-to-deal doctrine because most "anticompetitive and restrictive conditions on customers[] can be conceptualized as a conditional refusal to deal." *United States v. Google LLC*, 778 F. Supp. 3d 797, 867 (E.D. Va. 2025) (cleaned up). As in the antitrust cases brought by the Department of Justice against Google and Apple, and the Federal Trade Commission against Amazon, the duty-to-deal doctrine does not apply here.

The duty to deal doctrine does not apply because, as discussed above, Zillow adopted its standards with the "*purpose to create or maintain a monopoly.*" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). Since *Colgate* in 1919, it has been black letter law for over 100 years that the duty to deal doctrine only applies "[i]n the absence of any purpose to create or maintain a monopoly." *See Colgate*, 250 U.S. at 307. But here, because Zillow's conduct has the purpose to maintain a monopoly, the doctrine does not apply.

Moreover, the duty to deal doctrine does not apply because "[c]ourts have declined to extend a refusal-to-deal-with-rivals analysis to anticompetitive restraints that a monopolist places on its customers, as opposed to its competitors." *United States v. Google LLC*, 778 F. Supp. 3d 797, 866-67 (D.D.C. 2024) (cleaned up) (refusing to apply the duty to deal doctrine). Zillow is putting anticompetitive restraints on its customers (home sellers and agents), not its competitors (competing online search platforms). *See* PX-143 (Zillow Standards govern home sellers and agents, not competing online home search websites); *see also* PX-165 at 3 (Zillow's Annual Report identifies its customers as "renters, buyers, sellers, and real estate professionals," but not websites like Compass.com); Hr'g Tr. 167:19-22 (Samuelson) (referencing Zillow's "agent customers" and "consumer customers").

Thus, this case is just like the recent decisions against Google, Apple, and Amazon that rejected the duty-to-deal doctrine. In *Google*, the Court rejected the doctrine because Google was "limiting Google's publisher customers' choice of publisher ad server for reasons other than competition on the merits." 778 F. Supp. 3d at 867. In *Apple*, the Court held "the refusal to deal doctrine does not apply to Apple's alleged conduct in this case because Plaintiffs do not allege Apple is failing to deal with its smartphone rivals, but rather that Apple's conduct is imposing

restrictions on developers and smartphone users." *United States v. Apple, Inc.*, No. 24-cv-4055, 2025 WL1829127, at \*12 (D.N.J. June 30, 2025); *see also Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 23-cv-01495, 2024 WL 4448815, at \*6-7 (W.D. Wash. Sept. 30, 2024) ("Amazon actively deters third-party sellers from offering lower prices for their products on sites other than Amazon's. This suffices to state a claim under Section 2 of the Sherman Act.") (internal citations omitted). As in *Google*, *Apple*, and *Amazon*, Zillow's conduct is imposing restrictions on customers (here, agents and home sellers; in *Google*, publisher customers; in *Amazon*, retail customers; and in *Apple*, developer and smartphone customers).

Even if the duty to deal doctrine applies, "such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 n.32 (1992) (quoting *Aspen Skiing*, 472 U.S. at 602-05). Zillow's contemporaneous documents show it has no legitimate reason for its standards; instead, Zillow adopted the standards to stop competition from the "contagion" of unique inventory on other online home search websites. Additionally, Zillow is foregoing listings (and short-term profits) to achieve its anti-competitive goals. *See Aspen Skiing*, 472 US at 610-11 (finding liability under the duty to deal doctrine where "was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival."). Zillow loses money from every banned listing, and by banning listings, it diminishes the value of its own website; it is thus sacrificing short-term benefits for the long-term benefit of harming Compass.com and other online search websites. *Infra* ¶¶ 192-96.

## IV.    A PRELIMINARY INJUNCTION WILL PRESERVE THE STATUS QUO

"The status quo to be preserved by a preliminary injunction is the last peaceable uncontested status that preceded the pending controversy. Preserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action." *Mastrio v.*

*Sebelius*, 768 F. 3d 116, 120-21 (2d Cir. 2014) (per curium). Here, the last actual, peaceable uncontested status which preceded the pending controversy was after March 25, when NAR adopted its "Multiple Listing Options for Sellers," but before June 30, when Zillow started enforcing the standards. Therefore, the status quo is that home sellers and agents can market their homes off-MLS and off-Zillow without any punishment, and that should be preserved pending trial on the merits.

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**

I.    **BACKGROUND**

 A. **Compass Launches Its Successful And Innovative 3-Phased Marketing
Strategy**

 1. Compass operates an online home search platform, Compass.com, where anyone can search residential real estate listings for free, including when the home seller has chosen to market with a Compass agent off-MLS and off-Zillow. Hr'g Tr. 50:5–10; 62:14–17 (Reffkin).

 2. Compass is a technology-forward company and has invested significant resources into Compass.com, including investing nearly $2 billion in developing Compass.com and other related technologies. *Id.* at 48:12–20; 84:14–85:4 (Reffkin).

 3. Compass also is the largest independent real estate brokerage in the United States by sales volume. Hr'g Tr. 49:11–12 (Reffkin) (Compass is "the largest brokerage firm in most of the major markets").

 4. As a brokerage, in exchange for a portion of the agent's commission, Compass provides agents with access to technology, marketing tools, and other resources. *See generally* PX-208 at ¶¶ 37–39; Hr'g Tr. 50:5–14.

 5. Real estate agents are independent contractor small businesses and are fiduciaries for their clients. *Id.* at 48:5-8 (Reffkin) (describing agents "as small business owners and

-15-

independent contractors"); *Id.* at 49:3-8 (Reffkin) (describing real estate agents and brokerages as "those who have the fiduciary responsibility [to their clients]").

6.      In November 2024, Compass launched the "3-Phased Marketing Strategy." *Id.* at 394:2–9 (Alexander).

7.      3-Phased Marketing is based on the strategy that homebuilders use, and it provides home sellers with a tailored and bespoke marketing plan to realize their goals for the home selling process. *Id.* at 54:21-35 (Reffkin); 476:10–14 (Navab-Boshehri).

8.      While 3-Phased Marketing is an option for home sellers, Compass cannot force any agents to offer 3-Phased Marketing, and it cannot force any home sellers to use 3-Phased Marketing or any other marketing strategy. *Id.* at 73:1-2 (Reffkin) ("It's impossible for Compass to mandate market strategies because agents are independent contractors."); 136:14-22 (Carr) (explaining as a real estate agent, Ms. Carr never forces clients to adopt a marketing strategy and instead she "presents all the options" and tells them about "the pros and cons of everything.")

9.      In the first phase of the 3-Phased Marketing strategy, "Private Exclusive," the listing is publicly marketed, but it does not appear on portals like Zillow or the MLSs, which are the regional listing databases for real estate brokers. *Id.* at 52:12-53:6 (Reffkin) (explaining what MLS means); *Id.* at 58:10-18 (Reffkin) (noting that Private Exclusives are not visible on the MLS).

10.     Instead, the home is marketed directly to: (a) Compass agents; (b) non-Compass agents; (c) clients of Compass agents; (d) home buyers searching Compass.com that are not clients of Compass agents; (e) home buyers or agents who set up a search with Compass that automatically will send new Private Exclusives listings to them; and (f) home buyers or agents who visit any Compass office. *Id.* at 57:11–58:1, 64:11-65:10 (Reffkin).

11.    To see a Compass Private Exclusive, home buyers and agents do not need to formally register with Compass, do not need to be represented by a Compass agent, and do not need to be represented by any agent. *Id.* at 58:2–9 (Reffkin); 409:13-410:3 (Alexander); 134:16-135:11 (Carr).

12.    Compass.com also advertises the existence and quantity of Private Exclusives, and how a home buyer or agent can learn more about them: any time a consumer searches on Compass.com, a "Black Box" appears which informs the consumer of the exact number of Private Exclusives that match their search criteria, and provides the consumer with information about how they can access those listings. *Id.* at 63:9–24; 67:4–9 (Reffkin).

**Figure 1: Example of the Black Box on Compass.com**



PX-190.

13.    In the second phase, "Compass Coming Soons," in addition to the public marketing like a Private Exclusive, the listing also is displayed on Compass.com with information such as home address, home description, and photos. *Id.* at 60:17–22 (Reffkin); ECF No. 29 at ¶ 14 (Decl. of Will Hardy).

14.     While Compass Coming Soon listings appear on Compass.com, they do not appear on other online home search websites and, while on Compass.com as a Coming Soon, they do not have the negative insights that are found on Zillow and other online home search websites. *Id.* at ¶ 14.

15.     Negative insights are not part of the listing, or even facts about the property itself (e.g., year home was built, number of bedrooms or bathrooms, physical/tangible features of the home), but instead are information such as the number of days that a listing has been "on Zillow" and the listing's price history (which reflects any reductions to the listing price). Hr'g Tr. at 483:9-16 (Navab-Boshehri); *Id.* at 208:5-9 (Samuelson) (testifying that he is aware of listings on Zillow that are over 500 days old).

16.     Another example of negative insights on Zillow listings is the "Zestimate", which provides an estimated value of a property, and has an error rate of 20% or higher in some markets. *Id.* at 704:5-705:9 (Wu).

//

//

**Figure 2: Illustrative Example of Negative Insights on Online Home Search Portal**



DX523 at 3.

17.     Negative insights create a "negative cloud" or "negative perception" over the listing. Hr'g Tr. 483:11-16 (Navab-Boshehri).

18.     For example, buyers may view listings that have been on the market for many days or with a price-drop history as "damage[d] goods." *Id*. at 56:13-20 (Reffkin).

19.     Compass Coming Soon listings are freely viewable by any consumer or agent who has access to the internet, and again without any registration. *Id.* at 60:17-22 (Reffkin) ("Anyone can see it. Anywhere in the world. You don't need a log in.").

20.      In the final phase of 3-Phased Marketing, the listing is syndicated by the MLS to thousands of websites, including all of the online home search portals like Zillow.com. Hr'g Tr. 61:4–14 (Reffkin) ("Phase three is when [the listing is] on the MLS and all the portal sites.").

21.      As Compass' CEO testified, 94% of Compass listings "that are private exclusives end up going to the third phase." *Id.* at 61:5-7 (Reffkin).

**B.      Compass Has Invested Heavily In Its 3-Phased Marketing Strategy**

22.      Compass has invested heavily in its 3-Phased Marketing Strategy.  As Compass' CEO testified, "Q. How has Compass invested in its marketing strategies? A: Compass invested nearly $2 billion in building the technology platform Compass.com. In that platform, half of what it is are for sellers and marketing properties and a massive listing system." *Id.* at 84:15-18 (Reffkin).

23.      In addition to monetary investment, Compass' SVP of Strategy testified that she and her team "spend a significant amount of our time[,] probably 80 to 90 percent . . . is dedicated to work on this strategy." *Id.* at 392:14-16 (Alexander).

24.      Compass also undertook extensive efforts to educate its agents regarding the strategy, including holding many training sessions and creating content regarding how 3-Phased Marketing benefits clients and how agents could use 3-Phased Marketing to win pitches and differentiate themselves from competing agents. *Id.* at . 89:6-90:4 (Reffkin) (explaining that he, as CEO, personally spent months promoting 3-Phased Marketing to agents, speaking to "over 10,000 agents in person," outlining the benefits it would have to home sellers, agents, and Compass.com's online home search).

**C.      The 3-Phased Marketing Strategy Was An Immediate Success**

25.      Compass saw immediate results after launching 3-Phased Marketing: when the program launched in November 2024, about 5% of Compass sellers chose to use these strategies,

*id.* at 396:1-3 (Alexander); adoption ramped up significantly and by April 2025, approximately 40% of Compass home sellers were using 3-Phased Marketing. *Id.* at 396:3-5 (Alexander).

26.     The five-month increase from 5% to 40% indicated how much the strategy was resonating with sellers and agents: "[w]e rolled the product out in November, as I mentioned, and we very immediately saw traction with sellers, so sellers were seeing value and benefit in using these marketing strategies. We saw them adopting at a very quick rate, choosing to launch their listings in this way." *Id.* 394:14-18 (Alexander).

27.     As explained by Compass' SVP of Strategy:

> Our agents are independent contractors, so they don't have to use any strategies or tools that they don't actually think add value for their clients, who they're fiduciaries for, so just the fact that agents were excited about this, that they were choosing to have these conversations with their sellers and offer these strategies, that was an indication to us that there was a lot of value here, and we also heard from our agents that it was helping them grow and support their businesses. So we saw that as a strong indication that this strategy was really working.

*Id.* at 394:20-395:4 (Alexander).

28.     Compass' SVP of Strategy testified that "I've been at Compass for eight years, and I would characterize this as one of the, if not the, most successful product launch that I've seen. " *Id.* at 394:12–14 (Alexander).

29.     During its roll out, both agents and home sellers reacted very positively to 3-Phased Marketing, recognizing its value and benefits. PX-085 at -640-41 (agent e-mail describing how she had been using 3-Phased Marketing and the various use cases for the strategy); PX-090 at -208 (agent e-mail stating "The biggest surprise for me is how the sellers feel like you're going above and beyond and doing more work when you have a three phased approach. They feel like you're doing three times the effort and they really appreciate it. Some sellers ask if the Compass 3-Phased Marketing Strategy costs more commission, reflecting how much they value it."); PX-

096 at -582 (agent e-mail describing 3-Phased Marketing as "a huge edge for us as agents . . . and the clients themselves" and explaining how 3-Phased Marketing had helped him win business).

30.     Agents reported that it was helping them grow their business, Hr'g Tr. 395:1-4, and agents recruited by Compass specifically pointed to 3-Phased Marketing as a reason for why they joined the company, PX-091 at -191-92 (Compass internal e-mail stating that the top reason a new agent had joined was 3-Phased Marketing).

31.     Even Zillow's Chief Industry Development Officer acknowledged that unique inventory can be a powerful tool for recruiting agents. Hr'g Tr. 182:5-7 (Samuelson) ("Q: If Compass has exclusive listings for an agent, moving to Compass could be an appealing proposition to get access to those listings. A. I would agree with that.").

32.     Others began noticing the traction that Compass' 3-Phased Marketing was having success with agents and clients, and started rolling out competing products: ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ PX-010 at –740; *infra* ¶¶ 111-113.

33.     Within months of Compass launching 3-Phased Marketing, other brokerages began introducing similar strategies. *Id.* at 396:8–397:2 (Alexander).

34.     By April 2025, other brokerages including Sotheby's New York, Sotheby's DC, Douglas Elliman, and Corcoran had launched their own pre-marketing programs. *Id.* at 487:18–488:8 (Navab-Boshehri); DX-375.

**D.      3-Phased Marketing Was Successful Because It Benefits Consumers**

      i.      3-Phased Marketing Benefits Home Sellers

35.     Home sellers are actively demanding alternatives to the traditional "one size fits all" home marketing and selling model, Hr'g Tr. 483:1-8 (Navab-Boshehri), a reality that even Zillow's own data confirms. Zillow's research with Harris Poll reveals that 31% of sellers explicitly "prefer to have it [their home] on a private listing network," which is an off-MLS and off-Zillow strategy, instead of immediately listing their home on a real estate website like Zillow. DX-318 at 3. Agents from brokerages other than Compass have similarly commented on home sellers' demand for options, including off-MLS and off-Zillow options. *See* PX-134 at -107 (e-mail from eXp agent to CEO of eXp explaining that he disagrees with eXp supporting Zillow's Standards and outlining various scenarios showing that "it's not always in the best interest of the client to not be able to market their property without putting it on the MLS.")

36.     And that demand is resilient: even when Zillow presented those surveyed with research suggesting private networks might yield lower prices, 56% of those surveyed still preferred private listings over listing their home on a real estate website like Zillow, prioritizing control and privacy over price alone. DX-318 at 3 ("Americans are split on where they prefer their home to be listed…31% say they would prefer to have it listed on a private listing network…" and 44% of those home sellers still wanted to use a private listing network even after being presented with a study showing that their home might sell for less); Hr'g Tr. 282:6-13 (Samuelson) ("Q: That's 44 percent of the people, even after being told about Bright MLS's research, still wanted to use a private listing network; is that right? A: That is correct. . . ").

37.     In fact, it is "rarely the case" that a home seller's only goal is the highest price; sellers often prioritize specific terms, timing, or avoiding the disruption of public tours, meaning a mandate to list on-Zillow fails to meet diverse consumer needs. *Id.* at 132:4-10 (Carr).

38.     As such, 3-Phased Marketing meets that consumer demand and thus benefits home sellers by providing them with choice on how to market their property and more control over the home sale process. *Id.* at 476:10-14 (Navab-Boshehri) (explaining that 3-Phased Marketing provides home sellers with "more choice" around the home sale process).

39.     While all consumers want choice, there are many reasons home sellers choose 3-Phased Marketing, including to:

- **Ensure the Fastest, Best Home Sale.** Research shows that homes pre-marketed as Compass Private Exclusives and/or Compass Coming Soon before going active on the MLS were associated with an average 2.9% higher close price compared to those that were not pre-marketed, received an accepted offer 20% faster on average once active on the MLS, and 30% fewer listings taking a price drop once active on the MLS. PX-082 at -622.

- **Test Price**. Sellers can use the Private Exclusive and Coming Soon phases as a "focus group" to collect feedback on listing price. Hr'g Tr. 481:14–482:4 (Navab-Boshehri); 55:23-57:1 (Reffkin); 132:22–133:3 (Carr).

- **Secure Privacy:** Home sellers undergoing life transitions such as divorce, illness, or job changes, or home sellers that simply value their personal privacy may prefer to market their homes discreetly instead of through a full launch. *Id.* at 483:1–8 (Navab-Boshehri); 55:6–14 (Reffkin); 134:16-135:12 (Carr).

- **Provide Convenience:** A home seller may also simply value the convenience that a phased marketing approach can provide, such as not having to host open houses on demand or open their home for tours. *Id.* at 133:16-21 (Carr) (providing an example of a home seller client that was an elderly widower who did not want "a bunch of people

through her property" and had mobility issues that limited her ability to leave the

property).

- **Obtain Feedback:** The pre-marketing phase allows home sellers to gather feedback on

  the home's condition and make repairs before exposing the property to the broad

  market. *Id.* at 55:23–56:5 (Reffkin); 146:20-147:4 (Carr).

- **Generate Excitement and Demand:** 3-Phased Marketing allows home sellers to generate

  momentum, excitement, and demand for their listings much like a movie trailer builds

  excitement for a theatrical release. *Id.* at 55:15-22 (Reffkin); 60:18-22 (Reffkin); 413:23-

  414:16 (Alexander). Zillow itself acknowledges these benefits, *see* PX-010 at -739



. PX-020 at -457

40.    Agent Kerry Carr provided specific examples of how 3-Phased Marketing

has helped her home seller clients:

- o  **The farmhouse:** Ms. Carr used the Private Exclusive phase to assist a

     widowed client with health issues who wished to sell her farmhouse without the

     disruption of public tours. The property sold during the Private Exclusive phase to

     a client represented by a Berkshire Hathaway agent, and it ended up selling for

     more than the initial offer that they received. *Id.* at 133:16–134:11 (Carr).

- o **The townhome:** 3-Phased Marketing helped Ms. Carr sell a client's townhome for a price higher than any other townhome in the development. *Id.* at 134:18– 135:1 (Carr).

- o **The Lansdale listing:** Ms. Carr has a current listing that is in the Private Exclusive phase. The homeowners are currently building a home, and the construction will not be completed until January. The client was interested in marketing their home in the interim. Ms. Carr pitched Compass' 3-Phased Marketing as a way for the homeowners to market their current house without accruing negative insights such as days on market until the new home is built. Although Ms. Carr has not received any offers yet, her clients feel better knowing that the listing is ready to launch on the MLS when the home sellers are ready and after the new house is built. *Id.* at 135:4–20 (Carr).

- o **The colonial:** The owners of the colonial listing needed time to repair the property before listing it on the MLS. The homeowners wanted to list the property at a price that Ms. Carr felt was too high. Ms. Carr recommended using 3-Phased Marketing so the homeowners could receive feedback on pricing and complete the repairs. Ms. Carr received feedback from other agents that the price was too high, and the homeowners decided to launch the property on the MLS at a slightly lower price. *Id.* at 135:23–136:7 (Carr).

    ii.     3-Phased Marketing Benefits Home Buyers

41.     As Compass' Co-President testified, 3-Phase Marketing brings more homes to market: "[A]cross the U.S. right now we're in a tight inventory market in many places. If sellers didn't have to worry about negative insights creating this perception that there's something wrong with their home, I think if more homes could be in a private exclusive phase and still publicly

market, it would just create more inventory. More inventory only helps buyers." *Id.* at 484:16–
23 (Navab-Boshehri).

42.    The strategy also provides buyers a valuable early or first look, enabling them to
identify properties and formulate competitive offers. *Id.* at 483:23–484:15 (Navab-Boshehri) ("it
gives buyers just a little bit of time…when a home is launched and there's an open house and
there's all these other families walking through the open house, I think—and because a seller's
worried about days on market racketing up, the pressure of time is felt by both the seller and the
buyer. Buyers have to move fast, cobble together an offer, having only even spent ten minutes in
the home that they're going to live [in] and move their entire family into. And so to have the
opportunity, while it's still private exclusive, the seller is not worried about days on market. It
allows you to ask to go back to the home once or twice, spend time putting together a thoughtful
offer, thinking about what contingencies or seller concessions you may want to attach to the offer.
It allows you to sort of slow down and take your time."). And by giving buyers more time to see
homes and more time and information to make offers, the 3-Phased Marketing strategy improves
"the quality of the match between the property and the buyer's preferences." PX-208 ¶ 74 (Dr.
Aron explaining that because real estate transactions are not a "zero-sum game," a transaction
occurring at a higher price can be "better for both parties than one at a lower price if the property
is more to the liking of the buyer, just as a transaction at a lower price can be better for both
parties than transacting the same property at a higher price if the deal is consummated sooner, and
if the seller has high enough costs of waiting or costs of maintaining or showing the property in
the interim.").

43.    Uniquely, Compass' 3-Phased Marketing strategy also provides buyers with
greater transparency into off-MLS inventory: Compass.com, which is freely accessible to anyone

able to search the internet, informs buyers of the exact number of Private Exclusive and Coming Soon listings that match their search criteria and how to access them, ensuring home buyers have a complete picture of the homes for sale. *Supra* ¶¶ 11-13.

44.    Finally, the 3-Phased Marketing strategy supports the many buyers who are also sellers, allowing them to test the market to determine exactly what they can afford for their next purchase. *Id.* at 485:1–7 (Navab-Boshehri) ("If you're buying a home, you may often also be the seller of a home, and the only way you can accurately know what home you can buy or what offer you should put out there is if you have some sense of what you can probably sell your home for, which the private exclusive allows you to test the market and get that feedback, as a seller, so you know as a buyer what can you afford in the next home you're going to buy.").

        iii.    3-Phased Marketing Benefits Agents

45.    As Compass' SVP of Strategy testified, Compass has received "very positive feedback from our agents . . . that [3-Phased Marketing] was helping them grow and support their businesses." *Id.* at 394:19–395:4 (Alexander); *see also* PX-092 at -616-17 (agent email summarizing several "case studies about my experience with 3 phased marketing" and all associated benefits for her and her home seller and home buyer clients).

46.    Compass' Co-President testified that she heard from agents that they felt they were "disproportionately winning more listing pitches as a result of that strategy. They felt like they had an advantage going into the living room [to pitch home sellers]." *Id.* at 478:13-17 (Navab-Bosheri); *see also* PX-160 at -732 (April 1, 2025 email from Ms. Navab-Bosheri stressing that "Compass agents have an outsized advantage at winning listings by pitching the Compass 3-Phased Marketing Strategy, while the competition is not.")

47.    3-Phased Marketing allows agents to differentiate themselves from competitors by offering a tailored, bespoke marketing plan rather than a "one size fits all" approach. *Id.*

at 476:15–477:4 (Navab-Bosheri) ("The way agents typically launch a listing for a homeowner is one size fits all. Most homeowners know that their listing goes live one day on MLS, it appears on a bunch of websites. That's the pitch. It's pretty uniform. I would say immediately, at the outset, when we programmatized a phased marketing strategy, I heard from our agents that they felt the differentiation in the listing pitch; when they go into a living room to pitch a homeowner, to earn the right to help sell their home, they immediately felt the differentiation of something that's tailored, unique, bespoke, built off of the rapport they're building with the homeowners to learn what their goals are and to tailor a marketing plan to their specific family.").

48.     This differentiation is critical in listing pitches, where agents must demonstrate unique value to potential sellers. *Id*. at 80:1–4 (Reffkin) ("We compete on giving options to sellers[, so i]f every one of our agents could only do the one-phase marketing strategy, we would have much less competition.").

49.     Compass agents also reported that 3-Phased Marketing was a powerful tool for securing home buyer clients, not just home sellers. *Id.* 414:3-11 (Alexander) ("[W]hat I've heard from agents is that they actually think they're winning buyers as well…Buyers love getting a first look, right? They want to see things as soon as they're going to be available for sale, and they want to be well positioned, if it's a home they really think they want to buy, to make the best offer. And so I think that this strategy is actually also helping our agents win business on the buy side.").

50.     The 3-Phased Marketing also drives more traffic to Compass.com, which in turn generates more leads for Compass agents, *infra* ¶¶ 65-85, *see also* Hr'g Tr. 145:19-25 (Carr) (testifying that she has been able to close two transactions that came from Compass.com leads in the past two years), which in turn drives more repeat and referral business. *Infra* ¶ 160

**E.      3-Phased Marketing Was A Critical Driver For Compass' Home Search Portal, Compass.com**

  i.      Online Home Search Websites Generally

51.      Online home search platforms allow consumers to search for properties using criteria such as location, price, and features when viewing available listings in an area. Hr'g Tr. 50:10-14 (Reffkin); 160:9-22 (Samuelson); Hr'g Tr. 685:15-19 (Wu) (testifying that "Dr. Aron's market comprised of online home search platforms [is] a reasonable starting point [for product market definition").

52.      Some brokerages, like Compass, Redfin, and eXp Realty, LLC ("eXp"), have home search websites. *Id.* at 160:9-19 (Samuelson).

53.      Zillow and other major home search platforms do not charge consumers to use their search platforms. *Id.* at 523:11-16 (Aron); 220:19-21 (Samuelson). Instead, these platforms monetize user traffic in other ways, such as selling advertising or selling leads to real estate agents. *Id.* at 50:15-19 (Reffkin); *Id.* at 160:23-25 (Samuelson); 161:25-162:5 (Samuelson).

54.      These online search websites compete with each other to attract visitors on features and user experience, such as "saved search" features that many portals have which automatically notify users of new properties that meet their search criteria. *Id.* at 64:11-20 (Reffkin) (describing capability to set up "saved search" so recipient is "automatically pinged" with new relevant and responsive listings); *Id.* at 629:5-9 (Wu) (explaining that portals compete "by giving better user experience").

55.      Online home search platforms offer consumers the same home search functionality at the same price (i.e., free) across the entire country. *Id.* at 527:20-529:10 (Aron). Consumers often search on multiple platforms. Hr'g Tr. 229:8-25 (Samuelson) (testifying that online home searches typically search multiple home search platforms at the same time); Hr'g Tr. 702:6-703:6

(Wu) (testifying that users regularly shop on multiple websites at once, and that it is easy for users online to switch between websites). Dr. Wu conceded that users' "switching costs"—*i.e.*, the time or effort it takes for users to switch between websites—are low, *id.* at 703:6-11 (Wu), meaning there is no real cost to users having to look at multiple places to see properties.

56.     Users can access online home search platforms' websites anywhere in the United States, and the platforms offer a uniform search experience regardless of the user's location. *Id.* at 204:10-19 (Samuelson); 528:7-11 (Aron); *see also* DX483 (a Zillow study on "where home shoppers from around the country are searching for homes" shows that for individuals searching for homes in Seattle, Washington, around 36% of those individuals were searching from locations outside Seattle); PX-077 (showing for Sacramento, California, over 50% of users searching for homes in that area were searching from locations outside Sacramento.").

57.     Moreover, home search platforms have a feature where consumers can compare listings in different geographic areas across the country. *Id.* at 530:12-20 (Aron) ("And in addition, the evidence I've seen is that people use the features of the platform that are explicitly created to allow users to compare different geographic areas.")

58.     Zillow and its competitors engage in national planning and strategy. Hr'g Tr. 528:7-20 (Aron).

59.     The largest online search portals are all national with national websites. PX-208 at ¶ 159. For example, Homes.com, Realtor.com, and Redfin.com have similar national coverage as Zillow. *Id. See also* Kelman Dep. Tr. 244:11-14 (agreeing that "Redfin competes at a nationwide [level] for home search").

60.     Zillow also tracks and reports its traffic metrics on a national level. Zillow's internal documents consistently analyze competitive dynamics nationally, benchmark Zillow's

performance against national competitors, and rely on exclusively national audience share data. Hr'g Tr. at 528:21-24 (Aron) (Zillow and its competitors measure the "market share of their platform[s]" on a "nationwide basis"); *see also* PX-182 at 6-7 (measuring traffic and user engagement across Zillow, including its "U.S. real estate app").

61.    The CEO of Zillow similarly acknowledged during his deposition ██████████

███████████████████████████████████████████████████████████

████████████ Wacksman Dep. Tr. 12:13-16; 7:4-17.

62.    Zillow's Standards are a national strategy, and Zillow intends to apply the policy on a national basis. PX-024 at -172 (listing "[c]ommitment on [l]isting [t]ransparency / [a]ccess" as table stakes for a proposed deal that apply "[n]ationally"); *see also id.* at 529:1-10 (Aron) ("They are intended to be national, they are implemented nationally . . . ."); 690:7-10 (Wu) ("Q. They didn't offer any local or regional distinctions in announcing those standards on April 10th; is that right? A. My understanding is that the Zillow standards would apply nationally.").

63.    In fact, the Zillow's Standards FAQs—in the Zillow's Standards FAQs, Zillow specifically states that the policy is to apply regardless of local MLS rules. PX-112 at -181.

64.    Compass already has a presence in most major cities, receives over 300 MLS feeds for its search platform, and "effectively has nationwide MLS coverage" for its platform. PX-005 at -125-126 (explaining that Compass is therefore "competitive with other national real estate apps"). Moreover, Compass wants to and is continuing to further build out its capabilities for home search nationally. PX-085 at -639-640 (Compass executives discussing the buildout of national capabilities and the importance of having agents be able to see Phase 1 listings outside of their particular geographic market).

   ii.  Compass.com Competes in Online Home Search by Offering Unique
      Inventory Powered by 3-Phased Marketing

65. As Compass' SVP of Strategy testified, "the 3-[P]hase[d] marketing strategy has immediate benefits for sellers, agents, and even buyers, but—the fact that it creates these unique listings on our website is really the core differentiating part of our strategy on [C]ompass.com. . . ." Hr'g Tr. 400:15-21 (Alexander).

66. Zillow recognizes that Compass competes in the online home search market against Zillow and other portals. *See, e.g.*, PX-005 at -125 ("Compass is a full-service brokerage, and its consumer-facing search platform aggregates listing data from all the MLS markets where Compass operates. Buyers using Compass' website or mobile app can search the active MLS inventory similar to any major portal."); *Id.* at -126 ("Essentially, Compass['] app is competitive with other national real estate apps, blending search and CRM-like collaboration features in one."); PX-014 at -728 (Zillow identifying its "competition" as Homes.com and Compass).

67. 3-Phased Marketing generates unique listing inventory for Compass, which serves as a core competitive differentiator for the Compass.com home search platform. Hr'g Tr. at 398:14–24 (Alexander) (stating that "[t]hese marketing strategies are a core part of our home search strategy . . . [and] create a competitive advantage for us in our home search platform."); *Id.* at 400:15-21 (Alexander) (explaining that Compass' investments in 3-Phased Marketing was "core and foundational to our home search platform strategy and plan"); 610:10–21 (Bhonsle) (noting that 3-Phased Marketing provides Compass with "differentiated inventory on the website").

68. In a Board presentation from August 2024, Compass noted that because "[d]ifferentiated marketing programs (e.g. Private Exclusives) attract more sellers to list with Compass . . . [and] create exclusive inventory. Access to exclusive inventory enables Compass to

become '**the platform**' that buyers and buyers' agents want to use to find [and] purchase a home. More buyer traffic attracts more sellers and sellers' agents, powering the inventory flywheel." PX-209 at -868 (emphasis added); *see also* PX-088 at -169 (explaining that investors also recognized "the combination of the Compass 3-Phased Marketing Strategy + our Platform + Inventory Depth as a way for us to expand our opportunity set (beyond just brokerage) longer-term.").

**Figure 3: The Compass Flywheel**



DX175 at –358.

69.    In fact, anticipating Compass' own strategy and internal documents, Zillow's executives warned that "Brokerages don't need to take the majority of listings private: Once brokerages can claim (even a small number of) exclusive listings, they start a flywheel . . ." PX-002 at -165.

70.    With unique listings that are only on Compass.com, Compass creates *differentiated supply* (listings) that sets it apart from other home search competitors like Zillow that rely on *undifferentiated* MLS feeds for their listing data. Hr'g Tr. at 398:14–24 (Alexander) ("These marketing strategies are a core part of our home search strategy. The

benefit to the sellers is related to listing, but another sort of consequence of sellers choosing to market their homes this way is that it creates unique listings on Compass.com. Those unique listings create a competitive advantage for us in our home search platform. It becomes a reason, a draw, something that buyers want to see, and we believe that it would increase the users on our platform, and we had started to see that happening."); 610:15-18 (Bhonsle) ("[I]t's an opportunity to have differentiated inventory on the website, where we can attract buyers to the website, and those leads can then be, you know—we can provide those leads to our agents."); *Id.* at 375:18-25 (Hofmann) (explaining that Zillow does not differentiate itself from competitors based on its listings because "[w]e get listings via IDX feeds, and those listings are freely shareable across a multitude of participants.").

71.     Later strategy documents began incorporating the idea that "[p]hased marketing programs" would be the tool that would generate the exclusive inventory that would in turn drive the flywheel. PX-209 at -861.

72.     In that same Compass presentation, executives said that its inventory strategy "will create differentiation, attracting traffic to Compass.com and creating a pathway to regain control of our listings, and to compete with well-funded aggregators" and they discussed how to use Compass.com-only listings to "drive[] traffic to Compass.com." PX-209 at -859, -861.

73.     Compass' CEO explained that "If Compass is able to say that we have listings that Zillow doesn't have, then people would search Compass." Hr'g Tr. 79:25-80:6; 91:1-3 (Reffkin).

74.     In fact, one agent explicitly drew the connection between the 3-Phased Marketing and "increasing the online traffic to Compass.com" and the Compass lead program. PX-096 at -582.

75.    3-Phased Marketing also provides Compass.com with unquantifiable upside by allowing Compass to leverage its key asset—its inventory. *Id.* at 550:10-15 (Aron) ("So it's about allowing product differentiation . . . which is valuable to consumers in the marketplace and which is ubiquitous in real markets, rather than assuming that a marketplace in which everyone has all the listings is a superior market structure.").

76.    Indeed, Compass had planned a large billboard campaign capitalizing on 3-Phased Marketing to brand itself as having exclusive inventory on Compass.com.

**Figure 4: Compass' Planned Billboard**



DX-098 at -963.

77.    Moreover, the "Black Box" feature on Compass.com also serves as a competitive differentiator for Compass in online home search. This feature not only provides transparency to consumers about the existence of Private Exclusives (additional homes for sale) and how to access those available listings, but it also serves a commercial purpose of driving website engagement and consumer leads to Compass.com for Compass agents. *Id.* at 409:13–410:13 (Alexander) (explaining that Compass "think[s] it's important that any buyer has visibility and

access to know that these listings exist and to be able to see those listings" and the Black Box feature serves a commercial purpose because it can drive buyers "to call Compass, walk into an office and say, I saw that there are four listings that match my search criteria, can you please introduce me to the listing agent that is representing that seller.").

78.     In short, 3-Phased Marketing and the Black Box "create differentiation, attracting traffic to Compass.com and creating a pathway to regain control of our listings, and to compete with well-funded aggregators" such as Zillow. PX-209 at -859.

79.     As the 3-Phased Marketing was scaling up, the flywheel was working and Compass.com was growing: it "attracted over 21 million visits between January and March 2025" and that "[a]s a core part of our Compass 3-Phased Marketing Strategy, this visibility helps sellers create early demand, test pricing, and protect their privacy, without the risks of public days on market or visible price reductions." PX-118 at -839.

80.     Between November 2024 and April 2025, unique monthly active users on Compass.com increased steadily, reaching a peak of over 7 million unique users in April 2025. *Id.* at 399:14–22 (Alexander); *see also* DX664 (internal Compass e-mail discussing traffic to Compass.com and stating that while Compass would not "beat a portal" in a "straight 1:1 fight on numbers," Compass could still compete because "we only need the right users that facilitate 4-5M transactions per year").

81.     3-Phased Marketing also drove more user engagement on Compass.com; users were more engaged with Compass' unique listings on Compass.com compared to non-unique listings on Compass.com (e.g., listings active on the MLS). The number of unique users on Compass.com viewing Compass Coming Soon listing pages increased by 127.9% year over year from 471K to 1.07M from March 2024 to March 2025 (which is significant compared to an

18.2% year over year increase over the same time period for listing on Compass.com that were active on the MLS and not unique to Compass.com). PX-105 at -095.

82.    Additionally, Compass.com generates leads whereby potential clients searching on Compass.com can be connected with a Compass agent, thus again driving more business to Compass' brokerage operations. *Id.* at 412:12-22 (Alexander) ("[L]eads come off [the] platform. Every time that a buyer who isn't already working with an agent sees a listing and wants to go tour it or just is perusing the website and wants to be connected with an agent, that creates an online lead or an online referral that then we can give back to agents within the Compass brokerage. That's helping them grow their business. That's one more buy side transaction that they wouldn't have otherwise had.").

83.    3-Phased Marketing and the growth of Compass.com led to a "100% year-over-year increase in Compass.com leads in Q1 2025." PX-082 at -623.

84.    On-page lead conversion (e.g., users completing an online 'form' to be connected with a Compass agent on a Compass.com listing page) for Compass Coming Soons and Private Exclusives increased from an average of 0.9% to 5% from March 2024 to March 2025, which is significant compared to an average conversion rate improvement from 1.3% to 1.7% over the same time period for listings on Compass.com that were active on the MLS and not unique to Compass.com. DX-089 at -116.

85.    The growth of Compass.com as an online home search platform also has increased and will further increase Compass' brand awareness, which will in turn drive more clients to hire Compass agents. *Id.* at 412:1-11 (Alexander) ("As more users are on Compass, as they associate sort of the unique, high-quality listings with their experience with Compass, that builds brand equity over time. That creates a positive feeling, I believe. It could create a positive feeling

amongst consumers towards Compass. It makes them more likely to use the Compass website again. But it also means they enter into a listing presentation pitch with a Compass agent with a certain feeling towards that brand. And so… [there's a] brand equity component of building our home search platform.").

## II.     WHEN CHALLENGED BY 3-PHASED MARKETING AND COMPASS.COM, ZILLOW ADOPTS ITS "STANDARDS" TO CONSTRAIN COMPASS, CONTROL THE FUTURE OF THE ONLINE HOME SEARCH, AND DIRECT HOW THE REAL ESTATE INDUSTRY WILL WORK

86.     Zillow owns and operates the largest residential home search website in the United States. *Id.* at 536:19–537:4 (Aron) (discussing metrics showing that "of all the people that looked at an online home search platform," "66[%] of them looked at Zillow"); PX-182 at 3 (February 2025 Zillow Investor Presentation) ("'Zillow' is searched more than the term 'real estate'[] with 4x the daily active app users of nearest competitor"). *See also* PX-165 at 3, 5 (Zillow 2024 Form 10-K) (acknowledging that it is "the most visited real estate website in the United States [with] Hundreds of millions of people visit[ing] our mobile applications and websites every month").

87.     Zillow's customers include "agent customers" and "consumer customers." Hr'g Tr. 167:19-22 (Samuelson); PX-165 at 7 (Zillow 2024 10-K) (Zillow identifies its customers as "renters, buyers, sellers, and real estate professionals," not other websites).

88.     Zillow monetizes these listings primarily by selling advertising and by selling leads to real estate agents. *Id.* at 160:23-25 (Samuelson) (acknowledging that Zillow sells advertising); 161:25-162:5 (Samuelson) ("[A]gents pay to advertise in a particular local zip code and then they are put in the rotation to be connected with consumers who would click on one of those buttons."); 50:16–51:13 (Reffkin) (explaining that there are three ways for online home search portals to make money, "[o]ne, by selling leads to agents. Two, by selling advertising, and then three buy transacting on homes, by doing the actual transaction," and that "Zillow's model is

the selling leads model"); PX-165 at 40-41 (Zillow 2024 Form 10-K) ("Premier Agent revenue is generated by the sale of advertising services, as well as marketing and technology products and services. . ."); Hr'g Tr. 685:20-686:1 (Wu) (explaining that Zillow is not an actual transaction platform, and property cannot be bought or sold on Zillow) .

89.    When a consumer selects the "contact agent" or "schedule a tour" button when viewing a listing on Zillow, Zillow connects that consumer with an agent who pays Zillow for that connection. *Id.* at 50:20-51:2 (Reffkin) ("Zillow's model is the selling leads model. The primary way they make money is when people click "contact agent" or "schedule tour," it gets sent to a third-party agent where Zillow charges thousands of dollars."); 161:15-162:5 (Samuelson) (explaining that Zillow profits "indirectly" when a consumer clicks a "call[] to action on the Zillow site includ[ing] taking a tour or reaching out to an agent."). As Compass' CEO explained, "that button is the most expensive click in real estate and the buyer doesn't know. You push the button and thousands of dollars is the result." Hr'g Tr. 50:25-51:2 (Reffkin).

### A.    NAR Provided More Options To Home Sellers

90.    In late 2024, Zillow grew concerned that NAR, which adopts policies for most of the multiple listing services in the United States, would provide home sellers with more options to market their properties by loosening restrictions on public marketing under its Clear Cooperation Policy ("CCP"). *Id.* at 52:12-21 (Reffkin) (explaining what NAR does); 177:19-22 (Samuelson) ("Q: Do you recall that Zillow developed tactics to address the CCP change? A. We certainly were considering various tactics at this time in December [2024].").

91.    Zillow lobbied NAR to stop this from happening. *Id.* at 172:13–173:11 (Samuelson) (explaining Zillow was urging NAR "to keep [CCP] and, to your point, in fact strengthen it."); PX-119 at -417 (letter from Zillow's Chief Industry Development Officer to NAR "writing to urge NAR to uphold the mandatory [CCP].").

92.     Zillow viewed off-MLS marketing options as a significant threat to its business model because it could lead to a proliferation of what Zillow describes as "private listing networks (PLNs)." Hr'g Tr. 175:11–19 (Samuelson) ("Q. Zillow understood that Compass' PLN and "Coming Soon" approach could impact Zillow and that Zillow needed to act, right? A. Yeah, Zillow and the whole marketplace.").

93.     Under Zillow's terminology, PLNs are where a brokerage markets listings to consumers but does not send the listing to the MLS for public distribution. *Id.* at 170:3–171:9 (Samuelson).

94.     The spread of PLNs threatened Zillow's online home search monopoly because Zillow does not have its own listings and instead relies on the MLSs for virtually all of its listing data. *Id.* at 185:11-15 (Samuelson) ("Q. Now if the listings throughout the real estate industry fragmented, that would be a problem for Zillow, right, because they wouldn't have access? A. I think it would be a problem for the industry in general, including Zillow.")

95.     Zillow recognized that listings are the "lifeblood of the company," stating: "No listings, no eyeballs, no sales." *Id.* at 165:14–166:5 (Samuelson); PX-017 at -232.

96.     It is important to Zillow to have "as many listings as possible." Hr'g Tr. 167:1–2 (Samuelson).

97.     Compass' ability to leverage its inventory as a competitive advantage in the online home search market was well-known and openly discussed internally at Zillow: in a "Competitive Teardown" of Compass' search tools and search capabilities, Zillow stated that "Compass One [a branded tool that includes home search for consumers] might pose the greatest risk to Zillow's [Agent Software and Advertising] platform if the following scenario plays out: . . . Compass convinces a substantial percentage of their sellers to list through the 3-phased marketing

strategy . . . Hence a meaningful portion of Compass' listing[s] start on the private listing network (PLN)." PX-004 at -328, -331.

98.    Zillow also noted that buyers can use Compass to "easily review their home search collection, view their home tour, review personalized market analyses, and access Compass-exclusive inventory" and specifically identified Compass' "powerful pre-marketing tools like Compass' 3-Phased Marketing Strategy." *Id.* at -328.

99.    Indeed, the Zillow competitive intelligence team tasked with the analysis highlighted that buyers could "access listings from a personalized dashboard, including properties that are only on Compass.com" as one of the "value proposition[s] for buyers" of using Compass and Compass.com. *Id.*; *see also* PX-005 at -125 ("In addition, Compass offers 'Compass Exclusives' (formerly called Private Exclusives and Coming Soons) . . . This gives Compass clients a potentially broader set of properties (including those not yet on the public MLS).").

100.    Zillow's CEO even acknowledged the competitive threat that Compass.com and its unique inventory posed to Zillow. PX-010 at -753 █████████████████████████████████ ███████████████████████████████████████████████████).

101.    If home sellers are choosing to market their homes off-MLS and off-Zillow, more consumers will be drawn to visit brokerages' websites with this unique inventory instead of Zillow. *Id.* at 242:14-23 (Samuelson) ("Because we felt that you would see more and more brokers, particularly large brokers, taking listings off the MLS; putting them into their own private listing networks. That means that we and other platforms would not receive the listings, and we're an advertising platform. So with listings, we attract fewer, you know, a smaller audience, fewer buyers. With fewer buyers, we can't charge as much for advertising, and we can't fulfill our brand mission.")

102.     This exclusive, unique inventory thus enables brokerages to compete with Zillow in the online home search market, because consumers will be incentivized to visit brokerages' websites more often or in the first instance to view their exclusive inventory. *Id.* at 398:20-24 (Alexander) (explaining that "unique listings" create "a reason, a draw, something that buyers want to see" which in turn increases traffic to a brokerages' home search website).

103.     If Zillow lost access to listings, this would impact its bottom line. *Id.* 166:6-12 (Samuelson) ("Q. And losses of listings would affect Zillow's bottom line, right? A. Correct, in the sense that if you're a buyer, you come to the site, the site's missing inventory, you're going to lose trust in the site, you'll probably go to one of our competitor sites. Because we have an advertising-based business, smaller audience, less ability to sell advertising."); *see also* PX-017 at -232 ("But it's not even a case of 'no-listings'; even a degradation of our listing content will reduce leads and [paid advertising] revenues.").

104.     As Zillow's CEO acknowledged, Zillow does not differentiate itself from competitors based on its listings because "[w]e get listings via IDX feeds, and those listings are freely shareable across a multitude of participants." *Id.* at 375:18-25 (Wacksman). In fact, Compass' SVP of Strategy testified that during a meeting with Zillow executives, they told her that Zillow "like[s] undifferentiated supply because they already have all the buyers, they have differentiated demand, and so undifferentiated supply helps them maintain their user base." *Id.* at 411:7-11 (Alexander).

105.     Because Zillow does not compete based on unique listing inventory, Zillow instead has chosen to compete on user experience (e.g., features and functionality). Hr'g Tr. 338:20-22 (Wacksman) ("When the listings are commoditized we all have to compete on the user experience and on the brand and on the audience."); *Id.* at 167:25-168:4 (Samuelson) ("Q. Zillow's

executives prefer to compete on features and functionality rather than on scarcity of listings; isn't that right? A. I'm not sure if you're reading from the deposition, but the concept is right, yeah.").

106.    Zillow knew that competition in online home search based on unique inventory would spell disaster for Zillow: the "effect of this on Zillow will be erosion of traffic, and eventually revenue." *Id.*

**B.    Zillow Intentionally Blocked The New Home Seller Options And Any Online Home Search Website From Having Unique Inventory**

107.    On March 25, 2025, NAR adopted a new policy titled "Multiple Listing Options for Sellers." *Id.* at 59:2–5 (Reffkin); 244:2-18 (Samuelson).

108.    In its press release announcing the change, NAR explained that the policy change would "provide sellers and their agents more options and choice when marketing a property." PX-169 at 1.

109.    In an internal document dated in December 2024 preparing for the NAR announcement, Zillow "want[ed] to be more aggressive with hardline tactics to keep ALL listings in IDX, on Zillow," including "offer[ing] carrots (i.e. 'good data' fund, access to ZG products/data services, in-market advertising, etc) to brokers and MLSs that maintain [the NAR policy limiting home seller options]" and using a "stick" on uncooperative brokerages including, for example, suppressing listings, throttling data quality for those brokerages' listings on Zillow, removing listings, and suppressing the delivery of leads to brokerages' agents. PX-002 at -168-69, -187; *see also* PX-021 at -747 (describing its carrots and sticks strategy).

110.    Zillow first deployed its "carrots" strategy in early 2025 when it began to negotiate with major brokerages to ensure they would not offer home sellers options to market properties off-MLS and for direct feeds of their listings. *See* Hr'g Tr. 251:18-252:13 (Samuelson). Zillow was successful in entering into agreements with at least three brokerages. *Id.*



PX-020; Hr'g Tr. 420:4-421:25 (Samuelson).

*Id.* at 423:7-14 (Samuelson).

*Id.* at 424:15-425:2 (Samuelson).

PX-010 at – 739.

*Id.* at –741.

*Id.*

Hr'g Tr. 428:19-429:6 (Samuelson).

114.    Zillow approached brokerages with offers of favorable commercial terms, such as discounts on its paid advertising products or increased visibility for their listings, on the condition that those brokerages refrain from adopting off-MLS strategies and ensuring that Zillow had access to their full listing inventory. PX-021 at -747; Hr'g Tr. 302:4-17, 303:5-14 (Wacksman).

115.    Zillow also attempted to push its pro-CCP agenda via "communications [and] research report studies the entire year" to the market. Hr'g Tr. 189:10-21 (Samuelson). Zillow's Chief Industry Development Officer admitted those efforts were not "having an impact." *Id.*

116.    When the carrots and PR strategy did not work, on April 10, Zillow announced its Standards as part of its "stick" strategy. *Id.* at 181:5-13 (Samuelson).

117.    The announcement stated if "a listing is publicly marketed to consumers . . . it must be submitted to a Multiple Listing Service (MLS) within one business day and published on Zillow and other sites that receive listing feeds." PX-143 at 1.

118.    Zillow acknowledged that such a hardline plan "assumes we can be successful at using a hammer to keep sellers and agents on our site." PX-002 at -187.

119.    The announcement also noted that the standards would not apply to several categories of listings. Zillow currently does not punish many types of listings that are initially marketed publicly off-MLS and off-Zillow, often for much longer than the first two phases of 3-Phased Marketing: (1) Zillow does not ban listings where the home seller fired both the brokerage and agent who did the off-Zillow marketing; (2) Zillow does not ban builder listings that did off-Zillow marketing; (3) Zillow does not ban listings that are marketed only privately; (4) Zillow does not ban for sale by owner listings that did off-Zillow marketing; and (5) Zillow does not ban listings by agents who have received less than 3 warnings from Zillow for off-Zillow marketing. PX-206 (September 2025 Zillow web post regarding the Zillow standards and explaining categories of listings that are exempt from standards and how standards are enforced).

120.    The consequence of non-compliance is the listing being banned from Zillow. PX-143 at 1 ("Listings that don't meet these standards won't be published on Zillow or Trulia for the life of the listing agreement between that listing broker and seller.").

121.    Zillow implemented a two-strike warning system: agents receive notices for the first two violations, and upon a third violation, the listing is blocked from appearing on Zillow. *Id.* at 2.

122.    Zillow did not begin enforcing its Standards until June 30. *Id.*

123.    Zillow executives explained that they adopted the standards "to create a deterrence" and "cause agents to think twice about steering sellers into keeping their listings off the market[.]" Hr'g Tr. 189:4-17; Hr'g Tr. 186:9-15 (Samuelson).

124.    Zillow's CFO expressed his desire to "stomp" out private listing networks that he expected to "start popping up everywhere very quickly" due to Compass' 3-Phased Marketing. PX-028 at -971.

125.    One Zillow executive reported that Zillow's Co-founder, Co-Executive Chairman and President, Lloyd Frink, "wants us to try and *maintain/force the status quo*. i.e. listings continuing to go into the MLS and being distributed to all brokers. . . ." PX-002 at -159 (emphasis added).

126.    When commenting on other brokerages' decision to launch pre-marketing programs to compete with Compass, Zillow executives warned that Zillow "can't have these launches look like what Compass is trying to get away with," and that Zillow "can't have them launch something that is *showcased to consumers*." PX-016 at -303 (emphasis added).

127.    In fact, Zillow explicitly stated they wanted to "punish the agent for choosing to put their listings on alternate networks," "want[ed] agents to leave these offending brokerages" and a "[d]esired [o]utcome[]" would be that "seller[s] switch agents" and "get agents to switch brokerages" PX-002 at -184-86; *see also* PX-013 at -811 ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████ ; *see also* PX-136 at -198 ██████████████████

██████████████████████████████████████████████████████

128.     Zillow's executives even hoped that just announcing Zillow's Standards would "stomp" out off-MLS marketing and have a "chilling effect" among brokerages who might offer tailored marketing to home sellers: "here are my concerns . . . these pln's are going to start popping up everywhere very quickly[,] they are only popping up bc of compass[,] we have to say we are going to stomp that out[,] we probably need to say publicly what the policy is going to be to send a chilling effect. . . ." PX-028 at -971; *see also* PX-029 at 029-30 (explaining that the urgency to announce Zillow's Standards was to "get ahead of competitors—particularly to deter moves like Corcoran's and stop additional PLN announcements.").

129.     Zillow executive wrote: "Almost daily we see another PLN. We need to give people pause." PX-013 at -810.

130.     Zillow stated, "Goals: . . . Deter other brokerages from creating their own Private Listing Networks (PLNs) . . . Encourage MLSs to uphold NAR rules." PX-029 at -032.

131.     Similarly, Dr. Wu conceded that the entire purpose and function of Zillow's Standards is to force brokerages to put listings into the MLS, thus forcing brokerages to work with everyone on the same terms and at the same time regardless of what happens on Zillow's platform. Hr'g Tr. 708:13-709:1 (Wu) (explaining that the listing standards require a brokerage to send listings to the MLS, "because Zillow gets its feeds from the MLS, which in turn means that listings go to every other brokerage that has a membership in that MLS."); *see also id.* at 546:18 (Aron) ("So in the case of 3-phased marketing plan, all of the platforms have the listing at the same time, except Compass will have it sooner. So there's no major competitive disadvantage to Zillow vis-a-vis the major platforms that it claims to be its competitors.").

C.    **Zillow Also Intentionally Sowed Confusion To Stop Off-Zillow Public Marketing**

132.    The April 10th announcement intentionally contained minimal details about what conduct constituted "public marketing" and would be considered a violation of the standards. *Id.*

133.    Instead, Zillow sought to "drop[] big news without the T&Cs [terms and conditions]" as a deliberate tactic to create uncertainty and "deter others from going down the PLN path." PX-029 at -032.

134.    Zillow's vague and ambiguous announcement indeed created uncertainty and confusion in the market. Hr'g Tr. 76:2-3 (Reffkin) (explaining that Zillow did not "give us the details until months later" after the April 10th press release).

135.    Ms. Carr testified that there was "a lot of confusion at Compass," *id.* at 137:4-9 (Carr), and Compass' Co-President added that "there was a lot of chaos and confusion created in [Zillow's] initial communications." *Id.* 480:2-3 (Navab-Boshehri).

136.    Compass' SVP of Strategy echoed this sentiment, explaining that Zillow's April 10th announcement "was a very high-level press release that spoke in very generalized terms about what Zillow intended to do, so immediately after that announcement, there was a lot of confusion and uncertainty, both within Compass . . . [and] in the marketplace in general." *Id.* 401:6-12 (Alexander).

137.    Zillow's "continuous drip of new information and clarifications" was a "confusing environment" for Compass and other brokerages to operate in. Hr'g Tr. 406:6-8 (Alexander).

138.    Ms. Carr acknowledged that even as of October, she was "still confused about how [Zillow's Standards] works." *Id.* at 157:11-14 (Carr).

139.    After the April 10th announcement, Zillow slowly released additional details regarding its standards, including issuing a "Frequently Asked Questions" document on May 20,

2025. *See generally* PX-113. That document outlined certain details about Zillow's plan to roll out its Standards and additional details about the types of marketing that would not be allowed, including social media posting, yard signs, open houses, or display on a broker's website. *Id.* at -191-92.

140.    Mr. Samuelson testified that Zillow issued these FAQs given the "questions that had been coming in" from industry participants. Hr'g Tr. 246:7-12 (Samuelson).

141.    Zillow has continued to drip information about its Standards as recently as September 24, 2025. *See generally* PX-206.

142.    Compass has had to spend significant resources and divert focus to explaining to agents what Zillow's Standards entail, what agents can and cannot do under Zillow's Standards, and reframing Compass' strategies. Hr'g Tr. 87:11-16 (Reffkin) (explaining that Compass has had to work differently to implement its 3-Phased Marketing strategies and other marketing strategies, including needing to overcommunicate with Compass agents); *Id.* at 480:14-22 (Alexander) ("I would say we diverted a lot of resources to educate our agents nationally; we created a lot of new training materials and content to support national training programs; and then all of our local offices had to create new content local to their markets, had to divert sales meeting agendas, business coaching one-on-ones with agents in order to help educate and cut through the confusion created by the ban.").

143.    And it was not just Compass; the entire market was confused as to exactly how Zillow's Standards were going to be enforced and applied. *See Id.* at 320:19-321:12 (Wacksman) (describing a call that Zillow's CEO had with the CEO of Redfin regarding confusion over when a direct listings feed could be provided to Zillow under Zillow's Standards); *id.* at 403:22-406:9

(Alexander) (explaining how Zillow's Standards rules seemed to continually be changing and that there was a "continuous drip of new information and clarifications").

**D.    Zillow Tried To Buy Off Compass In Exchange For Reducing Home Seller Options And Competition, And When Compass Refused, Zillow Targeted Compass**

144.    Zillow was concerned about the rising threat posed by Compass specifically. *Id.* at 174:14-175:19 (Samuelson) ("Q. Zillow understood that Compass' PLN and "Coming Soon" approach could impact Zillow and that Zillow needed to act, right? A. Yeah, Zillow and the whole marketplace, but yes."). Leading up to Zillow's announcement of its standards, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ PX-044 at -577. ██████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ PX-041 at -358.

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ PX-047 at -152. ████████████████

███████████████████████████████████████████████████

█████████████████ *Id.* at -154.

145.    Indeed, roughly a month before the Standards were announced, a Zillow executive pushed to expedite Zillow's plan and execute agreements with brokerages to fall in line with the upcoming standards, warning that "Compass is getting more emboldened by the week." PX-039 at -426.

146.    Zillow also attempted to negotiate a partnership with Compass. Zillow's partnership was conditioned on Compass abandoning its unique inventory strategy for Compass.com and complying with the Zillow Standards. Hr'g Tr. 377:2-10 (Hofmann) ("Q. You understood that any partnership with Compass would require Compass to adhere to Zillow's standards, right? A. Yes. Q. And that included to remove Compass' black box from Compass.com? A. Yes.")

147.    A Zillow executive explained that Compass "has to clearly understand they [Compass] have to abort the entire 'we have stuff come see it' or there is no deal." PX-012 at -716.

148.     In meetings with Compass in April 2025, Zillow offered various terms for the potential partnership, including a variety of product offerings and benefits that Zillow predicted would result in Compass earning an additional $1.3 to $1.6 billion annually and doubling Compass' market share. PX-062; Hr'g Tr. 377:11-378:4.

149.    Zillow also offered Compass the opportunity to double-end more transactions. *Id.* at 378:8-15 (Hofmann). During these negotiations, Zillow asserted that the "Black Box" on Compass.com potentially violated its standards and would need to be removed or altered. *Id.* at 405:9-24 (Alexander).

150.    Compass rejected Zillow's offer and demands. *Id.* at 378:16-22 (Hofmann).

151.    Zillow focused on Compass to send a message to the entire market, protect CCP, and stop the proliferation of competitive strategies that threatened its monopoly. PX-001 at -116 (discussing the proliferation of "Coming Soon" listings "starting with Compass but with a contagion effect across all other large brokerages"); PX-002 at -165 (discussing that "CCP was

implemented only five years ago" but "Compass is agitating, and has a clear plan of attack for a post-CCP market").

152.    Zillow specifically targeted Compass with its Standards. PX-028 at -971 (internal Zillow texts stating that off-Zillow marketing systems were "only popping up bc [sic] of compass"); PX-010 at -753 (April 8, 2025 email from Zillow's CEO stating that ███████████ ████████████████████████████████████████

153.    Zillow also strategized ways that it could help "[f]riends" to compete with Compass, including by giving those "friends" Zillow tools while denying Compass those same tools. PX-021 at -747. Zillow executives testified that making sure "friends" would feel supported was indeed the intent behind Zillow's Standards. Hr'g Tr. 302:24-303:21 (Wacksman), 386:20–25 (Hofmann).

154.    Zillow thus sought to stop online home search competition by "draw[ing] a clear line between 'on internet' vs. 'off internet' such that Compass (or other bad actors) can't become IDX+ [an alternative to Zillow], and . . . isolate Compass and any other bad actors that emerge." PX-021 at -747.

155.    As Zillow's CFO testified, "Q. And Zillow was concerned that brokerages around the country would decide to follow Compass' three-phase model, is that right? A. We were concerned . . . That other brokerages . . . would follow suit on competitive grounds, and ultimately create a contagion of these types of private listing networks[.]" Hr'g Tr. 370:25-71:5-13 (Hofmann).

156.    As of November 14, 2025, Zillow has issued 1,202 listing violation notices. 1,137 notices (95%) have been issued to Compass agents. Zillow has also banned 48 listings from its platform due to violations of Zillow's Standards. DX-662.

157.    All but five of those banned listings are with a Compass agent. *Id.*

158.    Ms. Carr testified that if Zillow's Standards were to continue to be in force, she already knows specific listings where she will likely need to fire herself as an agent so that her sellers can relist with another brokerage and be able to list the property on Zillow. Hr'g Tr. 137:10–20 (Carr) (describing the Landsdale property as one such listing), 139:2–17 (Carr) (testifying that, because part of her fiduciary duty is "to make sure that none of [her] clients are hurt. . . by the fact that they don't have Zillow buyers eyes on" their listings, she came up with a plan in the case of a listing being banned to "fire myself as their agent and get an agent in another brokerage to market their home so they're not hurt.").

159.    And there would be an exponential loss from being fired or losing on a listing because the agent could not offer marketing options: as real estate professional Kerry Carr testified, "[f]rom one listing, we get the neighbor down the street that also wants to list. We get buyers that call us on the listing that are unrepresented. It's exponential income for us. One listing turns into family and friends referrals as well. So one listing could be ten in ten years." *Id.* at 141:22-142:1 (Carr).

160.    The loss of one listing would not be just limited to the loss of that individual listing—as Ms. Carr testified, real estate is a repeat and referral business, meaning one lost listing is in reality an immeasurable number of lost future listings. Hr'g Tr. 128:14-129:3 (Carr) (explaining that most of her ten years of business experience is from "repeat and referral[s]," which refers to clients referring family or friends to Ms. Carr or coming back themselves and asking Ms. Carr to buy or sell their next property, and that in the real estate business, one listing or buyer "usually turns into three or four more listings or buyers.").

161.    But Compass was not alone; in the internal strategy documents developing its Standards, Zillow repeatedly cited to Homes.com trying to compete with unique inventory as a reason why Zillow needed to stop off-Zillow marketing. *See, e.g.*, PX-002 at -159 (strategy document discussing CoStar as a competitor that was "relentlessly support[ing] PLNs/Coming Soons, with potential negative implications for Zillow"), -165 (stating that CoStar was "a platform [that] exists today that is willing to leverage and fund exclusives and off-MLS listings" which could "hurt us directly").

### E.    Zillow's Standards Successfully Reduced Off-Zillow Marketing

162.    Zillow's Standards effectively prohibit all forms of public marketing off the MLS for more than one business day. Hr'g Tr. 408:9-409:11 (Alexander) (providing examples of public marketing activities that would violate Zillow's standards); *see also* Hr'g Tr. 248:11-19 (Samuelson) (stating that Zillow "intentionally wrote the standards to say put the listing in MLS and then included them in these IDX or VOW feeds . . . so that every platform, every website, would have an opportunity to display these listings."); Hr'g Tr. 708:13-709:1 (Wu) ("Q. Okay. And so the listing standards not only require that you do business with Zillow, but the listing standards require that you submit your listing to everyone, correct? A. Yeah.").  This includes a brokerage website advertising the existence of private listings, such as Compass' Black Box. *Id.* Rather, only privately marketing a listing within a brokerage is permitted. Hr'g Tr. 407:5-10 (Alexander) ("Private marketing, truly—truly only private marketing is actually allowed.")

163.    As a result, the Zillow standards stopped that progress, reduced the adoption of 3-Phased Marketing, and hurt Compass.com; agents and sellers have expressed their reluctance to use the 3-Phased Marketing strategy due to the risk of being banned from Zillow. *See, e.g.*, PX-114 at -879 (e-mail discussing a Compass client that was afraid of being banned from Zillow); PX-106 at -224 (describing that due to the Zillow Standards "one of my agents who has a referral

partner in Texas told me that her Compass colleague lost a listing because the seller feared

Compass would not syndicate with Zillow.").

164.     As Compass' SVP of Strategy testified, "One of the results of the Zillow ban is

that… a lower percentage of the sellers who are listing with us are using these strategies, which

means that we have a lower percentage of unique listings on our platform." *Id.* at 410:20-411:1

(Alexander). "We saw that adoption drop off pretty precipitously," *Id.* at 415:25-416:1

(Alexander), from 39% in April 2025 to 22% just three months after Zillow announced its

standards:

**Figure 5: Compass 3-Phased Marketing Adoption Charts**




PX-083 at -060.

165.     Accordingly, the Standards have led to "a decline in both engagement and users on

our platform." Hr'g Tr. 410:19-411:1 (Alexander).

166.    As explained by Compass' CEO, "[t]he Zillow listing access standards have nearly eliminated our ability to innovate on any marketing that's not on Zillow." Hr'g Tr. 86:13-20 (Reffkin). As Compass' CEO further testified,

> The harm to Compass from Zillow is unquantifiable. I can't imagine how many buyers or how much more traffic we would have if this billboard was in every market in the country over the last eight months. How much more traffic would we have had? How many more buyers would we have had? How many more agents would we have had? How many more sellers would we have had? It's unquantifiable. How much more trust would we have had? How much more brand value would we have had if this billboard could have been in every market in the country? So, from that perspective, it's unquantifiable.

Hr'g Tr. 92:2-11 (Reffkin).

167.    Beyond Compass, internal Zillow chat messages also noted that there were "[n]ot a lot of PLN announcements" during the week of April 17, 2025, seemingly proud that their goal to "stop the PLNs," PX-009 at -307-08, was indeed working.

168.    As Zillow stated:

> Since Zillow began sending [email] notifications to agents over the summer . . . ≈90% of agents who received a Listing Access Standards notice from Zillow only received one, *meaning the initial notice resulted in most agents making sure their next listing was available widely and aligned with the Zillow standards*.

 PX-142 at 1.

## III.    ZILLOW HAS MONOPOLY POWER

### A.    Zillow Is A Critical Tool For Home Sellers And Agents, Even If They Use 3-Phased Marketing

169.    Zillow (and its competitors) have a broad range of users, including home buyers who use the portals and websites to search for a home they may want to sell and home sellers and their agents who want to use the portals and websites to market their homes. Hr'g Tr. 216:15-217:7 (Samuelson) (explaining that Zillow serves buyers, sellers, and agents).

170.     Agents and home sellers see Zillow as a must-have resource given Zillow's vast user base and brand recognition. *Id.* at 127:17-128:1 (Carr) (expressing fears that Zillow would retaliate for testimony during the hearing).

171.     Ms. Carr testified that Zillow is incredibly important to her home seller clients, as it is "the site that people go to the most and first to look for listings." Hr'g Tr. 140:23-141:4 (Carr).

172.     Compass' Co-President also testified that she was not aware of any other home search portal that was as important to home sellers and buyers as Zillow (except for StreetEasy in New York which is also owned by Zillow). *Id.* at 482:5-9 (Navab-Bosheri) (testifying there are "absolutely not" any other search portals as important as Zillow).

173.     Other Compass agents likewise explained that sellers "are constantly focusing on Zillow to see how their properties are doing" and that, if listings were to get banned from Zillow, then Compass agents would "have to make a hard decision" because "sellers will not understand and for now that's a fight that we will lose." PX-100 at -601.

174.     This view is widespread across brokerages and home sellers, with eXp agents expressing similar sentiment regarding the importance and power of Zillow. PX-135 at -231 (explaining that eXp agent was "terrified" and "freaking out" that her listing may be banned from Zillow because her sellers were texting her about the property not being visible).

175.     As Compass' CEO explained, this power comes from the reality that even with 3-Phased Marketing, home sellers and agents likely need to be on Zillow at some point: "It's not called the one-phase marketing strategy" and 94% of Compass listings "that are private exclusives end up going to the third phase," where the listings need to be on Zillow, the MLS, and other websites. H'rg Tr. 61:5-7, 11 (Reffkin).

176.    In fact, Zillow knew it was critical to agents and home sellers: its CEO testified that he was "confident that it [Zillow's Standards] would work." Hr'g Tr. 344:13:15 (Wacksman).

177.    Indeed, Zillow was so confident it would succeed in strong-arming compliance with its Standards that it did not perform a single study to assess the risk of not succeeding. Hr'g Tr. 381:8-17 (Hofmann) (testifying that Zillow did not examine whether profits would decrease and explaining that Zillow "felt like we had a good shot of success with the listing access standards [] and that there was no risk to it."); 696:23-697:19 (Wu) (testifying he was not aware of any calculation analyzing the financial impact of allowing pre-marketed listings on the Zillow platform or how much revenue Zillow would lose by banning listings).

178.    Zillow itself acknowledged that in announcing Standards, it was stepping into the role of NAR and "doing [NAR's] dirty work." PX-037 at -383.

179.    One Zillow executive reported that Zillow's Co-founder, Co-Executive Chairman and President, "wants us to try and maintain/force the status quo. i.e. listings continuing to go into the MLS and being distributed to all brokers. . . ." PX-002 at -159.

180.    Elsewhere in the same "Strategy Synthesis" document, Zillow states "[w]e want to punish the agent for choosing to put their listings on alternate networks." *Id.* at -185.

181.    Two days before Zillow announced its standards, Zillow's CEO wrote: ███████
███████████████████████████████████████ PX-010 at -753.

182.    Zillow executives stated in April 2025 that they were "intentionally dropping big news" about Zillow's Standards "without the [terms and conditions] of our standards as a means of deterring others from going down the PLN path." PX-029 at -032.

183.    And Zillow's strategy worked exactly as Zillow knew it would: on October 13, 2025, Zillow announced that nearly all agents have decided to fall in line and cease employing

their pre-marketing strategies. PX-142 at 1 ("[approximately] 90% of agents who received a Listing Access Standards notice from Zillow only received one, meaning the initial notice resulted in most agents making sure their next listing was available widely and aligned with the Zillow standards.").

184.    Specifically, Zillow explained that 9 out of every 10 agents who received a notice that they were violating Zillow's Standards did not continue to pre-market their listings publicly. *Id.* ("Only about 10.5% of agents who received notices get two - meaning almost 9 in 10 agents who received a notice from Zillow are first-timers who do not continue to only selectively market their listings through private listing networks.").

**B.    Zillow And Others In The Industry Publicly Describe It As A Dominant Online Home Search Platform**

185.    In its 10-K reporting, Zillow acknowledged that "more people search for 'Zillow' than 'real estate' and we have the leading number of active app users in the residential real estate industry. As a result, Zillow is the most visited and trusted brand in the online real estate industry." PX-165 at 5 (Zillow 2024 10-K).

186.    Zillow touts its high audience share using all relevant metrics that Zillow and others use to monitor portals' competitive presence, such as userbase, website and mobile app traffic, and time users spend on the site. PX-208 ¶¶ 176-82.

//

//

**Figure 6: Zillow's Audience and App User Share**



PX-182 at 6-7 (Zillow February 2025 Investor Presentation).

187.    Based on Comscore data, the industry standard, Zillow has 66% of the real estate audience share and 59% of overall time spent on app within the real estate category. Hr'g Tr. 536:19–537:7; 540:4–13 (Aron).

188.    Zillow's audience share is more than its three closest competitors' share combined. PX-208 ¶¶ 178-80; PX-167 at 1 ("Zillow's traffic share appears larger than that of its next three competitors combined . . . .").

189.    Moreover, Zillow executives admit that ComScore data *understates* Zillow's competitive presence in the online home search market, meaning Zillow's share is in practice even greater than the 66% presented during the hearing.  PX-182 at 6 (February 2025 Zillow Group Zillow Investor Presentation touting Zillow's 66% Real Estate Audience Share); Hr'g Tr. 206:17-19 (Samuelson) (Zillow executive testimony that this figure undercounts the true traffic to Zillow).

190.    Zillow's expert testified that "[t]he number of home buyers that come to a platform could be data that one could use to calculate market share." Hr'g Tr. 691:21-25 (Wu).

### C.    Zillow Acts Like A Monopolist

191.    Like a monopolist, Zillow is adopting industry-wide standards and choosing to ban valuable listings. *Infra* ¶¶ 117-31.

192.    Zillow also is degrading the quality of its product. The Zillow Standards make Zillow' website less accurate, less transparent, and less up to date, misleading Zillow users into believing banned listings actually for sale are homes that are "off market." Hr'g Tr. 274:23-278:8, 257:13-258:19 (Samuelson) (explaining no specific information identifying banned listings that are actually for sale on the website); *Id.* at 689:17-690:3 (Wu); Pareja Dep. Tr. 103:22-104:6

████████████████████████████████████████████████████████

███████████████

193.    In fact, Zillow's adoption of standards would not have mattered unless Zillow had monopoly power because home sellers and agents would not care if they were banned. *Id.* at 517:1-6 (Aron) ("Zillow's listing access standards are indeed rational for Zillow if one recognizes and only under the condition that Zillow has market power. Zillow did not have market power, the listing access standards would not be rational.").

194.    Under those circumstances, home sellers and agents would continue to engage in pre-marketing activities because the loss of exposure for the listing from Zillow would not be detrimental. *Id.* at 517:18-518:1 (Aron) (explaining that if Zillow imposed the listing access standards absent market power, Dr. Aron would expect "agents and sellers [to] shrug their shoulders and say, well, we want to premarket this property in a way that's precluded by these standards, so we won't get on Zillow. But we would still be able to list this property when it gets to stage three on homes.com and Realtor.com and Redfin and other platforms, and that's adequate exposure for the property.").

195.    The listing would still be available on other home search portals such as Homes.com, Realtor.com, and Redfin, and home sellers would consider that to be adequate exposure for their listings. *Id.*

196.    This outcome would not make economic sense for Zillow because Zillow would ban those listings, thus depriving it of vital inventory which would diminish and devalue their platform. *Id.* at 518:9-20 (Aron) ("listings are Zillow's lifeblood. It's very important to Zillow to have listings, and that losing listings diminishes and devalues their platform. I don't see credible evidence that forgoing those listings entirely could be better for Zillow than having the listings at the conclusion of a premarketing phase.").

197.    "[B]ecause of Zillow's market power, agents and sellers decide that it's too important to have the listing on Zillow to forgo that opportunity even though the listing would still be on other platforms, and instead they choose to—in a substantial number of cases—to forgo the opportunity to premarket." *Id.* at 518:21-519:5 (Aron)

### D.    Zillow Is Protected By High Barriers To Entry

198.    Market participants also routinely discuss Zillow's power, describing it as the "clear leader" in the market and discussing its "deep moat" and "network effect" advantages. For these reasons, analysts covering the sector conclude that Zillow "is likely to hold a leading position in this category for at least the next few years." PX-208 ¶ 182.

199.    It is very difficult to enter and gain traction in the online home search market, in part because "it is very, very costly," entailing "hundreds of millions or billions of dollars to enter this market and become a player." Hr'g Tr. 542:1-17 (Aron).

200.    Redfin's Chief Executive Officer, Glenn Kelman, testified that it would take any new entrant a billion dollars to enter the market in a way that would take away a percentage of market share from Zillow. Kelman Dep. Tr. 253:1-17; Hr'g Tr. 542:1-17 (Aron).

201.    Zillow's brand name and brand awareness also acts as a barrier to entry. *Id.* at 542:23-543:5 (Aron) ("[E]conomics teaches that brand awareness is or can act as a barrier to entry, and the research that I talked about a moment ago about Zillow's brand awareness is instructive that Zillow has a very powerful brand name, by far the most powerful brand name, according to the search evidence that I've seen in the marketplace. And that can act as a barrier to entry for another competitive provider to attempt to make headway against the market leaders.").

202.    Zillow's brand name is very powerful which makes it difficult for any new market entrant to make headway and compete. *Id.*

203.    For example, after CoStar acquired Homes.com in 2021 it invested close to a billion dollars in Homes.com in 2024 but has been unable to move the competitive needle and meaningfully eat into Zillow's audience share. *Id.* at 542:1-17 (Aron) ("CoStar acquired homes.com in 2021, and homes.com, with that infusion of capital, did grow very quickly, but then, famously, invested close to a billion dollars, $900 million in 2024, and that was expected to be a significant boost to that platform but it turned out to really, by all evidence, not move the needle.").

204.    Recently, Homes.com has been losing traffic or seeing its traffic stabilize (despite its massive investment), all while Zillow continually increases its size and audience. *Id.* ("In fact, from what I've seen, homes.com, since that infusion, has declined in presence, or stagnated.").

205.    Indeed, Zillow's internal documents show ███████████████████ ███████████████████████████████████████████████ ████████████████ PX-147 at -407, -409, -450.

206.    Even highly capitalized companies like Google and Yahoo have attempted to enter the online home search market. Hr'g Tr. 542:18-22 (Aron) ("It's also meaningful to me that very

heavily, very highly capitalized companies like Google and Yahoo attempted to enter this market, a while back now for sure, but they found that it was not a worthwhile endeavor for them. They exited and they have not attempted to re-enter."). Those companies were unable to gain traction and have since exited the market. *Id.*

## IV. ZILLOW ENTERED INTO AN ANTICOMPETITIVE AGREEMENT WITH REDFIN

207.    Zillow and Redfin are competitors in the online home search market. Hr'g Tr. 312:1-4 (Wacksman); PX-154 (Redfin Form 10-Q Q1 2025, Ex. 10.2 Partnership Agreement).

208.    In early 2025, Zillow and Redfin signed a written agreement for Zillow to pay Redfin $100 million in exchange for Redfin to exit rental advertising. *Id.* at 310:8-9 (Wacksman).

209.    On September 30, 2025, the Federal Trade Commission sued Zillow and Redfin for violating the antitrust laws through a conspiracy to allocate markets. ECF No. 110 at 17 (Plaintiff's Supplemental Brief In Support of Motion for Preliminary Injunction) (*citing Fed. Trade Comm'n v. Zillow Grp, Inc.*, No. 1:25-cv-1638 (E.D. Va. Sep. 30, 2025)).

210.    Zillow and Redfin's next agreement, on off-MLS listings, was only by phone: between March and May 2025, Zillow's CEO Mr. Wacksman and Redfin's CEO Mr. Kelman engaged in a series of private phone calls during which they discussed Compass, CCP, and strategies to restrict PLNs. *Id.* at 311:1-13 (Wacksman).

211.    Mr. Wacksman did not take notes during the calls, nor were other individuals on these calls. *Id.* at 312:24-313:3, 315:25-316:8, 317:6-318:3, 323:18-324:1.

212.    On March 13, 2025, Mr. Kelman texted Mr. Wacksman, and asked if he had time for a call. Kelman Dep. Tr. 29:11–19; PX-048. Following the phone call on March 14, 2025, Mr. Wacksman reported to his team that Mr. Kelman was "culturally aligned" with Zillow's approach

to Compass and CCP, and that Mr. Kelman was "feeling [Wacksman] out if [Zillow would] do

more aggressive countertactics." *Id.* at 313:21-314:4; 314:17-315:4 (Wacksman); PX-006.

213.    On March 25, 2025, the same day that NAR announced it was providing home

sellers with more options, Mr. Kelman called Mr. Wacksman again. PX-038 at -693.

214.    On March 27, 2025, ███████████████████████████████

███████████████ PX-121 at -105. ██████████████████████████



*Id.* at –107.

215.    In short, as of late March 2025, Mr. Kelman recognized the competitive advantage

that Redfin would have over other home search platforms and brokerages post-CCP, and Mr.

Kelman had plans for how to exploit that advantage.

216.    On April 9, 2025, however, Mr. Wacksman texted Mr. Kelman and requested a

call. PX-127. During the call, Mr. Wacksman informed Mr. Kelman that Zillow would be

announcing its listing access standards the next day. Hr'g Tr. 317:33-318:11 (Wacksman);

Kelman Dep. Tr. 61:10-20. Mr. Wacksman outlined what those standards would be and the

timeline for implementation. Hr'g Tr. 319:5-13 (Wacksman). ██████████████████

███████████████████████████████ Kelman Dep. Tr. 62:13-18

217.    Mr. Wacksman reported back to his team about the call with Mr. Kelman. He wrote that Mr. Kelman was "THRILLED we are doing this – and said he likely will do the same." PX-033 at -846.

218.    On April 10, 2025, Mr. Kelman called Compass' CEO. Mr. Kelman informed Mr. Reffkin of Redfin's support for Zillow's policy and encouraged Mr. Reffkin to work with Zillow and abandon pushing for pre-marketing strategies. Kelman Dep. Tr. 176:18-188:19.

219.    Also on April 10, 2025, Mr. Kelman circulated a draft blog post internally regarding ZLAS and Redfin's position. PX-133 at –663; Kelman Dep. Tr. 64:15-65:4. A Redfin employee responded that ████████████████████████████████████████████ ████████████████ PX-133 at -662. On April 11, 2025, Redfin's Senior Director of Brokerage Operations, Joe Rath, responded on the email thread and wrote ████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████ *Id.* (emphasis added). ██████████████████████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████ ████████████████████████████████████████ ███████████████████████████ *Id.*

220.    Despite these internal warnings, Mr. Kelman and Redfin announced on April 14, 2025 that Redfin would implement standards similar to Zillow's Standards. Kelman Dep. Tr. 70:18-71:7 (discussing Redfin's announcement of █████████████████████████████

█████████ on April 14, 2025); PX-146 (Redfin webpage announcement titled, "Buyers Should See All the Listings, Sellers Should Control How Their Listing Appears Online," dated April 14, 2025).

221.    Redfin's standards were identical to Zillow's in the sense that they too banned listings that were publicly marketed prior to being submitted to the MLS and all portals: "Redfin.com will not publish any listings that have been publicly marketed before being shared with all real estate websites via the MLS." PX-146.

222.    That same day, Mr. Samuelson spoke with Mr. Rath and shared non-public information regarding Zillow's Standards. PX-125 at -232 ("I spoke with Errol Samuelson who was happy to hear that we have our own rule on the display of private listings. He also provided clarification on how Zillow treats certain types of listings under its new rule.").

223.    In an internal email dated April 14, 2025, a Redfin employee wrote that "just the idea that a listing could disappear from Zillow and Redfin without notice and without recourse (because it was truly a violation of the policy) will be enough to **give listing agents pause**." PX-125 at –231 (emphasis added).

224.    On May 20, 2025, Zillow published a "Frequently Asked Questions" to its website, providing additional details regarding Zillow's Standards. PX-113. That same day, Mr. Kelman texted Mr. Wacksman and requested a phone call. PX-007. Although Mr. Wacksman was on vacation in Europe, Mr. Wacksman called Mr. Kelman the next day. PX-177.

225.    Mr. Kelman requested the call because █████████████████████████

████████████████████████████████████████████

█████████████████████ Kelman Dep. Tr. 104:1-14. Mr. Kelman wanted to

clarify █████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at 99:20-101:10.

226.    After the phone call, Zillow changed the FAQs to address Mr. Kelman's concern

and inserted language stating that Zillow would accept direct feeds only if the MLS does not send

feeds with all listings (i.e. no direct feed could be used to "supersede the MLS"). PX-112; Hr'g

Tr. 325:2-326:25 (Wacksman).

227.    To date, Redfin has not enforced its standards ████████████████████████

███████████████████████ Kelman Dep. Tr. 74:18-75:12.

## PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

I.    JURISDICTION AND VENUE ARE PROPER

228.    The Court has subject matter jurisdiction over Compass' federal antitrust claims under 15 U.S.C. §§ 15, 26 and 28 U.S.C. § 1331 (federal question), 1337 (statutes regulating commerce or antitrust), and 2201 (declaratory relief). Zillow does not contest this Court's subject matter jurisdiction.

229.    The Court has personal jurisdiction over Zillow because it: (a) resides in this district or transacted business in this district; (b) directly and/or indirectly marketed and sold products and services in this district; (c) has had continuous and systematic contacts with this district; and (d) engaged in anticompetitive, unfair, and deceptive business practices that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this district, including Compass. *See, e.g.*, *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) (personal jurisdiction existed in counterfeit good dispute over non-resident defendant who "offer[ed the counterfeit items] for sale to New York customers on [a] website and [sold] at least one [such item] to New York consumers"). Zillow does not contest this Court's personal jurisdiction.

230.    Venue in this district is proper under 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391, because Zillow transacted business, resided, and/or had agents in this district, a substantial part of the events giving rise to Compass' claims occurred here, and a substantial portion of the affected interstate trade and commerce has been carried out in this district. Zillow does not contest that venue in this District is proper.

231.    To fall under the jurisdiction of the Sherman Act, a defendant's conduct must either (1) directly interfere with the flow of goods in the stream of commerce or (2) have a substantial effect on interstate commerce. *Hamilton Chapter of Alpha Delta Phi v. Hamilton*

*Coll.*, 128 F.3d 59, 66-67 (2d Cir. 1997). A plaintiff need not establish a causal link between the anticompetitive conduct and interstate commerce, but instead need only demonstrate that there are aspects of the defendant's business that are infected by the anticompetitive conduct that have a "not insubstantial effect on interstate commerce." *Id*. Zillow does not dispute that its conduct had a substantial effect on interstate commerce.

## II.    THE PRELIMINARY INJUNCTION STANDARD

232.    Section 16 of the Clayton Act entitles a party to obtain injunctive relief against threatened loss or damage under the antitrust laws. 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws…"); *Actavis*, 787 F.3d at 650. A preliminary injunction is designed to preserve the status quo—"the last peaceable uncontested status preceding the present controversy"—pending trial on the merits. *Hercules Pharms., Inc. v. Cherne*, No. 24-2545-cv, 2025 WL 1099431, at *2 (2nd Cir. Apr. 14, 2025); *Tom Doherty Assocs, Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995).

233.    A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) irreparable harm is likely; (3) the balance of hardships weighs in favor of the injunction; and (4) the injunction serves the public interest. *FuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 133 (S.D.N.Y. 2024).

## III.    COMPASS, AGENTS, HOME SELLERS AND BUYERS, AND COMPETITION ARE SUFFERING IRREPARABLE HARM

234.    To demonstrate irreparable harm, a movant must show that it is "likely" to suffer irreparable harm in the absence of preliminary relief. *New York v. Trump*, 767 F. Supp. 3d 44, 70 (S.D.N.Y.), *opinion modified on denial of reconsideration*, 778 F. Supp. 3d 578 (S.D.N.Y. 2025),

and *modified*, 784 F. Supp. 3d 619 (S.D.N.Y. 2025). Although the mere possibility of irreparable harm is insufficient, a movant need only show that there is a threat of irreparable harm, not that irreparable harm has already occurred. *Id.* at 83 (citation omitted).

235.    Additionally, in an antitrust case, the risk of irreparable harm to competition and consumers must also be considered when determining whether a preliminary injunction should be granted. *See Actavis*, 787 F.3d at 661 ("Threaten[ed] economic harm to . . . consumers . . . is plainly sufficient to authorize injunctive relief." (quoting *California v. Am. Stores Co.*, 495 U.S. 271, 283 (1990)); *FuboTV*, 745 F. Supp. 3d at 150 (same).

### A.     Irreparable Harm To Compass, Other Brokers, And Agents

#### i.      Loss of 3-Phased Marketing to Drive Other Business Lines and Growth More Broadly

236.    The Second Circuit has recognized that an irreparable harm is likely to occur "[w]here the availability of a product . . . increases business of the plaintiff beyond sales of that product" because "the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss." *Tom Doherty*, 60 F.3d at 38.

237.    The evidence shows Compass was using 3-Phased Marketing to "increase[]" business" beyond just adoption of 3-Phased Marketing. *Supra* ¶¶ 65-85.

238.    Indeed, Compass invested heavily to make 3-Phased Marketing a core part of its larger business strategy and to drive traffic to other parts of its business, including its Compass.com search platform, its Compass One product, and more broadly to drive agent and client growth and retention. *Supra* ¶¶ 67-75, 78-85.

239.    Compass also had planned a large billboard campaign capitalizing on 3-Phased Marketing to brand itself as having exclusive inventory as a way to drive agent retention and growth. *Supra* ¶ 76.

240. Compass specifically saw 3-Phased Marketing as an investment in its Compass.com search platform. *Supra* ¶¶ 73-75, 77-85.

241. After Compass introduced 3-Phased Marketing, unique monthly traffic to Compass.com grew. *Supra* ¶¶ 79-81.

242. But the mere announcement of the Zillow Listing Access Standards has put a stop to that growth, as evidenced by the severely decreased adoption numbers of 3-Phased Marketing and decreased traffic to Compass.com. *Supra* ¶¶ 163-65.

243. Compass also saw 3-Phased Marketing as the foundation of its inventory strategy more broadly. *Supra* ¶¶ 67-73. Thus, from the outset 3-Phased Marketing was conceived as a way to expand and create a competitive advantage for Compass' in the online home search market. *Supra* ¶¶ 65-85.

244. Injunctive relief is thus necessary to allow Compass to continue to use 3-Phased Marketing as a branding and larger growth tool, for Compass.com and Compass' brokerage, until a trial can be held on the merits.

ii. Compass is Losing Goodwill and Business Reputation

245. The Second Circuit has also repeatedly recognized that loss of goodwill and business reputation can constitute an irreparable harm, particularly where that loss of goodwill and business reputation will lead to the loss of an unquantifiable amount of future opportunities. *See Register.com Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *see also Reuters, Ltd. v. United Press Int'l Inc.*, 903 F.2d 904, 907-08 (2d Cir. 1990); *see also Cantor v. Multiple Listing Service of Dutchess County, Inc.*, 568 F. Supp. 424, 430 (S.D.N.Y. 1983) (finding that real estate brokerages had been injured by anticompetitive MLS rule restricting their ability to advertise homes in the manner they saw fit because they had lost the "competitive

advantage" that would have been gained by "capitaliz[ing] on the goodwill and favorable brand image generated by [their] organization's distinctive advertising").

246.    The core issue, as with the prior category of irreparable harm, is the difficulty of establishing and measuring potential damages. *See Register.com*, 356 F.3d at 404. Thus, where it would be difficult or impossible to estimate "with any precision" the amount of monetary loss that the loss of goodwill or reputation would lead to, there is likely to be irreparable harm. *Id.*

247.    Indeed, the Second Circuit has even held in such a situation, "even a speculative loss may cause immediate irreparable harm" where the likely loss in goodwill and reputation is "self-evident." *Reuters*, 903 F.2d at 908.

248.    The Second Circuit has also held that "the loss of a relationship with a client that would produce an indeterminate amount of business in years to come" is likely to be an incalculable loss, and therefore an irreparable harm. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68-69 (2d Cir. 1999).

249.    And courts have explained that the harm that would occur from the loss of *new* customers is particularly difficult to measure, making it likely that such harm would be irreparable. *Regeron Pharms, Inc. v. United States Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 39-40 (S.D.N.Y. 2020).

250.    Compass staked its reputation on 3-Phased Marketing, particularly after its successful launch. *Supra* ¶¶ 22-30. But because of Zillow's Standards, Compass' opportunities to use 3-Phased Marketing as a brand differentiator has significantly decreased, as shown by the decreased adoption of 3-Phased Marketing and the fear and confusion in the market surrounding off-Zillow listings. *Supra* ¶¶ 163-65.

251.    This has and will lead to lost listings for agents, and in turn, lost agents for Compass. *See, supra* ¶¶ 158-63 (discussing listings where Compass agents would need to remove themselves as agents or lost listings because of the Zillow Standards).

252.    Compass' CEO testified that because of the listing access standards, ability to innovate on any marketing that is not on Zillow has been nearly eliminated. *Supra* ¶ 166.

253.    In short, Compass is losing the ability to brand itself as an innovator providing home sellers with sophisticated choices.

254.    Because of the evidence that 3-Phased Marketing was driving growth and was the specific reason for increased business, it is evident that without injunctive relief, an immeasurable amount of growth and increased business opportunity will be lost.

        iii.     Compass is Losing Its First-Mover Advantage

255.    Finally, the Second Circuit has held that the loss of the first-mover advantage can constitute irreparable harm. *See Norbrook Lab'ys Ltd. v. G.C. Hanford Mfg. Co.*, 126 F. App'x 507, 509 (2nd Cir. 2005) (loss of "advantage of being the pioneer in the field" as an irreparable harm) (citation omitted); *see also Muze, Inc v. Digit. On-Demand, Inc.*, 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000) (recognizing that the "risk of harm to [the plaintiff's] reputation as a leader in its field" and the "loss of market advantage" constituted irreparable harm).

256.    The reasoning in *Muze, Inc. v. Digital On-Demand, Inc.*, is particularly helpful here—the court in *Muze* recognized the competitive harms that would occur by allowing the defendant to engage in misconduct that would damage the plaintiff's "goodwill and market position" at the same time, making it harder for the plaintiff to compete. *Id.*

257.    Compass has sufficiently demonstrated that absent injunctive relief, it will lose its hard-earned first-mover competitive advantage.

258.    Documents and testimony show that Compass invested heavily to create and earn its first-mover advantage, and that other brokerages were rapidly trying to adopt similar programs. *Supra* ¶¶ 22-24, 31-34.

259.    Zillow has argued that this first-mover advantage has already been lost, but has produced no evidence in support. Rather, given Compass' heavy investment in its 3-Phased Marketing, how early Compass began developing the program, and how successful the program was from its launch, *supra* ¶¶ 6, 22-24, 25-30, coupled with how effective Zillow has been at causing confusion in the market to stop similar programs from developing, *supra* ¶¶ 132-43, 162-68, it is clear that Compass still has its first-mover advantage over competitors. That other competitors have copied Compass' strategies (to a far less advanced degree) does not mean Compass' first-mover advantage has been completely erased.

260.    But, should injunctive relief be denied, those companies that are still pursuing a 3-Phased Marketing-style strategy will have more time to catch up with Compass, including by taking advantage of the confusion Zillow has caused and Zillow's targeting of Compass, thereby destroying Compass' first-mover advantage.

**B.    Irreparable Harm To Consumers And Competition**

261.    Compass has also established that without injunctive relief, competition and consumers are likely to suffer irreparable harm.

262.    In an antitrust case, the risk of irreparable harm to competition and consumers must also be considered when determining whether a preliminary injunction should be granted. *See Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 698-99 (2d Cir. 1973); *FuboTV*, 745 F. Supp. 3d at 150.

263.    This factor applies even in cases brought by private parties, and "doubts as to whether an injunction sought is necessary to safeguard the public interest . . . should be resolved in favor of granting the injunction." *Gulf & Western*, 476 F.2d at 699.

264.    First, Zillow specifically intended Zillow's Standards to prevent its competitors, including Compass, from competing in the online home search market. *Supra* ¶¶ 179-84.

265.    Second, starting with Compass, Zillow recognized and feared Compass becoming a competitor in the online home search market, and recognized and feared that Compass' exclusive listings, such as those gained through 3-Phased Marketing, would give Compass' online home search platform a competitive advantage. *Supra* ¶¶ 66, 92, 97-100.

266.    Third, Zillow also intended to stop other online home search portals, like Homes.com (owned by CoStar Group), from being able to compete in the online search market with unique listings. *Supra* ¶ 161.

267.    Fourth, Zillow is blocking home sellers who want to use off-MLS and off-Zillow marketing options. *Supra* ¶¶ 35-40.

268.    Thus, because of the strong evidence of Zillow's anticompetitive intent*, supra* ¶¶ 92. 105-06, 109-116, 124-31, and the strong evidence that consumers want options for marketing their homes (including off-Zillow options), irreparable harm is likely to occur to competition and consumers without injunctive relief.

269.    Indeed, every consumer is thus harmed by Zillow's conduct – even those not interested in 3-Phased Marketing—because competition affects all participants "in the market." *FuboTV*, 745 F. Supp. 3d at 150.

**C.      Zillow's Arguments Regarding Irreparable Harm Are Unpersuasive**

270.    Zillow has argued that there is no irreparable harm because agents and consumers still can choose to work with Compass and market listings not on Zillow, so long as they

accept the consequence of their listings potentially being banned. But, as the Ninth Circuit

explained in *PLS*, this is not a defense—"dominant firms forc[ing] their suppliers or customers to

choose between assisting the dominant firms injuring their competitors or working exclusively

with those competitors," is "precisely the dilemma the Sherman Act is designed to prevent." *See*

*PLS.com, LLC v. Nat'l Ass'n of Realtors,* 32 F.4th 824, 836 (9th Cir. 2025).

271.    Zillow also has argued that Compass' harms are self-inflicted and avoidable

because Compass knew that Zillow views 3-Phased Marketing listings as violating Zillow's

Standards but failed to inform its agents.

272.    However, Zillow deliberately released its Standards with few initial details and

over time, changed the details of how its Standards was going to be enforced. *Supra* ¶¶ 132-43.

273.    Finally, Zillow has argued that irreparable harms in an antitrust case must be

within the relevant market, and Compass' claimed harms are not in the relevant market since

Compass also suffered harms related its clients and agents related to its brokerage services.

274.    But Compass has identified harms within the relevant market. *Supra* ¶¶ 66, 92, 97-

100 (discussing Zillow's fears and recognition that brokerages could use exclusive and unique

inventory to become competitors in online home search) and 161 (discussing a Zillow strategy

document that recognized that CoStar, owner of Homes.com, was planning to leverage exclusive

lists and off-MLS listings to "hurt [Zillow] directly" in the online home search market).

275.    And harms outside of that market are still relevant for assessing irreparable injury.

Zillow has put forward no case law that supports the proposition that irreparable harms for a

preliminary injunction must be within the antitrust relevant market, and in non-antitrust cases,

Courts routinely issue preliminary injunctions based on harm outside of the product or market at

issue. *See, e.g.*, *Muze*, 123 F. Supp. 2d at 129-30 (explaining that the irreparable harm was that the

defendant was using a breach of contract to unfairly compete against the plaintiff for sales of a separate product). Zillow's argument ignores that irreparable harm and relevant market are two separate issues. Zillow's argument also again ignores that Compass was using 3-Phased Marketing as a competitive tool in multiple ways, including to attract agents and clients at the brokerage level but also to get exclusive listings and drive traffic to Compass.com so it can better compete against Zillow in the online home search market. *Supra* ¶¶ 67-75, 77-85.

**D.    Zillow Would Not Suffer Irreparable Harm If It Were Enjoined**

276.    First, Zillow currently does not punish many types of listings that were initially marketed publicly off-MLS and off-Zillow, often for much longer than the first two phases of 3-Phased Marketing, further supports that Zillow would not be irreparably harmed: (1) Zillow does not ban listings where the home seller fired both the brokerage and agent who did the off-Zillow marketing; (2) Zillow does not ban builder listings that did off-Zillow marketing; (3) Zillow does not ban listings that are marketed only privately; (4) Zillow does not ban for sale by owner listings that did off-Zillow marketing; and (5) Zillow does not ban listings by agents who have received less than 3 warnings from Zillow for off-Zillow marketing. *Supra* ¶ 119. By not punishing these types of listings that otherwise would be violations of the Zillow Standards, Zillow seems to recognize that it would not suffer any harm by not banning listings under the Zillow Standards while the case continues to be litigated.

277.    Second, a pause in enforcement is not substantially all of the relief Compass seeks and is not irreversible. *See Phillip v. Fairfield University*, 118 F.3d 131, 134 (2d Cir. 1997) (holding that the injunction had not granted the movant all of the relief sought because the penalties that the movant sought to enjoin could simply be reinstated if the injunction were to be dissolved); *see also Eng v. Smith*, 849 F.2d 80, 82-83 (2d Cir. 1988) (explaining that an injunction requiring defendants to provide mental health treatments until a trial on the merits would not grant

the movant substantially all of the relief sought because the treatments could simply be discontinued after a trial on the merits). Zillow would not be irreparably harmed by an injunction, as it can simply restart enforcement of its Standards if after a trial on the merits its Standards are found to not be anticompetitive.

278.    Third, Zillow's co-conspirator, Redfin, recently announced that it would be holding off on implementing its version of Zillow's Standards, and appears to have suffered no harm. *Supra* ¶ 226.

279.    Fourth, Zillow would likely benefit in the short term from the injunction. Zillow, by its own admission, is giving up listings that it could use to earn profits because of the Zillow Standards. *Supra* ¶¶ 192, 196.

280.    Finally, Zillow has argued, incorrectly, that an injunction would "force[s] Zillow to display Compass' listings contrary to Zillow's mission." ECF No. 124 at 21. But this argument relies on a misreading of the law and an incorrect analysis of the status quo here. "The status quo to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy. Preserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action.[]" *Mastrio*, 768 F. 3d at 120-21 (cleaned up) (citations and internal quotations omitted). Here, the last actual, peaceable uncontested status which preceded the pending controversy was after March 25, when NAR adopted its "Multiple Listing Options for Sellers," but before June 30, when Zillow started enforcing the standards. Therefore, the status quo is that home sellers and agents can market their homes off-MLS and off-Zillow without any punishment, and that should be preserved pending trial on the merits. Under that proper definition of the status quo, the injunction sought is prohibitory, not mandatory.

281.     Further underscoring this conclusion is the fact that to enforce Zillow's Standards, Zillow has to take active measures to find non-compliant listings, send warning notifications, and ban listings. *Supra* ¶¶ 120-22. The injunction sought means that Zillow simply needs to stop taking those active measures.

## IV.     COMPASS IS LIKELY TO SUCCEED ON THE MERITS, OR AT LEAST HAS RAISED SERIOUS QUESTIONS

282.     Compass need only demonstrate that it is "more likely than not," *FuboTV*, 745 F. Supp. 3d at 133, to prevail on "at least one of [its] claims" following a trial on the merits to establish a likelihood of success on the merits. *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (citation omitted).

283.     Moreover, in the Second Circuit, if the balance of hardships decidedly favors the moving party, the movant need only show a "serious question[] on the merits" rather than a likelihood of success. *St. Joseph's Hospital Health Center v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025).

### A.     Compass Is Likely To Succeed On Its Section 2 Claim

284.     Zillow has monopolized the national market for online home search services in violation of Section 2 of the Sherman Act because it: (1) possessed monopoly power in the online home search market; and (2) willfully maintained that power through exclusionary conduct. *See Eastman Kodak*, 504 U.S. at 480-81.

285.     Under Section 2, Compass must show that Zillow had market power, either with (1) direct evidence or (2) by defining a relevant market and establishing the defendant had large shares of that market or other practical indicia. *United States v. Google LLC*, 747 F. Supp. 3d 1, 107 (D.D.C. 2024) (quoting *Microsoft*, 253 F.3d at 51); *see also Merced Irrigation District v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 141 (S.D.N.Y. 2016) (explaining that a plaintiff can

show monopoly power by direct evidence of the ability to control prices or exclude competition *or* by showing the relevant market share) (citations omitted).

286.    Compass also must establish a prima facie case of anticompetitive effects resulting from the challenged conduct. *Google LLC*, 747 F. Supp. 3d at 106 (citations omitted). Then, Zillow must proffer non-pretextual procompetitive justifications for its conduct. *Id.*

    i.    Direct Evidence of Zillow's Market Power

287.    Monopoly power, or market power, is the "power to control prices or exclude competition," and may be proven "directly through evidence of control over prices or the exclusion of competition . . . ." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (citations omitted).

288.    Here, the direct evidence shows that Zillow felt it could control competition and did in fact do so. *See, e.g., US Airways Inc. v. Sabre Holdings Corp.*, 11 Civ. 2725 (LGS), 2022 WL 1125956, at *9 (S.D.N.Y. Apr. 15, 2022) (concluding that alleged monopolist's "retaliatory conduct against [rivals] that promote innovation" was evidence from which "a reasonable jury could find that [the defendant] exercised monopoly power").

289.    Zillow's documents are filled with references to using its "hammer" and "sticks" to stop PLNs, to its ability to "chill[]" the market and "stomp" out forms of competition, and to impose "standards" on how the market should operate. *Supra* ¶¶ 109, 118, 124, 128.

290.    Zillow itself has stated that it has been successful in stopping competition, *Supra* ¶¶ 167-68, and Dr. Aron explained that it would not have made sense for Zillow to adopt the Zillow Standards unless it had sufficient power to force the market to adhere to stomp out such competition. *Supra* ¶¶ 193-197.

291.    Moreover, courts have found that, as here, *supra* ¶ 192, a defendant's willingness to degrade its product without fear of losing customers evinces the defendant's monopoly power.

*See, e.g.*, *Google*, 747 F. Supp. 3d at 118 (" Just as the power to raise price when it is desired to do so is proof of monopoly power,  so too is the ability to degrade product quality without concern of losing consumers.(internal citations omitted) The fact that Google makes product changes without concern that its users might go elsewhere is something only a firm with monopoly power could do." (internal citations omitted)); *see also United States v. Google LLC*, 778 F. Supp. 3d 797, 850 (E.D. Va. Apr. 17, 2025) (evidence of high market share and entry, which was "reinforced by evidence that Google has acted to degrade DFP's features without fear that its customers would switch to alternative publisher ad servers," proved monopoly power).

        ii.      Indirect Evidence of Zillow's Market Power

292.    Monopoly power also "may be inferred from a firm's large percentage share of the relevant market." *Geneva Pharms.*, 386 F.3d at 500.

293.    A market share of between 49% and 52% combined with other evidence has been found to be sufficient evidence of monopoly power. *Sabre*, 2022 WL 1125956, at *9; *see also Panini Am., Inc. v. Fanatics, Inc.*, 23-CV-9714-LTS-VF, 2025 WL 753954, at *6 (S.D.N.Y. Mar. 10, 2025) (holding that 33% market share was enough to support a claim that the defendant had monopoly power where it was demonstrated that the defendant was able to set prices and exclude competitors, including by requiring retailers to not carry competitors' products and successfully threatening retailers with future exclusion from the market if they did not comply with defendant's terms).

        iii.     The Relevant Product Market is Online Home Search

294.    The Parties agree that online home search is a relevant product market. *Supra* ¶ 51 (citing testimony from Zillow's expert that online home search is a reasonable product market).

295.    Courts routinely rely on statements and documents made by the defendant and other competitors or industry participants to determine a relevant product market. *See United*

*States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 337–38 (S.D.N.Y. 2001) (rejecting defendants' challenge alleged market where "defendants' documents explicitly recognize the existence" of the market as alleged). Zillow's own recognition that it competes in the online home search market supports finding an online home search product market.

296.    Courts also look to the "practical indicia" of a market to determine what the relevant product market is. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see also United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 57 (D.D.C. 2011) (rejecting argument that physical alternatives for tax preparation such as pen-and-paper were a reasonable alternative to tax preparation software).

297.    Here, the practical indicia support online home search as a relevant product market because: (1) the market consists of online (rather than physical) platforms; (2) these platforms all get their listings from the same IDX feeds; (3) these platforms are accessible to the public without cost or required membership and include listings across regions all on one platform; and (4) these platforms have nearly identical user interfaces and search functionalities. *Supra* ¶¶ 51-55, 70.

298.    Online home search is not the special type of two-sided market identified in *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018), because it is not a "transactions platform." *Supra* ¶ 88.

iv.    The Geographic Market is Nationwide

299.    The relevant geographic market is nationwide. Courts "generally measure a market's geographic scope . . . by determining the areas in which the seller operates and where customers can turn . . . for supply of the relevant product." *See Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219, 227 (2d Cir. 2006) (citations omitted), overruled on other grounds by, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008).

300.    Courts consider whether the defendants operate and compete nationally, such as by creating a national network of consumer or partners, providing the same services nationwide on websites and mobile applications, or imposing policies nationwide. *Davitashvili v. Grubhub Inc.*, 20-cv-3000 (LAK), 2022 WL 958051, at *9 (S.D.N.Y. Mar. 30, 2022); *see also In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 381 (E.D. La. 2013) (finding that the geographic market was properly alleged to be nationwide because while the product itself might have been sold locally, the evidence showed that the defendants operated on a national level, the defendants engaged in national planning, and that one of the defendants used its nationwide power to threaten competition in smaller geographic areas).

301.    The evidence demonstrates that the relevant geographic market is nationwide because Zillow and its largest rivals operate nationwide platforms for all customers nationwide; customers anywhere in the United States can and do use these platforms to look for listings across the United States; and Zillow and its competitors engage in national planning and strategy. *Supra* ¶¶ 55-64.

302.    Further demonstrating that the relevant geographic market is the Zillow's Standards FAQs—in the Zillow's Standards FAQs, Zillow specifically states that the policy is to apply regardless of local MLS rules. *Supra* ¶ 63.

303.    Zillow has argued that the geographic market is local because real estate is local and because Compass does not operate nationwide. But a market can be nationwide "even when market participants in some sense operate locally." *Davitashvili,* 2022 WL 958051, at *9.

     v.    Practical indicia show that Zillow has monopoly power in the nationwide online home search market

304.    Zillow has high market share, as shown by "appropriate indicators" like userbase, website and mobile app traffic, and time spent on site. *See, e.g.*, *Fed. Trade Comm'n v. Meta*

*Platforms, Inc.*, 775 F. Supp. 3d 16, 48 (D.D.C. Nov. 13, 2024) (defining market share based on usage metrics).

305.    Using the real estate audience share metric that Zillow uses to measure its market performance in the regular course of business, Zillow has at least 66% of the entire real estate audience share, likely even more, and its closest competitors have far less. *Supra* ¶¶ 186-90.

306.    Moreover, Zillow touts its dominance, and industry participants recognize it. *Supra* ¶¶ 185, 198.

307.    Further, significant barriers to entry and expansion in the online home search market, including Zillow's large userbase and brand strength combined with its network effects, *supra* ¶¶ 201-03. protect Zillow's monopoly power. *See Microsoft*, 253 F.3d at 51-52 (affirming finding that barriers to market entry existed based on market preference for established system with large amount of existing content and applications with substantial consumer base). Entry and expansion barriers include competitive advantages like "control of essential or superior resources" and a "wealth of . . . data that up-and-coming firms will lack." *Fed. Trade Comm'n v. Tapestry*, 755 F. Supp. 3d 386, 470 (S.D.N.Y. 2024).

308.    Further, it would cost at least billions to enter, and even then entry would be likely to fail. *Supra* ¶¶ 199-200, 203.

309.    Courts have found that sufficient barriers to entry exist where product infrastructure would take years and "millions of dollars" to build. *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 393 (S.D.N.Y. 2024); *see also Pac. Steel Grp. v. Com. Metals Co.*, Case No. 20-cv-07683-HSG, 2025 WL 2772618, at *7 (N.D. Cal. Sept. 29, 2025) (finding substantial barriers to entry where startup costs for a new mill would be "between 300 and 450 million dollars").

vi.    Zillow's Standards Constitutes Unlawful Exclusionary Conduct

310.    The central inquiry is whether "[a] firm . . . acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft Corp.*, 253 F.3d at 58 quoting *United States v. Grinnell Corp.*, 384 U.S. 563,  571 (1966); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979) ("Even if that power has been legitimately acquired, the monopolist may not wield it to prevent or impede competition."). In a Section 2 Sherman Act monopolization claim, "evidence of intent is . . . relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive . . . .'" *Aspen Skiing*, 472 U.S. at 602.

311.    In situations where a monopolist uses its dominant market power to "coerce" market participants into agreements or a particular behavior, the monopolist's conduct "crosses the line into anticompetitive behavior." *Panini Am.*, 2025 WL 753954, at *6; *see also Chase Mfg. Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1171 (10th Cir. 2023) (explaining that Section 2 misconduct usually involves some coercion of the marketplace by the monopolist).

312.    As discussed above in detail, Zillow's documents and testimony from Zillow executives demonstrate a clear intent to stop competition from Compass and "PLNs." *Supra* ¶¶ 92. 105-06, 109-116, 124-31.

313.    Zillow's intent with Zillow's Standards was not to create a new or innovative product, to create new features that would attract users, or to otherwise improve Zillow's offerings. Instead, the entire purpose of Zillow's Standards was to stop a new form of competition by interfering with how listings might flow to that new form of competition. *Id*.

314.    Not only that, Zillow itself has announced that it was successful in creating an anticompetitive effect of reduced choice and quality–announcing that it has been successful in

getting 90% of agents who previously offered off-Zillow options to stop. *Supra* ¶ 168; *see also Cantor*, 568 F. Supp. at 430 (finding that MLS rule prohibiting real estate brokers from marketing of homes for sale in a particular manner was anticompetitive because it "restrict[ed] plaintiffs' ability to advertise their services" and "substantially impar[ed] their freedom to conduct their businesses as they [saw] fit").

315.    Zillow claims that harm to Compass is not sufficient harm to competition, but that is wrong and, moreover, the evidence demonstrates the harm extends far beyond Compass. Zillow's own documents make clear that Zillow did not intend to only harm Compass. Rather, Zillow felt that Compass was a "contagion" that was going to lead to others also trying to compete the way Compass was competing, and targeted Compass in order to send a message to the entire market. *Supra* ¶¶ 128, 151, This type of behavior was intended to be and indeed is harm to competition. *See Cargill, Inc. v. Monfort of Colo., In*c., 479 U.S. 104, 117-18 (1986) (holding that conduct designed to hurt "competitors in the short run and reduc[e] competition in the long run . . . harms both competitors *and* competition" (emphasis in original)); *PLS*, 32 F.4th at 832 (stating that "sometimes harm to a competitor also harms competition which, in turn, harms consumers").

vii.    The Narrow Duty-to-Deal Doctrine Does Not Protect Zillow's Standards

316.    Zillow has argued that Zillow's Standards only govern how users can interact with Zillow, and that it has no "duty to deal" with competitors. Courts have refused to apply the duty to deal doctrine to conduct nearly identical to Zillow's for three primary reasons.

317.    First, the duty to deal doctrine does not apply when, as here, the evidence shows that the defendant monopolist engaged in the challenged conduct for the express purpose of maintaining its monopoly. For over 75 years, the Supreme Court has recognized that a monopolist

cannot "use[] its monopoly to destroy threatened competition." *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951).

318.    In *Lorain Journal*, the Supreme Court struck down the defendant newspaper's policy of refusing to sell advertising to advertisers who also advertised with the local radio station, an at-the-time rising competitive threat to the newspaper for delivering news. *Id.*; *see also Aspen Skiing*, 472 U.S. at 602 ("*In the absence of any purpose to create or maintain a monopoly*, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (emphasis in original) (citation omitted)).

319.    Here, the evidence is undisputed that Zillow adopted its Standards with clear intent to maintain its monopoly. Specifically, in its own words, Zillow sought to stop PLNs from proliferating and to stop online home search competitors from differentiating their product offerings through exclusive or differentiated listing inventory.  *Supra* ¶¶ 128, 161.

320.    Put simply, Zillow knew that, as the market leader, it would benefit by preventing competition on listings and inventory because Zillow (i) does not have its own listings to leverage, and (ii) already dominates other dimensions of online home search competition, such as monthly active users, online traffic and time spent on app, and brand strength.

321.    Accordingly, Zillow sought to maintain its monopoly by forcing its competitors to compete only in the manner that Zillow wanted them to compete. The "duty to deal" doctrine provides no refuge for monopolists who intentionally adopt anticompetitive policies that operate to maintain their monopolies.

322.    Second, the duty to deal doctrine does not apply in situations where, as here, the monopolist restricts how suppliers or customers behave competitively or interact with rivals,

including how they behave *off* the defendant's platform. *Novell, Inc. v. Microsoft Corp.,* 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.) (contrasting unilateral refusal to deal with actionable conduct that "limit[s] the abilities of third parties to deal with rivals"); *see also Chase Mfg.*, 84 F.4th at 1171-72 (holding that the case was improperly analyzed as a duty to deal case and should have instead been analyzed with regard to the "reality" of the market and "practical effect" of the defendant's conduct because monopolist defendant "threaten[ed] distributors that [it] would refuse to supply them with its products," and distributors gave in to the monopolist's "heavy economic pressure"  (internal citations omitted)).

323.    Third, the duty to deal doctrine does not apply here because the duty to deal "doesn't seek to displace doctrines that address a monopolist's more direct interference with rivals." *Novell*, 731 F.3d at 1076. That is exactly what Zillow is doing. In its own words, just before announcing its standards, Zillow's CEO wrote "we aren't going to allow Compass' program (by Compass or anyone else)," *supra* ¶ 152; Zillow's Co-founder, Co-Executive Chairman and President wanted "to try and maintain/force the status quo. i.e. listings continuing to go into the MLS and being distributed to all brokers," *supra* ¶ 179; and, just after the announcement, Zillow senior executives confirmed "[t]hat was our goal. .. to stop the PLNs." *supra* ¶ 167.

324.    Zillow is not just interfering with Compass and Compass.com, it is controlling the entire real estate industry. It is blocking off-MLS public marketing. It is not just controlling what agents and home sellers do on Zillow—Zillow is controlling what they do off Zillow. It forces agents and home sellers to send listings to entities that are completely separate from Zillow: the MLSs and thousands of websites that received the MLS data feeds. It interferes with the listing agreement between brokerages and home sellers. It interferes with the fiduciary duties of agents.

And that takes Zillow's standards out of any duty to deal doctrine. As then-Judge Gorsuch said, "a rival is always free to bring a section 2 claim for affirmatively interfering with its business activities in the marketplace." *Novell*, 731 F.3d at 1076.

325.    This principle has been applied consistently in recent cases involving technology platforms like Zillow's. Over the last two years, courts have refused to apply the duty to deal doctrine in monopoly cases against Google, Amazon, and Apple.

326.    In *Google*, the court found Google liable for monopolization under Section 2 in part because its "Unified Pricing Rules" restricted how Google's advertising customers priced their products on competing advertising exchanges. Citing *Lorain Journal*, the court reasoned that Google's policy was anticompetitive conduct because "it involved Google using its coercive monopoly power to deprive its publisher customers of a choice that they had previously exercised to promote competition." *Google*, 778 F. Supp. 3d at 864-65.

327.    And in the Federal Trade Commission's case against Amazon, the Court held that Section 2 applies because "Amazon actively deters third-party sellers from offering lower prices for their products on sites other than Amazon's. This suffices to state a claim under Section 2 of the Sherman Act." *Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 23-cv-01495-JHC, 2024 WL 4448815, at *8 (W.D. Wash. Sept. 30, 2024). In that case, Amazon prevented the brands that sold on its platform from selling their products at lower prices at competing online retailers like Walmart or Target.

328.    Just like Amazon's rules, Zillow's Standards "actively deter" home sellers from providing their listings only to online home search portals (like Compass.com) that do not charge the buyer's agent for the lead or charge less. *Supra* ¶ 89. (Compass CEO testifying that "Zillow's model is the selling leads model. The primary way they make money is when people click

'contact agent' or 'schedule tour,' it gets sent to a third-party agent where Zillow charges thousands of dollars.").

329.    The Google and Amazon restrictions are nearly identical to Zillow's Standards in that all three policies restrict the terms on which a supplier or customer of an online platform can deal with *rival platforms* and, in doing so, restrain competition to maintain the defendant's monopoly. The courts have been clear that, as here, such restrictions are not simple, traditional "refusals to deal" but, rather, are more pernicious in that they stretch *off platform* to regulate how market participants interact with the defendant's rivals.

330.    There are myriad cases rejecting Zillow's exact arguments. *See, e.g., Apple*, 2025 WL 1829127, at *12 (explaining that refusal to deal doctrine did not apply to Apple's restrictions on developers and users of the platform and recognizing that "[c]ourts across the country have refused to extend the refusal to deal doctrine to such conduct."); *see also Chase Mfg.*, 84 F.4th at 1173 (finding that the "refusal-to-deal-with-rivals" framework only applies in narrow situations regarding monopolists sharing their technology with rivals).

331.     Here, Zillow's Standards does not merely govern behavior on Zillow's platform; rather, Zillow's Standards dictates how Zillow's brokerage suppliers, including but not limited to Compass, behave *off Zillow*. *Supra* ¶¶ 86-87, 139.

332.    Zillow's Standards makes this clear on its face; the policy explicitly requires that home sellers and agents submit their listings *to the MLS* (not to Zillow) and thus requires sellers and agents to make the listings available to *everyone, everywhere, at the exact same time* (not just Zillow). *Supra* ¶¶ 139, 162.

333.    Moreover, by allowing banned listings to become unbanned as soon as the seller fires her agent and brokerage, Zillow is deliberately interfering in the fiduciary relationship between agents and their clients in order to achieve its anticompetitive goals. *See supra* ¶ 119.

334.    Zillow's attempt to sidestep these precedents by invoking *Trinko* because Compass in some respects competes with Zillow is misplaced. First, at a foundational level, Zillow's Standards is definitionally not an outright refusal to deal. Today, Zillow continues to deal with Compass and all other brokerages, regardless of the fact that listings of certain agents and sellers have been banned under Zillow's Standards. *Supra* ¶¶ 119-22. This selective decision to ban listings that are marketed on competing platforms is not a traditional refusal to do business with a market participant, as is required under the duty to deal doctrine.

335.    Second, the logic and facts of *Trinko*—the seminal duty to deal case—are inapplicable here. In *Trinko*, the Supreme Court held that Verizon did not have a duty under the antitrust laws to share its telecommunications network with its rival, AT&T. *Verizon Commc'ns., Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). The Supreme Court's ruling was premised on three critical facts: (i) the Telecommunications Act of 1996 already provided a detailed regulatory scheme that imposed certain duties on how competitors needed to share their networks, (ii) the Verizon services to which the plaintiff sought access were not "marketed or available to the public"; and (iii) any "forced sharing" of those services not offered to the public would be practically unworkable for the court to order and monitor. *Id.* at 410.

336.    Here, no such facts are present; the situation is precisely *the opposite*. There is no overarching regulatory scheme speaking to these issues, and Zillow routinely provides the listing services at issue here. Similarly, there are no "forced sharing" or workability concerns.

337.    Today, Zillow already displays thousands of Compass listings immediately and automatically by displaying all properties contained in the IDX and VOW feeds it receives from MLSs. *Supra* ¶¶ 156-57 (stating that Compass agents have received 1,137 listing violation notices and 43 listing bans. Zillow thus has to do *more work* to ban Compass listings than it does to receive them today.

338.    The default setting (but for Zillow's Standards) is that Zillow displays all Compass listings to Zillow's entire userbase. Compass is not asking–and the Court need not order–any "forced sharing" of Zillow's network infrastructure, as was the concern in *Trinko*.

339.    Third, Zillow ignores the foundational fact that Zillow's Standards governs Compass' (and all other brokerages') relationship with Zillow in their *capacity as a brokerage* not as a home search portal.

340.    Specifically, Zillow's Standards apply to agents and home sellers with real estate listings, not online home search portals, by dictating how and when those agents and home sellers market their listings.

341.    The fact that Compass operates as *both* a brokerage subject to Zillow's Standards and a home search platform is therefore immaterial, because the restraint at issue here is aimed at suppliers and customers of Zillow, exactly like the restraints at issue in *Google* and *Amazon*.

342.    In *Amazon*, for example, the fact that certain brands also sell their products direct-to-consumers on their own websites, while simultaneously selling those products on Amazon, did not magically transform Amazon's policy into a "refusal to deal" immune under Section 2. *See Amazon.com*, 2024 WL 4448815 at *6-9.

343.    And the same can be said for *Apple*. There, one of the restrictions challenged by the government is that Apple prevents developers from developing and launching on Apple

devices new digital wallets. But the court still refused to apply the duty to deal doctrine, even though any developer launching a new digital wallet would necessarily compete with Apple on some dimension by developing a competing product to Apple's own Apple Wallet. *Apple*, 2025 WL 1829127, at * 3-4.

344.    Last, applying the duty to deal doctrine here—which would be breaking from the other courts that have rejected it in similar cases—would leave no limiting principle, allowing monopolist platforms to adopt any and all policies they want even if the intent and effect is to extend their monopolies and crush budding competition. The law neither requires nor encourages such a result.

345.    Even if the duty to deal doctrine did apply, however, Compass is likely to demonstrate that Zillow's behavior was still anticompetitive. Under *Aspen Skiing*, a monopolist's refusal to deal with a rival is actionable exclusionary conduct when there was a prior profitable course of dealing between the firms, which the defendant unilaterally terminated, thereby suggesting a "willingness to forsake short-term profits to achieve an anti-competitive end." *See Trinko*, 540 U.S. at 409 (finding, despite the general rule, that a monopolization claim is stated where "[t]he unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end" (citing *Aspen Skiing*, 472 U.S. at 608, 610-11) (emphasis in original)); *Google*, 747 F. Supp. 3d at 182; *Eastman Kodak,* 504 U.S. at 483, 483 n.32 (1992) (stating that "[i]t is true that as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal" and finding that the defendant took exclusionary action to maintain its monopoly in on market and to strengthen its monopoly in a related market (quoting *Aspen Skiing*, 472 U.S. at 602-05)).

346.    That is exactly what happened here. Zillow has long displayed Compass' listings, and has long accepted listings that were previously Private Exclusives or Coming Soon listings. *Supra* ¶ 116 (showing that Zillow did not adopt its Standards until April 10 of this year) and ¶¶ 156-57 (showing that Zillow is still showing thousands of Compass listings, including some that were marketed off Zillow). And Zillow has recognized that listings are vital to its business, calling listings its "lifeblood" and stating that even a small degradation in the amount of listings it has access to could have negative consequences. *Supra* ¶¶ 95-96, 103.

347.    Yet, with Zillow's Standards, Zillow is willingly foregoing Compass' 3PM listings in violation of Zillow's Standards, as well as any similarly pre-marketed listings from other brokerages) on which it would earn revenue.

348.    Zillow is sacrificing the advertisements and leads that could be sold on those listings in order to ensure that the market remains frozen in place, with competition occurring only in the manner that works to maintain Zillow's monopoly. *Supra* ¶¶ 191-97.

349.    Last, as described below, Zillow has put forward no legitimate justification for Zillow's Standards (discussed below), meaning the sole reason for adopting Zillow's Standards was to harm competition and stop the competitive "contagion" of brokerages or other platforms using unique inventory to compete.

> viii.    Zillow's Proffered Justifications are Pretextual and Insufficient to Counterbalance the Anticompetitive Harms

350.    Zillow has offered three purported justifications for why it developed and enforced Zillow's Standards: (1) protection from listings that are "stale bread,"; (2) protecting "transparency"; and (3) protecting the market and itself from fragmentation and freeriding.

351.    None of these justifications are valid because they are pretextual, and even if they were not pretextual, they would be insufficient to counterbalance the anticompetitive harms. *See Google LLC*, 747 F. Supp. 3d at 106 (explaining that "[i]f the plaintiff makes out its prima facie case, the burden shifts to the defendant to proffer a 'procompetitive justification' for its conduct, that is, a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal" (citation omitted)).

352.    Strong evidence of justifications being pretextual can include strategy documents or statements by the defendant demonstrating that the true motive for the conduct was to harm competition. *See, e.g.*, *Actavis*, 787 F.3d at 658 (explaining that "[d]efendants' own documents" discussing their desire to slow competitors was evidence that the defendants' proffered justifications were pretextual).

353.    Other evidence of justifications being pretextual can also include evidence demonstrating that the defendant's conduct went against customer desires or was specifically targeted at competitors. *See Image Tech. Servs. V. Eastman Kodak Co.*, 125 F.3d 1195, 1213-14 (9th Cir. 1997) (finding that there was sufficient evidence of pretext because the defendant only adopted its anticompetitive conduct restricting whether customers would work with competitors only after a competitor began to win contracts and that customers preferred the services of the competitor); *see also Fed. Trade Comm'n v. Shkreli*, 581 F. Supp. 3d 579, 633 (S.D.N.Y. 2022) (rejecting monopolist's proffered procompetitive justifications relating to consumer benefits as pretextual because there was no evidence that the consumers actually received or wanted those benefits).

354.    As an initial matter, all of Zillow's offered justifications are pretextual. The evidence shows that Zillow had one goal in mind when it developed Zillow's Standards: protecting the current market structure and suppressing a method of competition that it did not like. *Supra* ¶¶ 92. 105-06, 109-116, 124-31.

355.    In any event, even if credited, Zillow's purported procompetitive justifications are not supported by evidence and fail to outweigh the anticompetitive effects of Zillow's Standards.

        a.      3-phased marketed listings are not "stale bread."

356.    For example, Zillow has claimed that one of its procompetitive justifications was to protect its platform from "stale bread," *i.e.* old listings.

357.    But the evidence shows that Zillow was so determined to achieve its anticompetitive goals that it did not undertake a single analysis seeking to study how pre-marketed listings differ from non-premarketed listings when they hit Zillow's website and did not at all examine the financial impact the Zillow Standards would have on Zillow. *Supra* ¶ 177.

358.    Moreover, the testimony undermines any concerns over "stale bread," as Zillow executives testified that there is no time limit for Zillow listings before they become stale, with Mr. Samuelson explaining that just this month he saw a listing that has been on Zillow for 500 days. *Supra* ¶ 15.

359.    In fact, Zillow accepts many types of listings that were marketed off-Zillow first. *Supra* ¶ 119.

360.    Finally, the notion that these listings are "stale" is implausible on its face; 94% of Compass listings that start in the first phase of 3-Phased Marketing end up going to phase three and thus sell on the MLS like all other listings. *Supra* ¶ 175.

361.    And, of course, Zillow receives these listings the moment they go active on the MLS at the same time as all other portals do; only Compass or the brokerage in question will have

the listings in advance. *Supra* ¶ 131 (Zillow expert explaining that when a listing goes to an MLS, Zillow and all others get the listing at the same time).

362.    Put simply, there is insufficient record evidence to substantiate Zillow's claim that 3-Phased Marketing listings are somehow "stale" by the time they get to the MLS and, by extension, Zillow and all other portals.

363.    By contrast, the opposite is likely true; Zillow itself acknowledges that pre-marketed listings may be more valuable, since they have gone through price discovery and "buzz generation." *Supra* ¶ 39.

364.    And Compass' research yielded precisely such results, finding that pre-marketed listings sell 20% faster than listings that go straight to the MLS. *Supra* ¶ 39.

                    b.    Zillow's Standards, and the listings they ban, decrease transparency.

365.    Zillow also has claimed that Zillow's Standards was adopted to protect "transparency" in the market.

366.    But Zillow is banning listings. *Supra* ¶ 120. That is not increasing transparency.

367.    Moreover, as explained above, the undisputed result of Zillow's Standards is that brokerages need to make their off-MLS inventory more private, pushing such listings back into the shadows rather than publicly marketing them to consumers who wish to see them. *Supra* ¶ 119 (stating that Zillow does not ban listings that have only been marketed privately.

368.    Zillow also does allow properties that were previously marketed off-Zillow to be marketed on Zillow—provided the seller fire her agent and brokerage. *Supra* ¶ 119 (stating that Zillow will not ban listings where a home seller fired both the brokerage and agent who previously marketed her listing off Zillow). This demonstrates that Zillow's interests here are not the accuracy of the information, but rather punishing agents and brokerages that market properties off-Zillow.

       c.     Alleged fragmentation and freeriding are competition, not excuses to block unique inventory on other online home search portals or deprive home sellers of choice.

369.   Zillow has also claimed that it wants to protect the market from "fragmentation and free riding." But this result is actually competition at work, and Zillow's efforts to kill it before it can take form is not sufficiently procompetitive at all.

370.   In *PLS*, the Ninth Circuit considered whether CCP, a policy very similar in substance to Zillow's Standards, was anticompetitive. *PLS*, 32 F.4th at 836.

371.   NAR argued that CCP was procompetitive because it reduced search and transaction costs because it provided " a listing service with all of the publicly available listings in one place." *Id.* The Ninth Circuit rejected this argument as a "frontal assault" on the basic policy of the Sherman Act. *Id.*

372.   Here, this is the exact argument Zillow has made regarding its supposed justifications—Zillow has argued that all Zillow is trying to do is ensure that everyone has access to all of the freshest listings, and that if listings displayers such as Zillow and Redfin instead compete on grounds other than listings consumers will be better off. *Supra* ¶ 105.

373.   Zillow itself appears to recognize that this is how competition would work without Zillow's Standards. *Supra* ¶¶ 90-94.

374.   Moreover, Zillow testified that the market is fragmented with or without the standards. In fact, Zillow witnesses admitted that home search users regularly search multiple home search websites or apps at the same time, and it is easy for them to do so. *Supra* ¶ 55.

375.   More than that, major portals allow users to create "saved searches" whereby users are notified when new listings matching their criteria hit the respective platforms, effectively bringing the new inventory directly to consumers as it comes online. *Supra* ¶ 54.

376.    In short, it is not Zillow's place to decide what is and is not good for consumers or the market—that is for competition to decide. See *Nat'l Soc'y*, 435 U.S. at 695.

**B.    Compass Is Likely To Succeed On Its Section 1 Claim**

377.    Compass has argued that Zillow and Redfin entered into an illegal agreement in violation of Section 1 of the Sherman Act whereby Redfin would adopt its own version of Zillow's Standards. Compass is likely to succeed in its claim that this agreement was an antitrust violation.

378.    A defendant violates Section 1 of the Sherman Act when it enters (1) an agreement (2) that unreasonably restrains trade. *United States v. Apple, Inc.*, 791 F.3d 290, 320-21 (2d Cir. 2015). To determine whether an agreement unreasonably restrains trade, courts apply one of three methods: the per se rule, quick look review, or the rule of reason. *See id.* at 322, 329-30.

379.    As discussed further below, in "group boycott" situations, i.e., when the agreement was between competitors to try to harm other competitors by coercing suppliers, the group boycott agreement is per se illegal if the boycotting firms possess a dominant position and cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete. *PLS*, 32 F.4th at 834-35; *see also Anderson News*, 680 F.3d at 183 (stating that "group boycotts are so likely to restrict competition . . . that they should be condemned as per se violations") (citations omitted).

380.    Here, Zillow executives and documents have confirmed that Zillow's Standards were intended to be a preservation of the pre-March 2025 version of CCP. The Ninth Circuit's analysis in PLS that CCP was a per se illegal group boycott is persuasive, and accordingly any group boycott agreement regarding Zillow's Standards would also be analyzed under the per se framework.

   i.  The Evidence Shows Zillow and Redfin Reached an Agreement

381. Compass has provided sufficient evidence showing "parallel conduct" and other plus factors to prove an antitrust conspiracy. *See, e.g., Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 323 (2d Cir. 2010) (reversing dismissal because "the allegations, taken together, place the parallel conduct 'in a context that raises a suggestion of a preceding agreement, not merely parallel conduct" (citation omitted)).

382. Case law governing antitrust cases does not require that the conspirators explicitly say that they were in agreement to take a specific course of action and does not require proof beyond a reasonable doubt that there was an agreement. *See Anderson News, LLC*, 680 F.3d at 183. Rather, a plaintiff need only show that the evidence "reasonably tends to prove" that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 184 (citation omitted); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001). Here, the scheme was to stop competitors that had private listings from competing on the basis of those private listings, and it is clear from the evidence that Zillow and Redfin had each expressed a commitment to that scheme via publication of standards. See *supra* ¶¶ 219-20; *see also In re Currency Conversion*, 773 F. Supp. 2d 351, 367-68 (S.D.N.Y. 2011) (denying summary judgment because a jury could find an agreement even though certain defendants did not finalize their allegedly conspiratorial fees until after other defendants had already announced their fees).

383. A plaintiff need not show direct evidence of an agreement such as a "smoking gun" document or show beyond a reasonable doubt that there was an agreement—rather, "even in the absence of direct 'smoking gun' evidence," an agreement may be inferred if a plaintiff can show conscious parallelism and sufficient plus factors, such as information exchanges or other usage of agreement-facilitating practices. *Todd*, 275 F.3d at 198.

384.    The Second Circuit has cautioned that in situations where the alleged conspiracy was "relatively simple in operation," "the best proof available most often will only tend to show the existence of an informal, perhaps even tacit, rather than explicit, agreement"—and that such an informal or tacit agreement is still an agreement for purposes of an antitrust claim. *See Apex Oil Co. v. Di Mauri*, 822 F.2d 246, 253 (1987).

385.    Indeed, the mere exchange of information can itself be a violation of the Sherman Act. *Todd*, 275 F.3d at 198 (explaining that a data exchange that caused a stabilization of prices and had an anticompetitive effect on the market was found to be an antitrust violation).

386.    Plus factors supporting a finding of conspiracy may include showing a highly concentrated market, conduct that is against the individual economic self-interest of the co-conspirators, and inter-competitor communications. *See Starr*, 592 F.3d at 323.

387.    A strong motive to conspire, knowledge of assured enforcement, and efforts to enforce the agreement can also be evidence of an agreement. *Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 305-07 (S.D.N.Y. 2014).

388.    Such evidence of an agreement "must be examined holistically" rather than evaluated in isolation. *See In re Currency Conversion,* 773 F. Supp. 2d at 370-71 (citations omitted).

389.    The parallel conduct here is undisputed: Zillow publicly announced its Standards on April 10, 2025, and Redfin informed Compass that same night that it too would be adopting a similar policy (which it publicly announced four days later). *Supra* ¶¶ 216-22; *see In re Amazon.com, Inc. eBook Antitrust Litig.*, No. 21-cv-00351 (GHW) (VF), 2023 WL 6006525, at *20 (S.D.N.Y. July 31, 2023) ("[A]dopting similar policies around the same time" is suggestive of "anticompetitive behavior").

390.     The plus factor evidence is likewise clear. Beginning with inter-competitor communications, the nature, timing, and characteristics of the numerous communications between competitors are strong plus factor evidence of an agreement between the two entities. *See In re Currency Conversion*, 773 F. Supp. 2d at 368-71 (nature, timing, and characteristics of numerous inter-firm communications sufficiently excluded the possibility of parallel yet independent conduct).

391.     Here, the timing, nature, and characteristics of the conversations between Zillow and Redfin are probative of an agreement. Between March 2025 and April 2025, Zillow and Redfin leadership had numerous conversions about CCP, Compass, Zillow's Standards and how they would work, and Redfin's plans to "likely to do same." *Supra* ¶¶ 207-25. Before being told of the Zillow plan, Redfin—by its own admission—was not planning to adopt its own listing access standards, *supra* ¶ 216, and in fact appeared as though it was making plans to try to mimic Compass' exclusive listings strategy, *supra* ¶ 214,, until it was told by Zillow that Zillow planned to adopt standards.

392.     The communications further show that after being told by Zillow what the plan was, Redfin abruptly shifted course and abandoned its exclusive listings strategy and took efforts to match up its new standards with Zillow's Standards. *Supra* ¶¶ 214-22.

393.     Redfin made this abrupt shift in course despite senior executives at Redfin warning that the shift would be bad for Redfin and could bring "scrutiny" for collaborating with a competitor. *Supra* ¶ 218. Redfin executives instead felt that Redfin could capitalize on the changes to CCP and use its own exclusive listings and access to listings to compete with Zillow. *Id.*

394.     The May 21, 2025 discussion, *supra* ¶¶ 224-26, between Mr. Wacksman and Mr. Kelman is additional and independent evidence of a conspiracy. During that call, Mr. Kelman sought and received a separate an additional benefit for Redfin—an explicit statement from Mr. Wacksman that Zillow would not be allowing direct listing feeds to satisfy Zillow's Standards and more importantly a commitment that Zillow would issue a *public* clarification on that exact point. *Id.*

395.     This public clarification was itself an anticompetitive benefit to Redfin—without the clarification, market participants might have thought that Zillow was indeed trying to compete via listings, and might be spurred to do the same, even if Zillow was not actually intending to do so. But, with this public commitment, Zillow was signaling to the entire market that it was not competing on those grounds—a public commitment that Redfin could use so that it too would not have to compete on inventory.

396.     Additionally, the online home search market is highly concentrated, with three large competitors making up over 90% of the market (Zillow and Redfin together make up over 70% of the market) and Zillow having over double the website traffic and more than four times the daily active application users of its next largest competitor. *Supra* ¶ 186; s*ee Visa*, 163 F. Supp. 2d at 341 (describing as "highly concentrated" a "market with only four significant competitors").

397.     Redfin and Zillow have also admitted that they had the exact same motives. *Supra* ¶ 212 (describing a call where the CEOs of Zillow and Redfin discussed that they were "culturally aligned" regarding Compass and CCP).

398.     Redfin executives further explained to Mr. Kelman why it was against Redfin's economic self-interest to support Zillow's stance. *Supra* ¶ 219. The parallel conduct and plus

factor evidence, including frequent communications, thus make it likely that Compass can show there was an agreement.

399.     Zillow has argued that there was no agreement because the CEOs denied they conspired. But such denials simply mean that the plaintiff must show that its proffered "plus factors" reduce the probability that the parallelism was the result of independent action. *Alexander v. Phoenix Board & Indem. Co.*, 149 F. Supp. 2d 989, 1000 (N.D. Ill. 2001) (stating that "[w]hen a defendant puts forward denials of a conspiracy . . . Courts have allowed plaintiffs to proceed by presenting evidence that there is some 'plus factor' which reduces the probability of independent action."). Given the significant and abundant evidence of plus factors here, including contemporaneous written evidence, the CEO of Zillow's later verbal denial of a conspiracy is of little evidentiary value.

400.     Zillow also claims that it had already decided to move forward with Zillow's Standards prior to reaching out to Redfin. This ignores the extensive communications between Zillow and Redfin in March when Zillow was actively developing Zillow's Standards. *Supra* ¶¶ 208-26.

401.     Zillow also ignores that by Redfin's own admission, Redfin had not been planning to adopt its own version of Zillow's Standards until Zillow told it was going to adopt Zillow's Standards and that when told of those standards, Redfin's CEO specifically said he was "likely to do the same." *Supra* ¶ 216. Based on this admission, the timing makes it clear— Redfin had no intent to create its own standards until Zillow said it was going to do so, at which point Redfin CEO Glenn Kelman decided to do the same, despite protests from his team. *Supra* ¶¶ 215-21.

402.    Zillow has further argued that there was no agreement, as there was no "quid-pro-quo." Here too, the case law does not require a separate "quid-pro-quo" among competitors—the benefit that each party to an antitrust agreement receives is the ability to avoid competition on the merits. *Apple*, 791 F.3d at 305 (explaining that the quid pro quo that the parties to the conspiracy received was the ability to avoid competition); *W. Va. ex rel. McGraw v. Bank of America, N.A.*, 790 F. Supp. 2d 106, 120 (S.D.N.Y. 2011) (explaining that the "quid pro quo" benefits of entering into the conspiracy was the ability to win future auctions without competition).

403.    There does, however, appear to have been a specific exchange of benefits in this instance. As discussed above, Zillow's testimony and documents show that between March and May of 2025, Zillow was actively engaged in negotiating direct listing feeds from various brokerages and had in fact succeeded in executing direct listing feed agreements with several brokerages. *Supra* ¶ 110. Mr. Wackman thus gave Redfin a clear benefit during the May 21, 2025 call between Mr. Wacksman and Mr. Kelman—a public and open commitment that Zillow would not be competing on listings. Even if Zillow had never intended to compete on listings, the public commitment was still a benefit, as it allowed Redfin to also continue to tell the market that because of that commitment, Redfin was also justified in not competing on listings.

404.    And Redfin specifically requested benefit ███████████████████████
█████████████████████████████████████████████████████████ *supra* ¶ 225–further evidence that the public assurance that Zillow was not doing so was a specific benefit that Redfin sought and received.

405.    Finally, Zillow has argued that there was no agreement, as Zillow and Redfin's announcements were not actually the same, and Redfin has not actually enforced its version of Zillow's Standards. As a factual matter, the announcements were identical on the important

parts—both announcements stated that each company would ban listings that were publicly marketed before being sent to the MLS. *Supra* ¶ 221.

406.    That Redfin also included a statement that it would be asking the MLSs to create a "Coming Soon" designation for listings, *supra* ¶ 220, is immaterial. That statement was unrelated to the core conduct that Zillow and Redfin had agreed to (banning listings that were marketed outside of the MLS) and was not even a policy position that Redfin was taking—it was merely a statement by Redfin that it would raise the issue with a wholly separate entity. *Id.*

407.    The antitrust laws do not require that the parallel conduct be identical in all aspects—so long as the "key parallel conduct" is the same. *See Anderson News, LLC*, 680 F.3d at 191 (stating that even though the alleged conspirators' initial reactions to the same stimulus were varied, an agreement was still plausible because ultimately, the conspirators took the same core action); *see also PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds of Pharm.*, 530 F. Supp. 3d 301, 334 (S.D.N.Y. 2021) (explaining that parallel conduct was not required to "occur precisely at the same time" and citing to case explaining that an agreement could be inferred from parallel conduct that is sequential rather than simultaneous); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015) (stating that parallel conduct "need not be exactly simultaneous and identical in order to give rise to an inference of agreement") (citation omitted).

ii.    The Zillow-Redfin Agreement is a *Per Se* Anticompetitive Group Boycott

408.    Zillow and Redfin's agreement is a per se anticompetitive group boycott. The classic per se anticompetitive group boycott is "a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *See United States v. Columbia Pictures Indus., Inc.,* 507 F. Supp. 412, 428 (S.D.N.Y. 1980) (citation omitted); *see also Primetime 24 Joint Venture v. Nat'l Broadcasting Co.* Inc., 219 F.3d 92, 102 (2d Cir. 2000).

409.    Another "classic" per se anticompetitive group boycott is a group boycott "designed to influence coercively the trade practices of boycott victims, rather than to eliminate them as competitors." *Columbia Pictures*, 507 F. Supp. at 428 (citation omitted). Ultimately, the "touchstone" of whether a group boycott is per se unlawful is whether the "purpose and effect" of the arrangement is "exclusionary or coercive." *Id.* (citation omitted).

410.    As explained above, the stated goal of Zillow's Standards and its agreement with Redfin was to stop competition in the form of "PLNs." *Supra* ¶¶ 167, 182.

411.    Zillow and Redfin explicitly wanted to ensure that listings would flow to the MLSs where they would both have immediate access, and explicitly wanted to set rules for the market. *Supra* ¶¶ 220, 223.

412.    Their concerted refusal to accept listings that had violated their respective standards thus were designed to "protect themselves from competition" and to "influence coercively the trade practices of boycott victims," i.e. brokerages who did not want to go along with the scheme. *See Columbia Pictures*, 507 F. Supp. at 428.

413.    Thus, as the Ninth Circuit held regarding CCP, by mandating that brokerages send their listings to an MLS and forego any type of off-MLS marketing, the Zillow-Redfin agreement constituted a per se unlawful group boycott. *PLS*, l2 F.4th at 833–37.

iii.    The Zillow-Redfin Agreement is Independently Unlawful Under a Quick Look or Rule of Reason Analysis

414.    Even if the Court were to apply quick look or rule of reason analysis, the Zillow-Redfin Agreement is more likely than not anticompetitive. *See N. Carolina State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 717 F.3d 359, 373 (4th Cir. 2013) (stating that although per se, quick look, and rule of reason exist on a "continuum," ultimately, "the criterion to be used in

judging the validity of a restraint on trade is its impact on competition" (citations

omitted)); *Realcomp II, Ltd. v. Fed. Trade Comm'n*, 635 F.3d 815, 826 (6th Cir. 2011).

415. The main difference between a per se and quick look or rule of reason analysis is

that under a quick look or rule of reason analysis, defendants may proffer procompetitive

justifications for their agreement, and if those justifications outweigh the anticompetitive harms,

the agreement is not an antitrust violation. *In re Payment Card Interchange Fee & Merch. Disc.*

*Antitrust Litig.,* 714 F. Supp. 3d 65, 81-82 (E.D.N.Y. 2024).

416. As discussed *supra* ¶¶ 350-76, however, Zillow's proffered procompetitive

justifications are pretextual and insufficient. *See PLS*, 32 F.4th at 836 (rejecting argument

that CCP was procompetitive in that it resulted in a "higher quality product: a listing service with

all of the publicly available listings in one place" because "justifying a restraint on competition

based on the assumption it will improve a product's quality 'is nothing less than a frontal assault

on the basic policy of the Sherman Act.'") (citation omitted); *see also Apple*, 791 F.3d at 331

(rejecting as "reflect[ing] as basic misunderstanding of the nature of the competition that antitrust

law protects" the argument that the defendant had created a cartel "at one level of the market" to

"promote[] market entry at another," and had therefore enhanced competition).

## V.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY
##       SUPPORT A PRELIMINARY INJUNCTION

### A.    The Balance Of The Equities Weighs Heavily In Favor Of Compass, As Zillow
###       Would Suffer No Harm From the Injunction

417. As part of the preliminary injunction analysis, courts must determine the

"balance of the equities," *i.e.*, "which of the two [sides] would suffer most grievously" if the

injunction motion is wrongly decided. *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,

922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (citation omitted).

418.    Here, the balance of the equities decidedly favors Compass. As discussed above, *supra* ¶¶ 234-75, Compass would suffer severe irreparable harms without injunctive relief, including the incalculable loss of its ability to use 3-Phased Marketing to drive other parts of its business; lost goodwill and reputation; and lost first-mover advantage.

419.    In contrast, as explained above, Zillow would suffer little if any harm if Zillow's Standards were to be enjoined. See *supra* ¶¶ 276-81. The injunctive relief would also only be temporary until a trial can be held on the merits. At such time, if Zillow's conduct and agreement with Redfin are deemed not to be anticompetitive, Zillow can simply turn enforcement of Zillow's Standards back on.

### B.    The Public Interest Weighs In Favor Of The Injunction

420.    Finally, the public interest would best be served by the injunction. When evaluating this factor, a court must ensure that the public interest would not be disserved by the injunction. *FuboTV*, 745 F. Supp. 3d at 151. In antitrust cases, protecting the public from a potential antitrust violation cuts strongly in favor of the injunction. *See Gulf & W. Indus.*, 476 F.2d at 698-99; *see also fuboTV*, 745 F. Supp. 3d at 151 (stating that "the public's interest in enforcement of the antitrust laws and in the preservation of competition" is "[f]ar more important than the interests of . . . the existing industry.") This proposition applies even when the antitrust case is brought by a private entity. *Gulf & W. Indus.,* 476 F.2d at 698-99 (stating that private actions are a necessary supplement to antitrust actions by the government, and thus "doubts as to whether an injunction sought is necessary to safeguard the public interest" in such cases "should be resolved in favor of granting the injunction.") (citation omitted).

421.    The public would also benefit from the increased options and choice in how home sellers market their home, as the public has already expressed a desire for such options and

choice. *Supra* ¶ 35 . In the interim, until a trial on the merits can be held, the public interest would in fact benefit from the injunction.

## **CONCLUSION**

422.    The Court therefore grants Compass' motion. Compass has demonstrated irreparable harm; a likelihood of success on the merits; that the balance of the equities tips in its favor; and that the public interest would not be disserved by the injunction. At a minimum, Compass has raised a serious question as to the merits and that the balance of the equities tips decidedly in its and the public's favor.

423.    Zillow and its affiliates are enjoined from enforcing the Standards, or anything similar, pending a trial on the merits and resolution of this action.

Dated: December 5, 2025                              Respectfully submitted,


                                        */s/ Chahira Solh*
                                        Chahira Solh (*admitted pro hac vice*)
                                        Daniel A. Sasse (*admitted pro hac vice*)
                                        CROWELL & MORING LLP
                                        3 Park Plaza, 20th Floor
                                        Irvine, CA 92614
                                        Telephone: (949) 263-8400
                                        csolh@crowell.com
                                        dsasse@crowell.com

                                        Kenneth Dintzer (NY Bar No. 2476687)
                                        (*admitted pro hac vice*)
                                        CROWELL & MORING LLP
                                        1001 Pennsylvania Avenue, NW
                                        Washington, DC 20004
                                        Telephone: (202) 624-2500
                                        kdintzer@crowell.com

                                        Luke Taeschler (NY Bar No. 5308325)
                                        CROWELL & MORING LLP
                                        Two Manhattan West
                                        375 Ninth Avenue
                                        New York, NY 10001

Telephone: (212) 223-4000
ltaeschler@crowell.com

*Attorneys for Plaintiff Compass, Inc.*