UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

COMPASS INC.,

Plaintiff,

v. 25 Civ. 5201 (JAV)

ZILLOW INC., et al,

Defendants.

Hearing

------------------------------x

New York, N.Y.
November 18, 2025
9:00 a.m.

Before:

HON. JEANNETTE A. VARGAS,

District Judge

APPEARANCES

CROWELL & MORING LLP
Attorneys for Plaintiff
BY: CHAHIRA SOLH
KENNETH DINTZER
LUKE TAESCHLER
SIMA NAMIRI-KALANTARI

WILSON SONSINI GOODRICH ROSATI PC
Attorneys for Defendant
BY: BONNIE LAU
BEAU W. BUFFIER
NICHOLAS R. SIDNEY
ERIC P. TUTTLE
TONYA BOSI

(Case called)

MS. SOLH: Good morning, your Honor.

Chahira Solh from Crowell & Moring on behalf of the plaintiff, Compass. I am joined by Kenneth Dintzer, Luke Taeschler, Sima Namiri-Kalantari, Lauren Fleming, and Timothea Letson, who is in-house at Compass.

THE COURT: Good morning.

MS. LAU: Good morning, your Honor.

Bonnie Lau from Wilson Sonsini. I'm joined by my colleagues Eric Tuttle, Nick Sidney, and Beau Buffier, also from Wilson Sonsini. We also have Tonya Bosi, in-house counsel at Zillow.

THE COURT: Good morning.

So, to start off these proceedings, we're going to have 30 minutes allocated to each side for opening statements, but we did have reserved time on any objections to exhibits, and so I want to hear from the parties as to whether or not there's been meet and confers on admission of exhibits and if there are objections for the Court to take up this morning.

MS. SOLH: Your Honor, the parties have been meeting and conferring. I don't believe there's any objections to take up this morning.

THE COURT: All right. So then is there an application to move exhibits into evidence?

MS. SOLH: Yes, your Honor.

THE COURT: All right. What would you like to move into evidence?

MS. SOLH: We would like to move all of the exhibits on our exhibit list, your Honor.

THE COURT: All right.

No objections?

MS. LAU: No objections, your Honor.

THE COURT: All right. The Court accepts all of the exhibits on plaintiff's exhibit list into evidence, and I understand from prior discussions that there is also, to the extent not included on the exhibit list, an application to include any exhibits appended to declarations and to the existing motion papers. I don't know if there are any such exhibits that are not also included on the exhibit list, but to the extent there are, I'm also going to accept those into evidence as well.

Ms. Lau, do you have an application?

MS. LAU: I do, your Honor.

Likewise, we move to admit all exhibits listed on defendant's exhibit list, as well as all exhibits and deposition testimony appended to Zillow's filings.

Thank you.

THE COURT: All right.

Any objection?

MS. SOLH: No objections, your Honor.

THE COURT: Those are, likewise, received into evidence.

Thank you.

All right. For purposes of opening statements, it would be helpful to both the Court and the court reporter if you could stand at the podium, if that is acceptable. And I don't know if there's going to be any demonstratives or PowerPoints used with respect to the openings. If there are, I assume, in accordance with my rules of practice, they have been shared in advance with and there's no objections that I need to hear on those.

Is that correct?

MS. SOLH: That's correct, your Honor. They have been shared in advance and there is no objections.

THE COURT: All right.

Same for you, Ms. Lau?

MS. LAU: Yes, your Honor. We complied with disclosure and we have no objections.

We do have one additional issue where we would require the Court's feedback in advance of the opening statements.

THE COURT: Yes. Let me hear you on that.

MS. LAU: This morning we requested that Compass exclude from the courtroom for purposes of opening statements as well as testimony all of its fact witnesses who they anticipate testifying in this hearing. Under FRE 615(a), as

the Court is aware, at a party's request, the Court must order exclusion of those fact witnesses. And I can represent that in the course of the opening statement, at least for Zillow, we will be previewing the testimony that we anticipate our witnesses will offer, as well as the testimony that we expect to elicit from Compass' testimony, and so we request exclusion of all of Compass' fact witnesses.

MR. DINTZER: Kenneth Dintzer for Compass, your Honor.

Zillow's discovery of Rule 615 is late. We have executives who are actually here. There's no reason that Zillow couldn't have raised this days, weeks, months ago. So, first of all, we believe it's just tardy and the Court should reject the motion.

Second, it's only opening statements, there's no testimony. They can choose whether to provide the testimony or not.

And the third, this is a PI hearing and so not subject to the Federal Rules of Evidence, as far as evidentiary issues. Certainly seeing the opening statement will not prejudice Zillow on any testimony, and in fact because so much of their case seems to be built around not defending their conduct but attacking Compass, it seems only fair that Compass' executives should be able to be in the room so that they can hear what's being said.

So, with that, your Honor, we do have two executives

and an agent who we would ask to be able to stay, as well as our expert, which I understand they're not asking to exclude.

THE COURT: So, I'm consulting right now with Rule 615(a), which reads: At a party's request, the Court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony, or the Court may do so on its own. This rule does not authorize excluding a person who is a natural person; one officer or employee of a party that is not a natural person, if that officer or employee has been designated as the party's representative; or any person whose presence a party shows to be essential to presenting the party's claim or defense; or a person authorized by statute to be present.

So, I don't see that this rule is necessarily limited to trial and not to evidentiary hearings. I do agree with you that the Rules of Evidence are relaxed for purposes of a PI hearing, but obviously that doesn't mean that they don't wholly apply. Relaxed is not the same as inapplicable.

MR. DINTZER: We understand that, your Honor.

It does expressly only apply to testimony. So, Zillow's decision to transport testimony into its opening shouldn't be a basis for excluding our witnesses. That's a decision that they're making in the same way that if they were out in the hall talking about the testimony, if they do it in a way that one of our witnesses could hear, we can't control

that.

We would ask, though -- I mean, if necessary, we will designate a corporate representative and do it that way, at least to some extent. But in fairness, there is a tardiness element, and we have people who have traveled so that they can hear this opening, and we would ask the Court to allow them to stay. Only for the opening. We're not asking for them to stay for the testimony.

THE COURT: All right. And these are three executives who will be testifying at the hearing, so they are going to be fact witnesses.

MR. DINTZER: To be clear, two are executives and one is the agent that the Court has heard about. So, Mr. Reffkin will be our first witness, Ms. Alexander will testify later in the trial, and Ms. Carr, who is the agent, she will be our second witness.

So, those are the three people who will be testifying, but we're only asking, as far as 615 is concerned, for them to stay for the opening.

THE COURT: All right. Let me hear from Ms. Lau one final time.

MS. LAU: Thank you, your Honor.

First, there's no timeliness issue. We were actually quite surprised to see fact witnesses in the audience, as it is typically applied to opening statements. It is also a matter,

of course, for opening statements to clearly preview the evidence that we anticipate showing the Court, and that includes an overview of the primary testimony from witnesses on both sides.

There's no hardship here, your Honor. As we understand it, both Compass and its executives are all resident here in New York City, and the corporate representative that they have selected, based on counsel's representation, is the deputy general counsel, Ms. Letson, who is seated at counsel table.

So we request, your Honor, exclusions for the purpose of the opening statements.

Thank you.

THE COURT: I am going to grant in part and deny in part. I will grant in part the application with respect to testimony, as is traditional under 615(a). I'm going to deny it as to opening statements.

All right. Let's proceed.

MR. DINTZER: Thank you, your Honor.

We have paper slides to hand out, if that pleases the Court.

THE COURT: That would be fine.

MR. DINTZER: Thank you, your Honor.

(Pause)

MR. DINTZER: Just waiting until we get our slides

pulled up, your Honor.

Does the Court have access to the visuals?

THE COURT: I do.

MR. DINTZER: Thank you, your Honor.

THE COURT: You may proceed.

MR. DINTZER: May it please the Court.

Your Honor, this is a case about Zillow's attack on a new way to market homes in the United States. Zillow's weapons of choice were its market power in home search market and an agreement with a competitor, Redfin. Earlier this year, a rule-setting organization eased the restriction for marketing homes for sale in the United States. This change gave sellers a choice and opened the door for innovation in the home marketing industry.

Compass is one of the largest brokerages in the United States and, on a smaller scale, it competes with Zillow in the home search category. When the rules changed, compass was ready. It had already pioneered a marketing strategy that perfectly met the moment. This strategy offered new choices for sellers and developed unique content for Compass' online search platforms. But Zillow moved to squash the threat posed by Compass and by other brokerages that were following Compass' lead. Zillow knew that the new strategies could disrupt its control of the home search marketing industry.

Now, Zillow's planning came together in this 2024

document titled Strategy Synthesis. Zillow's senior leadership laid out the concerns about Compass and began preparing for the rule change that they saw coming. They listed tactics they might employ, tactics they acknowledged were punitive. They stated that Zillow's intent was, to be clear, we want to be more aggressive with hard-line tactics to keep all listings on IDX on Zillow. This is clear. It's all about the listings.

Identifying a listings ban was one option they considered in this document, and Zillow's executives then concluded, your Honor, everything about the hard-line plan assumes we can be successful at using a hammer -- a hammer -- to keep sellers and agents on our site.

Zillow says it's amped up on transparency, your Honor. Well, this is transparency. This is what they really thought, this is why they really acted. This is a monopolist planning punitive tactics to force consumers to stay on the monopolist's platform. This is what the antitrust laws were designed to prevent.

In this motion, Compass asks the Court to protect these agents, these sellers, and Compass itself from Zillow's hammer, at least until this matter can be resolved on the merits.

Now, what was the change that scared Zillow? What prompted its response? Zillow, Redfin, Compass, and others compete in home search. That is, you put an address, a

neighborhood, a city into the little search box and out comes the relevant homes for sale in that area. Now, listings on these websites are generally the result of efforts by agents working with home sellers to gather up their information and put it together to sell the properties. Once the listings are created, they are aggregated and sent to anyone with a brokerage license. That's why Compass and Zillow and Redfin generally have the same content on their websites.

But Compass has something that Zillow does not: It has its own agents and its own listings. And under the recent rule change, sellers could choose to market their listings on websites other than Zillow. Compass could take its unique listings from its agents and its clients and use them to differentiate itself from Zillow and Redfin. And Compass leaned into this strategy.

Now, what we have here, your Honor, is a mockup of a planned billboard that Compass was putting together, was planning to go public with, and then scrapped because of Zillow's conduct. It would have told people that they could see homes on Compass.com before they were available anywhere else. And Compass wasn't the only one that wanted to market off of Zillow, they were just the first. Other brokerages followed Compass' lead, moving exclusive content onto their websites, and this is what freaked Zillow out. So Zillow acted. Zillow adopted what it calls "standards," seeking to

stop seller choice, seeking to stop unique content on search rivals, and these standards had teeth. If you violated Zillow's rules, Zillow would ban your listing forever.

Now, as a starting point, what company thinks that it can issue standards for the industry in which it competes in? That, your Honor, is a monopolist flexing. And if we dig into the language of their standards, the language of Zillow's announcement, we understand the game that they're playing. And this is what they had: When the listing is publicly marketed to consumers, it must be published on Zillow. And let's focus on the word "publicly" there, your Honor. An agent can circulate the listings in a brokerage, she can show those listings to her customers, but she can't post them on a rival search engine without handing them off to Zillow. Zillow adopted the standards to insulate itself from competition, and these standards force sellers and agents onto Zillow, just as Zillow planned.

But, your Honor, even a monopolist likes to know someone has their back. Zillow enlisted Redfin to join in its efforts. Days after Zillow adopted its standard, Redfin pledged to follow Zillow's lead. CEOs from Zillow and Redfin adopted and implemented an agreement to boycott Compass' listings and punish their search rival.

Now, the evidence of the impact is undisputed, your Honor. One month ago, Zillow published a web page crowing

about the success of the Zillow ban. And this on the screen, your Honor, is Zillow's scorecard. Even with Zillow's publicized threats, some agents gave their clients choice to premarket their house before they appeared on Zillow. But when Zillow caught and warned these agents, nearly all stopped offering those options. And again, this is Zillow's own website. Zillow claims 90 percent of the agents who received a listing access standard notice from Zillow only received one, meaning the initial notice resulted in most agents making sure their next listing was available widely and aligned with the Zillow standards.

Your Honor, once the agents were threatened by Zillow, 90 percent of the agents stopped offering premarketing to their clients. Zillow takes credit for reducing seller choice and making sure no rival has listings that Zillow doesn't, and that, your Honor, harmed competition.

Now, with that, your Honor, I'd like to set an agenda for the rest of my opening. I'd like to do two things: First, talk about how we got here and discuss the real estate industry, describe the change that opened the door to competition; and next in turn, discuss the necessary showing for the requested injunction and connect that up to the Sherman Act violations that we've alleged. Throughout this presentation, your Honor, we will explain that the ban creates more harm than good, which is exactly -- exactly -- what

Zillow's executives wanted.

So, we'll take a minute and talk about the steps that led up to this lawsuit, and we'll start with Compass' three-phase marketing program.

Now, the first phase in this program is called private exclusive. Here, the property is marketed within Compass and shared with some outside agents. Compass' search engine alerted buyers to the existence of these listings, and they are available by visiting Compass' offices or calling an agent, or contacting an agent online.

For the second phase, the listings actually appear on Compass' search engine with a note that they're coming soon. So they're not ready on the market yet but they're on their way. It builds some excitement for the listings.

And finally, in the third phase, the listings are released through the brokerages, which means an agent can find them, show them to their client, and it means that the home search sites can include them in their search results.

Three-phase marketing gave Compass inventory for its home search site that no one else had. Almost all the listings end up in phase three here, that means they're almost all sold by distributing them to the brokerages and having them appear on the search engines. That means that access to Zillow and Redfin is an important component to this for many sellers.

Now, NAR is a trade association that sets the rules

for listings and for agents. And before 2025 they required that all listings be sent to an MLS, and that the MLS could distribute those listings to brokerages in the area who were connected with it. On March 25, NAR changed this policy. On its website, NAR said that they would "expand choice for consumers." That's how they put it, "expand choice."

Two weeks later, Zillow announced the Zillow ban to smother that choice. Zillow intended to step in as a self-appointed industry re-regulator, and Zillow wasn't subtle about announcing the ban. They publicized it well and it was captured in the press.

These actions, your Honor, led Compass to file this suit. Zillow's continuing enforcement of the ban led Compass to ask for this injunction.

So we turn now, your Honor, to the preliminary injunction standard. We have the burden of proof of meeting the four elements articulated by this Court. We embrace this burden. We will meet this burden.

The first prong considers the merits: Are we more likely than not to succeed on the merits of at least one of our claims? To address the likelihood of success, we have to consider the antitrust laws. Antitrust laws assume -- assume -- and this is something that Zillow doesn't like -- assume that competition is the best method of allocating resources in a free market. Zillow has no authority to act as a regulator or

as a standard-setting body for the real estate industry.

Section one of the Sherman Act protects competition from agreements among rivals. An agreement of two competitors to harm a third one -- an agreement among two competitors to harm a third one -- damages competition. These are boycotts. They're always illegal. And we'll look at how Zillow and Redfin agreed to boycott listings from Compass.

Your Honor, these four flags represent significant dates in this past spring. First, there was the rule change by NAR. Second, Zillow announces its ban without a lot of explanation. Third, Redfin's public pledge to follow Zillow's ban. And finally, in May Zillow announces the long delayed terms and conditions for its ban. In the next slide, I'll add in the phone calls among Zillow's and Redfin's CEO.

Along the bottom we can see when those calls took place. The first call was while they were waiting for NAR's decision on the rule change. They specifically discussed Compass' preparation for that change.

Next, they talked the same day that NAR announced the policy change. The third call was the day before Zillow publicly announced the ban. And the fourth call was the day Zillow announced the terms and conditions. We will show what happened in these calls, we will show that Zillow and Redfin worked together on the ban, we will show a *quid pro quo*, and we will show that they expressly targeted Compass.

But, your Honor, you don't have to believe us that their actions were. Now, this document is sealed for the public. The Court has a copy of it so I will just merely reference what the Court can see there. Mr. Rath, who is depicted on this document, he is the head of industry relations for Redfin. The day after Zillow announced its listing standards, before Redfin announced that it would follow, Mr. Rath sent the email that the Court can see right there. And he sent it with the question and the warning. First, he asked the question which is at the top of the slide, and we ask the Court obviously to read it, we won't read it out loud. And we believe that his concern was reasonable and was based on a competitive reading of the market. Then he included the warning that is the second part of the slide. I can't repeat it, but it reads on the allegations here specifically.

Your Honor, Redfin's CEO announced the Redfin pledge three days later.

And four days after that, another Redfin executive sent another email about the same subject. Mr. Taubman identified the impact of Redfin and Zillow working together, and this is what he wrote:

I think just the idea -- just the idea -- that a listing could disappear from Zillow and Redfin without notice and without recourse because it was truly a violation of the policy will be enough to give listing agents pause.

Your Honor, it's important to recognize that being banned by Redfin and Zillow could have a huge impact on agents and sellers. Just the knowledge that that could happen, the idea, it only took that to rip options away from agents and consumers. Your Honor, fear, uncertainty, and doubt were the tools of the boycott.

Now, collaborating with a rival to harm a competitor is a *per se* violation of section one. There is no defense. And, your Honor, there is no evidence that Zillow can cite to cure this. Their CEOs, not surprisingly, had no one else on these calls, they took no notes. We are, thus, more likely than not to succeed in showing a Sherman Act violation, and that alone is enough for us to satisfy the burden of the injunction standard.

But our monopolization case is just as powerful. There are three necessary proofs for Compass on a section two case: Market definition, which means identifying the relevant market; showing Zillow had market power in that market; and finally showing Zillow engaged in an anticompetitive conduct.

Starting with market definition. Online home search is the relevant market in this case. It allows users to find homes and condos that are for sale, and these are some of the players in the online home search market. Zillow is, by far, the larges.

Now, your Honor, brokerage services, which the Court

will hear about, are not substitutes for home search; they are separate markets. You can't substitute them for each other. Brokerage services provide agents that help them buy or sell your home. Search providers, like those on this slide, give you a box. You put the area you need in, and out comes a listing of the homes for sale. They are not substitutes.

The geographic market for home search, your Honor, is national. There is a national market in which these rivals compete. The top brands have websites that have the same results wherever you are. It doesn't matter where you go. You put an address in there, you're going to get the same result. And it allows people anywhere in the country to search anywhere in the country.

We will also show that Zillow has market power, your Honor, that they control the online search market, and we will use direct and indirect evidence to prove this. This, your Honor, is a Zillow strategy and planning deck from April 2025, so right at the time that they adopted the ban. It was presented at a company retreat days before the Zillow ban was announced. This slide shows Zillow's listing standards are a raw exercise of monopoly power.

The first thing that Zillow does in this desk, it asks what is and was happening, and it answers. Compass has made an aggressive bet on a landscape without CCP. Your Honor, they specifically mentioned three-phase marketing, and they say that

Compass is "agitating" the industry. And let's be clear, when they say "agitating", which nobody ever uses in a good way -- when they say "agitating," they mean they're trying to bring competition to it.

And then they ask themselves a question: Why do we care? And they answer it: Listing inventory is critical -- critical -- to our valued proposition and our business.

The presentation then pivots. What do we think is going to happen? And it answers it: A proliferation of coming-soon listings that brokerages, starting with Compass, but with contagion effect.

Your Honor, to Zillow, competition is a virus. Zillow's biggest fear is that Compass will lead other brokerages to doing the same thing. To following Compass' example.

And then the deck asks: What do we do about it? What's our strategy? And it has two. It has carrots. So those are benefits for the brokerages and agents who go along, and the stick. The listing access standards, that's the stick. The ban is the stick. And it's important to see here on this slide, your Honor, that it's in parenthesis, "and as needed enforcement." Because when you're a monopolist, you often don't need to enforce, you just have the threaten.

Your Honor, this document shows it is a clear articulation of Zillow's market power, but we will also use

indirect evidence to show Zillow's market power by looking at the number of monthly unique visitors. And to be clear, this is the measure that Zillow itself looks at inside its company. These numbers show that Zillow's platform has a huge advantage over unique users. And there's more evidence that can be found on Zillow's 10K. They brag about 241 million unique users per month, 9.3 billion visits in 2024. They call themselves the most visited brand in the online industry, and they note that on Google, more people search for the term "Zillow" than for the term "real estate."

All these facts are what makes it impossible for sellers and agents to resist Zillow's threat of the ban, why it's not necessary for them to enforce it that often. This is market power.

Finally, your Honor, we have anticompetitive conduct; that is conduct that excludes rivals on a basis other than competition. We're not here complaining about Zillow's competition, other than competition on the merits. We will show Zillow's conduct harmed competition, not just the competitor but the tools to competition itself. The ability for a rival to stop unique listings. And so we'll take a moment to talk about Zillow's intent.

Proving monopoly maintenance claim does not require us to prove intent; however, demonstrating an anticompetitive intent, an intent to harm competition, can show underlying

conduct is anticompetitive. We will show Zillow sought to harm competition.

This is another one of Zillow's planning documents called CCP considerations. This is where they formulated the plan. And I'm quoting here. "If initial tactics look to be insufficient, we will escalate to carrots to friends and sticks to foes." Carrots equal more direct payment for content, sticks equal listing ban and Z products ban at the brokerage level. And then they state their goal: The goal is 90 percent listings on Zillow and isolate Compass and any other bad actors that emerge. And let's be clear, when Zillow says "bad actors," they mean competitors.

This plan shows anticompetitive intent. They're not talking about improving their product so that they can go right after Compass, they're talking about a stick.

Now, during the hearing, the Court will see other documents that show the intent to block rivals using unique listings to compete. Our first witness, your Honor, will be Compass' CEO and founder, Robert Reffkin. He will explain that compass prides itself on the technology it makes available to buyers, sellers, and agents, and this includes the home search website Compass.com.

Now, why Compass? Why target Compass? Compass created the three-phase marketing in anticipation of the rule change. They were the first mover in this area, so Zillow

sought to make an example of Compass. That's why Compass appears in the documents over and over, and it's why the injunction is necessary while the litigation continues.

After we meet our burdens to show monopoly maintenance, the burden shifts to Zillow. Zillow can try and prove that the conduct is procompetitive, but before the court need even evaluate those justifications, Zillow -- Zillow -- must show that they're not pretextual. That is a must show that the claim justifications were the actual reason that the standards exist. That they cannot do, because the written record, your Honor, makes that impossible.

We've seen Zillow's opening slides, and I don't want to ruin the surprise for the Court, but not a single one will even address their planning for the Zillow ban. That's because they all have very bad things for them.

Now, in its briefing, Zillow argues that they don't want stale bread on the website. Your Honor, Zillow never did any financial or consumer analysis that supports their stale bread argument. Not one cost benefit analysis valuing premarketed listings on Zillow. It was specifically that: Nothing. This is not a situation where a bakery sells yesterday's bread at deep discount; it's the opposite. After listings go through the first two stages of three-phase marketing, they're more valuable -- more valuable -- because they've been premarketed. They're more valuable.

Ninety-four percent of the listings proceed to the third phase for general distribution on search engines. And the time and money that was spent on marketing them ensures that they're well priced, ready to move, and when the listings hit Zillow and the other websites, they have actual value, which is why, when Zillow has them on their website, they still sell advertising and they still sell links to them.

Your Honor, Zillow's stale bread theory is, and I hate to say this, half baked. Because Zillow's actions harmed competition in home search, the Court should hold we are more likely than not to prove the section two claim.

We'll turn now, your Honor, to the injunction standard second prong, irreparable harm. The movant must demonstrate injury that cannot be remedied by a damage award. Your Honor, Zillow's conduct creates three times of irreparable harm: Harm to competition, harm to consumers, and harm to Compass. And each of those, your Honor, sufficiently satisfy our burden.

This Court has held that harm to competition is properly considered irreparable harm, and that makes sense, because it's impossible to compensate all the stakeholders who rely on a functioning, competitive market. The agreement between Redfin and Zillow satisfies the injunction requirement.

Also, lost competition harms all buyers and sellers, even those with no interest in marketing off of Zillow. By stifling competition and home search, Zillow builds a moat

around the monopoly. It allows Zillow to walk when it should run.

The harm to Compass.com was immediate and continues. The number of unique visitors on Compass.com was rising until April when the ban was announced and then it fell off. Growth in the website will be very difficult, if not impossible, to measure, and an injunction would stop any necessity of trying to figure that out.

The second order, benefits, your Honor, are even harder to calculate. That's the money that Compass is losing from the lost leads that they would get when people came on their website.

And finally, your Honor, harm to Compass. This takes the form of three different types: Lost product, lost good will, lost mover advantage. Zillow's ban has already had a huge effect on Compass. A recent email from June shows the seller's concerns. We had a $4.5 million client who did not want to use private exclusives because she heard something on NPR about Zillow and is scared to be banned from Zillow. She insisted we write into the contract that we would not go on Compass private exclusives or Compass coming soon. Your Honor, Zillow is harming both the reputation of Compass and of its three-phase marketing program.

And as this planned billboard was set to do, it was set to tell people about the program, and it was never used

exactly because of the announcement of the program.

The first mover position is captured in April 1 email nine days before Zillow announced the ban. This is a Compass executive who wrote: Team, it's so clear that Compass agents have an outsized advantage at winning listings by pitching the Compass three-phase marketing strategy while competition is not. This advantage won't last forever.

Your Honor, this shows the value in Compass' first mover advantage. Compass knew its rivals were not standing still. Compass' ban has undermined that advantage.

THE DEPUTY CLERK: Mr. Dintzer, you have three minutes.

MR. DINTZER: Thank you.

Then we turn to balancing the equities. Who was most harmed by an incorrect result here? Your Honor, the Court has heard that Zillow's coconspirator, Redfin, has put enforcement of its pledge on indefinite hold. Clearly, Zillow will not be injured facing a similar hold.

And finally, the public interest. Competition is always in the public interest. If we show our antitrust claims then the Court should find that an injunction is in the public interest.

In closing, your Honor, my colleague, during her turn, may talk about transparency, about efforts to help the real estate industry. She may criticize company executives or talk

about a velvet rope strategy. Your Honor, this is an antitrust case. Those things are all irrelevant. Counsel may argue that competition is bad for everyone, but that's not their call to make. Congress already made that call with passage of the Sherman Act. We have brought Sherman Act claims, and the bottom-line question is what did Zillow do and why did they do it.

Facing real competition for listings, they pulled out carrots and sticks, they made deals with competitors, they forced agents and sellers to stay on Zillow. In doing so, they violated the antitrust laws and they undermined competition, which harmed every American buying and selling a house.

At the end of the hearing, the Court should conclude that Compass is likely to prove its antitrust claims, that Zillow is harming the entire real estate market, including Compass, and that the balance of the equities favor an injunction.

And finally, the public would be greatly served by enjoining the Zillow standards until we can have trial on the merits.

With that, your Honor, thank you for your patience, and we thank you.

THE COURT: You may proceed.

MS. LAU: Thank you, your Honor.

Good morning, your Honor.

This is case about whether this Court can compel Zillow to promote its rivals' business on its own website. When Compass' listings run counter to Zillow's, mission to democratize real estate information, and to protect consumers' listings transparency and the quality of its own platform.

But the antitrust law imposes no such duty to deal, and Compass fails to show any of the required elements for its preliminary injunction. Compass' theory that Zillow should be compelled to display these stale, failed listings that it couldn't sell privately finds no support in the law, the evidence, or in sound economics.

The evidence will make clear that Zillow made an independent, lawful business decision to protect transparency and consumers, as well as its own listing supply. The CEOs of Zillow and Redfin will each testify that they made no agreement at all, much less one to boycott Compass, and instead they independently announced different policies at different times for what their websites would display. Redfin has never implemented any such rule. So Compass is unlikely to succeed on it's section one conspiracy claim.

Compass is unlikely to succeed on its section two monopolization claim as well. Zillow's listing access standards are procompetitive. They increase transparency. And while a monopolist might hoard listings, Zillow's standards encourage all brokerages to promptly share those listings with

the MLS, and that shares them with thousands of different brokerage and online home search platforms. Rather than boycott Compass, the standards apply equally to all brokerages, anyone who wants to list on Zillow, with two warnings before any listing is not shown.

And just the opposite of playing industry regulator, the standards do not attempt to control content on any other website but Zillow's. Compass remains free to differentiate itself with unique content, with exclusive listings, and eXp, Redfin, Realtor, Homes.com, thousands of these other websites continue to display today the Compass listings that are no longer displayed on Zillow. In fact, some of those companies even boost those listings.

Now, Zillow's business documents predating this lawsuit confirm it had legitimate procompetitive reasons to enact the standards. It needed to protect its platform from free riding and degradation. No evidence suggests that Zillow's reasons were, in any way, pretextual.

And so at bottom, what the evidence is going to show is that Zillow's standards have had no impact whatsoever, much less foreclosed competition in the online home search market.

The evidence will also make clear that there is no past or future irreparable harm to Compass. Now, Compass cries irreparable harm to this Court, claiming serious lasting damage that cannot be undone or compensated. But outside this

courtroom to its agents, to its sellers, to its board, and to its investors, it tells a very different story.

Now, Compass originally came to this Court and claimed: We have staked our company on 3PM, that Zillow's standards completely block Compass' ability to use 3PM and threaten the very core of its business. But just last week in its public earnings call, Compass' CEO said 3PM had not reduced but increased agents' changes of getting listings. Compass' 3PM has not been completely blocked. In fact, it continues to use private exclusives and coming-soons today, as its CEO admitted.

Compass has not disclosed its standards as a material risk to its business either to its investors or when recently acquiring anywhere for billions in Compass stock. And now while demanding an emergency injunction to force Zillow to host its listing, Compass actually sells agents and sellers that it is an illusion that Zillow is essential to the home-selling process. And, your Honor, these contradictions go to the heart of Compass' credibility here. They show that Compass is not facing anything remotely approaching the dire consequences that they now claim.

And finally, let's consider the broader implication of granting Compass' motion. An injunction would not only harm Zillow, it would also harm consumers. What it would lead to is a fragmented market. What would happen is that multiple large

brokerages would hoard their exclusive listings behind a velvet rope, depriving buyers and sellers of access to free and transparent information, and ultimately resulting in higher costs and reduced competition. And that's what Zillow's standards protect: Fairness, transparency, and liquidity in the real estate market.

So Compass cannot use antitrust law or this court to impose a duty to deal with a rival. It cannot compel Zillow to display Compass' stale, failed listings which contradict Zillow's procompetitive pro-transparency and pro-consumer mission. What Zillow standards ultimately reflect is its commitment to supporting openness in the real estate market, and so forcing Zillow to change its platform rules would infringe on its expressive choices. Compass cannot satisfy its burden on any element and so its preliminary injunction should be denied.

My name is Bonnie Lau, and together with my colleagues Beau Buffier, Eric Tuttle, Nick Sidney, and our entire team at Wilson Sonsini, we have the privilege of representing the Zillow defendants. With me today is Tonya Bosi, in-house counsel representing Zillow.

Since Zillow's founding in 2004, its mission has been to democratize the real estate industry, to break down information barriers, and to increase transparency. What Zillow would like is for all consumers to have free and equal

access to for-sale listings, to make home a reality for more people. Zillow has always believed, long before this lawsuit was filed, that a transparent liquid market benefits every participant in the real estate industry, and so that's why Zillow's multisided platform not only connects buyers and sellers but also agents to consumers.

And because listing supply is broadly available to all these different websites through the MLS, Zillow doesn't compete on commoditized listing supply, it competes on user experience. It's invested in innovative tools, technology, and services, it supports all manner of different aspects of real estate transactions, and has ultimately created a website that is beloved.

What buyers do is they get to search Zillow for free. They learn innovative property insights like the Zestimate or school and walk scores to help them find their dream home.

Sellers and their agents get to use Zillow to gain exposure to a very wide audience of potential buyers, and they use its data to inform pricing and marketing strategies.

And last, agents try to use the website to attract clients, and so they use Zillow to advertise their services, get leads from local potential buyers, and purchase Zillow's technology tools.

Now, the benefits of listing transparency are recognized and long supported by many participants in the real

estate industry. Online home search portal Redfin is an excellent example. Back in 2019 they came out saying transparency is a crucial protection for consumers, especially minority groups.

Bright MLS conducted a study showing transparency is essential for ensuring equitable access to home ownership, and many brokerages feel similarly. Here's eXp stating that consumers and the industry are better served by transparency. And so in keeping with this broad census in 2020, the national association of realtors implemented the Clear Cooperation Policy. CCP requires that when homes are publicly marketed, they must be entered into their local MLS within one business day. And what this does is it avoids the harms of homes being selectively marketed to some but not to others.

Now, in contrast, there are certain large brokerages, most vocally Compass, that have endorsed the private listing networks that Zillow views as anticonsumer. Compass is the largest brokerage in the United States, soon to become much larger after its pending merger with Anywhere. And in late 2024 Compass began heavily promoting its three-phased marketing program, 3PM. Homes rarely sell in phase one private exclusives or phase two coming-soons.

Now, Compass likes to tout this percentage but misses the point. Ninety-four percent of homes fail to sell until they get the broad exposure of the MLS in phase three, which

then shares that with the thousands of websites like Zillow that offer that broad audience.

Compass' internal strategy documents and data show that Compass' motivation for 3PM is quite simple: Compass can profit more by hoarding listings, decreasing transparency, and limiting competition. And when those listings are hidden and limited only to Compass, Compass can do what's called double-ending, representing buyer and agent in the same deal, and earn both sides of the commissions.

Compass' own analysis shows that off-market sales or private exclusives double-end approximately 72 percent more frequently than on-market transactions on the MLS. So the motivation is quite obvious.

But it's not just Compass, there are several large brokerages that have announced or launched their own versions of private exclusives, such as Douglas Elliman and Corcoran. As more and more brokerages proliferate these hidden listing schemes and withdraw from the market, they hoard these dark pools of inventory away from buyers and sellers, and the market suffers in fragments. Sellers are harmed by exposure to fewer buyers, and that means fewer offers, weaker offers, or longer selling times. Buyers use this single source of free access to all listings, and, instead, they're forced to search and maybe even sign up with multiple brokerages just to understand what's available in the market, and this also removes buyer choice of

agent.

Smaller or independent brokerages, they suffer. They can't access these big listing networks and they face competitive challenges.

And finally, we'll see research that shows private listings lead to fair housing and equality issues. Certain disadvantaged groups are often the ones who don't get access and who can't see these exclusive listings.

So for all these reasons, Zillow was concerned about the proliferation, about the contagion of these private listing networks. They thought they would harm consumers and reverse decades of gains in terms of real estate transparency.

And Zillow was also concerned that hidden listings would harm and decrease its own listing supply of inputs to its platform.

Now, contrary to what Compass' counsel represented, there are numerous prelitigation documents that establish Zillow had procompetitive reasons for this conduct. The documents show that consumer trust has always been essential to Zillow's success and that that trust, in turn, is built on three principles, that Zillow is showing as many listings as possible as soon as they reach the market and as accurately as possible. When large brokerages like Compass withhold their inventory, it is not possible for Zillow to meet these goals.

When they withhold those listings, Zillow's listings

become less comprehensive and Zillow is left with, yes, the stale bread with inaccurate information about pricing history and days on market, and this erodes consumer trust and degrades the quality of Zillow's platform.

Now, Zillow was also concerned about a different concept called free riding. Our expert, Dr. Lawrence Wu, will explain economists use the term "free riding" to mean benefiting from something without paying for it or without contributing to it. And so what Compass or large brokerages are doing here is trying to unfairly benefit from the benefits of Zillow's hard-won audience without contributing any of those valuable new listings in return. And so Zillow made the independent decision to launch its listing access standards on April 10, 2025. The standards require brokerages to publish to the MLS, not exclusively to Zillow, contrary to the misleading excerpt in Compass' opening slides. Compass mischaracterizes and exaggerates the standards to somehow portray Zillow as this industry regulator. So I think it would be really helpful for us to spend a little bit of time and talk about what the standards do not do.

First, the standards do not dictate what happens off Zillow, off of Zillow's platform. They don't place any requirements at all on any brokerage websites or online search portals. Those websites can continue to display any listing they want and they still show Compass listings that have been

removed from Zillow.

Next, the standards do not eliminate seller choice. Sellers may still choose whether and how to publicly or privately market their homes. While Compass makes much of the fact that 90 percent of listings received only one Zillow notice, what you will see during the hearing is research that shows when you actually disclose the risks of private listings to sellers, most choose broad exposure and the public option.

(Continued on next page)

MS. LAU: Third, the standards do not target any specific brokerage and certainly do not boycott Compass. Zillow applies the standards equally to all brokerages that want to list on Zillow. And while there are certain Compass listing that no longer appear, Zillow still shows tens of thousands of active Compass listings on its site today.

Fourth, the standards do not prevent Compass or any other brokerage from marketing as they wish. As we'll hear, and as Compass concedes, it continues to use 3PM, private exclusives and coming soons. Other brokerages continue to launch and expand their private listing networks. So the standards do not foreclose any competition at all in the national market for online home search, or really any online home search market.

So I'd like us to walk through what happens with a listing that violates the standards. This one is in Takoma Park. After receiving two warnings, this listing was no longer displayed on Zillow. But what is the harm? Today it remains up on all of the other major home search sites; Realtor.com, Redfin.com. It's even boosted on Homes.com. It also remains up on thousands of brokerage websites. So we see it here on Compass.com, on eXp, on Corcoran.com. You can find it elsewhere online, on social media, on Google, and on Facebook Marketplace.

So the only consequence of a listing violating the

standards is that it is no longer displayed in one place on Zillow. That's it. That hardly shows foreclosure of the online home search market.

Now Compass makes much of Zillow's strategy to incentivize transparency by allegedly offering carrots to friends and foes, six to foes. But you'll hear from Zillow's witnesses that it did try to partner with Compass. For example, they met in person on April 1 and propose to Compass ways to grow its business while being pro-transparency. So Zillow did extend carrots to Compass. Because while they strongly disagree on some things, Compass is still a valued brokerage partner to Zillow.

Turning now to the legal elements. There's no evidence of irreparable harm. Compass cannot demonstrate the kind of actual imminent and unavoidable injury that's necessary to justify injunctive relief. And this failure alone requires denial of its preliminary injunction. Compass has repeatedly told its employees, agents, investors and the board that the standards do not affect private exclusives in any way. And they do not change coming soons for 50 percent of Compass listings because of the existing local MLS rules.

And on June 23, the very day they filed this lawsuit, Compass said to its employees that 3PM-PM was still allowed, and pushed agents to share 3PM-PM with its clients. Now Compass has pushed 3PM-PM on its agents even after it

understood Zillow's position on private exclusives. Unlike Trulia private exclusive, Compass tries to skirt the rules and selectively market them by using this, the black box. This is a bait to lure buyers to sign up with one of its agents, to see behind the velvet rope and access these private exclusives.

Based on this billboard what they're withholding. Consumers must to see behind the velvet rope and access these exclusive listings, consumers must connect or sign up with Compass in order to see them. Now, Zillow explain to Compass as early as mid-April that Zillow viewed its black box as a violation of the standards. And now Compass tries to pretend that it was confused or didn't understand the rules. But Ashton Alexander memorialized this understanding in an email to Compass' leadership on April 15, BCC'ing chief of staff Will Hardy. But Compass hid this from its agents. It kept pushing them to use private exclusives without sharing this understanding at all. And then when agents and sellers were caught unawares by violation notices from Zillow, Compass would try to blame Zillow for the harm.

So here's an example. Compass' agent Kerry Carr remained unaware of this all the way up until October 13 when she received a warning from Zillow on one of her listings. Even then Mr. Hardy didn't tell Ms. Carr what he already knew. Instead, Agent Carr learned from the first time at her deposition that Compass had known Zillow's position on the

black box all along since April, but compass had never told her or any of its agents, a risk that Carr felt she had an obligation to disclose as a fiduciary to her sellers.

Now Compass' claim irreparable harm is undone by its own admissions that it will continue to be successful despite Zillow's standards. This is confirmed by Compass' own third quarter financial disclosures which shows record breaking quarterly results, record breaking recruitment of agents and project continued growth with no mention of the standards as a material risk to either 3PM-PM or its business.

And while it now claims that 3PM-PM is undermined or usage is down. In July, Ms. Alexander said it was full steam ahead on 3PM-PM, and predicted home owners would choose it more over the coming months. And while it now claims that Zillow is somehow an essential platform. Compass tells agents that Zillow is not necessary to sell homes and gives sellers the top reasons why not to list on Zillow.

Turning now to the Section One claim. The evidence shows that Compass cannot prevail on this claim because there is simply no evidence whatsoever of any unlawful agreement between Zillow and Redfin to boycott Compass. Testimony from both CEOs, Mr. Wacksman and Mr. Kelman, expressly deny there was any agreement. Instead, Zillow by itself carefully planned its approach to the standard for months. And then the day before publicly announcing it, Zillow pre-briefed the media and

key partners, including brokerage customers. Compass and Redfin both received a heads up.

Now Mr. Kelman never thought of anything like the standards, but he immediately liked them and he said he'd think about it. And after consulting internally at Redfin, and also with Compass, on April 14 Mr. Kelman independently announced a policy that was consistent with views that he had publicly expressed for years. And that Redfin has taken no steps and not even decided whether to implement a policy undermines any claimed boycott.

Compass also abandoned its other conspiracy claim because eXp's CEO testified there was no unlawful agreement there either. So instead Compass engages in rank speculation based on documents and testimony that fall far short of any kind of direct evidence of a conspiracy. There's simply no smoking gun here. References to cultural alignment do not amount to unlawful agreement, especially when both companies have a long and public history of advocating for transparency. In their declarations Compass' executives described a suppose call with Mr. Kelman where he allegedly relaid his discussion with Mr. Wacksman. But when pressed, Compass' executives backed off in deposition. They had no independent recollection of that call, and they could not testify to its details; instead demurring to their declarations. Now putting aside the obvious multiple hearsay problems, this testimony fails to show

likelihood of success on the conspiracy claim.

Compass has recognized that this is a duty to deal case from the very outset, but has since run away from the doctrine. And that's because the evidence shows that it cannot meet the narrow Aspen Skiing exception to the settled rule that a company has no duty to deal with its rival on the rival's preferred terms. Aspen Skiing requires proof of a voluntary profitable course of dealing that was terminated in such a way that suggests a willingness to sacrifice short-term profit to harm competition. But here, Zillow standards respond to harmful market practices, and there's no evidence that Zillow in any way had to forego short-term profit.

Next, the national market. Zillow will not be able to show that Zillow has market power in any national market for online home search. So when we define a relevant market in antitrust cases, we look at the question, what other options do consumers have that could serve as a reasonable substitute. So let's say I am a prospective home buyer looking for my dream home in Salt Lake City. Here's what Zillow shows. So, yes, it's true, Zillow does operate and offer home across the country in every local market, but that doesn't mean the market is national. Among the many competing platforms, let's say now I go to Compass. And what we find is there are no search results.

Compass itself is not a reasonable substitute in a

national market for online home search because Compass doesn't serve certain markets. It focuses on the local markets where its a brokerage and where its agents have listing. So Compass itself disproves the notion of any national market here. Nor has Compass shown that Zillow possesses monopoly power. There's no direct evidence whatsoever here like increase prices or decreased quality or output, and Compass' reliance on a purported 66 market share is faulty and based on irrelevant rentals data.

THE DEPUTY CLERK: Ms. Lau, you have three minutes.

MS. LAU: Thank you.

Instead, eXp and Redfin have both testified to how competitive the online search market is, and Homes.com, a new entrance that's already grown to 20 percent market share, disproves that there are any meaningful barriers to entry.

Next, the evidence will show there were numerous pro-competitive benefits to the standard, like reducing freeriding enhancing the customer experience, and maintaining the quality of Zillow's platform. There's no evidence that these reasons are pretextual. And Compass' own complaint in fact acknowledges the legitimate reasons for Zillow to create the standards.

Finally, Compass has no response to Zillow's argument that there's been no harm to competition in the market. Compass's internal document show it doesn't seriously compete

in online home search or even really think much about it. This slide shows where Compass operates today in blue boxes, like brokerage and mortgage, but it does not compete in search and leads. And that's because Compass' CEO does not even track or measure.

(Media played)

MS. LAU: So Compass cannot show harm to competition in the market from online home search.

At the end of the day, your Honor, Compass is asking this Court to intervene at the very outset of the case in a way that would fundamentally alter the competitive landscape in the real estate market. It's Compass, not Zillow, that seeks to play industry regulator here, and force its stale failed listings onto Zillow's platform even though they undermine Zillow's mission of transparency and consumer empowerment. This is not just a request for access. It is an attempt to dictate how Zillow operates its business and publishes on its platform. It cannot meet any of the elements of its preliminary injunction.

It hasn't shown irreparable harm or likelihood of success, or most important that the public interest would be served by an injunction. And so we urge the Court to deny Compass' motion and to allow Zillow to offer a transparent innovative and comparative platform that allows people to find their dream home. Thank you.

THE COURT: Thank you, Ms. Lau. I think what we're going to do now is take a 15-minute break before we start with the evidentiary presentation. And just to preview the schedule. We're going to take a 15-minute break now. We'll come back shortly after 10:30. We will start hearing testimony at that point. Then probably around 12:15 we'll take an hour break for lunch and then continue with the afternoon session. There'll also be a 10 to 15-minute break before we conclude at 4:00 p.m. We're going to take a break now.

(Recess)

(Continued on next page)

THE COURT: Plaintiff's counsel may call your first witness.

MS. SOLH: Thank you, your Honor. The plaintiff calls Robert Reffkin.

ROBERT REFFKIN,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

THE DEPUTY CLERK: Please state and spell your name for the record and speak directly into the microphone.

THE WITNESS: Robert Reffkin, R-E-F-F-K-I-N.

THE COURT: Ms. Solh, you may proceed.

MS. SOLH: Your Honor, we provided a copy of the binder of exhibits to the witness.

DIRECT EXAMINATION

BY MS. SOLH:

Q. Mr. Reffkin, good morning.

A. Good morning.

Q. What is your current role?

A. CEO and co-founder of Compass.

Q. How long have you been in that role?

A. I've been in the role since 2012.

Q. And what led you to found Compass?

A. I found Compass because of my mom who is right here in the red, who's a real estate agent and has been nearly my entire life. She's been an agent first in life insurance, then in

real estate. And I saw her struggle and move from firm to firm to firm hoping to get the tools and the resources and the programs and the offerings to better serve her clients and grow her business.

Every agent's an independent contractor, and I built Compass to help them as small business owners and independent contractors grow and succeed so they can help their clients and support their families.

Q. Mr. Reffkin, do you think Compass is different from other brokerages?

A. Yes, I believe Compass is different than other brokerages?

Q. And what makes Compass different from other brokerages?

A. Compass, we raised nearly $2 billion over the last 13 years to invest in programs offering support technology for real estate agents.

And we ask what they want us to build that will help their clients, and we invested money in those things. So we've invested more than any other traditional brokerage firm, and then became the number one independent brokerage firm in the country over that time.

Q. Mr. Reffkin, it might be helpful to talk a little bit about the structure of the real estate industry.

Can you tell me who the participants are in the real estate industry?

A. I think broadly speaking there are two groups. There are

those that do the work, and then there are those that profit from the work of others.

So real estate agents do the work. Real estate brokers do the work, and the listing agreements are with them. And then MLSs, NAR, organize real estate portals like Zillow, they profit from the work of others. A different way to describe it is, there's those who have the fiduciary responsibility, which is the agent and the brokerage firm. And the organizer of those groups do not. Lastly, there are those that give listings, and those that take listings.

We, Compass, as the largest brokerage firm in most of the major markets, we give more listings to MLS. We give more listings to Zillow than almost any other major brokerage firm. Zillow doesn't give any listings to us, because they don't have agents. They don't have listings.

Q. Mr. Reffkin, why don't we take one each of those one piece at a time.

What does a real estate agent do?

A. A real estate agent, they're all independent contractors. There's 1.5 million of them in the country. It's one of the largest industries of entrepreneurs in the country, largest industry of people that can be in their 60s, 70s, or 80 as a mom and still be in the business.

It's the largest industry dominated by women. It's an industry of families that work together often, and they help

buyers and sellers buy homes and sell homes.
Q. And what is a brokerage do?
A. A brokerage provides the support for an agent and gives them the resources to serve their buyers and sellers.
Q. Mr. Reffkin, how does Compass fit into this ecosystem?
A. Well, Compass, we're a brokerage firm and an online search portal. As a brokerage firm, we consider the agent as our client. We work for them, not the other way around, helping them serve their clients.
Q. And you mentioned online home search portals, what are those?
A. So an online home search portal is a company like Zillow, Homes.com, Realtor.com, Compass.com and Redfin.com. These are places where buyers search listings.
Q. And how do online home search portals make money?
A. There are three ways that online home search portals make money. One, by selling leads to agents. Two, by selling advertising, and then three buy transacting on homes, by doing the actual transaction.
Q. What do you mean by selling a lead?
A. So Zillow's model is the selling leads model. The primary way they make money is when people click "contact agent" or "schedule tour," it gets sent to a third-party agent where Zillow charges thousands of dollars.
And so that button is the most expensive click in real

estate and the buyer doesn't know. You push the button and thousands of dollars is the result.
Q. Then you mentioned selling advertising.
What does that mean?
A. The selling. The buyer thinks they're contacting a listing agent the majority of the time, but then they don't know that they're getting sent to an agent that's paying for the lead.
Selling advertising, that's the Homes.com model where they pay -- listing agents and sellers pay to be promoted on their site. That's more the traditional transparency model. Google, you pay to be sponsored. Facebook and Instagram, you pay to be sponsored, and that's the transparent way to show property.
Q. And then, Mr. Reffkin, you also mentioned that home search portals can make money by selling properties. And what does that mean?
A. We're a real brokerage, not just a brokerage that got a license so they can get all the listings from MLS, but a real brokerage with agents with listings. We actually transact on the properties.
Q. Mr. Reffkin, earlier you heard that free writing was described as getting a benefit without contributing.
Is Compass freeriding?
A. I find that hypocritical because Compass gives more listings to Zillow in the majority of our major markets than

any other brokerage firm because we're the biggest brokerage firm. Zillow gives no listings to us. The only way Zillow makes money is charging can leads off of listings that aren't theirs. They don't give at all, but they benefit.

If you want to think about free riding, they're the free riding. A different way I feel someone made a comment once that it's like going to a picnic without a fork, or a potluck without a fork. This is worse. What Zillow is doing is going to the potluck without a fork, taking the food for free, and then selling it for 40 percent referral fee to other people, then shaming you for even being around.

Q. Mr. Reffkin, you also mentioned NAR, or National Association of Realtors. What is that?

A. NAR is National Association of Realtors. There are 1.5 million realtors that are members of NAR.

In most cases they force you to be able to do your job because you can't access the MLS or your state forms if you're not a member. They have a large number of mandatory rules that dictate how everybody operates, and it's been happening since 1913. And they have a lot of mandatory rules that force agents how to operate and run their business.

Q. And you mentioned the MLS, what is an MLS?

A. The MLS is the Multiple Listing Service. There are over 500 of them. There's only one per market. They have a real monopoly, meaning 100 percent of agents have to be members

because you can't do your job if you can't access these listings because they have 100 percent of them. And they don't allow each other to compete with each other, so they keep their monopoly. There's no competition. You can't do your job without it. And they don't allow any other choices inside, so they dictate rules as well of how you sell property.

There are two approaches of how MLSs started to operate. One is, they all have mandatory rules that say you must give them your listing. If you don't give them your listing, they can fine you up to $5,000. Agents cannot watermark their own photos. MLS watermarks it, so they actually control the listing.

And one is when you give it to the MLS -- two years ago there's around 90 percent of MLSs or 86 percent of MLSs in our markets were descended to everyone, so thousands of sites. The salesmen had no control of what happened to their listing. And as people wanted more and more control over their privacy, over their content, that became an issue.

Now 59 percent of all MLSs are letting sellers controls how it goes to the internet, and that's where Zillow put in the Zillow band. Because in the last two years, we were advocating for more and more sellers in MLSs to let us share in MLS. It's actually in the MLS.

Here in New York City if you have a listing that's not -- any listing, private listing or anything, it has to be

in MLS, so all the agents can see it. You call it participate only, but it's not on Zillow or it's not on another site. So you're cooperating through MLS with all agents, that's what Zillow wanted to stop. They wanted to stop any choices of people to market where it's not on their platform.

Q. Mr. Reffkin, have you heard of the term organized real estate?

A. Yes. Organized real state is a term that NAR created. It's on their website. They, I guess, consider themselves organizing real estate. NAR is associations in their MLSs. They're all related and intertwined.

Q. Thank you, Mr. Reffkin.

I want to shift gears and talk about three-phase marketing since it's a topic we're going to talk about a lot today.

Does Compass offer any marketing strategies that its agents can use with their clients?

A. Yes. Listing agents are in the business of meeting a seller and giving competitive offerings on how they can market their homes.

So we launched the Compass three-phase market strategy which was based off of what agents said the most sophisticated sellers of real estate in the country were doing, home builders. Home builders sell hundreds of thousands of homes where its pre-marketed off the MLS, not Zillow.

And so we create an entire website that says, Compass is launching the three-phase marketing strategy to give the individual home owners the benefits, the same marketing strategies as the professional home builders. That was the website that marked three-phase marketing.

Q. At a high level can you tell us what three-phase marketing does?

A. There are dozens of reasons why people want to start by marketing off MLS, but I put it in four categories.

One, true privacy. It's run 10 percent of the time. So true privacy would be a law enforcement official. It could be a CEO. It could be someone who doesn't want their neighbor to know or their kids friends to know in school. That's true privacy.

90 percent of the time it's in these other three buckets. One would be for the same reason a movie trailer to build momentum and demand would premarket before launching the movie. It's premarketing to build momentum and demand, to build excitement. Imagine if every movie because of the movie association of America was not able to do trailers, like that's kind of what's happening here. They don't want to do premarketing anyway, but that's one.

Two is to get real feedback. So the movie, you have a screening before the actual movie, and you get feedback from the entire audience. What do you like? What should you cut?

I don't know what they would say. But here you get the same feedback. And the feedback would be, do we need to paint the walls? Do we need to fix the kitchen? Do we need to replace the rug? What kind of home development do you need? So builders do it for those reasons to get feedback as well.

The last reason is to price discovery. Very important. In the same way IPOs before going public and saying, hey, we're going public at $18. You have a testing the waters in a roadshow where you meet a bunch of investors and get feedback on the story and the price. Because if you have the wrong price, you're going to get slaughtered in the markets.

The same thing happens here. 42 percent of all homes on the market today in the country, not just Compass, in the country, have a price drop. They all look like damage goods. Every one of those homes should have had their agent say, let us test prices privately, so we know when its live it's the right price. Because if it's the wrong price, you look like damage goods. Days on market is the killer value. Price drop history is the killer value.

So the only reason -- you cannot do that if you're sent thousand of sites, Zillow is one, cause they are testing the price publicly. You see a public price drop. So price discovery is I would think the most important reason. It is why those MLSs went from 14 percent to 59 percent. They're

letting people test price privately.

The eighth one MLS in the country MRED has a private listing network. They actually launched private listings before Compass. They launched private listings in 2015. We launched ours in 2018. We learned it from them and from the builders on what to do.

But 60 percent of all the agents in the state of Illinois use their private listing network, not just Compass agents, and that shows the demands the sellers have for testing price privately.

Q. Mr. Reffkin, let's go in depth into each of the phases so we can all understand what they are.

How does phase one of three-phase marketing work?

A. So phase one would be, it's a private exclusive. That's the term. It's just a branded term. It is not private. It is not hidden. Private label clothes, private client services, private banking, private credit, private equity. It doesn't mean that it -- if it was really private, it couldn't sell. You can't sell something to yourself. It has to be marketed, but it's a term that people like.

On here I saw Chase private client services I think. People like the term. It helps agents make you feel special as sellers that you have a private listing. In this phase, it's marketed to all Compass agents, all clients of Compass. Any non-Compass agent can see these. Any consumer who doesn't want

to work with an agent can see these.

Q. Mr. Reffkin, how can a consumer who doesn't want to work with an agent see the phase one listings?

A. We give directions on our site on that black box. It said, listings are only private online. Any agent and any buyer can see these by visiting our office or calling Compass. If you want, I can set you up. You don't have to work with me. I can set you up so you can see these digitally as well and they get sent to you.

The private exclusives, the reason why they look the way they do with the black box is the NAR and MLS rules require it. In our other offer MLS listings in 2018, when we launched MLS listings, 90 percent of them did not require a log in. 90 percent of them were called coming soons, visible without registering. Anyone can see it. Then NAR created a rule that said if it's not on MLS in 24 hours, it has to behind. It cannot be visible to the consumer. So they forced us to put it into the black box.

If there was no Zillow band and there was no NAR fine to agents who don't give them listings, our listings would move back naturally to coming soons. Because, remember, only 10 percent of the time is it really about privacy. The rest it's about premarketing and those other benefits.

Q. Mr. Reffkin, what percent of buyers use agents?

A. Ninety percent of buyers use an agent. I guess a good --

one of the benefits of private exclusives is NAR changed the rules recently. They said -- actually, they changed the rules two weeks before the Zillow band, and they expanded choice for sellers.

And of the two rules, changes one were, now for the first time you're able to send listings that are not in MLS. You can send them to agents at other brokerages. So if 90 percent of agents -- if 90 percent of buyers use an agent, I can give you 90 percent exposure with zero percent of the risk. What I can tell you is, the risk is days on marketing price drop history that's on all the portals. I can test price privately at Compass, but also I can test price without days on market price drop history. I can test price with all of the agents in the neighborhood.

And so because 90 percent of buyers use a agent, I can give you 90 percent exposure. But I can do that without days on market price drop history because I'm going to control for you how it's marketed, and it won't go to thousands of different sites. Because of this rule change it's really great to see that we're now selling more listings that are off MLS with non-Compass agents. So nearly 70 percent of the time when a listing is sold as a private exclusive, it's sold with a non-Compass agent.

Which is an example of the less restrictive rules that are on our industry, Zillow band and NAR, the more we'll be

able to share listings with agents and a consumer outside of their system.

Q. Mr. Reffkin, why can't a seller do price discovery on the MLS or on Zillow?

A. When you do -- when it's on Zillow, it has days on market and price drop history which is the killer of value. And so let's just say, like I mentioned, 42 percent of the homes have a price drop. And really after a week or two, people say, this is old, and it makes sellers feel that buyers are going to negotiate against them just because with the days on market.

So if I want to have a week of having people come in to get feedback on positioning, I can't do that per the Zillow band because I'm publicly marketed. Zillow will band an agent from inviting agents of other companies to look at the listing and give feedback.

Q. So I think that takes us to phase two.

What is phase two of three-phase marketing?

A. Phase two once on Compass.com is a coming soon. Anyone can see it. Anywhere in the world. You don't need a log in. Everything is there. It doesn't show days on market. It doesn't show price drop history, and that's the premarketing phase to build excitement and demand.

The coming soon phase, we launch private exclusives and coming soons in 2018. Coming soons came from Zillow. Zillow and Redfin both had coming soons. We're like, that's

great, so we launch it because they had it. We just did it so much that now they don't like it. In private exclusives again came from the builders and from MRED's private listing network.
Q. And what is phase three of three-phrase market?
A. Phase three is when it's on the MLS and all the portal sites. 94 percent of our listings that are private exclusives end up going to the third phase.

The counsel on the other -- on Zillow side said this is an example of private listings being failing and then going there. It's called the three-phase marketing strategy for a reason. It's not called the one-phase marketing strategy. It's called the private exclusive strategy. It's the three phase. You're suppose to test price, build momentum and demand and go, just like the builders do, to the third phase.

What Zillow wants it to be is the one phase. They want the one phase to be Zillow. If it's not on Zillow, it must not be transparent and it has to be band.
Q. Are the listings that go into phase three considered stale?
A. Stale, no. Stale in my mind, when I think of stale, I can't eat the bread, so it's not something that you can buy that you can eat. It's not functional.

Those 94 percent of listings, all of them sell. Every one of those listings sold. And so by definition, those are great. Those are listings that -- the duty to deal what I have heard is that you would forego short-term profits to control

the market. Every listing they can get, they should naturally want because its their ability to make revenue off it. They're saying they do not want these listings, their foregoing short-term profits to control how everyone sells and list property.

Q. Mr. Reffkin, are all three phases of the three-phase marketing strategy available on Compass.com?

A. All three phases are available on Compass.com.

MS. SOLH: Your Honor, we pulled together a few of the exhibits that we've marked to show Compass.com, so they're going to be grouped together. That's under tab one of the binder which is labeled PXD001.

THE COURT: I have it.

Q. Mr. Reffkin, what is this page right now?

A. This is Compass' home page. And what you would do here is you would type in the city or neighborhood or zip code, so you could type in New York City as an example.

Q. And then what would happen next after you typed in New York City?

A. What would happen next is, it would bring you to a page. And this page looks just like very similar to all those other home search portals, as well as this page would look like all the other home search portals.

But here on the left, these are all the listings. These are all Compass listings, but also all the MLS listings.

The only listings that I know that are not shown here are listings that Zillow have that they don't give to us. So those are builder listings that they get that they aren't giving to us. Those are auction home listings they have that they don't give to us, and those are for sale by owner that they don't give to us.

Some of those listings will decide to go to MLS, and when they go to MLS, they come to us. We don't band on them.

Q. And on this page can you tell us where phase one where the three-phase marketing strategy would be?

A. So phase one is the black box. If you circle the black box, what it shows you is this is New York City. It's saying there are 334 listings that are not in the MLS, but that are called Compass price exclusives. Below it says listings are only private online.

Again, the reason they're private online is NAR's rules force them to be private online. It's not MLS. Across the country the rule is that it cannot -- you cannot be public for more than 24 hours. Then it says, all buyers and agents can access in our office by contacting Compass. You don't have to work with the Compass agent. You can come to our office. You can call Compass. You can call an employee. We can set you up. We can give you these listings. You don't have to work with a Compass agent to see these.

By the way, the evidence is in the nearly 70 percent.

How else could we sell nearly 70 percent of our private exclusives to buyers that came through non-Compass agents if you had to work with our agent to access it. And so that's the private exclusive phase. The next one is coming soons.

THE COURT: Mr. Reffkin, can I interrupt and ask you a question to clarify that.

If someone calls to Compass pursuant to the instructions on this black box, how do they then work with a non-Compass agent to potentially purchase the property if they're interested?

THE WITNESS: So if someone is working with a non-Compass agent, the non-Compass agent would probably make the call. And they could call one of our agents to get -- an agent will set them up. If you're an agent, I'm an agent or an employee of Compass, I would say come to our office. You can see the listings. That's one. Two is, I'll set you up on a saved search for all the private exclusives. So many agents are just set up -- whenever there's a private exclusive that comes up, they're automatically pinged. It automatically goes to them because Compass just sets them up.

THE COURT: And that non-Compass agent can show that to their client?

THE WITNESS: Yeah. But then also our agents because the new NAR rule, the new NAR rule in March 2025 said for the first time, it's okay. We can share outside of our brokerage.

Now agents are sending it to other agents at other brokerages because you're allowed to do that. That was a huge change. It let's people share listings outside the MLS and portal system.

If you're a consumer and you don't want to work with an agent at all -- a non-Compass agent or a Compass agent -- you can come to our office and call and see our listings and go directly to the listing agent. The reason you may want that is when you go through Zillow and you click that button, you have to pay a buyer agent commission. When you go directly to the listing agent, you don't have to. You can just go direct.

What Zillow will say is, their site is free. It's free to search. But when you click that button, you have to pay a commission that you didn't even know until it's too late. Once you see the property, you have to pay the person who took you there.

THE COURT: Apologies, Ms. Solh.

MS. SOLH: Please. Any time you have a question, please jump in.

Q. So, Mr. Reffkin, is phase two on this page as well?

A. Phase two is the coming soon on the left. As you can see, anyone can see these listings. They're fully visible in every single way. Our site has millions of people that search it. And you look at the top right it says register. This is not registered. No one signed on. Anyone can see this.

In 2018 when we launched coming soons and private

exclusives, because we had both of them then, they weren't called three-phase marketing. We branded it recently. But at that time, 80 percent of all of our listings started off MLS. It was so exciting for our agents and their clients. Eighty percent of them started off MLS. Why wouldn't you. If I can help you market without days on market and price drop history, why would any seller say I don't want to see what happens without that.

At that time, 90 percent of all the listings that were off MLS were coming soons, visible to anyone. So of all listings of the 90 percent, just about 75 percent of all listings started as coming soons. Visible by anyone. No log in. You don't need to call. It's right there. But then NAR created that rule that let every MLS fine agents of up to $5,000 if they didn't put a listing into MLS that was publicly marketed for more than one day. So it forced everything into private exclusives.

Mathematically here, there's 334 private exclusives in New York. You can see there's only two in New York that are coming soons that are visible. This is 336. So less than 1 percent of our off MLS listings are publicly visible in a complete way. If there wasn't the NAR rule, and of course the Zillow band, if it wasn't the NAR rule of these 336, 300 would have been coming soons visible to everyone.

I saw the velvet rope around all the brokerages. The

velvet rope, that's created by NAR. And what Zillow wants, Zillow wants that to be a lockbox. What they're doing is they say, it's okay to have private listings. It's totally fine. What's not okay is the publicly market listings. We do three things that I believe are deeply important for fair housing and transparency. On every search it says how many -- that the private listings exist. On every search it tells you how many there are for that search. On every search it tells you how to find them.

Each one of those three things are violations of the Zillow band. If we took off all three of those things, then they won't band any of those private listings. So it's not a band to protect transparency. It's a band to protect Zillow to make sure that no one knows that listings exist that aren't on Zillow.

Q. Mr. Reffkin, thank you. And for the court reporter's benefit, I'm going to remind you to speak a little slower.

Is phase three on here as well?

A. Yes. Phase three is on the bottom right, and that's a listing as it goes through the MLS with everything else.

Q. And are you able to tailor the search any further?

A. Yeah. You can -- right now it says New York on the top left. You can make it a neighborhood. Let's do West Village. So on the top left it says West Village. And then making the price point less than 2 million, so 0 to 2 million. And now

you can see, instead of there being 336 private exclusives, there's seven. Again, it's telling you on every single search regardless of your background, it's telling you exactly that these listings exist that are non-MLS.

It tells you exactly how many there are and how to find them. From this prospective Compass is the most transparent brokerage in the country.

Q. Mr. Reffkin, do other brokerages offer similar information on their online home search portals?

A. If you look at Douglas Elliman, the exact same search in West Village. It doesn't say that private listings exist. It doesn't tell you how many, and it doesn't tell you directions on how to find them.

Q. And if we go to the next page.

A. Here, to get to this page, you have to go to the top right where it says World of Elliman. You go there. And then on the left down the middle it says World of Elliman. It says in the center middle Elliman private listings. And it tells you to log in, but it doesn't tell you how many there are on your searches.

On the next page is another example. Long and Foster is -- the Berkshire Hathaway has a brokerage firm. This is their biggest brokerage firm division called Long and Foster. And here it says private listings, private listings in the middle, private exclusives, all throughout. But it doesn't

tell you when you're searching Long and foster that these listing exist, how many there are and how to find them.

Keller Williams has an identical page to this. They're the largest franchiser, 2,000 agents. This is the typical way that brokerages talk about private listings, but it's not in the search, so buyers don't know it's there.

Q. And if we could go to the next page, please.

A. This is Harwood the number one luxury brokerage in the country. On the bottom left it says access our off-MLS listings. And it tells you they have $1.3 billion in inventory. But if you're searching their site, it doesn't tell you the listings, how many there are and how to find them.

Q. Mr. Reffkin, do you know why these brokerages are not sharing how many listings are under private exclusives or offer exclusives?

A. Every major broker I know, Zillow met with them and told them, if they share the private listings exist on a search, if they share how many there are or how to find them that they'll be band. And so if I were these brokerages, I think they're scared to be band.

Q. Mr. Reffkin, you mentioned the Zillow listing access?

A. To put it in perspective, Zillow is a $20 billion company. Douglas Elliman is the second largest brokerage in New York, and it's a $200 billion company.

Zillow is a huge, huge company. And they're telling

anyone if you show that listings exist off Zillow, we'll band you.

Q. Mr. Reffkin, you mentioned the Zillow listing access standards. What is your understanding of what they mean and if you go to the next slide we actually have a screenshot.

A. So the Zillow band is not a band against private listings. It's a band against publicly marketing listings. They say in their rules that they won't band private listings as long as -- as long as they're private.

But they say here, what does Zillow consider public marketing. Public marketing is any time it's promoted in any way that reaches consumers outside of a simple one-on-one communication between agent and their existing clients. I have 10,000 people on my end as an agent, I can't share with them. It has to be one and one with an email with their client.

And then if you look where it says brokerage websites or apps. Posting listings or even advertising the existence of additional listings. And so obviously that's the black box. So they went to every brokerage and said, if you even advertise the existence of additional listings, you're band. And then here it says, where it says examples, website that shows more listing that match your search criteria.

If every brokerage firm has listings that are on MLS. You sign the listing agreement. It can takes weeks to prepare to put in MLS. What Zillow is saying is, if they care about

transparency, why are they banding us on a search. We say that there are seven more listings that match your criteria. That's not to protect transparency. That's to protect Zillow.

(Continued on next page)

BY MS. SOLH:
Q. Mr. Reffkin, do other brokerages not share or not publicly market their private exclusives?
A. Do other brokers not share --
Q. Do other brokerages not publicly market their private exclusives?
A. If they did, they're going to get banned. Compass is one of the only companies that's standing up to Zillow.
Q. So if we go to the next page here, can you tell us what this is?
A. So, this is Douglas Elliman, the second largest brokerage in New York. And so this is the world that Zillow will accept, where Elliman can't say if listings exist, how many there are on the search, and how to find them. And if you look at what Compass is doing, what looks more transparent: The way the element is or, on the top right, where it says there's seven more, here's how to find them? You don't need to be a Compass agent. You don't even need to be working with an agent at all. And the world that we should want is the world on the right. But if the Zillow ban wins, that's gone and everyone is going to look like Elliman.
Q. Mr. Reffkin, does Compass mandate any of those marketing strategies?
A. Compass does not mandate any marketing strategies.
Q. And could it even do so?

A. It's impossible for Compass to mandate market strategies because agents are independent contractors. We're not legally allowed to control them. And of course then they have their clients, the sellers who make the decision. So we're two degrees away from being able to mandate how homes are sold.
Q. Mr. Reffkin, you can set this document aside and we can take it off the screen.
A. Thank you.
Q. You've referenced this a little bit earlier but I did want to ask you just to provide us a little bit of background here. When did Compass start offering these marketing options to agents and their clients?
A. Compass launched Compass private exclusives and Compass coming-in-soons in 2018.
Q. And how were they received in 2018?
A. In 2018, 75 percent of all of our listings started off as a Compass coming soon, and then another five percent or so went as private exclusives.
Q. And you mentioned earlier that the NAR passed a rule around 2018, 2019. Can you please provide a little more information on that?
A. Yeah. NAR controls the vast majority -- I think it's around 80 percent -- of those MLSs, and the MLSs are listing monopolies. They're digital listing monopolies. And in listing outside their platform was competition for them. So

they created this rule, they let every MLS fine agents up to $5,000 if they marketed a listing outside their platform for more than 24 hours. And so it basically -- it took those coming-soons and brought it to near zero and moved them all to private exclusives. The only way a seller could list outside MLS is now -- was, after that, a private exclusive, until we advocated very much for them to give more options for sellers and stop restricting them.

Q. And when did you start doing that advocacy?

A. So, we started about two years ago. I flew around the country meeting MLS CEOs, I met with NAR many times. And then September 2024 we gave a formal proposal to NAR saying that you should let us share our listings that are on MLS with agents at other brokerage firms, which they ultimately let us do, and they created another status called "delayed marketing" and gave more choices for sellers to not all be in a one-size-fits-all world.

Q. Was Zillow advocating for a similar rule change to NAR?

A. So Zillow -- we were advocating to allow us to share coming-soons and private exclusives with agents -- or private exclusives with agents at other brokerage firms and really have no restrictions. Zillow said you should eliminate private exclusives and coming-soons. There should be nothing. The sellers should not be able to do anything unless it's on Zillow. And specifically, if it's marketed in any way, like on

a flyer in a church, a yard sign. This is the Zillow ban today as written. It's a flyer, a yard sign, a digital newsletter, social media. If Zillow finds any of those and it's not on Zillow, you're banned.

Q. So, Mr. Reffkin, do you know around what time Zillow issued its -- what time in the year Zillow issued its listing access standards?

A. So, on March 25 NAR said that they expanded choices for consumers. And here, consumers mean sellers. They were expanding choices for them to market. And then two weeks later Zillow came out with the Zillow ban.

Q. And --

A. The other context is during this two-year period we were getting the MLSs to expand choice for sellers. Only 14 percent of our MLSs were letting us market private exclusives and coming-soons to market outside the MLS, but now it was 59 percent.

Q. Mr. Reffkin, how did the Zillow listing access standards impact how Compass and its clients could market their properties?

A. It took away their choice. Their agents are being intimidated, the agents are being bullied, the agents are fearful to give -- because they're -- if they market a home on Zillow, then they're banned.

Q. When you first heard about the Zillow listing access

standards, what did you understand them to do?

A. At first there's a press release. They didn't actually give us the details until months later. It was a press release that just said that they were going to implement Clear Cooperation, that rule that lets agents find -- it lets MLSs fine people $5,000, they're going to implement their version of Clear Cooperation on Zillow.

And so I actually thought it was going to be a good thing because Clear Cooperation, the new version, expanded choice for sellers. The more choices sellers have, the more successful our agents will be because our agents will be able to compete with more market offerings. The more successful our agents are, the more successful Compass will be. So I originally thought, hey, this is going to be fine. If they're just implementing the expanded choices that we now have as of two weeks ago, it's not going to be that bad, but I was wrong. Instead of going with NAR, they went the opposite direction. They went further than any entity has gone in restricting choice.

Q. Did the Zillow listing access standards only impact how you marketed properties on Zillow?

A. So, what frustrates me and our agents is Zillow isn't just telling you how you have to operate on Zillow and how -- they're telling you how you have to operate outside of Zillow. They're saying that -- there is not a rule that just says this

is what you have to do when you're on our site. Okay, that'd be fine. They're saying when you're off our site, you can and cannot do these things, and you must put it in the MLS. And so in there, they're dictating and controlling how the entire real estate industry works.

Q. Are there other technology companies that do something similar?

A. I mean, I looked. This is like Google saying -- just imagine a world where the dominant platform in every industry did what Zillow is doing. If Google said anyone that advertises off of Google, I will ban you. If Amazon says anyone that sells something off of Amazon, I will ban you. And even worse is, like, Amazon saying if you're a corporation, you can market off of Amazon and then come in, but if you're a small business you can't.

Because what Zillow does is they actually let builders -- builders can market off -- in the Zillow ban, it says it's exemption for builders. They can market off Zillow and then put it in Zillow. But agents, which are small business owners and who represent the individual American homeowner, if an agent markets off of Zillow, they can't go on Zillow without being banned.

I just don't even know how you justify -- the answer to almost everything that we do is why do builders do it. And they -- every part of our market strategy, builders are doing

it every single day. Hundreds of thousands of homes. But also for the Zillow ban, if they're not doing it for builders, why are they doing it to us? And I think the answer is pretty simple: Builders have billions of dollars and they can't be bullied. And we are big enough now where we cannot -- you know, I work for agents, they're my clients. This is my life's work, this is my mom. We advocate for agents, and someone needs to advocate for them.

Q. Mr. Reffkin, is Compass currently able to tell agents and their clients that they can market their properties as they see fit?

A. No.

Q. And why is that?

A. The Zillow ban.

Q. Mr. Reffkin, I'd like to shift gears and point you to an additional exhibit. If you can turn to tab two of your binder, which is Exhibit -- Defendant Exhibit 168.

A. I got it.

Q. Mr. Reffkin, do you recall preparing in May of 2025 to speak at a fireside chat with JPMorgan Chase?

A. I do.

Q. Do you recognize this document?

A. I do.

Q. Okay. What is this document?

A. This is an email to our head of investor relations from me

about talking points for a JPMorgan investor conference.
Q. And what is the date of this email?
A. The date is May 13.
Q. And in this email, in the second paragraph, you write: This was the ideal outcome. CCP and the Zillow ban helps Compass financially.
What did you mean by "CCP"?
A. So Clear Cooperation Policy. That was the revised version of the NAR rule on March 25. It said for the first time ever, or since 2019 when they put in the original CCP, now we can market our listings to other agents and to other -- outside the brokerage firm, and they gave the expanded multiple list -- a delayed marketing option as well.
Q. And at the time that you wrote this email on May 13, what did you understand the Zillow ban to entail?
A. I thought the Zillow ban was going to give us the expanded options that NAR did with CCP. Because they -- because until this point they only had a press release that said that they were going to implement CCP. They did not give us the details of what they were going to actually do. The actual policy wasn't there yet.
Q. And, Mr. Reffkin, you wrote: This was the ideal outcome. CCP and the Zillow ban helps Compass financially.
What did you mean by that?
A. What I mean is we -- the more options agents can give

sellers, the more successful Compass will be. We compete on giving options to sellers. If every one of our agents could only do the one-phase marketing strategy, we would have much less competition. And CCP, the new version, allowed us to do three days of market strategy, even more options, because now I wouldn't have to just keep in our firm.

A very real example, in Tribeca, so right here, there's an agent, Ernesto Gomez, who had a listing and it was a private exclusive, and I went there with my wife, we go to houses every Sunday, and he -- I go in, and right after me there are three agents with the other brokerage firms, the agency Brown Harris Stevens and Elliman. And the ultimate buyer came from the agency. The more you're able to share outside of the brokerage firm, the easier it is to sell. That's a good thing. So now I can go to a seller and I can say, "There's no days on market listing, there's no price drop history." That seller was able to test a price, get feedback without the risk, without risk of the clock is clicking days on market, what if you're wrong on price. And so its -- and the sellers, they just have more choice, and that was a choice that helped him win the listing, I don't know if he would have won the listing without it, but also was able to get a buyer that came from a non-Compass agent.

So the more options that you have -- I thought that's what Zillow was going to do. I thought they were going to

allow activity like that. That rule -- under the Zillow ban, he would not be able to invite agents from other brokerage firms. If Zillow found out those three other brokers were even there, boom, you're banned. And by the way -- yeah, they're banned.

Q. Thank you.

Mr. Reffkin, you can set this document aside.

Mr. Reffkin, what have you heard Zillow say about Compass' three-phase marketing and transparency?

A. They say that Compass isn't transparent. They say that the marketing strategy isn't transparent.

Q. And what if a listing is everywhere except on Zillow?

A. So what the Zillow ban is saying is if it's not on Zillow it is not transparent. Because if I market your listing everywhere in the world, every website, every billboard, every YouTube ad, if it's not on Zillow, you're banned. But is that because I'm not being transparent? No. In there it shows that Zillow is not protecting transparency, they're just protecting Zillow's business model of getting our listing through the MLS because the MLS is their free listing supply chain. It's one monopoly protecting another monopoly.

Q. Mr. Reffkin, have you heard the criticism that marketing off of the MLS or off Zillow is bad for home sellers?

A. Yes, I've heard the criticism that marketing off the MLS is bad for home sellers. But a couple things: One is I think the

home seller should be able to choose what's bad for home sellers, not some technology company based in -- not a technology company. And I believe in choice versus control. I think consumers and sellers should have the choice of how their homes are marketed, and it should not be mandated and dictated by platforms out of fear of bans of their fiduciary. And so I believe choice over control.

But "if" is bad for sellers. Why do the most sophisticated, profit-driven, repeat sellers of real estate, the home builders, do it every day? Hundreds of thousands of homes the builders are marketing outside of Zillow. And so if it's so bad, why are they doing it? And if it's so bad with buyers then why can't they do it? And why does the Zillow ban let the home builders do it and be on Zillow but they won't let agents and the individual American homeowner do it and then go on Zillow? Again, I think it's just because Zillow knows who they can bully and who they can't. It's hard to bully Lennar, who sells 80,000 homes a year, or Pulte who sells 100,000 homes a year and has billions of dollars. They would not allow for that.

But it's easy to bully an industry of individual agents like my mom or independent contractors. They do not make a salary. And if you threaten them -- they're getting threatened with their commission, because the only way -- if my mom gets kicked off of Zillow, the only way that the listing

will get back on Zillow is if the agent fires my mom. That's the way the Zillow ban is written. The homeowner -- you can get back onto Zillow but you've got to fire both the agents and the brokerage firm. So my mom is terrified, absolutely terrified, of giving this choice because if you give the choice and then -- you know, you may want to start private because of the law, law enforcement, but then it doesn't sell. It's been two months and now you're just dying to sell. You just have to sell. You've got to go quickly. Well, now if you're working with me and I made that choice, now you can't be on Zillow without firing me.

So what's that going to do to every agent? Their fiduciary duty as a disinterested adviser is being foregone because they can't be disinterested because there's a ban over their head for the entire commission check.

Q. Mr. Reffkin, have the Zillow listing access standards had an impact on competition in the industry?

A. The Zillow listing access standards have absolutely taken away competition in the industry. You don't have to go farther than the website on Zillow that said 90 percent of the agents who were giving choice to sellers to market off Zillow are no longer doing it after getting the violation email that says, hey, if you do this again you're going to be banned, and the only way your client gets back in is by firing you. So, yeah, that means agents today, per Zillow's press release, 90 percent

of the agent are no longer giving sellers choice because they're too scared.
Q. Mr. Reffkin, how did the Zillow listing access standards impact consumers?
A. It's taking a choice away from sellers. Sellers are consumers also, and they should be able to have a fiduciary, given all the pros and cons and disinterested advise, on how to market their homes, the risks and the benefits, and give them multitude of strategies. It shouldn't just be the three-phase marketing, there should be dozens of way to sell a home. Let agents be creative and market homes that meet their client's need, not in a one-size-fits-all way so that platforms can make money monetizing their home's listing.
Q. How has Compass invested in its marketing strategies?
A. Compass invested nearly $2 billion in building the technology platform Compass.com. In that platform, half of what it is are for sellers and marketing properties and a massive listing system.
Q. Are there any tools that Compass has built for agents and for customers?
A. Yes. There's Compass Collections, Compass One, Compass Concierge, Compass three-phase marketing strategy. So we have dozens of different types of tools that agents can go to and say, the reason you want to work with me as a seller is I'm going to help you meet your specific needs that are all

different -- some people care more about price, some people care more about speed, some people care more about privacy, some people care more about timing -- and I have these tools to meet your very specific needs.
Q. Mr. Reffkin, how many employees does Compass have?
A. Compass has nearly 3,000 employees.
Q. And as CEO of the company, if you wanted to get information about some of the investments that Compass has made in its technology, who would you go talk to about that?
A. I would go to our head of product and head of technology, Roman.
Q. And is there anyone else you would talk to?
A. For investment and technology, maybe our CFO. Yep.
Q. Mr. Reffkin, how important are marketing strategies like three-phase marketing to Compass?
A. The three-phase marketing strategy is critical to our future.
Q. And how damaging are the Zillow listing access standards to Compass?
A. Very harmful.
Q. Do the Zillow listing access standards impair Compass' ability to compete on inventory?
A. The Zillow listing access standards impair -- it nearly eliminates our ability to compete on inventory. The online home search portals, similar to Amazon, similar to Netflix,

these portals, all you can compete on is inventory. There can only be so much on a listing page to make it stand out. You're competing on listings, and that's Amazon who has the most listings, Netflix who has the most movies. And so, yes, what Zillow is saying is they're going to ban anything, any listing that is on our site that's not on their site, and they're going to go do it by getting all the agents to know that their commission will be at risk because their client will have to fire them to get back on Zillow. It would be like -- yeah. Yeah.
Q. Mr. Reffkin, do you consider Compass to be an innovator?
A. I believe Compass is an innovator.
Q. And how have the Zillow listing access standards impacted Compass' ability to innovate?
A. The Zillow listing access standards have nearly eliminated our ability to innovate on any marketing that's not on Zillow.
Q. And why --
A. If someone said, can you give me the ten ways that we can market outside of Zillow without being banned, I couldn't -- you can't do that. That's what the Zillow ban is.
Q. Why is it important to Compass that it be able to deploy marketed strategies like three-phase marketing?
A. The only way that we compete is by giving more choice to sellers, and that's how you get sellers, and so it's very important. If we can't differentiate ourselves, then there's

no competition.
Q. And do the tools and the technologies that Compass has developed that differentiate it make it a pioneer in the field?
A. Yes. Compass was the first to build these listings that everyone already had, but to put in a listing system and make it a national branded program.
Q. And was it successful?
A. It was very successful. It was so successful that Zillow created the Zillow ban because of it. Again, if Compass didn't have -- if it was market strategy there would be no Zillow ban.
Q. Does Compass now need to work differently to be able to implement these three-phase marketing strategies or other marketing strategies?
A. Yes. We've had to overcommunicate with our agents. We were going up and up and up and up, and then the Zillow ban happened and our adoption went the other direction.
Q. Did those Zillow listing access standards cause Compass to lose its competitive advantage of being a pioneer or a first mover?
A. The Douglas Elliman launched their private business network, the second largest brokerage in New York, I think just a month or two ago, and so we were the first ones with this national program, and we're seeing Long & Foster -- I don't remember them having that two years ago, Keller Williams I don't remember them having that two years ago. And so our

first mover advantage of being the innovator in this space, giving sellers, being the company known as -- the brand that I wanted to have at this time was I wanted to kind of set the brand of Compass gave the individual American homeowner the innovative marketing strategies by the most sophisticated people in real estate, the home builders. That was the whole page, I think it's still there, is that home builders are able to market their properties in all these different ways. We are giving you, the seller, the power of a billion dollar home builder. That was the brand that we were going to have, and I want us to be known for that in the country. That we gave this to the individual American homeowners.

Q. Has Compass' ability to grow its business been impacted by the Zillow listing access standards?

A. We would have grown much more if there was no Zillow ban.

Q. Why do you believe that?

A. Because I saw the direction of adoption of the three-phase market strategy going from looking like this to the opposite triangle.

Q. Has Compass' good will or business reputation been impacted by the Zillow listing access standards?

A. Yes. Our good will in business reputation has been impacted. This was the whole strategy. I wasn't flying -- the reason I was flying around to meet MLS CEOs across the country and meeting with NAR in Chicago is a reflection of how

important this was. For us to have freedom to market our listings at the approval -- at the request of our sellers in the way that we and they wanted, without organized real estate finding and banning our agents for doing so. Because that is --

I have talked about this topic every day. Every Saturday, every Sunday, every single day, this is what I talk about, because I think this is an injustice and is not right. But in the probably five or six months preceding the Zillow ban, I went -- I spoke with over 10,000 agents in person, talking about the future that we are going to build together, where they're going to be able to give sellers the -- it would be -- it would be a win-win. Sellers will have a site for the first time without days on market and price drop history where they can market their property without risk, and in doing so will have all this inventory that will give to the public, where the public can search it and bring in traffic. So you have more traffic you can give to sellers, to be able to list without days on market, price drop history, the more inventory, and that, in turn, will bring more buyers, and that would be the flywheel.

And I met with -- it was last year -- we have a two-week spring break for our kids. Every single day I was in offices with my family going through this presentation about this specific strategy, and that was the month before the

Zillow ban. That's how important it was. Every single day over spring break I was there, and even mocked up a billboard. I told everyone in the offices, this is what we're going to launch, this is the plan.

Q. So let's -- if I may introduce Defendant Exhibit 98, if we could put that up. If you could turn to tab three, and it's going be the last page.

Mr. Reffkin, is this the billboard that you showed as a mockup?

A. It is. And so if you look at the bottom, it says "where homeowners choose to market first. No days on market and no price drop history." Because in phase one and phase two, there's no days on market, there's no price drop history. Only in phase three when every site has it do we apply that. But this is the win for homeowners.

And then for the buyers, because all these homeowners went on the market without days on market and price drop history, we have all this unique inventory, and so this was the billboard. See 25 percent of homes for sale one week before any other site. And I committed. I created good will with our agents to saying this is what we're going to do. I said, trust me, this is what is going to happen. But unfortunately, a real estate peer article leaked this on April 2. And then eight days after this was leaked by the press, the Zillow ban happened. Because this -- this would be the biggest

competitive threat to Zillow. If Compass is able to say that we have listings that Zillow doesn't have, then people would search Compass. It's a very simple thing. You don't need to be -- our website could be a Google spreadsheet. If it has this much unique inventory in New York, people want to search it. But that's why the Zillow ban came into effect eight days later.

Q. So, Mr. Reffkin, were you able to continue to implement the strategy that you discussed with the agents and that's here on the billboard?

A. No. I promised them that I would do this. I said, this is what we're going to do, but then the Zillow ban happened. I can't because we're not able to market off of any other site. Zillow's saying is every listing that -- any listing that is being marketed has to be marketed on Zillow. They want this number to be zero. See zero percent of the homes for sale any day not on Zillow.

Q. Mr. Reffkin, has competition returned to the market after you weren't able to fully deploy this strategy that's in the billboard?

A. No. We can't publicly market. While the MLSs and NAR were giving us more and more choices to not have everything at black box and they were giving us choices to market publicly, Zillow said no.

Q. Is the harm from the Zillow listing access standards to

Compass quantifiable?
A. The harm to Compass from Zillow is unquantifiable. I can't imagine how many buyers or how much more traffic we would have if this billboard was in every market in the country over the last eight months. How much more traffic would we have had? How many more buyers would we have had? How many more agents would we have had? How many more sellers would we have had? It's unquantifiable. How much more trust would we have had? How much more brand value would we have had if this billboard could have been in every market in the country? So, from that perspective, it's unquantifiable.
Q. Thank you, Mr. Reffkin.
MS. SOLH: I'm going to pass the witness.
You can take the exhibit off.
THE COURT: In terms of timing, I'm just going to say that we'll probably take our lunch break in about 30 minutes.
MS. LAU: I'm sorry, your Honor. Can you say that one more time?
THE COURT: I said in terms of timing, we're going to take a lunch break in about 30 minutes so --
MS. LAU: Thank you, your Honor.
THE COURT: -- it gives you a preview of where a good stopping point might be.
MS. LAU: Permission to approach, your Honor?
THE COURT: Yes, you may.

Do we have a binder for the witness as well?

MS. LAU: Yes. We're getting that together.

THE COURT: Okay.

(Counsel confer)

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MS. LAU:

Q. Nice to see you again, Mr. Reffkin.

A. Nice to see you as well.

Q. You don't know Compass' market share in online search; correct?

A. I don't know Compass' market share in online search.

Q. You don't know how Compass measures its market share in online home search.

A. I don't know how Compass measures market share in online home search.

Q. You don't know if Compass subscribes to any third-party analytics providers to measure web traffic?

A. We do subscribe to analytics, I believe, but I don't know the name of it.

Q. You don't know if Compass subscribes to any data providers to measure web traffic.

A. I don't know.

Q. You don't know if Compass subscribes to Comscore data to measure traffic.

A. I don't know.
Q. You don't know if Compass tracks the number of users who visit Zillow.
A. I don't know.
Q. You don't know if Compass tracks the number of visitors to Redfin.
A. I don't know.
Q. You don't know if Compass tracks the number of users who visit homes.com?
A. I don't know if we track the number of users to homes.com either.
Q. And you don't know if Compass measures the online home search data for any other brokerage.
A. I don't know if Compass measures the online home search data for any other brokerages.
Q. Mr. Reffkin, I'll have you turn to tab one in your binder, which is DX 618, and it'll also show up on your screen.
This is Compass' second supplemental response to Zillow's first set of interrogatories. Let's look together at page 20. This page, which is titled verification, is signed by Compass' deputy general counsel Timothea Letson; correct?
A. Yes, it's signed by Timothea Letson.
Q. And paragraph five represents that the information in these responses is true and correct; is that right?
A. Yes. It says the answers contained in these responses are

based on information assembled by plaintiff's employees and attorneys, and I am informed that the information set forth in the responses is true and correct.
Q. And you trust that your attorneys provided information in this response that's true and correct.
A. I trust that they -- that the responses they provided were true and correct.
Q. Let's turn now to page 16, and it's also up on your screen.
This states: Compass did not forecast potential earnings or future traffic to its home search platform that would flow from 3PS.
Is that correct?
A. I'm sorry, I just need a moment.
Can you ask the question again, please?
Q. My question is, does this interrogatory response state Compass did not forecast potential earnings or future traffic to its home search platform that would flow from 3PS?
A. Yes. It says: For example, Compass did not forecast potential earnings or future traffic to its home search platform that would flow through 3PS.
But I don't know what 3PS is.
Q. Is 3PS three-phased strategy?
A. I don't know. I've never heard -- I don't -- I have not used that term before.
Q. Do you have any reason to doubt the accuracy of your

attorney's representations in this signed, verified interrogatory response?
A. I just don't know what 3PS is.
Q. My question is, do you have any reason --
A. No.
Q. -- to doubt the --
A. No, I don't.
Q. -- accuracy of your attorney's representations in this document?
A. No, I do not.
Q. And I'll just ask that you wait to answer until I've completed my question, for the court reporter's benefit.
I'm going to have you turn now to tab two in your binder, which is DX 175.
This slide presentation is titled strategy overview; correct?
A. Yes, it is.
Q. And it's dated April 2024; correct?
A. Yes, it is.
Q. And it is labeled in the corner "privileged and confidential, board of directors only"; correct?
Look at the bottom right corner of the first slide.
A. That's correct. Privileged and confidential.
Q. It's important to be truthful and accurate when preparing a deck for Compass' board of directors; correct?

A. Yes, that's correct.
Q. Let's look together at page nine.
In this slide, blue boxes are used to show where Compass operates today; correct?
A. It says Compass operates today.
Q. Compass has a blue box around "brokerage"; is that right?
A. Compass has a blue box around "brokerage", that's correct.
Q. Compass also has a blue box around "mortgage" because Compass is in the mortgage business; correct?
A. That's correct.
Q. There's no blue box around "search leads."
A. There should be a blue box around "search leads."
Q. My question is, is there, on this slide, a blue box around "search leads"?
A. No, but this is -- this slide is incorrect.
Q. Thank you, Mr. Reffkin.
Let's turn to tab three together, which is DX 655.
This is Compass' third quarter 2025 earnings call transcript; is that correct?
A. That's what it says. It says it's FQ3 2025 earnings call transcript.
Q. Do you have any reason to doubt that this is your Q3 2025 earnings call transcript?
A. No, but I have not seen this before.
Q. The date of this document is November 4, earlier this

month; is that right?
A. The date of this document is November 4, that's correct.
Q. Compass' Q3 comprises July, August, and September of 2025?
A. That's correct.
Q. Zillow's standards were in place during these three months; correct?
A. The Zillow confusion and fear was but to my knowledge, the Zillow standards were only in one MLS market of the over-500.
Q. My question, Mr. Reffkin, is, were Zillow's standards in place during these three months?
A. When you say "the Zillow standards," do you mean -- what does that mean? Just to make sure I'm answering it correctly.
Q. The Zillow listing access standards.
A. And there was a website that had listed stuff, then most agents probably aren't even looking at, but in terms of -- I guess there's a website and then there's enforcement. To my knowledge, you --
Q. My question is, are the standards in place during the three months, July, August, September, 2025? Did Zillow have the standards in place?
A. In more than 90 percent of our markets there was no standards being enforced.
Q. Mr. Reffkin, please listen to my question.
Were the standards in place? I am not asking you about enforcement, I am asking you if Zillow's standards were

in place during these three months of 2025.
A. Under the way I view what it means to be in place, my answer would be no.
Q. So you --
A. The 90 percent --
Q. So you don't believe that Zillow's standards were in effect during the three months that you were reporting Q3 2025 earnings?
A. In my understanding they were only in effect in the D.C., Maryland, Virginia area with --
Q. I am not asking a question about enforcement.
MS. SOLH: Objection.
THE COURT: Let me hear the objection.
MS. SOLH: I'm sorry. Objection. She's cutting him off. I would like to let the witness answer the question.
THE WITNESS: To --
THE COURT: Hold on. Hold on.
THE WITNESS: I'm sorry. I'm sorry.
THE COURT: One moment.
I think the witness has now given his answer several times so why don't we move on from that question. I understand what you're getting at. The witness has answered.
BY MS. LAU:
Q. Let's look at the bottom of page four.
Compass had the strongest Q3 2025 results in its

history; correct?
A. Compass had the strongest Q3 2025 results in our history.
Q. Turn to the next page.
Compass outperformed the market in Q3; correct?
A. Which page is this on?
Q. This is on page five. The language is pulled out for you and highlighted.
A. I'm sorry. Can you ask the question again?
Q. The question is, did Compass outperform the market in Q3?
A. Compass did outperform the market in the third quarter.
Q. Turn back to the bottom of page four.
Compass delivered the best organic principal agent growth in the company's history; correct?
A. Compass did have the best recruiting quarter for principal agents.
Q. And turn again to page five.
Given this increased momentum, you state that you expect Compass to add 800 more principal agents organically in Q4.
A. Yes.
Q. Let's turn to page 12, the last paragraph.
You were asked a question about adoption of 3PM and you state, "No agents told me in the last quarter that that reduced their chances of getting the listing. I've only heard that it's increased their chances."

Was that your statement?
A. My statement was that sellers want more choices, not --
Q. My question is, yes or no, was that your statement during this Q3 transcript of your earnings call?
A. That no agent told me that offering less choices was helpful? Because what I'm saying is that --
Q. Mr. Reffkin, I'd like you to answer my question, please.
A. Okay. Yes, I said no agents told me last quarter that offering an additional choice of three-phase marketing strategy hurt their ability to get a listing. Because the -- we compete on offering more, so by offering three-phase market strategy, you get more listings. That's our business.
Q. And 3PM offers more of that optionality; is that correct?
A. Three-phase marketing is a choice that our agents are able to give that is more -- the more choices -- no seller wants less choices, they all want more choices. So the more choices we can give, the more our agents will win listing.
Q. Let's turn now --
A. The three-phase marketing strategy is that.
Q. Thank you, Mr. Reffkin.
Let's turn now to tab four, DX 006.
This is a transcript of Compass' second quart 2025 earnings call on July 30; is that correct?
A. I'm sorry. I just -- 006? Okay, yes. This is the second quarter 2025 earnings call transcript.

Q. And Compass' Q2 comprises April, May, and June; correct?
A. It's April, May, and June.
Q. Zillow's listing access standards were announced on April 10; correct?
A. That's incorrect.
Q. When do you believe the listing access standards were announced?
A. Sometime in late May they give us the standards. In April they gave us a press release that said they were going to enforce CCP.
Q. So the press release for Zillow's listing access standards was published on April 10; correct?
A. That's incorrect. They only gave a press release, there were no standards.
Q. My question was about a press release, Mr. Reffkin. Listen to my question.
Was the press release for Zillow's listing access standards published on April 10?
A. Again, under my definition, no. There was a press release that said in the time ahead they will tell us what these standards are, but they didn't give us any standards. It took them months. I think with -- I think it was designed to --
Q. I'd like to move on, Mr. Reffkin.
Let's turn to page four together.
And here you announce, in Q2, Compass had the

strongest quarterly results in the company's history; correct?
A. That's correct.
Q. And you state that Compass achieved ten quarterly records?
A. Yes. I'm pleased to share that Compass team produced the strongest quarterly results in our history with ten quarterly records.
Q. Turn to page ten.
And here you state, on July 30, that the number of Compass private exclusives stayed at basically the same level through these three months. Again, that's April through June.
Is that correct?
A. That is correct.
Q. Turn to tab five, DX 528, please.
This is a press release announcing Compass' combination with Anywhere Real Estate; is that correct?
A. Yes, this is a press release of our combination -- Compass announces combination with Anywhere Real Estate in all-stock transaction.
Q. And indeed, the Anywhere merger is only going to be paid for in Compass stock; is that correct? So no cash, all equity.
A. Compass is -- they -- Anywhere has equity and Anywhere has debt. Compass is assuming the debt and -- which is the majority of the enterprise value of the company is actually in debt, and then the equity we're paying -- it's a -- a reason our equity -- becomes equity.

Q. Anywhere is one of the largest real estate franchisors in the United States; is that correct?
A. Anywhere is one of the largest real estate franchisors in the country.
Q. And the combined company is expected to have an enterprise value of approximately $10 billion; is that correct?
A. The combined company will have an enterprise value of approximately $10 billion.
Q. Let's turn to the next tab, and I'm pulling up DX 531.
Mr. Reffkin, this is Compass' responses to Zillow's second set of request for production.
Let's turn together to page six.
And this request for production requests you to produce all disclosures made by you to Anywhere in connection with the transaction regarding Zillow's listing access standards.
Do you see that highlighted language?
A. Yes.
Can I just have one moment just to read this? This doesn't look familiar. I just want to refresh my recollection.
(Pause)
A. Okay. I read what you read.
Q. And now turning to the bottom of page six, Compass writes: Compass responds that after conducting a reasonable search, Compass did not identify any responsive documents.

Did I read that correctly?
A. Again, this is a -- let me just -- may I have one moment to read this, please?
(Pause)
A. That's what it says: Compass responds that after conducting a reasonable search, Compass did not identify any responsive documents.
Q. And let's turn to page eight.
Do you see the signature block there of your attorneys?
A. I do see Chahira and Kenneth, our attorneys.
Q. And you believe that Compass' attorneys were accurate and truthful when they confirmed there were no such written disclosures to Anywhere?
A. Yes, I believe they were truthful.
This is a document I have not seen.
Q. Compass has known about Zillow's position that the black box violated the listing access standards; correct?
A. Can you please ask that question again?
Q. Compass knows that Zillow's position that the black box violates the listing access standards; correct?
A. I don't think it's clear in how anything is being enforced. I think -- it, to me, looks like Zillow is trying to create confusion fear.
MS. LAU: Your Honor, permission to approach?

THE COURT: Yes, you may.
Q. Mr. Reffkin, you remember that you were deposed on September 5, 2025; correct?
A. I remember I was deposed.
Q. And you took an oath and swore to tell the truth during your deposition?
A. I did.
Q. Let's pull up 54, lines 14 to 20.
"Q. My question was: Did Zillow explain its position as to whether the black box violated Zillow's listing access standards?
"A. Zillow said the black box violates the Zillow ban, Zillow listing access standards."
Did I read that correctly?
A. You read that correctly.
Q. And Compass knew because Zillow and Compass had a discussion on April 14 about how Zillow planned to implement the standards; correct?
A. On April when?
Q. April 14.
A. I mean, that's a long tile time ago. I can't say for certain if it was on April 14.
Q. Let's pull up DX 33, which is tab ten in your binder.
This is an April 15 email from Ashton Alexander memorializing an April 14 discussion between Compass and

Zillow. Is that correct?
A. I see -- I'm reading what you're -- can I take a moment?
Q. You may.
A. Yes or no? I'm sorry.
Q. Yes.
(Pause)
Q. Mr. Reffkin, I'm going to point your attention to certain specific aspects of the document.
A. Okay.
Q. You are a CC recipient of this email; correct?
A. Yes, I am.
Q. I'm going to turn your attention towards the bottom of the first page --
A. Uh-huh.
Q. -- where Ms. Alexander writes: Notes on how Z will implementation the new standard.
Do you see that language? It's highlighted in front of you.
A. Yes.
Q. And under "office exclusive," she writes, "Z takes issue with black box showing number of private exclusives with click through to learn more public advertisement saying come see my private exclusives."
Is that correct?
A. I'm reading what you're reading.

Q. Is that what this email recites?
A. There was no --
Q. Is that what this email recites?
A. I -- I read the same words that you're seeing, but there was no Zillow --
Q. Thank you.
A. There was no --
Q. You have no reason to believe that Ms. Alexander's notes of this April 14 meeting are not truthful and accurate.
A. I have no reason to believe that there were Zillow listing access standards at this time. There were no standards. This is just a conversation between two people.
Q. My question was, do you believe that Ms. Alexander misrepresented or lied to you in writing this email confirming Zillow's position on its listing access standards?
A. When I read "takes issue," "takes issue" does not mean there are standards that you cannot do something. "Takes issue," to me, reads they're trying to negotiate and they want all that they can possibly want.
I was in a meeting before this --
Q. Mr. Reffkin --
A. Yeah.
Q. -- my question is, do you believe Ms. Alexander is lying to you when she records a conversation --
A. I do --

Q. -- that Compass had with Zillow regarding how the listing access standards would apply to Compass' black box?

That's my question. Did she lie to you?

A. Can I have a moment to read this, please?

Q. Yes.

(Pause)

A. So, to my knowledge, this is wrong, because --

Q. My question is --

A. -- Zillow --

Q. Excuse me. Mr. Reffkin, I'd like you to answer my question, please. And the question is, do you believe Ms. Alexander lied or misrepresented that conversation in the written record of that call here?

MS. SOLH: Objection, your Honor. Asked and answered. He's been trying to answer the question and she's not allowing him.

THE WITNESS: If I could just have one --

MS. SOLH: Wait one --

THE WITNESS: Oh, I'm sorry.

THE COURT: Mr. Reffkin, one moment.

I think Mr. Reffkin has expressed several times that the issue is with the phrasing of the question, so perhaps you could rephrase your question, Ms. Lau, because there is certain assumptions inherent in the question you're asking.

MS. LAU: I think I'll move forward, your Honor.

Thank you.

BY MS. LAU:

Q. I'm going to pull up DX 398, which is in tab 11 of your binder, Mr. Reffkin. And in this April 22 email, you are sending a message to Nicole Kessler; is that correct?

A. That's correct.

Q. Okay. And Nicole Kessler is a Compass agent?

A. Nicole Kessler is a Compass agent.

Q. And in the first paragraph, last sentence, you write, "I met Zillow and they are 100 percent fine with private listings, just as CCP is fine with it.

Is that correct?

A. That's correct.

Q. And you go on to write, "Zillow is not banning Compass private exclusives or Compass coming-soons.

Is that correct?

A. That's correct.

Q. And later in the paragraph, you write: Zillow has confirmed that Compass agents can continue to use Compass private exclusives for unlimited days and not be banned from Zillow.

Is that correct?

A. That's correct.

Q. Compass is still using the black box today; correct?

A. Compass is still using the black box.

Q. And April 22 comes after April 15; correct?
A. The Zillow listing standards did not come out --
Q. My question is, does the date April 22 come after the date April 15?
A. The 22nd is after the 15th and before Zillow published --
Q. Thank you.
A. -- the Zillow --
Q. I'm moving onto the next exhibit, which is DX 18. You'll find that in tab 12 of your binder.
These are the slides that were prepared for an April 22 board meeting of Compass; is that correct?
A. That's correct.
Q. Let's look together at page 31.
The first bullet under the blue box says: Compass private exclusives are not impacted, as we are able to continue to privately market listings.
Correct?
A. That's correct.
Q. And the second bullet says: This will change nothing in markets representing 50 percent of our listing volume, where Compass coming-soons already can only be publicly marketed for one business day based on MLS rules; is that correct?
A. It's correct in this board meeting came out before the Zillow access standards through the following month.
Q. And again, the date April 22 comes after the date April 15;

is that correct?
A. And in the date April 15, there were things that Zillow -- April 15 it said you can email one-on-one agents outside your brokerage firm. That's an example of something Zillow doesn't let you do. So it shows that what was written there is not the Zillow ban.
Q. Thank you, Mr. Reffkin.
There are other brokerages that premarket properties before they go into the MLS; is that right?
A. I'm sorry. Can you please ask that question again?
Q. There are other brokerages that premarket properties before they go into the MLS; is that correct?
A. What's your definition of "premarkets"?
Q. Does Douglas Elliman have a program called Black Label?
A. I know they have a private listing program, I don't know what they call it.
Q. Does Sotheby's have private exclusives?
A. What's your definition of "private exclusive"?
Q. Let's take a look at your deposition again together, and I'm going to direct your attention to 29:14 to page 30:11.
"Q. Which brokerages?
"A. I think Douglas Elliman recently launched something called Black Label, I believe. I believe -- what do you call it? Sotheby's has something but Sotheby's is a collection of, I believe, over 100 franchises. And so I think they all do it

differently but I've seen something called Sotheby's, actually private exclusives, in Washington, D.C. I've seen some were close to here, I think it was Long Island, Sotheby's quiet exclusives. I think those are the big ones. And of course, I mean it's, different, but some MLSs have premarket properties, but it's in MLS already so it's in a different context."

Do other brokerages have versions of premarketing or off-marketing of homes?

THE COURT: Ms. Lau, do you want to finish that impeachment by asking him if you read that correctly?

MS. LAU: Yes.

Q. Did I read that correctly?

MS. LAU: Thank you, your Honor.

THE COURT: I think you missed a couple words but I'll leave that for the witness to answer the question.

BY MS. LAU:

Q. Did I read that correctly?

A. That was very long, but I thought I heard it correctly, I believe.

Q. So do other brokerages have their version of premarketing or off-marketing of homes?

A. I think of the 80,000 brokers in the country, that almost every one of them has listing agreements that are signed that are an MLS and are sharing that in some context. What we do is we're the ones who make it visible so on every search you know

they exist, how many there are, and how to find them.
Q. Thank you. Thank you, Mr. Reffkin.
A Douglas Elliman agent, for example, must comply with the standards in order to list on Zillow; is that correct?
A. To me, it looks like you're just targeting Compass, so I don't know if that's correct. What I hear from our agents is that you're targeting Compass and other brokers, other agents, aren't getting the bans.
Q. The listing access standards say that all agents, regardless of brokerage, must comply with the standards in order to list on Zillow; is that correct?
A. Those are the words, but your enforcement is targeting Compass.
Q. Once again, Mr. Reffkin, do the listing access standards say that all agents, regardless of brokerage, must comply with the standards in order to list on Zillow?
A. Of the thousands of agents that I talked to, they only know --
Q. Mr. Reffkin --
A. -- Compass agents have been banned.
Q. -- I would really appreciate if you could answer my question.
A. I think you're only banning Compass.
Q. Okay.
A. I think you're trying to target --

Q. Please look at your deposition, and we're pulling up here the clip at 33, lines two through 12.
"Q. So for all agents at all brokerages, they must comply with the listing access standards in order for their listing to be displayed on Zillow; is that correct?
"A. I believe the rule -- the Zillow ban -- Zillow listing access standards says that all agents, regardless of brokerage, must comply with the Zillow bans listing access standards in order to list on Zillow."
Q. Did I read that correctly?
A. "Says" is different than "does." You say --
Q. Did I read that correctly, Mr. Reffkin?
A. You read it but what you do is different.
THE COURT: Mr. Reffkin --
THE WITNESS: Yeah.
THE COURT: -- answer her question.
THE WITNESS: Yes, it does.
MS. LAU: Thank you.
THE COURT: All right. We're going to take a break for lunch now, we're at 12:15, so we're going to resume promptly at 1:15 here in the courtroom.
MS. LAU: Thank you, your Honor.
THE COURT: Mr. Reffkin, while you're off the stand you cannot speak with your attorneys about your testimony or with any other individual until we resume at 1:15.

THE WITNESS: Thank you, your Honor.

MS. LAU: Thank you, your Honor.

(Luncheon recess)

AFTERNOON SESSION

1:15 p.m.

(In open court)

THE COURT: Everyone, please be seated. Ms. Lau, you may resume.

MS. LAU: Thank you, your Honor.

CROSS-EXAMINATION (resumed)

BY MS. LAU:

Q. Mr. Reffkin, I'm going to pull up DX 619, which is Tab 13 in your binder. This is an April 12, 2025, email from you to your chief of staff, Will Hardy, is that correct? Again, it's highlighted on the screen for you.

A. Yes. It's an email from April 12 from me to Will Hardy.

Q. You write, Will, here is something to work with. Please work with top agents and then workplace to get the ten best things you can say. Is that correct?

A. That's what it says.

Q. And in the second paragraph, in the second sentence, you write, here are 50 compelling reasons you can give to your sellers to explain why being on Zillow is not necessarily in their best interest. Did I read that correctly?

A. I didn't write that.

Q. You did not write that?

A. No, that's ChatGPT.

Q. OK. What was the prompt that you put into ChatGPT to

generate these 50 compelling reasons?
A. I don't remember.
Q. And were you intending to give sellers reasons to help "counteract the idea that Zillow is a must have"?
A. I don't remember.
Q. OK. But do you see that language there in the 4/12/2025 email to Mr. Hardy?
A. I see what is written there, but that's ChatGPT.
Q. Thank you. Let's move now to DX 602, please, and that's Tab 14 in your binder. That is a transcript of a call on May 13, 2025, that you did with Kalani. Is that correct?
A. I'm not sure what this is. Can I have a moment to read it?
Q. I'm only asking you to confirm the information at the very top. Did you do a call with Kalani Reelitz, CFO of Compass, on or around May 13, 2025?
A. I don't remember.
Q. Do you have any reason to question whether there is a transcript of a Robert and Kalani call for sales leaders on or about May 13, 2025?
A. I have never seen this before, so I just don't know what this is.
Q. Are you always truthful and accurate when speaking to Compass sales leaders?
A. Yes.
Q. Please turn to Page 11. In the second paragraph of the

document -- and this is your language -- you say, this is what I want to kind of close on. Zillow has built its business around the illusion that it is essential to the home buying process. Is that what you said?

THE COURT: Ms. Lau, I believe you said "home buying process." I believe the document says "home selling process."

MS. LAU: Home selling. Thank you, your Honor.

Q. With that amendment, is that what this document says?

A. It says, this is what I want to kind of close on. Zillow has built its business around the illusion that it is essential to the home selling process.

Q. And looking two paragraphs down -- again, words attributed to Robert Reffkin-- it says, in their own investor relations presentation, they said only three 360,000 homes were Zillow transactions. That's 3 percent of homes. Did I read that correctly?

A. Yeah. That's what it said.

Q. Again, do you have any reason to believe that this transcript is inaccurate?

A. I don't have any reason to believe it's inaccurate.

Q. If a Compass listing violates Zillow's listing access standards, that listing is not removed from Sotheby's website, correct?

A. Can you please ask the question again?

Q. If a Compass listing violates Zillow's listing access

standards, that listing is not removed from Sotheby's website, is that correct?
A. Not that I know of.
Q. And you're not aware of any Compass listing that eXp has blocked from its website, correct?
A. Not that I know of.
Q. You are not aware of any brokerage site blocking a Compass listing because of Zillow's listing access standards, correct?
A. No, not that I know of.
Q. In fact, some sites like homes.com have boosted a Compass listing that was impacted by Zillow's listing access standards, correct?
A. Homes.com has boosted some listings that were blocked by Zillow, but I don't recall.
Q. And you are unable to identify a single homeowner whose Compass listing was removed from any website other than Zillow's because it violated the listing access standards?
A. We -- to my knowledge, the Zillow ban results in -- well, I guess there are other brokers, like Zillow.
Q. Mr. Reffkin, can you please answer just my question?
A. Yes, I can name other brokers.
Q. My question is: You cannot identify a single homeowner whose Compass listing was removed from any website other than Zillow's because it violated the listing access standards?
A. I can mention -- there are other -- there are homeowners.

Q. I'd like to turn your attention to your deposition transcript, Mr. Reffkin. Let's pull up 167 lines 11-18.
A. What am I looking at, which number? 15 or 16?
Q. It will come up on the screen.
"Q. So as you sit here today, you are unable to name any homeowner whose Compass listing has been removed from a website other than Zillow's platform.
"A. I don't have a paragraphic memory."
Did I read that correctly?
A. You've read that correctly.
Q. Compass is not a licensed brokerage in all 50 states.
A. Compass is not a licensed broker in all 50 states.
Q. You cannot identify any markets where Compass is not a brokerage but has access to that market's MLS or IDX feed?
A. Can you please ask that again?
Q. Is there a market where Compass is not a brokerage but has access to that market's MLS or IDX feed?
A. I don't know.
Q. Let's pull up DX 559, please. This is tab 15 in your binder. This is Compass's website, Compass.com, is that correct?
A. This is -- it appears to be Compass.com.
Q. If you look at the map, it is for Salt Lake City, Utah, correct?
A. That's correct.

Q. And over to the right, you see that it reports, we found no matching results for your search. Is that correct?
A. That's correct.
Q. Compass.com typically does not show for sale home listings in local markets where Compass is not a licensed brokerage, correct?
A. Can you please ask the question again?
Q. Compass.com typically does not show for sale home listings in local markets where Compass is not a licensed brokerage?
A. How do you define a local market?
Q. Salt Lake City.
A. So city -- we're in many cities where we don't have agents, if that's what you're asking.
Q. That is not my question. My question is: Compass.com typically does not show for sale home listings in local markets where Compass is not a licensed brokerage, is that correct?
A. I'm not sure.
Q. Double-ending is when one brokerage or sometimes one agent represents both the buyer and the seller in one home sale transaction, is that right?
A. I think that's right. Double-ending is when an agent is on both sides of a transaction, or a brokerage firm is on both sides of a transaction.
Q. Let's pull up DX 162, please. This is tab 17 in your binder, Mr. Reffkin.

In the right-bottom corner, it says board materials, confidential, do not forward. Is that correct?
A. Yes.
Q. And in the left corner, it says April 2025.
A. Yep. Yep.
Q. And I'm going to direct your attention to the subheading which reads, research question, is there a quantifiable difference in outcomes between premarketing a home using Compass three-phase marketing versus directly marketing on the MLS. Did I read that correctly?
A. You've read that correctly.
Q. And you don't have any reason to believe that your team would create board materials that are false or inaccurate, correct?
A. This definitely never went to the board.
Q. My question was: Do you have any reason to believe that members of your team would prepare false and inaccurate materials for the Compass board?
A. I am not certain. All I can tell you is this is something -- I'm on the board, and this has never been to the board, so I don't know.
Q. My question is: Do you have any reason to believe that members of your team would prepare false and inaccurate information for your board?
A. I don't have any reason to believe people would create

false and inaccurate information.
Q. Let's turn to Page 3. On the right side it says, yes, over the last two years, premarketing results in a consistently higher percentage of transactions where Compass is on both sides. Premarketing appears to be resulting in an increasing percentage of double-ended transactions, given recent focus on Compass three-phase marketing. Did I read that correctly?
A. You read that. It says, yes, over the last two years premarketing results in a consistently higher percent of transactions where Compass is on both sides.
Q. Let's turn to Page 5. In the footnote in the bottom left, off-market is defined as less than or equal to one day on the MLS, is that correct?
A. Again, I have never seen this. This is --
Q. The question is: Did I read that correctly?
A. Let me see. That's what it says.
Q. OK. On the right it says, yes, off-market sales double-end approximately 72 percent more frequently than on-market transactions. 31 percent versus 18 percent. Did I read that correctly?
A. I don't know what these numbers are.
Q. The question is: Did I read that language correctly?
A. That's what -- yes.
Q. Mr. Reffkin, earlier this morning, you testified that Compass had mocked up a billboard that it wanted to display.

Do you remember that testimony?
A. I do.
Q. And you wanted to launch it around the country.
A. I did.
Q. But it was leaked to the media on April 2.
A. That's correct.
Q. And Zillow announced the listing access standards on April 10.
A. That's correct.
Q. And because of that, Compass was forced to scrap the billboard in that nationwide campaign, is that correct?
A. That's correct.
Q. Did you give a speech in Denver at a Compass retreat on June 3, 2025?
A. I don't remember the day.
Q. Did you give a speech in Denver at the Compass retreat this summer?
A. Yes.
Q. We're going to pull up DX 436 from 36:02 to 36:47.
(Video played)
Do you admit or deny that you made these statements in DX 436?
A. Those are the statements I made.
MS. LAU: Thank you. I pass the witness.
THE COURT: Any redirect?

MS. SOLH: No redirect, your Honor.

THE COURT: You may step down. Thank you.

THE WITNESS: Thank you, your Honor.

(Witness excused)

THE COURT: Ms. Solh, you may call your next witness.

MS. SOLH: We're getting her from the back, your Honor.

Your Honor, Compass calls Kerry Carr as the next witness.

THE DEPUTY CLERK: Please take the witness stand. Remain standing.

KERRY CARR,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

THE DEPUTY CLERK: Please state and spell your name for the record and speak directly into the microphone.

THE WITNESS: Kerry Major Carr, M-a-j-o-r.

THE COURT: You may proceed.

MS. SOLH: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. SOLH:

Q. Ms. Carr, what do you do for work?

A. I'm a Realtor at Compass. I'm also a team leader with the Carr Team.

Q. And how long have you been a real estate agent?

A. I have been a real estate agent for ten years.
Q. And how long have you been affiliated with Compass?
A. I have been affiliated with Compass for six years, since November 6.
Q. You mentioned that you lead the Kerry Carr Team. Do you have other agents on your team?
A. Yes, I have 14 other agents.
Q. And where do you and your team primarily work?
A. We work in the greater Philadelphia area, probably about like three or four hours from the city of Philadelphia.
Q. Ms. Carr, can you provide a brief description of your educational background?
A. Yes. I have an economics degree, undergrad, and education administration as a master's degree.
Q. What did you do before you became a real estate agent?
A. I was a Division I volleyball coach at Penn.
Q. Ms. Carr, how do you feel about testifying here today?
A. I'm really nervous and I'm scared.
Q. Why is that?
A. Sorry. So I am also a Zillow Flex agent with Zillow, which means that my team of junior agents have -- they take leads from Zillow, and they represent about 50 percent of our income.
Q. And what do you fear that Zillow could do?
A. I am nervous about Zillow retaliating and taking away our Zillow Flex by speaking out against what I think in this

lawsuit.
Q. Ms. Carr, is Compass paying you to testify here today?
A. No, they're not.
Q. Did you enter an agreement with Compass related to your testimony?
A. Yes. I entered into an agreement that said they would pay my lawyer fees to look over any documents. They would pay my travel expenses, and if Zillow retaliated, they would try to compensate me with leads from other sites. And if I wasn't able to get the same amount of leads, because Zillow provides us with about 150 leads a month, that they would try to make me whole between the amount that we produced in transactions this year for the next five years.
Q. And would this agreement with Compass make you whole if Zillow did retaliate against you and your team?
A. Actually not. Because one transaction -- when you get a listing or a buyer, it usually turns into three or four more listings or buyers. So even if they replace that money for that one transaction, we would exponentially lose money overall by losing Zillow.
Q. And how do you get most of your business?
A. Most of my business, ten years of business, is repeat and referral. I rarely take a Zillow lead; one or two here and there.
Q. What do you mean by repeat and referral?

A. That means that my clients come back to me and ask me to buy or sell their next property, or they refer me to family and friends.
Q. You said you had a team of 14 agents. How does your team get most of their listings?
A. So there are five partners on my team, and they get about half their business from repeat and referral and half from Zillow. And the rest are junior agents or new agents, that I coach to be "rock star agents" is what I call them, through getting new leads and getting established as an agent.
Q. And does Zillow require you and your team to do anything to get the leads?
A. Yeah. We are -- we have to meet once every two weeks with our Zillow advisor. He goes through. We have to buy the Follow Up Boss database. They go through and tell us if we're following up with them right. They also have a quota of people that we need to send to their Zillow home loans organization for pre-approvals, and if we don't meet a number of closings per month or Zillow home loans pre-approvals, we can get disengaged from the program.
Q. Ms. Carr, why are you willing to testify today?
A. I truly believe in everything we do to help our clients and I believe in seller's choice. I believe in the way we market our listings and options we give our sellers, and I don't understand why another company is telling us how to do this.

Q. Ms. Carr, do you pitch potential clients to try to get them to hire you?
A. Yes, I do.
Q. And can you please walk us through what you would discuss during a listing presentation for a potential seller?
A. So a listing presentation for me is about going over the house, looking at the house, looking at what repairs are needed, looking at the curb appear, and then really just listening to the clients about their pain points. At first it always seems like it's about price, but it's never ever about price. It's about terms; when they want to sell; how they want to sell it; what they really care about. And then the sellers net what they're going to walk away from the table with after this is all done.
Q. And why do you discuss those topics during your listing presentations?
A. I really just let them speak, and then I categorize and come up with a bunch of different options for them to sell their home that actually deals with the things that are most important to them.
Q. And can you please walk us through what you would discuss during your presentation for a potential buyer?
A. Sure. So some of our buyers that come to us through the lead process, we meet for the first time at a house, and we try to walk through the process with them at the house. Or if we

get a chance to get them in the office for a buyer's presentation, we walk through all of the important things about the buying process besides just the house and price. We talk about their financing –– that's a big factor –– and what may happen if we come up with multiple bids with their type of financing, and how to put them in the best possible light to get what we call their "dream home."

Q. And why do you discuss these topics with potential buyers?

A. It's an important part of them being able to buy a home and also to protect them, to let them know what to look for when buying a home, and all of the different obstacles that can come up, and how we will counter them and get through them or help them through all the problems of a transaction.

Q. And do you sometimes work with clients that are both looking to sell their home and to buy a home?

A. Yes. Those we sometimes call "move-up clients" or "downsizing clients." Those are the most difficult clients, but they happen to be a lot of our business. Because my goal is that they're not homeless in between this transaction and timing it, timing a home to sell while they're also looking for a home is very difficult. It's hard to buy a home in today's market with a home sale contingency, so we talk about the many different ways they can put their home on the market while they're still looking for a home.

Q. Ms. Carr, in your experience, is every buyer's primary goal

to get the highest price for its listing?
A. Every seller?
Q. I'm sorry, yes. Every seller.
A. So no. I would say it's almost rarely the case to get the highest price only because I think when you explain the whole process to them and how a home is sold and how many people will be going through their homes in a weekend and all the things that they care about, whether they have to do repairs or not repairs, I think they understand that there's a lot of different things besides price to consider.
Q. And is every buyer's primary goal to get the lowest price on the property that they're considering?
A. No. That would be nice, but it's not something that they aim for. They aim for the right home for themselves and their family. They aim to get it under the right conditions. Some of them have a lease ending at a certain time that they need to time it for. There's many different reasons other than price that a buyer considers.
Q. Ms. Carr, are you familiar with Compass's three-phase marketing?
A. Yes, I am.
Q. What do you understand three-phase marketing to mean?
A. Three-phase marketing, the first part is the private exclusive stage where we're able to try out a listing with a small subset of buyers that can give us information on if the

price is too high, if we don't have the right curb appeal, if there's something wrong with the house, we can change it before it actually goes to market.

Compass Coming Soon is the second phase. We only use that for a couple hours because our MLS rules state that we cannot publicly market it for longer than 24 hours. And then the final stage is the MLS, which then goes out to the world on 700 websites like Zillow.

Q. Ms. Carr, are there specific examples from the past year where three-phase marketing has been something that you've worked with your clients on?

A. Yes. I have four different examples.

Q. OK. Why don't we take them one by one.

A. OK.

Q. Let's talk through what is the first example?

A. The first example was this summer. I had a recently widowed, older woman that wanted to sell her farmhouse out in the country. It was a unique property with 10-acres. And she was adamant about not leaving the house until it was sold, but she also had a hard time leaving the property. And she also said she didn't want a bunch of people through her property. She thought it might sell to one of her neighbors, so I suggested the private exclusive stage as a way to protect her while someone had a home sale contingency, and then we might get a back-up offer. That could not hurt her with days on the

market if she went to the MLS, and we could also market it properly.
Q. And Ms. Carr, did this house eventually sell?
A. Yes, it did. It did not go to the first offer that she got from her neighbor. That fell through. We had two offers from the private exclusive, one from a Berkshire Hathaway agent and the other from the Compass agent, and it ended up selling for more than the first offer.
Q. Did it sell through the Compass agent or the Berkshire Hathaway agent?
A. Berkshire Hathaway.
Q. And for the benefit of counsel for Zillow, so that we are talking about the same examples, we'll call this one the farmhouse so that we're not disclosing nonpublic, personal information.

Thank you for that first example. Do you have a second example?
A. Yes. My other example this year was a townhome. My client was moving up to the Poconos for her retirement home, and she wanted to price it at a price higher than any other townhome had sold in there. I thought she could get that because her townhome was nicer, but she also wanted to sell it at a time that after she closed on her Poconos home, she could move up there. We priced it at her dream price, and she ended up getting an offer that she ended up taking with all the terms

she wanted, closing date, for 10,000 over her dream price.

Q. Thank you. And for the second example, we'll call this one townhome to make it easy.

Is there a third example, Ms. Carr?

A. Yes. I have one currently in private exclusive in Lansdale, which is about an hour outside of Philly. They are previous buyers of mine that bought a piece of land and are building their next home. They really called me to ask me if there was a way to put it on the market and have a four-month escrow; meaning that they would get it under contract but not really sell it until their home was built at the end of January. I said, you know, it's not really a common thing, but we could take pictures now in the fall while your property is beautiful and market it in private exclusive. And see if there's anybody out there for this unique property while not accruing four months on the market.

We're doing that currently. We don't have an offer on it, but it makes them feel better to know that it's ready to go to the MLS when their home is built and their two kids and two dogs aren't there for showings.

Q. Thank you, Ms. Carr. We'll call this third example Lansdale.

You said you had four examples. What's the fourth example?

A. The fourth example is a four-bedroom colonial, and this

took a while to get on the market due to repairs. They wanted to go up, in my opinion, at too high of a price, but it's their decision. I listen to their options. They wanted to try the private exclusive first, and we put it in there for three or four days and got some agent feedback that it was too high a price. So we lowered the price slightly and then put it to the MLS.

The day I put it to the MLS, I put it in Compass Coming Soon for an hour; put it to MLS at 4:00, and I think at 4:15 or somewhere around then, I got an email from Zillow saying I had violated their listing standards.

Q. Thank you, Ms. Carr. We'll call this fourth example the colonial, and we'll come back to that.

During your career as a real estate agent for the last ten years, have you ever forced any of your clients to adopt a marketing plan for their home for which they weren't comfortable?

A. Never, no. I present all the options. I explain it to them. We go through a ton of paperwork. It tells about the pros and cons of everything, and if they want to go straight to the MLS and go straight into open houses, we absolutely will do that.

Q. Ms. Carr, you mentioned that you received a warning email related to the colonial property, but let's step back in a minute and just reset a little bit.

Do you know what the Zillow listing access standards are?
A. Yes, I think.
Q. When did you first hear about them?
A. It was in April or May of this year. We heard about it first kind of through the news, and there was a lot of confusion at Compass. I think we decided that it didn't really apply to us since we weren't publicly marketing our listings in private exclusive.
Q. What do you understand the warning process to be?
A. The warning process, the way I understand it, is that it's two letters or emails, like, I get, and then the third one will result in it not being on Zillow. This concerned me most for my actual -- for my Lansdale property because there was two listings that I went from private exclusive to the MLS that same day of the colonial house. One got a letter. One didn't. But my third would have been the Lansdale listing, and that one definitely needs to be on Zillow because it's so far away from the city. There's not many Compass agents up there, and a lot of them use Zillow up there for looking at homes.
Q. To step back for a minute, on the day that you put the colonial property into the MLS, you also put a second property into the MLS?
A. Yes. I had two simultaneous listings.
Q. And that second property that got put into the MLS had been

in the private exclusive stage previously?
A. The same amount of time, yes.
Q. Did you receive a warning letter for that second property?
A. I did not. I did everything the same.
Q. Ms. Carr, you said you received an email from Zillow that notified you that you had violated the terms of the listing access standards, is that correct?
A. Yes.
Q. What were you thinking when you received this email?
A. I mean, I was scared to continue using private exclusive. I was angry, and I wrote back to Zillow. Why did I get this letter? I did not publicly market it. I think I got a chat bot which gave me the same answer was to look at the frequently asked questions section of Zillow, which I didn't even know about. But I did, and it said there something about a button on any website directing them to an off-market listing would be a violation.
Q. So do you have a better understanding now of how you allegedly violated the policy?
A. Yes. Through the deposition, I think they talked about a black box. I can't see that. It's not publicly -- it's publicly facing, but I enter Compass a different way. And that button, that black box, when you press on it, goes to agents, which is how we get Compass leads like Zillow leads, and I think they are considering that public marketing the private

exclusive, which I still don't understand.

Q. How has receiving the warning letter impacted you?

A. I think obviously it's my fiduciary duty to make sure that none of my clients are hurt with this, so I need to in listing presentations, even though I explain all the pros and cons, come up with a game plan that if Zillow bans one of my listings, what we're going to do. And what I've come up with personally for my listings is that I would tell them, especially the Lansdale listing, that I would fire myself as their agent and get an agent in another brokerage to market their home so they're not hurt by the fact that they don't have Zillow buyers eyes on it.

Q. And if they fired you as an agent and went to another brokerage, would you make any commission or any money from that listing?

A. No. I would actually lose money because I spent a lot of money marketing it up until then.

Q. Ms. Carr, does it concern you that your clients' listings might not appear on Zillow?

A. Absolutely. A lot of my team -- and again, I don't know if these listing access standards, because the Kerry Carr Team is on every single one of our listings, I don't know if it's cumulative to the third listing of my team or is it just myself is unclear. I couldn't find an answer to that. But, yeah, it's going to change my options for my sellers and sometimes,

like the cases I stated my options for my sellers. And sometimes, like the cases that I stated, it's best to put it in this three-phase marketing before going to the MLS.

Q. Ms. Carr, have you done any listing pitches since you received the warning letter?

A. No, I have not.

Q. And do you know how you would -- would you approach your listing pitch any differently now that you received the warning letter?

A. Yes. I talked to my team about it, because they have gone on listing presentations, and I told them that they really need to consider this component and decide how they're going to talk about it, whether -- you know, obviously they have to say there's a chance it won't appear on Zillow if they go through this private exclusive stage, and then their seller can decide. They can also, like I'm going to do which is the best thing for the seller and they want to go forward with it; like we have one seller that really wants it to be in private exclusive, I think I have to say that if we get to the point where we're ready to turn on the MLS and Zillow sends this letter, we have to cancel the listing and start up a new one with another brokerage.

Q. Ms. Carr, do you think it's necessary for a property to be on Zillow to sell?

A. Isn't necessary. I think it has sold not on Zillow, but

where we sell in the Poconos and Lancaster and York and some places out in the country, it's definitely the site that people go to the most and first to look for listings. So I think it would hurt.

Q. And do you think that your clients will stop using three-phase marketing going forward?

A. I think when they hear about it, they will want to still use it, but I do think that we would have to caution them against it.

Q. Ms. Carr, how do you think you will be harmed?

A. Personally, I think it's going to change the way I coach my agents, and it really is about the other agents on my team. I know I can weather a storm of less listings and get fired from listings and be OK. I'm just worried about my younger agents, that only do a couple -- ten sales a year, losing a listing like that. And I think it's important that, you know, they realize that their fiduciary duty is with the seller and to make sure that they're advising them properly.

Q. And would the ramifications of losing a seller be limited to just that one seller?

A. Unfortunately, no. Again, if we talk about what one listing means. From one listing, we get the neighbor down the street that also wants to list. We get buyers that call us on the listing that are unrepresented. It's exponential income for us. One listing turns into family and friends referrals as

well. So one listing could be ten in ten years.

MS. SOLH: Ms. Carr, I'm going to pass the witness. I have no further questions for you right now.

MR. TUTTLE: May we approach, your Honor?

THE COURT: You may. I think we need to remove some of the binders from the last witness.

MR. TUTTLE: Oh, sure.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. TUTTLE:

Q. Good afternoon, Ms. Carr.

Home buyers generally benefit from the broad sharing of listings through the MLS and online, correct?

A. Generally, not in all cases.

Q. Generally yes, correct?

A. Yes.

Q. And when a listing is in a private exclusive program at one brokerage, there are potential buyers out there who aren't going to know about it, right?

A. Yes.

Q. And you agree that, in general, it's more fair if all buyers have the chance to bid on and see a home that is for sale, right?

A. Sorry. Can you repeat the question?

Q. I said, you agree that, in general, it's more fair if all

buyers have the same chance to bid on and see a home that's for sale, correct?
A. More fair, that's a hard question. But I will say it is fair a lot of the time.
Q. If a lot of brokerages had their own private exclusive programs, a buyer might need to go to many different brokerages to see all the listings that are available, right?
A. Sometimes. Sometimes we share the listings with each other on a one-to-one basis, as per the MLS rules allow.
Q. But they may have to go to more than one brokerage to see all the homes, correct?
A. They may, yes.
Q. And if buyers have to contact many different brokerages to see all the private exclusives, that would make it harder for buyers and take more time compared to when they can see all the listings in their favorite portal, right?
A. It might take more time.
Q. And if a lot of brokerages have their own private exclusive programs, that could impact your ability to show your buyer clients all the listings that are on the market, right?
A. It might. But I have developed relationships with most of the agents in my area, and we do share our off-market listings with each other on a one-to-one basis.
Q. Ms. Carr, I took your deposition in this case about ten days ago, correct?

A. Yes.

MR. TUTTLE: May I approach, your Honor.

THE COURT: Yes

Q. I'd like to have you look at Page 12, lines 15 through 19, of your transcript.

A. Yes.

Q. And you were asked, if a lot of brokerages have their own private exclusive programs, could that impact your ability to show your buyer clients all the listings that are on the market, and the answer was yes.

Was that the question you were asked and the testimony you gave under oath?

A. Yes.

Q. Private exclusives only expose a listing to a small subset of buyers, correct?

A. I'm sorry.

Q. Private exclusives only expose a listing to a small subset of buyers, correct?

A. Correct.

Q. And when you put it on the MLS, it goes to everyone, right?

A. Yes.

Q. And you as an agent have benefited from the broad sharing of listings through the MLS and online, right?

A. Yes, I have.

Q. The sharing of listings allows you to be able to show your

buyer clients all the available listings, right?
A. Yes.
Q. And from Zillow having access to a lot of available listings, you and your team get leads, right?
A. Yes.
Q. And that's another way that you benefit from the broad sharing of listings, right?
A. Yes.
Q. This year you and your team had over 200 buyers and sellers under contract pending or closed, right?
A. Yes.
Q. And you personally this year have closed 35 -- 35 closed or pending buyers and sellers, right?
A. Around that number, yes.
Q. And in the last two years combined, your whole team, as far as you know, has gotten one or two leads from Compass.com at close, correct?
A. I'm sorry. What was the question again?
Q. In the last two years combined, your whole time, as far as you know, has gotten one or two leads from Compass.com that closed, correct?
A. Yes, that closed so far.
Q. OK. And you personally have gotten one lead from Compass.com in that period that you closed?
A. That I closed, yes.

Q. And your understanding is that your buyer clients are searching for homes on other sites until they meet you and your team, and then you get them on Compass.com to search in Compass's collections, right?
A. Yes.
Q. And you do that by inviting them to Compass's client portal, right?
A. After they become our clients, we invite them to a collection of homes that they can search online.
Q. And from what you can tell, your buyer clients don't view Compass.com and Zillow as interchangeable, correct?
A. No. When they're searching on Compass.com, even if I sent them a listing, oftentimes they'll still send me the Zillow house and say, I saw this one on Zillow. Even if it's in the collection, I think it's the first site they go to.
Q. And Zillow and Compass.com are just very different platforms, right?
A. I think their intent is the same, but there is one that is more popular and most people go to first.
Q. Now, one reason you recommend the Compass private exclusives is when your home isn't ready to be shown and you need time to get it ready, right?
A. Yes.
Q. And instead of a Compass private exclusive, you could do a listing contract with that seller and just defer the marketing

and defer marketing of any kind until the house is ready, correct?
A. We could but then we wouldn't have a chance to get other agents' opinions on it.
Q. And that would not violate Zillow's listing access standards, correct?
A. As far as I know.
Q. OK. Another reason you recommend a Compass private exclusive is when the seller doesn't want the public coming and seeing their home such as a celebrity or someone who is homebound, right?
A. Yes.
Q. And the people who want to keep their listing purely private, they can always do a private listing because they don't want to be on Zillow, right?
A. They could do that, but then they would lose the access to put it on if it didn't work that way or they vacated the home later.
Q. If they could do it purely privately without doing private exclusive, they can do that, can't they?
A. Yes.
Q. OK. Another situation is a seller who doesn't want a lot of people coming through the house. She wants a more limited number of people. I think you talked about that, right?
A. Yes.

Q. And you would explain to that seller that she might be losing out on a higher price for her home in that situation, right?
A. I explained to that seller that there is a possibility of multiple bids if we go to the MLS market. We ended up getting multiple bids in private exclusive anyway, which drove the price up.
Q. And for a seller like that, you could put that listing on the MLS and choose no internet, correct?
A. Yes.
Q. Phase two of the three-phase marketing program is Compass coming soon, right?
A. Yes.
Q. And you never do a Compass coming soon for more than one business day before sharing it with the MLS, right?
A. Correct. Those are the MLS rules.
Q. Correct. That's because MLS requires that right?
A. Bright MLS requires if we go and do public marketing, that we are only allowed 24 hours before putting it on the MLS.
Q. And sharing Compass coming soons within one day with the MLS has never caused you to lose any listings, right?
A. I don't know the -- I don't think so. I got a notice from Zillow after I did that, but I don't think they're correlated.
Q. So as far as you know, you've never lost any listings from putting Compass coming soons into the MLS within a day?

A. Correct, unless, yeah.

Q. After Zillow announced its listing access standards, you received guidance from Compass about whether the three-phase marketing would violate Zillow's standards, right?

A. We did ask Zillow and Compass what this meant.

Q. And Compass's leadership told you that Zillow's listing access standards would not affect you, correct?

A. Right, because we're not publicly marketing it.

Q. And in May or June, there were meetings where Compass told you that Compass private exclusives do not violate Zillow's standards because they're not publicly marketed, correct?

A. There was a ton of confusion at this time but that generally it was stay the course because we couldn't get a very specific answer from Zillow.

Q. OK. But you got guidance in May and June that the private exclusives complied with Zillow's listing access standards, right?

A. That they complied because they're not publicly marketing the home, yes.

Q. From Compass, right?

A. Yes.

Q. OK. And from April through September, you were advising sellers about how to market their homes with the understanding you received that phase one private exclusives compiled with Zillow standards right?

A. Yes. We would talk about all three standards.
Q. And you were continuing to list homes as Compass private exclusives through October, correct?
A. Yes.
Q. And you said you haven't done a listing presentation since then?
A. Since October, yeah, I have not done one in the last...
Q. Let's pull up Defendant's Exhibit 265, and if we could go to the second page.
Ms. Carr, this is a Compass disclosure form for the three-phase marketing, correct?
A. Yes.
Q. And you use this with all sellers to disclose options and risks?
A. Yes. This is one of 14 forms that we talk about and summarize for them and then we give them to sign.
Q. And this a Compass form in particular?
A. This one is a Compass form, yes.
Q. And you've been using this since around May of 2025?
A. I believe so.
Q. And it's mandatory by Compass's rules, right?
A. Yes.
Q. And if we look at number two, phase two, Compass coming soons, the last sentence discloses that -- it has the seller represent, I also understand that if per local MLS rules the

coming soon period lasts more than 24 hours/one business certainly third-party websites, including but not limited to Zillow and Trulia, may not accept my list as a later date.

Do you see that?

A. Yes.

Q. And if you look at the paragraph about phase one, the private exclusive, there's nothing in there about a risk that if a home is listed as a Compass private exclusive Zillow may not accept the listing, correct?

A. Correct.

Q. And as an agent, you're a fiduciary to your seller, correct?

A. Yes.

Q. And it's important to disclose to the seller the possible risks and consequences of the marketing strategy that the seller chooses, right?

A. Yes.

Q. And if you knew that there was a risk that Zillow may not accept a listing that has been through phase one, private exclusives, you would want to disclose that to the seller, right?

A. Well, I know that now.

(Continued on next page)

BY MR. TUTTLE:
Q. And if you knew that, you'd want to disclose that to the seller, right?
A. Yes.
Q. And in the September or October time frame, you started hearing about people getting warning letters from Zillow for private exclusives, right?
A. In October, yes.
Q. And around that time, you asked Compass what was going on, right?
A. Yes, I wanted to know, when I got that warning letter, what the parameters were for the warning letter. I asked Zillow first, though.
Q. And Compass told you that they didn't know why Zillow was treating private exclusives as violating the standards, right?
A. There was a lot of confusion, whether it was a digital ad in the Compass "Coming Soon" phase, whether it was——
Q. Ms. Carr, I'm sorry. I'm going to stop you there. I just have a simple question. The Compass representatives you talked to said they didn't know why Zillow was treating those private exclusives as violating the standards, correct?
A. I think we were all trying to figure it out, at that point.
Q. Can I bring up the transcript, page 37——
A. Yes.
Q. ——lines 19-22. Sorry. 18-22.

A. 18.
Q. And at the deposition, Ms. Carr, when you were under oath, I asked you, "So the Compass representatives you talked to said they didn't know why Zillow was treating those private exclusives as violating the standards?" And the answer you gave was, "Correct."
A. Yes.
Q. Okay. In October, you got a warning letter from Zillow, and that changed things for you, right?
A. Yes. It scared me.
Q. And after you got your warning notice in October, you asked Will Hardy at Compass if Zillow considered private exclusives to be public marketing, and he said he didn't know but maybe, right?
A. I can't recall the exact conversation that I had with him, but I did send the warning email to my managers, who sent it to Will Hardy.
Q. And he said, I don't know but maybe, right?
A. I can't remember exactly what he said. It was a phone conversation.
Q. Okay. He didn't tell you that Compass private exclusives violate the standards.
A. I really can't recall exactly.
Q. Okay. I want to ask you a few questions about the black box that shows up in home search results on compass.com, okay?

A. Okay.

MR. TUTTLE: Can we bring up Exhibit 267.

Q. Ms. Carr, I showed you this exhibit at your deposition, correct?

A. Yes. That's the first time I saw this.

Q. Right. And you'll see over in the upper right-hand side, it's a little blurry in this photocopy, but there's a black box about Compass private exclusives, right?

A. Mm-hmm, yes.

Q. And prior to me showing that to you in your deposition, you were not even aware of the existence of the black box, correct?

A. I knew there was a button on Compass's site that it would lead to agents. I believe that's how we get Compass leads.

Q. Okay. Can I have you take a look at your transcript, page 55——

A. Yes.

Q. ——lines 15-18.

You were asked, "Prior to me just showing you now, are you familiar with that thing that I'm calling the black box?" And you said, "No." Correct?

A. Yes, I'd never seen that black box before.

Q. Okay. And until I showed it to you in the deposition, you didn't know about that black box, right?

A. I didn't know about the black box, what it said. I did know there was a button on Compass's website that buyers could

click to talk to agents.
Q. Okay. And you're not aware of ever receiving a serious buyer inquiry from someone clicking on that black box, correct?
A. I would assume that when they click on the button, it goes to an agent that is a Compass lead.
Q. Can I have you take a look at your deposition, page 55, lines 19-22.
A. Sure. Yes.
Sorry. Page 55? Yup.
Q. Lines 19-22.
A. Yes.
Q. In the deposition you were asked, "Have you ever, to your knowledge, gotten a serious buyer inquiry from someone clicking on that black box?" And your answer was, "I don't know." Correct?
A. Correct.
Q. No one from Compass has ever told you that Zillow considers the inclusion of a Compass private exclusive listing in the black box to be public marketing of the listing, correct?
A. Correct.
Q. No one from Compass has ever told you that all Compass private exclusive listings violate Zillow's listing access standards, correct?
A. Sorry. Repeat the question again?
Q. Sure. No one from Compass has ever told you that all

Compass private exclusive listings violate Zillow's listing access standards, correct?
A. I think they——no. Right. Correct.
Q. And if you'd known that Zillow considers all Compass private exclusive listings to violate the listing access standards, because of the black box, you would have wanted to disclose that information to your sellers, right?
A. Correct.
Q. You and your team haven't lost any listings because of Zillow's listing access standards, correct?
A. Not yet.
Q. Okay. And as far as you know, none of your clients have been unable to sell or buy a home because of listing access standards, Zillow's listing access standards, correct?
A. No, it has not been banned yet.
Q. And as far as you knew, none of your clients have been unable to sell or buy a home because of the standards, right?
A. Correct.
Q. There are some sellers you work with that don't ever want to be on Zillow, right?
A. Correct.
Q. For example, you sold two homes this year, not on Zillow, right?
A. Yes.
Q. And buyers who are interested in finding a home can also

look for home listings on Redfin, realtor.com, homes.com, and a local broker site, right?
A. They can, but they go to Zillow first.
Q. And from your perspective, Zillow's standards have not harmed your buyer clients, correct?
A. Not that I know of.
Q. Now you mentioned a client, I think you called it the Colonial, that you signed up with private exclusive back in September, right? Correct?
A. Yes.
Q. And you didn't disclose at that time a risk related to private exclusives not being on Zillow 'cause you weren't aware of it, right?
A. I was still confused about how it works.
Q. Okay. And if you told the seller back in September that if you go forward with this private exclusive, you may not be allowed on Zillow, you don't know what they would have decided, they might have gone either way, correct?
A. Right.
Q. And since——sorry. I withdraw that question.
I just want to talk briefly about the listing where you got the warning. I think you called that the Colonial, correct?
A. Yeah.
Q. And I think I might have made a mistake earlier. The one

that was in September was the Landsdale, correct?
A. They were both signed around that time.
Q. Okay. Let's talk about the Colonial, the one you got the violation notice for, okay?
A. Yes.
Q. The violation notice you received for this property is the only one you've received, as far as you know.
A. As far as I know, yes.
Q. And this listing remained on Zillow, correct?
A. Yes. It was my first violation.
Q. And it remained on every other home search portal, right?
A. Yes.
Q. And the home went under contract.
A. Yes, we got one offer.
Q. It's under contract today.
A. It just got under contract, yes.
MR. TUTTLE: I have nothing further, your Honor.
THE COURT: Any redirect?
MS. SOLH: No, your Honor.
THE COURT: You may step down. Thank you for your testimony today.
(Witness excused)
MR. DINTZER: Your Honor, we're prepared to call our next witness, but if it's the Court's pleasure to call a break now, then we'd be ready to call the witness when we got back.

THE COURT: We can do a little break now. Let's say ten minutes and we'll be back.

MR. DINTZER: Sure. Appreciate that.

THE COURT: Wonderful. Thank you.

THE DEPUTY CLERK: All rise.

(Recess)

THE COURT: Be seated, everyone.

MR. DINTZER: The plaintiffs call Errol Samuelson as our next witness.

(Witness sworn)

THE DEPUTY CLERK: Please be seated.

Please state and spell your name for the record and speak directly into the microphone.

THE WITNESS: My name is Errol Samuelson, which is spelled E-R-R-O-L, last name S-A-M-U-E-L-S-O-N.

ERROL SAMUELSON,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DINTZER:

Q. And where do you work, Mr. Samuelson?

A. I work at Zillow.

Q. And how long have you worked there?

A. I've been there since March of 2014.

Q. And what's your title at Zillow, sir?

A. The chief industry development officer.

MR. DINTZER: And if it pleases the Court, could we distribute binders at this time?

THE COURT: Yes, you may.

Q. We're going to start with Exhibit 199, which is in the binder, and we're also going to be putting the exhibits on the screen, so that for ease of use, you're welcome to just look there.

And this is Zillow, right? You put in a search into the little bar and you get the results of homes and condos and the like that are for sale; is that right?

A. Yes.

Q. And Redfin has a search box like this that performs a similar function, right?

A. Yes.

Q. And eXp?

A. I'm not familiar with eXp's website, but presumably, yes.

Q. And Compass?

A. Yes.

Q. And users come to home search sites to see listings of houses and condos for sale, correct?

A. Yes.

Q. Okay. And Zillow sells advertising on the results of some of these searches; is that right?

A. We do.

Q. And if I click on one of these little dots or I click on one of the houses on the right-hand side, is that an HDP——home detail page——that will come up?
A. Yes, that's right.
Q. A home detail page——I'm going to use HDP. An HDP that has one single house for sale; is that right?
A. It——pardon me. It's featuring primarily one house for sale. It may show elsewhere on the page nearby homes, but it's primarily focused on the one home.
Q. And I'll know it's for sale because there will be a little thing on it that says "on market" and it will have information about it being for sale; is that right?
A. Yes. You'll see that——the tag, you'll see the list price, you'll see the agents involved, and so on.
Q. And the HDP has something called "calls to action" on that site; is that correct?
A. Yes.
Q. And a call to action is a button that somebody can click and do something, right?
A. It's an include button, yes.
Q. And some of the calls to action on the Zillow site include taking a tour or reaching out to an agent; is that right?
A. Those are two of the calls to action, contact agent or take a tour.
Q. And Zillow monetizes those calls to agency; you click on

those, Zillow makes money.
A. Yes, indirectly, in the sense that agents pay to advertise in a particular local zip code and then they are put in the rotation to be connected with consumers who would click on one of those buttons.
Q. No further questions on that document, sir.
And then MLS stands for multilisting services; is that right?
A. Multiple listing service.
Q. Brokers send their listings to the local MLS if they want to make the listings widely available; is that right?
A. That is correct, with the——with the nuance that while the broker typically owns the listing, it's typically the agent or their assistant who would enter it into the MLS.
Q. And the MLS is a clearinghouse so that it is then sent out to other brokerages; is that right?
A. So other brokerages, other agents who are members of that MLS can look at——can log in and see the listings inside the MLS, but the MLS also has a facility to distribute those listings to third parties.
Q. And that's done through a feed, an IDX feed; is that right?
A. There are typically two feeds that the MLS will use for public display of listings. One is IDX, which is internet data exchange; the other is VOW, which stands for virtual office website.

Q. And Zillow has access to those feeds for MLSs from all over the country; is that right?
A. Yes. So for MLSs where we're members, we are——we have the ability to request one of those feeds.
Q. So somebody from the Sotheby's brokerage, they send out a listing to the MLS anywhere and the MLS would then put it in the IDX feed that goes to Zillow, Zillow has it to display on its website, correct?
A. It depends on the way that these——in your example, the Sotheby's broker would enter the listing, so for example, the broker could click on a field called "no internet," in which case it would not be included in the IDX feed, but in a typical——for a typical listing, listing broker or agent enters the listing, goes to the MLS, MLS puts that in the IDX feed, and to the extent we're receiving a feed, we would receive the listing.
Q. Now Zillow is a brokerage; is that right?
A. So——
Q. Technically.
A. We have brokerage licenses in all 50 states and the District of Columbia, yeah.
Q. But Zillow doesn't have its own agents.
A. We do have some employees on staff who hold agents licenses, but you're correct in the sense that we're not a traditional brokerage in that we have thousands of agents or we

have thousands of listings. You would never——you wouldn't, for example, see a blue yard sign that has the name Zillow on it. So we hold the licenses but we operate differently.
Q. And Zillow doesn't send listings to the MLSs; is that correct?
A. We——we do co-broker some listings in the local markets, and those listings do get sent to the multiple listing service, but there are not a lot of listings.
Q. So primarily Zillow does not send listings to the MLSs; is that correct?
A. Other than those——correct. Other than those co-brokered listings, we do not send listings to the MLS.
Q. How many co-brokered listings are we talking about nationwide?
A. I don't know off the top of my head, but we're talking on the order of probably thousands or less, not tens of thousands.
Q. So Zillow gets the listing feeds for hundreds of thousands of properties and sends a few thousand properties at most to the MLSs; is that correct?
A. We probably receive more than hundreds of thousands, but we——yeah.
Q. I lowballed it. It's probably millions, isn't it?
A. It's in the millions, yes.
Q. So it gets millions of listings and sends a few thousand the other direction; is that right?

A. That is correct.
Q. Okay. And let's go to PX 17, sir.
And this is an email chain you're on; is that correct, March 7, 2025?
A. Yes, it is.
Q. Okay. And the subject is the agency sponsorship; you see that?
A. I do.
Q. Okay. And you're in the middle of the email chain, and you're sending the email to a number of Zillow executives; is that right?
A. Yeah, I'm on the chain. There are other executives. And I respond part way through the email, yes.
Q. And you can see it on the screen. You're totally welcome to see the hard copy, but it may be easier on the screen.
And you write, "Listings are the lifeblood of our company." Do you see that?
A. I do see that, yes.
Q. And the point you were making is that listings are terribly important to Zillow in the way that it functions; is that right?
A. Yeah. The point here is that consumers come to our site to see homes that are for sale——in other words, listings——and without the listings, we can't deliver one of the core functions that we offer to consumers.

Q. And in fact, the next line you write is, "No listings, no eyeballs, no sales." That emphasizes the same point, correct, that the listings are what attract the eyeballs?
A. It's certainly one of the primary things that attracts the eyeballs, yes.
Q. And losses of listings would affect Zillow's bottom line, right?
A. Correct, in the sense that if you're a buyer, you come to the site, the site's missing inventory, you're going to lose trust in the site, you'll probably go to one of our competitor sites. Because we have an advertising-based business, smaller audience, less ability to sell advertising.
Q. And you wrote, "But it's not even a case of 'no-listings'; even a degradation of our listing content will reduce leads and PA revenues." Do you see that?
A. I do see that.
Q. So it was fundamentally important for Zillow that it try to get a hundred percent of the listings, right?
A. Yeah. If I can, the context of this email——
Q. That's okay. If you can just answer my question. I'm sure your counsel will ask you to provide context. Just answer my question.
A. Sure.
Q. Okay. And my question is: Terribly important to Zillow that it try to lock down all the listings, right?

A. It is important to us to get as many listings as possible. We don't have all, but certainly as many as we can.
Q. Now I think you told me in your deposition——no further questions on that document, sir——that Zillow focuses on the consumer experience; is that right?
A. It's certainly an important focus for us, yes.
Q. And Zillow's website and app provide maps and floor plans and photo and even climate data; is that right?
A. Among other things, correct, yes.
Q. And I think you told me that Zillow's competitive advantage in home search comes from its consumer-facing product; is that right?
A. I don't know if I said that in my deposition, but certainly it's not all the business but an important part of the business is the——what we can provide, the transparency, the completeness, the accuracy of the content we provide consumers.
Q. Zillow's executives prefer to compete in home search on features and functionality; is that right?
A. I think——I think that that——as a general statement, I think that's true. We believe that features and functionality are, and doing our best to serve our agent customers and our consumer customers is more——I think when we did the deposition, I was saying it was more important than having scarcity of listings I think was the context.
Q. You got there ahead of me, sir. Zillow's executives prefer

to compete on features and functionality rather than on scarcity of listings; isn't that right?
A. I'm not sure if you're reading from the deposition, but the concept is right, yeah.
Q. And because Zillow prefers to compete on consumer experience instead of on scarcity of listings, it believes——Zillow believes in transparency, right?
A. The main reason we believe in transparency is the benefits for buyers and sellers and the impact on the marketplace, and that's the reason we focus on transparency.
Q. Not on the fact that Zillow doesn't have any unique listings of its own to post to its website.
A. There actually are listings on Zillow that don't show up on other websites, but that's not where we're focusing our competitive efforts.
Q. And to be clear, Zillow has new housing and new construction listings on its website; is that right?
A. We do have information about communities, homes that can be built, new construction.
Q. Okay. And the new construction, that's not subject to the Zillow listing standards; is that right?
A. So for the——
Q. Sorry. I just need you to answer my question.
A. Well, it depends on the situation. So for the production builders who are doing tract housing, in most cases they

haven't built the home. It might just be a home plan and a lot that they're looking at. Because those listings can't be put into the MLS, they're not subject to our listing standards. If a builder——for example, an infill builder——tears down an old home in the city, builds that home, it's not uncommon for that builder to use an agent, in which case the listing would go on the MLS and would be subject to our listing access standards. So in terms of——

Q. You gave me a long answer for a question I didn't ask.

My question is: Builders, builders can——can——market their properties without being subject to the listing standards; is that right?

A. They can market their communities, their home plans, on Zillow, and for those types of listings, they are not subject to the listing access standards.

Q. Now we're going to use the term PLN. That means private listing network; is that right?

A. That's right.

Q. And one type of private listing network is where the agents share a listing with other agents within that brokerage and those agents can share the listings with clients, right? Sort of a hermetically sealed brokerage benefit, right?

A. Yes, that's correct.

Q. And another type——and I'm just going to use the term "pocket listings" for those, okay? That's a term that's used

sometimes, correct?
A. Sure, we can use that term.
Q. Okay. And then there's another definition that Zillow likes to use of PLNs, right? And that is where a brokerage market is listings to consumers but doesn't send the listings to the MLS for distribution, right?
A. Yeah. Let me just make sure we're on the same page here. So it's when a listing is taken by the brokerage, it is publicly marketed to a select group of buyers but is not put into the MLS, which means other brokerages don't see it and also would not get distributed to public-facing websites.
Q. Okay. And at Zillow, that's usually what you mean when you say PLN, that second one, where they're doing some marketing and it's not showing up on Zillow, right?
A. That's generally the case, yes.
Q. Okay. And so when I use PLN, just so we're on the same page, I'll use pocket listings for the one where they do no——it's hermetically sealed, and I'll use PLN——Zillow's term——when there's any kind of marketing outside of the brokerage. Do you understand that?
A. Sure. When there's——when there's public——selective public marketing.
Q. When you say selected, just so I'm clear, it could be on a website, I mean, anybody could come look at it, but if Zillow doesn't have it or the MLS doesn't have it to give to Zillow,

then it's subject to the listing standards, right?
A. The way the standards work is that if you do not provide the listing to the multiple listing service, which in turn means other brokerages don't get it, including Zillow——we don't get it either——but you are publicly marketing that listing in some way, it might be on the broker's own website, it could be a yard sign, but the full market isn't getting access to that listing, that's what we would refer to as a listing that is in a PLN.
Q. A PLN. And so Zillow categorizes the first two stages of Compass's three-phase marketing as PLNs, correct?
A. Can you maybe describe to me what those first two phases are.
Q. If you don't know, sir, then——
A. I just want to make sure that we're on the same——
Q. I don't want to give it to you. Are you familiar with the three stages of three-stage marketing for Compass?
A. So my understanding is, Phase I is Compass takes a listing, puts it inside the brokerage, also advertise, does not——but does not put it in the MLS, advertises the availability of that listing on compass.com. That's Phase I.
Phase II is it puts it into a "Coming Soon" status. That listing now appears on compass.com. To the extent that the MLS supports a "Coming Soon" status, Compass may or may not put it in the MLS. Depending on how the MLS treats those

"Coming Soon" statuses, it may or may not be in violation of our listing access standards, but there's certainly a flavor of that second phase that would violate our standards, and my understanding is that Phase III——
Q. We'll get to Phase III. Phase I and II are PLN in Zillow's terminology, correct? Or it can be PLNs.
A. They——depending on how the listing is advertised and depending on the local market MLS rules, which vary across the country, it could be——yes, it could be considered a PLN, and could be in violation of our listing access standards.
Q. And CCP stands for what, sir?
A. Clear Cooperation Policy.
Q. Okay. And 2024, NAR was considering changing its Clear Cooperation Policy, right?
A. Yes.
Q. And you reached out to NAR in 2024, right? You wrote them a letter?
A. I did.
Q. And in the letter, you asked NAR to keep and in fact strengthen CCP so it couldn't make a change that it was considering.
A. I mean, we weren't hundred percent sure how certain NAR was around making the change, but we were urging them to keep the policy and, to your point, in fact strengthen it.
Q. In that letter that you sent to NAR, you actually included

references to Compass, right?
A. I did.
Q. In fact, you used screenshots of Compass to make your point about what you wanted NAR to do, right?
A. I used screenshots to illustrate the way that some brokerages——and in fact, in the letter I said Compass and other brokers, I think other regional brokers, other large brokers——were keeping listings hidden from consumers, and why we thought that that was bad for the market, so the Compass screenshots were simply a "for example," but we were talking about Compass and other brokers.
Q. And then a few months later, even with you telling them about Compass and other brokerages, and even with you asking NAR, you know, keep or beef up CCP, NAR went the other direction and they actually loosened the reins of CCP, right?
A. That is correct.
Q. Okay. And so they saw what Compass was doing and they loosened the reins, correct?
A. They did. I should make one clarification. They loosened the reins in terms of the way listings could be publicly marketed, but they actually tightened the policy in the sense that they then required an agent to get a signed disclosure form from their seller if that——if the agent was going to convince that seller to keep their listing off the MLS and off most public-facing websites. In recognition of the harm that

could——
Q. Okay. You can go farther with your——I'm on a clock here, so I got to keep things moving.
A. Okay.
Q. Let's go to PX 002.
And that should be in your binder, sir.
This is called Strategy Synthesis; is that right?
A. Yes.
Q. And you saw this document at the time, or around the time it was created; is that right?
A. I believe so. Probably.
Q. I believe in your deposition you——
A. Oh, yes. Okay. I recognize this one now. Yes, I did.
Q. Let's go to the next page, page 159 in the Bates.
And the title is Post Clear Cooperation Strategy. Do you see that, sir?
A. I do.
Q. This was a place to gather and discuss ideas on what to do if CCP changed, right?
A. It was——it was a place, yes, to discuss possible ideas if CCP were to go away, although I would note, it says their strategy is outdated as of December 17, 2024, so this is a snapshot in time of the conversations we were having.
Q. Okay. And so understanding that this was a snapshot in time, the first line under the summary is, "It is probable that

the Clear Cooperation Policy (CCP) will go away." Do you see that?
A. I do.
Q. And then it says—and within Zillow, you had an understanding that that might happen as of December, right?
A. It was a possibility for sure, yeah.
Q. Okay. And then it says, farther down, it says, "Additionally, CoStar." Who's CoStar, briefly?
A. Yeah, a large public company who operates a computing portal called homes.com.
Q. Okay. "Additionally, CoStar and Compass can be expected to continue to relentlessly support PLNs/"Coming Soons," with potentially negative implications for Zillow without appropriate preparation and action." Do you see that?
A. I do.
Q. Zillow understood that Compass's PLN and "Coming Soon" approach could impact Zillow and that Zillow needed to act, right?
A. Yeah, Zillow and the whole marketplace, but yes.
Q. Okay. And then if we can go to page 165. It's about six pages later, sir.
A. Okay.
Q. And it says, under Pre-CCP Era—do you see where that is? That's a heading. "Why is today different?"
A. I do.

Q. Okay. And it says, "Pre-CCP Era: Why is today different?"

"CCP was implemented only five years ago. Before that, Zillow's business and the industry landscape looked very different from today."

THE COURT: I'm going to ask you to slow down a little bit. I know you're on a clock, but we do have a court reporter, and you're kind of speed reading it for her.

MR. DINTZER: And I——all I can say, your Honor, is I've already apologized to the reporter in advance, but I will absolutely slow down.

THE COURT: Thank you.

BY MR. DINTZER:

Q. "Before that, Zillow's business and the industry landscape looked very different from today." This time, there are additional factors that would hurt Zillow's position in the market. Do you see that?

A. I do.

Q. And number two in the items that's listed there is——let's see. Where are we looking?

If you go down to the second bullet, it says, "Compass is agitating and has a clear plan of attack for a post-CCP market." Do you see that?

A. This is a different paragraph now?

Q. It is. It's under the same heading.

A. I see.

Q. But if you go down, you see that, "Compass is agitating"? You see that?
A. I do see that, yes.
Q. Okay. And one of the concerns for Zillow was that Compass was agitating for change in the CCP; is that right?
A. I——that may well be what this means. I'm not a hundred percent sure what the "agitating" refers to, but that could be it.
Q. Okay. And Compass had a clear plan of attack for a post-CCP market. That was its three-phase marketing, right?
A. Again, I'm not sure what the author had in mind.
Q. Okay. Let's go to page 168. And it says, "Tactics & Whether to Lean Into Them." Do you see that?
A. I do.
Q. It says, "We have developed a long list——and that looks like a link——of tactics that we could take (across all orgs) to help us reach our goals." Do you see that?
A. I do.
Q. Do you recall that Zillow developed tactics to address the CCP change?
A. We certainly were considering various tactics at this time in December.
Q. Okay.
A. Yeah.
Q. And then farther down, right above the box, it says,

"Examples of these hardline tactics (from least to most punitive/risky) are:" Do you see that it's right above the box, the start of the box?
A. Yes, I do see that.
Q. And it says, Example Hardline Tactics, in bold. And then the first one is, "Offer carrots." And it says, "(i.e. good data fund, access to ZG products)." The carrots were the incentives for brokerages and agents that played along with Zillow, right?
A. I think this is saying something a little different. Because if the Clear Cooperation Policy went away, which was a mandatory policy, for any of our affiliated multiple listing services, it would then be up to the local market MLSs to decide whether they wanted a rule like that, and so I think the concept here was, were there things that we could do to help local MLSs who decided to keep a rule that was the same as or similar to the Clear Cooperation Policy. I believe that's what this is talking about.
Q. Those are——so the hardline tactics are to be applied to the MLSs?
A. I think this part says offering carrots, in other words, incentives. I think——it looks like the document isn't structured properly.
Q. Right. Offer carrots to brokers that maintain CCP.
A. Brokers and multiple listing services, yeah.

Q. Okay. And then let's go to the next one. "Threaten hardline tactics (below)." Do you see that?
A. I do.
Q. Okay. And one of the threatened hardline tactics is, "Remove listings from uncooperative brokerages." Do you see that?
A. It's part of a sentence, yeah. Other ideas were changing the sort order and so on.
Q. Right. One of the things that Zillow's executives were considering at this time was removing listings from brokerages or agents; is that correct?
A. If I just have a clarification there. When you say executives, this document was created by our product people, but certainly would have——this is a document that executives such as myself had seen, and yes, one of the options that was being suggested here was removing listings from uncooperative brokers in low-risk markets.
Q. Okay. And let's go to the next page, sir.
Actually, let's go to the——well, you know, before we go——SLT, what do the initials SLT stand for, at Zillow?
A. It refers to the senior leadership team.
Q. And are you on the senior leadership team?
A. I am.
Q. Okay. And let's go to the very last page of Exhibit 2.
Let me know when you're there.

A. Is that 171? Oh, 187. Okay.
Q. 187, sir. And it says, at the top, "SLT meeting 12/17 takeaways." Do you see that?
A. I do see this.
Q. Okay. And the first bullet is, "We want to be more aggressive with hardline tactics to keep ALL listings in IDX, on Zillow." Do you see that?
A. I do. If I can just clarify something.
Q. No, that's okay. I'm just asking you these questions, and your counsel will ask you questions to help you clarify.
A. I just wanted to point out that this meeting I'm pretty sure was not an SLT meeting per se. It's mischaracterized. But I do see the line you're highlighting, yes.
Q. So you remember this meeting on 12/17; is that what you're testifying?
A. We had a——
Q. Just answer my question.
A. I don't remember this specific meeting, but I believe this is part of a series of recurring meetings.
Q. And then if we go four bullets down, it says, "Everything about the hardline plan assumes we can be successful at using a hammer to keep sellers and agents on our site." Do you see that?
A. I do.
Q. And that was one of the conclusions from the meeting on

12/17.
A. I'm not sure I'd call it a conclusion in the sense that there's also a bunch of questions here that need to be figured out, but it was certainly an output from that meeting.
Q. Okay. No further questions on that document, sir.
And that was dated December 17th. Zillow started discussing creating listing access standards in earnest in January of 2025; is that right?
A. That is correct. We had an on-site meeting in Seattle in January.
Q. And at that on-site meeting the listing access standard was discussed as an approach.
A. As a possible approach, yes.
Q. Okay. Now brokerages focus on recruiting agents; is that right?
A. I'm sorry. Could you please say again?
Q. Of course. Brokerages focus on recruiting agents; is that correct?
A. It's definitely a key focus, yes.
Q. And recruiting and retention is key for all brokerages; is that right?
A. I agree with that statement, yes.
Q. Agents bring their book of business with them when they go from one brokerage to another.
A. That's quite common.

Q. If a brokerage or franchisor loses agents, they lose revenue.
A. Assuming the agent's productive, that stands to follow, yes.
Q. If Compass has exclusive listings for an agent, moving to Compass could be an appealing proposition to get access to those listings.
A. I would agree with that.
Q. Some brokerages believe that they would get an advantage if they kept some of the listings off the MLS.
A. Yes.
Q. Large brokerages like Compass could use their private listing networks to lure agents.
A. To——I'm sorry?
Q. To lure agents?
A. To recruit, attract agents, yes.
Q. And large brokerages could use their exclusive listings on their website to attract those eyeballs we talked about before.
A. I think we discussed this at my deposition, where I think the incentive was not to grow traffic on their websites. I think the incentive was to have——ensure that existing buyers who were coming to their website, if they chose to look at those listings, the brokerage would have an opportunity to get commission on both sides, not just the listing side but also on the buy side.

Q. And my question was a lot simpler, sir.
A. Okay.
Q. If for a brokerage, it has exclusive listings, if they put them on their website, they can use those exclusive listings to attract eyeballs, correct?
A. I'm not sure I agree with that.
Q. Okay.
A. It——I think it would depend on the volume of listings.
Q. Fair enough. But large brokerages like Compass could use their private listing networks to attract eyeballs, if they had enough of them.
A. It's possible, but the number of listings would need, you know——in order to have an impact on traffic, the number of listings would need to be gi——enormous. I mean, I think in the document you showed me, we said at one point we were missing——we had only 78 percent of MLS listings on Zillow, and yet Zillow was still a very successful website, so the absence of listings didn't necessarily in that case deter——
Q. But you're answering a different question. My question is: The addition of exclusive listings——you haven't done the analysis, I assume, on how many exclusive listings Zillow would need to attract eyeballs.
A. I don't know, no.
Q. Now Douglas Elliman, they're a New York brokerage; is that right?

A. In New York and other markets.
Q. And in spring this year before the standards were announced, Douglas Elliman announced the PLN; is that right?
A. That's my understanding, yes.
Q. And in spring of this year, a bunch of brokerages announced or launched private listing networks; is that right?
A. Certainly some did, yes.
Q. And you saw other large brokerages launch their own PLNs, and that raised concerns.
A. It did.
Q. And you believe that other large brokerages were launching their own PLNs to catch Compass.
A. I think that they were doing it because they saw brokerages, including Compass, launching their own private listing networks. They were concerned that if Compass and other large brokerages were keeping listings off the market, meaning they didn't have access to those listings, they would lose agents, and so they would have to employ similar strategy and create internal private listing networks to similarly keep listings off the market.
Q. So some brokerages, seeing that their rivals were keeping some listings off the market, they wanted to be competitive and so they themselves were considering keeping some of their listings off the MLS.
A. I think that's right.

Q. Okay. And in fact, you thought there was an acceleration of brokerages deciding to create private listing networks.
A. That seemed to be the case in the spring.
Q. And in fact, this is what you and the other Zillow executives predicted would happen if NAR didn't strengthen CCP.
A. It was definitely one of our concerns.
Q. And in fact, one of the things you conveyed to NAR.
A. Yes.
Q. And NAR changed the rule anyway.
A. Yes.
Q. Now if the listings throughout the real estate industry fragmented, that would be a problem for Zillow, right, because they wouldn't have access?
A. I think it would be a problem for the industry in general, including Zillow.
Q. And you felt, and Zillow's executives felt, that unless Zillow stepped in, other brokerages didn't have a choice but to try and beat Compass at its own game, right?
A. Yeah. We were concerned about the contagion that you just described, that when you have Compass and other brokerages running these PLNs, other large brokerages would feel the need to create their own hidden listing network, private listing network.
Q. And you used the word "contagion." That's the same word you used in the deposition, right?

A. I probably did, yeah.
Q. Okay. And the trend towards listings starting off the MLS was bad for Zillow, so Zillow stepped in and created the listing access standard.
A. I think if you look at all of the written documentation that we put on——there's been a lot of it——we agree, it's bad for Zillow, but our point is, it is bad for consumers, competition, and the industry.
Q. Okay. And one goal of the listing standards was to deter other brokerages from creating their own PLNs, correct?
A. Our hope was that it would——it would cause agents to think twice about steering sellers into keeping their listings off the market, and then the knock-on effect of that would be that it would deter those brokerages from launching PLNs if their agents were interested in engaging in that practice.
Q. Let's go to PX 29.
This is an email chain that you're on; is that right?
A. I'm on part of it.
Q. And Zillow's CEO is on it as well; is that right?
A. Yeah, he looks to be. I don't know if he's on all of them, but he's on——
Q. Let's go to page 31 of it, at the bottom. You see the one that you've written, and then Ms. Brooks——I'm sorry. I take it back.
At the bottom of 31, you see an email from Ms. Brooks

to you and others?

It's on the screen as well, sir.

A. Yeah, okay.

(Continued on next page)

Q. And then if you go to the next page, it starts, hi all. That's Ms. Brooks, an email, correct?
A. I think that's coming from a different person. Camille, it looks like.
Q. I beg to differ.
A. Hang on. You are right. It's from --
Q. She writes a nice long email for us. Do you see that?
A. I do see it, yes.
Q. And she wrote it on April 1, is that right? I'm sorry. April 5.
A. April 5, I think.
Q. Yes. And she writes: Below is a summary of our proposed comms strategy for the next week when we plan to announce our listing standards. Do you see that?
A. I do see that.
Q. Comms is communication?
A. Yes, it is.
Q. So you are planning on issuing the standards the next week? This is April 5.
A. Yeah. As a matter of fact, we did issue them on April 10.
Q. If we go down to the word "goal," do you see that? It's a heading.
A. I do.
Q. The first one is: Deter other brokerages from creating their own private listing networks, PLNs. Do you see that?

A. I do.
Q. And Zillow wanted to deter other brokerages from creating their own private listing networks, right?
A. We wanted to create a deterrence, but through the mechanism I explained, which is when agents explain the harm that was done by keeping lists off-market to their sellers, sellers won't want to put their listings in the private network. The effect of that is the builder is not going to build a private network if no one wants to use it.
Q. And Zillow could have done that with communication, with PR, but instead the strategy was to issue standards and bans, correct?
A. We had actually been --
Q. Correct?
A. Not correct. Because we had actually been very active with communications research report studies the entire year, and it wasn't having an impact.
Q. Sir? Right. Right. Thank you.
So Zillow had tried to do it with information and get the information out, but it wasn't having an impact, correct?
A. That is correct.
Q. So this is the comms strategy for the ban, and it says, deter other brokerages from creating their own PLNs, correct?
A. I think I said that.
Q. I think you said yes, correct?

A. I think what I said was we were hoping to have agents talk to their sellers and educate them. Sellers -- and we have research that shows this -- once they understand the impact of keeping their listing off the market, the majority change their mind and say, I want to put the listing in the MLS. If agents and sellers don't have a demand for a PLN, brokers aren't going to create PLNs. That's the linkage.

Q. Let's go to internal comms FAQs at the bottom of that page, sir. We're still on Exhibit 29. The second bullet says, help teams understand they may not have all answers immediately. And then there's a paren. We're intentionally dropping big news without the T&Cs. And I think that means terms and conditions, right, sir?

A. It does, yes.

Q. Without the T&Cs of our standard as a means of deterring others from going down the PLN path. Zillow intentionally dropped big news about T&Cs, correct?

A. We did.

Q. No further questions on that document, sir.

PX 13. This is a text chain, April 3, that you're on, is that correct? And Mr. Wacksman is on it as well.

A. We had discussed this during the deposition, that we also use a messaging system called Slack. And I think this might not be a text messaging chain, but it is a messaging chain that includes Mr. Wacksman, yes.

Q. And you?
A. Yes, and me.
Q. OK. Mr. Wacksman writes, at the top of the first page, in my head, we would have lined up a group of deals, say eXp, KW, Anywhere, and then jointly announce them and announce our stick plans publicly. Do you see that?
A. I do see that.
Q. And you understood stick plans to mean the listing access standards?
A. To mean, yeah, disincentives like the listing access standards.
Q. Right. The stick was the disincentive, right?
A. Yeah. That's a word for it, yeah.
Q. And then you wrote, at Page 810, the second page, I like this approach. Almost daily we see another PLN. We need to give people pause, right?
A. I'm sorry. What page is that?
Q. That's on the second page at the top, sir.
A. Yes, I see that.
Q. And you believed that the listing access standards would give people pause, right?
A. Yes.
Q. And by pause, you meant you wanted them to reconsider their plans to launch PLNs?
A. We covered this in a lot more detail during the deposition,

but the general notion was --
Q. Sir, sir. You said to give people pause.
A. That's what I wrote.
Q. You didn't have a huge long explanation. You wanted to give anybody who would start a PLN pause.
A. I did write, we need to give people pause, yes.
Q. Let's see. No further questions on that document, sir.
And as I understand it, the black box is a violation of the listing standards because it lets people know about the mere existence of private exclusives, is that right?
A. It's more than that. We discussed this, I think, during my deposition, which is any user on the open internet can go to Compass.com; do a search; they'll see a black box that says there are additional private exclusive listings available. And then by clicking and connecting with a Compass agent, someone can go ahead and see those listings. And to us, you know, you're a couple of clicks away from seeing those private listings on the open internet. To us, that was tantamount to public marketing.
Q. And it violated the standards?
A. And therefore, selectively publicly marketing some listings without sharing it with the marketplace was a violation of listing access standards.
Q. And sharing it with Zillow?
A. Sharing it with all other brokers, all portals, including

Zillow.
Q. Now, if an agent violates the standards once or twice, they get a warning from Zillow, right?
A. Yes. So our goal was not to catch people --
Q. Sir, sir. That's an easy one.
A. Yes.
Q. If somebody violates the standards once or twice --
A. So the first time an agent has a listing that violates the standard, they get a warning on that listing. If the agent has a different listing that also violates the standard, they get a warning on that second listing as well.
Q. And then the next one, they get their listing blocked?
A. The third time, they have a listing that violates, that third listing would not show up on Zillow if it were later entered into the MLS.
Q. So just let's be clear. When you say the listing wouldn't end up on Zillow, the house is still on Zillow, right?
A. We have a database of over 100 million homes on Zillow. Some are for sale. Some are not. So if the home is in the database, which most are, then the property would still appear on Zillow but not the listing.
Q. Right. And so if somebody violates -- if an agent violates for the third time, Zillow will pluck that listing out of the feed, and it will not be shown as for sale on Zillow, correct?
A. I'm not sure I'd say pluck, but we will not show that

listing on Zillow as a for-sale property.
Q. And instead, that property will be shown with a sticker, a little tag, that she's what, sir? Tell me what it says.
A. It says off market along with an explanation of what off market means.
Q. How far down on the page does it say that?
A. It's different on Zillow and Trulia, but let's call it roughly halfway down the page.
Q. OK. But the tag on the property that Zillow knows is for sale because it's on the MLS, the tag on the property says what, sir?
A. It says off market, and then we explain that off market means not on Zillow's market, not on Zillow. And we also go on to say that that listing may appear on other websites or other public sources. Not the exact words but those are the general words.
Q. The box off market is false because Zillow knows for a fact that that property is on market, correct?
A. Given the way that we use the term off market, as we describe on the website, that tag is correct. And by the way, I can't think of a real estate website offhand that has every single last listing on their site, and so this is an endemic problem.
Q. But Zillow knows that this is on market because it takes it out of the feed. Sir, to get a house unblocked –– unblocked ––

the seller has to fire their agent and their brokerage, correct?

A. They don't have to fire them. In fact, generally speaking most listing agreements are hard to get out of. And so what would typically happen, this listing doesn't sell. At this point the seller is frustrated. The listing agreement expires. And if that seller decides they would like to try their luck with a different brokerage, then we're not going to harm that seller. We're going to let that listing come back on Zillow.

Q. Sir, I can show you your deposition, but let's just make this short. If a seller has their listing blocked and they fire their agent and fire the brokerage, they can immediately be eligible to be put on Zillow, is that right?

A. Generally speaking, you can't fire your agent. You have to wait until the agreement is expired. But to the extent they were able to fire their agent and decided to go to a different company, then that listing would reappear on Zillow, that new listing.

Q. So if Mary wants to sell her house and she goes with Compass and ultimately her listing is blocked, if she ends her relationship with Compass and goes to RE/MAX, she can immediately get their listing up on Zillow, right?

A. So long as the agent at RE/MAX chooses to abide by the listing access standards because we apply the standards equally to the various brokerages.

Q. Since launching the listing access standards, there have been fewer brokerages launching PLNs, right?
A. I believe that is true.
Q. Agents have been very responsive to Zillow's warnings, correct?
A. Honestly, it depends on the agent. Some agents don't care. Some agents have thanked us for letting them know what the standards are because they may not have been aware of them. So it varies.
Q. Just so we are clear, sir, are you familiar with the fact that Zillow has published a page that says that 90 percent of agents who have been warned don't need a second warning?
A. I have seen that, yes.
Q. OK. So 90 percent of agents who Zillow has warned once that they have violated the standards, Zillow doesn't have to go back and give them the second warning because they've stopped, right?
A. Or maybe they haven't taken additional listings, but the stat is correct, that agents who have received a first warning for one of their listings, 90 percent of the time, at least up until now or whenever the report was done, did not receive a second warning.
Q. Now, in April, shortly after Zillow announced the standards, Redfin announced a similar ban, is that right?
A. Can you repeat the question, please?

Q. Of course, sir. I'm going to reach for water. Pardon me, sir.

THE COURT: While we're paused, I am going to give you another reminder to slow down for the court reporter.

MR. DINTZER: I apologize, your Honor, and I will apologize to the court reporter. I will slow down.

BY MR. DINTZER:

Q. In April, shortly after Zillow announced the standards, Redfin announced a seller ban, is that correct?

A. So it was after we announced our standards, Redfin announced that they had come to the conclusion that they wanted to have a policy, although it wasn't tremendously well defined, that was similar in some respects to ours.

Q. OK. And when you say eventually, they did it four days after Zillow announced its standards, right?

A. April 14 sounds correct, yes.

Q. OK. So let's go to PX 36, sir.

And I won't try to guess what platform this is on. What platform is this text messaging on?

A. Let me take a look. I think this is probably, you know, on an iPhone, iMessage, it looks like.

Q. Who is John Lim?

A. Actually it might be Slack, but anyway, it's a message exchange. John Lim is a project manager who works at Zillow.

Q. And he writes to you on April 14, the same day that Redfin

announces its own listing standards. He writes, did you do this? And then he puts a link that I believe goes to the Redfin standards. Do you see that?
A. I do.
Q. And then you responded to Mr. Lim, is that right?
A. I did.
Q. And then you write to Mr. Lim, no. I made a point of not contacting Redfin. Do you see that?
A. I do.
Q. And you had been out contacting brokerages all over the country to try to get them to sign up for -- to agree to follow Zillow's standards, is that right?
A. All over the country might be a bit of a -- but we certainly contacted a number of franchise owners, a number of large brokerages and so on.
Q. And you specifically sir?
A. I made many of those calls, yes.
Q. But you specifically did not —— did not —— contact Redfin, is that right?
A. I think if you look at the context of the question when John is asking, did you do this; in other words, did I have some hand in their announcing their standards, my answer to that question, did you do this, is no. I made a point of not contacting Redfin. So I did not contact Redfin to encourage them to create their own standards, but as I said, I'm happy to

hear the news.
Q. And I'm sure you were. But my next question is: You did know that Mr. Wacksman was in contact with Redfin's CEO, right, because he told you?
A. I mean, I certainly know that we have -- we talked to Redfin or he talks to Redfin from time to time.
Q. Sir, sir --
A. I don't remember on this date, on the 14th, whether or not I knew whether Jeremy Wacksman talked with Redfin or not.
Q. As you sit here now, you know that Mr. Wacksman, before the standards were announced, had been in contact with Redfin's CEO, correct?
A. Yeah, I know today. I'm just saying I'm not sure I knew that was the case on the 14th of April back when this was written.
Q. Mr. Wacksman didn't tell you that in an email?
A. I don't recall.
Q. Let's go back to Exhibit 36.
And then Mr. Lim says, if we build a private listing detecting system, we should make it available to folks like Redfin too. Do you see that?
A. I do.
Q. And then you wrote back, it would be generous, but I disagree and can explain it next time we talk live. Do you see that?

A. I do.
Q. Whatever the explanation was, you weren't going to put it in the text, right?
A. I didn't put it in the text, but I also said, they're smart. They'll figure it out. I don't think they need our help.
Q. Let me ask you something, sir. No further questions on that document.
Did you, in fact, reach out to Redfin about the listing standards?
A. I think Redfin reached out to me about the standards.
Q. That day?
A. It's possible it was that day. We were getting a lot of inbound calls from --
Q. Was it before or after you told Mr. Lim that you didn't make an effort to reach out to Redfin?
A. If you have information on timing, let me know, because I don't remember precisely who I spoke with on the 14th or the sequence of calls. But I'm happy to look at something.
Q. Do you know who Joe Rath is?
A. I do. He is the head of brokerage operations for Redfin.
Q. Did you speak to Mr. Rath that same day that Redfin announces its listing standards?
A. I don't recall, but it's possible.
Q. OK. Let's go to PX 125, and part of this document is not

for publication but that's OK because that's not the part we're going to look at.

So this is an email chain, and I'm going to ask you to go to Page 232. And this is an internal Redfin email chain but it addresses you. Do you see that?

A. It looks like, assuming Joe wrote the email.

Q. He did.

A. Joe is saying, I spoke with Errol --

Q. We'll go through it.

A. OK.

Q. He says, I spoke with Errol Samuelson who is happy to hear we have our own rule on the display of private listings. Do you see that?

A. I do see that.

Q. And that was April 14, the same day that Redfin announced the listings, the ban? Do you see that?

A. I do see that.

Q. And that was the same day that you told Joe Lim that you intentionally didn't contact Redfin. Do you see that?

A. It looks to be the same day, yes.

Q. And then Mr. Rath says he also provided clarification on how Zillow treats certain types of listings under its new rule. Some we knew. Some we didn't. Now, did you, in fact, talk to him about how Zillow treats certain listings under its new rule?

A. So, like I said, I don't recall this call. But we were getting a lot of inbound calls shortly after announcing the standards -- this is four days after announcing the standards -- where brokers and agents were inquiring about edge cases. So the standards are pretty easy to understand for listings in general. But, for example, one of the edge cases he says here is discussing, well, what if the listing -- I'm assuming what he means here. What if the listing is not in IDX but is in VOW, would that violate the standards? And what he is saying is what our policy is, that the listing is in VOW and yet not in IDX.
Q. On the second bullet, sir, he writes, Zillow has no problem with private exclusives like in the case of a federal judge or Taylor Swift for sellers who do not want any public advertising. That's correct, correct?
A. That is correct, if they are true private exclusives like we talked about earlier. I think you called them pocket listings.
Q. Pocket listings. Then he writes, however, Zillow considers any ad urging buyers to contact an agent or sign up to see more homes as public advertising. Do you see that?
A. I do see that.
Q. Do you recall if you told Mr. Rath that?
A. I don't recall the phone call, but that is consistent that -- and we discussed this a minute ago -- if there's, on

the open internet, a call to action where a buyer can with a few clicks fill out a reg. form; go see listings that are selectively publicly marketed, that would be a violation of our standards. I explained this --

Q. And the next thing he writes is, meaning, Compass phase one private exclusives that are pocketed but advertised with a CTA, call to action, would not be allowed on Zillow. Do you see that?

A. I do see that.

Q. And you told Mr. Rath that?

A. Like I said, I don't recall the phone call to start with, but this could very well be his interpretation, where he says, Zillow considers any ad urging buyers to contact an agent or sign up to see more homes --

Q. Sir --

A. -- and then he adds the word "meaning." Meaning, to me, would suggest it might be his interpretation.

THE COURT: Again, let me pause everyone.

THE WITNESS: Too fast?

THE COURT: Too fast. Everyone is racing. Let the court reporter take down what you have to say. You are not in a race with one another.

MR. DINTZER: I take responsibility. I apologize, your Honor.

BY MR. DINTZER:

Q. Sir, let me just ask you, point blank as you sit here, did you -- and if you don't remember you need to say that. Did you tell Mr. Rath about the fact that Compass phase one private exclusives that are pocketed but advertised with a CTA would not be allowed on Zillow? Did you give him that information?

A. So I don't remember the call, and so I don't remember whether I did or not.

Q. OK. No further questions on that document, sir.

Now, home search is available to all users on the internet, is that right?

I'll make it easy. Wherever you are, if I open the Zillow box anywhere in the U.S., I can type in an address, and I can get a result, correct?

A. That is correct.

Q. And I'll get the same result whether I'm physically in New York or physically in Florida if I'm looking for a house in Los Angeles?

A. Sure, if you are doing the same search at the same time.

Q. Yes. And anybody, anywhere in the country, can search on a property in Los Angeles wherever they are, correct?

A. You do not have to be in Los Angeles to search in Los Angeles, correct.

Q. Now, Zillow receives feeds from more than 500 local MLSs, is that correct?

A. That is correct.
Q. And through that coverage, they have coverage throughout the USA, is that correct?
A. Through the MLS feeds and some broker feeds and so on, we have coverage in all 50 states and the District of Columbia.
Q. To improve the efficiency of their software, Zillow takes all the local feeds and normalizes them to make the database work better?
A. That is correct.
Q. Wherever you go to look at a listing, you will see the exact same thing on Zillow, except for the ads?
A. So if you are looking for that particular property, you will see the same information on that property.
Q. Yes, OK. And if you are looking for a specific neighborhood or region, you would see the same listings come up for that neighborhood or region?
A. Yeah. Provided you did the same search, yes.
Q. And Zillow tries to have uniformity across the country on the search side?
A. In the database for the searchable fields, yes. There are differences between lists across the country because, depending on the nature of local real estate there, we display different fields in the search results.
Q. Zillow has 200 million monthly unique users across both website and app if you included Trulia and StreetEasy?

A. It's in the neighborhood of 200. There's seasonality, of course.

Q. What is Comscore?

A. Comscore is a third-party internet traffic reporting service. So if you were to look at websites in the real estate industry, it will tell you things like the number of users that have visited the site that month, the number of page views, and so on.

Q. And Zillow subscribes to Comscore, it's a paid for service?

A. Yes, we do. It's a paid service.

Q. Zillow relies to some extent on its analysis, the Comscore analysis?

A. It's certainly a meaningful input, yes.

Q. When doing comparisons between Zillow traffic and third-party sites, Comscore is the best source that Zillow has?

A. For third-party traffic, that is correct.

Q. But you believe Comscore actually tends to undercount traffic on Zillow?

A. I believe that's the case, yes.

Q. Now, Zillow shows how many days a property has been on Zillow, right?

A. We do.

Q. And to be clear, it says days on Zillow, not days on market, right?

A. That is correct.

Q. So if a property had been pre-marketed and then it shows up on Zillow, there's nothing false if Zillow says it's been on Zillow for five days, right?

A. If you look at our FAQ, what we do say is days on Zillow actually represents the days on market field in the Multiple Listing Service if we get the listing through an IDX feed. If we get the listing, for example, directly from an owner or from the builder, then days on Zillow would represent the actual number of days on Zillow. So there's some nuance depending on where the listing comes from.

Q. But generally, if the property has gone through three-phase marketing. Say ten days, phase one; five days, phase two; and it goes to phase three and it goes to the MLS; the MLS will show that it's day one and Zillow will show that it's day one, is that correct?

A. We would show -- if we were to accept that listing, which we wouldn't normally under our listing access standards, it would show that the days on Zillow were one, which is misleading, right.

Q. It would be accurate because that would be the first day on Zillow, right?

A. I think consumers would probably take it to mean something different, but --

Q. Sir, just answer my questions. It would be accurate because that would be the first day on Zillow, right?

A. It would be accurate with respect to Zillow.

Q. Now, does Zillow have a time limit as to how long properties can stay on Zillow?

A. I'm not aware of one.

Q. And I can tell you -- and you can tell me if you think I'm wrong -- I think I've seen properties listed days on Zillow for 2-, 3-, 400 days. Is there any reason to think that doesn't happen?

A. I saw one the other day which was over 500 days.

MR. DINTZER: There you go.

And your Honor, we have some closed-door material, and we've talked to counsel for the defense, and we know that they have some time so they're not going to finish up today anyways. We're going to take a look and decide if we need to do that. I'm leaning towards yes, but we still need to think about it. We'll let them and the Court know tomorrow, so I'm going to pass the witness but with the caveat that we may have to return to that.

THE COURT: All right. Thank you.

MR. DINTZER: With that, your Honor. I pass the witness. No further questions.

THE COURT: Ms. Lau, we have about 12 minutes left in our trial day. Do you want to start with witness and use this time, or would you prefer to start tomorrow?

MS. LAU: It's up to you, your Honor. I'm happy to

start tomorrow as well.

THE COURT: I will leave it to you. It's 12 minutes, so I'm happy to use the time efficiently so that we can get through as we can. But I do also understand that it's hard to start and then ten minutes later to stop.

MS. LAU: I appreciate that, your Honor. We'll go ahead and adjourn for the day.

THE COURT: I'll give you an instruction, Mr. Samuelson. You'll be resuming tomorrow. In the interim, since you are on the stand and you have been sworn in, you shouldn't be speaking to anyone about your testimony and that includes your lawyers.

MR. DINTZER: Your Honor, can we, just to clarify the direction, also ask that the witness not do any outside research on any of the subjects so that the nature of the testimony doesn't change over the time?

THE COURT: Yes, I will also provide that instruction, that you are essentially on the stand and should consider yourself on the stand even once you leave this courtroom. So you shouldn't be doing anything like looking at additional documents, trying to refresh your recollection, speaking with your attorneys. You are in the middle of testimony for all intents and purposes.

THE WITNESS: I understand. Can I ask a question?

THE COURT: Yes.

THE WITNESS: If I wanted to answer emails in the hotel room, is that OK?

THE COURT: Yes, yes. You are allowed to communicate with the word. You are just not allowed to communicate about your testimony or to research issues related to your testimony.

THE WITNESS: I understand.

MR. DINTZER: Thank you.

MS. LAU: Thank you, your Honor.

THE COURT: Are there any housekeeping issues that we need to take up this evening?

MR. DINTZER: Not for the plaintiffs, your Honor.

MS. LAU: And not for the defendants, your Honor. Thank you very much.

THE COURT: All right. Wonderful. We'll resume tomorrow promptly at 9:00. If whoever the timekeeper for both sides can consult with Ms. Molinelli, we can confirm that everyone's time count is accurate.

I did want to make one note for the record, that I had reserved approximately 45 minutes to an hour for any evidentiary issues that we needed to take up this morning. We obviously did not need to do that, so our clock is a little bit expanded. Plus, we have the additional hour on Friday. So by my calculations I think an even division of time now gives each side about eight hours of testimony time.

MR. DINTZER: We appreciate that, your Honor, and I

will slow down.

THE COURT: Thank you. I appreciate it, and I think the court reporter would likewise appreciate that.

MR. DINTZER: And I apologize to Madam Court Reporter as well.

THE COURT: We're adjourned, and we will resume at 9:00 a.m. tomorrow. See you then. Thank you.

(Adjourned to November 18, 2025, at 9:00 a.m.)

INDEX OF EXAMINATION


Examination of: Page

ROBERT REFFKIN

Direct By Ms. Solh . . . . . . . . . . . . . . . .47

Cross By Ms. Lau . . . . . . . . . . . . . . . . .93

Cross By Ms. Lau . . . . . . . . . . . . . . . . 117

KERRY CARR

Direct By Ms. Solh . . . . . . . . . . . . . . . 126

Cross By Mr. Tuttle . . . . . . . . . . . . . . 142

ERROL SAMUELSON

Direct By Mr. Dintzer . . . . . . . . . . . . . 159