**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COMPASS, INC.,

              Plaintiff,

      -against-

ZILLOW, INC., ZILLOW GROUP, INC., and
TRULIA, LLC,

            Defendants.

Case No.:  1:25-cv-05201-JAV

**<ins>DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION</ins>**
**<ins>TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</ins>**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     SUPPLEMENTAL STATEMENT OF FACTS ................................................ 3

    A.    Zillow's Standards are a Reasonable Response to Growing Harms of
         Private Listings in the Brokerage Market ................................................ 3

         1.    The Standards Sought to Address the Rise of Private Listing
               Networks ............................................................................... 3

         2.    The Standards Are Narrowly Tailored and Govern Only Zillow's
               Own Platform ........................................................................ 5

    B.    The Standards Are Procompetitive and Competition Has Not Been
         Harmed ..................................................................................................... 6

    C.    Zillow Did Not Conspire with Redfin ..................................................... 7

    D.    Zillow Is Not a Monopolist ..................................................................... 8

    E.    Compass Will Not Be Irreparably Harmed Absent an Injunction. ...................... 10

    F.    Buyers, Sellers, and Zillow Will Be Harmed by an Injunction. .......................... 12

III.    LEGAL STANDARD ...................................................................................... 13

IV.     ARGUMENT .................................................................................................... 14

    A.    Compass Has Not Shown Irreparable Harm ......................................... 14

         1.    3PM Is Not Essential and Does Not Increase Other Business ................. 15

         2.    Compass's Claimed Harms Are Speculative ........................................... 16

         3.    Any Harm Is Self-Inflicted and Avoidable ............................................ 17

    B.    Compass Cannot Show a Likelihood Of Success on the Merits .......................... 18

         1.    Compass Cannot Prevail on Its Section 1 Claim ..................................... 18

               a.    There Was No Unlawful Agreement with Redfin ........................ 18

b.     The Alleged Conspiracy with Redfin Is Not an Unlawful Restraint of Trade ........................................................................ 20

2.     Compass Cannot Prevail on Its Section 2 Claim ...................................... 21

a.     Compass's Section 2 Claim Fails as a Matter of Law Because Zillow Has No Duty to Deal with Compass .................. 22

b.     Compass Has Not Shown Any Harm to Competition ................. 25

c.     Compass Has Not Carried its Burden to Rebut to Zillow's Procompetitive Rationales ........................................................... 26

d.     Compass Has Not Established That a Nationwide Market Is Appropriate .................................................................................. 27

e.     Compass Has Not Established That Zillow Has Monopoly Power in the Alleged Market ........................................................ 28

3.     Compass Lacks Antitrust Standing ........................................................... 30

C.     Consumers Will Be Harmed By An Injunction .................................................... 31

D.     Zillow's First Amendment Rights and Platform Will be Harmed By an Injunction .......................................................................................................... 31

V.     CONCLUSION ................................................................................................................ 32

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

## CASES

*1-800 Contacts, Inc. v. Fed. Trade Comm'n*,
    1 F.4th 102 (2d Cir. 2021) (per curiam)................................................................25, 27

*Am. Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010)...............................................................................................18

*Am. Patriot Express v. City of Glens Falls*,
    474 F. Supp. 3d 508 (N.D.N.Y. 2020).....................................................................14

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    899 F.3d 87 (2d Cir. 2018)......................................................................................19

*Anti-Monopoly, Inc. v. Hasbro, Inc.*,
    958 F. Supp. 895 (S.D.N.Y.) ...........................................................................18, 29

*Arcesium, LLC v. Advent Software, Inc.*,
    2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) .................................................30

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985).....................................................................................22, 23, 25

*Biocon Ltd. v. Abraxis Bioscience, Inc.*,
    2016 WL 5817002 (S.D.N.Y. Sept. 26, 2016)..................................................17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)................................................................................................30

*Carpetmaster of Latham, Ltd. v. Dupont Flooring Sys., Inc.*,
    12 F. Supp. 2d 257 (N.D.N.Y. 1998)......................................................................16

*Chung v. Royal Care, Inc.*,
    2025 WL 1029432 (E.D.N.Y. Jan. 8, 2025) .....................................................30

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016)......................................................................................27

*Convergen Energy WI, LLC v. L'Anse Warden Elec. Co.*,
    2020 WL 5894079 (S.D.N.Y. Oct. 5, 2020) ....................................................17

*CoStar Grp., Inc. v. Com. Real Estate Exch., Inc.*,
    141 F.4th 1075 (9th Cir. 2025) .........................................................................24

*Design Strategy, Inc. v. Davis*,
    469 F.3d 284 (2d Cir. 2006)....................................................................................16

*F.T.C. v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986)................................................................................................20

*FTC v. Amazon.com, Inc.*,
    2024 WL 4448815 (W.D. Wash. Sept. 30, 2024)............................................................24

*fuboTV Inc. v. Walt Disney Co.*,
    745 F. Supp. 3d 109 (S.D.N.Y. 2024)...............................................................................15

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
    386 F.3d 485 (2d Cir. 2004)..............................................................................................28

*Honey Bum, LLC, v. Fashion Nova, Inc.*,
    63 F.4th 813 (9th Cir. 2023) .............................................................................................20

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014)........................................................................................21, 23

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016)..............................................................................................30

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)................................................................................................23

*In re Keurig*,
    2014 WL 12778832 (S.D.N.Y. Sept. 19, 2014)..........................................................16, 17

*In re Mylan N.V. Sec. Litig.*,
    666 F. Supp. 3d 266 (S.D.N.Y. 2023)..............................................................................18

*In re Payment Card*,
    729 F. Supp. 3d 298 (E.D.N.Y. 2024) ..............................................................................29

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019)................................................................................................30

*JTH Tax, LLC v. Agnant*,
    62 F.4th 658 (2d Cir. 2023) ...............................................................................13, 14, 16

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)..........................................................................................................24

*Mason v. Jews for Jesus*,
    2006 WL 3230279 (S.D.N.Y. Nov. 8, 2006)...................................................................31

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024).........................................................................................................31

*Muze, Inc. v. Digital On-Demand, Inc.*,
    123 F. Supp. 2d 118 (S.D.N.Y. 2000)..............................................................................16

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
    296 F. Supp. 3d 442 (E.D.N.Y. 2017) .............................................................................19

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018).................................................................................14, 21, 26

*New York ex rel. Schneiderman v. Actavis PLC*,
 787 F.3d 638 (2d Cir. 2015)...................................................................................13

*New York v. Meta Platforms, Inc.*,
 66 F.4th 288 (D.C. Cir. 2023)...........................................................................23, 24

*New York v. United States Dep't of Educ.*,
 477 F. Supp. 3d 279 (S.D.N.Y. 2020)....................................................................13

*Norbrook Laby's Ltd. v. G.C. Hanford Mfg. Co.*,
 126 F. App'x 507 (2d Cir. 2005) ............................................................................16

*Novell, Inc. v. Microsoft Corp.*,
 731 F.3d 1064 (10th Cir. 2013) ...................................................................22, 24, 25

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
 472 U.S. 284 (1985)................................................................................................20

*Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
 322 F.3d 147 (2d Cir. 2003)....................................................................................27

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
 555 U.S. 438 (2009)..........................................................................................22, 24

*PepsiCo, Inc. v. Coca-Cola Co.*,
 315 F.3d 101 (2d Cir. 2002)....................................................................................29

*Person v. N.Y. Post Corp.*,
 427 F. Supp. 1297 (E.D.N.Y. 1977) .......................................................................31

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
 32 F.4th 824 (9th Cir. 2022) ...................................................................................21

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
 507 F.3d 117 (2d Cir. 2007)..............................................................................24, 31

*Register.com, Inc. v. Verio, Inc.*,
 356 F.3d 393 (2d Cir. 2004)....................................................................................16

*Reuters Ltd. v. United Press Int'l, Inc.*,
 903 F.2d 904 (2d Cir. 1990)....................................................................................16

*Ross v. Am. Exp. Co.*,
 35 F. Supp. 3d 407 (S.D.N.Y. 2014).......................................................................20

*Solus Alternative Asset Mgmt. LP v GSO Cap. Partners, L.P.*,
 2018 WL 620490 (S.D.N.Y. Jan. 29, 2018) ...........................................................17

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
 131 F.4th 102 (2d Cir. 2025) .............................................................................14, 15

*Starr v. Sony BMG Music Ent.*,
 592 F.3d 314 (2d Cir. 2010)....................................................................................19

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ...................................................................................................21

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
   60 F.3d 27 (2d Cir. 1995) ...............................................................13, 14, 15, 16

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
   964 F.2d 186 (2d Cir. 1992) ...................................................................................27

*United States v. Apple, Inc.*,
   2025 WL 1829127 (D.N.J. June 30, 2025) .........................................................24, 25

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) ...................................................................................18

*United States v. Google LLC*,
   778 F. Supp. 3d 797 (E.D. Va. 2025) ....................................................................24

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ...........................................................................27, 29

*Verizon Commc'ns Inc. v. L. Offs. of Curtis v. Trinko, LLP*,
   540 U.S. 398 (2004) ................................................................................... *passim*

## RULES

Fed. R. Civ. P. 37(c)(1) ...............................................................................................16

## MISCELLANEOUS

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1506 (2025). ....................................29

## I.    INTRODUCTION

Compass improperly asks this Court to assume the role of industry regulator and to compel Zillow to display on its platform, for free, Compass listings that contradict Zillow's core principle of transparency in real estate information. The proposed injunction is antithetical to innovation and competition as Zillow's ability to continue innovating on and building a product loved by millions would be eroded. As a unanimous Supreme Court has warned, "[e]nforced sharing … requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing." *Verizon Commc'ns Inc. v. L. Offs. of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("*Trinko*"). Because the antitrust laws do not allow Compass to use this Court to dictate the terms on which Zillow and Compass may deal, the Court should deny Compass's Motion for a Preliminary Injunction ("PI Motion").

Compass cannot tell this Court that it will be irreparably harmed, yet tell investors, agents, and customers the opposite. Compass originally told the Court that it would be irreparably harmed because it had "staked its future" on implementing a hidden listing scheme called 3-Phase Marketing ("3PM") and that Zillow's Listing Access Standards ("Standards") would block its use. Mot. 10. In the months that followed, Compass has repeatedly touted the success of its business and 3PM in particular:

- Just last week, on November 4, Compass CEO Robert Reffkin told investors that "***No agents told me in the last quarter that [3PM] reduced their chances of getting the listing. I've only heard that it's increased their chances***." DX655 at 12 (emphasis added).[1] Indeed, "Compass delivered the strongest Q3 results in [its] history," its "value proposition remains strong," and it "continued to outperform the industry" in growing transactions. DX615 at 1.

- On September 22, Compass agreed to acquire its largest competitor, Anywhere Real Estate ("Anywhere"), in an all-stock transaction with a combined value of approximately $10 billion, DX528, yet ***claims to have no documents disclosing***

---

[1] Exhibits and depositions are attached to the concurrent Declaration of Beau Buffier unless otherwise noted.

> *to Anywhere that Zillow's Standards posed a risk to Compass's business or stock value*. DX531 at 6–8.

- *Compass has not disclosed to investors that the Standards pose a material risk to its business*. In August and November, Compass filed quarterly SEC reports that do not mention Zillow's Standards *at all*. DX010 at 42; DX659 at 46–52.

- *Compass has continued to use 3PM* despite the Standards, Reffkin Tr. 113:10–18, undermining its claim that an injunction must issue for Compass to use 3PM.

- *Compass has repeatedly told its agents and customers that Zillow is not important to its business* because it is an "illusion that [Zillow is] essential to the home selling process" and home "[l]istings are placed on 1,000's of websites." DX601 at '723–24.

On this record, Compass cannot establish that it will be irreparably harmed absent an injunction, and the Motion should be denied on this basis alone.

Compass's attempt to show a likelihood of success on the merits does not fare any better. 164,000 pages of documents, 16 depositions, five interrogatories, and two expert reports have consistently undermined Compass's PI Motion. Compass's supplemental brief ignores the evidence and speculates that Zillow and Redfin violated Section 1 by conspiring to boycott Compass. No evidence supports that speculation. The evidence shows that Zillow and Redfin made no agreements and instead made independent business decisions to announce rules for what listings they would display on their own sites. Redfin was recently acquired and has not taken any steps to implement its policy.

Compass's Section 2 claim also fails. Compass has abandoned its efforts to satisfy the "sole exception" to Zillow's right to choose the terms on which it will deal with rivals. Compass's arguments for monopolization fail across the board because Zillow does not have market power in any market for online home search, where barriers to entry are low, and Compass has made no effort to rebut Zillow's procompetitive rationales for the Standards. Nor can Compass establish antitrust standing for any of its claims.

Further, Compass's injunction risks serious harm to consumers and to Zillow. Home sellers will be harmed by a fragmented market that reduces exposure for their listings, and buyers will be harmed when it is more difficult and more expensive to find listings hidden away by brokerages like Compass. Zillow will be harmed by being forced to carry advertisements that undermine its mission, underwrite a competitor's business strategy, and support an anti-consumer business model that degrades Zillow's platform and impairs its ability to compete on the merits.

Compass fails every requirement for a preliminary injunction, and its Motion should be denied.

## II.     SUPPLEMENTAL STATEMENT OF FACTS

### A.     Zillow's Standards are a Reasonable Response to Growing Harms of Hidden Listings in the Brokerage Market

#### 1.   The Standards Address the Rise of Hidden Listings

Zillow developed its Listing Access Standards in response to a debate in the real estate industry about private listing networks ("PLNs"). Hardy Decl. (Dkt. 29) ¶¶13–15; DX591. Through PLNs such as Compass's 3PM, brokerages initially withhold listings from the MLS (thus hiding them from other brokerages) and bait buyers and sellers with those exclusive listings. Hardy Decl. ¶¶13–15. These hidden listings often do not sell because, according to Compass agent Kerry Carr, during this phase, "most sellers try to put [listings] up at a higher price than what the market can bear." Carr Tr. 67:16–23. Brokerages later share unsold listings with the MLS as a fallback, which sends them to websites including Zillow. Hardy Decl. ¶14(c).

PLNs undermine transparency and thus harm consumers, the online home search market, and Zillow. Market fragmentation harms both buyers and sellers by limiting their ability to easily reach and transact with each other. DX657 ¶¶245–255. Zillow's business model and customer

experience are also degraded when Zillow lacks access to the most up-to-date and complete listings—Zillow does not want to have its platform stock "stale bread" while PLNs hoard fresh inventory. Compl. ¶72.

After lobbying from Compass, the National Association of REALTORS ("NAR") decided in late March 2025 to weaken its Clear Cooperation Policy ("CCP"), which had previously limited PLNs. *Id.* ¶40; Samuelson Tr. 31:05–32:17. Around the same time, Compass significantly ramped up its 3PM efforts. Hardy Decl. ¶13.

Zillow developed a competitive response to these changing market conditions to protect the quality of its platform, maintain its access to critical inputs, and disincentivize brokerages from freeriding. DX302 at '360–62; DX372 at '863; Wacksman Tr. 180:08–25; PX001 at '114 ("Why do we care: Listings inventory is critical to our value proposition"). Zillow initiated a strategy of incentives and disincentives (or in corporate jargon "carrots and sticks") to promote transparency, which many in the industry already supported. Under Zillow's Standards, if a brokerage wants a listing to be on Zillow, that brokerage must share the listing with everyone through the MLS within one business day of publicly marketing it, instead of using the MLS (and Zillow) as a fallback only after selective marketing fails. Samuelson Decl. (Dkt. 51) ¶43; DX576 at '650. The brokerage must provide something of value (a timely listing) in order to receive something valuable from Zillow (exposure to Zillow's audience). Zillow garnered further industry support for the Standards by taking a clear public stand and encouraging brokerages to maintain transparency while growing their business. Wacksman Tr. 14:12–15:09, 119:04–121:03, 147:17–148:07; DX371 at '393.

There is no evidence that Zillow created the Standards to quash competition in online home search. Compass remains free to differentiate itself by displaying its exclusive listings on

Compass.com or anywhere else. Indeed, there is no evidence that Zillow or Compass see each other as true rivals in online home search. Zillow simply sought to preserve its ability to provide a superior consumer experience and compete in home search by protecting its listing quality, which promotes innovation. DX302 at '360–62; DX576 at '652; PX001 at '114; Compl. ¶72. Zillow took this step while understanding it might lose some stale listings in service of transparency by incentivizing brokerages to share all listings with everyone once marketed to anyone. DX302 at '360–62.

## 2. The Standards Are Narrowly Tailored and Govern Only Zillow's Own Platform

Zillow made the Standards public so that industry participants could make informed choices about the merits of different marketing strategies. Hofmann Tr. 68:02–71:03. Zillow began implementing the Standards on May 28, 2025 by sending notices to agents and began rejecting non-compliant listings (only after two prior notices) on June 30. Samuelson Decl. ¶57. Agents or brokerages who do not comply are not "banned" or punished; only repeat violative *listings* are not displayed on Zillow. DX100. Listings that Zillow chooses not to display are still available elsewhere. *See* Golod Tr. 104:20–105:07; Alexander Tr. 90:04–91:11; Reffkin Tr. 127:21-128:7; DX601 at '724 ("Listings are placed on 1,000's of websites."). No agent is precluded from having their compliant listings displayed on Zillow, "regardless of an agent's past violations." DX100 at 3. In short, there is no "ban."

While Compass complains that 90% of the 821 agents who received a notice from Zillow did not receive a second notice, this does not show that agents are terrified of Zillow or that competition has been harmed. The data is equally consistent with agents and sellers being unaware of Zillow's Standards—exacerbated by Compass executives misleading their own agents—and later deciding that private marketing is inferior to public marketing, especially once

the option to freeride is removed. Through October 15, 2025, agents from nineteen brokerages have received warnings and only 27 Compass listings have been rejected by Zillow, out of over 49,180 new Compass listings displayed on Zillow since May 28. DX532 at 2, 4.

### B. The Standards Are Procompetitive and Competition Has Not Been Harmed

Zillow's rationales for implementing the Standards are procompetitive and advance legitimate business objectives. Zillow's expert witness Dr. Lawrence Wu, President at NERA Economic Consulting, analyzed the effects of the Standards and determined that they:

- Promote greater liquidity and efficiency in real estate transactions, which benefits home buyers, sellers, and Zillow;

- Help improve the quality of Zillow's platform by reducing the incentive to supply stale listings to Zillow, which would otherwise trigger an economic phenomenon called adverse selection that risks flooding Zillow with low-quality listings; and

- Help prevent freeriding on Zillow's investments, which preserves Zillow's incentives to innovate and improve quality for consumers.

DX657 ¶¶12, 63. This is consistent with Zillow's goals for the Standards. DX371 at '394, '402; DX576 at '652 ("Priority 1: Comprehensive Listings").

Competition in online home search remains fierce. Homes.com, for example, took the opposite approach and actively "boosts" listings removed by Zillow. Reffkin Tr. 133:05–23. Homes.com is an "extremely well-funded" and "formidable" competitor that has "grown fast" and can compete with Zillow. Kelman Tr. 219:02–18. Redfin announced its intent to take a middle ground whereby it would not display some listings while advocating for MLSs to give sellers more control over listing information, but has taken no steps to implement its policy. Kelman Tr. 110:16–111:15. Critically, there is no evidence that *any* home search competitor has raised prices or reduced output or quality. Aron Tr. 55:08–57:19; 58:19–62:04.

C.     **Zillow Did Not Conspire with Redfin**

Redfin and Zillow did not agree to boycott Compass or to jointly implement listing policies.[2] Kelman Tr. 166:02–167:11, 126:06–12; Wacksman Tr. 63:04–66:7. On April 9, the day before publicly announcing its Standards, Zillow made calls to media outlets and major industry players (including Compass) to pre-brief them. Wacksman Tr. 56:08–12; Hofmann Tr. 140:07–15. As part of that, Zillow's CEO, Jeremy Wacksman, informed Redfin's CEO, Glenn Kelman, of Zillow's plan to announce the Standards. Kelman Tr. 61:10–62:18, 161:13–162:03. This was the first time that Mr. Kelman learned of the Standards. Kelman Tr. 161:13–162:03; Wacksman Tr. 63:4-13. Mr. Kelman "thought it was a good idea" and consistent with his longstanding public support for listing transparency, but Redfin was "still processing it" and "had to figure out [its] own approach to it." Kelman Tr. 61:22–62:10, 135:02–17. Mr. Wacksman did not ask Mr. Kelman to implement the Standards or seek his feedback, and Mr. Kelman did not agree to implement a similar policy. Kelman Tr. 162:21–167:11; Wacksman Tr. 62:09–63:06; DX379 at '846.

After consulting internally and with Compass, Redfin announced its own listing policy on April 14. Redfin made that decision independently, without input from Zillow, "minutes or hours" before its announcement. Kelman Tr. 70:20–71:15, 168:16–169:05. Redfin was recently acquired and its new owners have not decided whether to implement a policy, so Redfin has not taken any steps toward implementation. *Id*. 74:18–75:12. Compass listings that violate Zillow's Standards remain available on Redfin.com. *Id.* 201:13–22.

---

[2] Compass has abandoned its theory that Zillow and eXp conspired to boycott Compass. Br. 11, n.29. This is no surprise. eXp's CEO, Leo Pareja, testified that eXp has not conspired with Zillow, Redfin, or anyone else to boycott Compass. Pareja Tr. 109:15–111:01. The vertical listing feed agreement between Zillow and eXp has no effect on eXp's website, which displays all listings shared by Compass regardless of their compliance with Zillow's Standards. *Id.* 115:21–116:08, 146:23–147:10.

Compass has all but disavowed its witnesses' description of an April 10 meeting with Mr. Kelman. Reffkin Decl. ¶15; Alexander Decl. ¶12. Mr. Kelman denies saying that Redfin and Zillow made any agreement, or that Zillow would compensate Compass for complying with Zillow's Standards. Kelman Tr. 182:13–16, 166:02–167:11, 184:15–185:21. Compass witnesses, in contrast, offer no testimony about this conversation beyond their declarations. Reffkin Tr. 183:04–188:11; Alexander Tr. 216:11–220:18. Mr. Reffkin claimed to remember little and demurred to his declaration when asked to detail the meeting. *See* Reffkin Tr. 183:04–19, 184:13–22, 187:06–16, 187:17–25.

### D.    Zillow Is Not a Monopolist

Zillow does not have monopoly power in the market for online home search because the market is not national, Zillow lacks market power, barriers to entry are low, and the Standards are not evidence of monopoly power.

First, the evidence confirms the geographic market for online home search is not national. Compass adapted 3PM to comply with varied local MLS rules and recognized the Standards "mean[] nothing for the 50% of our listing volume in MLSs that do not have rulesets that allow Compass Coming Soons to be publicly marketed for more than one business day." DX019 at '788; *see also* DX590; Alexander Tr. 104:12–105:18; Golod Tr. 156:24–157:14. Compass operates in less than half of the country's 500 MLSs and does not display listings nationally, so consumers cannot turn to alternatives that, like Compass, do not operate in the local areas where they are searching for a home. DX657 ¶157 n.219; Aron Tr. 103:20–104:11. The market thus cannot be nationwide.

Second, Compass fails to establish market power. Its assertion that Zillow has a 66% market share is based on data its expert misinterpreted. Br. 21. Compass's data measures the proportion of users who visit *any* real estate website who *also* visit Zillow. DX657 ¶189. That

results in Dr. Aron relying on "shares" that add up to over 140% across all sites. *Id.* n.272; *see also* DX354; DX355; Wacksman Tr. 59:19–60:07. The data also includes visits for rental listings, which both experts agree are irrelevant to the market for online for-sale home search. DX657 ¶190; Aron Decl. ¶126. Instead, Compass and others recognize Zillow does not have market power because of its audience. *See* DX601 at '724 ("most viewers [on Zillow] are simply just that"). Homes.com's CEO asserts Zillow "accounts for less than half" of user traffic because "many buyers use multiple sites when searching for homes." DX388 at '620.

Third, barriers to entry are low. Broad access to listings allows competitors to build better websites without undertaking the effort of obtaining listings from thousands of brokerages. Kelman Tr. 147:18–149:04, 152:04–19. Newcomer Homes.com has dramatically increased its share of audience traffic from 2.9% to 19% in only four years. DX657 ¶198.

Finally, Compass's argument that the Standards are themselves evidence of market power is circular and flawed. Br. 20. Compass argues that sellers and agents would not forgo 3PM unless a monopolist refused to carry stale listings, but offers no evidence to support that assertion beyond a flawed hypothetical from its expert. *Id.*; DX657 ¶¶171–87. Compass cannot show that 3PM offers more than marginal perceived benefits to sellers over other marketing strategies that comply with MLS rules and Zillow's Standards. If the risk of losing access to one site with a fraction of the buyer audience exceeds those marginal benefits, rational sellers will drop the strategy. In other words, it doesn't take a monopolist to dampen enthusiasm for 3PM; it just takes a home search platform whose audience is more valuable than whatever marginal benefits 3PM offers.

### E.        Compass Will Not Be Irreparably Harmed Absent an Injunction.

Compass does not and will not face irreparable harm. The evidence shows Compass has continued implementing 3PM, does not assess Zillow's Standards to be a material risk, and has misled its agents and clients about how the Standards work.

Compass asserts that it will be irreparably harmed because of lost competitive advantage and ability to grow its business. The evidence shows otherwise. When Compass agreed to acquire a major competitor, Anywhere, in an all-stock transaction, Compass made *no written disclosures* that the Standards could pose a risk to Compass's future performance. DX531 at 6–8. Nor has Compass disclosed the Standards as a material risk to investors. DX010 at 42; DX659 at 46–52; Reffkin Tr. 177:23–180:18; Bhonsle Tr. 155:06–158:20. While Compass now attempts to position 3PM as a key differentiator from other brokerages, Br. 27, Compass was already losing differentiation *before* Zillow's Standards because other brokerages had launched programs similar to 3PM. Navab Tr. 111:06–116:24. Compass also asserts it planned to use 3PM to drive traffic to its website, but no evidence describes this plan or any impact to its website. DX658 at 14–18.

Compass claims it will lose goodwill and reputation because of reduced adoption of 3PM, but has never shown that reduced usage of 3PM impacts online home search, or translates to fewer customers or transactions. To the contrary, on November 4, Mr. Reffkin told investors: "No agents told me in the last quarter that [3PM] reduced their chances of getting the listing. I've only heard that it's increased their chances." DX655 at 12. Compass also reported "the strongest Q3 results in [its] history, marked by several quarterly records," with record revenue, profit, agent recruiting, and market share. DX615 at 1. Nor is it clear that 3PM usage has even dropped. In July, Mr. Reffkin told investors that Private Exclusives have stayed at "basically the same level," DX464 at 11, while another executive projected that more sellers would adopt 3PM.

-10-

DX027. In any event, Compass agents do not even agree that 3PM is beneficial. DX076 at '678–80.

Moreover, while telling the Court that Zillow is essential, Compass tells agents and customers the opposite. Mr. Reffkin told sales leaders it is an "illusion that [Zillow] is essential to the home selling process." DX602 at '469; *see also* DX168 (Standards are "ideal outcome" for Compass); DX410; DX084; DX414 at '955. Compass training documents also instruct agents to tell sellers they may be better off if Zillow does not show their listings. *See, e.g.*, DX620; DX621 at '554 ("How Zillow HARMS, Not Helps!"); DX523 at '101 ("Portal Views Don't Equal Results"). One executive also wrote to employees that Compass has "solved for all of the benefits that an aggregator [like Zillow] might offer an agent or an agent's client" and "provide[s] our agents with tools that outperform what the aggregators promise." DX041.

Any harm to Compass is self-inflicted and avoidable. Despite claiming to the Court that 3PM violates Zillow's Standards, Compass tells agents and sellers that 3PM is compliant—leaving them surprised when they receive notices from Zillow. Carr Tr. 56:17–58:19; DX022; DX033 (as of April 14, Compass aware that Private Exclusives as then-implemented violated the Standards); DX021 (instructing employees June 23, the day this lawsuit was filed: "Private Exclusives and the Compass 3-Phased Marketing Strategy are still allowed"); DX601 at '714 ("Zillow policy changes do not impact the ability to pitch and [u]se" 3PM); DX171 (proposing "Zillow path" and "non-Zillow path" for implementing 3PM). This double-speak benefits Compass at its agents' and sellers' expense. DX162 at '881–83 (3PM increases double-ending); DX169 at '788 (same); DX328 at '442 (3PM helps Compass "skim[]" additional profit from buyers). As agent Ms. Carr testified, Compass executives led her to believe that Zillow did not view Private Exclusives as a violation of the Standards; as a result, she did not know to advise

sellers—whom Compass locks into exclusive contracts and to whom agents owe fiduciary duties—of the risk that Compass Private Exclusives listings might be rejected by Zillow. Carr Tr. 33:22–37:22.

### F. Buyers, Sellers, and Zillow Will Be Harmed by an Injunction.

Buyers, sellers, and Zillow will be harmed if Zillow is forced to display listings contrary to its transparency mission while Compass and like-minded brokerages, under the Court's protection, fragment the real estate market and degrade the consumer experience on Zillow and other platforms.

First, it would be more difficult for home buyers to find all available listings, leading to increased search costs. Carr Tr. 8:15–13:01; DX097; DX424; DX657 ¶249.[3] The market fragmentation would particularly impact minority or low-income buyers who might not be shown the same listings as others. Kelman Tr. 128:13–22; Pareja Tr. 129:01–130:24.

Second, industry participants agree that there are serious risks to sellers from reduced listings exposure:

- Redfin: "[t]he most effective way to sell your home and reach as many buyers as possible is to list it publicly in the [MLS]"; they should proceed with private marketing only if they "are willing to miss out on the significant value of public marketing." Kelman Tr. 157:2–159:3; *see also* DX215 at '407.

- eXp: "we'd like to convey that limited exposure reduces the pool of qualified buyers … And reduced competition means you lessen your chances for the highest sales price and best terms." Pareja Tr. 137:11–142:09; *see also* DX239.

- Compass: "Compass Private Exclusive or Compass Coming Soon … could reduce (i) the number of potential buyers who can learn about the property; (ii) the

---

[3] Compass's claimed consumer harms are speculative. Dr. Aron conceded that her "assignment didn't include analyzing irreparable harm to competition in the online home search platform market." Aron Tr. 59:02–24. She opined that "whether any seller was harmed … could not be estimated without speculation" and conceded "it is not possible to know with reasonable certainty which buyers were harmed." Aron Decl. ¶¶233-234.

number of showings; (iii) the number of offers; and (iv) the final sale price for the property." DX541.

Research by Zillow and consumer advocacy groups confirms the same. Sellers get less exposure when their listings are not on the MLS, leading to fewer potential buyers, less competition, and weaker offers. Sellers also need broad exposure to meaningfully gauge interest and determine the right price. Samuelson Decl. ¶31, Dkts. 51-4, 51-5, 51-7, 51-9, 51-10. Finally, Zillow will be harmed if forced to carry listings with which it disagrees, foreclosed from curating the best content for its platform, and forced to allow PLNs—such as Compass's 3PM—to freeride on Zillow's investments, thus degrading the customer experience and Zillow's ability to compete. *See* DX372 at '863. The erosion by private listings of a transparent, liquid market for home sale transactions will also impair Zillow's ability to serve customers across multiple business lines. DX657 ¶¶256–58; Wacksman Tr. 104:06–105:06.

## III.    LEGAL STANDARD

A preliminary injunction is a "drastic" remedy, and ordinarily requires a plaintiff to show that: (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent relief; (3) the balance of equities supports an injunction; and (4) an injunction is in the public interest. *New York v. United States Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020). Here, Compass's burden is higher, and requires "a strong showing of irreparable harm" and "a clear or substantial likelihood of success on the merits" for two reasons. *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

First, Compass seeks a disfavored "mandatory injunction," because it attempts to "alter the status quo by commanding [a] positive act." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). The status quo is "the last actual, peaceable uncontested status

which preceded the pending controversy." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Compass requests the Court force Zillow to display Compass' listings contrary to Zillow's mission, which threatens Zillow's First Amendment rights and abrogates its freedom to determine the content of its platform, altering the status quo. *See id.* (status quo between federation and league was not how federation last ranked the league, but federation's right to determine ranking); *see also infra* §IV.D.

Second, Compass's injunction seeks substantially all the relief sought in the litigation, which "cannot be undone" if Zillow prevails on the merits. *JTH Tax*, 62 F.4th at 667. "[I]f a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits," the heightened standard applies. *Tom Doherty Assocs.*, 60 F.3d at 34–35. Here, for the pendency of the ligation, Zillow's right to determine the messages that its platform conveys would be curtailed in violation of the First Amendment, *see infra* §IV.D, while the quality of its platform degrades and Compass freerides off Zillow's investments. Compl. ¶8. The effects of such an injunction are irreversible and irremediable. *Am. Patriot Express v. City of Glens Falls*, 474 F. Supp. 3d 508, 525 (N.D.N.Y. 2020) ("Violations of the First Amendment are presumed irreparable.").

While a heightened standard applies, Compass's PI Motion easily fails under the ordinary standard. Zillow therefore applies the ordinary standard *arguendo* in this brief.

## IV.    ARGUMENT

### A.    Compass Has Not Shown Irreparable Harm

Compass makes no "clear showing" that it will suffer an actual injury that cannot be remedied with monetary damages. *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) ("*Joseph's Health*") (summary order). "The

irreparable harm requirement is the single most important prerequisite" and "must therefore be satisfied before the other requirements … can be considered." *Id*.

Compass argues it will lose some competitive advantage and goodwill because the Standards have "led to a significant drop in 3PM usage." Br. 25–26. That cannot carry Compass's burden for three reasons. First, in this Circuit, harms caused by reduced adoption of an existing product "with a sales record" are irreparable only when the product "is essential to the life of [plaintiff's] business" or "increases business of the plaintiff beyond sales of that product." *See Tom Doherty Assocs.*, 60 F.3d at 38. Second, Compass has not shown that any of its claimed harms are "actual and imminent." *Joseph's Health*, 131 F.4th at 106. Third, Compass's claimed harms are self-inflicted and avoidable.

### 1.  3PM Is Not Essential and Does Not Increase Other Business

3PM is not essential to Compass's business and Compass concedes it will "continue[] to be successful" despite the Standards. Br. 29. *Cf. fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 146 (S.D.N.Y. 2024) (conduct would "precipitate [plaintiff's] imminent downfall").

Compass's representations to the market confirm that any impact on 3PM is immaterial. Its most recent financial results were the "strongest Q3 results" in its history. DX655 at 4. Likewise, Compass did not disclose or even discuss the Standards as a risk to its business or stock value when it agreed to acquire Anywhere. DX531 at 6–8. Nor has it disclosed to investors that the Standards could pose any risk to its business. Bhonsle Tr. 155:06–165:12; DX010 at 42; DX659 at 46–52. Compass cannot have it both ways: either the Standards will cause irreparable harm that it has not disclosed to investors or counterparties, or, more likely, there will be no such harm.

Further, while Compass now asserts a connection between 3PM and its website traffic, it previously disclaimed the existence of any evidence to support that connection. Compass's

verified interrogatory response attested it "did not forecast … future traffic to its home search platform that would flow from [3PM]." DX658 at 16. Compass cannot now claim a harm or causal link that it failed to disclose in discovery. *See* Fed. R. Civ. P. 37(c)(1); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296–97 (2d Cir. 2006) (affirming exclusion of undisclosed damages theory). Compass also offers no evidence of such a link or that it has made any substantial investment in making Compass.com a meaningful competitor to other major home search platforms. Reffkin Tr. 96:22–97:17; Bhonsle Tr. 192:13–197:20.

While Compass argues that any impact on competitive advantage or goodwill is irreparable harm, none of its cases support that position. *Norbrook Laboratories Ltd. v. G.C. Hanford Manufacturing Co.*, 126 F. App'x 507, 509 (2d Cir. 2005), is a trade secret case where a presumption of irreparable harm applies. *See Carpetmaster of Latham, Ltd. v. Dupont Flooring Sys., Inc.*, 12 F. Supp. 2d 257, 263 (N.D.N.Y. 1998). The court in *Reuters Ltd. v. United Press International, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990), relied on "uncontested testimony" that the plaintiff might lose *all* its customers, which Compass does not claim. Nor does this case involve misuse of Compass's data. *Cf. Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (defendant violated contractual terms relating to use of plaintiff's data). And *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000), applied the standard from *Tom Doherty Associates*, 60 F.3d at 27, which Compass cannot meet as shown above.

## 2.   Compass's Claimed Harms Are Speculative

Compass's claims of future loss of customers, agents, and website traffic are too speculative to support an injunction. *See JTH Tax*, 62 F.4th at 673 (plaintiff must present "actual evidence" that it "will suffer an injury that is neither remote nor speculative"); *In re Keurig*, 2014 WL 12778832, at *6 (S.D.N.Y. Sept. 19, 2014) (future decline in sales and goodwill too speculative), *aff'd*, 618 F. App'x 31 (2d Cir. 2015). Projections of future growth and lack of

  
harm undercut claims of irreparable harm. *See Keurig*, 2014 WL 12778832, at *7–8 (denying antitrust injunction where plaintiff projected sales growth). Here, a Compass executive projected on July 11 that "homeowners will choose to use [3PM] more over the coming months." DX027. And Compass tells investors that it will grow: Compass's most recent November 4 financial results show Compass is projecting year-over-year growth for Q4 while the Standards remain in effect. *Compare* DX614 at 5 (projecting $1.6-$1.7 billion in revenue for Q4 2025), *with* DX617 at 5 (reporting $1.4 billion in revenue for Q4 2024). The same goes for claimed loss of agents, as Compass projects future growth in its agent ranks, Bhonsle Tr. 82:11-83:11, and is ahead of its recruiting goals for the year. Golod Tr. 14:10–16:22; DX655 at 4 (Reffkin: Q3 2025 was "the best organic principal agent recruiting quarter in the company's history").[4]

### 3. Any Harm Is Self-Inflicted and Avoidable

Compass's alleged harms are self-inflicted and avoidable. "[I]f the harm complained of is self-inflicted, it does not qualify as irreparable" and "irreparable harm does not exist where alternatives are available." *Convergen Energy WI, LLC v. L'Anse Warden Elec. Co*., 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020). Compass tells its agents that 3PM complies with Zillow's Standards and induces them to sign-up sellers to that program, even as Compass executives' testimony and documents show that they know Zillow views 3PM listings as violating the Standards. Carr Tr. 33:22–37:22, 56:17–58:19; Alexander Tr. 123:03–25, 35:07–18; DX033; *see also supra* §III.E. The harms flowing from that duplicity are on Compass, not Zillow, and do not justify this Court's intervention.

---

[4] Compass cannot rely on harm to others to establish irreparable harm. *See Solus Alternative Asset Mgmt. LP v GSO Cap. Partners, L.P*., 2018 WL 620490, at *6 (S.D.N.Y. Jan. 29, 2018) (no "court has found irreparable injury based solely on public harm without any … irreparable harm to the plaintiff"); *Biocon Ltd. v. Abraxis Bioscience, Inc.*, 2016 WL 5817002, at *4 (S.D.N.Y. Sept. 26, 2016) ("Any potential harm to [parties] who are not plaintiffs in this action is not controlling").

### B.    Compass Cannot Show a Likelihood Of Success on the Merits

#### 1.    Compass Cannot Prevail on Its Section 1 Claim

Compass's Section 1 claim fails because there is no agreement between Zillow and Redfin to boycott Compass. Compass must show that Zillow and Redfin had "a conscious commitment to a common scheme designed to achieve an unlawful objective," *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015), i.e., to "restrain trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). Discovery has shown that Compass cannot establish any agreement. Compass is also wrong about the standard under which such a counterfactual agreement would be evaluated.

#### a.    There Was No Unlawful Agreement with Redfin

The evidence shows there is no agreement between Zillow and Redfin; instead, each independently decided to announce its standards. *See Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 906–07 (S.D.N.Y.) ("A lack of factual support is fatal to … conspiracy claims."), *aff'd*, 130 F.3d 1101 (2d Cir. 1997). Compass's brief mischaracterizes the record.

"Direct evidence in a Section 1 conspiracy must be … explicit and require[] no inferences to establish the proposition or conclusion being asserted." *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 319 (S.D.N.Y. 2023) (quotations omitted). The only direct evidence is that Zillow and Redfin did *not* agree to boycott Compass. Mr. Wacksman and Mr. Kelman each denied reaching any agreement. Kelman Tr. 166:02–167:11, 126:06–12; Wacksman Tr. 63:04–66:7. Mr. Kelman did not learn about the Standards until Zillow had already decided to announce them, and he independently decided to announce Redfin's listing policy after consulting with his colleagues and Compass. Kelman Tr. 161:13–162:03, 164:23–165:03, 168:16–169:05, 70:20–71:15. Redfin's subsequent decision to indefinitely delay implementation also undermines any agreement. *Id.* 74:18–75:12.

Documents that Compass misleadingly quotes are not direct evidence. Compass cites a March 14 message in which Mr. Wacksman noted that Redfin and Zillow were "culturally aligned" on their approach to NAR's Clear Cooperation Policy. PX006; Wacksman Tr. 74:15–75:23. But both CEOs confirmed they did not discuss Zillow's Standards or how the companies would respond to a CCP rule change, instead discussing NAR lobbying efforts as they pursued similar transparency goals. Wackman Tr. 69:18–71:15; Kelman Tr. 30:8–32:23. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████. DX200. Compass also attempts to paint as suspicious a call more than a month after Zillow's and Redfin's respective announcements, in which Mr. Kelman asked how Zillow would obtain listings from brokerages (such as Redfin), and Mr. Wacksman clarified that Zillow would continue obtaining listings from the MLS where possible. Wacksman Tr. 30:10–31:02; Kelman Tr. 100:11–101:01.

Lacking direct evidence, Compass relies on parallel conduct and "plus factors," Br. 13–14, but those at most can get a plaintiff past a motion to dismiss and do not prove a conspiracy.[5] Even to survive summary judgment, Compass must present evidence that "tends to exclude the possibility that the alleged conspirators acted independently," *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018).[6] This it cannot do, given Mr. Wacksman's and Mr. Kelman's testimony explaining why they each believe private listings are harmful to consumers and why they each independently wanted to maintain access to high quality listings. Kelman Tr. 128:13–130:10, 147:18–151:03; Wacksman Tr. 104:06–15, 123:18–124:06.

---

[5] *Starr v. Sony BMG Music Entertainment* is inapposite because the court addressed what a plaintiff must plead *to survive a motion to dismiss* and did not mention plus factors at all. 592 F.3d 314, 322 (2d Cir. 2010).

[6] Compass cannot show likelihood of success if its claims would not even survive summary judgment. *See N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 468 (E.D.N.Y. 2017) (denying PI where plaintiff failed to exclude the possibility of independent action).

Compass also cannot rely on the FTC's allegations regarding rental listings. Allegations of one conspiracy are not evidence of another conspiracy where "no prior judgment or guilty plea [has] established the existence" of the first conspiracy and there is no "direct, logical relationship" between the two. *See Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 449–50 (S.D.N.Y. 2014), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015) (quotations omitted). The FTC's allegations—which Zillow will vigorously defend against—relate to a separate market for multifamily rental listings in which Zillow and Redfin publicly announced their agreement to syndicate listings, and have no connection to a purported secret conspiracy in for-sale home search.

### b.    The Alleged Conspiracy with Redfin Is Not an Unlawful Restraint of Trade

Even if Compass could establish that Zillow and Redfin agreed to jointly implement listing standards to boycott Compass (and it cannot), Compass's claim still fails because Compass cannot establish an unlawful restraint of trade under a *per se*, quick look, or rule of reason theory.

As Zillow previously explained (Opp. 20–22), *per se* analysis is inappropriate "where the economic impact … is not immediately obvious," *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458–59 (1986), and reserved for boycotts with "no purpose other than disadvantaging the target," *Honey Bum, LLC, v. Fashion Nova, Inc.*, 63 F.4th 813, 820 (9th Cir. 2023). *See also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985) (identifying factors relevant to whether a group boycott is *per se* unlawful). Compass does not respond to that argument, and instead relies on a district court decision that is inconsistent with and predates the Supreme Court's seminal decisions in *Northwest Wholesale* and *Indiana Federation of Dentists*. Br. 14–15.

Compass's reliance on *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) ("*PLS*") is also misplaced. There, the Ninth Circuit found at the pleadings stage that an outdated version of CCP constituted a *per se* group boycott based on allegations that the defendants jointly coerced agents not to supply listings to the plaintiff. *See id.* at 831, 834–35. But Compass has not alleged that Zillow and Redfin jointly coerced any agent or seller not to supply listings to Compass, and cannot prove that the number of listings, agents, or users on Compass's website has decreased. DX657 ¶¶237–41; Aron Tr. 55:08–57:19, 58:19–62:04. Indeed, Compass concedes that listings rejected by Zillow remain available on Compass.com and other websites, including Redfin and eXp. Reffkin Tr. 122:22–123:20, 128:09–129:05, 126:17–23; DX658 at 8–10 (identifying no listings removed anywhere other than Zillow).

Nor will Compass's claims survive quick look or rule-of-reason analysis. Compass does not dispute Zillow's argument, Opp. 20, that quick look only applies to plainly anticompetitive agreements that require a mere "cursory examination" to condemn them. *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n.3 (2006). And Compass's rule-of-reason analysis fails for the same reasons as its Section 2 claim, discussed below.

## 2. Compass Cannot Prevail on Its Section 2 Claim

Compass fails its burden to establish each element of its Section 2 claim: that Zillow (1) has monopoly power in (2) a relevant market, and (3) maintained that power through "anticompetitive conduct." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014), *as corrected* (June 19, 2014) ("*Adderall*"). To show anticompetitive conduct, Compass must prove (a) conduct that has no "legitimate business purpose [and] makes sense only because it eliminates competition," *id.*; and (b) that Zillow's procompetitive justifications for the conduct are pretextual or "could have been achieved through less restrictive means," *N. Am. Soccer League*, 883 F.3d at 42. Compass fails every element. But the Court can reject the Section 2

claim outright without substantially engaging in the facts because the alleged anticompetitive conduct is insufficient as a matter of law.

### a.    Compass's Section 2 Claim Fails as a Matter of Law Because Zillow Has No Duty to Deal with Compass

Compass's Section 2 claim rests on false assumptions: that Zillow is a monopolist in home search, that Compass is a competitive threat in home search, and that Zillow intended to maintain its monopoly and block a rival home search platform. *See infra* §IV.B.2.b-e.

Even taking those assumptions as true, Compass's claim fails as a matter of law because it rests on Zillow's refusal to deal with an alleged rival—Compass—on the rival's preferred terms. An alleged monopolist has no duty to deal with an alleged rival on *any* terms. The law is clear in this Circuit that the *only* exception is when a plaintiff can show *Aspen Skiing* factors, which Compass has not even tried to do.

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the … conditions of that dealing." *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Thus, "there is no [general] duty to aid competitors." *Trinko*, 540 U.S. at 411; *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600 (1985) ("even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor"). And "a defendant with no antitrust duty to deal with its rivals has no duty to deal under the terms and conditions preferred by those rivals." *linkLine*, 555 U.S. at 457; *see also Trinko*, 540 U.S. at 407–08 (explaining rationale for rule); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.) (same).

Compass claims it is trying to compete with Zillow in home search by developing an exclusive inventory of hidden listings to attract consumers to Compass's site over Zillow's (and other websites), but claims to require access to Zillow's website because Compass will attract

sufficient listings only if it may later display stale failed listings on Zillow. *See* Compl. ¶¶8, 43, 72, 91, 105. For supposed anticompetitive conduct, Compass points to Zillow's refusal to carry Compass's listings after they have been selectively marketed. *See id.* ¶¶43–44, 119–20. This falls squarely within the refusing-a-rival precedent of *Trinko*, and the Second Circuit and others have repeatedly rejected similar claims. *See, e.g.*, *Adderall*, 754 F.3d at 134–35 (reduced supply of drug to competitor unactionable); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) ("refusing to sell competitors" parts and tools unactionable); *see also New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) (argument that Facebook as "a dominant firm must lend its facilities to its potential competitors" runs into *Trinko*).

In this Circuit, "the *sole* exception to the broad right of a firm to refuse to deal with its competitors" is set forth in *Aspen Skiing*. *Elevator Trust Litig.*, 502 F.3d at 52–53; *see also Adderall*, 854 F.3d at 134. To satisfy that exception, the plaintiff must show (1) termination of a preexisting, voluntary, and presumably profitable course of dealing with the rival, that (2) suggests a willingness to forsake short-term profits to achieve an anticompetitive end. *Trinko*, 540 U.S. at 409. Compass does not even try to show this, and its expert disclaimed any such analysis. Aron Tr. 47:15–49:1. While Zillow has long carried Compass listings that are transparently marketed to everyone, Zillow developed its Standards in response to the introduction by Compass and others of private listing marketing schemes that withhold significant numbers of previously marketed listings until they are stale. Compl. ¶72. Zillow has publicly opposed these schemes from the outset, lobbying to have them curtailed by NAR and the MLSs and, when that failed in March, taking steps itself in April to protect consumers and its own platform. And there is no evidence that carrying brokerages' stale listings is profitable to Zillow, or that Zillow's Standards have cost it short-term profit. On the contrary, the evidence

shows that proliferation of these hidden listing schemes is harmful to consumers and Zillow. *See supra* §§A.1, B. This is not remotely a circumstance where Zillow's refusal is "irrational but for its anticompetitive effect," *Novell*, 731 F.3d at 1075, or lacking "a legitimate business reason," *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 126 (2d Cir. 2007).

Because it cannot meet the standard for refusal to deal with a *rival*, Compass turns to inapposite cases where an alleged monopolist placed anticompetitive restraints in its deals with its *customers*, which prevented a rival from competing.[7] *See, e.g.*, *United States v. Google LLC*, 778 F. Supp. 3d 797, 866 (E.D. Va. 2025) (explaining distinction). In that context, courts have found additional exceptions to the general no-duty-to-deal rule—such as tying arrangements, exclusive dealing, and predatory pricing. *See, e.g.*, *id.*; *Novell*, 731 F.3d at 1072-73. None of those cases or exceptions apply here. In *Lorain Journal Co. v. United States*, a newspaper imposed exclusivity by refusing to carry advertisements for customers that also advertised with an upstart radio station. 342 U.S. 143, 147–79 (1951). Zillow has not sought exclusivity, but the opposite; Zillow has insisted that listings must be shared with *everyone* to be displayed on Zillow. *See Meta*, 66 F.4th at 304 (policy limiting what can be done on firm's own site, and leaves customers "entirely free" to work with competitors, not analogous to *Lorain Journal*). Compass's other cases are similarly inapposite. *See Google*, 778 F. Supp. 3d at 867 (tying in customer deals); *CoStar Grp., Inc. v. Com. Real Estate Exch., Inc.*, 141 F.4th 1075, 1082, 1090 (9th Cir. 2025) (customers constrained by exclusive deals and technological barriers); *FTC v. Amazon.com, Inc.*, 2024 WL 4448815 (W.D. Wash. Sept. 30, 2024) (prohibiting or deterring customers from offering lower prices through competitor); *United States v. Apple, Inc.*, 2025 WL

---

[7] That Compass is a customer or supplier of leads to Zillow, as well as a putative competitor, does not matter. In *Trinko* and *linkLine*, the plaintiff sought wholesale services from the defendant in order to compete with the defendant in the retail market. *See linkLine*, 555 U.S. at 449–50.

1829127 (D.N.J. June 30, 2025) (contractual and technological limitations on developer customers).

Finally, Compass cannot play at semantics by "trying to recast [Zillow's] conduct as an 'affirmative' act of interference with a rival rather than a 'unilateral' refusal to deal." *Novell*, 731 F.3d at 1078. That argument could be made "in almost *any* case where a monopolist first shares and then withdraws its property—as in *Aspen* and *Trinko*"; indeed, "[t]hat's the whole reason why competitors sue for refusals to deal—because they now have to incur costs associated with doing business another firm previously helped subsidize." *Id.* at 1079. Whether styled as a refusal to deal or withdrawal of assistance, the *Aspen/Trinko* framework applies, *id.*, and Compass fails it.

### b.    Compass Has Not Shown Any Harm to Competition

Compass has not established that the Standards harm competition in online home search. "Anticompetitive effects in a relevant market may be shown through direct evidence of output reductions, increased prices, or reduced quality in the relevant market." *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 118 (2d Cir. 2021) (per curiam). Direct evidence must be "empirical" and not "theoretical and anecdotal." *Id.* Compass offers no empirical analysis of competitive harm.

Compass points to Zillow's October 13, 2025 blog post, which states that 90% of the 821 real estate agents who received a warning notice from Zillow—out of over one million U.S. agents—did not receive another. Br. 1, 26. This at most shows that Zillow affects how some agents consider the pros and cons of anti-consumer private marketing as a brokerage strategy. It does not show that any home search platform has fewer listings or website visitors, or that home search has gotten worse for any consumers. The thousands of agents who chose to publicly

market their listings, and thus did not receive notices, may have collectively increased output. Compass only has speculation, not evidence of harm to competition.

### c.    Compass Has Not Carried its Burden to Rebut Zillow's Procompetitive Rationales

Compass has no legitimate answer to Zillow's arguments, Opp. 17–18, that the Standards advance multiple procompetitive objectives, including reducing freeriding and improving the customer experience and Zillow's platform quality. Br. 23–24; DX657 ¶¶108–28; PX001 at '114. Once the defendant has proffered procompetitive rationales, the burden shifts to the plaintiff to show that the rationales are pretextual or "could have been achieved through less restrictive means." *N. Am. Soccer League*, 883 F.3d at 42. The failure to rebut procompetitive justifications is fatal to a preliminary injunction. *See id.* at 45 (affirming denial of preliminary injunction where plaintiff failed to demonstrate less restrictive alternatives). Compass dismissively labels Zillow's procompetitive rationales as "irrelevant" and "pretextual," but cites no evidence nor offers any less restrictive alternative. Compass has utterly failed to meet its burdens under Section 2.

*Procompetitive Rationales Are Not Irrelevant*. Compass's contention that Zillow's rationales are "irrelevant," Br. 23, is not supported by any of the cases it cites, none of which excuse it from the burden of rebutting procompetitive rationales.

*No Evidence of Pretext*. Compass asserts that Zillow's rationales are pretextual, but the Complaint confirms that the Standards protect Zillow's legitimate business interests: "If Compass continues to scale its [3PM], then Zillow in turn will not have access to Compass's (and other brokerages') newest and most in-demand listings. … Zillow thus fears it will be relegated to listing 'stale bread.'" Compl. ¶72. Thus, Zillow created the Standards "to protect Zillow's … listing supply chain[]." *Id.* ¶115. These allegations in the Complaint "are judicial

admissions" that bind Compass; it cannot now pretend that the Standards do not advance Zillow's interests merely by proclaiming pretext. *See Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003); *see also Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 191 (2d Cir. 1992) (rejecting pretext where plaintiff acknowledged defendant preserved its business interests).

Indeed, the Standards advance "competition on the merits" such as "greater efficiency or enhanced consumer appeal." *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001). Zillow sought to maintain a reliable, high-quality supply of listings, and was concerned that a fragmented market would frustrate Zillow's ability to obtain listings, harming its platform quality. Wacksman Tr. 104:06–105:06; DX576 at '650; DX319 at '441–42; DX591 at '030.

*Compass Has Failed to Offer Any Less Restrictive Alternatives*. In this Circuit, the plaintiff "must show that a less restrictive alternative exists that achieves the same legitimate competitive benefits." *1-800 Contacts*, 1 F.4th at 120–21. Compass does not discuss—much less prove—any less restrictive means to accomplish Zillow's procompetitive objectives. Compass thus fails to meet its burden.

### d.    Compass Has Not Established That a Nationwide Market Is Appropriate

Compass is wrong that the geographic market is national, Br. 20, because it ignores contrary evidence that consumers' ability to move between search platforms is constrained by local market forces. "[T]he geographic market analysis seeks to identify the precise geographic boundaries of effective competition … by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52–53 (2d Cir. 2016) (citations omitted) (affirming dismissal). The failure to prove a valid market is fatal to a Section 2 claim. *Id*. at 52, 55.

Whether Zillow offers the same app nationwide does not answer the relevant question. Consumers overwhelmingly look for homes in some local region, not across the nation, so their search options are constrained to the services that display listings in the region they are interested in. DX657 ¶¶142–45; Wacksman Decl. ¶4; Samuelson Decl. ¶18. For example, Compass does not operate in and does not display listings from over 300 out of the country's 500 MLSs. DX657 ¶157. Consumers cannot reasonably turn to Compass to find a home in regions Compass does not support. Its executives also admit that the country's 500 MLSs operate differently, which restricts Compass's ability to implement 3PM nationwide irrespective of the Standards. *See* Alexander Tr. 103:25–105:18; Golod Tr. 63:22–64:13; DX094. Local MLS rules also affect how Zillow implements the Standards in each region. Wacksman Tr. 155:10–163:09. Compass's alleged nationwide market ignores these deficiencies.

### e.    Compass Has Not Established That Zillow Has Monopoly Power in the Alleged Market

Compass's claim that Zillow has monopoly power in online home search distorts the law and facts. "Monopoly power is the power to control prices or exclude competition. It can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). Compass has neither.

*No Direct Evidence.* Compass has no relevant direct evidence of market power. DX657 ¶¶162–69; Aron Tr. 223:25–227:14. Compass relies primarily on Zillow's October 13 blog post, but it does not show that *any* online home search provider has raised prices or reduced output. *See supra* §II.B. Rather, the evidence shows that other platforms respond to any perceived degradation of Zillow's platform with fierce competition. DX388; Kelman Tr. 215:23–217:15.

Tellingly, Compass neither claims nor proves that any platform has experienced decreased listings, traffic, or transactions.

That some Zillow employees used business jargon to refer to its strategy as a mix of "carrots and sticks" or pondered "hardline tactics" in response to the rise of PLNs and hidden listings does not show monopoly power. "[C]ompetition is the process of trying to prevail over rivals…. [and] [a]n aggressive state of mind is fully consistent with antitrust objectives when the behavior is proper." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1506 (2025). Indeed, "[e]ven an act of pure malice by one business competitor against another"—which Compass does not allege—"does not, without more, state a claim under the federal antitrust laws." *Microsoft*, 253 F.3d at 58.

*No Indirect Evidence.* Compass's indirect evidence is also insufficient. In this Circuit, "market share alone cannot conclusively establish monopoly power," *In re Payment Card*, 729 F. Supp. 3d 298, 322 (E.D.N.Y. 2024) (cleaned up), and "[a]bsent additional evidence … a 64 percent market share is insufficient." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002). Compass's reliance on a purported 66% market share (which itself is highly unreliable, *see supra* §II.D) is legally unsound.

Compass also claims barriers to entry but cites no evidence that entry has been curtailed. To the contrary, barriers are low because listings are widely available. *See supra* §II.D. Moreover, "unrebutted evidence that actual competitors have entered the market is a strong indicator that [the defendant] lacks market power." *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 904 (S.D.N.Y.), *aff'd*, 130 F.3d 1101 (2d Cir. 1997). Compass trivializes Homes.com as a failure, Br. 22, but does not dispute that Homes.com entered the market less than five years ago and has grown to capture a nearly 20% audience share, inconsistent with Compass's claim

that Zillow holds monopoly power. Kelman Tr. 219:02–18; DX657 ¶¶197–98. Compass's anecdotal evidence about Zillow's purported importance are also contradicted by its admissions that Compass has solved for the benefits that Zillow provides, Golod Tr. 83:01–87:16, and that agents do not need Zillow to sell homes. DX621 at '554; DX620; DX602 at '469; DX619.

### 3.    Compass Lacks Antitrust Standing

Compass does not rebut Zillow's argument, Opp. 22–24, that it lacks antitrust standing and thus "effectively concedes the argument[]." *Chung v. Royal Care, Inc.*, 2025 WL 1029432, at *10 (E.D.N.Y. Jan. 8, 2025) (cleaned up). "[A]n antitrust plaintiff must demonstrate that it has 'antitrust standing,'" *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019), and show that it suffered "antitrust injury," meaning a harm to competition rather than a harm to itself. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Compass cannot.

First, Compass's alleged harms from reduced adoption of 3PM are not cognizable because "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016). Dr. Aron concedes that 3PM exists in a market for brokerage services, not online home search. Aron Tr. 67:22–68:06; Aron Decl. ¶41. Compass offers no evidence that reduced adoption of 3PM affects Compass *as a home search competitor*, such as through fewer listings or reduced website traffic.

Second, Compass has not shown "market-wide harm" to competition rather than harm to itself. *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *7 (S.D.N.Y. Mar. 31, 2021). "[I]dentif[ying] the anticipated anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges," it is clear that Compass has no evidence

that the Standards have actually reduced competition or degraded the quality of services for consumers in home search. *Port Dock*, 507 F.3d at 122; Reffkin Tr. 122:19–125:10.

### C. Consumers Will Be Harmed By An Injunction

Compass does not seriously dispute that 3PM increases barriers to information and leads to a less liquid, less transparent real estate market. *See supra* §II.F. Studies show that reduced transparency imposes real harm on buyers and sellers. Samuelson Decl. ¶31; Dkts. 51-4–51-13; DX657 ¶¶253–55. Even Compass's own agent agreed that reduced transparency harms buyers. Carr Tr. 8:15–13:01. That multiple disinterested parties agree that private listings are bad for consumers undermines any showing that the public interest favors Compass. *See* Opp. 28.

### D. Zillow's First Amendment Rights and Platform Will be Harmed By an Injunction

Zillow's Standards reflect a message that "everyone deserves fair access to real estate information," DX100, and Zillow's decisions to curate "the third-party speech that will be included in or excluded" from its platform "is expressive activity of its own." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). An injunction that "restrict[s] [d]efendant's constitutionally protected speech causes the balance of hardships to favor [d]efendant." *Mason v. Jews for Jesus*, 2006 WL 3230279, at *5 (S.D.N.Y. Nov. 8, 2006). Here, enjoining the Standards would force Zillow to "accommodate messages it would prefer to exclude" and "overrid[e] [its] expressive choices," which "confronts the First Amendment." *Moody*, 603 U.S. at 731–32; *see also Person v. N.Y. Post Corp.*, 427 F. Supp. 1297 (E.D.N.Y. 1977) (denying antitrust PI where defendant refused to publish plaintiff's content), *aff'd*, 573 F.2d 1294 (2d Cir. 1977).

Compass does not dispute that forced sharing of Zillow's investments will also reduce Zillow's incentives to innovate, harming Zillow and its customers. *See* Br. 29; Samuelson Decl.

¶¶33–35. And an injunction would put the Court into the improper role of central planner, and require countless judgments about how Zillow runs its business as this case proceeds.

## V.     CONCLUSION

Accordingly, Compass's PI Motion should be denied.

Dated: November 12, 2025                    Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*s/ Beau W. Buffier*
Beau W. Buffier (NY Bar No. 3932050)
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: bbuffier@wsgr.com

Bonnie Lau (admitted *pro hac vice*)
One Market Plaza, Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
Email: blau@wsgr.com

Eric P. Tuttle (admitted *pro hac vice*)
Nicholas R. Sidney (admitted *pro hac vice*)
701 Fifth Avenue, Suite 5100
Seattle, Washington 98104
Telephone: (206) 883-2500
Facsimile: (866) 974-7329
Email: eric.tuttle@wsgr.com
Email: nsidney@wsgr.com

*Counsel for Defendants Zillow, Inc., Zillow
Group, Inc., and Trulia, LLC*

**WORD COUNT CERTIFICATION PURSUANT TO**
**LOCAL RULE 7.1(c) AND INDIVIDUAL RULE 5.A**

Pursuant to Southern District of New York Local Rule 7.1(c) and Rule 5.A of this Court's Individual Rules and Practices in Civil Cases, I hereby certify that the above memorandum is 10,000 words.

s/ *Beau W. Buffier*
Beau W. Buffier