# EXHIBIT I

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2

3  COMPASS, INC.,                    )
                                     )
4                  Plaintiff,        )
                                     )
5  vs.                               )  Cause No.
                                     )  1:25-cv-05201-JAV
6                                    )
   ZILLOW, INC., ZILLOW GROUP,       )
7  INC., and TRULIA, LLC,            )
                                     )
8                  Defendants.       )

9

10

11

12        VIDEOTAPED DEPOSITION OF DEBRA ARON, Ph.D.

13            TAKEN ON BEHALF OF DEFENDANTS

14                 OCTOBER 22, 2025

15

16              --HIGHLY CONFIDENTIAL--

17              --COUNSELS' EYES ONLY--

18

19

20

21

22

23

24        Reported by Celena D. Davis, RPR, CSR

25

| | | |
|---|---|---|
| 10:12:47 | 1 | is saying here too.  It's new inventory to the platform, |
| 10:12:52 | 2 | and that's when it gets the most attention because when |
| 10:12:56 | 3 | a new shoe drops, when a new album comes out, when a new |
| 10:13:01 | 4 | product is for sale, that's what people want to see. |
| 10:13:04 | 5 | So when it's new to the platform, it will |
| 10:13:07 | 6 | draw attention, and that's what Zillow's study showed. |
| 10:13:10 | 7 | Q.   So your testimony is that no matter if a |
| 10:13:12 | 8 | listing has been premarketed on platforms other than |
| 10:13:16 | 9 | Zillow for months, the minute that it hits Zillow, it's |
| 10:13:21 | 10 | of the same value as a brand-new listing that's never |
| 10:13:25 | 11 | been marketed on any platform before? |
| 10:13:28 | 12 | MS. NAMIRI-KALANTARI:  Objection. |
| 10:13:28 | 13 | A.   There's nothing in the analysis conducted |
| 10:13:36 | 14 | that would lead to any different answer. |
| 10:13:42 | 15 | MR. BUFFIER:  Why don't we take a break. |
| 10:13:45 | 16 | VIDEOGRAPHER:  Ending Media 1 of the |
| 10:13:47 | 17 | deposition of Dr. Aron.  Off the record at 10:13 a.m. |
| 10:14:15 | 18 | (A break was taken.) |
| 10:29:21 | 19 | VIDEOGRAPHER:  Beginning Media 2 of the |
| 10:29:23 | 20 | deposition of Dr. Debra Aron.  We are back on the record |
| 10:29:26 | 21 | at 10:29 a.m. |
| 10:29:28 | 22 | BY MR. BUFFIER: |
| 10:29:29 | 23 | Q.   Dr. Aron, as an antitrust economist, are |
| 10:29:32 | 24 | you familiar with the concept of a unilateral refusal to |
| 10:29:37 | 25 | deal by a dominant firm? |

COMPASS, INC. v
ZILLOW, INC.

Highly Confidential

Debra Aron. Ph.D.
October 22, 2025

47

10:29:39    1        A.    I'm familiar with that concept.

10:29:50    2        Q.    And have you testified in any cases

10:29:54    3    involving an alleged unilateral refusal to deal?

10:29:58    4        A.    Not an antitrust litigation.

10:30:09    5        Q.    You have testified in telecom-related

10:30:22    6    matters involving unilateral refusals to deal; is that

10:30:27    7    right?

10:30:27    8        A.    Involving very similar concepts, you know,

10:30:35    9    they weren't brought under antitrust laws but under --

10:30:38    10    in the context of regulatory proceedings.

10:30:42    11            The issues in the early days of the

10:30:45    12    Telecommunications Act of 1996 involved disputes about

10:30:49    13    what competitive telephone companies would be allowed to

10:30:53    14    access from the incumbents.

10:30:57    15        Q.    In your opinion, is this case about a

10:31:00    16    unilateral refusal to deal?

10:31:02    17        A.    No, it hasn't been brought as a refusal to

10:31:06    18    deal or unilateral refusal to deal, and I don't see it

10:31:14    19    that way, no.

10:31:15    20        Q.    Why not?

10:31:18    21        A.    Well, a couple of reasons.  One is that in

10:31:36    22    this case, the alleged conduct -- the alleged

10:31:41    23    anticompetitive conduct is -- is ruled by the company

10:31:52    24    with market power in the relevant antitrust market that

10:32:00    25    is intended and has the effect of modifying to the

48

10:32:09  1  benefit of the company with market power other

10:32:19  2  companies' conduct off of the relevant assets that

10:32:32  3  are -- you -- I think would be considered the

10:32:37  4  refusal-to-deal assets.

10:32:40  5          So in other words, the listing access

10:32:49  6  standards are intended and have the effect of affecting

10:32:57  7  the conduct of competitors in the marketplace on their

10:33:07  8  own platforms.  So that's -- that's one.

10:33:16  9          The other is really, you know, I think what

10:33:19  10  this is about is not a refusal to deal but a forced

10:33:30  11  deal.  It's like what Zillow is achieving through the

10:33:36  12  listing access standards, because of its market power,

10:33:42  13  is requiring the originators and owners of the listings

10:33:52  14  that Zillow monetizes -- that's its business model -- to

10:33:57  15  provide those listings throughout their marketing life

10:34:10  16  cycle rather than leaving some measure of control of

10:34:17  17  those listings to their owners.

10:34:19  18      Q.   Are you familiar with the concept of a duty

10:34:22  19  to deal?

10:34:23  20      A.   Well, I think it's part of the concept of

10:34:28  21  refusal to deal.

10:34:30  22      Q.   Okay.  And is it your opinion that Zillow

10:34:33  23  has a duty to carry all the listings of its competitors?

10:34:42  24          MS. NAMIRI-KALANTARI:  Objection.

10:34:43  25      A.   I didn't analyze this case as a

49

| | |
|---|---|
| 10:34:45 | 1 refusal-to-deal or as a duty-to-deal case. |
| 10:34:48 | 2        The way I analyzed it was there's a rule |
| 10:34:54 | 3 being implemented by Zillow.  It has an effect on its |
| 10:35:00 | 4 competitors in the online home search platform market |
| 10:35:07 | 5 because of its -- Zillow's market power and only because |
| 10:35:12 | 6 of Zillow's market power. |
| 10:35:13 | 7        And as a result of that effect, those |
| 10:35:22 | 8 competitors are unable to execute their preferred |
| 10:35:28 | 9 strategy by which they could differentiate themselves in |
| 10:35:33 | 10 the online home search platform market from Zillow, |
| 10:35:36 | 11 thereby impeding their ability to compete.  That's my |
| 10:35:43 | 12 analysis. |
| 10:35:43 | 13 BY MR. BUFFIER: |
| 10:35:43 | 14        Q.   Well, I didn't ask about your analysis. |
| 10:35:46 | 15        I asked:  Sitting here today, is it your |
| 10:35:50 | 16 opinion that Zillow has a duty to carry all the listings |
| 10:35:53 | 17 of its competitors? |
| 10:35:57 | 18        MS. NAMIRI-KALANTARI:  Objection. |
| 10:35:58 | 19        A.   And the answer I started with was I have |
| 10:36:03 | 20 not analyzed the case that way, so I haven't reached an |
| 10:36:07 | 21 opinion on that question. |
| 10:36:08 | 22 BY MR. BUFFIER: |
| 10:36:08 | 23        Q.   So sitting here today, you don't have an |
| 10:36:10 | 24 opinion on that issue? |
| 10:36:12 | 25        A.   Correct, subject to my explanation of how I |

50

| | | |
|---|---|---|
| 10:36:14 | 1 | did analyze the case. |
| 10:36:16 | 2 | Q.   What is your understanding of the purpose |
| 10:36:18 | 3 | of the antitrust laws? |
| 10:36:22 | 4 | MS. NAMIRI-KALANTARI:   Objection. |
| 10:36:24 | 5 | MR. BUFFIER:   What's -- Counsel, what is |
| 10:36:25 | 6 | the basis for the objection? |
| 10:36:27 | 7 | MS. NAMIRI-KALANTARI:   Okay, I'll withdraw |
| 10:36:28 | 8 | that objection. |
| 10:36:29 | 9 | MR. BUFFIER:   Thank you. |
| 10:36:31 | 10 | BY MR. BUFFIER: |
| 10:36:31 | 11 | Q.   You may answer. |
| 10:36:33 | 12 | A.   Purpose of the antitrust laws is to protect |
| 10:36:41 | 13 | markets from anticompetitive conduct in order to advance |
| 10:36:46 | 14 | the interests of consumers and the marketplace. |
| 10:36:54 | 15 | Q.   And does the antitrust laws -- strike that. |
| 10:36:58 | 16 | Do the antitrust laws protect individual |
| 10:37:00 | 17 | competitors? |
| 10:37:01 | 18 | A.   That's not their intent, no. |
| 10:37:05 | 19 | Q.   From an economic perspective, what does |
| 10:37:11 | 20 | Section 2 of the Sherman Act prohibit? |
| 10:37:14 | 21 | A.   I am not a lawyer and I'm -- I can't give |
| 10:37:18 | 22 | you a legal opinion, nor can I give you an exhaustive |
| 10:37:27 | 23 | answer. |
| 10:37:27 | 24 | But one thing that Section 2 addresses is |
| 10:37:38 | 25 | conduct by which a company with market power attempts to |

54

| | | |
|---|---|---|
| 10:44:57 | 1 | Companies like Compass and not just |
| 10:45:00 | 2 | Compass, companies that are brokerages, you can think of |
| 10:45:04 | 3 | as listing factories.  That's where the listings are |
| 10:45:07 | 4 | made for the industry. |
| 10:45:09 | 5 | And Compass and others have reached the |
| 10:45:15 | 6 | conclusion that an effective strategy is to take |
| 10:45:26 | 7 | advantage of that specialized asset that they have in |
| 10:45:28 | 8 | order to differentiate the strategy from Zillow.  And |
| 10:45:31 | 9 | that's a very classical competitive strategy that we |
| 10:45:36 | 10 | teach in competitive strategy cases. |
| 10:45:39 | 11 | And the value to consumers is a topic that |
| 10:45:45 | 12 | I address extensively in my report.  It's the value to |
| 10:45:55 | 13 | buyers and sellers of the opportunity to use not just a |
| 10:46:05 | 14 | single strategy of listing of marketing and listing on |
| 10:46:12 | 15 | internet platforms like Zillow, but to use both Phase 1 |
| 10:46:19 | 16 | and/or Phase 2 of the 3-phased marketing plan, which |
| 10:46:23 | 17 | exposes those properties to consumers in a different way |
| 10:46:30 | 18 | that demonstrably some consumers find valuable. |
| 10:46:36 | 19 | Q.   Did you measure what proportion of |
| 10:46:38 | 20 | consumers would find those strategies valuable? |
| 10:46:41 | 21 | A.   I did not measure that.  I examined the |
| 10:46:47 | 22 | record for evidence of that.  And the evidence is |
| 10:46:57 | 23 | that -- and I report this in my declaration -- at the |
| 10:47:07 | 24 | peak of the 3-phased marketing program before the |
| 10:47:13 | 25 | listing access standards and the threats of banning from |

10:47:19  1  Zillow, something on the order of 38 percent of Compass

10:47:28  2  listings were in the 3-phased marketing program.

10:47:34  3          And I take that to mean that a significant

10:47:39  4  proportion of customers found that option to be of value

10:47:47  5  to them.  That's a choice that the seller makes; it's

10:47:52  6  not a choice that the agent makes.  And those sellers

10:47:58  7  found that to be of value to them.

10:48:01  8          Q.   Do you provide any evidence in your report

10:48:14  9  that Zillow's listing access standards have raised

10:48:21  10  prices to consumers?

10:48:23  11         A.   I think it's important to understand that

10:48:50  12  in this market, just as a first matter, the price of a

10:49:01  13  property is not a determinative metric of consumer

10:49:11  14  welfare, because in a real estate transaction, there are

10:49:16  15  a number of factors that affect consumer welfare.  One

10:49:24  16  is the price; another is the speed of the transaction;

10:49:28  17  and another is the quality of the match.

10:49:32  18         And so what the literature in the

10:49:35  19  professional scholarly work looks at are all of those

10:49:42  20  factors for determining consumer welfare as a function

10:49:48  21  of different marketing approaches in the real estate

10:49:54  22  industry.

10:49:56  23         So with that preamble, I would say that the

10:50:01  24  second point is the ability to measure the effect of the

10:50:11  25  listing access standards on home prices.  I don't know

COMPASS, INC. v
ZILLOW, INC.                    Highly Confidential

Debra Aron. Ph.D.
October 22, 2025

56

10:50:15  1  that it's been -- in the marketplace, the listing access

10:50:21  2  standards have been in the marketplace long enough to --

10:50:24  3  that one could do such a study.  So I don't present any,

10:50:28  4  especially in a world in which the listing access

10:50:32  5  standards are and have been either not enforced or in --

10:50:39  6  completely enforced during most of the period in

10:50:44  7  which -- since they've been announced.

10:50:46  8         Q.   So you said in a real estate transaction,

10:50:48  9  there are a number of factors that affect consumer

10:50:51  10  welfare:  One is the price, another is the speed of the

10:50:54  11  transaction, and another is the quality of the match.

10:50:57  12         Where in your report do you provide any

10:51:01  13  evidence that the listing access standards have affected

10:51:04  14  any of those metrics of consumer welfare that you

10:51:06  15  listed?

10:51:07  16         MS. NAMIRI-KALANTARI:  Objection.

10:51:08  17         A.   Well, I provide multiple bits of evidence

10:51:21  18  that the 3-phased marketing plan has been found to be

10:51:28  19  valuable to buyers and sellers for a variety of reasons

10:51:37  20  in a variety of scenarios, including scenarios where,

10:51:44  21  you know, it's an elderly person who needs to sell a

10:51:51  22  home and would prefer to not have to fix it up for the

10:51:58  23  marketplace, incur those expenses in that time, or when

10:52:03  24  there are other factors that make timing of great

10:52:11  25  importance to the seller.

57

10:52:13   1           You know, there's a whole variety of

10:52:15   2   anecdotes and scenarios in which 3-phased marketing is

10:52:21   3   valuable for different reasons to buyers and/or sellers.

10:52:21   4   So that's one piece of it.

10:52:27   5           And then --

10:52:27   6   BY MR. BUFFIER:

10:52:28   7       Q.   But none of those --

10:52:28   8       A.   I didn't finish.  I'm sorry.

10:52:30   9       Q.   Go ahead.

10:52:31  10       A.   The other piece of it is the evidence that

10:52:33  11   the listing access standards have been coincident with

10:52:39  12   and according to the -- the narrative testimony or the

10:52:47  13   narrative evidence has caused a decline in the use of

10:52:53  14   the 3-phased marketing plan.

10:52:56  15           So those two pieces together demonstrate

10:53:00  16   that the listing access standards, by reducing the

10:53:07  17   adoption of the 3-phased marketing plan and its

10:53:13  18   different components, has harmed consumers who would

10:53:20  19   otherwise have liked to use it.

10:53:21  20       Q.   And is it your opinion that that is

10:53:24  21   sufficient evidence of market-wide harm to consumers?

10:53:28  22           MS. NAMIRI-KALANTARI:  Objection.

10:53:29  23       A.   Yes.  I think that given the evidence in

10:53:40  24   this expedited proceeding, that is good evidence that

10:53:52  25   consumers are finding value in the Private Exclusive

COMPASS, INC. v
ZILLOW, INC.                    Highly Confidential                    Debra Aron. Ph.D.
October 22, 2025

58

10:54:01   1  approach and/or the Coming Soon phase of 3-phased

10:54:07   2  marketing plan.  There are many examples and

10:54:12   3  descriptions of why people might value that, given their

10:54:21   4  property and their lives.

10:54:22   5        And there is evidence that agents are

10:54:31   6  reluctant to recommend it to their clients that they

10:54:39   7  think would otherwise benefit from it, and they're

10:54:43   8  reluctant because of the listing access standards.

10:54:54   9        I think -- I think Mr. Reffkin testified

10:54:56  10  that agents are terrified of it.  I think agents have

10:54:59  11  reported that they are reluctant to recommend it to

10:55:02  12  their clients.  They have a fiduciary responsibility to

10:55:05  13  their clients, and they want to and are required to do

10:55:07  14  what's best for their clients.  And under the

10:55:11  15  circumstance of the Zillow listing access standards,

10:55:15  16  they -- many have reported that they aren't comfortable

10:55:19  17  doing that.

10:55:19  18  BY MR. BUFFIER:

10:55:20  19      Q.   Where in your report do you provide any

10:55:22  20  evidence that Zillow's listing access standards reduce

10:55:25  21  market output?

10:55:25  22      A.   By "market output," do you mean the

10:55:34  23  quantity of transactions?

10:55:37  24      Q.   I mean the quantity of home searches.

10:55:43  25      A.   I have not conceptualized the quantity of

59

10:55:49  1  home searches as the relevant market output.

10:55:55  2        Q.   What is the relevant market output that you

10:56:00  3  would conceptualize as the most relevant for assessing

10:56:06  4  competitive effects in this matter?

10:56:08  5        A.   Well, two things about that:  One is my

10:56:35  6  analysis is that the nature of the effect on competition

10:56:43  7  of the listing access standards in the online home

10:56:50  8  search platform market is that it chills, not just the

10:57:02  9  desired differentiation strategy of Compass, but a

10:57:09 10  different way of marketing in the industry.

10:57:13 11            And the evidence of that is precisely

10:57:16 12  Zillow's testimony and documents that speak to the fear

10:57:24 13  that Zillow has that if premarketing strategies, one

10:57:28 14  example of which is the 3-Phrased Marketing plan of

10:57:33 15  Compass, are permitted to thrive and grow across the

10:57:41 16  industry, it will undermine Zillow's business model.  So

10:57:46 17  that's bad for Zillow.  But allowing other platforms to

10:57:57 18  make inroads on Zillow's dominance in that market is

10:58:04 19  good for competition.

10:58:06 20            The other thing is in my report, I analyze

10:58:09 21  irreparable harm to consumers.  But my -- if this is

10:58:14 22  what you were asking, you know, my assignment didn't

10:58:17 23  include analyzing irreparable harm to competition in the

10:58:26 24  online home services platform market.

10:58:29 25        Q.   So you don't have any analysis in your

Case 1:25-cv-05201-JAV-SDA    Document 163-11    Filed 12/16/25    Page 14 of 32

COMPASS, INC. v                                                        Debra Aron. Ph.D.
ZILLOW, INC.                    Highly Confidential                    October 22, 2025

60

10:58:42  1  report on whether there's a reduction in output in any

10:58:48  2  market as a result of Zillow's listing access standards,

10:58:52  3  do you?

10:58:53  4        A.   I would disagree with that.  Because the

10:58:56  5  evidence that I gave and that I have is that there has

10:59:00  6  been a reduction in the output, you could say, or use of

10:59:13  7  premarketing strategies that are demonstrably desired by

10:59:21  8  a nontrivial component of the customer marketplace.

10:59:27  9        Q.   But that's not market-wide evidence.  All

10:59:30  10 you pointed to is an arguable reduction in the uptake of

10:59:38  11 3-phased marketing by Compass, a single player in the

10:59:42  12 market.

10:59:42  13       Where is the evidence of any market-wide

10:59:46  14 reduction in output, reduction in price, or reduction in

10:59:51  15 quality?  You don't have any in your report, and you

10:59:55  16 can't point us to any.

10:59:58  17            MS. NAMIRI-KALANTARI:  Objection.

10:59:59  18       A.   I don't think that's true.

11:00:01  19 BY MR. BUFFIER:

11:00:01  20       Q.   Well, point us, in your report, to those

11:00:04  21 things:  Market-wide evidence of price, quality, or

11:00:12  22 output effects.  Where is it in the report?

11:00:15  23            I've read the report many times --

11:00:18  24            MS. NAMIRI-KALANTARI:  Objection.

11:00:18  25 BY MR. BUFFIER:

61

11:00:19    1            Q.    -- and I haven't seen it.  So if I'm

11:00:21    2    missing it, I would appreciate you pointing it out.

11:00:29    3            A.    I have multiple pieces of evidence, and

11:00:37    4    I'll look for them, if you disagree that they exist, for

11:00:42    5    the proposition that not just Compass, but other

11:00:54    6    brokerages have been and are interested in pursuing a

11:00:59    7    premarketing strategy, number one; number two, that

11:01:07    8    Zillow's documents show that its intent was not only to

11:01:17    9    apply a "stick" to Compass so that it would not pursue

11:01:26   10    the strategy that Zillow didn't want it to pursue, the

11:01:29   11    premarketing 3-Phased strategy, and that by doing so,

11:01:39   12    Zillow was recognizing that if it didn't do so, there

11:01:45   13    would be an effect across the market because there would

11:01:50   14    be a contagion of that strategy among multiple

11:02:03   15    brokerages.

11:02:04   16            You know, the evidence shows that Zillow

11:02:06   17    created a list of the brokerages it wanted to target by

11:02:15   18    priority for enforcing the listing access standards.

11:02:22   19    Compass was first on the list, but there were many

11:02:26   20    brokerages on that list against which Compass was

11:02:33   21    instructing its -- its team to enforce the listing

11:02:39   22    access standards.

11:02:40   23            And I view that as industry-wide evidence

11:02:47   24    of the understanding by Zillow that the listing access

11:02:58   25    standards were intended not just to shut down Compass's

11:03:01  1  3-phased marketing plan, but to -- but to put a wall

11:03:17  2  that would prevent the industry contagion from happening

11:03:22  3  that Zillow was ultimately worried about.  That's an

11:03:27  4  industry-wide concern and an industry-wide effect.

11:03:29  5        Q.   But as you sit here today, you can't name a

11:03:33  6  single broker that has abandoned a private listing

11:03:39  7  strategy because of the listing access standards; right?

11:03:42  8              MS. NAMIRI-KALANTARI:  Objection.

11:03:43  9        A.   I don't have access to internal documents

11:03:45 10  from other brokerages.  In this proceeding where we have

11:03:53 11  limited discovery, we just don't have that kind of -- of

11:04:00 12  evidence.  But what we do have is the evidence from

11:04:04 13  Zillow where Zillow has shown who it's targeting first

11:04:10 14  across the industry to enforce its listing access

11:04:15 15  standards.

11:04:15 16  BY MR. BUFFIER:

11:04:15 17        Q.   It was a very simple question.  You can't

11:04:17 18  name a single broker that has abandoned a private

11:04:21 19  listing strategy because of the listing access

11:04:23 20  standards, can you?  Yes or no?

11:04:26 21              MS. NAMIRI-KALANTARI:  Objection.

11:04:28 22        A.   The answer is yes for the reasons that I

11:04:30 23  just described.

11:04:31 24  BY MR. BUFFIER:

11:04:31 25        Q.   Thank you.

63

11:04:32  1           I want to turn to your declaration again,

11:04:50  2  if you turn to paragraph 94 of your report.  It's on

11:04:53  3  page 35.

11:05:01  4           A.   I'm there.

11:05:02  5           Q.   You had said that the relevant product

11:05:05  6  market for assessing Zillow's conduct in this case is

11:05:07  7  residential real estate online search platforms; right?

11:05:11  8           A.   Correct.

11:05:12  9           Q.   And that includes search portals like

11:05:16 10  Zillow, Realtor.com, Redfin, and Homes.com; correct?

11:05:20 11           A.   Correct.

11:05:21 12           Q.   Okay.  And it's your opinion that that

11:05:25 13  includes all brokerage websites; is that right?

11:05:28 14           A.   Are you seeing that in this paragraph?

11:05:42 15           Q.   No.  I'm asking you.

11:05:44 16           A.   Oh, well, no, not all brokerages have an

11:05:51 17  online search -- home search platform.  So they may have

11:05:57 18  a website, but I wouldn't consider the website as part

11:06:02 19  of the online home search platform.  It's not a search

11:06:06 20  platform.

11:06:06 21           Q.   So what's the difference in -- strike that.

11:06:12 22           What distinction are you drawing?  If I can

11:06:14 23  go to a broker website and search for homes on that

11:06:18 24  website, is it in your market or out of the market?

11:06:22 25           A.   Well, first of all, you are -- part of the

Case 1:25-cv-05201-JAV-SDA   Document 163-11   Filed 12/16/25   Page 18 of 32
COMPASS, INC. v                                                    Debra Aron. Ph.D.
ZILLOW, INC.                    Highly Confidential                October 22, 2025

66

11:10:17   1          MS. NAMIRI-KALANTARI:  Objection.

11:10:18   2          A.   -- one would like to do that if it were

11:10:21   3  possible to do that, yes.

11:10:22   4  BY MR. BUFFIER:

11:10:27   5          Q.   What analysis did you perform to arrive at

11:10:30   6  your product market definition in this case?

11:10:34   7          A.   I did the analysis that I described in my

11:10:44   8  report, which is from paragraph 94 through my analysis

11:11:01   9  of the practical indicia, which goes through

11:11:20  10  paragraph 136.

11:11:21  11          Q.   Did you conduct a quantitative hypothetical

11:11:25  12  monopolist test?

11:11:26  13          A.   No.  I discuss the hypothetical monopolist

11:11:33  14  test and describe the test and concluded that not only

11:11:48  15  do data for such a test are not available at least at

11:11:58  16  this time in this case, but also that a hypothetical

11:12:02  17  monopolist test is not necessary for a proper product

11:12:09  18  market definition analysis.

11:12:10  19          Q.   In paragraph 98 of your report, you say:

11:12:18  20  "We can consider a thought experiment reflecting the

11:12:23  21  HMT, the hypothetical monopolist test."

11:12:25  22             Do you see that?

11:12:26  23          A.   I do.

11:12:26  24          Q.   Okay.  And do you think a thought

11:12:33  25  experiment is appropriate methodology to support a

COMPASS, INC. v
ZILLOW, INC.                    Highly Confidential

Debra Aron. Ph.D.
October 22, 2025

67

11:12:38  1  market definition exercise?

11:12:43  2            MS. NAMIRI-KALANTARI:  Objection.

11:12:44  3       A.    I don't think it's sufficient on its own to

11:12:50  4  support a market definition, but I think an economist

11:12:54  5  conducting a market definition analysis would consider

11:12:59  6  whether a hypothetical monopolist test is useful and

11:13:07  7  doable in the case at hand, given the available

11:13:12  8  information.

11:13:13  9            Certainly a thought experiment is a useful

11:13:17 10  exercise.  But the -- the body of my analysis is

11:13:24 11  contained in the subsequent many pages of analysis that

11:13:30 12  follow.

11:13:30 13  BY MR. BUFFIER:

11:13:31 14       Q.    Even in your thought experiment of the

11:13:34 15  hypothetical monopolist test, did you apply the

11:13:42 16  hypothetical monopolist test to all sides of Zillow's

11:13:48 17  platform?

11:13:49 18            MS. NAMIRI-KALANTARI:  Objection.

11:14:01 19       A.    You will have to tell me what you mean by

11:14:04 20  "all sides," please.

11:14:05 21  BY MR. BUFFIER:

11:14:06 22       Q.    In going through the thought experiment,

11:14:09 23  did you consider the reactions of participants on the

11:14:18 24  agent side of the platform to any sort of hypothetical

11:14:22 25  price increase or hypothetical quality decrease on

68

| | | |
|---|---|---|
| 11:14:26 | 1 | Zillow's platform? |
| 11:14:30 | 2 | MS. NAMIRI-KALANTARI: Objection. |
| 11:14:31 | 3 | A. The way I have defined the market, the |
| 11:14:38 | 4 | agent interaction with the platform is part of the |
| 11:14:45 | 5 | brokerage market, not part of the online home search |
| 11:14:51 | 6 | platform market. |
| 11:14:53 | 7 | BY MR. BUFFIER: |
| 11:14:53 | 8 | Q. What do you think the primary purpose of |
| 11:14:57 | 9 | Zillow's platform is? |
| 11:14:58 | 10 | A. I think it is to generate interest in |
| 11:15:10 | 11 | listings so that they can be monetized in various ways. |
| 11:15:14 | 12 | Q. Is a purpose of Zillow's platform to |
| 11:15:27 | 13 | facilitate real estate transactions between buyers and |
| 11:15:30 | 14 | sellers? |
| 11:15:33 | 15 | MS. NAMIRI-KALANTARI: Objection. |
| 11:15:34 | 16 | A. The way I would understand it and put it is |
| 11:15:43 | 17 | that it's to provide opportunities to monetize -- to |
| 11:15:50 | 18 | generate interest in real estate properties so as to |
| 11:15:56 | 19 | monetize that interest in a number of ways, including |
| 11:16:03 | 20 | selling leads to listings and other strategies that |
| 11:16:10 | 21 | Zillow pursues, such as facilitating mortgages and |
| 11:16:21 | 22 | enhancing listings. |
| 11:16:23 | 23 | BY MR. BUFFIER: |
| 11:16:24 | 24 | Q. Have you heard of Zillow's Flex program for |
| 11:16:27 | 25 | agents? |

69

11:16:28   1          A.   I have.  I discuss it in my report.

11:16:31   2          Q.   Okay.  And is it your understanding that

11:16:34   3   under the Flex program, Zillow only gets paid by the

11:16:40   4   agent if it facilitates a transaction -- a specific

11:16:45   5   transaction by that agent?

11:16:47   6          A.   Under the Flex program, Zillow, as I

11:16:56   7   understand it, only gets paid if that agent who

11:17:02   8   purchased that listing -- sorry -- lead to a potential

11:17:08   9   buyer for that listing makes a sale within a time period

11:17:14   10  that's defined to that buyer.

11:17:17   11         Q.   So Zillow doesn't get paid unless a

11:17:24   12  transaction results in some way from the connection

11:17:27   13  between the consumer and the agent; correct?

11:17:31   14              MS. NAMIRI-KALANTARI:  Objection.

11:17:31   15         A.   I think I said it a little bit more

11:17:36   16  precisely, but subject to that, yes, I agree.

11:17:40   17  BY MR. BUFFIER:

11:17:41   18         Q.   So would you agree Zillow has an incentive

11:17:45   19  to facilitate real estate transactions?

11:17:50   20              MS. NAMIRI-KALANTARI:  Objection.

11:17:51   21         A.   It has an incentive to encourage interest

11:18:02   22  by buyers' agents to seek to acquire leads for buyers

11:18:16   23  who are interested in properties on Zillow where there's

11:18:22   24  a good likelihood that that lead will result in a

11:18:30   25  transaction.

Case 1:25-cv-05201-JAV-SDA    Document 163-11    Filed 12/16/25    Page 22 of 32

COMPASS, INC. v                                                    Debra Aron. Ph.D.
ZILLOW, INC.                    Highly Confidential                October 22, 2025

102

13:05:40  1          MS. NAMIRI-KALANTARI:  Objection.

13:05:41  2          A.   I would say two things about that:  One is

13:05:44  3  I have not analyzed restaurant platforms, so I don't

13:05:48  4  have an opinion about national or local restaurant

13:05:54  5  reservation platforms; but the second thing is I don't

13:05:59  6  think that this relevant market, the market for online

13:06:04  7  home search platforms, is national only for any one

13:06:10  8  reason, including the fact that you can access it from

13:06:14  9  anywhere in the country.  I think that's a relevant

13:06:18 10  factor, but it's not the reason.

13:06:20 11          And your question, would it be a national

13:06:23 12  market just because I can access it from Massachusetts,

13:06:28 13  the answer is no, not just because that.

13:06:30 14  BY MR. BUFFIER:

13:06:30 15          Q.   Okay.  So for home search, then, just

13:06:33 16  because I could access a home search site from any

13:06:38 17  location in the country or even overseas, that doesn't

13:06:42 18  make it -- that alone doesn't make it a national market.

13:06:45 19  That's your testimony; right?

13:06:47 20          MS. NAMIRI-KALANTARI:  Objection.

13:06:48 21          A.   That alone doesn't make it a national

13:06:52 22  market.  The analysis encompasses many factors and many

13:06:58 23  considerations and evidence regarding those multiple

13:07:02 24  factors.

13:07:02 25  BY MR. BUFFIER:

103

| | | |
|---|---|---|
| 13:07:02 | 1 | Q.    Uh-huh. |
| 13:07:03 | 2 | Does Compass claim that its ability to |
| 13:07:08 | 3 | drive traffic to its website, Compass.com, depends on |
| 13:07:14 | 4 | its ability to utilize 3-phased marketing? |
| 13:07:29 | 5 | MS. NAMIRI-KALANTARI:  Objection. |
| 13:07:30 | 6 | A.    I don't know the answer to that. |
| 13:07:31 | 7 | BY MR. BUFFIER: |
| 13:07:33 | 8 | Q.    Okay.  If you turn to paragraph 149 of your |
| 13:07:39 | 9 | report.  There you say:  "The 3PM Strategy was intended |
| 13:07:57 | 10 | to be adopted across all areas where Compass operates, |
| 13:08:00 | 11 | aiming to drive consumer traffic from across the country |
| 13:08:03 | 12 | to Compass's website to see its inventory of listings." |
| 13:08:06 | 13 | Do you see that? |
| 13:08:07 | 14 | A.    I do. |
| 13:08:07 | 15 | Q.    Does Compass offer brokerage services in |
| 13:08:11 | 16 | all 50 states today? |
| 13:08:13 | 17 | A.    No. |
| 13:08:13 | 18 | Q.    Does Compass display for-sale listings on |
| 13:08:16 | 19 | its website in all 50 states today? |
| 13:08:19 | 20 | A.    I think the answer is no. |
| 13:08:22 | 21 | Q.    So there are geographies today where buyers |
| 13:08:28 | 22 | are looking for homes where they cannot use Compass's |
| 13:08:32 | 23 | online home search tool; correct? |
| 13:08:36 | 24 | MS. NAMIRI-KALANTARI:  Objection. |
| 13:08:37 | 25 | BY MR. BUFFIER: |

| | | |
|---|---|---|
| 13:08:37 | 1 | Q.    If Compass is -- let me rephrase that. |
| 13:08:39 | 2 | If Compass, for example, to pick a city, is |
| 13:08:43 | 3 | not in Salt Lake City, Utah, I, as a consumer, cannot go |
| 13:08:51 | 4 | to Compass.com and search for properties in Utah; |
| 13:08:56 | 5 | correct? |
| 13:08:56 | 6 | A.    Yes. |
| 13:08:57 | 7 | Q.    Sorry, in Salt Lake City, Utah. |
| 13:09:00 | 8 | A.    In Salt Lake City, Utah, I think that's |
| 13:09:02 | 9 | correct.  I don't think that's determinative of whether, |
| 13:09:06 | 10 | it's a national market, but I think that's true, "it" |
| 13:09:09 | 11 | being the online home search platform market. |
| 13:09:13 | 12 | Q.    Uh-huh. |
| 13:09:18 | 13 | Then in paragraph 215 -- skip ahead a |
| 13:09:24 | 14 | little bit -- you state that, again the last two lines: |
| 13:09:33 | 15 | "The 3PM Strategy gives the Compass online home search |
| 13:09:39 | 16 | platform access to material numbers of properties that |
| 13:09:41 | 17 | Zillow would not be able to access." |
| 13:09:43 | 18 | Do you see that? |
| 13:09:44 | 19 | A.    Yes, "material number of properties." |
| 13:09:52 | 20 | Q.    Okay.  Does Compass -- Compass's adoption |
| 13:09:58 | 21 | of 3-phased marketing vary by region? |
| 13:10:06 | 22 | MS. NAMIRI-KALANTARI:  Objection. |
| 13:10:08 | 23 | A.    As I say in my report, the ability of |
| 13:10:19 | 24 | agents to implement the 3-phased marketing Strategy to |
| 13:10:29 | 25 | some extent, especially with respect to Coming Soons, |

Case 1:25-cv-05201-JAV-SDA    Document 163-11    Filed 12/16/25    Page 25 of 32

COMPASS, INC. v                                                        Debra Aron. Ph.D.
ZILLOW, INC.                        Highly Confidential                October 22, 2025

105

| | | |
|---|---|---|
| 13:10:37 | 1 | varies by MLS rules. |
| 13:10:45 | 2 | And so that affects its structure in the -- |
| 13:10:51 | 3 | its -- I should say not structure, its strategies in the |
| 13:10:57 | 4 | real estate brokerage markets.  And yet what we see in |
| 13:11:03 | 5 | the online home services platform market is a |
| 13:11:06 | 6 | commonality, a uniformity of policies, decisions, and |
| 13:11:14 | 7 | other factors that I go through in my analysis of |
| 13:11:18 | 8 | geographic market definition. |
| 13:11:20 | 9 | BY MR. BUFFIER: |
| 13:11:20 | 10 | Q.  Well, in your report, you contend that |
| 13:11:25 | 11 | Compass's 3-phased marketing Strategy and having |
| 13:11:28 | 12 | exclusive inventory is important for Compass to |
| 13:11:32 | 13 | differentiate itself and drive traffic to Compass.com; |
| 13:11:37 | 14 | correct? |
| 13:11:37 | 15 | A.  Correct. |
| 13:11:38 | 16 | Q.  Okay.  And one of those drivers would be |
| 13:11:44 | 17 | the amount of exclusive inventory that Compass has; |
| 13:11:47 | 18 | correct? |
| 13:11:50 | 19 | MS. NAMIRI-KALANTARI:  Objection. |
| 13:11:51 | 20 | A.  It could be, yes. |
| 13:11:53 | 21 | BY MR. BUFFIER: |
| 13:11:54 | 22 | Q.  Well, if Compass has no exclusive inventory |
| 13:11:59 | 23 | in a particular region, would it have any advantage, |
| 13:12:02 | 24 | under your analysis, in driving traffic to its website? |
| 13:12:10 | 25 | MS. NAMIRI-KALANTARI:  Objection. |

17:20:42  1  to the results of that study comparing off-MLS outcomes

17:20:48  2  for sellers versus on-MLS outcomes for sellers.

17:20:53  3           Did you review that?

17:20:54  4      A.   You said a name that I didn't --

17:20:57  5      Q.   Mr. Samuelson, Errol Samuelson.

17:21:05  6      A.   Oh, okay.

17:21:05  7      Q.   It's in his declaration and attached.  It

17:21:09  8  is also referred to in Dr. Wu's report.

17:21:11  9      A.   Yes.  And there are actually a number of

17:21:14 10  Bright studies, and I have reviewed them.

17:21:16 11      Q.   Okay.  And do you have any views as to the

17:21:18 12  reliability of those studies?

17:21:20 13      A.   They are not peer-reviewed.  They are not

17:21:26 14  sufficiently complete to understand the actual model

17:21:37 15  that was estimated and whether it controls for causality

17:21:42 16  and whether there are -- what the statistical

17:21:47 17  significance is of the supposed results and what the

17:21:54 18  data -- all the things that a professional economist

17:21:56 19  would evaluate in considering empirical research on a

17:22:02 20  question like that.

17:22:04 21           There is an empirical research on housing

17:22:07 22  outcomes from various policies, and so there are

17:22:10 23  standards and there are methodologies that could be

17:22:14 24  applied, but there's no disclosure in that paper as to

17:22:19 25  which, if any, were applied.

COMPASS, INC. v
ZILLOW, INC.                    Highly Confidential                    Debra Aron. Ph.D.
October 22, 2025

223

17:22:21   1           So my conclusion is that I would not rely

17:22:27   2  on those results other than to be aware of them and take

17:22:36   3  them for what they are, take them with a grain of salt.

17:22:40   4           Q.   Uh-huh.

17:22:41   5           Isn't it true that a seller can perceive

17:22:45   6  benefits from being listed on Zillow without Zillow

17:22:50   7  having market power?

17:22:53   8               MS. NAMIRI-KALANTARI:  Objection.

17:22:54   9           A.   I think that's true, yes.

17:22:59  10  BY MR. BUFFIER:

17:22:59  11           Q.   Okay.  So if a seller decides to forgo

17:23:09  12  public marketing because it sees some benefit from

17:23:13  13  having exposure on Zillow, does that prove that Zillow

17:23:19  14  has market power?

17:23:20  15               MS. NAMIRI-KALANTARI:  Objection.

17:23:23  16           A.   If one seller makes that decision, does

17:23:29  17  that prove that Zillow has market power?  No.  That's

17:23:34  18  not the nature of the evidence that I provided, though.

17:23:36  19  BY MR. BUFFIER:

17:23:39  20           Q.   Okay.  And is there any numerical analysis

17:23:45  21  provided in your analysis of this -- of this question?

17:23:52  22               MS. NAMIRI-KALANTARI:  Objection.

17:23:55  23           A.   May I hear the question read back?

17:23:57  24  BY MR. BUFFIER:

17:23:59  25           Q.   Strike that.  Let me rephrase it.  It was a

COMPASS, INC. v
ZILLOW, INC.                         Highly Confidential                    Debra Aron. Ph.D.
October 22, 2025

224

17:24:01  1  bad question.

17:24:02  2           So in the section of your report here where

17:24:05  3  you opine on direct evidence of market power, you apply

17:24:13  4  what you call a "contrary hypothesis," correct, where

17:24:19  5  you say suppose that Zillow did not have market power,

17:24:21  6  and then you take us through a series of logical steps;

17:24:25  7  correct?

17:24:25  8           A.   Correct.

17:24:25  9           Q.   Okay.  Is that based on any empirical data?

17:24:55  10          A.   This analysis is based on the documentary

17:25:03  11 evidence that --

17:25:05  12          Q.   That wasn't my question.  My question was

17:25:08  13 empirical data.

17:25:11  14          MS. NAMIRI-KALANTARI:  You can continue

17:25:12  15 your answer.

17:25:12  16          A.   I'll finish my answer.

17:25:14  17          This analysis is based on documentary

17:25:17  18 evidence that supports the proposition that agents are

17:25:24  19 afraid to not have their clients' properties, and the

17:25:34  20 clients are afraid to not have their properties on

17:25:38  21 Zillow, and that that chills the use of the strategy.

17:25:43  22          And I provide numerical evidence of the

17:25:47  23 extent to which the use of the 3-phased marketing has

17:25:53  24 declined based on testimony, evidence, presentation to

17:26:00  25 the Board and documents.  And that is my understanding

COMPASS, INC. v
ZILLOW, INC.

Highly Confidential

Debra Aron. Ph.D.
October 22, 2025

225

17:26:09    1  of what the Court wanted to see at this stage of the

17:26:13    2  case.

17:26:14    3  BY MR. BUFFIER:

17:26:16    4        Q.  So it isn't based on empirical evidence;

17:26:20    5  correct?

17:26:21    6              MS. NAMIRI-KALANTARI:  Objection.

17:26:21    7        A.   No.  That's not what I said.  I said

17:26:25    8  it's -- it includes evidence of the extent to which the

17:26:27    9  3-phased marketing plan has declined.

17:26:30   10              We talked about the fact that one can

17:26:34   11  imagine other explanations for at least some of the

17:26:41   12  decline.  I don't find it plausible that all of the

17:26:44   13  decline was the result of anything but the listing

17:26:52   14  access standards, given the evidence.

17:26:53   15  BY MR. BUFFIER:

17:26:53   16        Q.  Okay.  When you describe this analysis here

17:26:56   17  as a hypothesis; correct?

17:26:59   18              MS. NAMIRI-KALANTARI:  Objection.

17:27:00   19        A.   When you say this hypothesis -- I mean,

17:27:03   20  "this analysis here," are you referring to the

17:27:08   21  section --

17:27:08   22  BY MR. BUFFIER:

17:27:08   23        Q.  Paragraph 168, that, "The Zillow standards

17:27:12   24  are evidence of market power can be seen by considering

17:27:15   25  the contrary hypothesis."

226

17:27:18   1              And I'm asking you the paragraph that

17:27:20   2   follows, that is a hypothesis of yours; correct?

17:27:27   3              In other words, it's not based on actual

17:27:31   4   observed behavior.  It's not based on actual empirical

17:27:37   5   data, is it?

17:27:38   6        A.   I'm sorry.  I'm really lost now about what

17:27:41   7   you're referring to.

17:27:42   8              Is it paragraph 168?

17:27:44   9        Q.   It's paragraph 168.  The sentence that

17:27:46  10   begins that paragraph says that, "The Zillow standards

17:27:50  11   are evidence of market power can be seen by considering

17:27:53  12   the contrary hypothesis."

17:27:55  13              And then you outline a hypothesis; correct?

17:27:58  14        A.   Correct.

17:27:59  15        Q.   Okay.  So I'm asking:  Is the only direct

17:28:03  16   evidence you have of market power this hypothesis or do

17:28:07  17   you have other direct evidence?

17:28:08  18        A.   Well --

17:28:09  19              MS. NAMIRI-KALANTARI:  Objection.

17:28:11  20        A.   -- it's the entire analysis in the section

17:28:13  21   through paragraph 175 and all of the supporting evidence

17:28:20  22   in that section.  It's not just that paragraph.

17:28:38  23   BY MR. BUFFIER:

17:28:38  24        Q.   When -- when the courts talk about direct

17:28:41  25   evidence of market power, they talk about actual proof

COMPASS, INC. v                                          Debra Aron. Ph.D.
ZILLOW, INC.                    Highly Confidential          October 22, 2025

227

17:28:46   1  that a firm can exercise market power without relying on

17:28:51   2  any inferences.  So it requires proof of an actual

17:28:54   3  detrimental effect on competition.

17:28:57   4          Does anything in this paragraph provide

17:29:00   5  actual proof of a detrimental effect on competition --

17:29:03   6          MS. NAMIRI-KALANTARI:  Objection.

17:29:04   7  BY MR. BUFFIER:

17:29:04   8      Q.    -- or is it just a hypothesis?

17:29:07   9          MS. NAMIRI-KALANTARI:  Objection.

17:29:09  10      A.    The concept of direct evidence of market

17:29:20  11  power is that one shows that the conduct would not be --

17:29:34  12  one way of showing direct evidence of market power is to

17:29:38  13  show that the conduct would not be rational but for

17:29:43  14  market power.  And that's what I've done.

17:29:46  15  BY MR. BUFFIER:

17:29:47  16      Q.    And in considering whether the conduct

17:29:49  17  would not be rational but for the market power, wouldn't

17:29:54  18  one need to consider the legitimate business

17:30:00  19  justifications of procompetitive rationales to decide

17:30:04  20  whether the conduct would be rational but for market

17:30:07  21  power?

17:30:09  22          MS. NAMIRI-KALANTARI:  Objection.

17:30:16  23  BY MR. BUFFIER:

17:30:17  24      Q.    That is what Dr. Wu does, isn't it?

17:30:19  25          MS. NAMIRI-KALANTARI:  Objection.

228

17:30:20  1          A.    I'll answer your first question first --

17:30:24  2  BY MR. BUFFIER:

17:30:24  3          Q.    Uh-huh.

17:30:25  4          A.    -- which is the error in that framing that

17:30:30  5  you just gave is that in the case of the Zillow

17:30:36  6  standards, if there's no market power, then the Zillow

17:30:42  7  standards would result in premarketed listings not being

17:30:55  8  listed on Zillow at all.

17:31:00  9          It's not that they would be listed stale

17:31:07 10  as -- as the -- I think Dr. Wu describes it, but that

17:31:12 11  they wouldn't be listed at all.

17:31:14 12          And so between the -- the scenario in which

17:31:24 13  Zillow does not have market power with the listing

17:31:27 14  standards and does not have market power without the

17:31:30 15  listing standards, the difference is that with the

17:31:33 16  listing standards, Zillow doesn't list these properties

17:31:37 17  at all and with them -- without them, it does list them.

17:31:42 18          And so one would have to show that Zillow

17:31:47 19  is better off not listing these properties at all than

17:31:55 20  listing them with an asterisk to say that they are

17:32:00 21  premarketed properties.

17:32:03 22          And there's no argument in

17:32:07 23  Dr. Wu's report to that effect, and that's because the

17:32:12 24  error in Dr. Wu's report is that when he does his

17:32:20 25  but-for analysis, he does it in the context of Zillow