HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

COMPASS, INC.,

               *Plaintiff*,

       *v.*

ZILLOW, INC., ZILLOW GROUP, INC., and
TRULIA, LLC,

          *Defendants*.

Case No. 1:25-cv-05201-JAV

# EXPERT DECLARATION OF
# LAWRENCE WU, PH.D.

**October 10, 2025**



Compass, Inc. v.
Zillow, Inc. et al.,
**DX657**
No. 1:25-cv-05201-JAV-SDA

# Table of Contents

I.    INTRODUCTION ................................................................................................ 1
    A.   QUALIFICATIONS AND EXPERIENCE ............................................................... 1
    B.   OVERVIEW OF THE PARTIES AND ALLEGATIONS ............................................. 2
    C.   NATURE AND SCOPE OF THE ASSIGNMENT ..................................................... 4
    D.   INFORMATION RELIED UPON ......................................................................... 5
    E.   SUMMARY OF OPINIONS ............................................................................... 5

II.   BACKGROUND .............................................................................................. 10
    A.   OVERVIEW OF THE REAL ESTATE INDUSTRY ............................................... 10
    B.   THE RELEVANT INSTITUTIONS, RULES, AND POLICIES THAT FACILITATE A WELL-FUNCTIONING, COMPETITIVE REAL ESTATE MARKETPLACE ................................................................. 12
        1.   *Multiple Listing Services* ....................................................... 13
        2.   *The National Association of Realtors (NAR)* ......................... 17
        3.   *Brokerage Websites and Real Estate Platforms* .................... 19

C.   THE RULES AND POLICIES THAT FRAME THE COMPETITIVE ISSUES IN THIS CASE ................. 20
        1.   *The Multiple Listing Options for Sellers (MLOS) Policy* ...... 20
        2.   *Compass's 3-Phase Marketing Strategy (3PM)* .................... 22
        3.   *Zillow's Listing Access Standards (LAS)* ............................. 24

D.   THE RELEVANT ECONOMIC PRINCIPLES APPLICABLE TO UNDERSTANDING THE FUNCTIONING OF REAL ESTATE MARKETS ......................................... 28

III.   FRAMEWORK FOR ASSESSING THE EFFECT OF THE ALLEGED EXCLUSIONARY CONDUCT ... 33

IV.   OVERARCHING FLAWS IN THE ARON DECLARATION ................................. 36
    A.   FAILURE TO FOCUS ON THE EFFECT OF ZILLOW'S LAS POLICY IN PROMOTING EFFICIENT AND COMPETITIVE REAL ESTATE TRANSACTIONS .............................................................. 37
    B.   FAILURE TO UNDERSTAND THE ROLE OF EXTERNALITIES AND INFORMATION IN ENSURING AN EFFICIENT AND COMPETITIVE REAL ESTATE MARKET ................................................. 40
    C.   FAILURE TO EVALUATE THE MULTI-SIDED NATURE OF ONLINE HOME SEARCH PLATFORMS ............ 42
    D.   FAILURE TO ANALYZE THE DYNAMICS OF THE MARKET AND THE RESPONSES OF MARKET PARTICIPANTS ....... 46

V.   THE BUSINESS RATIONALE FOR AND PROCOMPETITIVE BENEFITS OF ZILLOW'S LISTING ACCESS STANDARDS ........................................................... 47
    A.   PROTECTING ZILLOW'S VALUE PROPOSITION AND DISINCENTIVIZING FREE RIDING ............................ 47
    B.   THE LAS IS PROCOMPETITIVE BECAUSE IT PROMOTES GREATER TRANSPARENCY, LIQUIDITY, AND EFFICIENCY IN REAL ESTATE TRANSACTIONS .............................................................. 51

VI.   RELEVANT MARKET DEFINITION ............................................................... 55
    A.   DR. ARON'S PROPOSED ONLINE HOME SEARCH PLATFORM PRODUCT MARKET DEFINITION ............ 57
    B.   DR. ARON'S PROPOSED NATIONAL GEOGRAPHIC MARKET DEFINITION .......................... 58
        1.   *The Origin of Home Search Traffic Does Not Inform the Relevant Geographic Market* ............ 59
        2.   *Dr. Aron Offers No Support for Her Argument Why the Relevant Geographic Market Should Combine Many Local Markets Into One* ................................ 62
        3.   *Commercial Realities in the Online Real Estate Search Services Market Indicate that the Relevant Geographic Markets Are Local* ............................ 62

VII.   ANALYSIS OF MARKET POWER ................................................................. 67
    A.   THERE IS NO DIRECT EVIDENCE OF MARKET POWER IN THE ARON DECLARATION ............ 68
    B.   IMPLEMENTING THE LAS IS NOT EVIDENCE OF MARKET POWER ............................ 71
        1.   *An Incorrect Premise that All Listings Are Equal* ................ 72
        2.   *Failure to Compare a World with LAS to a World Without LAS* .... 73

1

3.    *Failure to Fully Consider the Responses of All Market Participants* ....................................75

C.    FLAWS IN DR. ARON'S MARKET SHARE ANALYSIS ..........................................................77

D.    FLAWS IN DR. ARON'S ANALYSIS OF BARRIERS TO ENTRY ...............................................80

1.    *There Is No Evidence that New Entry Has Been Deterred* ...........................................80

2.    *The Facts Do Not Support Dr. Aron's Claims that There Are Barriers to Entry*..................82

a.    *Entrants are Able to Make Large Capital Investments* ...............................................83

b.    *Zillow's Brand Recognition Is Not a Barrier to Entry* ................................................83

c.    *Consumer Switching Costs Do Not Pose a Barrier to Entry*........................................85

d.    *Network Effects Imply that a High Market Share is Evidence of Economies of Scale and Scope, Not Market Power*.......................................................................................86

3.    *There Are No Barriers to Expansion by Existing Competitors* ....................................87

VIII. ZILLOW'S LAS HAS NOT LED AND IS UNLIKELY TO LEAD TO ANY HARM TO COMPETITION OR A REDUCTION IN CHOICE FOR BROKERAGES, HOME BUYERS, OR HOME SELLERS............89

A.    THERE IS NO EVIDENCE TO INDICATE THAT THE LAS WILL REDUCE COMPETITION AMONG ONLINE HOME SEARCH PLATFORMS ..........................................................................................89

B.    THERE IS NO EVIDENCE THAT THE LAS WILL REDUCE CHOICE FOR BROKERAGES, HOME BUYERS, OR HOME SELLERS .......................................................................................................93

1.    *The LAS Does Not Restrict Brokerages' Ability to Offer Private Listings*....................93

2.    *The LAS Does Not Restrict the Options Available to Home Sellers* ............................96

3.    *The LAS Does Not Reduce the Choices Available to Home Buyers* ............................98

IX.    COMPASS'S PRIVATE LISTING STRATEGY HARMS THE MARKET AND PARTICIPANTS ............98

A.    COMPASS'S 3PM STRATEGY HARMS HOME BUYERS ......................................................98

B.    COMPASS'S 3PM STRATEGY HARMS HOME SELLERS ...................................................100

C.    COMPASS'S 3PM STRATEGY WILL DIMINISH ZILLOW'S AND OTHER REAL ESTATE PLATFORMS' ABILITY TO FACILITATE EFFICIENT MATCHING OF BUYERS AND SELLERS .........................102

**DX657 - page 3 of 149**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

# I.    Introduction

## A.  Qualifications and Experience

1.      I am an economist at and President of NERA. NERA is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal issues. I received my B.A. from Stanford University and my Ph.D. from the University of Chicago, Graduate School of Business. Prior to joining NERA, I was a Staff Economist in the Bureau of Economics at the Federal Trade Commission ("FTC"). From 2011 to 2015, I was a Visiting Scholar at the Stanford Institute for Economic Policy Research at Stanford University.

2.      My relevant area of expertise is in the economics of antitrust, which is based on my knowledge of and training in economics, including industrial organization, statistics, and econometrics. I also have experience analyzing and calculating damages in connection with alleged anticompetitive conduct. More generally, I have been retained as an economic expert to testify on issues related to antitrust liability, damages, and class certification. I also have testified on issues related to market definition and market power in antitrust litigations, including those involving allegations of monopolization, alleged conspiracies, exclusive contracting, price discrimination, and anticompetitive exclusionary conduct. My expert experience includes matters involving the U.S. real estate industry. I have provided written and oral expert testimony on numerous occasions, including testimony in U.S. district courts and presentations before the FTC and the Antitrust Division of the U.S. Department of Justice ("DOJ"). My research has appeared in *Antitrust*, *The Antitrust Bulletin*, *The Antitrust Chronicle*, *The Antitrust Source*, *Antitrust Report*, *European Competition Law Review*, *Journal of Business Venturing*, and *Medical Care*. I have edited three books that have been published on the economics of antitrust, including a book on the use of econometrics in antitrust analysis. I also am a co-author of a book on antitrust class certification. My publications, prior testimony, and selected consulting assignments are listed in my curriculum vitae, which is appended to this declaration as **Exhibit 1**.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## B. Overview of the Parties and Allegations

3.    Compass, Inc. ("Compass") is a real estate services company that includes the largest real estate brokerage in the United States by sales volume.[1] Compass describes itself as "tech-enabled," and operates a proprietary technology platform that "aims to digitize, integrate and simplify all real estate workflows for agents and their clients."[2] However, Compass generates virtually all of its revenue through traditional brokerage services by collecting a share of the gross sales commissions that its home seller and home buyer agents earn from home sales.[3]

4.    Zillow Group, Inc. ("Zillow") is a real estate marketplace company that provides information about homes, real estate listings, and mortgages through its online platform.[4] Zillow Group also includes Zillow, Inc., Trulia, LLC, and other affiliated brands.[5] Zillow's platform seeks to connect buyers, sellers, and real estate professionals to each other to facilitate the buying and selling of homes. Home buyers and sellers can access the listings on this platform for free. Zillow primarily generates revenue from its platform from agents who pay Zillow fees or shares of commissions earned in real estate transactions in exchange for leads connecting them to prospective home buyers.[6] Zillow also generates revenue in other ways, including through an online rental marketplace that is unrelated to the allegations in this case.[7]

---

[1] Compass, Inc., Form 10-K, 2024, at p. 4, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001563190/d2ad6449-9e23-447b-907f-64ffb0f905e2.pdf.

[2] Compass, Inc., Form 10-K, 2024, at p. 5.

[3] Compass, Inc., 2024 Annual Report (Form 10-K), p. 4 ("We primarily generate revenue from our owned-brokerage business when we collect a share of the gross sales commissions that the agents earn from home sales and certain other fees, such as flat transaction commission fees"), p. 39 ("We generate substantially all our revenue by assisting home sellers and buyers in listing, marketing, selling and finding homes. We hold the real estate brokerage license that is necessary under relevant state laws and regulations to provide brokerage services and therefore we control those services that are necessary to legally transfer real estate between home sellers and buyers. We are the principal in the transaction and recognize as revenue the gross amount of the commission we receive in exchange for those services.").

[4] Zillow Group, Inc., Form 10-K, 2024, at p. 3, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001617640/7204bf7d-e80a-4f24-8e69-5a1264c2df17.pdf; https://www.bloomberg.com/profile/company/ZG:US#xj4y7vzkg

[5] Zillow Group, Inc., Form 10-K, 2024, at p. 5.

[6] Zillow Group, Inc., Form 10-K, 2024, at p. 40.

[7] Zillow Group, Inc., Form 10-K, 2024, at p. 5.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

5.    Since 2024, Compass has pursued a strategy of initially marketing some of the listings it controls as private listings on its own website.[8] Because the strategy involves three phases, Compass dubbed it the 3-Phased Marketing ("3PM") Strategy. These private listings are only available to buyers represented by Compass agents.[9]

6.    In 2025, Zillow implemented its Listing Access Standards ("LAS"), which require all publicly marketed listings to be entered into the Multiple Listing Service ("MLS") within one business day for distribution and display on other MLS participants' websites, including but not limited to the Zillow.com website and mobile apps and the Trulia.com website and mobile apps. Listings that do not align with the LAS cannot be published on Zillow or Trulia for the life of the listing agreement, and any subsequent listing agreement, between that listing broker and seller.[10]

7.    In its Complaint, Compass alleges that "Zillow has willfully maintained and abused its monopoly power in the residential real estate online search services market" through its "anticompetitive and exclusionary" LAS.[11] Compass claims that the LAS "denies home sellers (and their real estate brokers and agents) a choice in how to list their homes and denies competitors the ability to differentiate and compete to challenge Zillow's monopoly," and instead "forces home sellers to list their homes in the way Zillow demands and competing home search platforms to display those listings in the way Zillow demands, otherwise denying access to the Zillow platform and the massive consumer demand it brings."[12]

8.    Compass also alleges that Zillow conspired with Redfin Corp. (another online real estate platform and brokerage) and eXp Realty (a brokerage) "to jointly boycott Plaintiff Compass and other entities that would introduce competition in the market for residential real estate online search."[13] Compass alleges that Redfin has announced it will begin enforcing a

---

[8] Also referred to as "exclusive listings," "private exclusives," or "pocket listings," private listings are generally understood as for-sale listings promoted by real estate brokers within their personal networks and are not shared broadly with other real estate agents and the public through the Multiple Listing Service ("MLS").

[9] Complaint, *Compass, Inc., Plaintiff, v. Zillow, Inc., Zillow Group, Inc., and Trulia, LLC, Defendants,* Case No. 1:25-cv-05201, United States District Court for the Southern District of New York, June 23, 2025 ("Complaint"), ¶ 57.

[10] Zillow Group, "Zillow's Listing Access Standards: What Agents Need to Know," https://www.zillow.com/premier-agent/agents-know-listing-access-standards/ (accessed September 26, 2025).

[11] Complaint, ¶ 119.

[12] Complaint, ¶ 119.

[13] Complaint, ¶ 112.

3

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

policy similar to Zillow's LAS starting this year.[14] Compass also claims that eXp has publicly supported Zillow's LAS and has committed to ensuring eXp's for-sale listings are compliant with the LAS.[15]

## C. Nature and Scope of the Assignment

9.      I was asked by counsel for Zillow to evaluate the expert declaration of Plaintiff's economic expert, Dr. Debra J. Aron.[16] In particular, I have been asked to address the following questions:

- Is Dr. Aron's analysis the product of reliable economic principles and methods applied to the facts of the case?

- Is there a procompetitive rationale for Zillow's LAS?

- Has Dr. Aron defined appropriate relevant antitrust markets in which to evaluate Plaintiff's claims that Zillow has market power and the ability to lessen competition in that market?

- Does the economic evidence suggest that Zillow has market power in any relevant market?

- Has Zillow's LAS led to any harm to competition?

- Has Zillow's LAS harmed real estate sellers, real estate buyers, or brokerages?

- Has Compass's 3PM strategy led to any harm to competition?

- Has Compass's 3PM strategy harmed real estate sellers, real estate buyers, or brokerages?

---

[14] Complaint, ¶ 79.

[15] Complaint, ¶ 76.

[16] Expert Declaration of Debra J. Aron, Ph.D., September 12, 2025, 1:25-cv-05201-JAV ("Aron Declaration"). Throughout this declaration, I refer to factual statements, legal theories, and positions that Plaintiff or its expert have alleged or asserted. I do not agree with or concede any of these allegations or assertions. For the ease of reading, I do not use the term "alleged" or "asserted" every time I discuss or address those factual statements, legal theories, or positions. I offer no legal opinions, legal theories, or legal positions in my declaration.

4

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

10.     I have not been asked to offer an opinion on Compass's claim that Zillow conspired with Redfin and eXp "to jointly boycott Plaintiff Compass and other entities that would introduce competition in the market for residential real estate online search services in the United States in violation of Section 1 of the Sherman Act."[17] Dr. Aron also offers no opinions on Compass's Section 1 claims in this regard.

## D.  Information Relied Upon

11.     The opinions in this declaration are based on my professional training and experience, as well as on my review of the Complaint, publicly available documents, documents that are in the evidentiary record (including deposition transcripts and exhibits), and the declaration submitted by Dr. Aron (as well as the materials cited by Dr. Aron). A complete list of the materials and information that I relied upon in preparing this declaration is attached as **Exhibit 2**.

## E.  Summary of Opinions

12.     Based on the information available to me and my analysis to date, I have reached the following high-level conclusions:

- There are strong business and procompetitive rationales for Zillow's LAS. Specifically, the LAS improves the quality of Zillow's multi-sided platform by (a) ensuring that listings on Zillow are accurate and current and (b) mitigating free-riding by brokerages on its substantial investments. The LAS also promotes greater transparency in the market, greater liquidity for home buyers and home sellers, and increased efficiency in real estate transactions generally.
- The Aron Declaration suffers from four overarching flaws that affect Dr. Aron's entire approach to the competitive analysis and, as a result, render unreliable the conclusions that she draws from her analysis. These are fundamental conceptual flaws that stem from the following failures:

---

[17] Complaint, ¶ 112.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

- ○ The failure to evaluate the ultimate competitive and market outcome that matters to home buyers, home sellers, real estate agents, and brokerages, which is an efficient and competitive market for real estate transactions.
- ○ The failure to account for the market factors that ensure and facilitate a well-functioning and competitive market, most critically Zillow's role in providing home buyers and sellers with a flow of current and complete market data on all listings and a platform that (a) attracts potential home buyers and (b) gives home sellers the opportunity for their property to be seen by as many interested buyers as possible..
- ○ The failure to analyze online home search platforms as a multi-sided market when evaluating issues related to market power, the rationale for the LAS, and the competitive impact of the LAS.
- ○ The failure to analyze the dynamics of the market and the dynamic responses of market participants when evaluating the rationale for the LAS and the competitive impact of the LAS.

- While I do not concede that the "market for residential real estate online search platforms," is a properly defined relevant market, I view it as an acceptable starting point for evaluating the allegations in this matter. As such, throughout my declaration, I analyze competitive issues using this product market definition.

- Dr. Aron's opinion that the relevant geographic market is the United States does not hold up to scrutiny for several reasons. First, the alleged anticompetitive harm varies across the MLSs that implement and enforce local rules in their respective local coverage areas. Dr. Aron notes that Zillow chose to enact the LAS on the national level, but the incremental effect of Zillow's LAS will vary by the local geographies serviced by each MLS. Second, home buyers search homes in specific geographic areas. Even "out of area" buyers still search for information about properties located within a specific, localized geographic area. Third, even if Dr. Aron believes that there are broader markets, the smallest market principle means that she cannot reject the fact that local relevant geographic markets may exist. Fourth, professional and industry reports describe the market reality—local conditions determine the prices of real estate. Buyers search for homes in particular local geographic areas and sellers seek to sell their property to home

6

buyers who seek to buy in those specific areas and compete with other sellers in the same area. Fifth, Compass's own research (evidenced by its website and internal communications) recognizes that real estate markets are local. Finally, the DOJ, various courts, and academic research support the view that real estate markets are local.

- Dr. Aron introduces no direct evidence showing that Zillow has market power, and there is no evidence that Zillow has "degraded the quality of its product" in an attempt to exercise market power. In fact, the opposite is true. Zillow has made and continues to make substantial investments to improve the quality of its product. And if Zillow were to experience a decline in the relative quality of its platform for any sustained period of time, Zillow would rapidly lose traffic to Realtor.com, Redfin, Homes.com, and other rival platforms.

- There also is no evidence that Zillow's LAS has impeded any online home search company from competing for the attention of home buyers and sellers. In fact, the opposite is true. Several major online home search platforms, including Realtor.com and Homes.com report that visits to their sites are increasing. Redfin is also a serious competitor as demonstrated by its recent $1.75 billion acquisition by Rocket Companies. All of these rival platforms are well-funded and actively investing to expand their reach. The strength of these rivals indicates a robust and competitive marketplace, not one dominated by a single firm as portrayed by Dr. Aron.

- Dr. Aron concludes that Zillow must have market power because it introduced the LAS. This conclusion is not based on any quantitative analysis; instead, it is based on an unreliable hypothetical analysis of Zillow's incentives, which she assumes to be driven solely by the desire to put as many listings as possible on the Zillow platform without regard for the quality and content of the information in Zillow's listings. This analysis, however, is flawed because Dr. Aron inappropriately assumes that all listings are of equal value and that Zillow competes with other online home search platforms merely by increasing the quantity of listings on its website. Dr. Aron's approach ignores Zillow's interest in providing home buyers with a superior search experience and trustworthy information on all MLS listings on the market, including the newest properties that were just put on the market. Dr. Aron also (a) fails to compare a world with the LAS to a world without the LAS; (b) conducts an analysis that does not fully consider the dynamic

7

responses of brokerages, home buyers, and home sellers, which leads her to take an overly narrow and short-term view of the market; (c) ignores facts which indicate that Zillow does not have market power but faces numerous competitive constraints; and (d) fails to analyze or consider the procompetitive justifications and business rationales for the LAS, such as improving the quality and utility of Zillow's platform and mitigating free riding on Zillow's investments. As a result, Dr. Aron's analysis of market power is not only based on flawed assumptions, but also divorced from the commercial realities of the marketplace.

- Dr. Aron claims that Zillow has a high market share, but the data do not support this conclusion. Moreover, a high market share does not imply durable market power, particularly in this case, where Zillow's incentives as a home search platform are to promote an efficient and competitive platform for connecting buyers, sellers, and agents. Zillow has invested in giving home buyers, home sellers, brokerages, and agents high quality information and access to liquidity (i.e., the ability to quickly and easily sell property at its market value), which promotes efficient and competitive real estate transactions.

- Dr. Aron claims that Zillow has high shares and that they imply market power because of barriers to entry. However, Zillow's purported high shares do not imply market power, and there is no evidence that new entry has been deterred. In fact, the opposite is true. Zillow faces at least two well-financed recent entrants into the market for residential real estate online search services (CoStar, through Homes.com, and AddressUSA), indicating that Dr. Aron's alleged barriers to entry do not exist or can be overcome. Further, Dr. Aron does not describe any barriers to expansion by Zillow's existing competitors, who are well-financed and have been investing to increase the reach of their platforms and who face low marginal costs in expanding to service additional users. This lack of barriers to expansion serves as a further competitive constraint on Zillow.

- Dr. Aron does not demonstrate that the LAS is likely to reduce competition among online home search platforms, and the facts suggest that there is no harm to competition due to the LAS. The antitrust laws are concerned with harm to competition, not harm to an individual competitor. Harm to competition means a reduction in quality, an increase in price, a reduction in innovation, or a reduction in sales or total output, relative to

8

competitive levels. But Dr. Aron offers only evidence of an arguable constraint on the business strategy of a single competitor, not harm to competition itself.

- Zillow's LAS has not led to a reduction in choice for brokerages, home buyers, and home sellers. There is simply no evidence that the LAS reduces choice in the market, much less that it causes market-wide anticompetitive effects such as reduced output, declining innovation, or higher prices. Dr. Aron notes evidence that 3PM adoption has declined at Compass, but this is not the same as evidence that private listings have been eliminated as a choice. The LAS does not restrict any brokerage from offering private listings or prevent home sellers from turning to Compass and other brokerages who wish to offer private listings. In fact, the opposite is true. The LAS promotes competition by incentivizing brokerages who offer private listings to be even more competitive if they want to succeed, requiring such brokers to offer tangible value to sellers or buyers—not merely the ability to exploit information asymmetries or to free ride on others' costly efforts to create liquidity. The LAS also does not restrict home buyers in any way. When seeking information about the market, they can and do choose from among any number of online home search platforms. When searching for a buyer broker, they can and do choose from any number of brokerages.

- In contrast to Zillow's LAS, Compass's private listing strategy reduces the flow of information in the real estate market, which is likely to lead to a less efficient and less competitive real estate market because buyers and sellers are less informed than they are today. This increases costs for buyers who must navigate a fragmented listings ecosystem to search for homes. And it increases costs for sellers whose listings receive less exposure and thus have fewer buyers competing for them.

- Dr. Aron offers no evidence to support her assertion that the LAS lessens choice for and irreparably harms home buyers and home sellers. She admits her lack of evidence in stating that it would be a "speculative endeavor" to estimate whether buyers "are deprived of the opportunity to purchase a property better suited to the buyer's preferences or of finding a suitable property more quickly" and that "it is not possible for any seller to know with reasonable certainty whether the outcome for any specific property would have been better had it been pre-marketed." There is, however, ample evidence that private listings are more likely to lead to an inefficient real estate market. Research

9

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

demonstrates that home buyers and home sellers would be worse off with the expansion of private listings, and the ability of Zillow and other online home search platforms to provide reliable and current information about listings and the market would be greatly diminished.

## II.    Background

### A.  Overview of the Real Estate Industry

13.    In 2024 more than four million homes were sold in the U.S.[18] Most of these transactions involved a real estate professional, with 90% of home sellers completing the sale with the assistance of a real estate agent.[19] Most home buyers (86%) seeking to purchase a home also relied on an agent to help them find a property and negotiate the transaction.[20] Real estate agents assist sellers in listing their property for sale and negotiating the transaction and assist buyers in identifying potential homes that meet their criteria and negotiating the transaction.

14.    State laws require real estate agents to work under the supervision of a licensed real estate broker.[21] Brokerages own the property listings their brokers and/or agents secure by representing home sellers and are legally responsible for any resulting real estate transaction facilitated by their brokers and/or agents.[22] Brokerage firms employ one or more licensed brokers and also typically hire one or more agents, either as employees or as independent contractors, to represent home buyers and home sellers in real estate transactions. Brokers can also act individually to represent buyers and sellers. There are approximately 150,000 brokerage

---

[18] National Association of Realtors, "Existing Home Sales Overview," https://www.nar.realtor/sites/default/files/2025-09/ehs-08-2025-overview-2025-09-25.pdf  (accessed September 18, 2025).

[19] National Association of Realtors, "Profile of Home Buyers and Sellers, 2024," at p. 128 https://www.nar.realtor/sites/default/files/2024-11/2024-profile-of-home-buyers-and-sellers-highlights-11-04-2024_2.pdf (accessed September 24, 2025).

[20] Profile of Home Buyers and Sellers, 2024, at p. 50.

[21] U.S. Bureau of Labor Statistics, "Occupational Outlook Handbook: Real Estate Brokers and Sales Agents," https://www.bls.gov/ooh/sales/real-estate-brokers-and-sales-agents.htm#tab-2 (accessed October 1, 2025).

[22] Indeed, "Real Estate Salesperson vs. Broker: What's the Difference?," Updated June 9, 2025, https://www.indeed.com/career-advice/finding-a-job/real-estate-salesperson-versus-broker (accessed October 1, 2025).

offices in the U.S.,[23] about 80% of which are franchisees of large brands such as RE/MAX, Keller Williams Realty, and Coldwell Banker.[24]

15.     Compass is a licensed brokerage, and its primary business model is to perform brokerage services—that is, to represent buyers and sellers in real estate transactions.[25]

16.     Zillow is also a licensed brokerage but its business model extends beyond offering traditional brokerage services.[26] Zillow was founded in 2004 with the goal of transforming the real estate experience for consumers by empowering consumers with the information they need to make smarter decisions for an incredibly important endeavor: shopping for a home and valuing their home's worth.[27] Zillow is best known for its online home search portal. Home buyers visiting Zillow's websites and apps can search more than 165 million U.S. homes listed for sale and connect with an agent to represent their interests.[28] Home sellers can use Zillow's Zestimate to understand valuations and the demand for homes like the seller's before deciding whether they wish to sell or move—an inquiry historically requiring the assistance of a real estate agent or broker.[29] A seller can also use Zillow to find and choose an agent to list their home (the traditional sales method) or a seller can choose to market the home as "for sale by owner" listing, without the assistance of a listing agent.[30] A seller may also elect to have Zillow

---

[23] U.S. Census Bureau, "Real Estate and Rental and Leasing: Summary Statistics for the U.S., States, and Selected Geographies: 2022," NAICS Code 5312, https://data.census.gov/table/ECNBASIC2022.EC2253BASIC (accessed September 24, 2025).

[24] T3 Sixty 2025, "Real Estate Almanac 2025," https://www.realestatealmanac.com/brokerages/ (accessed September 24, 2025).

[25] Compass, Inc., Form 10-Q for the Quarterly Period Ended June 30, 2025, U.S. Securities and Exchange Commission, p. 11, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001563190/ce784cee-6d5f-48c3-8cab-9debfcfcb122.pdf (accessed October 6, 2025) ("The Company provides an end-to-end platform that empowers its residential real estate agents to deliver exceptional service to seller and buyer clients. The Company's platform includes an integrated suite of cloud-based software for customer relationship management, marketing, client service and other critical functionality, all custom-built for the real estate industry, which enables the Company's core brokerage services. . . . The Company generates revenue from clients through its agents by assisting home sellers and buyers in listing, marketing, selling and finding homes . . . .).

[26] See, Zillow Group, "Real Estate Licenses," https://www.zillow.com/c/info/real-estate-licenses/ (accessed October 1, 2025). See, also, Zillow Group, "Zillow Q1 2024 Shareholder Letter," p.3, https://s24.q4cdn.com/723050407/files/doc_earnings/2024/q1/presentation/Zillow-1Q24-Shareholders-Letter.pdf (accessed October 1, 2025) ("Our for-sale growth pillars mark the pathway to meeting our goals to grow customer transaction share from 3% to 6% by the end of 2025")

[27] Pryne, Eric, "Zillow Reveals Financial Details as It Files to Go Public," The Seattle Times, April 18, 2011, Updated April 19, 2011, https://www.seattletimes.com/business/zillow-reveals-financial-details-as-it-files-to-go-public/ (Accessed October 1, 2025).

[28] Zillow Group, Inc., Form 10-K, 2024, at p. 3.

[29] Zillow Group, "What is a Zestimate?," https://www.zillow.com/z/zestimate/ (accessed October 1, 2025).

[30] Zillow Group, "Post a For Sale by Owner Listing," https://www.zillow.com/for-sale-by-owner/ (accessed October 1, 2025).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

co-list their home with another broker. Zillow also offers home buyers and sellers additional services that have traditionally been facilitated by agents and brokers, such as 3D virtual home tours, an automated process for scheduling in-person tours, mortgage origination services (Zillow Home Loans), and title and closing services (Spruce).[31] Zillow monetizes its platform by offering agents services that help them better serve their clients, including generating leads and other advertising services to facilitate connections between agents and consumers, customer relationship management software (Follow Up Boss), and transaction management software (dotloop).[32]

## B. The Relevant Institutions, Rules, and Policies That Facilitate a Well-Functioning, Competitive Real Estate Marketplace

17.    The residential real estate industry in the United States is a complex market environment in which there are participants competing at many levels to achieve a successful outcome—the sale of a home for the homeowner and the purchase of a home for the buyer. In this environment, sellers compete with other sellers for buyers, brokers and agents compete with other brokers and agents to list homes, buyers compete with other buyers to purchase homes, and brokers and agents compete with other brokers and agents to represent buyers. In addition, brokers and agents are often affiliated with a brokerage, and brokerages also compete against other brokerages to attract and retain individual agents. While there are many market participants that each play a role in the process of buying and selling a home, the desired outcome is the sale of a home at terms that are mutually acceptable to the buyer and seller.

18.    From an economic standpoint, there are a number of market conditions that facilitate a well-functioning, competitive market. In theory, the textbook competitive market is characterized by (a) the presence of many buyers and sellers, (b) product homogeneity, (c) low barriers to entry, and (d) perfect information.[33] An important issue in this case is the condition revolving around the flow of information in the real estate market. For the textbook competitive market, the other conditions are important, but in the case of residential real estate and the matter at hand, there is no allegation that there are (a) too few homebuyers, (b) too few home sellers, or

---

[31] Zillow Group, Inc., Form 10-K, 2024, at pp. 5, 41.

[32] Zillow Group, Inc., Form 10-K, 2024, at p. 41.

[33] Carlton, Dennis W., and Jeffrey M. Perloff, *Industrial Organization*, 4th edition, Boston: Pearson, 2005, at pp. 56–57.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

(c) too few brokers, agents, and brokerages. While residential homes are differentiated and often unique, such product differentiation is not at issue in this case.

19.     The important market condition at issue in this case is the flow of information in the market about the homes that are on the market. Buyers need to know what homes are on the market and at what price if they are going to be educated home buyers. Sellers need to know what homes are on the market and at what price if they are going to be educated home sellers. Because the flow of information is so important to having a well-functioning and efficient real estate market, many market institutions, rules, and policies have arisen to maximize the flow of information.

### 1.  *Multiple Listing Services*

20.     One such institution is the Multiple Listing Service ("MLS"), which is a database of homes listed for sale in a particular region that is accessible to the real estate professionals who do business in that region.[34] The MLS assists in facilitating the flow of information by helping brokers and agents obtain accurate and reliable historical information on prior transactions, as well as current information on the supply of homes on the market. An MLS operates as a multi-sided platform that brings together buyers and sellers through their respective agents seeking to complete a real estate transaction. Buyers benefit from the MLS because they can go to a single source for information regarding the vast majority of homes for sale within a given area, reducing their search costs and increasing the chance of finding the home that best fits their needs. Sellers benefit from the MLS because their listing is exposed to a wide audience of potential buyers, increasing the chance of selling their home quickly and for the best price possible. Sellers also benefit by using MLS information on homes comparable to their own to determine their listing price (and whether to sell at all).[35]

---

[34] Real Estate Standards Organization, "What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ," https://www.reso.org/mls-faq/ (accessed September 18, 2025).

[35] *See,* Zillow Group, "Off-MLS Home Sellers Left More Than $1 Billion on the Table the Past Two Years," February 14, 2025, https://www.zillow.com/research/mls-pln-sale-price-34846/ (accessed October 4, 2025); *See also,* Bright MLS, "On-MLS Study: Measuring the Benefits of an Open and Transparent Housing Marketplace," August, 2023, https://image.m.brightmls.com/lib/fe2b11747364047b741278/m/1/6534ddd0-6f2e-42dc-b05b-634e7b1ad23a.pdf, at p. 6 (accessed September 30, 2025).

13

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

21.    The first MLS dates to 1885, and today MLSs remain the central repository of information on properties that are on the market.[36] Most MLSs are owned and operated by local real estate professional associations, and most local real estate professional associations in the United States are members of the National Association of Realtors ("NAR").[37] Under NAR rules, MLS membership is limited to licensed brokers who "actively endeavor[] during the operation of [their] real estate business to list real property of the type listed on the MLS, share[] information on listed property, and make[] property available to other brokers for showing to prospective purchasers and tenants when it is in the best interests of their clients."[38] Only broker participants can list homes for sale using an MLS.

22.    Regional MLSs distributed information to brokerages on paper until the 1970s, when it became possible for agents to search for properties using computer terminals, and in the 1990s, the information from MLSs became available to the public through Realtor.com.[39] As of July 2025, there are more than 500 MLS systems in the United States.[40] Current MLSs are not just databases but organizations that create and enforce rules and standards for broker participants regarding listing sharing.[41] Each MLS can set its own rules, but MLSs that are owned or associated with local and state associations of the NAR abide by the rules and policies of the NAR.[42]

23.    The real estate industry depends on MLSs for distribution of aggregated for-sale listings data.[43] MLSs in turn depend upon their broker participants for listings data. A residential

---

[36] Marketplace, "All about the MLS: The fascinating history of real estate listings," September 18, 2024, https://www.marketplace.org/story/2024/09/18/mls-multiple-listing-service-home-sales (accessed September 18, 2025).

[37] *See,* Real Estate Standards Organization, "RESO Certification Status," https://www.reso.org/certificates/ (accessed October 2, 2025); *See also,* National Association of Realtors, About NAR, https://www.nar.realtor/about-nar (accessed October 1, 2025).

[38] National Association of Realtors. *Handbook on Multiple Listing Policy,* Section 2: Definition of MLS Participant (Policy Statement 7.9), January 1, 2025, https://www.nar.realtor/handbook-on-multiple-listing-policy/section-2-definition-of-mls-participant-policy-statement-7-9 (accessed October 8, 2025).

[39] Marketplace, "All about the MLS: The fascinating history of real estate listings."

[40] Real Estate Standards Organization,"What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ."

[41] Real Estate Standards Organization,"What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ."

[42] Real Estate Standards Organization,"What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ."

[43] *See,* Federal Trade Commission and U.S. Department of Justice, *Competition in the Real Estate Brokerage Industry,* 2007, at p. 12 http://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report- federal-trade-commission-and-u.s.department-justice/v050015.pdf (accessed September 30, 2025) ("As the primary source of information

14

for-sale listing in the MLS is generated by an agent or broker working on behalf of a home seller.[44] The MLS aggregates the listings data populated by individual agents and brokers and distributes those aggregated listings data back to all of its broker participants. In so doing, the MLS ensures that all of its broker participants have access to all property listings in the MLS— not just the ones they entered—which promotes an efficient real estate marketplace that benefits buyers, sellers, and real estate professionals.

24.    MLSs offer numerous benefits to their participants such as thicker markets (more buyers and sellers) and faster matching, better price discovery and higher realized prices for sellers, and reduced information asymmetries that lower search costs and improve liquidity (i.e., the ability to quickly and easily sell property at its market value) for buyers and sellers. "The efficiencies associated with use of an MLS in the real estate industry are well documented in the real estate, legal, and economic literature and in court decisions."[45] These benefits are especially apparent when comparing the U.S. real estate market with real estate markets overseas that do not have an equivalent system in place.[46]

25.    The geographic scope of a particular MLS varies. Some MLSs service multiple neighboring states, while others service only a subset of counties within a single state. For example, Bright MLS services six mid-Atlantic states and the District of Columbia,[47] while the California Regional Multiple Listing Service ("CRMLS") services 22 counties in central and

---

about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers.").

[44] Bankrate, "What is the MLS, and How Does It Work?," December 11, 2023, https://www.bankrate.com/real-estate/mls-multiple-listing-service/ (accessed October 1, 2025).

[45] Federal Trade Commission and U.S. Department of Justice, *Competition in the Real Estate Brokerage Industry,* at p. 13. In particular, there is an extensive literature in economics describing the efficiencies that can arise from platforms in two-sided markets. *See e.g,* Armstrong, Mark, "Competition in Two-Sided Markets," *RAND Journal of Economics* 37(3) (2006): 668–691;  Evans, David S., "The Antitrust Economics of Multi-Sided Platform Markets," *Yale Journal on Regulation* 20(2) (2003): 324–381; Carlton, Dennis W., and Alan S. Frankel, "Transaction Costs, Externalities, and 'Two-Sided' Payment Markets," *Columbia Business Law Review* 2005(3): 617–642.

[46] *See e.g,* Han, Brooklee, "International Markets Embrace the U.S. MLS Model," *HousingWire,* October 2, 2025, https://www.housingwire.com/articles/international-markets-embrace-the-u-s-mls-model/ (accessed October 4, 2025); Eales, Damian, "If You Want to Catch a Big Fish, Avoid Small Ponds," *Realtor.com,* June 16, 2025, https://www.realtor.com/homemade/if-you-want-to-catch-a-big-fish/ (accessed October 5, 2025) ("... the U.S. real estate market is unusual in that U.S. sellers do not pay for their home to be seen by buyers, and as a result buyers get fair access to all properties – not because of who they are or who they know, but because they have access to the internet.").

[47] *See,* Bright MLS, "Who we serve," https://www.brightmls.com/our-markets/ (accessed October 4, 2025).

15

southern California.[48] Many MLSs service only a single Metropolitan Statistical Area ("MSA"), such as the Lubbock Association of REALTORS® MLS,[49] the Vail Multi-List Service,[50] the Aspen Glenwood MLS,[51] and the Multiple Listing Service of Southern Arizona (servicing primarily the Tucson MSA).[52]

26.     In addition to their internal databases of listings that are only accessible by real estate professionals, many MLSs offer consumer-facing websites where buyers and sellers can search active listings without going through an agent.[53]

---

[48] *See,* CRMLS, "Our Coverage," https://go.crmls.org/coverage-area/ (accessed October 4, 2025).

[49] Lubbock Association of REALTORS®, "Market Reports," https://lubbockrealtors.com/market-reports/ (accessed October 5, 2025).

[50] Vail Board of Realtors®, "Vail Multi-List Service," https://www.vbr.net/vail-multi-list-service/  (accessed October 9, 2025).

[51] Aspen Glenwood MLS, "Local Market Update by Town," https://www.aspenglenwoodmls.com/page/Statistics (accessed October 9, 2025).

[52] Multiple Listing Service of Southern Arizona, "MLS Area Boundaries," https://mlssaz.com/wp-content/uploads/2022/07/Area-Maps-2017.pdf (accessed October 9, 2025).

[53] *See, e.g.,* Multiple Listing Service of Southern Arizona, "Public MLS Search," https://mlssaz.com/property-search/ (accessed October 9, 2025); Intermountain MLS, "Welcome Home," https://www.intermountainmls.com/ (accessed October 9, 2025); Houston Association of Realtors, "Texas Real Estate - 319,285 Homes for Sale and Rent," https://www.har.com/ (accessed October 9, 2025); Nestfully, "Find Home," https://www.nestfully.com/ (accessed October 9, 2025; SF Property Search, "Home Search," https://www.sfpropertysearch.com/en/ (accessed October 9, 2025; Naples Area, "Find Naples Home," https://www.naplesarea.com/find-naples-home; https://gofmls.remine.com/ (accessed October 9, 2025); FMLS Remine, "Home Search," https://gofmls.remine.com/ (accessed October 9, 2025, Carolina Home, "Home Search," https://search.carolinahome.com/homes?tl=-83.49539:37.20665&br=-80.23495:34.11101&sort=price-h&propertyType=House%2CLand (accessed October 9, 2025); RealTracs, "Listings Search," https://www.realtracs.com/listings/search (accessed October 9, 2025); Unlock MLS, "Search Listings," https://www.search.unlockmls.com/ (accessed October 9, 2025); Central Washington Board of Realtors, "MLS Search," https://www.cwbr.org/ (accessed October 9, 2025); Northwest Multiple Listing Service, "Listing Search," https://www.nwmls.com/what-is-the-mls/listing-search/#/ (accessed October 9, 2025); OneKey MLS, "Home Search," https://www.onekeymls.com/ (accessed October 9, 2025); Georgia MLS, "Listings," https://www.georgiamls.com/ (accessed October 9, 2025); Real MLS Homes for Sale, "Search Homes," https://www.realmlshomesforsale.com/ (accessed October 9, 2025); Utah Real Estate, "Home Search," https://www.utahrealestate.com/index/public.index (accessed October 9, 2025); Las Vegas Realtor, "Home Search," https://lasvegasrealtor.com/#lvr-home-search-store=%7B%22state%22%3A%7B%22status%22%3A%22INITIAL%22%2C%22filters%22%3A%7B%7D%7D%2C%22version%22%3A0%7D (accessed October 9, 2025); Move in Michigan, "Home Search," https://www.moveinmichigan.com/ (accessed October 9, 2025); MLS Technology Inc., "Search for Property," https://www.mlstechnologyinc.com/ (accessed October 9, 2025); Flexmls, "Listings Search," https://my.flexmls.com/mlsunited/mlsunited/idx_links/20230321205305600653000000/listings (accessed October 9, 2025); Doorify MLS, "Home Search," https://doorifymls.com/ (accessed October 9, 2025); Indiana Regional MLS, "Home Search," https://www.reindiana.com/ (accessed October 9, 2025); Metrolist, "Home Search," https://www.metrolist.com/ (accessed October 9, 2025; Live in Alabama, "Home Search," https://www.liveinalabama.com/; Valley MLS, "Home Search," https://www.valleymls.com/ (accessed October 9, 2025); MIBOR Realtor Association, "Property Search," https://property.mibor.com/ (accessed October 9, 2025); Northern Nevada Regional MLS, "Home Search," https://nnrmls.com/ (accessed October 9, 2025); Space Coast MLS, "Home Search," https://www.spacecoastmls.com/home (accessed October 9, 2025); REALTORS® Association of Maui, "Home Search," https://www.ramaui.com/ (accessed October 9, 2025); Triad MLS, "Home Search," https://triadmls.com/ (accessed October 9, 2025); Alaska Real Estate, "Home Search," https://www.alaskarealestate.com/ (accessed October 9, 2025).

### 2. *The National Association of Realtors (NAR)*

27.     The NAR has implemented a number of rules that affect how most MLSs operate. A lot of these rules are aimed at facilitating the flow of information in the market, such as promptly entering publicly marketed listings into the MLS, promptly reporting to the MLS sales of listed properties (including sales prices)[54] and cancelled sales,[55] and requiring all MLS listings to include a property address or other location information.[56]

28.     NAR has continued to facilitate the flow of information in the real estate market, including by incorporating technological advances, such as the Internet, that further increase the amount of information available to the public. For example, in 2000, NAR convened a special working group "[i]n anticipation of the increasing use of websites by REALTORS® . . . to determine how real estate applications on the Internet might be enhanced so that REALTORS® can inform and serve their clients and customers while, at the same time, assuring that the Internet does not become a medium for exploitation or abuse of the professional relationships and duties by which REALTORS® are legally and ethically bound."[57] The result was the establishment of the Internet Data Exchange ("IDX"), which was a new policy authorizing MLS participants to display listings of other MLS participants on their websites. Indeed, NAR has described the IDX as "the primary means of enhancing cooperation between REALTORS® to facilitate the purchase and sale of real property."[58] An IDX feed enables MLS broker participants to access accurate, comprehensive, and up-to-date listings information for homes listed on the MLS and to distribute those listings data for public display to consumers on the Internet (*e.g.*, on the brokerage's own website or app).[59]

---

[54] National Association of Realtors, *2025 Handbook on Multiple Listing Policy*, Statement 7.75, https://www.nar.realtor/sites/default/files/2025-05/PDF-HMLP-2025-Handbook-on-Multiple-Listing-Policy-2025-05-30.pdf (Accessed October 5, 2025).

[55] National Association of Realtors, *2025 Handbook on Multiple Listing Policy*, Statement 7.77.

[56] National Association of Realtors, *2025 Handbook on Multiple Listing Policy*, Statement 8.9.

[57] National Association of Realtors, "Internet Data Exchange (IDX) Background and FAQ," https://www.nar.realtor/about-nar/policies/internet-data-exchange-idx/internet-data-exchange-idx-background-and-faq (accessed September 18, 2025).

[58] National Association of Realtors, "Internet Data Exchange (IDX) Background and FAQ."

[59] National Association of Realtors, "Internet Data Exchange (IDX) Background and FAQ."

17

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

29.     A similar technology called Virtual Office Website ("VOW") targets real estate professionals and provides detailed data not only for the existing listings, but also for historical listings, sales history, and other information not available through IDX.[60] IDX policies standardized the rules of accessing and displaying listings across multiple MLSs and further contributed to the efficiency of the real estate market.

30.     The dissemination of listings data via IDX feeds has promoted effective competition among brokerages.[61] Broker participants receive MLS listings data through IDX feeds and compete to attract consumers to their websites to view residential real estate listings using various strategies such as website design, search engine optimization, email marketing, and social media.

31.     Since as early as 2013, NAR had expressed concerns related to the proliferation of "pocket listings" and "coming soon" marketing techniques, highlighting that these practices can result in "less complete and consequently less useful property data" and "increasingly fractionalized and less efficient residential real estate markets."[62] In 2020 NAR implemented the Clear Cooperation Policy ("CCP"), which is a mandatory NAR rule requiring listing agents who belong to NAR-affiliated realtor associations to list their clients' homes on the MLS within one business day of marketing the home to the public (e.g., listing the home on the broker's website, placing a yard sign in front of the home, running an advertisement, etc.).[63] NAR highlighted the

---

[60] National Association of Realtors. *Handbook on Multiple Listing Policy*, Virtual Office Websites Policy: Governing Use of MLS Data in Connection with Internet Brokerage, https://www.nar.realtor/handbook-on-multiple-listing-policy/virtual-office-websites-policy-governing-use-of-mls-data-in-connection-with-internet-brokerage (accessed September 18, 2025).

[61] *See*, for example, Amended Complaint, *United States of America v. National Association of Realtors*, No. 1:05-cv-05140, Northern District of Illinois, October 5, 2005, at pp. 1–2 ("Internet sites that enable the brokers' customers to search for and receive real estate listings over the Internet . . . replace or augment the traditional practice by which the broker conducts a search of properties for sale. . . . Since these websites were first developed, . . . brokers' use of the Internet in connection with their delivery of brokerage services has become an important competitive alternative to traditional "brick-and-mortar" business models.").

[62] National Association of Realtors, "Report & Conclusions of the Joint Work Group on Cooperation Issues (2013)," https://www.nar.realtor/about-nar/policies/report-conclusions-of-the-joint-work-group-on-cooperation-issues-2013 (accessed September 19, 2025) ("Pocket listings" take several forms including: "[o]ffice exclusive" listings, . . . "[p]re-MLS" listings, . . . "[v]erbal prelisting agreements", [and others]. . . . "Coming soon" advertisements can focus on unlisted properties which may . . . be listed with a broker in the near future, . . . properties . . . available to potential purchasers after a later, specific date, or only through the listing broker and not available, temporarily or indefinitely, for showing or purchase through other participants.").

[63] National Association of Realtors, "MLS Clear Cooperation Policy," https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy (accessed September 19, 2025). ("Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW),

18

importance of CCP as a mechanism for ensuring an efficient marketplace in its response to an FAQ asking "Why was this policy approved?": "Brokers and MLSs from across the country asked NAR to consider policy that will reinforce the consumer benefits of cooperation. The MLS creates an efficient marketplace and reinforces the pro-competitive, pro-consumer benefits that REALTORS® have long sought to support."[64]

32.    To provide flexibility for sellers "concerned about privacy and the wide exposure of their property being for sale," the NAR exempted from the CCP "Office Exclusive" listings, where the seller directs their agent to market the listing internally within the agent's brokerage on a one-to-one basis and to not allow the MLS to syndicate the listing for display on other brokerage websites or home search portals.[65] The Office Exclusive exemption required agents to still submit the listing to the MLS along with a certification signed by the seller acknowledging that they did not desire the listing to be disseminated to MLS broker participants.[66]

33.    The CCP was implemented January 1, 2020, with an adoption deadline of May 1, 2020 for all NAR-affiliated local MLSs.[67]

### 3.    Brokerage Websites and Real Estate Platforms

34.    As noted above, traditional brokerages like Compass have websites that they use to share information with potential home buyers and sellers. Brokerages primarily seek to attract home buyers to their website because it provides an opportunity for their own agents to connect with those consumers and represent them in real estate transactions. By driving home buyers to their websites, traditional brokerages increase the likelihood that one of their agents will represent both sides of a real estate transaction—the home buyer and the home seller—and thus,

---

digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public.").

[64] National Association of Realtors, "MLS Clear Cooperation Policy."

[65] National Association of Realtors, "MLS Clear Cooperation Policy"; National Association of Realtors, "Summary of 2020 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2020-mls-changes (accessed September 19, 2025).

[66] National Association of Realtors, "MLS Clear Cooperation Policy" ("If the seller refuses to permit the listing to be disseminated by the service, the participant may then take the listing (office exclusive) and such listing shall be filed with the service but not disseminated to the participants. Filing of the listing should be accompanied by certification signed by the seller that he does not desire the listing to be disseminated by the service.").

[67] National Association of Realtors, "Summary of 2020 MLS Changes."

the brokerage will capture the entirety of the commission on the transaction. This is referred to as "dual agency" or "double-ending" deals in the real estate industry.[68]

35.     There also are real estate platforms such as Zillow, Realtor.com, and Homes.com, which have business models that are aimed at facilitating the flow of information in the market and connecting buyers, sellers, and agents.[69] Like traditional brokerages, Zillow drives consumers to its websites and apps by offering access to accurate, timely, and comprehensive residential real estate listings and, once there, offering consumers additional services for their real estate journey. Zillow has invested hundreds of millions of dollars to create a platform that is not only an accurate and comprehensive source of listings, but also provides consumers with valuable information on properties such as the Zestimate, data on nearby schools, transportation information (including a "Walk Score," "Bike Score," and "Transit Score"), and climate risks.[70] This information attracts home buyers to Zillow's websites and apps, which increases the likelihood of connecting agents who advertise on Zillow with prospective buyers. The more high-intent home buyers and sellers that Zillow connects with agents who advertise on its sites, the more likely agents are going to continue to work with Zillow, and the more revenue Zillow generates from providing leads and other valuable services to these agents.

## C. The Rules and Policies That Frame the Competitive Issues in This Case

### 1. *The Multiple Listing Options for Sellers (MLOS) Policy*

36.     In 2025, NAR adopted a new discretionary policy called the Multiple Listing Options for Sellers (MLOS) policy.[71] The MLOS policy exempts from the CCP (in addition to Office Exclusive listings) "delayed marketing exempt listings" where sellers have instructed the listing agent to enter the listing into the MLS but to withhold the listing from syndication through

---

[68] Nesbit, Josephine, "What Is Dual Agency?," *U.S. News*, June 21, 2023, https://realestate.usnews.com/real-estate/articles/what-is-dual-agency (accessed October 9, 2025).

[69] Samuelson, Errol, "Make no mistake – we are championing transparency at Zillow," *LinkedIn*, April 18, 2025, https://www.linkedin.com/pulse/make-mistake-we-championing-transparency-zillow-zillow-gp9ac/ (accessed October 7, 2025).

[70] *See,* ECF No. 51, Declaration of Errol Samuelson in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, ¶ 17.

[71] National Association of Realtors, "Multiple Listing Options for Sellers," https://www.nar.realtor/about-nar/policies/multiple-listing-options-for-sellers (accessed September 19, 2025).

20

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

the IDX feed to other broker participants for a specified period of time, as permitted by local MLS rules.[72] Consistent with the Office Exclusives exemption, the MLOS policy also requires the agent to obtain a signed disclosure from the seller with an "acknowledgement that the seller understands the MLS benefits they are waiving or delaying with the exempt listing, such as broad and immediate exposure of their listing through the MLS."[73] NAR specified that the seller certification must "include[]:

- disclosure about the professional relationship between the Participant and the seller;
- acknowledgement that the seller understands the MLS benefits they are waiving or delaying with the exempt listing, such as broad and immediate exposure of their listing through the MLS; and
- confirmation of the seller's decision that their listing not be publicly marketed and disseminated by the MLS as an office exclusive listing or that their listing will not have immediate public marketing through IDX and Syndication as a delayed marketing listing."[74]

37.    NAR president Kevin Sears described the introduction of this policy as "an outcome that promotes individual choice while also reinforcing a system of openness for all."[75] But some industry participants have expressed concerns over the adoption of the MLOS policy, which NAR introduced "under increasing pressure from powerful, national brokerages to drop the [CCP]."[76] For example, an article in USA Today stated that few sellers had asked for more private and limited ways to sell their home, "but are instead steered to it by brokers, who stand to benefit from keeping listings semi-private and shared among their own client networks."[77] The

---

[72] National Association of Realtors, "Multiple Listing Options for Sellers."

[73] National Association of Realtors, "Multiple Listing Options for Sellers."

[74] National Association of Realtors, "Multiple Listing Options for Sellers."

[75] National Association of Realtors, "VIDEO: NAR President Kevin Sears Discusses Details of the New MLS Policy, Including How It Came to Be and How It Will Benefit Consumers," https://www.nar.realtor/about-nar/policies/multiple-listing-options-for-sellers (accessed September 19, 2025).

[76] CRMLS, "Important News Regarding CRMLS and New NAR Policy," April 18, 2025, https://go.crmls.org/important-news-regarding-new-nar-policy-and-crmls/ (accessed September 26, 2025).

[77] Riquiter, Andrea, "As new real estate listings rules take effect, will buyers and sellers benefit?," *USA Today*, April 4, 2025, https://www.usatoday.com/story/money/personalfinance/real-estate/2025/04/04/real-estate-rules-seller-listings-buyers/82656588007/ (accessed September 19, 2025).

private listings trend can also increase discrimination and "impact consumers by making it harder for small and independent brokers to compete with industry heavyweights like Compass."[78] Some brokers also expressed concerns that delayed marketing could make it harder for buyers to see full range of homes available for sale, impact fair housing efforts, and contribute to market fragmentation and confusion, explicitly stating that "observers say adding more private or semi-private options creates an inefficient market that does little to benefit buyers and sellers."[79] Some MLSs have announced they will not be implementing delayed marketing exempt listings and will instead opt for maintaining a "transparent, consumer-friendly marketplace."[80]

38.    There are brokerages and others who approve of the MLOS policy, even though it delays the provision of listings to the public through IDX feeds.[81]

39.    The MLOS policy was implemented on March 25, 2025, with an adoption deadline of September 30, 2025 for all NAR-affiliated local MLSs.[82]

## 2.    Compass's 3-Phase Marketing Strategy (3PM)

40.    In November 2024, Compass announced a new private listing strategy termed the "3-Phased Marketing Strategy," or "3PM."[83] Compass claims its 3PM strategy "allows home sellers to show a home before they or the home are fully market-ready, generate urgency and early interest, and test market demand and listing price—all while maintaining the seller's

---

[78] Riquiter, Andrea, "As new real estate listings rules take effect, will buyers and sellers benefit?"

[79] Haddad, Richard, "New MLS Policy Provides Privacy Options for Sellers," *HomeLight*, April 11, 2025, https://www.homelight.com/blog/multiple-listing-options-for-sellers/ (accessed September 19, 2025).

[80] NorthstarMLS, "NorthstarMLS Decision on NAR's Multiple Listing Options for Sellers Policy," June 4, 2025, https://northstarmls.com/insights/northstarmls-decision-on-nars-multiple-listing-options-for-sellers-policy/ (accessed October 1, 2025).

[81] Brambila, Andrea, "MLSs scramble to assess and implement new NAR MLS policy," *Inman*, March 31, 2025, https://www.inman.com/2025/03/31/mlss-scramble-to-assess-and-implement-new-nar-mls-policy/ (accessed October 9, 2025).

[82] National Association of Realtors, "Multiple Listing Options for Sellers."

[83] Compass, "A Letter From Robert Reffkin: Win More Listings With Compass' New 3-Phased Marketing Strategy," https://growatcompass.com/blog/a-letter-from-robert-reffkin (accessed September 26, 2025).

22

privacy and without accumulating days on the market or broadcasting public list price reductions that could harm the seller's efforts."[84]

41.     "Phase 1" of this listing strategy is to market the home as a "Compass Private Exclusive." [85] Compass listing agents market these properties to Compass clients on a one-to-one basis, and share the listings with other Compass agents. Compass also allows agents from other brokerages to visit a Compass office and "individually browse Private Exclusives listings on a 1:1 basis that are not publicly available online."[86]

42.     Compass advertises the existence of Compass Private Exclusives on its public-facing website, inviting buyers to "unlock . . . more homes you won't find anywhere else" by registering with Compass and agreeing to work with a Compass agent, (see Figure 1).[87] By clicking on the "See Private Exclusives" button, visitors are taken to a page that says "Find an agent who knows your market best" and includes a search bar to enter a "[n]eighborhood, city, county, ZIP code, office, or agent name."[88]

---

[84] Complaint, ¶ 58; *See also,* Compass, "Compass 3-Phased Marketing Strategy," https://www.compass-homeowners.com/ (accessed September 26, 2025).

[85] Compass, "Compass Private Exclusives," https://www.compass.com/private-exclusives/ (accessed September 26, 2025).

[86] Compass, "Compass Launches Compass Private Exclusives Book, Accessible to All Agents," May 1, 2025, https://www.compass.com/newsroom/press-releases/4aPEadsMI1yWCqXnY2NON2/ (accessed September 26, 2025).

[87] Compass, "Washington, DC Homes for Sale & Real Estate," https://www.compass.com/homes-for-sale/washington-dc/ (accessed October 8, 2025).

[88] Compass, "Find an Agent That Knows Your Market Best," https://www.compass.com/agents/ (accessed October 8, 2025).

**Figure 1. Compass Advertises 208 Private Exclusive Listings in Washington, DC**



43.     In "Phase 2" of the 3PM listing strategy, homes that do not sell as Private Exclusives may be marketed as "Compass Coming Soon" listings.[89] These "coming soon" listings are displayed on Compass.com to "all agents and consumers on the internet without displaying days on market or price drop history."[90]

44.     Finally, in "Phase 3," homes that fail to sell during the first or second phase may be listed on the MLS, and syndicated for display on broker participants' online real estate platforms.[91]

### 3.   Zillow's Listing Access Standards (LAS)

45.     In April 2025, Zillow announced the Listing Access Standards (LAS).[92] Zillow developed and implemented the LAS in response to NAR's weakening of the CCP through the MLOS policy and mounting announcements by brokerages, including Corcoran, Sotheby's, and Douglas Elliman, that they would pursue private listing networks.[93] Zillow was concerned that if

---

[89] Compass, "Compass Coming Soon," https://www.compass.com/coming-soon/ (accessed September 26, 2025).

[90] Compass, "Compass 3-Phased Marketing Strategy."

[91] Compass, "Compass 3-Phased Marketing Strategy."

[92] Zillow Group, "Zillow's Listing Access Standards: What Agents Need to Know."

[93] Wall, Sheridan, "Elliman, Corcoran unveil private exclusive listing platforms," *The Real Deal*, April 7, 2025, https://therealdeal.com/national/2025/04/07/elliman-corcoran-introduce-private-exclusive-platforms/ (accessed October 9,

more and more large brokerages introduced private listings networks and withheld a significant number of listings from the MLS (and therefore from broad distribution to all consumers), the real estate market could fragment and no longer operate as efficiently to the detriment of all market participants.[94] Namely, the listings transparency that is promoted and maintained by the MLS as the central aggregator and distributor of for-sale listings would be diminished by the largest brokerages in the industry withholding private listings from the general public.[95] Zillow viewed the proliferation of private listing networks as against the interest of home buyers, home sellers, and the real estate industry as a whole, which functions most efficiently when all participants in the marketplace have equal access to listings and where information is transparent and widely available.[96] Zillow believes the LAS will ensure that consumers have "fair access to listings without having to get access behind a velvet rope controlled by any one company" and promote "a more transparent, fair and efficient marketplace for agents and brokers."[97]

46.    The LAS requires that "[p]ublicly marketed listings should be entered in the MLS within one business day and published on Zillow as well as other sites that receive MLS feeds so it is viewable to all buyers and participants in the market."[98]

47.    Zillow began implementing the LAS "in a phased approach to ensure quality and experience . . . across local markets on a nationwide basis."[99] Zillow began enforcing the LAS on June 30, 2025. Agents receive a notification if their listing violates the LAS, with the third and

---

2025); Sotheby's, Private Exclusive Listings, available at https://www.sothebysrealty.com/eng/private-exclusive-listings (accessed Sept. 30, 2025).

[94] Zillow Group, "If a Listing is Online, it Should be Online Everywhere: Zillow's New Listing Access Standards," April 10, 2025, https://www.zillowgroup.com/news/zillows-new-listing-access-standards/ (accessed September 26, 2025) ("Practices that selectively share listings — such as with buyers or sellers who agree to work with an agent due to the promise of exclusive access — create confusion, harm consumers and erode trust in the marketplace.").

[95] Samuelson, Errol, "Make no mistake – we are championing transparency at Zillow."

[96] Samuelson, Errol, "Make no mistake – we are championing transparency at Zillow" ("A healthy housing market thrives on competition and transparency. Our industry is at its best when it is focused on fostering a robust market. When listings are widely available to the public, buyers can make the best decisions. Sellers, in turn, benefit from a larger pool of potential buyers, which leads to better offers and a more efficient market."). *See also* Kelman Deposition Transcript, October 9, 2025 ("Kelman Dep. Tr.") at 137:2–10 (explaining that based on his "20 years as a real estate broker," Kelman believes that "buyers want to see all the homes for sale" and "[s]ellers want their homes to reach the most buyers."); Kelman Dep. Tr., at 168:19–170:5 (explaining that fragmenting access to listings would be "terrible" for consumers).

[97] Zillow Group, "If a Listing is Online, it Should be Online Everywhere: Zillow's New Listing Access Standards."

[98] Zillow Group, "If a Listing is Online, it Should be Online Everywhere: Zillow's New Listing Access Standards"; Zillow Group, "Zillow Listing Access Standards Quick Access Guide," https://grow.zillow.com/hubfs/Zillow-Listing-Access-Standards.pdf (accessed September 26, 2025).

[99] Zillow Group, "Zillow's Listing Access Standards: What Agents Need to Know."

25

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

any subsequent listings that violate the LAS "blocked from Zillow and Trulia for the life of the listing agreement or any subsequent listing agreement between that broker and seller."[100]



50.     The LAS only governs Zillow's websites, and no other websites. Listings that do not comply with the LAS can appear on any other home search platform or MLS that will display them, and at least one platform is actively courting such listings: on April 29, 2025

---

[100] Zillow Group, "Zillow's Listing Access Standards: What Agents Need to Know."



26

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Homes.com began offering its "Boost" product for free to listings that were removed from Zillow's websites, pushing such listings to the top of the Homes.com search results.[106]



---

[106] Homes.com, "Sell Your Home Faster and for More with a Homes.com Boost," https://www.homes.com/advertise/boost/ (accessed September 27, 2025); Lentz, Sarah, "Banned by Zillow? Homes.com Will Boost Your Listing for Free," *Nowbam*, May 9, 2025, https://nowbam.com/homes-com-will-boost-listings-banned-by-zillow-for-free/ (accessed September 27, 2025); McPherson, Marian, "Homes.com Will 'Boost' Listings that are Banned on Zillow: Florance," *Inman*, May 9, 2025, https://www.inman.com/2025/05/09/homes-com-will-boost-listings-that-are-banned-on-zillow-florance/ (accessed September 27, 2025); LaTrace, AJ, "Homes.com Aims to One-Up Zillow with Listings 'Boost'," *Real Estate News*, May 9, 2025, https://www.realestatenews.com/2025/05/09/homes-com-aims-to-one-up-zillow-with-listings-boost. (accessed September 27, 2025).



27

## D. The Relevant Economic Principles Applicable to Understanding the Functioning of Real Estate Markets

53.    I now discuss several economic principles that are relevant to understand the way real estate markets function and how to analyze the issues in this matter. Specifically, home buyers and home sellers benefit from greater liquidity, more even distribution of information, and the existence of policies that mitigate information asymmetry, principal-agent issues, and free-riding behavior. As I explain below and in more detail throughout this declaration, Zillow's LAS promotes the efficiency of real estate transactions by addressing these issues, whereas Compass's 3PM strategy exacerbates them. If similar private listing strategies are adopted en masse by other brokerages, that could lead to an unraveling of the market that would leave all market participants worse off.

54.    First, markets, including real estate markets, benefit from having a greater number of buyers and sellers, which leads to increased transactions and liquidity.[112] On the buyers' side, more participants makes it increasingly difficult for any individual buyer to purchase a property at a price lower than what others are offering for similar properties. Similarly, for sellers, a larger pool of comparable properties on the market limits the ability to sell above the prices accepted by others.

55.    When competing buyers offer prices that exceed the prices at which competing sellers are willing to sell, new buyers are attracted to the market by the relatively low asking prices, and new sellers are drawn in by the high offers. This increased competition from both sides drives the offered and accepted prices closer together until they match.[113] At this point, all properties with willing buyers and sellers are successfully sold. Thus, thicker markets and higher liquidity promote market efficiency, meaning that transaction prices fairly reflect actual supply and demand conditions and that the time taken to close a mutually beneficial transaction is optimal.

---

[112] *See*, for example, Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization*, Fourth Edition, 2005, at pp. 57–58.

[113] Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization*, Fourth Edition, 2005, at p. 57. ("If there are many similar firms, no one firm can charge a price above the market price . . . Similarly, consumers cannot find a firm willing to sell below the market price . . .").

DX657 - page 31 of 149

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



29



████████████████████████████████████████████████

████████████████████████████████████████████████

61.     The nature of free riding in the context of this matter is similar. Here, we have MLSs and online real estate portals (including Zillow) that together have organized a network where brokerages can contribute their new and current property listings. Buyers want to see the most up-to-date inventory so that they can act on any homes relevant to their search as soon as possible.[122] There are positive externalities because when more brokerages provide their new and current listings, there are plenty of listings of different varieties for potential home buyers to see. This attracts new buyers and increases the value of the whole network. On top of that, Zillow's portal further increases the market exposure for home sellers by adding valuable information to the listings and making listings publicly available and convenient to view free of charge.

62.     But a brokerage that does not contribute its new and current listings and, instead, contributes its older and less current listings, would be free riding on the efforts of MLSs, Zillow, and the other brokerages in that the free-riding brokerage would be enjoying the benefits of listing on MLS and Zillow's platform, which brings potential home buyers who want to see the new and current homes that are on the market, but not doing its part to contribute its current and new listings. Such free riding would diminish the value of MLSs and the online real estate portal to potential home buyers and the positive externalities generated by MLS and the portal and the brokerages who have contributed their new and current listings. To protect their investment and to maintain the value of the market information, liquidity, and transparency that the portal and other brokerages have sought to create, an online real estate portal may therefore want to adopt policies that deter such free riding in order to maintain or enhance the value of the platform it has created.

63.     Zillow's LAS is designed to promote the positive aspects of the real estate market while protecting against the downsides that externalities can create. Specifically, Zillow's LAS

---

[122] Data from Zillow's platform demonstrates that buyers find new property listings on Zillow particularly valuable. Most page views, saves, and tour requests through Zillow take place within the first few days a listing is on the market. ZG-00033376 (most page views and saves take place within the first few days a listing is displayed); ZG-00033349 (same for number of tours booked through Zillow's product, ShowingTime+). *See also* Kelman Dep. Tr., at 150:7–9 (Everyone wants to see new inventory. When a new shoe drops, when a new album comes out, when a new product is for sale, that's what's in the window of the store.").

promotes transaction efficiency by reducing information asymmetry between sellers and buyers.[123] It ensures that the data on such metrics as days on the market and price history is accurate, enabling buyers to make better-informed decisions. Additionally, Zillow's LAS addresses the principal-agent problem by prompting real estate professionals to disclose the risks associated with selective marketing and listing strategies. This empowers home sellers to have greater control over the sale process and stay better informed about their agents' actions. Zillow's LAS also mitigates the free-riding issue by protecting Zillow's investments in its platform and preventing brokerages from abusing it by posting listings that they could not sell through their own platforms.[124] As a result, Zillow's LAS ensures that both buyers and sellers can rely on Zillow for their real estate transactions, fostering participation from many users on both sides of the market and ultimately promoting overall liquidity and transaction efficiency.



---

[123] Samuelson, Errol, "Make no mistake – we are championing transparency at Zillow" ("we believe that every buyer, seller and agent deserves equal access to information. Our new listing access standards - requiring that a listing marketed to some buyers should be available to all buyers- reinforce this belief.").

[124] Berroth Deposition Transcript, September 9, 2025 ("Berroth Dep. Tr.") at 106:6–16 ("[P]rior to our listing access standards, a brokerage or agent team, you know, is capable of selling a consumer on a kind of -- you know, selling a consumer on the idea that you can both have this sort of velvet-rope opportunity for your listings to be not available to the market and then also get the benefit of the broadest marketing available. And that second piece really is, you know, free riding on the back of an ecosystem that's designed for transparency and accessibility.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



## III. Framework for Assessing the Effect of the Alleged Exclusionary Conduct

33



34



35

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



## IV. Overarching Flaws in the Aron Declaration

**DX657 - page 39 of 149**



## A. Failure to Focus on the Effect of Zillow's LAS Policy in Promoting Efficient and Competitive Real Estate Transactions

78.     Dr. Aron understands that brokerages and agents provide a service to home buyers and home sellers. That service is to help home buyers find a home and to help home sellers sell a home. The result is a transaction between a willing buyer and a willing seller at an agreed-upon price, which is ultimately what the market for real estate (or any other market) is supposed to yield.[134] Yet this is not the focus of Dr. Aron's declaration. When evaluating whether Zillow's LAS policy is anticompetitive, she does not focus on or evaluate the ways in which Zillow's LAS promotes an efficient and competitive real estate market.

---

[134] Indyck, Robert S., and Daniel L. Rubinfeld, *Microeconomics*, 8th edition, Pearson, 2018, at pp. 7–10.

79.     First, Dr. Aron focuses on whether a competitor is doing well or not. But harm to a competitor is not the same as harm to competition, as discussed above. Harm to competition focuses on market outcomes, and not on the outcome of the competitive process on a single competitor such as Compass.

80.     For example, Dr. Aron states that Zillow's LAS policy will "substantially reduce adoption by home sellers of Compass's 3PM strategy . . . ."[135] This is neither a market outcome nor an outcome that aligns with consumer welfare, which in this case, would reflect what home buyers and home sellers want: an efficient transaction that results in the sale of a home where buyers and sellers can trust that the transaction price accurately reflects actual supply and demand conditions.

81.     Similarly, Dr. Aron's competitive analysis revolves around the degree to which "Compass can take advantage of the fact that, as a brokerage, it has access to listings to which Zillow does not have access . . . ."[136] This, too, is not a market outcome. It does not measure consumer welfare or whether the online home search market is functioning efficiently and competitively.

82.     Second, Dr. Aron does not evaluate Compass's allegations based on an approach that considers the effect of Zillow's LAS on the overall efficiency and competitiveness of real estate transactions in addition to those that reflect the efficiency and competitiveness of the online home search market. For example, to evaluate the allegations in this matter, it is important to keep in mind the incentives that frame and drive the competitive process that is at issue in this matter. For example, because the allegations center on Zillow's LAS policy, one must keep in mind Zillow's platform and business model incentives, which are to connect buyers, sellers, and agents efficiently and competitively. When the market for real estate functions efficiently and competitively, Zillow benefits (as do home buyers and home sellers and agents). This is because Zillow's revenues are derived from the services that it provides to home buyers (e.g., information about homes that are on the market), home sellers (e.g., information about homes that are on the market, as well as exposure to potential home buyers), and real estate agents and brokers (e.g.,

---

[135] Aron Declaration, ¶ 210.

[136] Aron Declaration, ¶ 215.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

the opportunity to connect with consumers and provide their professional services). Because each of these services facilitate real estate transactions, Zillow benefits when the broader real estate market functions more efficiently and competitively (increasing the total number of transactions that Zillow can help facilitate). Indeed, this is why Zillow's incentives ultimately are aligned with those of home buyers and home sellers.

83.     Third, Dr. Aron's analysis does not consider the possibility that Zillow's LAS could have a procompetitive benefit. Yet this is a critical element in an economic analysis of alleged exclusionary conduct. For example, Compass claims that "Zillow is choosing to sacrifice short-term profits and terminate a profitable and pre-existing course of dealing with Compass" and other brokerages by enacting the LAS, which represents "textbook monopolistic conduct."[137] However, Dr. Aron offers no evidence or opinion on the relevant factors for proving an unlawful refusal to deal violative of Section 2 of the Sherman Act. I understand that in order to prove a violation of Section 2, a plaintiff must prove two elements: (1) the defendant possesses monopoly power in the relevant market, and (2) "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[138] While Dr. Aron discusses the first element, she does not discuss the second element: whether Zillow's conduct is exclusionary as a matter of economics. Dr. Aron claims to have analyzed whether Zillow's LAS are anticompetitive, but she has not assessed whether and how competition has been harmed. Nor has she addressed whether Zillow's LAS has a procompetitive justification.

84.     Because Dr. Aron has not undertaken these analyses, she is not in a position to evaluate Zillow's market power, the effect of Zillow's LAS policy on competition, or any procompetitive justifications of Zillow's LAS policy. Instead, Dr. Aron conducts an analysis that revolves around the notion that Zillow must be exercising market power because in a competitive market it would not choose not to display Compass's 3PM listings on its platform.[139] The number of Compass 3PM listings on Zillow, however, is not a metric that measures market power in the online home search market, the efficiency of the online home search market or the

---

[137] Complaint, ¶ 121.

[138] *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

[139] Aron Declaration, ¶ 17.

39

efficiency of real estate transactions, the competitiveness of the online home search market or the market for real estate transactions, or any market-based measure of output or innovation.

85.    In order to accurately assess Compass's allegations that Zillow has market power and that the LAS has harmed competition, and to assess the procompetitive rationale and justification for the LAS overall, I will address the impact of the LAS on the overall efficiency and competitiveness of the online home search market, as well as the market for real estate transactions. I also discuss Zillow's incentives and how they are aligned with the overall efficiency and competitiveness of the marketplace.

### B.  Failure to Understand the Role of Externalities and Information in Ensuring an Efficient and Competitive Real Estate Market



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



41



## C.  Failure to Evaluate the Multi-Sided Nature of Online Home Search Platforms

95.    Dr. Aron recognizes that online home search platforms exhibit a number of characteristics: (a) they bring together buyers and sellers, (b) there are zero prices for buyers when they search for listings and zero prices for sellers when they post a listing on an online

42

home search platform, and (c) there are feedback loops that create the benefits that buyers and sellers are looking for. These are characteristics of multi-sided markets or platforms that serve to bring together multiple groups, whether they are a seller with multiple groups of buyers, a buyer with multiple groups of sellers, or multiple groups of buyers and sellers.[142] The economics of multi-sided markets or platforms is the framework that is used to evaluate competitive issues involving platforms like Zillow. Dr. Aron, however, fails to consider that Zillow is a multi-sided platform that not only matches buyers with sellers, but also matches real estate professionals with consumers (buyers and sellers).

96.    Multi-sided markets generate value by bringing together multiple groups of buyers and sellers with the goal of completing a transaction. A good example of a multi-sided market is a shopping mall. Shopping malls invest in parking garages and create a nice shopping space to attract stores and shoppers. Similarly, Zillow invests in its platform to attract home buyers, home sellers, and agents.

97.    Multi-sided markets often have zero prices on one side of the platform. A shopping mall will charge stores a percentage of their revenues to operate a store at the mall, but shoppers are not charged for visiting the mall.

98.    Zillow also has zero prices for some uses of its platform. Zillow earns revenues from advertising placed by agents as well as from providing services that help agents facilitate real estate transactions more efficiently. Home buyers are not charged for visiting Zillow and home sellers (and their brokers) are not charged merely for their listings to be displayed on Zillow.

99.    Multi-sided markets have feedback loops that create the benefits that buyers and sellers are looking for. A shopping mall that is able to attract more shoppers, for example, will help the mall owner to attract more of the stores that shoppers want; more stores will help the mall owner attract more shoppers, which is the exposure stores want; and that, in turn, attracts more stores. Economists refer to these as indirect network effects, which occur when the value of

---

[142] Evans, David, and Schmalensee, Richard, "Multi-Sided Platforms," *The New Palgrave Dictionary of Economics*, 3rd Edition, 2018, pp. 9200–9208.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

one group of customers on the platform is higher when they have access to more members of other groups of customers on another side of the platform.[143]

100.    Like shopping malls, Zillow's incentives are aligned with this feedback loop. Zillow's incentives are to attract home buyers to its site. A platform that is able to attract more home buyers will make it an attractive platform for home sellers; more listings that buyers want and find useful help Zillow attract more home buyers, which is the exposure sellers want; and that, in turn, makes Zillow an even more attractive platform. This works in reverse also. A platform that does not have the listings that home buyers are looking for will lead to a reduction in home buyers visiting the platform; fewer home buyers makes the platform less attractive to home sellers; and that, in turn, makes the platform even less attractive to home buyers.

101.    Multi-sided platforms, such as Zillow, must select product and service features, pricing, and rules of participation to ensure optimal participation of the customer groups they serve across all sides of the platform. Rules of participation are particularly important to regulate the quality of the platform and to prevent one group of customers on the platform from reducing the value of the platform to other groups of customers, such as might occur if one group has different incentives from another group. eBay, for example, has rules restricting sellers from engaging in conduct that could undermine buyer trust or platform integrity, such as misleading buyers, manipulating feedback and ratings, or attempting to sell to buyers outside of eBay to avoid eBay fees.[144] eBay typically issues warnings, temporary holds, or restrictions before imposing a permanent ban on sellers that violate its rules.[145]

102.    Dr. Aron's analysis of market power is flawed because it does not consider the multi-sided nature of an online home search platform. That is because she focuses on metrics that do not capture what an online home search platform is supposed to do, which is to provide buyers and sellers with a better and more useful platform to facilitate real estate transactions (i.e., buy and sell homes). Instead, she focuses on metrics such as market share of searches. But a high

---

[143] *See*, for example, Stobierski, Tim, "Business Insights: What Are Network Effects?" *Harvard Business School Online Blog*, November 12, 2020, https://online.hbs.edu/blog/post/what-are-network-effects (accessed October 10, 2025).

[144] eBay, "eBay Rules and Policies Overview," https://export.ebay.com/en/fees-regulations-policies/ebay-policies/ebay-rules-and-policies-overview/ (accessed October 10, 2025).

[145] eBay, "Account Restrictions and Suspensions," https://www.ebay.com/help/account/account-holds-restrictions-suspensions/account-holds-restrictions-suspensions?id=4190 (accessed October 10, 2025).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

market share does not imply market power, especially if there is a zero price for home buyers to start a search on Zillow. A mall that is successful in creating a platform for shoppers and stores will also see a lot of foot traffic. A mall with high foot traffic is a mall that is attractive to both shoppers (because they want to go to the mall) and stores (who want the exposure to that foot traffic), but all of the foot traffic is meaningless if the shoppers never buy anything from the stores. Similarly, Dr. Aron's focus on the number of visits to Zillow's platform isn't meaningful without some understanding of how these visits produce value for Zillow and the platform users.

103.    By failing to address the multi-sided nature of an online home search platform and the importance of rules of participation for aligning incentives of different customer groups on a platform, Dr. Aron's approach does not allow her to analyze the procompetitive justification and rationale for the LAS. That is because she fails to recognize that multi-sided platforms have to make investments that make the platform a better place for buyers and sellers to transact and for real estate professionals to connect with consumers, and platforms must have rules to protect those investments. This is precisely what the LAS does. The LAS protects the investments that Zillow makes in its platform to be the place where home buyers want to visit and where home sellers want to display their listings, and in turn, where agents can provide professional services to facilitate real estate transactions. Dr. Aron focuses her competitive analysis on only one side of the platform–home sellers. But an online home search platform's purpose is to help multiple sides of the platform, i.e., buyers, sellers, and agents. Helping real estate professionals provide their services more efficiently further benefits buyers and sellers. By focusing on Compass's marketing program and its desire to offer certain home sellers a private listing alternative, she misses an important part of the picture, which is the ways in which Zillow provides information and a broad range of services that ultimately facilitate an efficient and competitive real estate transaction.

## D. Failure to Analyze the Dynamics of the Market and the Responses of Market Participants

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ ████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

106.    Thus, the consequence of eliminating the LAS would go well beyond simply forcing Zillow to include Compass's 3PM listings. Other brokerages would likely follow Compass's lead and the value of the listings on the Zillow website would degrade. And if the quality of the listings on Zillow were to drop, the likely consequence is a reduction in home buyer search traffic on Zillow, which would make Zillow less attractive to home sellers, which would make Zillow even less attractive to home buyers. This is the harmful feedback loop that Dr. Aron describes in her declaration, but the flaw is that Dr. Aron does not consider what would happen if other brokerages followed Compass's lead. The failure to account for and consider the responses of other brokerages is a critical flaw in the analysis.

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

───────────────────────────

█ ████████████████

46

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

# V. The Business Rationale for and Procompetitive Benefits of Zillow's Listing Access Standards

## A. Protecting Zillow's Value Proposition and Disincentivizing Free Riding

108.    Dr. Aron does not consider the business rationale and justification for the LAS, which is intended to protect Zillow's business model and costly investments in its online home search platform. Zillow's value proposition to consumers is, among other things, to provide a comprehensive, high-quality source of listings that home buyers can turn to for accurate information about the market.[147] The high volume of quality listings in turn attracts many buyers, who value Zillow as a comprehensive, current, and trustworthy source of listing information.[148] A major source of Zillow's revenue comes from referring these potential buyers to buyer agents, who, in turn, pay Zillow for the referrals. That is, Zillow's financial success depends on attracting as many buyers as possible to its platform.

109.    There are two key elements of the justification for LAS: protecting Zillow's brand promise and value proposition, and disincentivising free riding.

110.    First, Zillow's implementation of the LAS protects its reputation as a high quality source of information on real estate listings. Zillow has invested many hundreds of millions of dollars to create a platform that matches (i) buyers and sellers of real estate with each other; and (ii) buyers and sellers with real estate professionals. The return on the investments that Zillow makes comes from the revenue generated by the leads that are created from home buyer traffic, as well as revenue from ancillary services Zillow has developed to aid consumers in completing a real estate transaction (such as mortgage, title, and escrow services) and revenue services that improve agent productivity in facilitating real estate transactions. Indeed, Zillow's largest source

---

[147] ZG-00024595–603 at 597 ("A real estate portal must provide complete confidence that customers are seeing every available listing with real-time, accurate details—eliminating any fear of missing out on the perfect home. Because home buying and renting are high-stakes and time-sensitive activities, any gaps in coverage, delays in updates, or inaccuracies in data can lead to frustration, hesitation, and costly mistakes.").

[148] ZG-00033356–75 at 60–62.

47

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

of revenue (over 70%) comes from its online residential real estate search portal and associated products.[149]

111.    Buyers in particular rate Zillow highly for providing comprehensive, up-to-date, and trustworthy information on property listings.[150] These buyers find new property listings on Zillow to be particularly valuable—most page views, saves, and tour requests through Zillow take place within the first few days a listing is on the market.[151] Zillow understands that "[a] real estate portal must provide complete confidence that customers are seeing every available listing with real-time, accurate details—eliminating any fear of missing out on the perfect home," and that "[b]uyers and renters must trust that they're seeing every available home, not just a partial selection."[152] If Zillow were to accept stale and misleading listings, such as those that were initially selectively pre-marketed by brokerages, or listings from brokerages using private listing networks, the result would be lower buyer trust in the platform, which would undermine Zillow's value proposition to users. And if fewer buyers were to use Zillow, buyer agents would find it a less important source of leads (and other agent tools that facilitate transactions) and search for business elsewhere, directly harming Zillow's revenues. It would also allow Zillow's competitors, like Redfin, to outcompete Zillow on the quality of their home search platforms.[153]

112.    Zillow's motivation to promote transparency and access to listings through implementation of the LAS is motivated by more than just the desire to connect home buyers to buyer agents. In addition to services such as advertising and lead generation, Zillow also provides agents and other real estate professionals with tools that improve their ability to help consumers buy or sell a home that do not directly depend on the volume of buyers and sellers attracted to the platform. For instance, Zillow's tour scheduling (ShowingTime) and CRM (Follow Up Boss) tools increase agent efficiency, productivity, and customer service levels.

---

[149] Zillow Group generated $2.2 billion in revenue in 2024, $1.6 billion of which (73%) came from its for sale residential listings, as well as associated products such as ShowingTime+, StreetEasy for-sale, and Follow Up Boss; Zillow Group, Inc., Form 10-K, 2024, at pp. 40–41.

[150] ZG-00033356, at 60–62.

[151] *See,* ZG-00033376 for page views and saves, and ZG-00033349 for tours arranged through ShowingTime+. *See also,* Samuelson Declaration, ¶ 32.

[152] ZG-00032648–656, at 650.

[153] Kelman Dep. Tr., at 216:22–217:7 (explaining that, should the Zillow user experience degrade, Redfin would "take advantage" of the opportunity by promoting its own platform over Zillow's).

48

Zillow's 3D plans and virtual tours also improve the experience for buyers and allow listing agents to better showcase listings. Revenue from these products would also be reduced if Zillow becomes a less desirable real estate platform.

113.    Importantly, these Zillow services make money for Zillow regardless of the source of the lead for the agent using the Zillow product. And just as importantly, Zillow's customers for these services span brokerages of all types and sizes. Servicing this side of the market is critical for Zillow as it is the source of revenue whereas the consumer side is not monetized directly. Thus, Zillow's LAS aligns with its business interests on the professional side of the market as well. If private listings become more prevalent, smaller brokerages will find it harder to enter and compete, as they do not have the listing volume to create a viable private listing network of their own.[154] Indeed, internal Zillow documents discussing the LAS and its development recognized that in a private listings-dominated world, small brokerages would suffer without broad access to listings.[155] Not surprisingly, when Zillow announced the LAS, consumer advocacy groups highlighted how the policy may help address similar concerns for small brokerages.[156] Glenn Kelman, CEO of Redfin, testified that private listing networks "favor[] brokerages who have dominant share within a market."[157] These statements demonstrate that Zillow's LAS enhances listings access and transparency, which promotes competition

---

[154] LaTrace, AJ, "No Clear Cooperation? Expect 'an explosion' in private listings," *Real Estate News*, February 27, 2025, https://www.realestatenews.com/2025/02/27/no-clear-cooperation-expect-an-explosion-in-private-listings (accessed October 7, 2025); LaTrace, AJ, "How small brokerages—and an open housing market—could collapse," *Real Estate News*, August 29, 2025, https://www.realestatenews.com/2025/08/29/how-small-brokerages-and-a-free-market-could-collapse (accessed October 7, 2025).

[155] ZG-00022453–460 at 454 (March 2025 strategy document discussing potential responses to changes in NAR's CCP highlights that "[m]any agents, particularly at smaller brokerages or those brokerages without private listings, will be disadvantaged without CCP as they would be locked out of an 'exclusive club' and unable to show their clients all listings."); ZG-00025889–900 at 896 (May 2025 presentation on the LAS explains that "[p]osting [listings] in the MLS levels the industry playing field" and "[g]ives small brokerages the same access to listings and exposure as the big players," which "promotes more competition, not less").

[156] ECF No. 51-10 (Consumer Policy Center piece explaining that "[e]xperts fear that the private listing brokers will seek to sell listings only to buyers working with the company's own agents, then if they fail, make the listings available only to other big brokers with whom they collude. That collusion would greatly disadvantage small and local brokers as well as buyers."); ECF No. 51-12 (National Association of Hispanic Real Estate Professionals stating that without policies like LAS that support equal access to listings, "larger brokerages could manipulate listing access to their advantage, creating an uneven playing field and disadvantaging smaller brokerages. Fair and transparent access to real estate information supports competition and provides small businesses with equitable opportunities, which are essential for their success . . . .").

[157] Kelman Dep. Tr., at 133:4–134:12.

between agents and ensures that brokerages of all sizes can enter and compete, increasing the number of real estate professionals that will demand Zillow's services.

114.    Second, Zillow's implementation of the LAS is aimed at mitigating the incentives for all brokerages (not just Compass) to free ride on the investments undertaken by Zillow to enhance the value of its platform for users. A brokerage with a private listing initially withholds the listings from the MLS and Zillow and attempts to selectively pre-market and sell the listing to only a subset of buyers. Only if the listing does not sell does the brokerage make the listing available to the MLS and Zillow. Thus, brokerages with private listings aim to tap into Zillow's established audience (built by Zillow by virtue of its significant investments) to try to sell listings that they could not sell privately, while withholding such private listings from Zillow until they are "stale"[158] and undermining Zillow's value proposition of offering comprehensive and fresh listings.

115.    If private listing strategies such as Compass's 3PM were to be adopted widely by brokerages, it would reduce Zillow's incentives to make costly investments in its platform, which in turn could lead to worse outcomes for buyers, sellers, and agents that use Zillow's platform, as well as "spillover" effects that could reduce the efficiency and competitiveness of real estate transactions more generally. Zillow's LAS protects Zillow's investments in its platform and services by disincentivizing brokerages from withholding their most valuable listings for private sale and free riding on Zillow's investments to sell their "stale" listings.

116.    Thus, the LAS preserves Zillow's value proposition to buyers, sellers, and real estate professionals, and disincentivizes brokerages from free riding on Zillow's costly investments. Dr. Aron fails to account for Zillow's legitimate business justifications for the LAS,

---

[158] I note that these concerns are not unique to Zillow and have been voiced by other real estate platforms. *See,* for example "If You Want to Catch a Big Fish, Avoid Small Ponds." (In a recent blog post discussing private listing strategies, the CEO of Realtor.com stated "Essentially, the MLS acts as a cooperative – and cooperation, after all, is what enables the MLS to create this free and open marketplace for the benefit of all buyers and sellers. Why should an uncooperative listing agent be able to sell privately to a restricted group of buyer agents and buyers; and at the same time, benefit from unrestricted access to the listings of cooperative listing agents? Why should sellers be able to access the value of the very MLS they diminished by being uncooperative? One shouldn't turn up to a potluck dinner carrying only a fork."). *See also,* Kelman Dep. Tr., at 147:25–148:5 ("Well, would you shop in a grocery store that only had week-old bread? You wouldn't. Would you visit a real estate website that only had the homes for sale that someone had tried to sell through every other means and through every other channel? Probably not."); Kelman Dep. Tr., at 149:5–14 (if Redfin's platform only received stale listings, "no home buyers will want to come to our website. No home buyers will want to work with our agents because they would prefer to work with an agent who can give them early access to a home").

in particular in promoting a marketplace in which its real estate agent partners can be successful, thereby benefiting Zillow.

117.    Dr. Aron argues that Zillow's implementation of the LAS is, by itself, "evidence of market power."[159] However, Zillow's implementation of the LAS makes economic sense even if it does not eliminate or lessen competition (i.e., even in the absence of any alleged market power). Further, the market responses of other online home search platforms make it clear that Zillow is not alone in wanting to protect the integrity of the information that appears on its site. Both Realtor.com and Redfin have voiced support for policies that promote the widespread availability of listings in order to preserve the integrity of these platforms and promote an efficient marketplace. Redfin has also announced a policy intended to promote listings transparency.[160] Dr. Aron does not assert that any of these other platforms have any degree of market power. This further corroborates the rationale underlying Zillow's implementation of the LAS.

## B.  The LAS is Procompetitive Because it Promotes Greater Transparency, Liquidity, and Efficiency in Real Estate Transactions

118.    Antitrust economists and scholars regard a challenged constraint such as the LAS to be procompetitive if it increases consumer welfare by reducing cost, increasing output, improving product quality or service, or increasing innovation.[161] Procompetitive constraints often alleviate or prevent a market failure, which "occurs when the relevant market produces outcomes that are less efficient than they might be."[162]

119.    Transaction costs are one source of inefficiency that can lead to market failures. If transaction costs are high, they can cause market failures by preventing mutually beneficial

---

[159] Aron Declaration, ¶ 168.

[160] Kelman, Glenn, "Buyers Should See All the Listings, Sellers Should Control How Their Listing Appears Online," *Redfin*, April 14, 2025, https://www.redfin.com/news/buyers-should-see-all-the-listings-sellers-should-control-how-their-listing-appears-online/ (Accessed Oct. 10, 2025).

[161] Newman, John M., "Procompetitive Justifications in Antitrust Law," *Indiana Law Journal* 94(2) (2019): 501–544, at p. 516; United States Department of Justice and The Federal Trade Commission, "Merger Guidelines," December 18, 2023, https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf ("Merger Guidelines"), at p. 11.

[162] Newman (2019), at p. 509; *See also,* Bator, Francis M., "The Anatomy of Market Failure," *The Quarterly Journal of Economics* 72(3) (1958): 351–379, at p. 351 (describing a market failure as "the failure of a more or less idealized system of price-market institutions to sustain 'desirable' activities [consumption and production] and estop 'undesirable' activities.").

51

transactions from taking place. One type of transaction cost that can lead to market failure is search cost (e.g., the difficulty buyers and sellers have in finding each other). There is long-standing literature in economics studying the role of transaction costs, including search costs, in market failures.[163] Zillow's LAS is procompetitive because it discourages practices that would increase search and information costs for buyers and sellers and thus reduce consumer welfare.

120.    Zillow's real estate portal is able to increase consumer welfare by reducing search and information costs. It does so by being a multi-sided marketplace that brings together buyers, sellers, and agents seeking to complete a real estate transaction. It is well known that multi-sided platforms tend to create positive externalities and increase social surplus, including consumer welfare.[164]

121.    Lowering search costs is particularly important in markets for unique goods. Such goods include real estate, where the search for homes can be extremely costly and inefficient. For example, imagine a prospective home buyer driving around a neighborhood looking for "for sale" signs.[165] If the difficulty of searching for a home is too high, home buyers may not find the best home for their needs, and home sellers may not find the buyer willing to pay the highest price. This inefficiency is a market failure that reduces consumer welfare, as it could prevent real estate transactions from taking place or lead to less optimal transactions. Individual market

---

[163] *See,* for example, Arrow, Kenneth J., "The Organization of Economic Activity: Issues Pertinent to the Choice of Market versus Nonmarket Allocation." In *The Analysis and Evaluation of Public Expenditures: The PBB System,* Joint Economic Committee, 91st Congress, 1st Session, vol. 1, Washington, D.C.: Government Printing Office, 1969, 59–60 (describing one possible cause of market failure as a "lack of necessary information to permit market transactions to be concluded" and describing one source of transaction costs as "costs of communication and information, including both the supplying and learning of the terms on which transactions can be carried out"); Coase, Ronald H., "The Problem of Social Cost," *The Journal of Law & Economics* 3 (1960): 1–44, at p. 15 ("In order to carry out a market transaction it is necessary to discover who it is that one wishes to deal with [and] to inform people that one wishes to deal and on what terms … These operations are often extremely costly, sufficiently costly at any rate to prevent many transactions that would be carried out in a world in which the pricing system worked without cost.").

[164] *See,* for example, Armstrong (2006), at p. 668 ("There are many examples of markets in which two or more groups of agents interact via intermediaries or 'platforms.' Surplus is created—or destroyed in the case of negative externalities—when the groups interact."); Evans (2003), at pp. 331–332 ("A platform can increase social surplus when three necessary conditions are met: (1) There are two or more distinct groups of customers … (2) There are externalities associated with customers A and B becoming connected or coordinated in some fashion … (3) An intermediary is necessary to internalize the externalities created by one group for the other group.").

[165] *See, e.g.,* Stigler, George J., "The Economics of Information," *The Journal of Political Economy* 69(3) (1961): 213–225, at p. 216 ("With unique goods the efficiency of personal search for either buyers or sellers is extremely low, because the identity of potential sellers is not known … The costs of search are so great under these conditions that there is powerful inducement to localize transactions as a device for identifying potential buyers and sellers.").

participants cannot overcome this inefficiency on their own—an intermediary or platform is needed to efficiently connect buyers to sellers.[166]

122.    Zillow provides a platform that reduces home search costs by providing comprehensive and accurate listing information that reduces search costs for buyers and sellers. All real estate brokerages and online real estate platforms have access to the same set of real estate listings via IDX, so in an effort to differentiate itself and to attract more home searchers to its site, Zillow has invested heavily in its platform. Indeed, it is now the most visited real estate portal on the internet. Buyers in particular benefit not just from a comprehensive and up-to-date set of listings, but from the additional information Zillow provides on these listings, such as days on market, price drop history, the Zestimate, and neighborhood characteristics such as nearby schools, transportation information, and climate risks.

123.    Promoting policies that reduce search costs enhances the efficiency with which market transactions take place, but it also is in Zillow's own independent self-interest to promote such policies. By reducing search costs for home buyers, Zillow attracts more buyers and sellers to its platform, which enables it to sell more leads and other services to agents seeking to facilitate real estate transactions.

124.    In contrast, brokerages have different incentives. Brokerages generate revenue when their agents represent buyers and sellers in a real estate transaction. Thus, brokerages have an incentive to initially withhold listings from the MLS and Zillow and only market them to buyers represented by their own agents. This allows the brokerage to "double-end" the deal and collect commissions from both the buyer and seller sides of the transaction.[167] Brokerages would then want to display any leftover unsold private listings on the MLS and Zillow so the brokerages could at least collect the seller side commission. This is precisely the strategy Compass is pursuing with its 3PM strategy.[168]

---

[166] *See, e.g.,* Evans (2003), at pp. 332–333; Carlton and Frankel (2005), at pp. 627–628.

[167] Compass reports that "homes that went through the 3-Phased Marketing Strategy were associated with … [an] 800bps uplift in sides." *See,* CZ_COMP_000033781–791 at 788.

[168] CZ_COMP_000025879-883, at 881 (Compass presentation highlights that "over the last two years, pre-marketing results in a consistently higher % of [transactions] where Compass is on both sides. Pre-marketing appears to be resulting in an increasing % of double-ended [transactions], given recent focus on Compass 3 Phased Marketing.");

125.    In contrast to the listings on Zillow, private listings increase search costs in the real estate market, making it more difficult for buyers to find the best home for their needs, and for home sellers to find the buyer willing to pay the highest price. In addition, this inefficiency also harms Zillow, as withholding information on listings degrades the utility of Zillow's platform for buyers, sellers, and agents, reducing Zillow's revenue. An increased use of private listings by brokerages could even lead to the complete unravelling of Zillow's platform. The LAS is intended to preserve the procompetitive aspects of Zillow platform and thus protect Zillow's own interests, while at the same time protecting consumers.

126.    Other participants in the housing market also have recognized the procompetitive benefits of policies such as the LAS. Like Zillow's platform, local MLSs confer considerable procompetitive benefits when they contain a comprehensive set of listings,[169] and several participants in the housing market have adopted rules to preserve these benefits. For example, NAR adopted the CCP, a policy which requires brokers (with few exceptions) to list properties on the MLS within one business day of marketing a property to the public.[170] Dozens of local MLSs have also implemented the CCP or similar rules,[171] and a recent poll revealed that 68% of all agents believe the CCP is good for the real estate industry.[172] Redfin's CEO, Glenn Kelman, testified that Zillow "support[ing] the MLS and the broad distribution of listings to Zillow but also Realtor and Redfin . . . and also all the competitors, that's good news."[173]

127.    Even Compass recognizes the value of the transparent and efficient market the LAS is designed to protect. A key part of Compass's 3PM strategy is to free ride on the investments Zillow has made in attracting buyers to its platform, using Zillow as a clearing house to sell the private listings Compass cannot sell on its own. Compass ultimately ends up placing

---

CZ_COMP_000087384 at 384 (Robert Reffkin says during earnings callback with investors that "private websites equals more double-ending deals.").

[169] Federal Trade Commission and U.S. Department of Justice, *Competition in the Real Estate Brokerage Industry,* 2007, at pp. 12–14.

[170] National Association of Realtors, "MLS Clear Cooperation Policy."

[171] CZ_COMP_000092320.XLSX.

[172] Houston, Daniel, "Inside the stiff opposition to Compass' private-listing crusade," *Inman,* October 6, 2025, https://www.inman.com/2025/10/06/inside-the-stiff-opposition-to-compass-private-listing-crusade/ (accessed October 8, 2025).

[173] Kelman Dep. Tr., at 165:19–23.

54

most of its listings on the MLS and real estate portals such as Zillow: "94% of all sold Compass listings in 2024, including Private Exclusives and Coming Soons, were marketed and sold on the MLS and thus were also displayed on Zillow."[174]

128.    Dr. Aron, however, did not consider these procompetitive benefits in her declaration despite the fact that the procompetitive rationale underlying the creation of LAS applies to online home search platforms generally, regardless of any degree of market power that a platform may or may not allegedly have.

# VI.    Relevant Market Definition



---

[174] Complaint, ¶ 59; *See also,* CZ_COMP_000002687–88, at 87.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



56



### A. Dr. Aron's Proposed Online Home Search Platform Product Market Definition



**B.  Dr. Aron's Proposed National Geographic Market Definition**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



### 1. *The Origin of Home Search Traffic Does Not Inform the Relevant Geographic Market*

141.     Clearly, home buyers who utilize residential real estate online search services face limits in their ability to substitute across geographies. Most buyers are not searching for homes

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

nationwide but are instead constrained to search within specific geographic areas—and therefore constrained to use residential real estate online search services that operate in those specific geographic areas—due to jobs, schools, family obligations, and/or other factors.

142.    Home search data confirms that online real estate search is local. For example, U.S. Census data demonstrates that a majority of moves are within the same U.S. county,[199] and NAR's most recent survey of home buyers shows that between July 2023 and June 2024 the median distance between the home that recent buyers purchased and the home they moved from was 20 miles.[200] Zillow's own data reflect this pattern, showing that a majority of page views for properties listed in an MSA come from within that MSA.[201] Zillow also found that, "[b]ased on a snapshot of May 2025 data, nearly 70% of consumers who save two or more home listings to their Zillow account save homes that are within 50 miles of each other."[202] This is evidence that most potential buyers are not searching nationwide, but instead focus their residential real estate online searches on specific (often nearby) geographic areas.

143.    It follows, therefore, that potential buyers searching for homes within a local geography are constrained to using the residential real estate online search services of providers who display for-sale listings in the specific local geography in which those buyers are looking to purchase homes.[203] Such services may include so-called "national" portals such as Zillow, Realtor.com, Redfin, and Homes.com to the extent that those portals possess listings within the home buyer's specified geographic parameters, but also includes websites operated by local MLSs, brokerage websites for brokers that do business in that geography, and social media posts by local real estate agents or brokerages. Buyers searching for homes in Houston, TX do not

---

[199] United States Census Bureau, "CPS Historical Geographic Mobility/Migration Graphs, Figure A-1.2 Type of Move: 1948-2023," https://www2.census.gov/library/visualizations/time-series/demo/geographic-mobility/figure-a-1.2.png (accessed September 27, 2025).

[200] National Association of Realtors, "Profile of Home Buyers and Sellers, 2024," https://www.nar.realtor/sites/default/files/2024-11/2024-profile-of-home-buyers-and-sellers-highlights-11-04-2024_2.pdf, at p. 33 (accessed October 5, 2025).

[201] ZG-00033348; Zillow Research, "Search Trends," Zillow Group, March 20, 2025, https://www.zillow.com/research/home-shopping-search-trends-34988/ (accessed September 30, 2025).

[202] Samuelson Declaration, ¶ 19.

[203] Samuelson Dep. Tr., at 34:2–9 ("Real estate is local. People want to search in a particular local region . . . The home search is available on the internet, and the user would typically start their search by putting in a local region where they're interested in searching."); Samuelson Dep. Tr. at 24:24–35:5 (explaining that searches "can be by ZIP code. It can be by like a city name. It could even be . . . a neighborhood name within that city. But you start by putting in a local area that you're interested in.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

view Nestfully (operated by CRMLS, REColorado, and BrightMLS and therefore displaying homes for sale in California, Colorado and the mid-Atlantic) as a substitute to the Houston Association of Realtors ("HAR") MLS's website, HAR.com, because Nestfully.com does not display any listings in Texas. Conversely, buyers searching for homes in Washington, D.C. do not consider HAR.com as a substitute to Nestfully.com because HAR.com does not display listings outside of Texas and neighboring states.

144.     Similarly, home sellers want their listings to be seen by buyers interested in moving to (or within) the local area that includes their home, and have no incentive to list their homes on MLSs covering different geographic regions. For example, a seller listing a home in Salt Lake City, UT has no incentive to list the home on MLSs that do not cover the Salt Lake City MSA (e.g., BrightMLS or HAR MLS). Indeed, if the seller is working with an agent in Salt Lake City, this agent is unlikely to be licensed to enter the seller's listing into an MLS that operates outside this area. A listing only submitted to MLSs that cover the Salt Lake City MSA will not be syndicated or displayed by local MLS websites outside of the Salt Lake City MSA or by brokerage websites for brokers that do not do business in the Salt Lake City MSA, such as Compass. The home will, however, be displayed by the local MLS-powered website (www.utahrealestate.com), as well as by portals (e.g., Zillow) and brokerages (e.g., Keller Williams, Century 21) that are broker participants in the MLSs that service Salt Lake City (UtahReal MLS or URMLS) and receive IDX feeds for that geography.

145.     Thus, the relevant geographic markets for residential real estate online search services are local. Home buyers, regardless of where they currently live, conduct their searches in the specific local areas in which they wish to live, and home sellers provide their listings to MLSs (and from there, portals and brokerages) that do business in the local geographic area that includes their home.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**2.  *Dr. Aron Offers No Support for Her Argument Why the Relevant Geographic Market Should Combine Many Local Markets Into One***

████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████

████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████

**3.  *Commercial Realities in the Online Real Estate Search Services Market Indicate that the Relevant Geographic Markets Are Local***

████████████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████ ███████████████████
██████████████████████████████████████████████
███████████████████████████████████████

████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

████████████████████
██████████████████████████
██████████████████████████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**DX657 - page 66 of 149**





155.     Other online home search competitors also have stronger and weaker presence in certain areas of the country. Glenn Kelman testified that Redfin's platform derives "significantly more traffic" from the "first ten markets" Redfin launched in than other markets.[216]



157.     Compass itself does not offer residential real estate online search services nationwide—there are over 300 MLSs where buyers searching for a home within the geographies covered by these MLSs cannot search for homes on Compass.com.[219] Dr. Aron describes the 3PM strategy as "aiming to drive consumer traffic from across the country to Compass's website to see its inventory of listings,"[220] but of course this consumer traffic can only search for homes in the local areas where Compass operates, rather than nationwide. Like Compass, many other brokerages are not national, and only allow consumers to search listings in the local areas in which they operate.



[216] Kelman Dep. Tr., at 220:4–16.

[219] Compass operates in approximately 200 MLSs, and there are over 500 MLSs in the United States. *See* CZ_COMP_000092320.XLSX, Aron Declaration ¶ 44.

[220] Aron Declaration, ¶ 149.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



66



## VII.    Analysis of Market Power

162.    These conclusions are not supported by the facts. First, there is no direct evidence of market power in the Aron Declaration. Second, there is no basis for Dr. Aron's conclusion that implementing the LAS is itself evidence of market power. This is because there is a strong procompetitive rationale for the LAS. Third, Dr. Aron's analysis of market shares is flawed. She fails to understand the underlying data, and there is no reason to assume that high market shares imply market power. Fourth, the facts do not support Dr. Aron's conclusion that there are



67

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

barriers to entry into the market for online home search platforms. Fifth, there are no barriers to expansion by existing rivals and new entrants, which is a significant constraint on Zillow that Dr. Aron never accounts for.

## A.  There is No Direct Evidence of Market Power in the Aron Declaration

163.    In markets without a price, Dr. Aron defines market power as "the ability to degrade product quality without concern of losing consumers."[236] There is no evidence in the Aron Declaration that Zillow has degraded the quality of its product. Thus, there is no direct evidence of Zillow's alleged market power.

164.    Instead, Zillow has made and continues to make substantial investments to improve the quality of its product. Zillow's financial statements show that Zillow spent over $300 million on technology and development in the first half of 2025 (the period in which the LAS was announced), an increase of 3% over the first half of 2024.[237] Strategy documents show that Zillow continually invests in improving its for-sale user experience to compete with other portals.[238] Redfin sees Zillow as a "fierce" competitor because of its superior skills.[239]

165.    There also is no evidence that Zillow's LAS has impeded any online home search platform from competing. Just the opposite. Among the other major portals, both Realtor.com[240] and Homes.com[241] report increases in visits to their sites. Redfin, acquired by Rocket Companies

---

[236] Aron Declaration, ¶ 161.

[237] Zillow Group, "Form 10-Q, Second Quarter Ending June 30, 2025," https://s24.q4cdn.com/723050407/files/doc_financials/2025/q2/b145e4ea-5d1a-40c8-9409-79b926da9d32.pdf, at p. 5 (accessed October 5, 2025).

[238] *See, e.g.*, ZG-00033272–347 at 381, 384–388 (comparing Zillow's for-sale platform experience with competitor portals and finding certain aspects of Zillow's product in need of improvement and investment).

[239] Kelman Dep Tr., at 215:10–216:1 (describing Zillow as "technically capable, well-funded, high brand recognition, well-run.").

[240] Realtor.com, "How Realtor.com Is Building Trust and Gaining Ground in Real Estate Search," April 25, 2025, https://www.realtor.com/homemade/how-realtor-com-is-building-trust-and-gaining-ground-in-real-estate-search/ (accessed October 5, 2025).

[241] Delozier, Jonathan, "Homes.com Grows With Increased Agent Adoption, Consumer Demand," April 29, 2025, https://www.housingwire.com/articles/homes-com-q1-2025-earnings-andy-florance-increased-agent-adoption/ (accessed October 5, 2025).

68

in July 2025, remains a serious competitor.[242] Glenn Kelman testified that Redfin has "competed for 20 years because we can build a better mousetrap and even though we have far less marketing dollars, we can grow our business."[243] All of these competitors are well funded and actively investing to expand their reach. Dr. Aron barely mentions these rivals, let alone explains why they do not constrain Zillow today given the prevalence of cross-shopping (searching across multiple platforms) and zero switching costs for consumers.

166.    Not surprisingly, Dr. Aron offers no evidence that any other online home search platform has lost revenue, market share, or individual sales opportunities, or suffered increased costs because of the LAS. This includes Compass. There is no evidence in the Aron Declaration that Compass has lost home search revenue or suffered a decline of market share in home search.

167.    Dr. Aron claims that recent reductions in seller adoption of Compass's 3PM is "direct evidence" of Zillow's market power.[244] However, there are several problems with this analysis. First, Dr. Aron does not explain why 3PM adoption is a useful measure of consumer demand for pre-marketing approaches. Though her declaration discusses some purported benefits of pre-marketing and a handful of reported 3PM successes by Compass agents, this does not mean 3PM is a bellwether.

168.    Second, Dr. Aron fails to take into account other explanations for the apparent drop in 3PM adoption. For example, as noted above, the MLOS policy introduced by NAR in March 2025 specified the disclosures an agent must make to a seller related to pre-marketing strategies that limit the immediate public marketing of their listing. On May 28, 2025 Compass updated its seller disclosure form for 3PM that "incorporate[d] new language that reflects industry changes,"[245] apparently in response to the requirements of NAR's new MLOS policy.

---

[242] Rocket Companies, "Rocket Companies Completes Acquisition of Redfin," July 1, 2025, https://www.rocketcompanies.com/press-release/rocket-companies-completes-acquisition-of-redfin/ (accessed October 5, 2025). *See also,* Kelman Dep. Tr., at 45:25–46:1 (Redfin has the best real estate search site of any major brokerage.").

[243] Kelman Dep. Tr., at 218:2–7. Kelman also testified that both Realtor.com and CoStar (Homes.com) are important competitors who have grown significantly in recent years. Kelman Dep. Tr., at 218:17-219:18.

[244] Aron Declaration,. ¶ 175.

[245] Compass, "Compass Launches Enhanced Seller Disclosure to Promote Transparency and Homeowner Choice," May 28, 2025, https://www.compass.com/newsroom/press-releases/7GTGPrZsN0vVh15XkhDnWo/ (accessed October 8, 2025); *See also,* LaTrace, AJ, "Compass touts 'transparency' of new seller disclosure form," *Real Estate News*, May 28, 2025, https://www.realestatenews.com/2025/05/28/compass-rolling-out-new-seller-disclosure-form (accessed October 8, 2025).

The seller disclosure form was mandatory in some states and optional in others prior to the MLOS policy, which mandates such a disclosure now for broker participants in all NAR-affiliated MLSs.[246] Specifically, Compass's revised seller disclosure form informs sellers that choosing the 3PM strategy "could reduce (i) the number of potential buyers who can learn about the property; (ii) the number of showings; (iii) the number of offers; and (iv) the final sale price for the property."[247] Previous versions of Compass's 3PM disclosure form that I have seen did not include this language.[248] Thus, it is not clear what, if anything, was disclosed to sellers choosing the 3PM strategy prior to May 2025. And as this new mandatory disclosure is contemporaneous with Zillow's announcement and enforcement of the LAS (April and June 2025, respectively), Dr. Aron cannot demonstrate how much (if any) of the decline in the adoption of 3PM is due to the LAS rather than the increased consumer education resulting from Compass's revised disclosure form and industry discourse following NAR's introduction of the MLOS policy and Zillow's announcement of the LAS.

169.    Further, Compass witnesses have testified that seasonality impacts their business.[249] Compass documents also acknowledge that, even before Zillow announced the LAS, other brokerages were using similar pre-marketing approaches which may undercut 3PM adoption.[250] Compass documents suggest other reasons for a potential drop in 3PM adoption, including economic conditions in certain markets;[251] consumer sentiment against Compass's

---

[246] "Compass Launches Enhanced Seller Disclosure to Promote Transparency and Homeowner Choice." ("The form was previously mandatory in some states and optional in others. The form is now required to be reviewed and signed by all seller clients before any pre-marketing activity begins.").

[247] Compass, "Disclosure Regarding the Compass Three-Phased Marketing Strategy," May 27, 2025, https://assets.agentfire3.com/uploads/sites/1928/2025/06/Three-Phased-Marketing-Disclosure.pdf (accessed October 7, 2025).

[248] Compass, "Exclusive Right To Sell and Market Agreement," Appendix A, February, 2025. Compass, "Exclusive Right to Sell and Market Agreement," Listing Contract Addendum, n.d.

[249] Bhonsle Dep. Tr. at 15:11–16:10.

[250] CZ_COMP_000001732 (April 1, 2025 email from Neda Navab explaining that their 3PM "advantage won't last forever" as "[e]very week, we are seeing brokerages try to compete by offering copycats of the Compass 3-Phased Marketing Strategy."). Navab testified in her deposition that her view at the time of this email was that "our agents' differentiation in the living room would become harder to convey as other brokerages described programs that could sound similar to the three-phased marketing strategy." Navab Dep. Tr. at 113:2–7. See also, CZ_COMP_000064504 (April 8, 2025 email explaining that "[o]ur competitors are launching their own versions of the Three-Phased Marketing Strategy. Douglas Elliman just launched the 'Black Label Private Listings' program and Corcoran Reserve.").

[251] CZ_COMP_000011869 (March 12, 2025 email from Neda Navab explaining that federal government layoffs "are having a massive impact in DMV" and "[a]s a result, three phased is just not landing well in this exact moment, as it was a few weeks ago.").

70

prioritization of PLNs;[252] agent "fatigue" with the 3PM program;[253] and other problems with the program.[254] Recent industry coverage also suggests that agent and broker enthusiasm for private listings may be declining as agents at smaller brokerages and franchisees increasingly recognize that broad distribution on the MLS is to the advantage of most clients.[255] Dr. Aron fails to analyze how any of these alternative explanations impact her analysis.

## B.  Implementing the LAS Is Not Evidence of Market Power



171.    Without any evidence that Zillow has degraded the quality of its platform, Dr. Aron can only describe a hypothetical scenario that "proves" to her that Zillow's implementation of the LAS demonstrates market power. According to Dr. Aron, absent such market power, implementing the LAS would result in a reduced number of listings on Zillow. This would directly decrease Zillow's revenue from selling leads to buyers' agents, degrade the quality of Zillow's platform for buyers who will have access to fewer listings, and also decrease the value of Zillow's platform to sellers due to lower interest from buyers.[257] Therefore, in her view, implementing the LAS is evidence in support of Zillow's market power, because, without market

---

[252] CZ_COMP_000002013–015, at 014 (April 15, 2025 email reports that a "top agent[] lost a listing due to the seller's perceived sentiment around our company messaging on off-market listings.").

[253] *See, e.g.,* CZ_COMP_000031015 (May 6, 2025 email explaining that agents in northern California markets are feeling "[c]ommunication fatigue" which "can diminish its effectiveness and lead to disengagement" with 3PM); CZ_COMP_000031026 (May 6, 2025 update on 3PM from Texas markets: "Message fatigue [around 3PM] continues to be a common complaint, leading to Agents tuning us out.").

[254] *See, e.g.,* CZ_COMP_000019555–558 (April 9, 2025 email discussing agent in Boulder, CO having issues with "data entry" related to 3PM).

[255] Houston, Daniel, "Inside the stiff opposition to Compass' private-listing crusade," *Inman*, October 6, 2025, https://www.inman.com/2025/10/06/inside-the-stiff-opposition-to-compass-private-listing-crusade/ (accessed October 8, 2025).

■ ▬▬▬▬▬▬▬

[257] Aron Declaration, ¶¶ 168–173.

**DX657 - page 74 of 149**

power, such a policy would diminish the "attractiveness of and ability to monetize its platform" and would not be a rational choice.[258]

172.    Dr. Aron's hypothetical is flawed for at least the following reasons: (1) failure to recognize that not all listings are equally valuable to Zillow, (2) failure to compare a world with the LAS to a world without the LAS, (3) failure to fully consider the responses of all market participants; and (4) failure to consider the impact of free riding and exploitation of other externalities that if unchecked would harm buyer and seller welfare.

### 1.    An Incorrect Premise that All Listings Are Equal

173.    The most important flaw is that Dr. Aron's hypothetical is based on an incorrect premise. She presumes that excluding listings that had been privately marketed (e.g., Compass's 3PM listings) is synonymous with degrading the attractiveness and quality of the Zillow platform. The flaw is that Dr. Aron assumes that the quantity of listings on the Zillow platform is a measure of the quality of Zillow's product in the eyes of home buyers. This is tantamount to assuming that it is the listing itself that matters (as opposed to the content that is in each listing) and that all listings are therefore effectively equal. There is simply no support for this assumption.

174.    The quality of the Zillow platform is not driven by the mere quantity of listings that appear on the Zillow site, which is the underlying assumption in Dr. Aron's analysis. The quality of Zillow's platform hinges on Zillow's ability to deliver trustworthy, current information about the homes on the market. Zillow seeks to "provide complete confidence that customers are seeing every available listing with real-time, accurate details—eliminating any fear of missing out on the perfect home."[259] To that end, it is critical for Zillow and other home search platforms

---

[258] Aron Declaration, ¶ 173

[259] ZG-00032648–56 at 650; *See also,* Berroth Dep. Tr. at 183:13–184:1 ("There are a number -- consumers trust us, because they believe they're getting a good holistic view of the market and all the other attributes that I said that came along with that, quality, timeliness, accuracy, et cetera. And so I think the total number of listings or, maybe more important than that, of the available -- of the listings that are available that we have approaching a hundred percent of that comprehensive set. That's an important metric, but so too is quality of the listing, that those listings aren't stale, you know, that they're accurate. So they have some of the other attributes that I mentioned.").

72

to display the newest listings in the market. Buyers want to see the most up-to-date inventory so that they can act on any homes relevant to their search as soon as possible.[260]

175.    Yet in the hypothetical scenario that Dr. Aron describes in her attempt to prove that Zillow has market power, she does not consider the importance of providing trustworthy information to the marketplace, which Zillow does in order to drive home buyers to its website, which is critical to how the Zillow platform facilitates the efficient and competitive matching of buyers and sellers. Further, listings that have misleading information on key characteristics, such as failed attempts to sell the property or understated days on market, would degrade Zillow's product and harm buyers (and, if left unchecked would also ultimately harm sellers for the reasons discussed above in Section II.D). Dr. Aron also does not attempt to substantiate why Zillow's loss of a relatively small number of listings (from Compass's 3PM) would be expected to have a material impact on Zillow's audience or its ability to generate leads for its buyers. Thus, Zillow has every incentive to prevent and avoid publishing misleading information on its website.

### 2.  *Failure to Compare a World with LAS to a World Without LAS*

176.    The second major flaw in Dr. Aron's hypothetical is that she fails to compare market outcomes in a world where there is LAS to a world where there is no LAS. Dr. Aron's hypothetical is based on the wrong framework. To show that Zillow has market power and the ability to harm competition, she attempts to explain why Zillow would not have an incentive to implement LAS in such a world. The framework she has adopted is flawed because she has failed to see that Zillow's incentive to implement LAS is the same whether Zillow has market power or not.

177.    The right framework to determine whether LAS is a policy that would give Zillow the ability to harm competition is to compare a world with LAS to a world without LAS. If in a world with LAS (compared to a world without LAS) Zillow is better off and competition is enhanced, then it must be that Zillow's LAS is procompetitive and not a mechanism that would

---

[260] Most page views, saves, and tour requests through Zillow take place within the first few days a listing is on the market. ZG-00033376 (most page views and saves take place within the first few days a listing is displayed); ZG-00033349 (same for number of tours booked through Zillow's product, ShowingTime+). *See also,* Kelman Dep. Tr., at 150:1–13 (agreeing new listings are the most valuable).

73

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

allow Zillow to exercise market power. In contrast, if in a world without LAS (compared to a world with LAS), Zillow is better off and there is some reduction of market output or consumer welfare, then one might conclude that the implementation of LAS could be consistent with an attempt to exercise market power.

178.    I begin this analysis by first considering what a world without LAS would look like. In a world without LAS, if Zillow were to accept failed private listings from brokerages, then brokerages would likely increase their attempts to obtain a more profitable private sale first, and for the homes that failed to sell, brokerages would display these older, lower quality listings on Zillow. The result would be that listings on Zillow would be incomplete and of lower quality, making the platform less attractive to buyers as a whole.[261] Moreover, home buyers would have an incomplete and misleading view of the market, as they would not see homes that are "on the market" but only privately, and they would not see accurate information about the failed private listings (e.g., zero days on market when that was not, in fact, the case). Moreover, with more private listings, home buyers would have to contact each brokerage separately to learn about their respective private listings.

179.    I next consider what a world with LAS looks like. In a world with LAS, home sellers would still have a choice—they could market their home through brokerages who offer a private sale alternative (e.g., Compass's 3PM) or they could market their home through the MLS and Zillow. Thus, in this world, home sellers have a competitive choice to make regarding how they want to market and sell their home. This is because Zillow's LAS in no way prevents brokerages from pursuing strategies that do not involve listing on Zillow, including any office exclusive strategies or any strategies that involve marketing on online platforms other than Zillow, assuming that such listings comply with the relevant MLS rules. At the same time, there would be no degradation to the quality of information displayed on the Zillow platform. Thus, in this world, home buyers would continue to have reliable and current information about the

---

[261] *See,* for example, Lake Deposition Transcript, September 11, 2025 ("Lake Dep. Tr.") at 132:1–132:10 ("This is, I think, the race to the bottom that I discussed before, that if Compass is touting their exclusive inventory or any other broker is touting their exclusive inventory, that other brokers are going to want to follow a similar path to drive transactions and agent retention and all of that. And that leads to the world that I talked about earlier where in order to see the most up-to-date and the most accurate listings, you have to go to multiple different websites as a consumer and, you know, bad experience for -- for homebuyers.").

74

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

homes that are on the market, but with full knowledge that there could be homes that are being sold privately.

180.    If we compare the two scenarios, Zillow is better off in a world with LAS. This is because with LAS, there is no degradation to the quality of the listings that appear on the Zillow platform, which is an outcome that would tend to cause home buyers to go to Zillow for relevant and current information about homes that are on the market. Moreover, in a world with LAS, the outcome is likely to be a more efficient and competitive real estate market. This is because (a) home sellers still have choice on how to market their homes, (b) home buyers have full information on the homes that are on the market, while knowing there are homes listed privately, and (c) there would be no degradation of the quality of listings that appear on the Zillow platform. There is simply more information available in the market with LAS, and a market with more reliable information that is accessible easily to both buyers and sellers is likely to lead to more efficient and competitive outcomes. Thus, in a world with LAS, Zillow is better off and the market outcome is more efficient; this outcome is not consistent with an exercise of market power.

181.    This comparison is not the analysis that Dr. Aron performs, but it is the analysis that is (a) focused on market outcomes, (b) considers the role of information, which is essential to facilitating efficient, competitive markets, and (c) focused on market processes that allow home buyers and home sellers to make informed choices.

### 3.    *Failure to Fully Consider the Responses of All Market Participants*

182.    The third major flaw is that Dr. Aron's hypothetical does not fully consider the responses of market participants. The scenario that she analyzes focuses on her view of whether Zillow would have implemented LAS in a competitive market. Because, in her view, Zillow would not have implemented LAS in a competitive market, she infers that Zillow must have market power. This, however, is a conclusion that is drawn from an analysis that fails to fully consider the responses of market participants.

183.    First, the analysis fails to consider the responses of brokerages, who would expand their efforts to market homes privately. This would degrade Zillow's platform, as

75

described above. Thus, the degradation of the Zillow platform is not simply the display of Compass's 3PM stale listings on Zillow, but the display of a larger number of listings of homes that failed to sell privately (with misleading information on days on market) from all brokerages.

184.    Second, the analysis fails to consider the responses of home buyers, who would stop or no longer look to the Zillow platform for information about the marketplace. This begins the feedback loop that is characteristic of multi-sided markets. If Zillow were to lose its ability to attract buyers, it would lose profits far in excess of any incremental profits (which are, at best, speculative) to be gained by accepting stale private listings. Zillow would risk becoming a clearing house for undesirable properties rather than a high-quality home search platform.[262]

185.    If Zillow's consumers were unable to distinguish between new listings and listings that brokerages were unable to sell through their private listings process and were then belatedly displayed on Zillow, then Zillow's consumers would expect that any listing on Zillow is potentially "stale" or lower quality, which would decrease consumers' trust in the platform and deter consumers who are interested only in new listings from searching for properties on Zillow.

186.    This dynamic underpins Zillow's push to ensure that its platform is seen as being a comprehensive source of listings—in other words, Zillow realized that "[b]uyers and renters must trust that they're seeing every available home, not just a partial selection."[263] Zillow's "Priority 1" is to "ensure all listings stay on the site," and their allocation of resources to accomplish this goal is "as much as we need to do; no real upper bounds."[264]

187.    Indeed, in its 2024 10-K, Zillow described the following as a risk to their business: "[o]ur competitors and real estate market participants may engage in exclusionary

---

[262] In economics, this situation is known as the adverse selection problem. Described by Akerlof (1970) using the example of the market for used vehicles, the adverse selection problem relates to quality and uncertainty. In a market with asymmetric information, where sellers have more information about the quality of goods than buyers, as for example, in the market for used cars, adverse selection leads to the following effects: a) because buyers cannot distinguish quality, their expectation is that each good has the same average quality; b) the buyers who are only interested in higher quality goods withdraw, decreasing the overall demand; c) sellers of the higher quality goods no longer expect to sell their goods at a premium to average-quality goods and decide to leave the market; d) as the sellers of higher quality goods leave the market, the overall quality of goods sold declines; e) the expectation of quality deteriorates and if this cycle persists, the quality can deteriorate further and the whole market can collapse. Akerlof, George A., "The market for "lemons": Quality uncertainty and the market mechanism," *Quarterly Journal of Economics* 83(3) (1970): 488–500.

[263] ZG-00032648–656, at 650.

[264] ZG-00032648–656, at 652.

76

conduct that limits our ability to effectively compete, such as by restricting access to proprietary listing data or by putting homes for sale on a private listing network instead of publicly through the MLS."[265] Further, an internal Zillow strategy document emphasized the likely harm to Zillow and the market as a whole from "[w]eakened rules that require people to broadly share MLS listings [which] could lead to a resurgence of exclusive or off-market listings."[266]

## C. Flaws in Dr. Aron's Market Share Analysis



189.    First, the Comscore data that Dr. Aron relies upon do not show that Zillow's share has been at least 60 percent since December 2020.[270] The "share of unique visitors" (also known as "audience share") that Dr. Aron cites is not equivalent to a market share. Rather, Zillow's share of unique visitors as calculated by Comscore is the percentage of unique users who visited any real estate website who also visited a Zillow Group website. Treating this as a measure of market share is incorrect because consumers can (and frequently do) visit more than one real estate website, as demonstrated by Comscore cross-shopping data.[271] For this reason, the "real estate audience shares" in the Comscore data add up to well over 100% across the websites in the

---

[265] Zillow 2024 10-K, at p. 14.

[266] ZG-00032648–656, at 652.

[270] Aron Declaration, ¶¶ 177–178.

[271] ZG-00033994; Wacksman Deposition Transcript, August 26, 2025 ("Wacksman Dep. Tr.") at 60:04–60:06 ("[O]ur research shows that consumers . . . visit multiple websites when they shop for homes.").

real estate category, and cannot be interpreted as market shares.[272] In other words, while a Zillow audience share of 66% means "[a]bout 2/3 of the real estate audience uses Zillow somewhere along their journey,"[273] it does not follow that only 34% of the real estate audience visits other sites (as Dr. Aron erroneously concludes).[274]

190.    Further, the audience shares cited by Dr. Aron includes traffic for the entire Zillow Group, including irrelevant data for Zillow's rental listings and dotloop (which provides real estate transaction management services).[275] Similarly, the audience shares for the mobile app considered by Dr. Aron[276] also includes Zillow's rental listings.[277] As Dr. Aron has explicitly excluded search services for rental properties from her product market,[278] and presumably would exclude searches related to home loans and financing, this error in her calculations produces an incorrect and overstated estimate of Zillow's market share.

191.    Relatedly, not all online home search platform visitors are of equal value. The consumers that generate the most revenue for Zillow are using the platform to actively search for a home to purchase and connect with real estate professionals for this purpose.[279] This does not describe every consumer that uses Zillow's platform. Kathleen Berroth, Zillow's Vice President of Strategic Operations & Partnerships, testified that "audience is like a shorthand in some cases

---

[272] *See,* for example ZG_00017774.xlsx. In February 2025 the total audience share for just the four major portals (Zillow Group, Redfin, Realtor.com, and Homes.com) was 140%. ████████████████████████████████████████

[273] S&P Global, "Zillow Group, Inc. Nasdaq GS:ZG FQ1 2025 Earnings Call Transcripts," May 7, 2025, at p. 4.

[274] Aron Declaration, ¶ 178 ("The data showed that the Zillow Group accounted for 66 percent of the 'Real Estate Audience,' while companies not in the Zillow Group accounted for the remaining 34 percent.").

[275] Zillow Group, "Zillow Investor Presentation," February 2025, https://s24.q4cdn.com/723050407/files/doc_earnings/2024/q4/presentation/Zillow-4Q24-Investor-Presentation.pdf, at p. 6 (accessed September 27, 2025) (A note on the graph indicating a 66% audience share for Zillow Group states "Zillow Group includes Zillow, Trulia, Hotpads, StreetEasy, and dotloop brands." Zillow, Trulia, and StreetEasy include rental listings, and Hotpads only includes rental listings.); https://www.dotloop.com/about/ ("Dotloop is a real estate transaction management software that connects everyone and everything needed to close a deal.").

[276] Aron Declaration, ¶ 178.

[277] "Zillow Investor Presentation," February 2025, at p. 7 (A note on the graph indicating a 64% audience share of daily app users for Zillow Group states "Zillow Group includes Zillow, Trulia, Hotpads, and StreetEasy brands.").

[278] Aron Declaration, ¶ 94 ("The market does not include search services for rental properties, does not include search services for commercial properties, does not include generalized online search platforms such as google.com, does not include real estate search platforms that are not generally available to real estate buyers and sellers (such as the MLSs), and does not include offline search services such as newspaper advertisements.").

[279] Samuelson Declaration, ¶ 21.

78

for consumers, for the people who are coming to our site for a number of different reasons. It could be for entertainment. It could be . . . to execute a transaction."[280] Compass appears to recognize this—its CEO Robert Reffkin commented in an email to Compass agents that "[a]lmost 90% of buyers use a real estate agent, and while portals like Zillow say they have 200 million visitors to their website every month, there were only 4.2 million homes sold in the United States last year. This means the vast majority of people looking on Zillow are doing just that - 'looking.'"[281] Similarly, Zillow's own analysis shows that most of the visitors to their website are browsers who are unlikely to generate any revenue.[282] Like Zillow, agents using Zillow's platform care most about connecting with consumers who are ready to purchase a home. This indicates that even the proper audience shares for Zillow overrepresent its ability to attract committed buyers who are actually ready to connect with sellers.



---

[280] Berroth Dep. Tr. at 22:1–9.

[281] CZ_COMP_000003923–925, at 925.

[282] ZG-00032648–656, at 648 ("There are 233M monthly active users on Zillow and there are only 4.5M USA home buyers, and 1M? folks renting on Z. That leave[s] 227M unaccounted for customers that can only realistically be classified as a person who is browsing.").





**D. Flaws in Dr. Aron's Analysis of Barriers to Entry**

***1. There Is No Evidence that New Entry Has Been Deterred***

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

197.    Second, the facts simply contradict that there are barriers to entry. The reality is that Zillow faces at least two well-financed recent entrants into the market for residential real estate online search services (Homes.com and AddressUSA).

198.    For example, Dr. Aron points to Homes.com as an example of *unsuccessful* entry by a well-financed competitor. This, however, is not a conclusion that is consistent with the facts. CoStar has invested over a billion dollars in Homes.com since acquiring it in 2021. Compass claims this investment "has barely moved the needle,"[290] and Dr. Aron claims "despite its massive investments in Homes.com, CoStar does not appear to have succeeded at making Homes.com a true challenger for Zillow or Realtor.com."[291] However, this is not true— Comscore data confirms that Homes.com is growing rapidly, with its share of unique visitors to real estate websites increasing from 2.4% in February 2021 to 10.9% in February 2025.[292] By May 2025 Homes.com had an audience share of 19%, pulling to within 2 percentage points of Redfin.[293] Andy Florance, the CEO of CoStar, claimed in July that Homes.com is "now No. 1" in portals by "doing something completely different."[294] As described above, Homes.com is also aggressively attempting to expand its reach after the implementation of the LAS by offering its "Boost" product for free to listings that are taken down from Zillow Group websites.

199.    Zillow also faces a new, well-financed entrant in AddressUSA. In July 2025, the publishing company Gannett (one of the largest news publishers in the U.S.) partnered with AddressUSA to launch "an online real estate portal across the USA TODAY Network including USA TODAY and over 200 local publications nationwide."[295] This new portal has access to

---

[290] Complaint, ¶ 101.

[291] Aron Declaration ¶ 188.

[292] ZG-00017774.

[293] ZG-00033142–197, at 185.

[294] Anderson, Taylor, "Andy Florance Declares Victory in Portal Wars, Says Homes.com is 'Now No. 1'," *Inman*, July 31, 2025, https://www.inman.com/2025/07/31/andy-florance-declares-victory-in-portal-wars-says-homes-com-is-now-no-1/?utm_source=newsflash&utm_medium=email&utm_campaign=newsflash&utm_term=&utm_content=1086524_textlink_0_19700101&message_id=40942484.146517 (accessed October 9, 2025).

[295] Gannett, "Gannett and Address USA National Real Estate Agreement." July 7, 2025, https://www.gannett.com/pr/gannett-and-addressusa-announce-national-real-estate-agreement-2/ (accessed September 27, 2025); *See also* AddressUSA, "AddressUSA Home Page," https://www.addressusa.com/ (accessed September 27, 2025).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Gannett's audience of 195 million average monthly unique visitors, "an audience that could make it a serious competitor."[296]



### 2. The Facts Do Not Support Dr. Aron's Claims that There Are Barriers to Entry



---

[296] Anderson, Taylor, "Portal Wars Field a New Fighter — Backed by the Country's Largest News Publisher," *Inman*, July 8, 2025, https://www.inman.com/2025/07/08/portal-wars-field-a-new-fighter-backed-by-the-countrys-largest-news-publisher/ (accessed September 28, 2025).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### a. Entrants are Able to Make Large Capital Investments



### b. Zillow's Brand Recognition Is Not a Barrier to Entry





**DX657 - page 86 of 149**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**DX657 - page 87 of 149**



*c.* ***Consumer Switching Costs Do Not Pose a Barrier to Entry***



**DX657 - page 88 of 149**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### d. *Network Effects Imply that a High Market Share is Evidence of Economies of Scale and Scope, Not Market Power*



86



### 3. *There Are No Barriers to Expansion by Existing Competitors*

87

██████████████████████████████████

█████████████████ ████████████████████

███████████████████████████████████

███████████████████ █ █████████████████

█████████████████████████████

217.    The evidence also shows that these competitors' investments are increasing the reach of their platforms at the expense of Zillow. The growth in Homes.com is described in Section VII.A. Further, Realtor.com reports that as of June 2025 it had a 29% audience share in Comscore's real estate category, and had narrowed the gap in share between itself and Zillow by 26 percentage points between May 2024 and June 2025. Zillow itself fell from a 62% audience share in May 2024 to a 50% audience share in June 2025 (see Figure 3).[327]

**Figure 3: Realtor.com's Estimate of Audience Share as of June 2025**



---

██████████████████
██ ████████████████████
██ ████████████████

[327] Realtor.com, "From Innovation to Impact: Realtor.com is Gaining Ground," August 25, 2025, https://www.realtor.com/homemade/from-innovation-to-impact-realtor-com-is-gaining-ground/ (accessed October 5, 2025). Note that the audience scores presented here include traffic for Zillow's rental listings.

88

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## VIII.   Zillow's LAS Has Not Led and is Unlikely to Lead to Any Harm to Competition or a Reduction in Choice for Brokerages, Home Buyers, or Home Sellers

### A.   There Is No Evidence to Indicate that the LAS Will Reduce Competition Among Online Home Search Platforms

89



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**DX657 - page 94 of 149**



229.    Finally, there is no evidence that Zillow's LAS has diminished competition in the online home search market. The consumer interest in top online real estate search platforms has



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

been increasing for all platforms. Based on Google Trends, searches for "zillow", "realtor.com", "redfin", "homes.com", "trulia" have been trending upward in the last twelve months in the U.S. Additionally, traffic to zillow.com, realtor.com, redfin.com, homes.com, and trulia.com has been stable for the six months ending in July 2025, with no notable changes in shares of visitors to each of these platforms.[339]

## B. There Is No Evidence that the LAS Will Reduce Choice for Brokerages, Home Buyers, or Home Sellers

### 1. *The LAS Does Not Restrict Brokerages' Ability to Offer Private Listings*

---

[339] Data are from Semrush.com as of October 3, 2025.

93





**DX657 - page 97 of 149**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



95

### 2. *The LAS Does Not Restrict the Options Available to Home Sellers*

237. Dr. Aron claims that Zillow's LAS deprives home sellers of the opportunity to choose Compass's 3PM or other similar selective marketing strategies.[355] However, she provides no evidence of harm to home sellers and opines that "it is not possible to know which home sellers were in fact harmed and which were unaffected" by Zillow's adoption of the LAS.[356]

238. There is no harm to home sellers from Zillow's LAS because it does not prevent home sellers from choosing how to sell their homes. Instead, it facilitates risk disclosure by brokerages, allowing sellers to make better-informed decisions about their home-listing strategy.[357] Home sellers can still choose to–and do– market their homes using Compass's 3PM

[352] CZ_COMP_000046443–444, at 443.

[353] Compass, Inc., "Form 10-Q for the Quarterly Period Ended June 30, 2025," U.S. Securities and Exchange Commission, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001563190/ce784cee-6d5f-48c3-8cab-9debfcfcb122.pdf (accessed October 6, 2025).

[354] Callimachi, Rukmini, "Compass to Buy Top Rival, Further Condensing Brokerage Industry," *The New York Times*, September 22, 2025, https://www.nytimes.com/2025/09/22/realestate/compass-anywhere-real-estate-deal.html (accessed October 9, 2025). I understand that the Court has ordered Compass to provide certain documents related to its acquisition of Anywhere. As of October 10, 2025, Compass has not produced any documents in response to this order. I thus reserve my right to supplement my opinions based on information subsequently produced in response to this order.

[355] Aron Declaration, ¶ 230.

[356] Aron Declaration, ¶ 233.

[357] Kelman Dep. Tr., at 160:24–161:6 ("based on our ample experience, we believe that reaching as many buyers as possible gets the higher price, and we have found that when sellers do not see all of the options, they become worried that we aren't being straightforward. So we present all of the options and the seller makes an informed choice . . . .").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

or similar selective strategies.[358] This includes marketing a listing through the MLS without sharing the listing with portals like Zillow.[359]

239.    Even if a home seller were to initially choose to use Compass's 3PM approach, home sellers could still list their property on Zillow at any time. The seller could do so by switching to a broker that will abide by the LAS for that property. The seller could also decide not to engage in 3PM or any other similar selective strategy at all.

240.    Dr. Aron also claims that home sellers are harmed when "negative insights" are attached to the listing, such as price history and days on the market.[360] However, such insights have not deterred Compass from wanting to display its listings on Zillow should Compass fail to sell them during the first two phases of 3PM. The information on Zillow is valuable to consumers and attracts the buyers that sellers are seeking, increasing the chances of a successful transaction. Empirical research demonstrates that homes listed on the MLS sell for higher prices than homes sold off of the MLS. For instance, a BrightMLS study found that "homes sold on the MLS sold for 17.5% more than comparable homes sold without being listed on the MLS."[361] Similarly, recent research by Zillow found that "homes sold off the MLS typically sold for $4,975 less than those listed on the MLS," with California homes selling for more than $30,000 less.[362] With such outcomes, it is not clear any real benefits exist to sellers from delaying putting their listings on MLS and Zillow.

241.    Because properties listed on MLS sell for higher prices than properties sold off-MLS, there appears to be no harm to home sellers from the allegedly "negative" insights information, such as days on the market and price history. And Dr. Aron offers none. Instead, as

---

[358] Kelman Dep. Tr., at 140:1–14 (Zillow's LAS has not prevented Redfin from offering private listings).

[359] Kelman Dep. Tr., at 142:16–20 ("Every MLS in the country allows you to market a listing with or without putting it on all these real estate websites. You can market it just to the agents and with or without paying those agents.").

[360] Aron Declaration, ¶ 70.

[361] *See,* Bright MLS, "On-MLS Study: Measuring the Benefits of an Open and Transparent Housing Marketplace," August 2023, at p. 5, https://image.m.brightmls.com/lib/fe2b11747364047b741278/m/1/6534ddd0-6f2e-42dc-b05b-634e7b1ad23a.pdf (accessed September 30, 2025).

[362] Zillow Group, "Off-MLS Home Sellers Left More Than $1 Billion on the Table the Past Two Years," February 14, 2025, https://www.zillow.com/research/mls-pln-sale-price-34846/ (accessed October 4, 2025); *See also* Wacksman, Jeremy, February 17, 2025, "Private listing networks are damaging the housing market, harming buyers, sellers and agents," Zillow Group, https://www.zillowgroup.com/news/private-listing-networks-are-damaging-the-housing-market/ (accessed October 6, 2025).

discussed above in Section V.B, economic principles suggest that sellers too will ultimately be harmed if their free riding reduces or eliminates the procompetitive benefits of the MLS system.

### 3. The LAS Does Not Reduce the Choices Available to Home Buyers



## IX. Compass's Private Listing Strategy Harms the Market and Participants

244.    Dr. Aron seems to suggest that Compass's 3PM strategy benefits the market, but the reality is that private listings are more likely to lead to an inefficient market for real estate. The result is that home buyers and home sellers would be worse off with the expansion of private listings. Moreover, the ability of Zillow and other online home search platforms to provide reliable and current information about listings and the market will be greatly diminished.

### A. Compass's 3PM Strategy Harms Home Buyers

245.    Compass's private listing strategy harms home buyers by increasing the cost and reducing the quality of home searches.

246.    First, Compass's Private Exclusive listings are only available to a small subset of buyers in the market. Initially Compass's Private Exclusive listings were "only accessible to



98

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Compass agents and their serious buyers."[365] While Compass now claims it will share its Private Exclusive listings with other brokerages and MLSs under certain conditions,[366] thus far no sharing deals have been announced (nor did Compass expect to actually share these listings),[367] and as of today Compass's Private Exclusive listings are still only available to buyers working with a Compass agent.

247.    Compass Private Exclusive listings already comprise a sizable portion of the available listings in some markets, particularly for more expensive homes. For example, a draft slide deck for a February 2025 Compass Board of Directors meeting revealed that in January 2025 Compass Private Exclusive listings comprised 3% of all listings in New York, San Diego, and Washington D.C., and 4% of all listings in Greater Boston.[368] Among listings with a list price over $1.5 million, Compass Private Exclusives comprised 10% of listings in New York City,[369] 8% of listings in Washington D.C. and Greater Boston, and 6% of listings in San Diego.[370] Buyers who were not working with Compass agents were not able to view these listings.

248.    Second, buyers who wish to view Compass Private Exclusives can no longer freely choose which buyer agent to work with, or shop without an agent, if they wish to view these listings—they are forced to either sign a buyer agreement with a Compass agent or forego viewing Compass's Private Exclusive listings.[371]

249.    Third, Compass's 3PM strategy makes home searches more costly for buyers. Compass's Coming Soon listings are only listed on Compass's own website and are not initially shared with the MLS or real estate portals such as Zillow, requiring buyers and their agents to

---

[365] Compass, "Compass Private Exclusives"; *See also, CZ_COMP_000014045-090 at 058.*

[366] Compass, "Compass Commits to Sharing All Exclusive Inventory with All Brokerages and All MLSs," July 11, 2025, https://www.compass.com/newsroom/press-releases/3t29y2zXOlQP3FiHgDgayw/ (accessed September 26, 2025).

[367] Reffkin Dep. Tr. at 222:2–227:9.

[368] CZ_COMP_000014045–090, at 056–057.

[369] CZ_COMP_000014045–090, at 058.

[370] CZ_COMP_000014045–090 at 057.

[371] While a buyer working with a non-Compass agent could potentially become aware of and view Compass Private Exclusives if a Compass agent decides to share Private Exclusive listings on a one-to-one basis with an agent outside of Compass, the evidence suggests that this does not occur often (if at all). *See,* Reffkin Dep. Tr. at 222:2–227:9.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

search across multiple websites to discover the complete inventory of the newest available listings.[372] Discovering and comparing listings becomes more difficult, increasing search costs for buyers.[373]

250.     Fourth, Compass's private listing strategy withholds important information from buyers. Compass Private Exclusive and Coming Soon listings do not include information such as days on market and price drop history.[374] As explained above, buyers value this information and consider it when shopping for a home and determining what price to offer. Further, the Compass private listings that do eventually list in Phase 3 on the MLS are "stale" and thus less valuable to buyers (as explained in Section VI.D), and likewise hide the true days on market and price drop history information which buyers value.

## B.  Compass's 3PM Strategy Harms Home Sellers

251.     Home sellers are also harmed by Compass's 3PM strategy. Compass's Private Exclusive listings are only shown to buyers working with a Compass agent, which means that buyers using agents from other brokerages or online platforms such as Zillow have no opportunity to view these listings. Similarly, Compass's Coming Soon listings are only initially posted on the Compass website, which means that buyers using agents from other brokerages that rely on the MLS or online platforms such as Zillow have less opportunity to view the newest listings. As with buyers, search costs are increased for sellers; in this case, Compass's private listing strategy makes it more difficult to find the best buyer for the property. If home sellers do not have access to the full pool of buyers, the likely result is less competition among home buyers for a particular property, and lower home transaction prices.

252.     Other online home search portals agree with this sentiment. Redfin CEO Glenn Kelman testified that "a seller wants as many possible bids as she can get in most cases, because

---

[372] Compass, "Compass Coming Soon"; CZ_COMP_000014045–090 at 061 ("In the same way we go to multiple streaming providers to get different content [netflix and prime/disney/apple/etc.], in the same way we're willing to search multiple websites to get access to different inventory for virtually every retail good...they'll do that here. They'll search Zillow and Compass, Homes.com and Compass.").

[373] ████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[374] Compass, "Compass Coming Soon."

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

once you have a bidding war, you're going to sell the home at a premium. . . . You should want as many buyers as possible to see your home. And there's just so much data behind it."[375] And Damien Eales, CEO of Move (which operates Realtor.com) has explained that "the value of reaching the widest possible pool of buyers is undeniable," and for sellers, "if you want to catch a big fish, avoid small ponds."[376]

253.    Compass claims that homes sold using the 3PM strategy sell more quickly and at a higher price than Compass-listed homes listed on the MLS without using 3PM,[377] but Compass does not provide any evidence to support this assertion, and Dr. Aron explicitly notes she has "not replicated or vetted the analyses behind these numbers."[378] Instead, empirical evidence shows that homes that are sold as private listings sell for lower prices than comparable homes that are listed on the MLS.

254.    For example, a study by Bright MLS reviewed public records data on more than one million home transactions between 2019 and the first quarter of 2023 within the Bright MLS footprint (which covers six states and the District of Columbia), and found that for comparable properties and locations, "[h]omes that are listed on the MLS—as opposed to homes sold privately by the seller, offered as a broker's office exclusive, or otherwise sold without listing on the MLS—reach the greatest number of prospective homebuyers and bring the seller the most competitive offer."[379] Specifically, the study found that "[b]etween 2019 and the first quarter of 2023, homes sold on the MLS sold for 17.5% more than comparable homes sold without being listed on the MLS."[380]

255.    Similarly, Zillow analyzed 2.72 million property transactions from 2023 and 2024, comparing the sale prices of properties listed on an MLS to the sale prices of similar off-

---

[375] Kelman Dep. Tr., at 131:4–20. *See also* Kelman Dep. Tr., at 138:5-12 ("Have you ever been to an open house where you're the only one? I have. And the first thought you have is 'We're going to offer less than the asking price.' And I've also been to an open house where there were 20 people in that house and I remember what my wife said which was, 'We have to win this house.' And there was a palpable feeling of competition.").

[376] Eales, Damian, "If You Want to Catch a Big Fish, Avoid Small Ponds," *Realtor.com*, June 16, 2025, https://www.realtor.com/homemade/if-you-want-to-catch-a-big-fish/ (accessed October 5, 2025).

[377] Compass, "Compass 3-Phased Marketing Strategy," https://www.compass-homeowners.com/ (accessed September 26, 2025).

[378] Aron Declaration, fn. 124.

[379] Bright MLS, "On-MLS Study: Measuring the Benefits of an Open and Transparent Housing Marketplace," at p. 6.

[380] Bright MLS, "On-MLS Study: Measuring the Benefits of an Open and Transparent Housing Marketplace," at p. 5.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

MLS properties. This study found that "homes sold off the MLS typically sold for $4,975 less than those listed on the MLS, a median loss of 1.5% nationwide."[381]

### C. Compass's 3PM Strategy Will Diminish Zillow's and Other Real Estate Platforms' Ability to Facilitate Efficient Matching of Buyers and Sellers

256.    Compass's 3PM begins when Compass convinces sellers to withhold listings from the MLS, Zillow, and other real estate platforms, and only market them to buyers represented by Compass's own agents. Only Compass's stale private listings that fail to sell are submitted to the MLS and real estate platforms. Thus, Compass seeks to capitalize on Zillow's reputation as a transparent, fair, and comprehensive source of listings to sell Compass's failed private listings, while simultaneously refusing to contribute these private listings to Zillow until they fail to sell. Compass's strategy therefore amounts to free riding, and there are two main reasons why Compass's 3PM strategy will make the real estate market less efficient and reduce consumer welfare.

257.    First, the procompetitive benefits conferred by the MLSs, Zillow, and other real estate platforms will be eroded. As described above, search costs would increase for buyers and sellers, reducing the efficiency of real estate transactions.

---

[381] Zillow Group, "Off-MLS Home Sellers Left More Than $1 Billion on the Table the Past Two Years."

258.    Second, there is a risk that if other brokerages follow Compass's lead, the MLSs, Zillow, and other real estate platforms will only host lower quality listings that the brokerages failed to sell as private listings. As discussed in Section VIII.A, fewer buyers, sellers, and real estate professionals would participate through these platforms, creating a risk that liquidity will fragment into smaller, less efficient, "dark pools," each controlled by a brokerage or a private listing network hidden from the public, thus denying buyers, sellers, agents, and brokerages the considerable procompetitive benefits offered by Zillow and the MLS system.


_____

Lawrence Wu, Ph.D.

October 10, 2025

103

# **Exhibit 1**



## NERA

### Lawrence Wu
President

NERA
4 Embarcadero Center
Suite 400
San Francisco, California 94111
415 291 1007
lawrence.wu@nera.com



## Overview

Dr. Wu's expertise is in the economics of antitrust and intellectual property.  He has testified in US district courts, before Congress, and in a variety of regulatory proceedings.  Prior to joining NERA, he was a staff economist in the Bureau of Economics of the Federal Trade Commission (FTC).  From 2011 to 2015, he was a Visiting Scholar at the Stanford Institute for Economic Policy Research (SIEPR) at Stanford University.

In the area of antitrust, Dr. Wu's experience spans three broad areas.  In matters involving merger review and enforcement, he has evaluated the competitive effects of numerous transactions, with particularly deep experience in the software, data analytics, health care, and medical device industries.  In the area of class action litigation, he has calculated damages using econometric methods in a number of price fixing matters, and he has considerable experience analyzing market definition and market power.  Well known for his work in health care antitrust, Dr. Wu's experience analyzing the competitive impact of proposed mergers and the potential harm to competition in monopolization and collusive conduct litigations span the broad range of services that make up this segment of the economy, including health insurance, hospital services, physician services, pharmacy benefit management (PBM) services, pharmaceuticals, laboratory services, and a variety of medical devices and technologies.

With respect to intellectual property economics, Dr. Wu has testified on reasonable royalties and on the market definition and market power issues that are often raised in the context of an antitrust counterclaim.  He also has written and consulted on issues involving patent pools.

Dr. Wu is the co-author of a book on antitrust class certification, *The Revolution in the Law and Economics of Antitrust Class Certification*.  He also has edited three books on the economics of antitrust, including a book on the use of econometrics in antitrust analysis.  His publications, which have appeared in *Antitrust, The Antitrust Bulletin, Antitrust Chronicle, Antitrust Report, The Antitrust Source, European Competition Law Review, Journal of Business Venturing*, and *Medical Care*, include articles on merger analysis, market share-based merger screens, empirical methods in merger analysis, patent pools, and the multiple dimensions of market power.  He also is frequently invited to speak at conferences and seminars.

Dr. Wu earned his PhD from the University of Chicago Graduate School of Business and his BA from Stanford University.

© NERA

## Education

**University of Chicago, Graduate School of Business**          1992
Ph.D., Economics

**Stanford University**          1986
B.A., Economics

## Honors and Professional Activities

**Professional Activities**

California Lawyers Association, Antitrust, UCL and Privacy Section:

> Advisor, Executive Committee, 2018-present

The Bay Area Council Economic Institute:

> Member of the Board of Advisors, 2018-present

American Bar Association, Section of Antitrust Law:

> Member, Long Range & Strategic Planning Committee, 2021-2022

> Member, Special Ops Team: Imagining Antitrust Law Section 2.0, 2020-2021

> Member, Council, 2017-2020

> Member, Long Range Planning Committee, 2016-2017

> Member, Publications Advisory Group, 2009-2011

> Member, Competitiveness Task Force, 2007-2008

> Vice Chair, Economics Committee, 2003-2006

> Member, Exemptions and Immunities Task Force, 2003-2004

**Professional Memberships**

Member, American Bar Association, Section of Antitrust Law

Member, American Economic Association

Member, The Antitrust and Unfair Competition Law Section, State Bar of California

**Honors and Awards**

Federal Trade Commission Award for Meritorious Service, March 1996

Great American Cookie Company Grant and Fellowship, International Franchise Association Educational Foundation, 1990

University of Chicago Fellowship, 1987-1989

## Professional Experience

**NERA Economic Consulting**                                           1996 -
President (current position, since 2013)

**Stanford University, Stanford Institute of Economic Policy Research**    2011-2015
Visiting Scholar

**Federal Trade Commission, Bureau of Economics, Division of Antitrust**  1992-1996
Economist

**New York University, Robert F. Wagner Graduate School of Public Service**  Spring 1997
Adjunct Assistant Professor of Public Health Administration

**University of Chicago, Department of Economics**                      Fall 1991
Lecturer

**American Hospital Association, Division of Economic Analysis**        1990-1991
Research Analyst

**Federal Reserve Bank of New York, Banking Studies Department**        1986-1987
Research Assistant

## Testimony

**Expert Reports and Testimony**

Expert report on behalf of Tyson Foods, Inc., in *Re: Turkey Antitrust Litigation*, United States District Court, Northern District of Illinois, Eastern Division, Case: 1:19-cv-08318 (N.D. Ill.).  Report: September 5, 2025.

Deposition testimony and expert reports on behalf of Genius Sports, Ltd., in *Sportscastr Inc. v. Genius Sports Ltd., et al.,* United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2:23-cv-00471-JRG.  Reports: August 29, 2025 and September 29, 2025.  Deposition: October 8, 2025.

Deposition testimony and expert reports on behalf of defendants in *Pro Slab, Inc. et al., v. Argos USA LLC, et al.*, United States District Court for the District of South Carolina, Charleston Division, Case No. 2:17-cv-03185-BHH.  Reports: April 28, 2025 and July 14, 2025.  Depositions: May 20, 2025 and July 29, 2025.

Deposition testimony and expert report on behalf of SPINS LLC in *Crownalytics, LLC v. SPINS LLC et al.*, United States District Court for the District of Colorado, Case No.: 1-22-CV-01275-NYW-TPO.  Report: April 18, 2025.  Deposition: July 10, 2025.

Expert report (with Jennifer Kowalski) on behalf of Elevance Health, Inc. in connection with Elevance Health and Anthem Insurance Companies, Inc.'s proposed acquisition of control of Indiana University Health Plans, Inc., Indiana Department of Insurance.  Report: December 11, 2024.

Expert report on behalf of Novant Health and Community Health Systems in connection with *In the Matter of Novant Health, Inc., and Community Health Systems, Inc.*, Federal Trade Commission, Office of Administrative Law Judges, Docket No. 9425.  Report:  May 31, 2024.

Trial and deposition testimony and expert reports and declaration on behalf of Novant Health and Community Health Systems in connection with *Federal Trade Commission v. Novant Health, Inc., and Community Health Systems, Inc.*, United States District Court, Western District of North Carolina, Case No. 5:24-cv-00028.  Reports: March 6, 2024 and April 8, 2024.  Deposition: April 15, 2024.  Trial: May 9, 2024.  Declaration: May 22, 2024.

Deposition testimony and expert declaration on behalf of Dentsply Sirona, Inc. in connection with *In Re: Dentsply Sirona, Inc. Securities Litigation*, United States District Court, Eastern District of New York, Case No. 18 Civ 7253 (NG)(PK).  Declaration: February 8, 2024.  Deposition: April 23, 2024.

Deposition testimony and expert report on behalf of Tyson Foods, Inc. in connection with *In Re: Pork Antitrust Litigation*, United States District Court, District of Minnesota, Case Nos: 0:18-cv-01776-JRT-JFD.  Report: December 11, 2023.  Deposition: March 15, 2024.

Expert report on behalf of Inguran, LLC in *Inguran, LLC d/b/a STGenetics and Cytonome/ST LLC, v. ABS Global, Inc. and Genus PLC*, United States District Court, Western District of Wisconsin, Case No. 3:20-cv-00349.  Report: September 15, 2023.

Deposition testimony and expert report on behalf of HomeServices of America, Inc. in *Christopher Moehrl, et al., v. The National Association of Realtors, et al.*, United States District Court, Northern District of Illinois, Eastern Division, Case No. 1:19-cv-01610.  Report: June 1, 2023.  Deposition: July 25, 2023.

Expert reports and witness statements on behalf of Ryder Limited and Hill Hire Limited in *Ryder Limited & Another v. MAN SE & Others*, in the Competition Appeal Tribunal, Case No. 1291/5/7/18(T). First Witness Statement: September 6, 2019; Second Witness Statement: October 9, 2020; Third Witness Statement: April 19, 2021; Fourth Witness Statement: September 21, 2021; Fifth Witness Statement: May 31, 2022; Sixth Witness Statement: June 24, 2022; Seventh Witness Statement: July 26, 2022; Eighth Witness Statement: December 2, 2022; First Overcharge Report, October 7, 2022; First Pass On Report, October 7, 2022; Reply Report on Plausibility, December 23, 2022; Second Overcharge Report, December 23, 2022; Second Pass On Report, December 23, 2022. Supplemental Report, January 27, 2023; Various Joint Experts Statements, February 7, 2023, and February 9, 2023.

Trial and deposition testimony and expert reports on behalf of PennyMac Loan Services, LLC in *PennyMac Loan Services, LLC v. Black Knight Servicing Technologies, LLC; Black Knight, Inc.*, American

Arbitration Association, Case No.: 01-20-0005-0778.  Reports: August 31, 2022 and November 28, 2022.  Deposition: December 14, 2022.  Trial: May 15-16, 2023.

Trial and deposition testimony and expert report on behalf of the defendants in *Peter Staley, et al., v. Gilead Sciences, Inc., et al.*, United States District Court, Northern District of California, San Francisco Division, Case No. 3:19-cv-02573-EMC.  Report: July 22, 2022.  Deposition: August 19, 2022.  Trial: June 23, 2023.

Trial and deposition testimony and expert report on behalf of the defendants in *Scott and Rhonda Burnett, et al. v. The National Association of Realtors, et al.*, United States District Court, Western District of Missouri, Western Division, Case No. 19-CV-332-SRB.  Report: July 14, 2022.  Deposition: July 28, 2022.  Trial: October 26, 2023.

Retained (with co-authors at NERA and Venable, LLP) by the Honorable Lawrence F. Stengel, Special Master, to provide reports to the Special Master on the antitrust issues related to divestiture relief in *Steves and Sons, Inc. v. Jeld-Wen, Inc.*, Eastern District of Virginia, Case No. 3:16-cv-00545-REP.  Reports: January 5, 2022 and October 23, 2024.

Deposition testimony and expert report on behalf of the defendants in *United Biologics, LLC d/b/a United Allergy Services, v. Amerigroup Tennessee, Inc. et al.*, United States District Court, Eastern District of Tennessee, Case No. 3:19-cv-00180. Report: November 2, 2021.  Deposition: December 14, 2021.

Trial and deposition testimony, reports and declaration on behalf of Biosense Webster, Inc. in *Innovative Health, LLC v. Biosense Webster, Inc.*, United States District Court, Central District of California, Southern Division, Case No. 8:19-cv-1984 JVS (KESx). Declaration: September 20, 2021.  Reports: October 22, 2021, November 1, 2021, November 15, 2021, January 25, 2025, and March 14, 2025.  Depositions: December 1, 2021 and March 5, 2025.  Trial: May 15, 2025.

Trial and deposition testimony and expert report on behalf of Philips Medical Systems in *Philips Medical Systems Nederland B.V. et al., v. TEC Holdings, Inc., et al.*, United States District Court for the Western District of North Carolina, Case No.: 3:20-cv-00021-MOC-DCK.  Report: August 16, 2021.  Deposition: September 8, 2021.  Trial: April 24, 2023.

Trial and deposition testimony and expert report on behalf of the merging parties in *Federal Trade Commission v. Hackensack Meridian Health, Inc. and Englewood Healthcare Foundation*, United States District Court for the District of New Jersey, Case No. 2:20-cv-18140-JMV-JBC.  Report: April 9, 2021.  Deposition: May 5, 2021.  Trial: May 14, 2021.

Deposition testimony and expert report on behalf of defendant in *Plymouth County Retirement System, Individually and on Behalf of All Others Similarly Situated, v. Patterson Companies, Inc., and Scott P. Anderson*, United States District Court, District of Minnesota, Case No. 0:18-cv-00871-MJD-HB.  Report: February 26, 2021.  Deposition: April 15, 2021.

Deposition testimony and expert submission on behalf of defendants in *Mid-Florida Hematology & Oncology Centers, P.A., v. Adventist Health System Sunbelt Healthcare Corporation, et al.*, Circuit Court

of the Seventh Judicial Circuit, in and for Volusia County, Florida, Case No. 2015 10543 CIDL. Report: October 29, 2020. Deposition: January 7, 2021.

Deposition testimony and expert report on behalf of defendants in *In re: Blue Cross Blue Shield Antitrust Litigation (MDL No. 246)*, United States District Court, Northern District of Alabama, Southern Division, C.A. No. 2:13-cv-20000-RDP. Report: July 15, 2019. Deposition: November 13, 2020.

Trial testimony on behalf of CVS Health Corporation in *United States of America, et al., v. CVS Health Corporation, et al.*, United States District Court, District of Columbia, Civil Case No. 18-2340. Trial: June 5, 2019.

Deposition testimony and expert report on behalf of Holy Stone Enterprise Co., Ltd. and related defendants in *In Re Capacitors Antitrust Litigation*, United States District Court, Northern District of California, Case No. 17-md-02801-JD; *Direct Purchaser Class Action*, Case No. 3:14-cv-03264; *Avnet, Inc. v. Hitachi Chemical Co., Ltd., et al.*, Case No. 17-cv-7046; *The AASI Beneficiaries' Trust, by and through Kenneth A. Welt, Liquidating Trustee v. AVX Corp., et al.*, Case No. 3:17-cv-03472; and *Benchmark Electronics, Inc., et al. v. AVX Corp., et al.*, Case No. 17-cv-7047. Report: February 22, 2019. Deposition: May 17, 2019.

Trial and deposition testimony and expert reports on behalf of Anthem, Inc. in *In re: Anthem-Cigna Merger Litigation*, Court of Chancery of the State of Delaware, Consolidated C.A. No. 2017-0114-JTL. Reports: December 17, 2018, and January 11, 2019. Deposition: January 30, 2019. Trial: March 8, 2019.

Deposition testimony, expert reports, and declaration on behalf of Franciscan Health System et al. in *State of Washington v. Franciscan Health System d/b/a Franciscan Health; Franciscan Medical Group; The Doctors Clinic, A Professional Corporation; and Westsound Orthopaedics, P.S.*, United States District Court, Western District of Washington at Tacoma, Case No. 3:17-cv-05690-BHS. Reports and declarations: October 26, 2018, November 20, 2018, and December 19, 2018. Deposition: December 7, 2018.

Trial and deposition testimony and expert report on behalf of Patterson Companies, Inc. *In the Matter of Benco Dental Supply Co., Henry Schein, Inc., and Patterson Companies, Inc.*, United States of America, Before the Federal Trade Commission, Docket No. 9379. Report: September 5, 2018. Depositions: October 9, 2018, and November 9, 2018. Trial: February 7-8, 2019.

Deposition testimony and expert report on behalf of Hamilton Beach Brands, Inc. in *f'real Foods, LLC and Rich Products Corporation v. Hamilton Beach Brands, Inc., Hershey Creamery Company, and Paul Mills d/b/a Mills Brothers Markets*, United States District Court, District of Delaware, C.A. No. 1:16-cv-0041-GMS. Report: August 24, 2018. Deposition: October 12, 2018.

Deposition testimony and declarations on behalf of Google, Inc. in *Rick Woods v. Google, Inc.*, and subsequently, *Rick Woods and Rene Cabrera v. Google, LLC* and *Rene Cabrera, et al., v. Google, LLC*, Northern District of California, San Jose Division (Case No. 11-cv-01263-EJD). Reports and declarations: March 20, 2018, June 5, 2018, November 29, 2018, January 3, 2019, January 25, 2019, November 19, 2021, October 24, 2024, December 6, 2024, and December 9, 2024. Depositions: May 8, 2018, December 12, 2018, and December 20, 2024.

Trial testimony and affidavits on behalf of Blue Cross/Blue Shield of Louisiana in *Opelousas General Hospital Authority, A Public Trust, d/b/a Opelousas General Health System v. Louisiana Health Service & Indemnity Company, d/b/a Blue Cross/Blue Shield of Louisiana*, State of Louisiana, 27th Judicial District Court, Parish of St. Landry, Civil Docket No. 16-C-3647-C.  Affidavits: June 21, 2017, and December 1, 2020.  Trial: June 12, 2019.

Expert reports on behalf of Lite-On IT Corp., Koninklijke Philips Electronics N.V., Philips & Lite-On Digital Solutions Corp. ("PLDS") and related defendants in I*n Re: Optical Disk Drive Products Antitrust Litigation*, United States District Court, Northern District of California, San Francisco Division, MDL Case No. 3:10-md-02143-RS, *Ingram Micro Inc., et al., v. LG Electronics, Inc., et al.,* Individual Case No. 3:13-cv-05372-RS.  Reports: April 3, 2017, and May 12, 2017.

Expert reports on behalf of Lite-On IT Corp., Koninklijke Philips Electronics N.V., Philips & Lite-On Digital Solutions Corp. ("PLDS") and related defendants in I*n Re: Optical Disk Drive Products Antitrust Litigation*, United States District Court, Northern District of California, San Francisco Division, MDL Case No. 3:10-md-02143-RS, *Acer Inc., et al. v. Lite-On Corp., et al.,* Individual Case No. 3:13-cv-4991-RS.  Reports: April 3, 2017, May 12, 2017, and June 9, 2017.

Expert reports on behalf of  Lite-On IT Corp., Koninklijke Philips Electronics N.V., Philips & Lite-On Digital Solutions Corp. ("PLDS") and related defendants in I*n Re: Optical Disk Drive Products Antitrust Litigation*, United States District Court, Northern District of California, San Francisco Division, MDL Case No. 3:10-md-02143-RS, *Alfred H. Siegel, as Trustee for the Circuit City Stores, Inc. Liquidating Trust v. Sony Corp., et al.* and *Peter Kravitz, as Trustee for the RSH Liquidating Trust v. Sony Corp., et al.,* Individual Case Nos. 3:15-cv-03248 RS and 3:15-cv-06325 RS.  Reports: April 3, 2017, May 12, 2017, and June 9, 2017.

Deposition testimony and expert reports on behalf of HomeTeam Pest Defense, Inc. in *Jose Garnica et al. v. HomeTeam Pest Defense, Inc. and Rollins, Inc.*, United States District Court, Northern District of California, Civil Action No. 14-cv-05243-VC.  Reports: October 21, 2016, and December 10, 2016. Deposition: November 8, 2016.

Deposition and oral testimony and expert report on behalf of TriStar *In the Arbitration of TriStar and BCBST, HCA Health Services of Tennessee, Inc., Hendersonville Hospital Corporation, Central Tennessee Hospital Corporation, HTI Memorial Hospital Corporation, and TriStar Health System, Inc., v. BlueCross BlueShield of Tennessee, Inc.*  Reports: February 16, 2016, and March 4, 2016.  Deposition: March 16, 2016.  Oral testimony: May 9, 2016.

Written and oral testimony on behalf of Centene Corporation *In the matter of The Proposed Acquisition of Control of Health Net Life Insurance Company, an indirect subsidiary of Health Net, Inc., by Centene Corporation and Chopin Merger Sub I, Inc. and Chopin Merger Sub II, Inc*.  Before the Commissioner of Insurance of the State of California.  Written testimony: January 15, 2016.  Oral testimony: January 22, 2016.

Deposition testimony and expert report on behalf of Eaton Corporation in *Mark S. Wallach, et al. v. Eaton Corporation, et al.*, United States District Court, District of Delaware, Civil Action No. 10-260-SLR

and *In re Class 8 Transmission Indirect Purchaser Antitrust Litigation*, United States District Court, District of Delaware, Civil Action No. 11-cv-00009.  Report: May 22, 2015.  Deposition: June 17-18, 2015.

Deposition testimony and expert report on behalf of MAG Aerospace Industries, Inc. in *MAG Aerospace Industries, Inc. v. B/E Aerospace, Inc.*, United States District Court, Central District of California, Western Division (Case No. CV-13-06089-JFW).  Reports: October 9, 2014, and December 5, 2014.  Deposition: December 2, 2014.

Deposition testimony and expert report on behalf of Koninklijke Philips N.V. and Philips Electronics North America Corporation in *In Re: Cathode Ray Tube (CRT) Antitrust Litigation*, United States District Court, Northern District of California, San Francisco Division (Master File No. CV-07-5944-SC, MDL No. 1917).  Reports: April 15, 2014, August 5, 2014, September 23, 2014, and November 6, 2014. Depositions: July 11, 2014, September 12, 2014.

Declaration on behalf of Philips Electronics North America Corporation in *The State of California, et al. & The City and County of San Francisco v. Chunghwa Picture Tubes, LTD., et al.,* Superior Court for the State of California for the County of San Francisco, Unlimited Jurisdiction (Case No. CGC-11-515786). Declaration: October 29, 2013.

Trial and deposition testimony, expert report, and declaration on behalf of the defendants in *In re: Vitamin C Antitrust Litigation*, United States District Court for the Eastern District of New York (Case No. 06-MD-1738 (BMC) (JO)).  Report: June 29, 2012.  Deposition: August 1, 2012. Declaration: October 12, 2012.  Trial: March 11, 2013.

Deposition testimony and expert reports on behalf of the defendants in *Stanislaus Food Products Company v. USS-POSCO Industries, et al.*, United States District Court for the Eastern District of California (Case No. CV F 09-0560 LJO BAM).  Reports: October 24, 2012, and November 9, 2012. Deposition: December 7, 2012.

Deposition testimony and expert report on behalf of Ortho-Clinical Diagnostics, Inc. in *In re: Blood Reagents Antitrust Litigation*, United States District Court for the Eastern District of Pennsylvania (MDL Docket No. 09-2081).  Reports: October 26, 2012, and April 22, 2016.  Depositions: February 24, 2016, and June 2, 2016.

Deposition testimony and expert report on behalf of Martek Biosciences Corp. in *BNLfood Investment SARL v. Martek Biosciences Corp.*, United States District Court for the District of Maryland, Northern Division (Case No. 1:11-CV-00446-WDQ).  Report: June 15, 2012.  Deposition: July 30, 2012.

Deposition testimony and expert reports on behalf of American Society of Heating, Refrigerating and Air-Conditioning Engineers Inc. in *Thermal Design, Inc. v. American Society of Heating, Refrigerating and Air-Conditioning Engineers Inc.*, United States District Court in the Eastern District of Wisconsin, Milwaukee Division (Case No. 07-C-0765:WEC).  Reports: June 1, 2012, and July 9, 2012.  Deposition: July 9, 2012.

Expert report on behalf of Fujifilm North America Corporation in *Retail Imaging Management Group LLC v. Fujifilm North America Corporation*, United States District Court for the District of Oregon, Portland Division (Case No. 3:11-cv-01242-SI).  Report: March 27, 2012.

Trial and deposition testimony and expert reports on behalf of the patent holder in *Jan K. Voda, M.D., v. Medtronic Inc., and Medtronic Vascular, Inc.*, United States District Court for the Western District of Oklahoma (Case No. 5-09-CV-00095-L).  Reports: September 2, 2011, September 15, 2011, and February 10, 2012.  Deposition:  October 12, 2011.  Trial: January 23, 2012.

Deposition testimony on behalf of the defendants in *United States Federal Trade Commission v. Laboratory Corporation of America, et al.*, United States District Court for the Central District of California, Southern Division (Case No. SACV-10-1873-AG (MLGx).  Deposition: January 24, 2011.

Declaration on behalf of LabWest, Inc. and Laboratory Corporation of America in *In re: Westcliff Medical Laboratories, Inc. and Biolabs, Inc.*, (Case No. 8:10-bk-16743-RK, jointly administered with 8:10-bk-16746-RK) and *LabWest, Inc. and Laboratory Corporation of America v. Federal Trade Commission*, United States Bankruptcy Court, Central District of California, Santa Ana Division.  Declaration: November 16, 2010.

Expert report prepared for mediation on behalf of Fairmont Hotels & Resorts (U.S.) Inc. in *Mark Apana, et al., v. Fairmont Hotels & Resorts (U.S.) Inc., dba Fairmont Kea Lani Hotel & Resort*, United States District Court for the District of Hawaii, (Civil No. 1:08-cv-00528-JMS-LEK).  Report: September 13, 2010.

Expert reports on behalf of St. James Healthcare in *Jesse A. Cole, M.D., v. St. James Healthcare and Sisters of Charity of Leavenworth Health System, Inc.*, Montana Second Judicial District Court, Silver Bow County (Case No. DV-07-44).  Reports: August 2, 2010, and September 13, 2010.

Deposition testimony and expert reports on behalf of Allied Exhaust Systems, Inc. in *Gorlick Distribution Centers, LLC v. Car Sound Exhaust System, Inc. and Allied Exhaust Systems, Inc.*, United States District Court for the Western District of Washington at Seattle (Case No. C07-1076 RAJ).  Reports: April 12, 2010, and May 19, 2010.  Deposition:  May 12, 2010.

Deposition testimony and expert report on behalf of a defendant in *John Karamanos, Advanced Microtherm, Inc.; HVAC Sales, Inc., v. Norman Wright Mechanical Equipment Corporation, et al.*, United States District Court for the Northern District of California, San Jose Division (Case No. C04-02266 JW).  Report: February 5, 2010.  Deposition: March 24, 2010.

Expert report on behalf of the defendant physicians in *Mark G. Wood, M.D. v. Archbold Medical Center, Inc., John D. Archbold Memorial Hospital, Inc., et al.*, United States District Court for the Middle District of Georgia, Valdosta Division (Case No. 7:07-cv-109).  Report: July 28, 2009.

Oral testimony at an Informal Fact Finding Conference on behalf of Inova Health System in connection with Virginia Department of Health Certificate of Public Need Request No. Va-7622.  Testimony: May 12, 2009.

Deposition and trial testimony and declarations on behalf of Johnson & Johnson and Cordis Corporation in *Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and*

*Schneider (Europe) GmbH v. Johnson & Johnson and Cordis Corporation* and *Cordis Corporation v. Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GmbH*, United States District Court for the Northern District of California, San Francisco Division (Case No. 02-0790 SI).  Declarations: May 9, 2008, and September 22, 2008.  Deposition: June 5, 2008.  Testimony at Evidentiary Hearing: February 2, 2009.

Testimony and affidavit on behalf of Delta Dental Plan of Massachusetts in *Concerning Fees that Dental Services of Massachusetts d/b/a Delta Dental Plan of Massachusetts Pays Participating Dentists and the Method Used to Determine Such Fees Pursuant to M.G.L. c. 176E, Section 4*, Commonwealth of Massachusetts, Office of Consumer Affairs and Business Regulation, Division of Insurance (Docket No. G2008-10).  Testimony: December 18, 2008.  Affidavit: March 5, 2009.

Deposition testimony on behalf of The Hospice of the Florida Suncoast, Inc. in *Hospice of Palm Coast, Inc. vs. Agency for Health Care Administration and The Hospice of the Florida Suncoast, Inc.*, State of Florida, Division of Administrative Hearings (DOAH Case No. 06-1272 CON).  Depositions: December 2, 2008, and March 12, 2009.

Deposition testimony and expert report on behalf of United Healthcare of Ohio, Inc. in connection with class certification in *Academy of Medicine of Cincinnati, et al. v. Aetna Health, Inc., et al.,* Court of Common Pleas, Hamilton County, Ohio (Case No. A0204947).  Report:  September 29, 2008.  Deposition: November 20, 2008.

Declarations on behalf of Inova Health System in connection with Virginia Department of Health Certificate of Public Need Request No. Va-7529 by Inova Health Care Services on behalf of Inova Fairfax Hospital.  Declarations: August 1, 2008, and September 9, 2008.

Declaration on behalf of the defendants in *Hawai`i Children's Blood and Cancer Group v. Hawai`i Pacific Health; Kapi`olani Medical Specialists; Kapi`olani Medical Center For Women and Children*, United States District Court for the District of Hawai`i (Civil No. CV03-00708).  Declaration: July 14, 2008.

Declaration and expert report on behalf of the defendants in *Kelley Woodruff, M.D. and Hawai`i Children's Blood and Cancer Group v. Hawai`i Pacific Health, et al.*, Circuit Court of the First Circuit, State of Hawaii, (Civil No. 02-1-0090-01 (BIA)).  Declaration: February 14, 2008.  Expert Report: February 22, 2008.

Deposition testimony on behalf of St. Joseph's Hospital in connection with *St. Joseph's Hospital, Inc., d/b/a St. Joseph's Hospital v. Agency for Health Care Administration, et. al.*, State of Florida, Division of Administrative Hearings (Case No. 05-2754).  Deposition: September 25, 2007.

Declarations on behalf of the defendants in *The City of New York v. Group Health Incorporated, HIP Foundation, Inc., and Health Insurance Plan of Greater New York,* United States District Court for the Southern District of New York (Case No. 06 Civ. 13122 (KMK) (RME)).  Declarations: March 6, 2007, November 9, 2007, and February 18, 2010.

Deposition testimony and report on behalf of the plaintiff in *American Medical Response Inc. v. City of Stockton*, United States District Court in and for the Eastern District of California (Civil Action No. 2:05-CV-01316 DFL-EFB). Report: November 2, 2006. Deposition: January 19, 2007.

Expert report on behalf of the defendant in connection with *San Diego Physicians Medical Group, Inc. v. Sharp Community Medical Group Inc.*, Superior Court of the State of California for the County of San Diego Central (Case No. GIC 862275). Report: April 14, 2006.

Deposition testimony and report on behalf of PCI Holding Corporation in connection with *Chemed Corporation v. PCI Holding Corporation, et al., v. Vitas Healthcare Corp.*, Superior Court of the Commonwealth of Massachusetts (Civil Action No. 04-2354-BLS2). Report: November 30, 2005. Deposition: June 30, 2006.

Testimony before the Provider Reimbursement Review Board, Centers for Medicare and Medicaid Services, on behalf of St. David's Healthcare System in *St. David's Healthcare System v. Blue Cross Blue Shield Association/Trailblazer Health Enterprises, LLC*, Exception to Related Organization Principle (PRRB Case No. 95-0315G). Testimony: September 29, 2005.

Deposition testimony and reports on behalf of the defendants in connection with *East Portland Imaging Center, P.C., and Body Imaging, P.C., v. Providence Health System-Oregon, Providence Health Plan, Portland Medical Imaging, LLP, Radiology Specialists of the Northwest, P.C., Center for Medical Imaging, LLP and Advanced Medical Imaging, LLC,* United States District Court for the District of Oregon (Case No. 05-CV-465-KI). Reports: June 1, 2005, and November 1, 2005. Deposition: November 22, 2005.

Expert report on behalf of Regence Blue Shield of Idaho, Inc. in connection with *Government Employees Medical Plan and Mutual Insurance Associates, Inc. v. Regence Blue Shield of Idaho, Inc. and Blue Cross of Idaho Health Services, Inc.*, United States District Court for the District of Idaho (Case No. CIV 04-284-E-BLW). Report: May 16, 2005.

Expert reports on behalf of the defendant in connection with *George Yardley Co. and Yardley-Zaretsky, Inc. v. Johnson Controls, Inc., et al.* (American Arbitration Association, Case No. 72 110 01086 02 HLT). Reports: October 4, 2004, and December 1, 2004.

Expert report on behalf of Business Venture Investments No. 790 (PTY) Limited and Afrox Healthcare Limited in connection with the proposed acquisition of an ownership interest in Afrox Healthcare Limited. Report was submitted to the Competition Tribunal of South Africa in connection with Case No. 76/LM/DEC 03. Report: July 1, 2004.

Expert report on behalf of Nestlé in connection with Nestlé's proposed acquisition of Chocolates Garoto, S.A. Report was submitted to Brazil's competition authority, CADE (Conselho Administrativo de Defesa Econômica), in connection with the agency's review of the proposed transaction. Report: December 3, 2003.

Deposition testimony and expert report on behalf of the defendants in connection with EasCare, LLC v. Cape Cod Healthcare, Inc. and Cape Cod Medical Enterprises, Inc. d/b/a Cape Cod Ambulance and

Medical Services Ambulance, United States District Court for the District of Massachusetts (Civil Action No. 02-11460-RWZ). Report: July 25, 2003. Deposition: September 11-12, 2003.

Deposition and trial testimony on behalf of Naples Community Hospital in connection with *Collier HMA, Inc.'s Certificate of Need Application (CON #9551)*, State of Florida, Division of Administrative Hearings. Deposition: February 11, 2003. Trial testimony: March 18, 2003.

Deposition and trial testimony on behalf of LifePath, Inc. in connection with *LifePath, Inc. v. Agency for Health Care Administration and Hernando-Pasco Hospice, Inc.,* Case Nos. 00-3203 *et seq.*, State of Florida, Division of Administrative Hearings. Deposition: June 29, 2002. Trial testimony: August 7, 2002.

Deposition testimony and expert report on behalf of three defendants (suppliers of biotin) in connection with *In re: Vitamins Antitrust Litigation*, United States District Court for the District of Columbia (M.D.L. Docket No. 1285). Report: June 28, 2002. Deposition: August 26, 2002.

Deposition and trial testimony and expert reports on behalf of the merging parties in the matter of *Federal Trade Commission v. Swedish Match North America, Inc. and National Tobacco Company, L.P.,* United States District Court for the District of Columbia (No. 1:00-CV-001501 TFH). Reports: July 28, 2000, and August 15, 2000. Deposition: August 16, 2000. Trial testimony: September 7-8, 2000.

Expert report on behalf of Aetna U.S. Healthcare in connection with Aetna U.S. Healthcare's proposed acquisition of Prudential Health Care Plan, Inc. before the Department of Insurance of the State of Georgia. Report: May 19, 1999.

Oral testimony and expert report on behalf of Aetna U.S. Healthcare in connection with Aetna U.S. Healthcare's proposed acquisition of Prudential Health Care Plan, Inc. before the Department of Banking and Insurance and the Department of Health and Senior Services of the State of New Jersey. Report and Testimony: April 9, 1999.

Deposition and trial testimony and expert report on behalf of the Federal Trade Commission in the matter of *Federal Trade Commission and State of Missouri v. Tenet Healthcare Corporation and Poplar Bluff Physician's Group, Inc.*, United States District Court for the Eastern District of Missouri (No. 4:98-CV-709 CDP). Report: May 20, 1998. Deposition: June 2, 3, and 5, 1998. Trial: June 23 and 26, 1998.

Deposition testimony and expert report on behalf of the defendants in connection with *William G. Marshall, Jr., M.D., v. Edward Planz, M.D. and Southeastern Cardiovascular Associates, P.C.*, United States District Court for the Middle District of Alabama (No. CV-97-T-793-S). Report: March 16, 1998. Deposition: May 22, 1998.

Deposition and trial testimony on behalf of the Federal Trade Commission *in the Matter of International Association of Conference Interpreters*. Docket Number 9270, Federal Trade Commission administrative proceeding. Deposition: January 4, 5, and 6, 1996. Trial testimony: January 16-19, 1996.

**Statements and Testimony at Government Hearings and Workshops**

Statement before the United States House Committee on the Judiciary, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, on "Competition in the Pharmaceutical Supply Chain: The Proposed Merger of CVS Health and Aetna," Washington, D.C., February 27, 2018.

Statement on "Direct Evidence of Competitive Effects." Prepared for the Federal Trade Commission and the Department of Justice Horizontal Merger Guidelines Workshop, Stanford, CA, January 14, 2010.

Statement on the Analysis of Entry in Health Insurance Markets.  Prepared for the Federal Trade Commission and the Department of Justice Hearings on Health Care and Competition Law and Policy, Washington, D.C., April 24, 2003.

Statement on the Analysis of Competitive Effects in Health Insurance Markets.  Prepared for the Federal Trade Commission and the Department of Justice Hearings on Health Care and Competition Law and Policy, Washington, D.C., April 23, 2003.

Statement on the Analysis of Hospital Post-Merger Conduct.  Prepared for the Federal Trade Commission and the Department of Justice Hearings on Health Care and Competition Law and Policy, Washington, D.C., April 23, 2003.

Statement before the Federal Trade Commission on Health Insurance: Payor/Provider Issues.  Prepared for the Federal Trade Commission Workshop on Health Care and Competition Law and Policy, Washington, D.C., September 9, 2002.

## Project Experience

**Software, Data Analytics, and Online Advertising**

- *Mindbody and ClassPass:* a vertical transaction that combined a company (Mindbody) that develops and sells business management software used by fitness studios and a company (ClassPass) that helps fitness studios and wellness facilities sell their excess inventory of classes and appointments, 2021.

- *Buildertrend and CoConstruct:* a transaction that combined two companies that provide construction management software solutions, 2021.

- *Intuit and Credit Karma:* a transaction that combined two companies that provide tax and financial products, 2020.

- *J.D. Power and Autodata Solutions:* a transaction involving competition in the provision of vehicle data and software solutions to the automotive industry, 2019.

- *RealPage, Inc. and The Rainmaker Group:* a transaction involving the Lease Rent Options business and the provision of software and data analytics to the real estate industry, 2017.

- *Stamps.com and Endicia*: a transaction that combined two providers of Internet-based postage, mailing, and shipping services, 2015.

- *Zillow, Inc. and Trulia, Inc.:* a transaction that combined two online real estate advertising platforms, 2014-2015.

**Health Care**

- *CVS Health and Aetna:* a transaction that required analyses of competition in Medicare Part D prescription drug plans and pharmacy benefit management services, 2019.

- *Express Scripts, Inc. and Medco Health Solutions:* a transaction involving pharmacy benefit management (PBM) services, 2011-2012.

- *Laboratory Corporation of America and Westcliff Medical Laboratories, Inc.:* a transaction involving the provision of clinical laboratory services to physicians in Southern California, 2010-2011.

- *McKesson Corporation and US Oncology:* a transaction involving competition in physician practice management services and the distribution of oncology drugs to physician practices, 2010.

- *The City of New York v. Group Health Incorporated, HIP Foundation, Inc., and Health Insurance Plan of Greater New York:* a transaction of two health insurance plans, 2007.

- *Fresenius Medical Care and Renal Care Group*: a transaction of two national chains of kidney dialysis treatment centers in the US, 2005-2006.

- *Aetna U.S. Healthcare and Prudential Health Care Plan, Inc.*: a transaction of two health insurance plans, 1998-1999.

- *Tenet Healthcare Corporation and Poplar Bluff Physician's Group, Inc.:* a transaction of two hospitals in Missouri (on behalf of the Federal Trade Commission), 1998.

- *Pacificare Health Systems, Inc. and FHP International Corporation*: a transaction of two health insurance plans that required analyses of competition in Medicare managed care, 1996-1997.

**Medical Devices**

- *Stryker Corporation and Mako Surgical Corporation:* a transaction involving technology for robot-assisted orthopedic surgery, 2013.

- *Thoratec Corporation and HeartWare International, Inc.:* a transaction involving manufacturers of mechanical circulatory support devices used to treat patients with advanced heart failure, 2009.

- *Datascope Corporation and Getinge AB:* a transaction involving companies that make and sell surgical grafts, 2008.

- *General Electric Company and Instrumentarium Corporation*: a transaction involving patient monitoring devices (on behalf of a third party), 2003.

- *Philips Medical Systems and Agilent Technologies, Inc.*: a transaction involving Agilent's Healthcare Solutions Group that required analyses of competition in the manufacturing and sale of cardiac ultrasound machines, 2000-2001.

- *Tyco International Ltd. and Pulmonetic Systems, Inc.*: a transaction that required analyses of competition in the provision of home care respiratory ventilators, 2001.

- *Cytyc Corporation and Digene Corporation*: a transaction involving the sale of diagnostic test kits for the human papillomavirus (HPV), 2002.

- *Arrow International, Inc. and C.R. Bard*: a transaction involving the acquisition of C.R. Bard's cardiac assist unit that required analyses of competition in the manufacturing and sale of intra-aortic balloon pumps and catheters, 1998.

**Other Industries**

- *Boral Limited and Headwaters Inc.*: a transaction involving competition in the supply of building and construction materials, focusing on concrete and clay roof tiles, manufactured stone, and fly ash, 2016-2017.

- *Cal Dive International, Inc., Helix Energy Solutions Group, Inc., and Horizon Offshore, Inc.*: a transaction involving certain diving and offshore pipelay assets, 2007.

- *Libbey, Inc. and Anchor Hocking Glass Company*: a transaction that required analyses of competition in the glass beverageware industry, 2001-2002.

- *Swedish Match North America, Inc. and National Tobacco Company, L.P.*: a transaction involving smokeless tobacco products, 2000.

- *Newell Rubbermaid, Inc. and Regal Ware, Inc.*: a transaction that required analyses of competition in the cookware industry, 1999.

- *Vail Resorts, Inc. and Ralston Resorts, Inc.*: a transaction that required analyses of competition among ski resorts in Colorado, 1996.

**Selected Litigation Consulting Experience**

- *In re: High-Tech Employee Antitrust Litigation* (in the Northern District of California, San Jose Division, 2012): retained by counsel for Disney to assess issues related to class certification in connection with claims that the defendants had agreed to fix and suppress the compensation of their employees.

- *In re: DRAM Antitrust Litigation* (in the United States District Court for the Northern District of California, 2006): retained by counsel for a defendant, Nanya Technology Corporation and Nanya Technology Corp. USA, to assess issues related to antitrust liability in connection with claims that manufacturers of DRAM (dynamic random access memory) chips and modules had agreed to fix prices.

- *In re: Cotton Yarn Antitrust Litigation* (in the United States District Court for the Middle District of North Carolina, Greensboro Division, 2004-2005): retained by counsel for the defendant, Parkdale America, LLC and Parkdale Mills, Inc., to estimate antitrust damages in connection with claims that the defendant had agreed to fix the price of cotton yarn in the United States.

- *In re: Managed Care Litigation* (in the United States District Court for the Southern District of Florida, Miami Division, 2003-2005): retained by counsel for the defendants to assess issues related

to antitrust liability in connection with claims that the defendant commercial health insurance plans had agreed to deny, delay, and diminish payments to physicians.

- *In the Matter of Certain Recordable Compact Discs and Rewritable Compact Discs* (in the US International Trade Commission, 2002-2003): retained by counsel for the defendant, Philips Electronics N.V. and U.S. Philips Corporation, to assess the competitive issues surrounding the CD-R and CD-RW patent pools and allegations of patent misuse and injury to competition.

## Selected Industry Experience

**Consumer Goods and Services**

Bakeware/Ovenware
Chocolate Candies
Compact Discs
Cookware
Glass Beverageware
Mattresses
Mobile Phones and Wireless Products and Services
Ski Resorts
Smokeless Tobacco

**Health Care Services**

Ambulance Services
Dialysis Services
Distribution of Dental Supplies
Health Insurance (e.g., HMOs and other managed care products)
HIV Drugs and Regimens
Hospice and Palliative Care
Hospital Beds
Hospital Services
Laboratory Tests and Services
Methadone Maintenance Treatment
Over-the-Counter Drugs
Pharmacy Benefit Management (PBM) Services
Physician Practice Management Services
Physician Services (e.g., cardiovascular surgery, nephrology, obstetrics, orthopedic, radiology)
Specialty Drug Distribution (oncology)
Specialty Pharmacy Services
Vitamins

**Medical Devices**

Blood Testing Instruments and Supplies
Cardiac Catheters and Stent Delivery Systems
Cardiac Mapping Systems

Cardiac Medical Devices (e.g., Intra-Aortic Balloon Pumps and Catheters)
Cardiac Ultrasound Machines
Clinical Diagnostic Tests (cervical cancer screening)
Coronary Stent and Balloon Angioplasty Catheters
Diagnostic Imaging Equipment
Mechanical Circulatory Support Devices (e.g. ventricular assist devices used to treat patients with advanced heart failure)
Microfiltration Products
Orthopedic Products
Patient Monitoring Equipment and Anesthesia Machines
Respiratory Ventilators
Sleep Therapy Devices
Surgical Grafts and Stent Grafts Used to Repair Damaged Blood Vessels
Urinary Catheters

**Software and Technology**

Automotive Data, Software, and Applications
CRT (cathode ray tubes)
DRAM (dynamic random access memory)
Internet Search and Online Advertising
Internet-based Postage and Shipping Services
Online Real Estate Advertising Platforms
Real Estate Data, Software, and Applications
Software Solutions (time and billing solutions sold to law firms; time solutions sold to hospitals and health care providers)
SRAM (static random access memory)

**Other Products and Services**

ARA and DHA Amino Acids made for use in Infant Formula
Aircraft Vacuum Toilets
Automotive Parts Distribution (exhaust systems)
Capacitors
Carton Sealing Tape
Commercial Self-Serve Frozen Beverage Mixers
Concrete
Concrete Roof Tile, Manufactured Stone Veneer, and Fly Ash
Cotton Yarn
Decorative Laminate Products (e.g., countertops)
Ferrous Scrap
Fertilizer
Heating, Ventilation, and Air Conditioning (products and contracting)
Insulation Systems used in Roofs and Walls of Metal Buildings (standards and building codes)
Lamps and Lighting

© NERA

Media Research
Mortgage Servicing
Navigation Software Sold to Automobile Manufacturers
Oil Pipelay Services
Outdoor Advertising
Photo Minilab Services
Pork Products
Postage Meters
Printers and Printing Supplies (e.g., wide format printers)
Real Estate Brokerage Services
Tin-Mill Products Used to Manufacture Tin Cans
Trucks
Truck Transmissions (Class 8)

## Publications

**Books and Monographs**

Michele Floyd and Lawrence Wu, *The Revolution in the Law and Economics of Antitrust Class Certification* (LexisNexis, Inc., 2015). (Second edition 2017.)

*Econometrics: Legal, Practical and Technical Issues, Second Edition*, ed. Lawrence Wu and Charles Biggio (American Bar Association Section of Antitrust Law, 2014).

*Economics of Antitrust: Complex Issues in a Dynamic Economy*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2007).

*Economics of Antitrust: New Issues, Questions, and Insights*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2004).

**Publications**

Lawrence Wu and Craig Malam, "An Economic Perspective on the Usefulness of the Consumer Welfare Standard as a Guiding Framework for Antitrust Policy," 31 *Competition: J. Antitrust and Unfair Competition Law Sec. Cal. L. Assoc.* 46 (2021).

Jeewon Kim Serrato and Lawrence Wu, "CCPA and Competition: The Value of Consumer Data, Privacy, and Pricing," *CPI Antitrust Chronicle*, Vol. 1, No. 1, pp. 28-35 (Winter 2021).

Jeewon Kim Serrato and Lawrence Wu, "Privacy, Pricing, and the Value of Consumer Data: The Complex Nature of the CCPA's Non-Discrimination Requirement," 30 *Competition: J. Anti., UCL & Privacy Sec. Cal. L. Assoc.* 100 (2020).

Paul Wong and Lawrence Wu, "Health Care Antitrust: Are Courts Adapting to a Complex and Dynamic Industry or Are They Making Exceptions?" 48 *Loyola University Chicago Law Journal* 667 (2017).

Nadia Soboleva and Lawrence Wu, "Standard Setting: Should there be a Level Playing Field for all FRAND Commitments?" *Competition Policy International Antitrust Chronicle*, Vol. 10, No. 1, Autumn 2013.

Gregory K. Leonard and Lawrence Wu, "Merger Assessment and Frontier of Economic Analyses (4): Empirical Methods in Antitrust Merger Review," *Kokusai Shoji Homu (International Business Law and Practice)* Vol. 40, No.3, 2012, pp. 391-401.

Gregory K. Leonard and Lawrence Wu, "Merger Assessment and Frontier of Economic Analyses (5): Empirical Methods in Antitrust Merger Review," *Kokusai Shoji Homu (International Business Law and Practice)* Vol. 40, No.4, 2012, pp. 557-564.

Gregory K. Leonard and Lawrence Wu, "Merger Assessment and Frontier of Economic Analyses (6): Empirical Methods in Antitrust Merger Review," *Kokusai Shoji Homu (International Business Law and Practice)* Vol. 40, No.5, 2012, pp. 731-739.

Corey Roush and Lawrence Wu, "Market Definition and Implications for Merger Review," *Law 360*, July 11, 2011.

Elizabeth M. Bailey, Gregory K. Leonard, and Lawrence Wu, "Unilateral Competitive Effects of Mergers Between Firms with High Profit Margins" *Antitrust*, Vol. 25, No. 1, Fall 2010.

Elizabeth M. Bailey, Gregory K. Leonard, G. Steven Olley, and Lawrence Wu, "Merger Screens: Market Share-Based Approaches Versus 'Upward Pricing Pressure'," *The Antitrust Source*, February 2010.

Gregory K. Leonard and Lawrence Wu, "Revising the Merger Guidelines: Second Request Screens and the Agencies' Empirical Approach to Competitive Effects," *Antitrust Chronicle*, Vol. 12, No. 1, Winter 2009.

Gregory K. Leonard and Lawrence Wu, "Assessing the Competitive Effects of a Merger: Empirical Analysis of Price Differences Across Markets and Natural Experiments," *Antitrust*, Vol. 22, No. 1, Fall 2007, pp. 96-101.

Paul Hofer, Mark Williams, and Lawrence Wu, "The Economics of Market Definition Analysis in Theory and in Practice," *The Asia Pacific Antitrust Review 2007*, Global Competition Review, May 2007, pp. 10-13.

Christian Dippon, Gregory Leonard, and Lawrence Wu, "Application of Empirical Methods in Merger Analysis," a chapter in a Japan Fair Trade Commission Competition Policy Research Center report titled *Merger Investigation and Economic Analysis*, November 2005, pp. 108-155.

Alan J. Daskin and Lawrence Wu, "Observations on the Multiple Dimensions of Market Power," *Antitrust*, Vol. 19, No. 3, Summer 2005, pp. 53-58. (Also see Chapter 11 in *Economics of Antitrust: Complex Issues in a Dynamic Economy*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2007), pp. 137-153.)

Lawrence Wu and Thomas R. McCarthy, "Essential Issues in the Competitive Analysis of Patent Pools," in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh (White Plains, NY: NERA Economic Consulting, 2005), pp. 233-249.

Robert Skitol and Lawrence Wu, "A Transatlantic Swim through Patent Pools: Keeping Antitrust Sharks at Bay," in *On the Merits: Current Issues in Competition Law and Policy, Liber Amicorum Peter Plompen*, ed. Paul Lugard and Leigh Hancher (Antwerpen-Oxford: Intersentia, 2005), pp. 103-116.

Paul Hofer, Patrick Smith, and Lawrence Wu, "Quantitative Techniques in Competition Policy Analysis," *The Asia Pacific Antitrust & Trade Review 2005*, Global Competition Review, April 2005, pp. 13-16.

Lawrence Wu and Rika Mortimer, "Competition and Innovation in Health Care Markets and their Implications for Antitrust Enforcement," *Antitrust Health Care Chronicle*, Vol. 18, No. 4, Winter 2005, p. 3, 12-16.

Paul Hofer, Mark Williams, and Lawrence Wu, "Principles of Competition Policy Economics," *The Asia Pacific Antitrust Review 2004*, Global Competition Review, April 2004, pp. 4-7.

Lawrence Wu, "Two Methods of Determining Elasticities of Demand and Their Use in Merger Simulation," in *Economics of Antitrust: New Issues, Questions, and Insights*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2004), pp. 21-33. (Previously published in *Antitrust Insights*, NERA Economic Consulting, January/February 2003.)

Lawrence Wu, Paul Hofer, and Mark Williams, "The Increasing Use of Empirical Methods in European Merger Enforcement: Lessons from the Past and a Look Ahead," in *Economics of Antitrust: New Issues, Questions, and Insights*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2004), pp. 71-83. (Originally prepared for the UCLA Law First Annual Institute on U.S. and E.U. Antitrust Aspects of Mergers and Acquisitions, Los Angeles, California, February 28, 2004.)

Lawrence Wu, "The Economic Analysis of Mergers After *Daubert*," *The Economics Committee Newsletter*, American Bar Association Section of Antitrust Law, Economics Committee, Vol. 1, No. 1, Spring, 2001, p. 16-20.

Robert E. Bloch, Scott P. Perlman, and Lawrence Wu, "A New and Uncertain Future for Managed Care Mergers: An Antitrust Analysis of the Aetna/Prudential Merger," *Antitrust Report*, October 1999, pp. 37-61.

Thomas R. McCarthy, Scott J. Thomas, and Lawrence Wu, "Efficiencies Analysis in Hospital Mergers," in *Antitrust and Healthcare Insights into Analysis and Enforcement*, American Bar Association, 1999, pp. 119-149. (A similar version appeared in the *Antitrust Health Care Chronicle*, Vol. 13, No. 1, Winter 1999, pp. 2-11.)

Lawrence Wu, "The Pricing of a Brand Name Product: Franchising in the Motel Services Industry," *Journal of Business Venturing*, Vol. 14, No. 1, January 1999, pp. 87-102.

Lawrence Wu, "The Evidence Is In: A Review of the Market Definition Debate in Hospital Merger Cases," *Antitrust Report*, November 1998, pp. 23-41.

Simon Baker and Lawrence Wu, "Applying the Market Definition Guidelines of the European Commission," *European Competition Law Review*, Vol. 19, No. 5, June 1998, pp. 273-280.

Lawrence Wu and De-Min Wu, "Measuring the Degree of Interindustry Competition in U.S. v. Continental Can," *The Antitrust Bulletin*, Vol. XLII, No. 1, Spring 1997, pp. 51-84.

David Dranove, William D. White, and Lawrence Wu, "Segmentation in Local Hospital Markets," *Medical Care*, Vol. 31, No. 1, January 1993, pp. 52-64.

**Other Professional Reports and Articles**

Jeffrey A. Eisenach, Lawrence Wu, Andrew Card, Robert Kulick, John Scalf, Ivan Tasic, and Megan Ye, "The Evolution of Competition in Local Broadcast Television Advertising and the Implications for Antitrust and Competition Policy," NERA Economic Consulting White Paper, October 2020.

Lawrence Wu, James Mellsop, Stephen King, Kristin Terris, and Will Taylor, "Levelling the Playing Field: The Role of the Internet and Mobile Computing in Improving the Efficiency and Competitiveness of Australian Small Business," November 17, 2014.

Elizabeth M. Bailey, Gregory K. Leonard, and Lawrence Wu, "Comments on the 2010 Proposed Horizontal Merger Guidelines," a comment prepared in response to the FTC and DOJ's Request for Views on Proposed Horizontal Merger Guidelines, June 3, 2010.

Gregory K. Leonard and Lawrence Wu, "Revising the Merger Guidelines: Second Request Screens and the Agencies' Empirical Approach to Competitive Effects," a comment prepared in response to the FTC and DOJ's Notice of Public Workshop(s) and Request for Comments in connection with the FTC and DOJ's Horizontal Merger Guidelines Review Project, November 9, 2009.

Paul Lugard, John Taladay, and Lawrence Wu, "Comments on Draft EC Guidelines on the Assessment of Non-Horizontal Mergers Under the Council Regulation on the Control of Undertakings Between Undertakings," on behalf of the International Chamber of Commerce, Commission on Competition. Submitted to the European Commission, May 13, 2007 (at http://ec.europa.eu/comm/competition/mergers/legislation/files_non_horizontal_consultation/icc.pdf).

Paul Lugard, Lawrence Wu, Ilene Gotts, John Taladay, Eileen Reed, and Doris Hildebrand, "Comments on the Church Report and its Implications for Non-Horizontal Merger Guidelines," a report to the European Commission on behalf of the International Chamber of Commerce, September 13, 2006 (at http://www.iccwbo.org/uploadedFiles/ICC/policy/competition/ Statements/CommentsChurchReport13Sept06.pdf).

Lawrence Wu, "Innovation in the Coronary Stent Industry: A Note on the Competitive Importance of Products in the R&D Pipeline," prepared for the 2005 Antitrust in Healthcare Conference sponsored by

© NERA

the American Bar Association Antitrust Law and Health Law Sections and the American Health Lawyers Association, Washington, DC, May 2005.

Lawrence Wu and Rika Mortimer, "Competition Policy Challenges in Innovative Health Care Markets," prepared for the 6th Annual Conference on Emerging Issues in Healthcare Law sponsored by the American Bar Association Health Law Section, Lake Buena Vista, Florida, February 2005.

Lawrence Wu, "Economic Aspects of an Analysis of Hospital Post-Merger Pricing and Conduct," prepared for the 2003 Antitrust in Healthcare Conference sponsored by the American Bar Association Antitrust Law and Health Law Sections and the American Health Lawyers Association, Washington, DC, May 15-16, 2003.

Lawrence Wu, "Using Surveys to Evaluate the Effect of Non-Infringing Alternatives on Patent Infringement Damages," a NERA Brief prepared for and presented at NERA's Intellectual Property Seminar Series, Washington, DC, October 28, 1998, and New York, New York, June 3, 1998.

## Presentations and Speeches

### Invited Presentations

### A.  Invited Presentations in the Economics of Antitrust and Competition Policy and Merger Analysis

### Topics in Antitrust Litigation and Competition Policy

"Intersection of Antitrust Law and Environmental, Social and Governance (ESG) Objectives."  Participant on a panel discussion at the Federal Bar Council Winter Bench & Bar Conference, Riviera Maya, Mexico, February 3, 2025.

"Remedies."  Participant on a panel discussion at the Golden State Antitrust and Unfair Competition Law Institute, San Francisco, California, October 24, 2024.

"Varied Approaches to Vetting Experts."  Participant on a panel discussion at the 2023 Northern District of California District Conference, Napa, California, April 22, 2023.

"Antitrust Economics: Developments in Economics Theory and Analysis." Moderator on a panel discussion at the Golden State Antitrust and Unfair Competition Law Institute, San Francisco, California, November 10, 2022.

"A Class, Apart—Class Certification Battles." Participant on a panel discussion at The Second Annual UK Competition Litigation Conference, sponsored by Monckton Chambers, NERA Economic Consulting, and Augusta, December 10, 2020.

 "Antitrust and Competition Policy."  Presentation at a Center for Economic Policy Speaker Series program, The University of Chicago Harris School of Public Policy, November 6, 2020.

"Accelerate: Getting to your North Star Faster." Participant on a webinar sponsored by BakerHostetler, BakerHostetler Digital Transformation and Data Economy Four-Part Webinar Series, May 20, 2020.

"Fundamentals – Antitrust." Participant on a webinar sponsored by the American Bar Association Antitrust Law Section, May 12, 2020.

"Damages."  Participant on a panel discussion at The Future of UK Competition Litigation conference, sponsored by Monckton Chambers, NERA Economic Consulting, and Augusta, London, United Kingdom, December 11, 2019.

"Precipice of Antitrust Overhaul or Business as Usual for Disruptive Tech?"  Participant on a panel discussion at the Disruptive Technologies Legal Summit 2019, sponsored by the Berkeley Center for Law & Technology, the High Tech Law Institute at Santa Clara University School of Law, and Winston & Strawn LLP, Santa Clara, California, September 12, 2019.

"Antitrust 'Markman' Hearings: Cartel Class Certification Battles."  Participant on a panel discussion at the 67th Annual Spring Meeting of the American Bar Association Section of Antitrust Law, Washington, DC, March 27, 2019.

"Class Certification." Participant on a panel discussion at the Antitrust Masters Course IX, sponsored by the American Bar Association Section of Antitrust Law, Cambridge, Maryland, October 19, 2018.

"Antitrust in a Digital Age: An Economic Perspective on Big Data and Multi-Sided Platforms." Presentation at the Competition Law Spring Conference sponsored by the Competition Law Section of the Canadian Bar Association, Toronto, Canada, May 10, 2018.

"Mock Trial." Expert witness in a mock trial involving an antitrust counterclaim and a patent holder's promise to license essential proprietary technology on FRAND terms in a standard-setting environment at the 66th Annual Spring Meeting of the American Bar Association Section of Antitrust Law, Washington, DC, April 12, 2018.

"Negotiating a Disposition in the United States."  Participant in a demonstration session on issues related to a firm's ability to pay, 12th International Cartel Workshop, sponsored by the American Bar Association Section of Antitrust Law and the International Bar Association Antitrust Committee, Paris, France, February 15, 2018.

"Rise of the Digital Economy and the Challenges for Antitrust Policy."  Keynote speech at Jornada de la Competencia 2017, a conference hosted by COFECE, the Mexican Competition Commission.  Mexico City, Mexico, October 31, 2017.

"Antitrust in High-Technology Markets: Ten Challenges for Lawyers, Economists, Regulators, and the Courts."  Presentation at a Japan Competition Law Forum seminar, Tokyo, Japan, May 24, 2016.

"Retreat from Trinko? Revisiting Refusals to Deal." Participant on a panel discussion at the 62nd Annual Spring Meeting of the American Bar Association Section of Antitrust Law, Washington, DC, March 28, 2014.

"What Does Comcast Portend for Economic Evidence Concerning Impact, Both on Class Certification and on the Merits?" Participant on a panel discussion at the Antitrust Law & Economics Institute for Judges, co-sponsored by the American Bar Association Section of Antitrust Law and George Mason University School of Law Judicial Education Program, Arlington, Virginia, October 8, 2013.

"The Proper Role of Economic Experts." Participant on a panel discussion at the Antitrust Law & Economics Institute for Judges, sponsored by the American Bar Association Section of Antitrust Law and George Mason University School of Law Judicial Education Program, Arlington, Virginia, October 9, 2012.

"The Law of Pricing, Including Resale Price Maintenance in California after *Leegin*." Participant on a panel discussion at the 21st Annual Golden State Antitrust and Unfair Competition Law Institute, sponsored by the State Bar of California Antitrust and Unfair Competition Section, San Francisco, California, October 27, 2011.

"Trying a Case Involving Mixed Vertical and Horizontal Restraints: The Legal, Economic and Practical Considerations." Participant on a panel discussion at a teleconference sponsored by the American Bar Association, Antitrust Section, Unilateral Conduct Committee, Trial Practice Committee, and Health Care and Pharmaceuticals Committee, October 20, 2011.

"Use and Misuse of Competitive Intelligence." Participant on a panel discussion at the Reed Smith Pharmaceutical, Medical Device and Life Sciences Antitrust Seminar, Philadelphia, Pennsylvania, December 2, 2009.

"True Grit: Weighing the Risks & Developing the Strategies for Private Litigation." Participant on a panel discussion at the Second Annual Chicago Forum on International Antitrust Issues, Northwestern University School of Law, Chicago, Illinois, June 9, 2011.

"Mock Trial." Expert witness in a mock trial on the competitive impact of a resale price maintenance agreement at the 56th Annual Spring Meeting of the American Bar Association Section of Antitrust Law, Washington, DC, March 27, 2008.

"Trial Preparation: Not Just for Outside Counsel." Presentation at the 54th Annual Spring Meeting of the American Bar Association Section of Antitrust Law, Washington, DC, March 29, 2006.

"The Ninth Circuit's Recent Decision in *Dagher v. Saudi Refining Inc.*" Participant on a panel discussion on joint ventures sponsored by the American Bar Association, Antitrust Section, Sherman Act Section 1 and Section 2 Committees, Washington, DC, October 26, 2004.

"An Economic Perspective on Business Practices with 'Billion Dollar' Price Tags." Presentation at the Antitrust Law Committee Forum, "Antitrust and Distribution: How to Avoid the Billion Dollar Judgment," at the Spring Meeting of the American Bar Association Section of Business Law, Seattle, Washington, April 3, 2004.

"The Sixth Circuit's Recent Decision in *Conwood Co., L.P. et al. v. United States Tobacco Co., et al.*" Participant on a panel discussion sponsored by the American Bar Association, Antitrust Section, Sherman Act Section 2 Committee, July 17, 2002.

"The Role of Economics in a Bid-Rigging Investigation." Presentation at the Antitrust Seminar, National Association of Attorneys General, Baltimore, Maryland, October 12, 1995.

**Merger Analysis**

"Navigating the Uncertain Climate of Vertical Merger Enforcement." Remarks at a conference sponsored by the Kellogg School of Management at Northwestern University, Evanston, Illinois, January 24-25, 2019.

"Key Issues Facing Boards of Directors: The Impact of Antitrust on Dealmaking & Operations in the US, EU & China."  Participant on a panel sponsored by The Directors Roundtable, Shearman & Sterling, and NERA Economic Consulting, Menlo Park, California, November 13, 2015.

"Merger Analysis from an Economist's Perspective."  Presentation on a webcast titled "Perspectives on Innovation, Information Exchange, and Antitrust in a Global Context," sponsored by The Knowledge Group, LLC, August 28, 2012.

"Let's Make a Deal: Roundtable on EU and US Merger Developments." Participant on a panel discussion sponsored by The New York State Bar Association Antitrust Law Section and The State Bar of California Antitrust & Unfair Competition Law Section, Los Angeles, California, July 20, 2011.

"The Federal Trade Commission's Challenge to Laboratory Corporation of America's Acquisition of Westcliff Medical Laboratories." Participant on a panel discussion sponsored by the American Bar Association, Antitrust Section, Health Care and Pharmaceuticals Committee and Mergers & Acquisitions Committee, Washington, DC, June 8, 2011.

"The Increasing Use of Empirical Methods in European Merger Enforcement: Lessons from the Past and a Look Ahead." Presentation at the UCLA Law First Annual Institute on U.S. and E.U. Antitrust Aspects of Mergers and Acquisitions, Los Angeles, California, February 28, 2004.

"Getting a Fix on *FTC v. Libbey, Inc., et al.*" Presentation at a seminar sponsored by the Antitrust Committee of the Boston Bar Association, March 8, 2002.

**Health Care Economics, Competition Policy, and Merger Analysis**

© NERA

"How Much of Health Care Antitrust is Really Antitrust?" Commentator on panel at a Loyola University Chicago School of Law conference, "Reconciling Competition and Consumer Protection in Health Care," Chicago, IL, September 20, 2016.

"Antitrust Counseling for Hospital and Physician Affiliations in an Age of FTC Dominance." Presentation at a Bloomberg BNA webinar, July 14, 2015.

"Assessing Market Power and Harm to Competition in Evolving Health Care Markets." Participant on a panel discussion at the 2014 Antitrust in Health Care conference, co-sponsored by the American Bar Association Antitrust Law and Health Law Sections and the American Health Lawyers Association, Washington, DC, May 14, 2014.

"Can Competition and Innovation Cure the Concerns over Health Care Spending?" Presentation for the Chicago Economics Society Distinguished Alumni Speaker Series, San Francisco, California, October 11, 2013.

"Understanding Competition in Health Care Markets: How is Health Care Different from Other Industries." Participant on a panel discussion sponsored by the American Bar Association, Section of Antitrust Law, Health Care and Pharmaceuticals Committee, Washington, DC, February 15, 2012.

"Challenges in Assessing the Competitive Effects of ACOs." Presentation at the 2011 Fall Forum, sponsored by the American Bar Association, Antitrust Section, Washington, DC, November 17, 2011.

"Current Issues in Healthcare Antitrust." Participant on a panel discussion at the 20th Annual Golden State Antitrust and Unfair Competition Law Institute, sponsored by the State Bar of California Antitrust and Unfair Competition Section, San Francisco, California, October 21, 2010.

"Mergers and Acquisitions Among Healthcare Providers in 2010: Are There New Rules for the Game?" Participant on a panel discussion at the 2010 Antitrust in Healthcare conference, co-sponsored by the American Bar Association Antitrust Law and Health Law Sections and the American Health Lawyers Association, Washington, DC, May 25, 2010.

"Hospital Mergers, Acquisitions, and Joint Ventures—Antitrust Considerations." Participant on a panel discussion at the Washington State Society of Healthcare Attorneys Annual Spring Hospital & Health Law Seminar, Seattle, Washington, April 30, 2010.

"Why Don't Health Insurance Markets Work Like Other Markets? Or Do They?" Participant on a panel discussion on the economics of health reform at an American Health Lawyers Association teleconference, co-sponsored by the Antitrust and Payors, Plans, and Managed Care Practice Groups and the Healthcare Reform Educational Task Force, April 27, 2010.

"Current Antitrust Issues in Healthcare: A New Dose of Competition or the Same Old Prescription?" Participant on a panel discussion at the New York State Bar Association Annual Meeting, Antitrust Section, New York, New York, January 28, 2010.

"Assessing Market Power in Healthcare Markets: Developments in Private Litigation and Government Enforcement." Presentation at the 2008 Annual Meeting of the American Health Lawyers Association before the Antitrust Practice Group, San Francisco, California, June 30, 2008.

"Fundamentals of Health Care Antitrust Economics."  Faculty presenter on the program, which was sponsored by the American Bar Association, Section of Antitrust Law, Economics and Health Care and Pharmaceuticals Committees, Washington, DC, November 8, 2007.

"Hot Topics in Healthcare Antitrust: Market Definition." Presentation at the 2005 Antitrust in Healthcare conference, co-sponsored by the American Bar Association Antitrust Law and Health Law Sections and the American Health Lawyers Association, Washington, DC, May 12, 2005.

"Protecting Competition or Protecting Competitors? Antitrust Issues for Plans and Providers." Presentation at the 2005 Law Conference on Health Insurance Plans: Bridging the Gap between Providers and Insurers, co-sponsored by America's Health Insurance Plans and the American Health Lawyers Association, Colorado Springs, Colorado, May 3-4, 2005.

"Is Competition the Answer: Did DOJ and FTC Get it Right, or Does Regulation Still Serve its Purpose in Healthcare?" Participant on a panel discussion at the 6th Annual Conference on Emerging Issues in Healthcare Law sponsored by the American Bar Association Health Law Section, Lake Buena Vista, Florida, February 24, 2005.

"Forces Shaping the Next Era in Health Care and their Economic Impact on Hospitals." Invited keynote speaker at the Mercer Human Resource Consulting and Marsh USA, Inc. Fifth Annual Hospital Management Seminar, Portland, Oregon, October 4, 2004.

"Antitrust and Health Care: Assessing Issues for California and the United States."  Presentation at a conference sponsored by the Nicholas C. Petris Center on Health Care Markets and Consumer Welfare at the University of California, Berkeley, California, April 30 – May 1, 2004.

"Rx/OTC Switches and Prescription Drug Reimportation: Consequences for Consumers." Presentation at the New York State Bar Association Annual Meeting, Food, Drug and Cosmetic Law Section, New York, New York, January 29, 2004.

"Forces Shaping the Next Big Idea in Health Care." Presentation at the Marsh Healthcare Forum, Colorado Springs, Colorado, September 9, 2003.

"Economic Perspectives on Retrospective Reviews of Healthcare Mergers." Presentation at the Antitrust in Healthcare Conference sponsored by the American Bar Association Antitrust Law and Health Law Sections and the American Health Lawyers Association, Washington, D.C., May 15-16, 2003.

"The Brave New World for Managed Care Mergers: The *Aetna/Prudential* Merger." Presentation at the 11th Annual Managed Care Law Conference, co-sponsored by the American Association of Health Plans and the American Bar Association, Kiawah Island, South Carolina, May 1, 2000.

"The Analysis of Product Market Definition and Entry in the *Aetna/Prudential* Transaction." Presentation at a health care antitrust conference sponsored by the American Health Lawyers Association, Arlington, Virginia, February 17-18, 2000.

"The New Challenge for Mergers of Health Plans: What Does the *Aetna/Prudential* Decree Portend?" Presentation at the Fifth Annual Health Care Antitrust Forum, Chicago, Illinois, October 22, 1999.

"Vertical Integration in Health Care." Presentation at the 47th Annual Spring Meeting of the American Bar Association Section of Antitrust Law, Washington, DC, April 14, 1999.

"Hospital Price Inflation: Will it Continue to Fall?" Presentation at a conference presented by J&H Marsh & McLennan, Inc., St. Louis, Missouri, February 25, 1999.

"An Introduction to the Economics of Hospital Merger Analysis." Presentation at a health care antitrust conference sponsored by the Federal Trade Commission, the Missouri Attorney General, St. Louis University School of Law and the American Bar Association Antitrust Section, St. Louis, Missouri, November 14, 1997.

"Hospital Merger Efficiencies: Passing on the Cost Savings to Consumers." Presentation at a health care antitrust conference sponsored by the Federal Trade Commission, Denver, Colorado, October 25, 1996.

**B. Invited Presentations in the Economics of Intellectual Property and Patent Damages**

"Patent Pools Face New Antitrust Threats," Participant on a panel discussion at the Antitrust and Intellectual Property Conference co-sponsored by the American Bar Association Sections of Antitrust Law and Intellectual Property Law and Stanford University, Stanford Law School, Stanford, California, October 10, 2013.

"Paper Tiger or Hidden Dragon: The Law, Economics and Business of Patent Infringement Damages in an Era of Innovation & Global Competition."  Participant on a panel discussion at the National Asian Pacific American Bar Association (NAPABA) Annual Convention, Los Angeles, California, November 19, 2010.

"Patent Licensing and Competition Policy:  Implications of *Quanta Computer* and Patent Trolls." Participant on a panel discussion at the 57th Annual Spring Meeting of the American Bar Association Section of Antitrust Law, Washington, DC, March 26, 2009.

"Mock Trial on Patent Damages."  Expert witness in a mock trial on reasonable royalty damages at an intellectual property seminar for Chinese judges sponsored by Stanford Law School, Stanford Program in Law, Science & Technology, August 16, 2007.

"Patent Pools and Standard Setting – an Economic Perspective." Presentation before the Antitrust Law Section of the Minnesota State Bar Association, Minneapolis, Minnesota, October 25, 2005.

"Standard Setting, Market Power, and IP Value." Presentation before the Antitrust Section of the Los Angeles County Bar Association, Los Angeles, California, December 14, 2004.

## C.  Other Invited Presentations

"What Are the Biggest Challenges Businesses Will Face in the Years Ahead?" Speaker on a webinar sponsored by the National Association of Corporate Directors (NACD) Utah Chapter, August 26, 2020.

"Navigating Pandemic Recovery: Managing Health, Economic, and Regulatory Risks," Participant on a webinar sponsored by Marsh, July 28, 2020.

© NERA

# **Exhibit 2**

**Materials Relied Upon by Lawrence Wu, Ph.D**

**Bates Stamped Documents**

| | | |
|---|---|---|
| CZ_COMP_000031015 | CZ_COMP_000002013 | ZG-00033349 |
| CZ_COMP_000030086 | CZ_COMP_000011869 | ZG-00033356 |
| CZ_COMP_000025787 | CZ_COMP_000025879 | ZG-00033376 |
| CZ_COMP_000000344 | CZ_COMP_000033781 | ZG-00033994 |
| CZ_COMP_000031607 | CZ_COMP_000036427 | REDFIN_CZ00000616 |
| CZ_COMP_000034908 | CZ_COMP_000036442 | |
| CZ_COMP_000064504 | CZ_COMP_000040207 | |
| CZ_COMP_000003923 | CZ_COMP_000045158 | |
| CZ_COMP_000002687 | CZ_COMP_000045205 | |
| CZ_COMP_000005639 | CZ_COMP_000045213 | |
| CZ_COMP_000091746 | CZ_COMP_000045669 | |
| CZ_COMP_000010554 | CZ_COMP_000046426 | |
| CZ_COMP_000010606 | CZ_COMP_000083154 | |
| CZ_COMP_000010655 | CZ_COMP_000092057 | |
| CZ_COMP_000010663 | CZ_COMP_000092320 | |
| CZ_COMP_000010674 | CZ_COMP_000111153 | |
| CZ_COMP_000010708 | CZ_COMP_000120597 | |
| CZ_COMP_000014045 | CZ_COMP_000031026 | |
| CZ_COMP_000014906 | CZ_COMP_000054337 | |
| CZ_COMP_000026462 | CZ_COMP_000046443 | |
| CZ_COMP_000031218 | ZG_00017774 | |
| CZ_COMP_000001732 | ZG-00014458 | |
| CZ_COMP_000019150 | ZG-00017774 | |
| CZ_COMP_000017273 | ZG-00031093 | |
| CZ_COMP_000019580 | ZG-00032648 | |
| CZ_COMP_000021181 | ZG-00033272 | |
| CZ_COMP_000026393 | ZG-00033143 | |
| CZ_COMP_000019555 | ZG-00033348 | |

**Depositions Transcripts, Declarations and Associated Exhibits**

Errol Samuelson Declaration, July 17, 2025

Soham Bhonsle Deposition Transcript, August 19, 2025

Elizabeth Alexander Deposition Transcript, August 26, 2025

Jeremy Wacksman Deposition Transcript, August 26, 2025

Errol Samuelson Deposition Transcript, August 28, 2025

Rory Golod Deposition Transcript, August 29, 2025

Neda Navab-Boshehri Deposition Transcript, September 3, 2025

William Hardy Deposition Transcript, September 4, 2025

Robert Reffkin Deposition Transcript, September 5, 2025

Kathleen Berroth Deposition Transcript, September 9, 2025

Steve Lake Deposition Transcript, September 11, 2025

Glenn Kelman Deposition Transcript, October 9, 2025

**Expert Declaration and Backup Materials**

Expert Declaration of Debra J. Aron, Ph.D., September 12, 2025

**Legal**

Amended Complaint, *United States of America v. National Association of Realtors,* No. 1:05-cv-05140, Northern District of Illinois, October 5, 2005

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977)

Competitive Impact Statement, *United States of America v. National Association of Realtors*, No. 1:20-cv-03356-TJK, United States District Court for the District of Columbia, December 10, 2020, https://www.justice.gov/atr/case-document/file/1344346/download.

Complaint, In the Matter of *Information and Real Estate Services, LLC*, Docket No. C-4179, Before the Federal Trade Commission, November 22, 2006, https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0610087complaint061201.pdf.

Complaint, In the Matter of *Williamsburg Area Association of Realtors, Inc.*, Docket No. C-4177, Federal Trade Commission, November 22, 2006, https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0610268complaint061128.pdf

Complaint, *Compass, Inc.* and *Compass Washington, LLC* v. *Northwest Multiple Listing Service*, No. 2:25-cv-00766, U.S. Dist. Ct. W.D. Wash. (Seattle)

Complaint, *Compass, Inc.*, Plaintiff, v. *Zillow, Inc., Zillow Group, Inc.*, and *Trulia, LLC*, Defendants, No. 1:25-cv-05201, United States District Court for the Southern District of New York, June 23, 2025 ("Complaint")

*Moehrl* v. *National Association of Realtors*, 492 F. Supp. 3d 768 (N.D. Ill. 2020)

Opinion, *Realcomp II, Inc.* v. *Federal Trade Commission*, No. 09-4596, United States Court of Appeals for the Sixth Circuit, 2011, https://www.ftc.gov/sites/default/files/documents/cases/2010/04/110408realcompopinion.pdf

*Sitzer v. National Association of Realtors,* 420 F.Supp.3d 903 (W.D. Mo. 2019)

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)

**Publicly Available Documents and Data**

AddressUSA, "AddressUSA Home Page," https://www.addressusa.com/ (accessed September 27, 2025)

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Akerlof, George A., "The market for "lemons": Quality uncertainty and the market mechanism," *Quarterly Journal of Economics* 83(3) (1970): 488–500

Alaska Real Estate, "Home Search," https://www.alaskarealestate.com/ (accessed October 9, 2025)

Anderson, Taylor, "Andy Florance Declares Victory in Portal Wars, Says Homes.com is 'Now No. 1'," *Inman*, July 31, 2025, https://www.inman.com/2025/07/31/andy-florance-declares-victory-in-portal-wars-says-homes-com-is-now-no-1/?utm_source=newsflash&utm_medium=email&utm_campaign=newsflash&utm_term=&utm_content=1086524_textlink_0_19700101&message_id=40942484.146517 (accessed October 9, 2025)

Anderson, Taylor, "Portal Wars Field a New Fighter — Backed by the Country's Largest News Publisher," *Inman*, July 8, 2025, https://www.inman.com/2025/07/08/portal-wars-field-a-new-fighter-backed-by-the-countrys-largest-news-publisher/ (accessed September 28, 2025)

Armstrong, Mark, "Competition in Two-Sided Markets," *RAND Journal of Economics* 37 (3) (2006): 668–691

Arrow, Kenneth J., "The Organization of Economic Activity: Issues Pertinent to the Choice of Market versus Nonmarket Allocation." In *The Analysis and Evaluation of Public Expenditures: The PBB System*, Joint Economic Committee, 91st Congress, 1st Session, vol. 1, Washington, D.C.: Government Printing Office, 1969, 59–60

Aspen Glenwood MLS, "Local Market Update by Town," https://www.aspenglenwoodmls.com/page/Statistics (accessed October 9, 2025)

Bankrate, "What is the MLS, and How Does It Work?," December 11, 2023, https://www.bankrate.com/real-estate/mls-multiple-listing-service/ (accessed October 1, 2025)

Bator, Francis M., "The Anatomy of Market Failure," *The Quarterly Journal of Economics* 72(3) (1958): 351–79

Beck, Jason, Frank Scott, and Aaron Yelowitz, "Concentration and Market Structure in Local Real Estate Markets," *Real Estate Economics* 40(3) (2012): 422–460

Brambila, Andrea, "MLSs scramble to assess and implement new NAR MLS policy," *Inman*, March 31, 2025, https://www.inman.com/2025/03/31/mlss-scramble-to-assess-and-implement-new-nar-mls-policy/ (accessed October 9, 2025)

Bright MLS, "On/Off MLS Study," July, 28 2021, https://www.brightmls.com/article/on-off-mls-study (accessed October 4, 2025)

Bright MLS, "On-MLS Study: Measuring the Benefits of an Open and Transparent Housing Marketplace," August 2023, https://image.m.brightmls.com/lib/fe2b11747364047b741278/m/1/6534ddd0-6f2e-42dc-b05b-634e7b1ad23a.pdf (accessed September 30, 2025)

Bright MLS, "Who we serve," https://www.brightmls.com/our-markets/ (accessed October 4, 2025)

Callimachi, Rukmini, "Compass to Buy Top Rival, Further Condensing Brokerage Industry," *The New York Times*, September 22, 2025, https://www.nytimes.com/2025/09/22/realestate/compass-anywhere-real-estate-deal.html (accessed October 9, 2025)

Carlton, Dennis W., and Alan S., Frankel, "Transaction Costs, Externalities, and 'Two-Sided' Payment Markets," *Columbia Business Law Review* 2005 (3): 617–642

Carlton, Dennis W., and Jeffrey M. Perloff, *Industrial Organization*, 4th edition, Boston: Pearson, 2005

Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th edition, Pearson, 2005

Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th edition, Harlow: Pearson Education, 2015

Carolina Home, "Home Search," https://search.carolinahome.com/homes?tl=-83.49539:37.20665&br=-80.23495:34.11101&sort=price-h&propertyType=House%2CLand (accessed October 9, 2025)

Central Washington Board of Realtors, "MLS Search," https://www.cwbr.org/ (accessed October 9, 2025)

Chin, Andrew, "Antitrust Analysis in Software Product Markets: A First Principles Approach," *Harvard Journal of Law and Technology* 18(1) (2004): 1–83

Coase, Ronald H., "The Problem of Social Cost," *The Journal of Law & Economics* 3 (1960): 1–44

Compass Inc., Form 10-K, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001563190/d2ad6449-9e23-447b-907f-64ffb0f905e2.pdf

Compass, "A Letter From Robert Reffkin: Win More Listings With Compass' New 3-Phased Marketing Strategy," (accessed September 26, 2025)

Compass, "Compass 3-Phased Marketing Strategy," https://www.compass-homeowners.com/ (accessed September 26, 2025)

Compass, "Compass Agents," https://www.compass.com/agents (accessed September 27, 2025)

Compass, "Compass Coming Soon," https://www.compass.com/coming-soon/ (accessed September 26, 2025)

Compass, "Compass Commits to Sharing All Exclusive Inventory with All Brokerages and All MLSs," July 11, 2025, https://www.compass.com/newsroom/press-releases/3t29y2zXOlQP3FiHgDgayw/ (accessed September 26, 2025)

Compass, "Compass Home Page," https://www.compass.com (accessed October 7, 2025)

Compass, "Compass Launches Compass Private Exclusives Book, Accessible to All Agents," May 1, 2025, https://www.compass.com/newsroom/press-releases/4aPEadsMI1yWCqXnY2NON2/ (accessed September 26, 2025)

Compass, "Compass Launches Enhanced Seller Disclosure to Promote Transparency and Homeowner Choice," May 28, 2025, https://www.compass.com/newsroom/press-releases/7GTGPrZsN0vVh15XkhDnWo/ (accessed October 8, 2025)

Compass, "Compass Private Exclusives," https://www.compass.com/private-exclusives/ (accessed September 26, 2025)

Compass, "Form 10-Q for the Quarterly Period Ended June 30, 2025," U.S. Securities and Exchange Commission, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001563190/ce784cee-6d5f-48c3-8cab-9debfcfcb122.pdf (accessed October 6, 2025)

Compass, "Find an Agent That Knows Your Market Best," https://www.compass.com/agents/ (accessed October 8, 2025)

Compass, "Washington, DC Homes for Sale & Real Estate," https://www.compass.com/homes-for-sale/washington-dc/ (accessed October 8, 2025)

Corcoran, "Corcoran Reserve," https://www.corcoran.com/reserve (accessed September 30, 2025)

Coulson, Edward, Seok-Joon Hwang, and Susumu Imai, "The Value of Owner Occupation in Neighborhoods," *Journal of Housing Research* 13(2) (2002): 153–174

CRMLS, "Important News Regarding CRMLS and New NAR Policy," April 18, 2025, (accessed September 26, 2025)

CRMLS, "Our Coverage," https://go.crmls.org/coverage-area/ (accessed October 4, 2025)

Davis, Peter, and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Delozier, Jonathan, "Homes.com Grows With Increased Agent Adoption, Consumer Demand," *HousingWire*, April 29, 2025, https://www.housingwire.com/articles/homes-com-q1-2025-earnings-andy-florance-increased-agent-adoption/ (accessed October 5, 2025)

Doorify MLS, "Home Search," https://doorifymls.com/ (accessed October 9, 2025)

Eales, Damian, "If You Want to Catch a Big Fish, Avoid Small Ponds," *Realtor.com*, June 16, 2025, https://www.realtor.com/homemade/if-you-want-to-catch-a-big-fish/ (accessed October 5, 2025)

eBay, "Account Restrictions and Suspensions," https://www.ebay.com/help/account/account-holds-restrictions-suspensions/account-holds-restrictions-suspensions?id=4190 (accessed October 10, 2025)

eBay, "eBay Rules and Policies Overview," https://export.ebay.com/en/fees-regulations-policies/ebay-policies/ebay-rules-and-policies-overview/ (accessed October 10, 2025)

Edina Realty, "Edina Realty Fact Sheet," July 8, 2025, https://www.edinarealty.com/news/fact-sheet (accessed September 30, 2025)

Elliman, Douglas, "Douglas Elliman Launches Elliman Private Listings," September 25, 2025, https://www.elliman.com/insider/douglas-elliman-launches-elliman-private-listings (accessed September 30, 2025)

Evans, David S., "The Antitrust Economics of Multi-Sided Platform Markets," *Yale Journal on Regulation* 20(2) (2003): 324–381

Evans, David, and Schmalensee, Richard, "Multi-Sided Platforms," *The New Palgrave Dictionary of Economics*, 3rd edition, 2018,  9200–9208

Federal Trade Commission and United States Department of Justice, *Competition in the Real Estate Brokerage Industry*, 2007, https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf (accessed September 30, 2025)

FINRA, "Can You Swim in a Dark Pool," November 15, 2023, https://www.finra.org/investors/insights/can-you-swim-dark-pool (accessed October 8, 2025)

Flexmls, "Listings Search," https://my.flexmls.com/mlsunited/search/idx_links/20230321205305600653000000/listings (accessed October 9, 2025)

FMLS Remine, "Home Search," https://gofmls.remine.com/ (accessed October 9, 2025)

Gannett, "Gannett and Address USA National Real Estate Agreement." July 7, 2025,   (accessed September 27, 2025)

Georgia MLS, "Listings," https://www.georgiamls.com/ (accessed October 9, 2025)

Google News Initiative, "Google Trends: Understanding the Data," https://newsinitiative.withgoogle.com/resources/trainings/google-trends-understanding-the-data/ (accessed October 9, 2025)

Haddad, Richard, "New MLS Policy Provides Privacy Options for Sellers," *HomeLight*, April 11, 2025, https://www.homelight.com/blog/multiple-listing-options-for-sellers/ (accessed September 19, 2025).

Han, Brooklee, "International Markets Embrace the U.S. MLS Model," *HousingWire*, October 2, 2025, https://www.housingwire.com/articles/international-markets-embrace-the-u-s-mls-model/ (accessed October 4, 2025)

Harney, Kenneth R., "Sites to Behold: A Guide to Online Real Estate," *The Washington Post*, January 16, 1999, https://www.washingtonpost.com/archive/realestate/1999/01/16/sites-to-behold-a-guide-to-online-real-estate/266ae76e-d82f-41df-8796-faae160aa604/ (accessed October 6, 2025)

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Homes.com, "Boost Advantage," https://www.homes.com/advertise/boost/ (accessed October 4, 2025)

Homes.com, "Sell Your Home Faster and for More with a Homes.com Boost," https://www.homes.com/advertise/boost/ (accessed September 27, 2025)

Houston Association of Realtors, "Texas Real Estate - 319,285 Homes for Sale and Rent," https://www.har.com/ (accessed October 9, 2025)

Houston Association of Realtors, "Texas Real Estate - 319,285 Homes for Sale and Rent," https://www.har.com/ (accessed October 9, 2025)

Houston, Daniel, "Inside the stiff opposition to Compass' private-listing crusade," *Inman*, October 6, 2025, https://www.inman.com/2025/10/06/inside-the-stiff-opposition-to-compass-private-listing-crusade/ (accessed October 8, 2025)

Hwang, Min, and John M. Quigley, "Economic Fundamentals in Local Housing Markets: Evidence from U.S. Metropolitan Regions," *Journal of Regional Science*, 46(3) (2006): 425–452

Indeed, "Real Estate Salesperson vs. Broker: What's the Difference?," Updated June 9, 2025, https://www.indeed.com/career-advice/finding-a-job/real-estate-salesperson-versus-broker (accessed October 1, 2025)

Indiana Regional MLS, "Home Search," https://www.reindiana.com/ (accessed October 9, 2025)

Indyck, Robert S., and Daniel L. Rubinfeld, *Microeconomics*, 8th edition, Pearson, 2018

Intermountain MLS, "Welcome Home," https://www.intermountainmls.com/ (accessed October 9, 2025)

Intermountain MLS, "Welcome Home," https://www.intermountainmls.com/ (accessed October 9, 2025)

Keller Williams. "Create an Internal Listing in Command (Keller Exclusives)," https://answers.kw.com/hc/en-us/articles/4436304396947-Create-an-Internal-Listing-in-Command-Keller-Exclusives (accessed September 30, 2025)

Kelman, Glenn, "Buyers Should See All the Listings, Sellers Should Control How Their Listing Appears Online," *Redfin*, April 14, 2025, https://www.redfin.com/news/buyers-should-see-all-the-listings-sellers-should-control-how-their-listing-appears-online/ (Accessed Oct. 10, 2025)

KW Coastal Resources. "Keller Williams Personal Exclusives," https://www.kwcoastalhub.com/kw-exclusives/personal-exclusives (accessed September 30, 2025)

Landes, William M., and Richard A. Posner, "Market Power in Antitrust Cases," *Harvard Law Review* 94(5) (1981): 937–983

Las Vegas Realtor, "Home Search," https://lasvegasrealtor.com/#lvr-home-search-store=%7B%22state%22%3A%7B%22status%22%3A%22INITIAL%22%2C%22filters%22%3A%7B%7D%7D%2C%22version%22%3A0%7D (accessed October 9, 2025)

LaTrace, AJ, "Compass touts 'transparency' of new seller disclosure form," *Real Estate News*, May 28, 2025, https://www.realestatenews.com/2025/05/28/compass-rolling-out-new-seller-disclosure-form (accessed October 8, 2025)

LaTrace, AJ, "Homes.com Aims to One-Up Zillow with Listings 'Boost'," *Real Estate News*, May 9, 2025, https://www.realestatenews.com/2025/05/09/homes-com-aims-to-one-up-zillow-with-listings-boost (accessed September 27, 2025)

LaTrace, AJ, "How small brokerages—and an open housing market—could collapse," *Real Estate News*, August 29, 2025, https://www.realestatenews.com/2025/08/29/how-small-brokerages-and-a-free-market-could-collapse (accessed October 7, 2025)

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

LaTrace, AJ, "No Clear Cooperation? Expect 'an explosion' in private listings," *Real Estate News*, February 27, 2025, https://www.realestatenews.com/2025/02/27/no-clear-cooperation-expect-an-explosion-in-private-listings (accessed October 7, 2025)

Lentz, Sarah, "Banned by Zillow? Homes.com Will Boost Your Listing for Free," *Nowbam*, May 9, 2025, (accessed September 27, 2025)

Live in Alabama, "Home Search," https://www.liveinalabama.com/ (accessed October 9, 2025)

Long & Foster, "Private Real Estate Listings," https://www.longandfoster.com/pages/private-real-estate-listings (accessed September 30, 2025)

Lubbock Association of REALTORS®, "Market Reports," https://lubbockrealtors.com/market-reports/ (accessed October 5, 2025)

Marketplace, "All about the MLS: The fascinating history of real estate listings," September 18, 2024, https://www.marketplace.org/story/2024/09/18/mls-multiple-listing-service-home-sales (accessed September 18, 2025)

McPherson, Marian, "Homes.com Will 'Boost' Listings that are Banned on Zillow: Florance," *Inman*, May 9, 2025, https://www.inman.com/2025/05/09/homes-com-will-boost-listings-that-are-banned-on-zillow-florance/ (accessed September 27, 2025)

Metrolist, "Home Search," https://www.metrolist.com/ (accessed October 9, 2025)

MIBOR Realtor Association, "Property Search," https://property.mibor.com/ (accessed October 9, 2025)

MLS Technology Inc., "Search for Property," https://www.mlstechnologyinc.com/ (accessed October 9, 2025)

Move in Michigan, "Home Search," https://www.moveinmichigan.com/ (accessed October 9, 2025)

Move, Inc. Form 10-K for the Period Ended December 31, 2012, https://www.sec.gov/Archives/edgar/data/1085770/000104746913001445/a2213016z10-k.htm (Accessed September 28, 2025)

Multiple Listing Service of Southern Arizona, "MLS Area Boundaries," https://mlssaz.com/wp-content/uploads/2022/07/Area-Maps-2017.pdf (accessed October 9, 2025)

Multiple Listing Service of Southern Arizona, "Public MLS Search," https://mlssaz.com/property-search/ (accessed October 9, 2025)

Multiple Listing Service of Southern Arizona, "Public MLS Search," https://mlssaz.com/property-search/ (accessed October 9, 2025)

Naples Area, "Find Naples Home," https://www.naplesarea.com/find-naples-home (accessed October 9, 2025)

Nasdaq, "A Beginner's Guide to Dark Pool Trading," https://www.nasdaq.com/articles/a-beginners-guide-to-dark-pool-trading (accessed October 4, 2025)

National Association of Realtors, "Existing Home Sales," nar.realtor/sites/default/files/2025-09/ehs-08-2025-overview-2025-09-25.pdf (accessed September 18, 2025)

National Association of Realtors, "Internet Data Exchange (IDX) Background and FAQ,"   (accessed September 18, 2025)

National Association of Realtors, "MLS Clear Cooperation Policy," https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy (accessed September 19, 2025)

National Association of Realtors, "MLS Clear Cooperation Policy," https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy. (accessed September 19, 2025).

National Association of Realtors, "Multiple Listing Options for Sellers," https://www.nar.realtor/about-nar/policies/multiple-listing-options-for-sellers (accessed September 19, 2025)

National Association of Realtors, "Profile of Home Buyers and Sellers, 2024," https://www.nar.realtor/sites/default/files/2024-11/2024-profile-of-home-buyers-and-sellers-highlights-11-04-2024_2.pdf (accessed September 24, 2025)

National Association of Realtors, "Report & Conclusions of the Joint Work Group on Cooperation Issues (2013)" https://www.nar.realtor/about-nar/policies/report-conclusions-of-the-joint-work-group-on-cooperation-issues-2013 (accessed September 19, 2025)

National Association of Realtors, "VIDEO: NAR President Kevin Sears Discusses Details of the New MLS Policy, Including How It Came to Be and How It Will Benefit Consumers," https://www.nar.realtor/about-nar/policies/multiple-listing-options-for-sellers (accessed September 19, 2025)

National Association of Realtors, *2025 Handbook on Multiple Listing Policy*, https://www.nar.realtor/sites/default/files/2025-05/PDF-HMLP-2025-Handbook-on-Multiple-Listing-Policy-2025-05-30.pdf (accessed October 5, 2025)

National Association of Realtors, About NAR, https://www.nar.realtor/about-nar (accessed October 1, 2025)

National Association of Realtors, *Handbook on Multiple Listing Policy*, Section 2: Definition of MLS Participant (Policy Statement 7.9), January 1, 2025. https://www.nar.realtor/handbook-on-multiple-listing-policy/section-2-definition-of-mls-participant-policy-statement-7-9 (accessed October 8, 2025).

National Association of Realtors, "Summary of 2020 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2020-mls-changes (accessed September 19, 2025).

National Association of Realtors. *Handbook on Multiple Listing Policy*, Virtual Office Websites Policy: Governing Use of MLS Data in Connection with Internet Brokerage, https://www.nar.realtor/handbook-on-multiple-listing-policy/virtual-office-websites-policy-governing-use-of-mls-data-in-connection-with-internet-brokerage (accessed September 18, 2025)

Nesbit, Josephine, "What Is Dual Agency?," *U.S. News*, June 21, 2023, https://realestate.usnews.com/real-estate/articles/what-is-dual-agency (accessed October 9, 2025)

Nestfully, "Find Home," https://www.nestfully.com/ (accessed October 9, 2025)

Nestfully, "Find Home," https://www.nestfully.com/ (accessed October 9, 2025)

Newman, John M., "Procompetitive Justifications in Antitrust Law," *Indiana Law Journal* 94(2) (2019): 501–544

Northern Nevada Regional MLS, "Home Search," https://nnrmls.com/ (accessed October 9, 2025)

NorthstarMLS, "NorthstarMLS Decision on NAR's Multiple Listing Options for Sellers Policy," June 4, 2025, https://northstarmls.com/insights/northstarmls-decision-on-nars-multiple-listing-options-for-sellers-policy/ (accessed October 1, 2025)

Northwest Multiple Listing Service, "Listing Search," https://www.nwmls.com/what-is-the-mls/listing-search/#/ (accessed October 9, 2025)

OneKey MLS, "Home Search," https://www.onekeymls.com/ (accessed October 9, 2025)

Peterson, Samantha, "Real Estate Shopping Goes Sky-High: Interactive Aerial Maps Create New Way of Looking at Homes Online," *Inman*, October 25, 2004, https://www.inman.com/2004/10/25/real-estate-shopping-goes-sky-high/ (accessed September 28, 2025)

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Pryne, Eric, "Zillow Reveals Financial Details as It Files to Go Public," *The Seattle Times*, April 18, 2011, Updated April 19, 2011, https://www.seattletimes.com/business/zillow-reveals-financial-details-as-it-files-to-go-public/ (Accessed October 1, 2025).

Real Estate Standards Organization, "RESO Certification Status," https://www.reso.org/certificates/ (accessed October 2, 2025)

Real Estate Standards Organization, "What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ," https://www.reso.org/mls-faq/ (accessed September 18, 2025)

Real MLS Homes for Sale, "Search Homes," https://www.realmlshomesforsale.com/ (accessed October 9, 2025)

Realtor.com, "From Innovation to Impact: Realtor.com is Gaining Ground," August 25, 2025, https://www.realtor.com/homemade/from-innovation-to-impact-realtor-com-is-gaining-ground/ (accessed October 5, 2025)

Realtor.com, "How Realtor.com Is Building Trust and Gaining Ground in Real Estate Search," April 25, 2025, https://www.realtor.com/homemade/how-realtor-com-is-building-trust-and-gaining-ground-in-real-estate-search/ (accessed October 5, 2025)

REALTORS® Association of Maui, "Home Search," https://www.ramaui.com/ (accessed October 9, 2025)

RealTracs, "Listings Search," https://www.realtracs.com/listings/search (accessed October 9, 2025)

Riquiter, Andrea, "As new real estate listings rules take effect, will buyers and sellers benefit?," *USA Today*, April 4, 2025, https://www.usatoday.com/story/money/personalfinance/real-estate/2025/04/04/real-estate-rules-seller-listings-buyers/82656588007/ (accessed September 19, 2025).

Rocket Companies, "Rocket Companies Completes Acquisition of Redfin," July 1, 2025, https://www.rocketcompanies.com/press-release/rocket-companies-completes-acquisition-of-redfin/ (accessed October 5, 2025)

Rocket Companies, "Rocket Companies to Acquire Redfin, Accelerating Purchase Mortgage Strategy," March 10, 2025, https://ir.rocketcompanies.com/news-and-events/press-releases/press-release-details/2025/Rocket-Companies-to-Acquire-Redfin-Accelerating-Purchase-Mortgage-Strategy/default.aspx (accessed September 28, 2025)

Samuelson, Errol, "Make no mistake – we are championing transparency at Zillow," LinkedIn, April 18, 2025, https://www.linkedin.com/pulse/make-mistake-we-championing-transparency-zillow-zillow-gp9ac/ (accessed October 7, 2025)

Sappington, David, "Incentives in Principal-Agent Relationships," *Journal of Economic Perspectives* 5(2) (1991): 45–66

Schmalensee Richard,"Brand Loyalty and Barriers to Entry," *Southern Economic Journal* 40(4) (1974): 579–588.

SF Property Search, "Home Search," https://www.sfpropertysearch.com/en/ (accessed October 9, 2025)

Shapiro, Carl, "Advertising as a Barrier to Entry," FTC Working Paper No. 74, 1982, https://www.ftc.gov/es/system/files/documents/reports/advertising-barrier-entry/wp074.pdf (accessed Sept. 28, 2025).

Sheldon, Stephen, Matthew Filek, and Patrick McIlwee, "Zillow Group Inc, " William Blair Equity Research Report, April 21, 2025.

Sotheby's, "Private Exclusive Listings," https://www.sothebysrealty.com/eng/private-exclusive-listings (accessed September 30, 2025).

Space Coast MLS, "Home Search," https://www.spacecoastmls.com/home (accessed October 9, 2025)

Stigler, George J., "The Economics of Information," *The Journal of Political Economy* 69(3) (1961): 213–225

Stobierski, Tim, "Business Insights: What Are Network Effects?" *Harvard Business School Online Blog*, November 12, 2020, https://online.hbs.edu/blog/post/what-are-network-effects (accessed October 10, 2025)

T3 Sixty 2025, "Real Estate Almanac 2025," https://www.realestatealmanac.com/brokerages/ (accessed September 24, 2025)

The Real Brokerage, "How to Enter a Listing in reZEN," https://support.therealbrokerage.com/hc/en-us/articles/9324314169623-How-to-Enter-a-listing-in-reZEN (accessed September 30, 2025)

The Real Deal, "Coldwell Banker Leans into the Private Listing Fray," August 28, 2025, https://therealdeal.com/national/2025/08/28/coldwell-banker-expands-exclusive-look-program/ (accessed September 30, 2025)

Triad MLS, "Home Search," https://triadmls.com/ (accessed October 9, 2025)

U.S. Department of Justice. *Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act*, Washington, DC: U.S. Department of Justice, 2008

United States Bureau of Labor Statistics, "Occupational Outlook Handbook: Real Estate Brokers and Sales Agents," https://www.bls.gov/ooh/sales/real-estate-brokers-and-sales-agents.htm#tab-2 (accessed October 1, 2025)

United States Census Bureau, "CPS Historical Geographic Mobility/Migration Graphs, Figure A-1.2 Type of Move: 1948-2023," https://www2.census.gov/library/visualizations/time-series/demo/geographic-mobility/figure-a-1.2.png (accessed September 27, 2025)

United States Census Bureau, "New Single Family Homes Sold: United States, 1963-2025" https://www.census.gov/econ/currentdata/?programCode=RESSALES (accessed September 28, 2025)

United States Census Bureau, "Real Estate and Rental and Leasing: Summary Statistics for the U.S., States, and Selected Geographies: 2022," NAICS Code 5312, https://data.census.gov/table/ECNBASIC2022.EC2253BASIC (accessed September 24, 2025)

United States Department of Justice and The Federal Trade Commission, "Merger Guidelines," December 18, 2023, https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf

Unlock MLS, "Search Listings," https://www.search.unlockmls.com/ (accessed October 9, 2025)

Utah Real Estate, "Home Search," https://www.utahrealestate.com/index/public.index (accessed October 9, 2025)

Vail Board of Realtors®, "Vail Multi-List Service," https://www.vbr.net/vail-multi-list-service/ (accessed October 9, 2025)

Valley MLS, "Home Search," https://www.valleymls.com/ (accessed October 9, 2025)

Varian, Hal, *Intermediate Microeconomics: A Modern Approach*, 8th edition, W.W. Norton & Company, 2010

Wacksman, Jeremy, February 17, 2025, "Private listing networks are damaging the housing market, harming buyers, sellers and agents," *Zillow Group*, https://www.zillowgroup.com/news/private-listing-networks-are-damaging-the-housing-market/ (accessed October 6, 2025)

Wall, Sheridan, "Elliman, Corcoran unveil private exclusive listing platforms," *The Real Deal*, April 7, 2025, https://therealdeal.com/national/2025/04/07/elliman-corcoran-introduce-private-exclusive-platforms/ (accessed October 9, 2025)

Zahirovich-Herbert, Velma and Gibler, Karen M., "The effect of new residential construction on housing prices," *Journal of Housing Economics* 26 (2014): 1–18

Zillow Group, listing for 3551 Hertford Pl NW, Washington, DC 20010,
    https://www.zillow.com/homedetails/3551-Hertford-Pl-NW-Washington-DC-20010/468087_zpid/
    (accessed Oct. 8, 2025)

Zillow Group, "Flex pricing," https://www.zillow.com/premier-agent/flex-pricing/ (Accessed September 30,
    2025).

Zillow Group, "Form 10-K for the Period Ended December 31, 2024,"
    https://d1rn0p25nwr6d.cloudfront.net/CIK-0001617640/7204bf7d-e80a-4f24-8e69-5a1264c2df17.pdf

Zillow Group, "Form 10-Q, Second Quarter Ending June 30, 2025,"
    https://s24.q4cdn.com/723050407/files/doc_financials/2025/q2/b145e4ea-5d1a-40c8-9409-
    79b926da9d32.pdf (accessed October 5, 2025)

Zillow Group, "If a Listing is Online, it Should be Online Everywhere: Zillow's New Listing Access
    Standards," April 10, 2025, https://www.zillowgroup.com/news/zillows-new-listing-access-standards/
    (accessed September 26, 2025)

Zillow Group, "Off-MLS Home Sellers Left More Than $1 Billion on the Table the Past Two Years," February
    14, 2025, https://www.zillow.com/research/mls-pln-sale-price-34846/ (accessed October 4, 2025)

Zillow Group, "Post a For Sale by Owner Listing," https://www.zillow.com/for-sale-by-owner/ (accessed
    October 1, 2025)

Zillow Group, "Real Estate Licenses," https://www.zillow.com/c/info/real-estate-licenses/ (accessed October 1,
    2025)

Zillow Group, "What is a Zestimate?," https://www.zillow.com/z/zestimate/ (accessed October 1, 2025)

Zillow Group, "Zillow Investor Presentation," February 2024,
    https://s24.q4cdn.com/723050407/files/doc_presentations/2024/Mar/13/zillow-investor-presentation-
    feb-2024.pdf (accessed October 4, 2025)

Zillow Group, "Zillow Investor Presentation," February 2025,
    https://s24.q4cdn.com/723050407/files/doc_earnings/2024/q4/presentation/Zillow-4Q24-Investor-
    Presentation.pdf.(accessed September 27, 2025)

Zillow Group, "Zillow Listing Access Standards Quick Access Guide," https://grow.zillow.com/hubfs/Zillow-
    Listing-Access-Standards.pdf (accessed September 26, 2025)

Zillow Group, "Zillow Listing Access Standards," https://www.zillow.com/c/info/zillow-listing-access-
    standards/ (accessed October 7, 2025)

Zillow Group, "Zillow Q1 2024 Shareholder Letter,"
    https://s24.q4cdn.com/723050407/files/doc_earnings/2024/q1/presentation/Zillow-1Q24-Shareholders-
    Letter.pdf (accessed October 1, 2025)

Zillow Group, "Zillow's Listing Access Standards: What Agents Need to Know,"
    https://www.zillow.com/premier-agent/agents-know-listing-access-standards/ (accessed September 26,
    2025)

Zillow Research, "Search Trends," Zillow Group, March 20, 2025, https://www.zillow.com/research/home-
    shopping-search-trends-34988/ (accessed September 30, 2025)

**Other Data and Documents**

Zillow SEM Data.xlsx

Sheldon, Stephen, Matthew Filek, and Patrick McIlwee, "Zillow Group Inc.," William Blair Equity Research
    Report, April 21, 2025

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Haas, Jason, Audey Ashkar, and Jun-Yi Xie, "CoStar, Inc. - Homes.com in Need of Further Renovations; Initiate at Underweight," Wells Fargo Equity Research, February 5, 2025

S&P Global, "Zillow Group, Inc. Nasdaq GS:ZG FQ1 2025 Earnings Call Transcripts," May 7, 2025

Tessler, Joelle, "Real Estate Brokerage Industry Enters the Internet Age," *Dow Jones*, January 2, 1999

Semrush.com Traffic Data