UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                        :

COMPASS, INC.,                      :
                        :

          Plaintiff,     :
                        :         25-CV-05201 (JAV)

      -v-               :
                        :       OPINION AND ORDER

ZILLOW, INC., ZILLOW GROUP, INC., and  :
TRULIA, LLC,                 :
                        :

         Defendants.    :
                        :
------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

      Plaintiff Compass, Inc. ("Plaintiff" or "Compass") brings this action against

Defendants Zillow, Inc., Zillow Group, Inc. ("Zillow"), and Trulia, LLC ("Trulia")

(collectively, "Defendants"), alleging that Defendants conspired to restrain trade

and unlawfully maintained monopoly power in violation of Sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1, 2. Zillow is a real estate technology company that

operates a popular online home search platform. Compass is the largest real estate

brokerage in most major United States markets, and also operates its own online

home search site. Compass challenges Zillow's recently-announced Listing Access

Standards, which exclude from the Zillow home search portal house listings that

had previously been privately marketed by a broker. Presently before the Court is

Plaintiff's motion for a preliminary injunction, which requests that the Court enjoin

Defendants' implementation of its Listing Access Standards under Section 16 of the

Clayton Act, 15 U.S.C. § 26.  ECF No. 23.  For the following reasons, Plaintiff's

motion for a preliminary injunction is DENIED.

## BACKGROUND

### A.    Procedural History

On June 27, 2025, Plaintiff filed the instant motion.  That same day, Plaintiff

filed a motion for expedited discovery, ECF No. 31, which the Court granted, ECF

No. 58.

From November 18, 2025, to November 21, 2025, the Court held an

evidentiary hearing on the preliminary injunction motion.  The Court received into

evidence the sworn testimony of several witnesses, including Compass Chief

Executive Officer ("CEO") Robert Reffkin, Compass Senior Vice President of

Strategy and Business Operations Elizabeth Ashton Alexander, Compass President

of Brokerage Operations Neda Navab-Boshehri, Compass Realtor and Zillow Flex

Agent Kerry Carr, Compass Head of Investor Relations Soham Bhonsle, Zillow CEO

Jeremy Wacksman, Zillow Chief Industry Development Officer Errol Samuelson,

Zillow Chief Financial Officer ("CFO") Jeremy Hofmann, CEO of Redfin Corporation

("Redfin") Glenn Kelman, Compass's economics expert Dr. Debra J. Aron, and

Zillow's economics expert Dr. Lawrence Wu.

### B.    Findings of Fact

"In deciding a motion for preliminary injunction, a court may consider the

entire record including affidavits and other hearsay evidence."  *Park Irmat Drug

Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (citation omitted);

*see Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (holding that "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction").  Accordingly, the following findings of facts are drawn from the entire record in this action, including the Complaint, documents cited in the Complaint, and affidavits submitted by the parties.  *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, 700 F. Supp. 3d 86, 92 (S.D.N.Y. 2023) (relying upon operative complaint as well as party affidavits in making findings of fact); *Pawelsky v. Cnty. of Nassau, New York*, 684 F. Supp. 3d 73, 78 n.1 (E.D.N.Y. 2023) (same).

### 1.    Industry Background

Most residential properties in the United States are bought and sold with the help of real estate brokers ("brokers") or sales agents ("agents").  PX-208 (ECF No. 114-1) ("Aron Decl."), ¶ 19.  Brokers are licensed to own their own businesses and practice independently, whereas agents must work with a licensed broker.  *Id.*, ¶ 19. Realtors are a subset of brokers or sales agents who are members of the National Association of Realtors ("NAR"), the largest trade association in the United States involved in the real estate industry.  *Id.*, ¶ 20.

A real estate brokerage ("brokerage") is a legal entity that employs brokers and agents.  *Id.*, ¶ 20.  Brokers and agents earn money through commissions.  *Id.*, ¶ 22.  The commissions earned by brokers and agents comprise a portion of a property's sale price and are paid out after completion of a sale.  *Id.*

Brokerages compete to provide agents to sellers of for-sale homes. *Id.*, ¶ 23. For-sale properties whose owners are represented by a brokerage's agent can be thought of as the brokerage's inventories. *Id.* Brokerages also compete to provide agent services to home buyers, and they compete to attract and retain agents. *Id.*

Brokers and agents representing buyers and sellers often leverage online marketing avenues when searching for and advertising properties. *Id.*, ¶ 24. Online home search platforms that aggregate listings, such as Zillow.com and Realtor.com, are used by buyers and their agents to search for properties that may be of interest to the buyer and by sellers and their agents to advertise properties for sale. *Id.*

There are two markets within the real estate industry that are relevant to the present action. The first is the market for online home search. *Id.*, ¶ 25. This is the market in which Zillow primarily operates and in which the competitive harm associated with the challenged conduct is occurring. *Id.* The second is the market for brokerage services. *Id.*, ¶ 26. In this market, brokerages contract with agents and brokers, whose job is to attract property listings by representing the seller in the sale of the property and to attract buyers to represent them in the purchase of real estate. *Id.* This market is relevant because it is the primary market in which Compass and other brokerages operate, including those that also compete with Zillow in the online home search market. *Id.* While this market is relevant for the parties in this litigation, it is secondary with respect to the antitrust allegations at issue here.

### 2.    Compass

Compass is a brokerage and technology company with an online home search platform.  ECF No. 15 ("Compl."), ¶ 4; Preliminary Injunction Hearing Transcript ("Hr'g Tr.") at 50:6-7 (Reffkin); Aron Decl., ¶ 37.  As a brokerage, Compass engages agents as independent contractors to assist home sellers and home buyers.  Aron Decl., ¶¶ 37, 223 n.346.  Compass agents assist home sellers to market their properties, determine pricing strategies, and find suitable buyers.  *Id*, ¶37.  Compass agents also assist home buyers to find suitable properties, track desired listings, schedule tours, and determine financing options.  *Id.*

Compass primarily generates its revenue through its brokerage business.  Aron Decl., ¶ 41.  Compass does this by collecting a share of the gross sales commissions that agents earn from representing sellers and/or buyers in real estate transactions.  *Id.*  Compass, in turn, provides agents with access to technology, marketing tools, and other resources.  *See id.*, ¶¶ 37, 39; Hr'g Tr. at 50:6-14 (Reffkin).  By sales volume (the total value of all properties sold by its agents), Compass has been recognized as the largest brokerage in the United States since 2021.  Aron Decl., ¶ 38.

As an online home search platform, Compass has a website and a mobile application ("app") that allow users to search real-time inventory of property listings along various metrics.  *Id.*, ¶ 40.  Compass's website supports home sellers by enabling them to connect with a Compass agent, who can assist with the sale.  *Id.*  Both Compass's website and app support home buyers by helping connect them

with properties and Compass agents who can assist with the purchase. *Id.* In this vein, Compass acts as an aggregator of real estate listings. *Id.*

The current purpose of Compass's online platforms is to support Compass's primary business of brokerage services by connecting buyers and sellers to Compass agents. *See* Aron Decl., ¶ 41. The capabilities and functionality of Compass's platforms, however, have drawn comparisons to other home search platforms like those of Zillow, Trulia, Redfin, and Homes.com, Inc. ("Homes.com"), as they compete with those other online platforms in the market for online home search. *Id.*

### 3. Zillow

Zillow is a real estate marketplace company that provides information about homes, real estate listings, and mortgages through its online home search platforms. DX-657 (ECF No. 127-53) ("Wu Decl."), ¶ 4. Zillow Group includes Zillow, Inc., Trulia, LLC, and other affiliated brands. *Id.* Accordingly, Zillow's online platforms include but are not limited to the Zillow website, Zillow app, Trulia website, and Trulia app. *See id.*, ¶ 6. Through these online platforms, Zillow provides information about property listings, including "days-on-market," price history for the property, and other data. Aron Decl., ¶ 30.

Zillow's platforms seek to connect buyers, sellers, and real estate professionals to each other to facilitate the buying and selling of homes. Wu Decl., ¶ 4. Zillow does not typically represent buyers or sellers in real estate transactions and obtains most of its for-sale property listings from local MLSs by virtue of being

a registered brokerage.[1]  Hr'g Tr. at 162:7–164:25, 221:21–222:13 (Samuelson).

Home buyers and sellers can access these listings on Zillow's platforms for free.  Wu

Decl., ¶ 4.

Zillow primarily generates revenue through its online platforms from agents

who pay Zillow fees or shares of commissions earned in real estate transactions in

exchange for leads or advertising that connects them to prospective home buyers.

*Id.*; Hr'g Tr. at 160:23-25, 161:25–162:5 (Samuelson).  For example, Zillow indirectly

generates revenue when users click certain buttons on Zillow's platforms, such as

"contact agent" or "take a tour," because agents pay to advertise in certain areas

and those agents are connected to users who click those buttons.  Hr'g Tr. at

161:21–162:5 (Samuelson).  While Zillow does not directly monetize listings on a

per-listing basis, *id.* at 334:22 (Wacksman), it does generate revenue on an indirect

pay-per-click model, *id.* at 161:15–162:5 (Samuelson).

Zillow attracts users to its online home search platforms by augmenting

listings with additional information—such as its "Zestimate" automated valuation

tool, neighborhood information, and tax information—and other technology like 3D

walkthroughs and virtual home staging.  ECF No. 51 ("Samuelson Decl."), ¶¶ 17-21;

Hr'g Tr. at 167:17–168:4 (Samuelson); *id.* at 333:10-19 (Wacksman).  Accordingly,

Zillow competes for online traffic not only through the volume, accuracy, and quality

of its listings, but also through user experience.  *See* Hr'g Tr. at 228:22–231:21,

---

[1] Although Zillow holds brokerage licenses, it does not operate as a traditional
brokerage.  Hr'g Tr. at 221:21–222:3 (Samuelson).

238:20–240:5 (Samuelson); *id.* at 334:6-20, 346:19–347:10 (Wacksman); *id.* at 625:14-22 (Wu); DX-576 at ZG-00032650-51.

### 4. Multiple Listing Services, the National Association of Realtors, and the Clear Cooperation Policy

Online home search platforms typically obtain their for-sale listings from local Multiple Listing Services ("MLSs").  *See* Hr'g Tr. at 218:12–219:3 (Samuelson). An MLS is a regional database of homes listed for sale.  Aron Decl., ¶ 31 n.30. There are over 500 local MLSs in the United States, and they typically allow only MLS members to view their listing databases.  Hr'g Tr. at 52:23–53:2 (Reffkin); *id.* at 218:9-20 (Samuelson); Samuelson Decl., ¶ 9.  Zillow, for example, receives listings through data feeds from local MLSs as a licensed brokerage and member of those MLSs.  Hr'g Tr. at 162:21–163:4, 218:21-24 (Samuelson).

MLSs are not just databases, however, but organizations that create and enforce rules and standards for broker participants regarding listing sharing.  Wu Decl., ¶ 22.  Each MLS can set its own rules.  *Id.*  MLSs therefore implement rules that affect how broker participants conduct their business.  *See, e.g.*, Hr'g Tr. at 491:10-23 (Navab-Boshehri); DX-339 at 1.

Furthermore, most MLSs are owned and operated by local real estate professional associations, and most local real estate professional associations in the United States are members of NAR.  Wu Decl., ¶ 21.  "Most MLSs are [therefore] owned and controlled by members of [NAR]."  *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 829 (9th Cir. 2022).  As a result, most MLSs in the United

States implement NAR's rules and policies, thereby affecting how most brokerages, brokers, and agents conduct their business.  Hr'g Tr. at 52:14–53:6 (Reffkin).

The NAR policy of particular relevance here is the Clear Cooperation Policy ("CCP").  Starting in 2020, NAR required its member MLSs to implement the CCP, which mandates that affiliated brokerages, brokers, and agents submit property listings to their local MLS within one day of publicly marketing those listings, with limited exceptions.  Aron Decl., ¶ 51; Wu Decl., ¶ 31; Samuelson Decl., ¶ 37.  NAR defines "public marketing" as "includ[ing], but . . . not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays[,] digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public."  Aron Decl., ¶ 51.

NAR implemented the CCP due to concerns about the proliferation of "pocket listings" and certain marketing techniques that could result in "less complete and consequently less useful property data" and "increasingly fractionalized and less efficient residential real estate markets."  Wu Decl., ¶ 31.  NAR also implemented the CCP to bolster MLSs' ability to "create[] an efficient marketplace."  *Id.*

"Private listings" or "pocket listings" can take several forms.  *Id.*, ¶¶ 5 n.8, 31 n.62.  Generally, "private listings" or "pocket listings" are for-sale listings promoted by real estate brokers within their private networks, known as "private listing networks," and are not shared broadly with other real estate agents and the public through MLSs.  *Id.*, ¶ 5 n.8; Aron Decl., ¶ 49.  In other words, PLNs are systems by

which homes are not publicly available or accessible on MLSs but are instead only shared with an exclusive set of agents. Aron Decl., ¶ 49. Accordingly, the CCP was effectively designed, *inter alia*, to counter PLNs, as PLNs were recognized as a threat to the centrality of MLSs in the real estate marketing process. *See id.*, ¶¶ 50-51.

Notably, the CCP contains an exemption for a subset of pocket listings known as "office exclusives." Aron Decl., ¶ 51; Wu Decl., ¶ 32. Office exclusives involve the seller directing their agent to market the listing internally within the agent's brokerage on a one-to-one basis and to instruct the MLS not to syndicate the listing for display on other brokerage websites or home search portals. Wu Decl., ¶ 32. Under this exemption, the listing must still be submitted to the MLS along with a certification signed by the seller acknowledging that they did not desire the listing to be disseminated to MLS broker participants. *Id.* This exemption is intended to provide flexibility for sellers concerned about privacy. *Id.*

The CCP does not mention the possibility of NAR imposing penalties for failure to comply with the CCP. Aron Decl., ¶ 52. Instead, compliance is left to MLSs. *Id.* Penalties enforced by an MLS for failing to comply with the CCP typically involve escalating warnings and fines. *Id.* The CCP does not provide for banning a listing from an MLS for failing to comply with the CCP. *Id.*

### 5. Compass's 3-Phased Marketing Strategy

In November 2024, Compass launched the "3-Phased Marketing Strategy" ("3PM"). Hr'g Tr. at 394:7-9 (Alexander). Listings using 3PM function as pocket

listings on a PLN during the first two phases before they are marketed on the MLSs during the third phase. *See* Hr'g Tr. at 61:5-14 (Reffkin). There are four primary advantages from off-MLS marketing: (1) privacy, (2) building momentum and demand through "premarketing," (3) receiving feedback as to what parts of the home need to be fixed or adjusted, and (4) price discovery. *Id.* at 55:8–56:20 (Reffkin). Of these four, price discovery is viewed by some market participants as the most important benefit because when homes on the market have a price drop, they look like "damage[d] goods," which can lead to more days on market, thereby further "kill[ing their] value." *Id.* at 56:6–57:1 (Reffkin). But when homes are marketed off the MLSs, they do not have a visible price-drop history or accrue days on market. *See* ECF No. 29 ("Hardy Decl."), ¶ 14(c).

Originally,[2] in the first phase of 3PM, "Compass Private Exclusive," the seller and Compass agent privately market the property to other Compass agents, clients of Compass agents, and home buyer who visit a Compass office. Hr'g Tr. at 57:11–58:1, 64:11–65:10 (Reffkin); Hardy Decl., ¶ 14(a). Private Exclusives do not appear on other online home search platforms, such as Zillow or MLS platforms. Hardy Decl., ¶ 9. Accordingly, home sellers can benefit from this phase of off-MLS marketing because it allows sellers to test price, gain critical insights about the property, and generate early demand before going public. *Id.*, ¶ 14(a).

---

[2] The scope of this private marketing has since expanded due to the weakening of the CCP, as detailed below.

Compass.com, however, does advertise the existence and quantity of Private Exclusives and how a home buyer can learn more about them in the "Black Box" on the frontpage of the website.  *See* Hr'g Tr. at 58:4-9, 63:9-24, 67:4-9 (Reffkin).  By clicking on the Black Box, home buyers can access information about specific Private Exclusives through Compass agents.  *See id.* at 58:4-9, 63:9-24, 67:4-9 (Reffkin); Hardy Decl., ¶ 9.  Compass advertises Private Exclusives in this manner, keeping specific information about the listings "behind" the Black Box, so that they do not run afoul of NAR and MLS rules such as the CCP.  Hr'g Tr. at 58:10-18 (Reffkin).

In the second phase of 3PM, "Compass Coming Soon," the listing moves to "Coming Soon" status and is publicly launched on Compass.com, showcasing it to all agents and consumers without displaying days on market, price drop history, or other insights that might negatively impact a listing.  Hardy Decl., ¶ 14(b).  This off-MLS marketing phase can benefit home sellers by building demand (through signaling upcoming competition) and providing another opportunity to collect feedback.  *Id.*

In the third phase of 3PM, the listing appears on MLS platforms and online home search platforms, informed by the information gathered from the first two phases.  *Id.*, ¶ 14(c).  In this phase, the listing now begins accruing days on market and displays price-change history.  *Id.*  Ninety-four percent of listings that use 3PM proceed to the third phase.  Hr'g Tr. at 61:6-7 (Reffkin).

In 2024, Compass lobbied NAR and local MLSs to repeal the CCP, while Zillow lobbied NAR to strengthen it.  PX-119 at 1-5; Samuelson Decl., ¶¶ 38-39; Hr'g Tr. at 172:11-24, 173:3-11 (Samuelson); *id.* at 397:8-21 (Alexander).  On March 25, 2025, NAR announced the Multiple Listing Options for Sellers ("MLOS") policy, which modifies the CCP to accommodate certain marketing strategies.  Hr'g Tr. at 173:12-25 (Samuelson); Aron Decl., ¶ 55; Samuelson Decl., ¶ 40.  Under the MLOS policy, "delayed marketing" listings are exempt from the CCP.  Wu Decl., ¶ 36. Delayed marketing listings involve a home seller instructing an agent to enter the listing into the MLS but to withhold the listing from syndication to other broker participants for a specified period of time, as permitted by local MLS rules.  *Id.* Consistent with the office exclusives exemption, the delayed marketing exemption requires a signed disclosure from the seller with certain acknowledgements.  *Id.*

The MLOS policy also loosened NAR's definition of public marketing, establishing that one-on-one communications between different brokerages about a listing are not considered public marketing.  Samuelson Decl., ¶ 40.  As a result, Compass began privately marketing Private Exclusives to non-Compass agents in a one-to-one manner.  *See* Hr'g Tr. at 59:2-7, 64:23–65:3 (Reffkin).

**6.    Zillow's Listing Access Standards**

Zillow's senior leadership was concerned that PLNs would proliferate if NAR repealed or weakened the CCP.  *Id.* at 242:14-20 (Samuelson); *id.* at 341:3-18 (Wacksman).  Several of those leaders were concerned that an increase of PLNs would degrade Zillow's platform; interfere with Zillow's ability to obtain fresh,

comprehensive, and accurate listings; encourage freeriding; fragment the real estate market; and limit transparency.  *Id.* at 237:19–238:19, 240:6-16, 242:14–244:1 (Samuelson); *id.* at 342:23–343:4 (Wacksman); *id.* at 380:20–381:7 (Hofmann); PX-001 at ZG-00030114-17.  In anticipation of NAR repealing or weakening the CCP, Zillow began developing the Listing Access Standards ("LAS") in 2024.  PX-002 at ZG-00026159; Hr'g Tr. at 241:11–242:23 (Samuelson); *id.* at 341:3-18 (Wacksman); *id.* at 368:5-8 (Hofmann).

On April 10, 2025, Zillow announced the LAS.  Hr'g Tr. at 246:9-12 (Samuelson); DX-381 at 1. The LAS provides that Zillow will not display on Zillow's platforms listings that are publicly marketed for more than one business day to select buyers but withheld from the MLS.  DX-381 at 1-2; DX-572.  If a brokerage cannot supply a listing to Zillow through the MLSs, then the LAS allows the listing to be submitted directly to Zillow.  Hr'g Tr. at 251:20–252:3, 252:19–253:5 (Samuelson); *id.* at 324:17-20, 328:10–329:2 (Wacksman); DX-428 at 3.  The LAS also exempts office exclusives and certain forms of premarketing from the policy. Hr'g Tr. at 347:20–349:8 (Wacksman).  Ultimately, the LAS incentivizes the submission of listings to the MLSs.  *See* DX-572, ¶ 3; Hr'g Tr. at 708:13–709:1 (Wu).

The LAS applies on a listing-by-listing basis.  DX-428 at 2; Hr'g Tr. at 248:3-23 (Samuelson).  Zillow provides agents or brokers two warnings before a violative listing is removed from Zillow.  DX-428 at 4.  If a listing is removed, Zillow will display that property as "off market."  Hr'g Tr. at 274:6-22 (Samuelson).  But if the listing agreement with the brokerage that carried out the marketing for the

removed listing ends, then Zillow will again display the listing. PX-206 at 6. Furthermore, an agent, broker, or brokerage that previously violates the LAS can subsequently list homes on Zillow that do not violate the LAS. DX-428 at 2; Hr'g Tr. at 248:20-23 (Samuelson).

Listings that utilize the first two phases of Compass's 3PM generally violate Zillow's LAS. Compass's use of the Black Box on Compass's website during the first phase of 3PM violates Zillow's LAS. DX-033 at 1; DX-034 at 1-2; Hr'g Tr. at 107:20-25, 110:24-25 (Reffkin); *id.* at 308:1-5 (Wacksman); *id.* at 389:12–390:9 (Hofmann); *id.* at 441:11-14 (Alexander); ECF No. 26 ("Alexander Decl."), ¶ 14. Listings in the second phase of 3PM also violate Zillow's LAS if the Compass Coming Soon listing stays in that phase of marketing for more than one business day. *See* PX-112 at 3-4.

In May of 2025, Zillow began warning agents if their listing violated the LAS. Hr'g Tr. at 254:23–255:14 (Samuelson). From May 28, 2025, to November 14, 2025, Zillow sent warnings regarding 1202 listings that violated the LAS to agents at 24 brokerages. DX-662 at 2; Hr'g Tr. at 288:15–289:6, 290:3-11 (Samuelson). Of these 1202 listings, 1137 belonged to Compass. DX-662 at 2.

On June 30, 2025, Zillow began enforcing the LAS. Hr'g Tr. at 255:9-14 (Samuelson); Samuelson Decl., ¶ 57. From June 30, 2025, to November 14, 2025, Zillow removed 48 listings from its website for violating the LAS. DX-662 at 4-5. Of these 48 listings, 43 belonged to Compass. *Id.*

The LAS has decreased general engagement with Compass, Compass's brand value, and Compass customers' use of 3PM. *See* Hr'g Tr. at 86:13-25 (Reffkin); *id.* at 410:19–411:1 (Alexander). Agents and home sellers have expressed their reluctance to engage with Compass or use 3PM due to the risk of their listing being removed from Zillow during the third phase of 3PM. *See, e.g.*, PX-106 at CZ_COMP_000081224; PX-114 at CZ_COMP_000110879; Hr'g Tr. at 126:23-24, 127:20, 141:5-25 (Carr). Additionally, of the home sellers using Compass to list their property, the percentage of those sellers who use Compass's 3PM originally increased from 5% in November 2024 to a high of 39% in April 2025. PX-083 at CZ_COMP_000122060. Once the LAS was announced, however, that percentage declined from 39% in April 2025 to 22% in July 2025. *Id.*

### 7. Zillow's Interactions with Redfin

Zillow and Redfin are competitors in the online home search market. Hr'g Tr. at 312:1-3 (Wacksman). On March 13, 2025, Glenn Kelman, the Redfin CEO, texted Mr. Wacksman, the Zillow CEO, and asked if he had time for a call. Kelman Deposition Transcript ("Kelman Dep. Tr.") at 29:11-19. Later that day, Mr. Kelman and Mr. Wacksman talked on the phone. *Id.* at 30:2-4. They talked, in part, about lobbying NAR to strengthen the CCP and Compass's lobbying efforts to remove or relax the CCP. *Id*. at 30:8-31:10; Hr'g Tr. at 313:25–314:16 (Wacksman). In Mr. Kelman's words, they talked about his "hatred of pocket listings." Kelman Dep. Tr. at 30:8-10. On March 14, 2025, Mr. Wacksman reported to his colleagues that Mr. Kelman was "unsurprisingly . . . culturally aligned" with Zillow's approach to

Compass and the CCP and that Mr. Kelman was "feeling [Mr. Wacksman] out if [Zillow would] do more aggressive counter tactics."  Hr'g Tr. at 313:21–314:4, 314:17–315:4 (Wacksman); PX-006.

On March 25, 2025, NAR announced its MLOS policy.  Samuelson Decl., ¶ 40. That same day, Mr. Kelman called Mr. Wacksman again.  PX-038 at ZG-00016693. They discussed one of the rules that NAR had announced that day alongside the MLOS policy regarding delayed marketing.  Hr'g Tr. at 315:25–316:4, 353:2-19 (Wacksman).[3]  Compass did not come up during this conversation, nor did the CEOs discuss potential responses to the MLOS policy.  *See id.* at 353:20–354:2 (Wacksman).

On March 26, 2025, Mr. Kelman emailed Redfin employees regarding NAR's announcement of the MLOS policy.  PX-121 at REDFIN_CZ00000105.  In the email, Mr. Kelman outlined Redfin's strategy, which included "[c]ampaign[ing] with MLSs to give home-owners more control over how their listing is marketed" and "[b]uild[ing] a new program that draws on our site's reach, using delayed-market listings."  *Id.* at REDFIN_CZ00000106.  Mr. Kelman also noted, "No other broker has taken such a consistent stand against the policies that permit pocket listings. But, given our scale, resources and online audience, the irony of our opposition to pocket listings is that few brokers are better positioned to benefit from them than us."  *Id.* at REDFIN_CZ00000107.

---

[3] Mr. Wacksman refers to this policy as "deferred marketing" in his testimony, but it is traditionally known as "delayed marketing."  Hr'g Tr. at 74:11-17 (Reffkin).

On April 9, 2025, the day before Zillow announced the LAS, Zillow pre-briefed the media and numerous industry participants about its adoption of this new policy. Hr'g Tr. at 354:3–355:21 (Wacksman). On that same day, as part of that outreach, Mr. Wacksman texted Mr. Kelman and requested a call. PX-127 at REDFIN_CZ00000613. During that call, Mr. Wacksman described the contemplated LAS policy and the timeline for its implementation, and he informed Mr. Kelman that Zillow would announce the LAS the next day. Hr'g Tr. at 317:3–319:13 (Wacksman); Kelman Dep. Tr. at 61:10-20. Before this call, Mr. Kelman and Redfin leadership had not contemplated adopting listing standards like the LAS. Kelman Dep. Tr. at 61:22–62:18. Although Mr. Kelman sounded "very pleased" on the call and his "immediate reaction was support," he was also "surprised" and said he "would . . . talk to his team [about the LAS] and think about it." Hr'g Tr. at 319:14–320:3 (Wacksman). Afterwards, Mr. Wacksman messaged his colleagues about the call, writing that Mr. Kelman "is THRILLED [Zillow] is doing this - and said he likely will do the same." PX-033 at ZG-00016846.

In the days following the April 9, 2025 phone call, Mr. Kelman discussed with his colleagues how to approach NAR's MLOS policy. *See* Kelman Dep. Tr. at 63:2–70:1; PX-133. On April 14, 2025, Redfin announced its own listing access policy. Kelman Dep. Tr. at 70:24–71:2. Redfin made the decision to announce its policy only "minutes or hours" before the announcement. *Id.* at 71:11-15, 168:16–169:5. Redfin's policy, like Zillow's LAS, states that "Redfin.com will not publish any listings that have been publicly marketed before being shared with all real estate

websites via the MLS."  PX-146 at 1; *see* Hr'g Tr. at 358:9-11 (Wacksman).

Critically, however, in contrast to Zillow's LAS, Redfin's policy states that Redfin

would "ask[] MLSs to create a coming-soon designation for listings that precludes

search sites from showing how long a home has been for sale and at what prices."

PX-146 at 1; *see* Hr'g Tr. at 358:11-14 (Wacksman).  This difference reflected

Redfin's split in incentives as both a real estate website (adopting a policy

encouraging the sharing of listings with MLSs) and a brokerage (adopting a policy

encouraging the MLSs to create a "coming-soon" designation similar to Compass's

3PM).

On April 14, 2025, Redfin's Senior Director of Brokerage Operations, Joe

Rath, spoke to Errol Samuelson, the Chief Industry Development Officer at Zillow.

PX-125 at REDFIN_CZ00000232; Samuelson Decl., ¶ 1.  In an internal email sent

that same day, Mr. Rath wrote, "I spoke with Errol Samuelson who was happy to

hear that we have our own rule on the display of private listings.  He also provided

clarification on how Zillow treats certain types of listings under its new rule."  PX-

125 at REDFIN_CZ00000232.

On May 20, 2025, Zillow published a "Frequently Asked Questions" ("FAQs")

page to its website, providing additional details regarding Zillow's LAS.  PX-113.

That same day, Mr. Kelman texted Mr. Wacksman and requested a phone call.  PX-

007.  The next day, on May 21, 2025, Mr. Wacksman called Mr. Kelman.  *See* PX-

177.  Mr. Kelman requested the call because he was concerned that Zillow was

cutting "side deals" whereby brokerages could avoid listing removals under the LAS

if those brokerages agreed to send their listings directly to Zillow.  *See* Kelman Dep. Tr. at 104:1-14; Hr'g Tr. at 326:13–327:25 (Wacksman).  Mr. Kelman also requested the call because he wanted to clarify whether Zillow was trying to funnel listings away from the MLSs.  *See* Kelman Dep. Tr. at 99:20–101:10.  During the call, Mr. Wacksman clarified that providing a direct feed of listings to Zillow was a backup option and not a substitute for sharing listings with an MLS, and Mr. Wacksman told Mr. Kelman that Zillow would change the FAQs to reflect that clarification. Hr'g Tr. at 327:1-5, 17-25 (Wacksman).  Sometime after the phone call, Zillow changed its FAQs to make clear that a direct feed was a backup option and not a substitute for sharing listings with an MLS.  *Id.* at 328:1-9 (Wacksman).

To date, Redfin has not enforced its listing access policy.  Kelman Dep. Tr. at 74:18-20.  Redfin's lack of enforcement was not a "formal[] deci[sion]."  *Id.* at 74:25– 75:3.  Rather, "Rocket acquired Redfin," so the lack of enforcement is due, in part, to "a corporate parent [wanting] to assess the strategy."  *Id.* at 74:25–75:7. Accordingly, Compass listings that violate Redfin's announced policy or Zillow's LAS remain available on Redfin.com.  *Id.* at 201:13-22.

## LEGAL STANDARDS

Section 16 of the Clayton Act authorizes injunctive relief "against threatened loss or damage by a violation of the antitrust laws."  *California v. Am. Stores Co.*, 495 U.S. 271, 280 (1990) (quoting 15 U.S.C. § 26).  "When interpreting a statute that authorizes federal courts to grant preliminary injunctions, 'absent a clear command from Congress, courts must adhere to the traditional four-factor test' for a

preliminary injunction to issue." *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 132 (S.D.N.Y. 2024) (quoting *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024)).  Accordingly, to determine whether injunctive relief should be granted under Section 16, courts apply "the four traditional preliminary injunction criteria." *Id.* at 133.  Specifically, a plaintiff seeking a preliminary injunction must establish (1) either a likelihood of success on the merits, or sufficiently serious questions going to the merits of the claim to make them a fair ground for litigation, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

A movant is held to a heightened standard, however, where "(i) an injunction is mandatory, or (ii) the injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (cleaned up).  "When either condition is met, the movant must show a clear or substantial likelihood of success on the merits and make a strong showing of irreparable harm . . . ."  *Id.* (cleaned up).

"Because the proposed injunction's effect on the status quo drives the standard, [the Court] must ascertain the status quo—that is, the last actual,

peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (cleaned up).  In other words, "[t]he status quo is the parties' pre-controversy position vis-à-vis the other." *Id.* at 38.  Before Zillow's adoption of the LAS, the parties commercially competed and collaborated in various ways and to varying degrees in the real estate industry.  *See* Hr'g Tr. at 85:21-87:1 (Reffkin); *id.* at 337:6–338:1, 346:2-6, 346:19–347:10 (Wacksman); *id.* at 385:11–386:25 (Hofmann). Nevertheless, each party retained discretion to determine and manage the content of their own platforms.  *See, e.g.*, *id.* at 54:13–55:5, 58:2–59:14 (Reffkin); *id.* at 248:3-7, 250:20–252:3 (Samuelson).  Directing Zillow to enjoin the implementation of the LAS on its platforms to accommodate Compass's 3PM and other premarketing or private listing strategies would alter Zillow's and Compass's positions vis-à-vis the other.  Compass's request for a preliminary injunction thus qualifies as a mandatory injunction, and a heightened standard therefore applies.

## DISCUSSION

In ruling on a motion for a preliminary injunction, the Court would ordinarily start with the movant's showing of irreparable harm, recognizing that it is "the single most important prerequisite for the issuance of a preliminary injunction." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (cleaned up); *see also id.* ("[The irreparable harm] requirement must therefore be satisfied before the other requirements for an injunction.").  Because

the Court concludes that Compass has not shown a likelihood of success on the merits, however, it need not reach the question of irreparable harm.

Compass alleges that Defendants violated the Sherman Act in three ways. Compl., ¶¶ 112-21. Under Section 1 of the Sherman Act, Compass alleges that "Zillow and its co-conspirators entered into and engaged in a horizontal contract, combination or conspiracy in restraint of trade to jointly boycott Plaintiff Compass and other entities that would introduce competition in the market for residential real estate online search services in the United States." *Id.*, ¶ 112. Compass also alleges that Zillow's LAS violates Section 1 because it "is unlawful under the rule of reason as an anticompetitive vertical restraint between Zillow and its partners." *Id.*, ¶ 117. Finally, Compass alleges that, under Section 2, "Zillow has willfully maintained and abused its monopoly power in the residential real estate online search services market by adopting the anticompetitive and exclusionary policy that is the [LAS]." *Id.*, ¶ 119.

Since Compass seeks a mandatory injunction, Compass must establish a clear showing of success on the merits. *Schneiderman*, 787 F.3d at 650. On the current evidentiary record, Compass fails to satisfy even the lesser "serious questions" standard.

## A.     Antitrust Standing

To successfully bring suit under the Sherman Act, a private plaintiff must demonstrate both constitutional standing and antitrust standing. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016); *see also Consol. Gold*

*Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 257-58 (2d Cir. 1989), *amended*, 890 F.2d 569 (2d Cir. 1989). "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) (citation omitted). A plaintiff seeking injunctive relief under Section 16 of the Clayton Act must therefore show a threat of antitrust injury, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 122 (1986), and that it is an acceptable plaintiff to pursue the alleged antitrust violations, *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 157.

Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The relevant inquiry is thus whether the challenged action threatens competition in the relevant market. *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). The Second Circuit has established a three-part test to determine whether there is an antitrust injury:

> (1) the court must identify the practice complained of and the reasons such a practice is or might be anticompetitive,
>
> (2) the court must identify the actual injury the plaintiff alleges[,] which requires . . . look[ing] to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct, and

> (3) the court compares the anticompetitive effect of the
> specific practice at issue to the actual injury the plaintiff
> alleges.

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62-63 (2d Cir. 2019)

(cleaned up).

Here, each part is satisfied.  First, Compass has alleged Zillow's LAS is

anticompetitive because it imposes restraints on consumers such as home sellers

and agents, limiting their ability to use certain marketing strategies with Zillow's

competitors as a condition of doing business with Zillow.  *See* PX-143 (describing the

application of Zillow's LAS to home sellers and agents); *see also* PX-165 (identifying

Zillow's customers as "renters, buyers, sellers, and real estate professionals" in

Zillow's Annual Report).  Second, as detailed earlier, most of the listings that

received LAS warnings and most of the listings that were subsequently removed

from Zillow's platforms used Compass's 3PM.  *Supra* Background, Part B.7.

Accordingly, listings associated with Compass bore the brunt of Zillow's LAS, and

this impact threatens Compass with the loss of customers.  Third, the alleged

anticompetitive practice, Zillow's LAS, is what has caused or threatens to cause

Compass's injury.

Compass is also an appropriate party to bring the instant claims.  Whether a

private plaintiff is an appropriate party to pursue a damages claim under Section 4

of the Clayton Act is generally assessed under the four "efficient enforcer" factors,

which look to (1) the directness or indirectness of the asserted injury; (2) the

existence of more direct victims of the alleged anticompetitive conduct; (3) whether

the asserted damages are speculative; and (4) the risk of duplicate recoveries or complex apportionment of damages. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772, 778 (2d Cir. 2016) (citation omitted). Application of these factors, however, is "less rigorous" in the Section 16 context, *Consol. Gold Fields*, 871 F.2d at 259 n.6, because claims for injunctive relief do not raise the same risks of multiple lawsuits or duplicative recoveries as do claims for treble damages, *Cargill*, 479 U.S. at 111 n.6 (citations omitted); *see also Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005) ("[T]he weight to be given the various factors will necessarily vary with the circumstances of particular cases." (citation omitted)). Compass, as a competitor in the relevant market, satisfies this relaxed test. As detailed previously, the injury to Compass is directly caused by Zillow's alleged anticompetitive policy. *Supra* Background, Part B.7. Compass is therefore well placed to represent other market competitors and consumers who are affected by Zillow's LAS.

## B. Compass's Claim Under Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "every contract, combination[,] . . . or conspiracy[] in restraint of trade or commerce." 15 U.S.C. § 1. "To hold a defendant liable for violating § 1 of the Sherman Act, a district court must find a combination or some form of concerted action between at least two legally distinct economic entities that constituted an unreasonable restraint of trade." *United States v. Apple, Inc.*, 791 F.3d 290, 313 (2d Cir. 2015) (cleaned up). Compass premises its preliminary injunction motion on its contention that Zillow and Redfin entered into

an illegal agreement for Redfin to adopt its own version of the LAS.  ECF No. 153 at

101.  Compass, however, has not adduced sufficient evidence to show that Zillow

entered into any such agreement with Redfin.  Accordingly, Compass has not

shown that it is likely to succeed on its Section 1 claim.

### 1.    Legal Standard

Under Section 1, "the crucial question is whether the challenged

anticompetitive conduct stems from independent decision or from an agreement,

tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (cleaned up).

This agreement, however, need not be a "formal agreement." *Am. Tobacco Co. v.

United States*, 328 U.S. 781, 809 (1946).  To establish the existence of an agreement,

"proof of joint or concerted action is required; proof of unilateral action does not

suffice." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330,

370 (S.D.N.Y. 2025) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d

162, 183 (2d Cir. 2012)).  "Parallel action is not, by itself, sufficient to prove the

existence of a conspiracy; such behavior could be the result of 'coincidence,

independent responses to common stimuli, or mere interdependence unaided by an

advance understanding among the parties.'" *United States v. Apple, Inc.*, 791 F.3d

at 315 (quoting *Twombly*, 550 U.S. at 556 n.4).  "Accordingly, to prove

an antitrust conspiracy, a plaintiff must show the existence of additional

circumstances, often referred to as plus factors, which, when viewed in conjunction

with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Id.*

(cleaned up).

"These additional circumstances can, of course, consist of direct evidence that the defendants entered into an agreement like a recorded phone call in which two competitors agreed to fix prices." *Id.* (cleaned up). "But plaintiffs may also present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* (cleaned up). Such circumstantial facts may "include a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (cleaned up).

Ultimately, however, the "[c]ircumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (cleaned up). In other words, the evidence must "reasonably tend[] to prove that the [parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* Consequently, "[t]here must be evidence that tends to exclude the possibility that the [alleged conspirators] were acting independently." *Id.*

Furthermore, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "Accordingly, ambiguous evidence—evidence that is equally consistent with independent conduct as with illegal conspiracy—is not enough to support a claim of conspiracy." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d at 371 (cleaned up).

2.     **Insufficient Evidence of an Unlawful Agreement**

Compass's claims under Section 1 of the Sherman Act fail because Compass has failed to show a likelihood that Zillow entered into an anticompetitive contract, agreement, or conspiracy with Redfin.  Compass has not presented any direct evidence of an anticompetitive agreement between Zillow and Redfin.  Further, the circumstantial evidence upon which Compass relies is not only ambiguous at best, but is also contradicted by credible witness testimony and the contemporaneous written record.

Compass argues that an anticompetitive agreement between Mr. Wacksman and Mr. Kelman formed during their four phone calls on March 13, March 25, April 9, and May 21, 2025.  *See* ECF No. 113 ("Compass Suppl. Br.") at 6, 12-13.  The Court had the opportunity to assess the demeanor of both Mr. Wacksman, who testified live at the preliminary injunction hearing, and Mr. Kelman, through his videotaped deposition.  Based on this first-hand observation of both witnesses, the Court found both witnesses' denial of any agreement between the companies to enact their respective listing access standards credible.  Hr'g Tr. at 354:3–360:14, 362:3-18 (Wacksman); Kelman Dep. Tr. at 126:6-22, 166:2–167:11, 174:9-16.

The contemporaneous communications, as well as the testimony of other witnesses, corroborate Mr. Wacksman's and Mr. Kelman's testimony and indicate that Zillow and Redfin independently developed and announced their policies.  *See* Hr'g Tr. at 198:18–199:1, 201:21–202:11, 250:8-22 (Samuelson); *id.* at 355:22-25, 362:3-18 (Wacksman); *id.* at 368:5–371:22, 387:17–389:11 (Hofmann).  Mr.

Wacksman's message to his colleagues about the April 9, 2025 call with Mr. Kelman, for example, stated, "[Mr. Kelman] is THRILLED we are doing this." PX-033 at ZG-00016846. The fact that Mr. Kelman was thrilled suggests that he was pleasantly surprised to find out about Zillow's new policy. In other words, Mr. Wacksman's message suggests that Mr. Kelman had only just learned about Zillow's LAS during the April 9 phone call. By this time, however, Zillow had already committed to its LAS and disclosed it to the media. Hr'g Tr. at 357:1-21 (Wacksman); PX-033 at ZG-00016844, ZG-00016846.

Although Compass hypothesizes that an agreement to adopt listing standards was formed by the Zillow and Redfin CEOs during their two calls on March 13 and 25, 2025, Redfin's internal documents reflect that as late as March 26, Redfin was not even contemplating taking such a step. To the contrary, in a March 26, 2025 email to Redfin employees, Mr. Kelman stated that, although "Redfin was one of the only major brokers to publish our immediate opposition to [the MLOS] policy, as part of our mandate to redefine real estate in consumers' favor," Redfin was planning on taking advantage of the MLOS policy by offering delayed-marketing listings. PX-121 (emphasis omitted). Mr. Kelman explained in his email, "Our commitment is to campaign for rules that favor the consumer, but also to adhere to the rules as they are written, not how we'd like them to be. We can't commit forever to disarm unilaterally, sharing listings freely with competitors whose entire strategy is to hoard listings." *Id.*

Mr. Kelman credibly testified that when Mr. Wacksman called Mr. Kelman to inform him of Zillow's LAS on April 9, 2025, Mr. Kelman "was surprised," Kelman Dep. Tr. at 165:12-13, because a policy like the LAS "hadn't occurred to [senior leadership at Redfin] before" that conversation, *id.* at 62:1-2. Mr. Kelman testified that, on this call, "I told [Mr. Wacksman] we would make our own decision and that I was still processing it but that I thought it was a good idea." *Id.* at 62:8-10. When asked why he did not decide whether Redfin would adopt a policy similar to the LAS during his conversation with Mr. Wackman, Mr. Kelman responded:

> Because I was just hearing about it, because I'm instinctively collaborative where, you know, immediately you're just thinking, gosh, I need to discus[s] the implications of this with the Redfin team. I knew, for example, that Jason Aleem, our sales leader, had a different point of view. And so we're not just a real estate website the way that Zillow is. We're also a real estate brokerage. And almost every policy position we take splits, because as a . . . brokerage, we think about buyers and sellers working with real estate agents.

*Id.* at 166:10-21.

There is no evidence in the record indicating that Redfin and Zillow employees communicated or collaborated on Redfin's policy during the period between Mr. Kelman's call with Mr. Wacksman on April 9, 2025, and Redfin's announcement of its policy on April 14, 2025. To the contrary, when Redfin adopted its policy on April 14, 2025, Jon Lim, a Zillow project manager, messaged Mr. Samuelson, the Zillow Chief Industry Development Officer, about Redfin's announcement of its policy, asking him, "[Y]ou do this?" PX-036; Hr'g Tr. at 197:22-24 (Samuelson). Mr. Samuelson responded, "I made a point of not contacting

Redfin. But I'm pleased that they're getting on board. I hoped they would. Glenn has always been pro-consumer, so good for him." PX-036.

That same day, Mr. Rath, Redfin's Senior Director of Brokerage Operations, reached out to Mr. Samuelson for clarification regarding Zillow's LAS. *See* PX-125 at REDFIN_CZ00000232; Hr'g Tr. at 201:21–202:11 (Samuelson). In an email to other colleagues at Redin following their call, Mr. Rath reported, "I spoke with Errol Samuelson who was *happy to hear* that we have our own rule on the display of private listings." PX-125 at REDFIN_CZ00000232 (emphasis added). These contemporaneous communications indicate that Mr. Samuelson had only just found out that Redfin was adopting a policy similar to the LAS on April 14, 2025.

In its closing argument, Compass argued that the Rath email demonstrates that Mr. Samuelson lied to Mr. Lim when he said he had not contacted Redfin. Hr'g Tr. at 814:7-13. The Court is not persuaded. As an initial matter, there is a 95-minute time gap between Mr. Samuelson's message to Mr. Lim and the time when Mr. Rath emailed his colleagues about his call with Mr. Samuelson, during which time the phone call between the two men could have taken place. *Compare* PX-036, *with* PX-125 at REDFIN_CZ00000232. More fundamentally, however, there is no inherent contradiction between Mr. Samuelson's representation to Mr. Lim that he "made a point of not contacting Redfin" to suggest that Redfin adopt a listing access policy and Mr. Samuelson responding to a call initiated by Redfin after that policy had been announced.

Compass also argues that the Court should infer that a quid pro quo occurred during Mr. Wacksman's and Mr. Kelman's May 21, 2025 call, in which Zillow agreed to issue a clarification of its FAQs in exchange for Redfin's adoption of a listing access standard. *See id.* at 815:19–817:5. But this is nothing more than pure speculation. The participants in this call testified that no such conversation took place. And Compass cannot identify any evidence in the record that Zillow's FAQ clarification departed from its intended policy or that Zillow substantively changed its policy to induce Redfin to adopt a listing access policy. *See* Hr'g Tr. at 817:6–820:8. To the contrary, several witnesses credibly testified that the clarification to the FAQs—that listings are supposed to be sent to the MLSs primarily and only directly to Zillow as a back-up option if those listings cannot be sent to the MLS—was Zillow's longstanding intention. *Id.* at 359:9-12; 360:4-12 (Wacksman); *see id.* at 248:8-19 (Samuelson). Zillow's planning documents support this conclusion as well. *E.g.*, DX-591 at ZG-00027030 ("Should CCP be weakened or eradicated Zillow will support efforts to maintain listing transparency for consumers by maximizing listings in the MLS, and thus in the IDX feed and on Zillow (and all other MLS members' IDX websites).").

Zillow's conduct is most plausibly explained as its own independent response to NAR's MLOS policy and the proliferation of PLNs. Separately, Redfin's conduct is most plausibly explained as an independent response to NAR's MLOS policy, the proliferation of PLNs, and Zillow's LAS. Consequently, on the current evidentiary record, Compass has failed to meet its burden regarding its Section 1 claims.

### C.  Compass's Claim Under Section 2 of the Sherman Act

Compass similarly fails to demonstrate that it is likely to succeed on its claim of monopoly maintenance under Section 2 of the Sherman Act, as it has not made a clear showing that Zillow has monopoly power in the online home search market.

Section 2 prohibits "monopoliz[ing], or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.  Monopoly maintenance violations of Section 2 consist of: "(1) the possession of monopoly power in the relevant market and (2) the willful . . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979) ("Even if that power has been legitimately acquired, the monopolist may not wield it to prevent or impede competition.").

#### 1.  The Relevant Market

To assess Compass's Section 2 claim, the relevant market must first be defined.  "The relevant market consists of a relevant product market and a relevant geographic market."  *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (citation omitted), *overruled on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).  "A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use[,] and qualities considered."  *Concord Assocs.,*

*L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (cleaned up). "By contrast, the geographic market analysis seeks to identify the precise geographic boundaries of effective competition in order to reach a more informed conclusion on potential harm to the market." *Id.* at 52-53 (cleaned up). "Courts generally measure a market's geographic scope, the area of effective competition, by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Id.* at 53 (cleaned up).

The parties' economics experts agree that the relevant product market is the online home search market. *Compare* Hr'g Tr. at 522:14-19 (Aron), *with* at 685:15-19 (Wu). The online home search market consists of specialized online platforms where home sellers, home buyers, and agents can access real estate listings, search recently sold homes, gather market intelligence, and post listings for sale. Aron Decl., ¶ 94; *see* Hr'g Tr. at 685:15-19 (Wu). This market does not include search services for rental properties, search services for commercial properties, generalized online search platforms like google.com, real estate search platforms that are not generally available to real estate buyers and sellers (such as the MLSs), or offline search services like newspaper advertisements. Aron Decl., ¶ 94; *see* Hr'g Tr. at 685:15-19 (Wu).[4]

---

[4] Compass's economics expert, Dr. Aron, contends that the online home search market should be analyzed as one-sided, *see id.* at 525:4–526:15 (Aron), while Zillow's economics expert, Dr. Wu, contends that the market is multisided, *id.* at 622:20–625:9 (Wu). *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 534 (2018). The relevance of this distinction is largely confined to their analysis of the competitive impact of the LAS, however, rather than the question of market power. *See* Wu Decl., ¶¶ 136, 184. Because the Court concludes that Compass has failed to

The parties do, however, disagree as to how to define the relevant geographic market. Dr. Aron contends that the relevant market is national, Hr'g Tr. at 527:2 (Aron), while Dr. Wu asserts that the relevant market is local, *id.* at 689:7-9 (Wu).

The Court concludes that the relevant geographic market is national. "Courts generally measure a market's geographic scope, the 'area of effective competition,' by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Heerwagen*, 435 F.3d at 227 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). Here, online home search platforms operate on a national basis as evidenced by national pricing, Hr'g Tr. at 527:20–528:6 (Aron), the implementation of national policies and national user interface on these platforms, *id.* at 528:7-20 (Aron), and the use of national metrics to determine their market share, *id.* at 528:21-24 (Aron). Indeed, Zillow's LAS is itself implemented nationally. *Id.* at 528:25–529:10 (Aron). Consumers can access these platforms anywhere across the nation, *see id.* at 528:7-11 (Aron), and consumers often use these platforms to shop for homes in locations outside their immediate local real estate markets, *see, e.g.*, PX-077 at 1-2 (showing that more than 50% of Zillow webpage views for homes in Sacramento, California and Birmingham, Alabama occur in locations outside those cities). Although Dr. Wu opines that the online

_____

make a clear showing that Zillow has monopoly power in the online home search market even on Compass's one-sided market theory, the Court need not decide whether the market is one-sided or multi-sided.

home search market is local because home buyers tend to search for homes within a particular region, some of Zillow's standards are evaluated on a local basis, and there are different competitors in different markets, Hr'g Tr. at 666:15–667:10 (Wu), "courts have recognized the existence of national markets even when market participants in some sense operate locally," *Davitashvili v. Grubhub Inc.*, No. 20-CV-3000 (LAK), 2022 WL 958051, at *9 (S.D.N.Y. Mar. 30, 2022) (citing *Grinnell Corp.*, 384 U.S. at 575-76). Here, the Court finds Dr. Aron's opinion more persuasive than Dr. Wu's opinion as it is more consistent with the evidentiary record. Accordingly, the Court finds that the geographic market for the online home search market is national.

### 2.    **Monopoly Power**

"Monopoly power, also referred to as market power, . . . is 'the power to control prices or exclude competition.'" *Tops Mkts.*, 142 F.3d at 97-98 (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). Monopoly power may be proven through direct evidence or indirect evidence. *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). Direct evidence consists of "evidence of control over prices or the exclusion of competition." *Id.* (citation omitted).

Courts, however, "often rely on indirect proof of market power because direct measures are often difficult or impossible to prove." *In re ACTOS Antitrust Litig.*, 783 F. Supp. 3d 749, 771 (S.D.N.Y. 2025) (quoting *Heerwagen*, 435 F.3d at 227). Accordingly, monopoly power "may be inferred from a firm's large percentage share

of the relevant market." *Geneva Pharms.*, 386 F.3d at 500 (2d Cir. 2004). "[A] market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power." *Tops Mkts.*, 142 F.3d at 99 (citation omitted). However, "[a]bsent market share data," "unambiguous" and "definite evidence of monopoly power is needed" to provide a basis for monopoly power. *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1362 (2d Cir. 1988).

Furthermore, "[a] court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics." *Tops Mkts.*, 142 F.3d at 98. "These characteristics include the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Id.* (cleaned up).

After inferring monopoly power from indirect evidence, "courts generally allow the defendant to rebut inferences of market power by showing easy entry conditions." *Id.* at 99 (cleaned up). "A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors." *Id.* (citation omitted).

### a.    Direct Evidence: Controlling Competition and Product Quality

Here, Compass's direct evidence is limited, partly due to the nature of the online home search market. Since Zillow and other online home search portals do

not charge home buyers or sellers who search for homes on their online platforms, there cannot be direct evidence of monopoly power through the charging of a supracompetitive price.  Aron Decl., ¶ 164.

Compass nonetheless argues that Zillow's control of competition through its LAS is itself direct evidence of Zillow's monopoly power in the online home search market.  Hr'g Tr. at 823:1-25; *see* ECF No. 24 ("Pl. Mem.") at 26; Compass Suppl. Br. at 20-21.  Compass points to Zillow's planning documents and communications outlining potential strategies for responding to the CCP being weakened or repealed, noting that they evince an intent to stop the proliferation of PLNs.  *See* PX-002 at ZG-00026168-69, ZG-00026187; PX-028 at ZG-00033971; PX-029 at ZG-00016029-30.  Compass also introduced into evidence Zillow's announcement that "90% of agents who received a Listing Access Standards notice from Zillow only received one, meaning the initial notice resulted in most agents making sure their next listing was available widely and aligned with the Zillow standards."  PX-142.

Considered holistically, however, the record fails to show that Zillow possessed the power to exclude competition from the online home search market. While the LAS may "discourage agents from engaging in premarketing" strategies, Hr'g Tr. at 534:5-17 (Aron), such as 3PM, there is no evidence that any brokerage stopped offering such strategies to consumers after Zillow announced its LAS, *id.* at 560:21–561:12, 561:21–562:3 (Aron).  Indeed, home sellers can still choose to list properties for sale through premarketing strategies like 3PM, *see id.* at 87:20-25,

112:22–125:23 (Reffkin); *id.* at 128:22–136:18 (Carr), albeit at the cost of foregoing exposure for those listings on Zillow, *id.* at 589:21–590:2.

Compass also contends that Zillow degraded the quality of its listings by implementing the LAS without fear of losing customers. *Id.* at 824:1-12; *see* Pl. Mem. at 28. Evidence of Zillow's ability to do so could support a claim that Zillow exercises monopoly power in the online home search market. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("Just as the power to raise price when it is desired to do so is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers . . . ." (cleaned up)); *cf. MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole." (citation omitted)). The record does not bear out Compass's claim, however.

Compass points to evidence that Zillow's website inaccurately displays LAS-noncompliant listings as "off market," when those homes actually remain for sale. Hr'g Tr. at 274:23–278:8 (Samuelson). Compass contends that this evidence demonstrates that the LAS renders Zillow's website more inaccurate. Compass also elicited testimony from Zillow's CFO, Jeremy Hofmann, that he was not worried that Zillow's profits would decrease due to enactment of the LAS. *Id.* at 381:8-11 (Hofmann).

While the Court recognizes that the LAS renders Zillow's listings less accurate with respect to removed listings alone, such listings are negligible relative

40

to the total volume of listings on Zillow platforms.  From May 28, 2025, to November 14, 2025, Zillow issued LAS violation warnings to 24 brokerages.  DX-662 at 2.  Of the 429,111 new listings that these 24 brokerages added to Zillow platforms in this period, only .011% were removed:  roughly 1 in 10,000.[5]  *Id.* at 2-5. Accordingly, the removed listings have not meaningfully impacted the overall accuracy of Zillow's listings, nor have they diminished the overall quality of listings in the online home search market.

Further, the sanctioned brokerages themselves do not appear significantly harmed by the LAS-induced removals when considering the number of listings removed alone.  In total, from June 30, 2025, to November 14, 2025, Zillow removed 48 listings belonging to two brokerages for violating the LAS.  DX-662 at 4-5.  From May 28, 2025, when LAS warnings first issued, to November 14, 2025, the two impacted brokerages, Compass and Howard Hanna, added 55,676 and 18,406 total new listings to Zillow platforms, respectively.  *Id.* at 2.  Accordingly, the 48 removed listings accounted for just 0.06% of these brokerages' 74,082 new listings.

### b.    Indirect Evidence: Market Share and Barriers to Entry

Compass points to market share data and purported barriers to entry as indirect evidence of Zillow's monopoly power in the online home search market.  The Court considers each in turn.

---

[5] This fraction would, of course, shrink further if data from other brokerages that did not receive LAS warnings was included in this calculation.

To demonstrate Zillow's monopoly power in the online home search market, Compass presents three different sets of data that purportedly measure Zillow's share of the real estate audience. Hr'g Tr. at 534:23–541:1 (Aron); PX–045 at ZG-00031717; PX-182 at 6-7. Based on this data, Compass argues that Zillow holds approximately two-thirds of the online home search market. Each of these metrics is an imperfect proxy to evaluate market share.

Compass's primary metric (the "site-user metric") measures Zillow's real estate audience share by dividing the number of visitors to Zillow's websites in a given period by the total number of visitors to real estate websites during that time. *See id.* at 537:1-7 (Aron). According to an internal Zillow presentation dated October 2024, Zillow's website audience share calculated in this manner hovered at roughly 60-70% from October 2022 through October 2024. PX-045 at ZG-00031717. In that same period, Zillow's nearest competitor's website audience share was roughly 29-39%, and Zillow's next-nearest competitor's website audience share was roughly 20-24%. *Id.* Zillow also included a similar metric in a February 2025 presentation to investors, representing that Zillow had a 66% website audience share.[6] PX-182 at 6.

The site-user metric, however, does not account for multi-homing, which is the practice of users visiting more than one real estate website. Hr'g Tr. at 537:10-15 (Aron). So, under this metric, companies' audience shares are not necessarily

---

[6] The February 2025 Zillow presentation does not identify a timeframe for its analysis.

mutually exclusive. *See id.* at 537:14-15 (Aron). In other words, companies'
aggregated audience shares can add up to more than 100%. Here, those shares add
up to 140%. *Id.* at 674:10-13 (Wu); *see* PX-45 at ZG-00031717. Audience share is
thus flawed as a measure of market share because it does not indicate the extent to
which any one company has displaced another in the market. Consequently, this
method does not reflect competitive control.

The site-user metric still provides helpful insight into Zillow's comparative
market position, particularly as Zillow has relied on it in representations to its
investors and in its financial pronouncements for this purpose. Hr'g Tr. at 535:14-
21 (Aron); *e.g.*, PX-182 at 1, 6.[7] Hr'g Tr. at 774:19–775:4 (Wu). If audience share, as
measured by website visitors, is sufficient to indicate a competitor's "significan[ce]"
in a given market, it is likewise sufficient to be suggestive of a competitor's market
power.

Compass's second measurement of Zillow's audience share concerns real
estate app usage (the "daily-app-user metric") and is calculated by dividing the
number of days users opened Zillow's apps (including the Zillow app, Trulia app,

---

[7] Dr. Wu also relies upon this data to opine that entry barriers to the market are
low, considering that "we have seen a significant competitor come in within the last
five years and go from 2 percent to 20 percent [audience share] over four years . . .
That's homes.com, which is now taken very seriously in the market." Although Dr.
Wu does not explicitly say "audience share" here, the Court interprets his testimony
as such, as he refers to Homes.com's audience share by these figures in his
declaration. Wu Decl., ¶ 198 ("Comscore data confirms that Homes.com is growing
rapidly, with its share of unique visitors to real estate websites increasing from
2.4% in February 2021 to 10.9% in February 2025. By May 2025 Homes.com had an
audience share of 19% . . . .").

HotPads app, and StreetEasy app) on their phones by the total number of days users opened any real estate app owned by the seven companies operating apps in the home search market.[8]  *Id.* at 539:7-18 (Aron).  This methodology examines data concerning the apps of seven real estate companies, but identifies only three: "Zillow Group," "Realtor.com," and "Redfin."  PX-182 at 7.  Accordingly, from January 2023 to December 2024, Zillow's daily-app-user share was 64%, Realtor.com's was 15%, Redfin's was 13%, and four unidentified real estate companies' apps shared the remaining 8%.  PX-182 at 7.

While the daily-app-user metric accounts for multi-homing (and thus totals 100%), Hr'g Tr. at 539:4-18 (Aron), it does not account for the different amounts of time users spend on each app, *id.* at 539:24–540:3 (Aron).  So, if a user spends all day on Zillow's app and ten minutes on Redfin's, or vice versa, each use will count as one day.

Lastly, Compass measures Zillow's share of the time users spent on real estate-related platforms by dividing the time users spent on Zillow's platforms by the total time users spent on 137 real estate-related platforms (the "time spent metric").  *Id.* at 540:4-21 (Aron).  By this metric, Zillow had a 59% share during an unspecified timeframe.  *Id.* at 540:11-13 (Aron).  This figure, however, is likely an

---

[8] For example, if Amanda opened Zillow's app on 10 days in May, Brian opened Zillow's app and Realtor.com's app on 10 days in May, and Cindy opened Zillow's app and Redfin's app on 10 days in May, then there would be 50 total "days" on which users opened a relevant app in May.  Accordingly, Zillow's daily-app-user share would be 60%, and Realtor.com's and Redfin's daily-app-user shares would each be 20%.

underestimate, as non-home search platforms like U-Haul were included in the "total time spent" calculation. *Id.* at 540:14–541:1 (Aron).

Zillow did not present any metric for the purpose of measuring Zillow's market power in the online home search market. Zillow's economics expert, Dr. Wu, did provide a methodology for measuring real estate website traffic (the "site-visit metric") in support of his opinion that entry barriers to the market are low. *Id.* at 774:19–775:4 (Wu); We Decl., ¶ 217. Dr. Wu calculated Zillow's share of web traffic by dividing the number of monthly visits to Zillow.com by the total sum of monthly visits to Zillow.com, Realtor.com, Redfin.com, and Homes.com. We Decl., ¶ 217 n.327; Realtor.com, "From Innovation to Impact: Realtor.com is Gaining Ground," August 25, 2025, https://www.realtor.com/homemade/from-innovation-to-impact-realtor-com-is-gaining-ground/ (last visited Feb. 4, 2026). According to this measurement, Zillow.com's monthly website traffic share dropped from 62% in May 2024 to 50% in June 2025, with a low of 47% within that period. Meanwhile, Realtor.com's share increased from 15 to 29%, peaking at 30% in June 2025; Redfin.com's share fluctuated between 10% and 15%, landing at 13%; and Homes.com's share ranged from 7% to 11%. *Id.*

These calculations, however, do not account for website traffic that Zillow's other online home search website, Trulia.com, received in this timeframe. *See id.* Accordingly, this metric likely downplays Zillow's relative position.

Each of these metrics, however, are imperfect proxies for market share in the online home search market for another fundamental reason: all measure the real

estate market as a whole, not the online home search market in particular. Zillow's platforms (such as, among others, Zillow.com, the Zillow app, Trulia.com, and the Trulia app) allow users to search not only for homes to buy and sell, but also for properties to rent. Hr'g Tr. at 538:7-15 (Aron). Accordingly, these platforms' audience share metrics reflect Zillow's and other companies' positions in the broader real estate market, not the relevant antitrust market in this case—the online home search market—which includes for-sale properties only. *Id.* at 538:14-15 (Aron). Consequently, on the record before the Court, it is unclear whether Zillow's audience share in the relevant market would be above or below the provided metrics if rental data was excluded from their calculations. *See id.* at 577:2-16 (Aron).

Relatedly, Compass's site-user metric and daily-app-user metric appear to inherently overstate Zillow's share of the online home search market, as both metrics include data from HotPads—a rental-only platform with an app and website—to measure Zillow's real estate audience share. *See* PX-182 at 6 n.1, 7 n.2; Wu Decl., ¶ 190 n.275. These real estate audience share figures thus necessarily overstate Zillow's share of the online home search market, though to what extent is unclear from the evidence before the Court.

The four metrics offered, all flawed proxies for Zillow's market share in the online home search market, calculate Zillow's latest real estate audience share as: 66% (site-user metric), 64% (daily-app-user metric), 59% (time-spent metric), or 50% (site-visit metric). Even assuming *arguendo* that the Court could rely on these figures, Zillow's market share in the online home search market would still only lie

somewhere between 50 and 66%. This places Zillow within a market share band that "can occasionally show monopoly power." *Tops Mkts.*, 142 F.3d at 99 (citation omitted) ("a [market] share between 50% and 70% can occasionally show monopoly power"). Accordingly, to infer monopoly power here requires "full consideration of the relationship between market share and other relevant market characteristics." *Id.* at 98.

Compass asks this Court to draw an inference of monopoly power by coupling its market share calculation with a finding that the online home search market has high barriers to entry. *See* Compass Suppl. Br. at 21-22. Specifically, Compass alleges that three factors—high costs of entry, brand recognition, and network effects—prevent entrance to the market. *Id.* at 22. As to cost, Dr. Aron testified that "hundreds of millions or billions of dollars [are required] to enter this market and become a player." Hr'g Tr. at 542:6-7 (Aron). She points to the acquisition of Homes.com in 2021 by CoStar Group ("CoStar") as evidence for this proposition, testifying that although "[Homes.com] did grow very quickly," CoStar invested an additional "$900 million in 2024, and [while] that was expected to be a significant boost to that platform[,] it turned out to really, by all evidence, not move the needle." *Id.* at 542:7-13 (Aron). Dr. Aron also stated that "highly capitalized companies like Google and Yahoo attempted to enter this market" but "found that it was not a worthwhile endeavor for them," so "[t]hey exited and they have not attempted to re-enter." *Id.* at 542:19-22 (Aron); *see* Aron Decl., ¶¶ 189-93. In her declaration, Dr. Aron also posits that Zillow's investments from 2022 to 2024 in

sales and marketing ($2.11 billion) and technology and development ($1.64 billion) "indicate that massive investments would be necessary for a newcomer to enter the market for online home search platforms and . . . compet[e] effectively." Aron Decl., ¶ 187.

As to brand recognition, Dr. Aron testified that "brand awareness is or can act as a barrier to entry," and "Zillow has a very powerful brand name, by far the most powerful brand name." Hr'g Tr. at 542:24–543:2 (Aron). As evidence, Dr. Aron cited recent internet search trends showing that "Zillow has overtaken real estate as a search term." *Id.* at 541:10 (Aron); *see* Aron Decl., ¶¶ 198-99; *id.*, Ex. 2.

Finally, Dr. Aron testified that there is a "network effect in this market," and "it's hard for someone else to break into and replicate that network effect." Hr'g Tr. at 543:12-14 (Aron). Dr. Aron defines "network effect" as "the phenomenon that a product or service becomes more valuable to each user as more people use it." Aron Decl., ¶ 200. She identifies a "a mutually beneficial and reinforcing dynamic" on online home search platforms, whereby value increases as more home buyers, sellers, and agents join the platform, such that more home buyers, sellers, and agents follow, and so on. Hr'g Tr. at 543:6-12 (Aron). Thus, "despite the presence of (at least) equally attractive competitors," Zillow's "lead in market share itself," and the "network effects associated with [that lead in] market share," Aron Decl., ¶ 206, create barriers that are "hard for competitors to surmount." Hr'g Tr. at 543:14-20 (Aron).

The Court is not persuaded that the online home search market's barriers to entry are so high as to merit an inference of monopoly power from Zillow's market share. Although the large amount of capital required to seriously compete in this market does seem to erect a significant barrier to market entry, Zillow's brand recognition and realized network effect do not. Compass's claims to this effect are undermined by the ubiquity of multi-homing, *id.* at 229:8-25 (Samuelson), and low switching costs (i.e., the time or effort it takes for users to switch between platforms), *id.* at 703:6-11 (Wu). Given that consumers use multiple online home search platforms simultaneously at little or no cost, Zillow's brand recognition and related network effect do not appear to have deterred prospective home buyers from cross-shopping amongst competitors or new entrants.

Compass's brand recognition and network effect arguments are further undermined by recent entry of competitors in the online home search market and evidence that Zillow's market share is declining. For instance, CoStar's audience share—calculated by the "site-user metric"—grew from 2.4% in February 2021, when it acquired Homes.com, to 19% in May 2025. Wu Decl., ¶ 198. AddressUSA has also become a "new, well-financed entrant" in just the last year, after major news publishing company Gannett partnered with AddressUSA in July 2025 "to launch an online real estate portal across the USA TODAY Network[,] including USA TODAY and over 200 local publications nationwide." *Id.*, ¶ 199 (cleaned up). Moreover, Zillow's dominance in the market does not appear immune to challenge. As measured by the site-visit metric, the gap between Zillow.com's and

Realtor.com's audience shares shrank 26% in just one year. *See id.*, ¶ 217. Indeed, while Zillow.com's audience share decreased from 62% to 50% between May 2024 and June 2025, Realtor.com's audience share increased from 15% to 29% in that same time. *Id.* These market developments suggest not only that Zillow is unable to exclude competition from the online home search market, but also that barriers to entry have not precluded meaningful new entrants to that market.

Consequently, even assuming that Zillow possesses a 50%-66% share of the relevant market, Compass has not provided sufficient evidence from which it can be inferred that Zillow has monopoly power in the online home search market. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power."). Accordingly, Compass has not demonstrated that it is likely to succeed on the merits of its Section 2 claim.

## CONCLUSION

Because Plaintiff has not shown a likelihood of success on the merits, Plaintiff's motion for a preliminary injunction is DENIED. The Clerk of Court is directed to terminate ECF No. 23.

SO ORDERED.

Dated: February 6, 2026
     New York, New York

_____
JEANNETTE A. VARGAS
United States District Judge